UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

NEW HEIGHTS FARM I, LLC, a Michigan
limited liability company, STACY BOERSEN,
NEW HEIGHTS FARM II, LLC, a Michigan
limited liability company, and NICHOLAS                    Case No. 1:23-cv-663
BOERSEN,

           Plaintiffs,                                     Hon.: Hala Y. Jarbour

v

GREAT AMERICAN INSURANCE COMPANY,
FEDERAL CROP INSURANCE CORPORATION, AND
UNITED STATES DEPARTMENT OF AGRICULTURE,

           Defendants.

| | |
|---|---|
| Ronald J. VanderVeen (P33067) | Thomas C. James, Jr., Esq. (OH0073531) |
| John D. Fitzpatrick (P85554) | Sanders & Associates, LPA |
| Carl Thorwall (P86746) | Attorneys for Defendant Great American |
| Cunningham Dalman, PC | 8040 Hosbrook Road, Suite 202 |
| Attorneys for Plaintiffs | Cincinnati, OH 45236 |
| 321 Sellers Road | (513) 229-8080 |
| Holland, MI 49422-1767 | tomjames@sanderslpa.com |
| (616) 392-1821 | |
| rjvv@cunninghamdalman.com | |
| jfitzpatrick@cunninghamdalman.com | |
| carlt@cunninghamdalman.com | |

**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

NOW COMES New Heights Farm I, LLC, Stacy Boersen, New Heights Farm II, LLC,

and Nicholas Boersen (collectively "Plaintiffs") state the following second amended complaint

against Great American Insurance Company, The Federal Crop Insurance Corporation and the

United States Department of Agriculture (collectively at times in this Complaint as

"Defendants"), as follows:

## THE PARTIES

1.  Plaintiff New Heights Farm I, LLC ("NHF-I"), is a limited liability company registered in the State of Michigan with a principal place of business at 6241 Ransom St., Zeeland, Michigan.

2.  Plaintiff Stacy Boersen, is an individual residing at 4678 72nd St, Zeeland, Michigan ("Stacy").

3.  Plaintiff New Heights Farm II, LLC ("NHF-II") is a limited liability company registered in the State of Michigan with a principal place of business at 6241 Ransom St., Zeeland, Michigan.

4.  Plaintiff Nicholas Boersen, is an individual who resides at 4678 72nd St, Zeeland, Michigan ("Nicholas").

5.  Defendant Great American Insurance Company ("GAIC") is a corporation registered to do business in the State of Ohio with a principal place of business at the Great American Insurance Group Tower, 301 E. Fourth St., Cincinnati, Ohio 45202 ("GAIC") and licensed to do business as an insurer in Michigan with a local address of 28175 Haggerty Road, Novi, MI 48377.

6.  The Federal Crop Insurance Corporation (the "FCIC"), is a federal corporation created pursuant to 7 U.S.C. § 1503 that resides in the District of Columbia.

7.  The United States Department of Agriculture (the "USDA") is a department of the federal government of the United States of America located in the District of Columbia and includes the Risk Management Agency ("RMA") that was created to manage and operate the FCIC.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 7 USC 1506 (d) which

requires suits against the FCIC to be brought in the United States District Courts.

9.      This Court has subject matter jurisdiction pursuant to 28 USC 1332 for the reason

        that:

    a.  The plaintiffs are Michigan residents, and the Defendants are residents of other

        states as outlined above and

    b.  The amount in controversy exceeds $75,000.

10.     This Court has personal jurisdiction over the FCIC and USDA pursuant to 28

USC 1506 (d) and 28 USC 1346 (b)(1)

11.     This Court has personal jurisdiction over GAIC for the reason that it does

substantial business in Michigan, including the Western District of Michigan.

12.     This Court is the proper venue (a) pursuant to 7 USC 1506 (d) in that Plaintiffs

reside within the Western District of Michigan and (b) pursuant to 28 USC 1391 for the reason

that GAIC does business in the Western District of Michigan and a substantial amount of the

events giving rise to this claim occurred in the Western District of Michigan.


## FACTS COMMON TO ALL COUNTS

13.     Stacy is the sole owner and sole manager of NHF-I.

14.     Stacy created NHF-I in March 2019 to engage in farming.

15.     Nicholas is the sole owner and sole manager of NHF-I.

16.     Nicholas created NHF-I in March 2019 to engage in farming.

17.    The FCIC was set up to provide for the national welfare by establishing a system of crop insurance, including but not limited to entering into reinsurance or similar agreements with approved insurance providers (each, an "AIP").

18.    GAIC is an AIP.

19.    The intent of the crop insurance program is to provide insurance coverage for farmers through an AIP in light of the risk associated with farming and provide a quick resolution of claims so farmers can continue farming the next crop year.

20.    Towards that end, AIPs issue crop insurance for a crop year and, if there are claims, adjusts, and determines the claims over the next few months so that the farmer can then move on to the next crop year.

21.    FCIC reinsures GAIC and other AIPs like GAIC.

22.    The USDA, through its Risk Management Agency (the "RMA") manages the FCIC.

23.    The FCIC (and thus, its manager, the USDA and RMA) are authorized to adjust and approve claims.

### *NHF-I's 2019 crop insurance*

24.    During March 2019, Stacy, through her insurance agent, applied for crop insurance for her NHF-I through GAIC for the 2019 crop year. **Exhibit 01**.

25.    Stacy's crop insurance application for her NHF-I was approved by GAIC in April 2019.

26.    GAIC issued crop insurance policy number MP-2019-MI-084-1139524 to Stacy's NHF-I. **Exhibit 02**.

27.    GAIC issued a schedule of insurance to NHF-I.  **Exhibit 03**.

28.     In reliance on the crop insurance policy:

    a.     NHF-I borrowed funds from Ag Resource Management ("ARM") and ARM advanced funds on a line of credit to NHF-I for the 2019 crop year;

    b.     Logan's Agri-Service, Inc. ("Logan's") sold inputs to NHF-I on credit for the 2019 crop year;

    c.     Stacy caused NHF-I to lease approximately 9,000 acres for the 2019 crop year;

    d.     Stacy caused NHF-I to pay rent for the leased acres;

    e.     Stacy engaged in farming through NHF-I for the 2019 crop year by renting equipment, purchasing supplies and inputs, planting and attempting to plant, tending to, and harvesting and attempting to harvest approximately 9,037.78 acres of corn and soybeans; and

    f.     ARM and Logan took a security interest in NHF-I's crops and crop insurance and their proceeds.

29.     During the late spring or summer of 2019, Stacy, for her NHF-I, contacted her crop insurance agent who then contacted GAIC to revise the acreage that NHF-I reported as planted for certain fields.

30.     GAIC indicated that it would make corrections to reported fields at year end.

31.     During the summer of 2019, NHF-I gave notice of a potential claim due to planting conditions. **Exhibit 04.**

32.     On or about December 9, 2019, NHF-I gave notice of a potential claim due to harvesting conditions and it harvest of corn and soybeans.  **Exhibit 05.**

33.     GAIC sent an adjuster to NHF-I to inspect corn or soybeans on hand and obtain records for the sale of corn or soybeans in about December 2019.

34.     The adjuster failed to properly measure the corn in the storage bins and submitted falsified storage bin summary records to GAIC's office, over-reporting the volume of corn in storage.

35.     NHF-I provided the records requested by the adjuster during December 2019 and/or January 2020 and provided access for inspection in December 2019.

36.     GAIC requested additional records in February 2020 that were promptly provided.

37.     GAIC requested additional records in March 2020 that were promptly provided.

38.     At all times, Stacy and her NHF-I cooperated with GAIC in providing information that GAIC requested.

39.     The crop insurance premium for the 2019 crop year was due by March 15, 2020.

40.     The premium is usually paid from the harvest proceeds or, if the farmer suffers a loss, from the insurance proceeds.

41.     In the course of GAIC's drawn-out adjustment process, in reliance on the policy and with the expectation that the claims would be paid in the near-term, Stacy caused NHF-I to enter into an agreement with GAIC to pay and did pay the crop insurance premiums to GAIC in installment payments totaling approximately $125,000 during 2020. **Exhibit 06**.

42.     GAIC accepted payment of the 2019 premium in installments from March 2020 through November 2020.

43.     GAIC continues to retain the insurance premiums that NHF-1 paid in the midst of the unreasonably delayed adjustment process.

44.    Stacy, acting on behalf of NHF-I, performed all conditions that GAIC required of NHF-I to maintain a claim under the policy.

45.    The normal process for handling crop insurance claims is for the insurer to:

    a.    request information from the insured,

    b.    review and confirm the information,

    c.    request additional information as needed,

    d.    prepare a claim based on what the insurer believes is owed on the claim,

    e.    submit the claim to the insured for signature and approval, and

    f.    pay the claim, as warranted.

46.    GAIC failed and refused to complete its investigation of NHF-I's claim and has refused to submit a claim to NHF-I for signature and approval.

47.    GAIC informed NHF-I in August 2020 that FCIC assumed control of the investigation and adjustment of the outstanding claim tendered to GAIC. **Exhibit 07**.

48.    Once the FCIC assumes adjustment of a claim, it is obligated to expeditiously process the claim.

49.    Despite Stacy's and NHF-I's cooperation and GAIC's continued acceptance and retention of premiums, GAIC and the FCIC have failed and refused to adjust their claim for the 2019 crop year.

50.    Instead of adjusting and paying NHF-I's claim, GAIC and FCIC have spent almost 3 years delaying the adjustment process to avoid satisfaction of the coverage to which NHF-I is entitled by making unfounded accusations that Stacy and NHF-I have: (i) committed or attempted to commit crop insurance fraud; and (ii) other alleged crimes.

51.    Despite spending more than 3 years purportedly investigating the background of the claim, GAIC, FCIC, USDA and RMA have failed to find facts upon which they would have a valid basis to deny NHF-I's claim.

52.    By failing to promptly adjust the 2019 drop insurance claim, GAIC and FCIC have unduly interfered with NHF-I's ability to recover its crop insurance claims for 2020 and subsequent years.

53.    NHF-I estimates that GAIC owes it no less than $1,229,779 for coverage it should have paid had the adjustment process been timely and properly conducted.

*NHF-II's 2019 crop insurance*

54.    During March 2019, Nicholas, through his insurance agent, applied for crop insurance for his NHF-II through GAIC for the 2019 crop year. **Exhibit 08 and 09**.

55.    Nicholas's crop insurance application for his NHF-II was approved by GAIC in April 2019.

56.    GAIC issued crop insurance policy numbers MP-2019-MI-084-1139526 and MP-2019-MI-084-1139527 to Nicholas's NHF-II. **Exhibit 10 and 11**.

57.    GAIC issued schedules of insurance to NHF-II.  **Exhibits 12 and 13**.

58.    In reliance on the crop insurance policy:

    a.    NHF-II borrowed funds from ARM and ARM advanced funds on a line of credit to NHF-II for the 2019 crop year,

    b.    Logan's sold inputs to NHF-II on credit for the 2019 crop year,

    c.    Nicholas caused NHF-II to lease approximately 8,600 acres for the 2019 crop year,

    d.    Nicholas caused NHF-II to pay rent for the leased acres,

e.   Nicholas engaged in farming through NHF-II for the 2019 crop year by renting equipment, purchasing supplies and inputs, planting and attempting to plant, tending to and harvesting and attempting to harvest approximately 8,682.20 acres of corn and soybeans, and

f.   ARM and Logan's took a security interest in NHF-II's crops and crop insurance and their proceeds.

59.     During the late spring or summer of 2019, Nicholas, for his NHF-II, contacted her crop insurance agent who then contacted GAIC to revise the acreage that NHF-I reported as planted for certain fields.

60.     GAIC indicated that it would make corrections to reported fields at year end.

61.     During the summer of 2019, NHF-II gave notice of a potential claim due to planting conditions. **Exhibit 14.**

62.     On or about December 9, 2019, NHF-II gave notice of a potential claim due to harvesting conditions and it harvest of corn and soybeans.  **Exhibit 15 and 16.**

63.     GAIC sent an adjuster to NHF-II to inspect corn or soybeans on hand and obtain records for the sale of corn or soybeans in about December 2019.

64.     The adjuster failed to properly measure the corn in the storage bins and submitted falsified storage bin summary records to GAIC's office, over-reporting the volume of corn in storage.

65.     NHF-II provided the records requested by the adjuster during December 2019 and/or January 2020 and provided access for inspection in December 2019.

66.     GAIC asked for additional records in February 2020 that NHF-II promptly provided.

67.     GAIC asked for additional records in March 2020 that NHF-II promptly provided.

68.     At all times, Nicholas and his NHF-II cooperated with GAIC in providing information as requested by GAIC.

69.     The crop insurance premium for the 2019 crop year was due by March 15, 2020.

70.     The premium is usually paid from harvest proceeds or, if the farmer suffers a loss, from the insurance proceeds.

71.     Because GAIC's process took so long, in reliance on the policy and with the expectation that the claims would soon be paid, Nicholas caused NHF-I to enter into an agreement with GAIC to pay and did pay the crop insurance premiums to GAIC in installment payments totaling approximately $100,000 during 2020. **Exhibits 17.**

72.     GAIC accepted payment of the premium in installments from March 2020 through November 2020.

73.     GAIC continues to retain the insurance premiums paid by NHF-II.

74.     Nicholas, for his NHF-II, performed all conditions required of NHF-II for a claim under the policy.

75.     GAIC failed to complete its investigation of NHF-II claim and has refused to submit a claim to NHF-II for signature and approval.

76.     NHF-II was informed by GAIC in August 2020 that FCIC took over the investigation and adjustment of the claim based on information provided to them by GAIC. **Exhibit 18.**

77.     Once the FCIC assumes adjustment of a claim, it is obligated to expeditiously process the claim.

78.     Despite Nicholas' and NHF-II's cooperation and payment of premiums, GAIC and the FCIC have failed and refused to adjust their claim for 2019 as GAIC continued to accept premium payments.

79.     Instead of adjusting and paying NHF-II's claim, GAIC and FCIC have spent almost 3 years attempting to delay and avoid payment by making false accusations that Nicholas and NHF-II have committed or attempted to commit crop insurance fraud and other crimes without basis for such allegations.

80.     Despite over 3 years of investigation, GAIC, FCIC, USDA and RMA have failed to articulate to Plaintiff any finding that might afford a basis to deny NHF-II's claim.

81.     By the GAIC and FCIC failing to promptly adjust the 2019 drop insurance claim, they have interfered with NHF-I's ability to recover its crop insurance claims for 2020 and subsequent years.

82.     NHF-II estimates that GAIC owes it approximately $1,104,045 on its claim.


**COUNT I**
**BREACH OF CONTRACT WITH NHF-I**

83.     Plaintiff incorporates the above allegations by reference.

84.     GAIC and NHF-I are parties to a valid multi-peril insurance policy contract. **Exhibit 3.**

85.     GAIC has a statutory and contractual duty to promptly investigate notices of loss, adjust and pay claims under the insurance policies.

86.     The FCIC and RMA have a statutory duty, once involved, to promptly investigate, adjust allow the AIP to pay under the insurance policies.

87.     NHF-I had a duty to provide GAIC, FCIC, USDA and its RMA with crop information and to pay GAIC the premium for Crop Year 2019.

88.     NHF-I provided all requested information and paid the total premium owed for 2019, fulfilling its obligation under the contract.

89.     Despite their duty and despite the information and cooperation from Stacy and NHF-I, GAIC, FCIC, USDA and its RMA have not adjusted or made a determination on NHF-I's claim and refuses to do so despite over 3 years of investigation.

90.     GAIC, FCIC, USDA and its RMA have not made any indemnity payments for crop year 2019.

91.     GAI, FCIC, USDA and its RMA have breached the contract by failing to perform their obligations in a timely manner.

92.     NHF-I has suffered and is suffering the following damages as a direct and proximate result of GAI, FCIC, USDA and its RMA's breach of contract:

a.   GAI's, FCIC's, USDA's and its RMA's inaction prevents adjustment and payment of crop insurance claims for 2019 and subsequent years,

b.   Nonpayment of GAIC 2019 insurance claims,

c.   Loss of goodwill with their creditors,

d.   Loss of goodwill with their landlords,

e.   Loss of ability to lease acreage for farming,

f.   Inability to secure favorable financing,

g.   Loss of profits and income, and

h.   Damage to standing and reputation in the community.

WHEREFORE, Plaintiff NHF-I requests that this Court enter judgment in its favor and against GAI, FCIC, USDA and its RMA (a) ordering GAIC and/or FCIC, USDA and its RMA to immediately complete adjustment of, and pay, NHF-I's claim and (b) award NHF-I judgment for its damages, including all actual, incidental and consequential other damages, plus all allowable costs, interest and attorney fees.

## COUNT II

## BREACH OF CONTRACT WITH NHF-II

93.     Plaintiff incorporates the above allegations by reference.

94.     GAIC and NHF-II are both parties to a valid multi-peril insurance policy contract. **Exhibit 11 and 12.**

95.     GAIC has a statutory and contractual duty to promptly investigate notices of loss, adjust and pay claims under the insurance policies.

96.     The FCIC and RMA have a statutory duty, once involved, to promptly investigate, adjust and allow the AIP to pay under the insurance policies.

97.     NHF-II provided all requested information and paid the total premium owed for 2019, fulfilling its obligation under the contract.

98.     Despite their duty and despite the information and cooperation from Stacy and NHF-I, GAIC, FCIC, USDA and its RMA have neither adjusted nor made a determination on NHF-II's claim and refuse to do so.

99.     GAIC, FCIC, USDA and its RMA have not made any indemnity payments for crop year 2019.

100.     GAI, FCIC, USDA and its RMA have breached the contract by failing to perform their obligations in a timely manner.

101.    NHF-II has suffered the following damages as a direct and proximate result of GAI, FCIC, USDA and its RMA's breach of contract:

    a.  GAIC's, FCIC's, USDA's and its RMA's inaction prevents adjustment and payment of crop insurance claims for 2019 and subsequent years,

    b.  Nonpayment of GAIC 2019 insurance claims,

    c.  Loss of goodwill with their creditors,

    d.  Loss of goodwill with their landlords,

    e.  Loss of ability to lease acreage for farming,

    f.  Inability to secure favorable financing,

    g.  Loss of profits and income, and

    h.  Damage to standing and reputation in the community.

WHEREFORE, Plaintiff NHF-II requests that this Court enter judgment in its favor and against GAIC: (a) ordering GAIC to immediately complete adjustment of, and pay, NHF-II's claim; and (b) award NHF-II judgment for its damages, including all actual, incidental and consequential other damages, plus all allowable costs, interest and attorney fees to which they may be entitled.

## COUNT III

## FAILURE TO PROMPTLY ADJUST, DETERMINE AND PAY CLAIMS IN VIOLATION OF 7 USC § 1508 AND MCL 500.2006(1)

102.    Plaintiff incorporates the above allegations by reference.

103.    Under Federal law, 7 USC §1508 (j) requires that the FCIC "establish standards to ensure that all claims for losses are adjusted, to the extent practicable, *in a uniform and timely manner*." (Emphasis added).

104.    Under Michigan law, the Insurance Code of 1956 codified as MCL 500.2006(1) requires that and insurer such as GAIC "must pay on a timely basis to its insured … or, in the alternative, the person must pay to its insured … 12% interest, as provided in subsection (4), on claims not paid on a timely basis. Failure to pay claims on a timely basis or to pay interest on claims as provided in subsection (4) is an unfair trade practice unless the claim is reasonably in dispute."

105.    NHF-I and NHF-II gave notice of a potential claim due to planting conditions in the summer and fall of 2019.

106.    NHF-I and NHF-II gave notice of a potential claim due to harvest conditions and results in late 2019.

107.    GAIC, FCIC, USDA, and RMA have requested and were supplied with all requested documents and information.

108.    Instead of dialogue and an understanding of the dispute and a path forward towards resolution, GAIC, FCIC, USDA, and RMA have spent over three years delaying the claims.

109.    GAIC, FCIC, USDA and its RMA have not requested a proof of loss from either NHF-I or NHF-II.

110.    After more than three years later, GAIC, FCIC, USDA and its RMA have not adjusted or determined the claim and have not tendered any indemnity payments to NHF-I and NHF-II.

111.    GAIC, FCIC, USDA and its RMA have not denied the claim.

112.    Failure to adjust, determine and pay the claims under the insurance policies for over three years is untimely.

113.     NHF-I and NHF-II have suffered the following damages as a direct and proximate result of GAIC, FCIC, USDA and its RMA's breach of their statutory duty to adjust, determine and pay claims:

    a.   GAIC's, FCIC's, USDA's and its RMA's inaction prevents adjustment and payment of crop insurance claims for 2019 and subsequent years,

    b.   Nonpayment of GAIC 2019 insurance claims,

    c.   Loss of goodwill with their creditors,

    d.   Loss of goodwill with their landlords,

    e.   Loss of ability to lease acreage for farming,

    f.   Inability to secure favorable financing,

    g.   Loss of profits and income, and

    h.   Damage to standing and reputation in the community.

WHEREFORE, Plaintiff NHF-I and NHF-II request that this Court enter judgment in their favor and against GAIC, FCIC, USDA and its RMA (a) ordering GAIC and/or FCIC, USDA and its RMA to immediately complete adjustment of NHF-I's and NHF-II's claim and (b) award NHF-I and NHF-II judgment for its damages, including all actual, incidental and consequential other damages, plus all allowable costs, interest and attorney fees to which they may be entitled, pursuant to 28 U.S.C. § 2412 and otherwise.

## COUNT IV

### INTENTIONAL INFLICTION OF EMOTION DISTRESS
### TO STACY BOERSEN AND NICHOLAS BOERSEN

114.     Plaintiff incorporates the above allegations by reference.

115.     Upon information and belief, FCIC, USDA and its RMA have made false statements to persons about Plaintiffs while investigating NHF-I's and NHF-II's claims.

116.   Upon information and belief, FCIC, USDA and its RMA have made false statements about Plaintiff's to the public while investigating NHF-I's and NHF-II's claims.

117.   Upon information and belief, FCIC, USDA and its RMA intentionally and deliberately misinformed Plaintiff's business affiliates that Plaintiff engaged in criminal behavior.

118.   GAIC, FCIC, USDA and RMA refuse to end the investigation and adjust, determine and pay the NHF-I and NHF-II claims under the guise that they are perpetually investigating the NHF-I and NHF-II.

119.   GAIC, FCIC, USDA and RMA's actions have inflicted injury upon Stacey Boersen & NHF-I and Nicholas Boersen & NHF-II, that is serious, withholding an estimated $2,333,824.00 in insurance benefits and causing severe mental disturbance or distress.

120.   GAIC's failure to properly adjust the claims at best was reckless and given the steps taken by GAIC during the adjustment process to manipulate the test weights among other conduct is demonstrable of intent.

121.   GAIC's referral to the FCIC, the USDA and RMA for investigation is a further showing of the intent to cause emotional harm to Stacey Boersen, NHF-I, Nicholas Boersen, and NHF-II.

122.   FCIC, USDA, and RMA's failure to reasonably adjust the claim over a period of three years is at best reckless and at worst intentional.

123.   GAIC, FCIC, USDA and RMA's conduct in the preceding paragraphs is extreme and outrageous, calculated to put Plaintiffs out of business and to undermine their credibility and trustworthiness.

124.   FCIC, USDA, and RMA caused Federal Investigators to raid NHF-I, NHF-II and threaten them with criminal prosecution.

125.    These were intentional tactics designed to instill fear and intimidate Stacy, NHF-I, Nicholas, and NHF-II away from pursuing their rightfully due and bona-fide crop insurance claim.

126.    GAIC, FCIC, USDA, and RMA's intentional and reckless conduct in not adjusting this insurance claim is the direct cause of the emotional harm done to Stacy, NHF-I, Nicholas, and NHF-I.

127.    Stacey, NHF-I, Nicholas, and NHF-II have suffered the following injuries each resulting in severe mental stress and directly caused by GAIC, FCIC, USDA, and RMA:

    a.  GAIC's, FCIC's, USDA's and its RMA's inaction prevents adjustment and payment of crop insurance claims for 2019 and subsequent years,

    b.  Nonpayment of GAIC 2019 insurance claims,

    c.  Loss of goodwill with their creditors,

    d.  Loss of goodwill with their landlords,

    e.  Loss of ability to lease acreage for farming,

    f.  Inability to secure favorable financing,

    g.  Loss of profits and income, and

    h.  Damage to standing and reputation in the community.

128.    GAIC, FCIC, USDA and RMA's improper withholding of funds and failure to pay out a bona fide claim has meant that Stacy, NHF-I, Nicholas and NHF-II has been unable to make payments on debts to creditors and suffered extreme trauma and stress due to these extreme hardships for three long years.

WHEREFORE, Plaintiff Stacy Boersen and Nicholas Boersen request that this Court enter judgment in their favor and against Defendants for Plaintiffs' actual, incidental, and consequential economic, non-economic and emotional distress and anxiety damages plus all allowable costs,

interest, and attorney fees to which they may be entitled, pursuant to 28 U.S.C. § 2412 and otherwise.

## COUNT V

## BAD FAITH ADJUSTMENT OF NHF-I AND NHF-II'S INSURANCE CLAIMS

129.    Plaintiff incorporates the above allegations by reference.

130.    GAIC, FCIC, USDA and RMA owe a duty of good faith and fair dealing to NHF-I and NHF-II as insureds with regards to claim handling.

131.    GAIC, FCIC, USDA and RMA have not adjusted the claim in over three years.

132.    GAIC, FCIC, USDA and RMA do not have a reasonable basis for denying benefits under the policy.

133.    GAIC, FCIC, USDA and RMA have been indifferent to the effect that refusal has had on NHF-I and NHF-II.

134.     GAIC, FCIC, USDA and RMA know or are recklessly disregarding the lack of a reasonable basis to deny the claim or pay the claim, mercilessly leaving the claimants, NHF-I and NHF-II in a state of uncertainty.

135.    GAIC failed to follow RMA-approved procedures when performing grain bin measurements to appraise the 2019 harvest and, in doing so, deprived NHF-I and NHF-II of an accurate appraisal of their 2019 crop and losses at no fault of NHF-I and NHF-II.

136.    GAIC failed to follow RMA approved procedures when adjusting the claim and in doing so deprived NHF-I and NHF-II of an accurate appraisal of their 2019 crop and losses at no fault of NHF-I and NHF-II.

137.    NHF-I and NHF-II have suffered the following damages as a direct and proximate result of GAIC, FCIC, USDA and its RMA's breach of their statutory duty to adjust, determine and pay claims:

a.  GAIC's, FCIC's, USDA's and its RMA's inaction prevents adjustment and payment of crop insurance claims for 2019 and subsequent years,

b.  Nonpayment of GAIC 2019 insurance claims,

c.  Loss of goodwill with their creditors,

d.  Loss of goodwill with their landlords,

e.  Loss of ability to lease acreage for farming,

f.  Inability to secure favorable financing,

g.  Loss of profits and income, and

h.  Damage to standing and reputation in the community.

WHEREFORE, Plaintiff NHF-I and NHF-II request that this Court enter judgment in their favor and against Defendants for Plaintiffs' NHF-I and NHF-II actual, incidental, and consequential economic, non-economic and emotional distress and anxiety damages plus all allowable costs, interest and attorney fees to which they may be entitled, pursuant to 28 U.S.C. § 2412 and otherwise.

## COUNT VI

### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS

138.   Plaintiff incorporates the above allegations by reference.

139.   GAIC, FCIC, USDA and its RMA knew that NHF-I and NHF-II had contracts with its landlords, ARM and various vendors.

140.   Upon information and belief, the conduct of GAIC, FCIC, USDA and its RMA intentionally and improperly interfered with these contracts by:

a.  delayed adjusting the insurance claims,

b.  contacting the landlords, ARM and vendors and making disparaging statements.

141.    Upon information and belief, the conduct by GAIC, FCIC, USDA and its RMA was undertaken and pursued with the intent to put NHF-I and NHF-II out of business and to deny it insurance claims.

142.    The conduct of GAIC, FCIC, USDA and its RMA caused harm to NHF-I and NHF-II by:

    a.    Causing certain of NHF-I's and NHF-II's landlords, ARM and vendors to cease doing business with them, and

    b.    Interfering with adjustment of their 2019 and subsequent crop insurance claims.

    c.    Starving NHF-I and NHF-II for cash.

WHEREFORE, Plaintiff NHF-I and NHF-II request that this Court enter judgment in their favor and against Defendants for Plaintiffs' NHF-I and NHF-II actual, incidental, and consequential economic, non-economic and emotional distress and anxiety damages plus all allowable costs, interest and attorney fees to which they may be entitled, pursuant to 28 U.S.C. § 2412 and otherwise.

## COUNT VII

### INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS OR EXPECTANCIES

143.    Plaintiff incorporates the above allegations by reference.

144.    NHF-I and NHF-II had business relationships with its landlords, ARM and other vendors and the expectancy that the relationships would continue.

145.    NHF-I and NHF-II had a reasonable expectation that the business relationships and expectancies would continue.

146.     GAIC, FCIC, USDA and its RMA knew that NHF-I and NHF-II had business relationships and with its landlords, ARM and various vendors the expectancy that the relationships would continue.

147.     Upon information and belief, the conduct of GAIC, FCIC, USDA and its RMA intentionally and improperly interfered with these business relationships and expectancies by:

      a.   delayed adjusting the insurance claims,

      b.   contacting the landlords, ARM and vendors and making disparaging statements.

148.     Upon information and belief, the conduct by GAIC, FCIC, USDA and its RMA was undertaken and pursued with the intent to put NHF-I and NHF-II out of business and to deny it insurance claims.

149.     The conduct of GAIC, FCIC, USDA and its RMA caused harm to NHF-I and NHF-II by:

      c.   Causing certain of NHF-I's and NHF-II's landlords, ARM and vendors to cease doing business with them, and

      d.   Interfering with adjustment of their 2019 and subsequent crop insurance claims.

      e.   Starving NHF-I and NHF-II for cash.

WHEREFORE, Plaintiff NHF-I and NHF-II request that this Court enter judgment in their favor and against Defendants for Plaintiffs' NHF-I and NHF-II actual, incidental, and consequential economic, non-economic and emotional distress and anxiety damages plus all allowable costs, interest, and attorney fees to which they may be entitled, pursuant to 28 U.S.C. § 2412 and otherwise.

## COUNT IX

## CONSTITUTIONAL DUE PROCESS VIOLATIONS

150.   Plaintiff incorporates the above allegations by reference.

151.   The 5th Amendment of the Constitution of the United States of America prohibits the Federal Government from depriving "a person of life, liberty, or property, without due process of law".

152.   42 U.S.C. 1983 authorizes civil actions to be brought against state actors for the deprivation of constitutional rights.

153.   FCIC, USDA and its RMA are state actors of the Federal Government.

154.   NHF-I's and NHF-II's insurance benefits are property rights.

155.   FCIC, USDA and its RMA are responsible for withholding payment of NHF-I's and NHF-II's claims in bad faith.

156.   FCIC, USDA and its RMA protracted investigation have deprived NHF-I and NHF-II of their substantive rights by depriving them of their property, their insurance premiums and the benefits owed under the policies, without just compensation.

157.   FCIC, USDA and its RMA protracted investigation have deprived NHF-I and NHF-II of their procedural due process rights by depriving them of their property, their insurance premiums, and the benefits owed under the policies without providing hearing, notice, paying out the claim, or denying the claim on reasonable grounds.

158.   FCIC, USDA and its RMA have abused and continue to abuse their governmental power by purposely delaying adjustment of the insurance claim while not denying it, threatening Plaintiffs with criminal prosecution and offering no reasonable explanation for the three-year delay.

WHEREFORE, NHF-I and NHF-II request that this Court enter judgment in their favor and against Defendants for NHF-I's and NHF-II's actual, incidental, punitive, and consequential economic, non-economic and emotional distress and anxiety damages plus all allowable costs, interest, and attorney fees pursuant to 28 U.S.C. § 2412 and 42 U.S.C. § 1988.

Dated: August 10, 2023                    /s/ Ronald J. VanderVeen
                                          Ronald J. VanderVeen (P33067)
                                          John D. Fitzpatrick (P85554)
                                          Carl Thorwall (P86746)
                                          Cunningham Dalman, PC
                                          321 Sellers Road
                                          Holland, MI 49422-1767
                                          rjvv@cunninghamdalman.com

## PLAINTIFF'S JURY DEMAND

Plaintiffs demand a trial by jury for all issues in this case pursuant to F.R.Civ.P 35.

Dated: August 10, 2023                    /s/ Ronald J. VanderVeen
                                          Ronald J. VanderVeen (P33067)
                                          Cunningham Dalman, PC

**EXHIBIT 01**

Page: 1 of 4

GREAT AMERICAN INSURANCE COMPANY
Crop Insurance

Regional Office

# Application/Renewal Form
### for the 2019 Crop Year

**Policy Number:** 1139524

**INSURED**

New Heights Farm I, LLC
6241 Ransom St
Zeeland, MI 49464

**Person Type:** LLC
**ID#:** 83-4161520   **Type:** ☐ SSN ☒ EIN ☐ RAN
Indicate State where articles are filed: Michigan

**Is applicant at least 18 years old?** ☒ YES ☐ NO
**Phone:** 616 875-7880 **Mobile:**
**E-Provisions:** ☐   **Email:**

**Spouse's Name:**
**Spouse's ID#:**
**Change:** ☐ Name ☐ ID#

**AGENCY**

Spartan Insurance - Main 2
806 Botsford Rd.
Petoskey, MI 49770

**Code:** 102212
**Phone:** 855 347-1066
**Fax:** 231-347-1067
**Agent:** Chris Shellenbarger
**Agent Phone:** 517-749-8938
**Agent Email:**
**Agency Email:** Cshell58@
hotmail.com

**Authorized Representative(s):** Stacy Boersen

**Power Of Attorney:**

**Limited Authorized Representative(s):**
Refer to the LAR Statement

☐ Add Authority   For designated person(s) to sign crop
☐ Remove Authority  insurance documents on behalf of the insured.

☐ I authorize all individuals listed as SBI to have authority as a Limited Authorized Representative.

**Substantial Beneficial Interest Information:** - List all person(s) with a substantial beneficial interest in you as defined in the applicable policy provisions (include landlords or tenants insured under the applicant).
If none, state NONE. Attach SBI Reporting Form if additional space is needed and check box ☐ (SBI Reporting Form is attached).

| | Name | Address | Telephone Number | ID Number | ID No Type (Check One) | Person Type |
|---|---|---|---|---|---|---|
| ☒ Add | Stacy Boersen | 4678 72nd St Zeeland MI 49464 | 616 875-4452 | 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 | ☒ SSN ☐ EIN ☐ RAN | Individual |
| ☐ Add | | | | | ☐ SSN ☐ EIN ☐ RAN | |
| ☐ Add | | | | | ☐ SSN ☐ EIN ☐ RAN | |

**Landlord/Tenant:**   In addition to my share on this policy, I am also insuring shares for my: ☐ Landlord ☐ Tenant  (Add L/T as an SBI)
By signing this form I, L/T hereby authorize the above named insured to insure my share under this policy. Otherwise, attach evidence of L/T approval.

**L/T Name:** _____   **Signature:** _____   **Date:** _____

**Effective Year:** 2019
**State:** 2019
☐ Cancel Entire Policy *

**Added County Election**
☒ YES ☐ NO ☐ Cancel

I request insurance coverage for my share of the Category B crops (except forage production) specified below with a designated county in all added counties where the crops are insurable. If your designated plan of insurance, level of coverage or price is not available in the added county, coverage will be provided through the Catastrophic Risk Protection Endorsement, if the crop is insurable in the actuarial documents for an added county.

| Crop/County Change | County Crop | Type Practice | Des. Cnty | ** New Producer | Plan of Ins. Current/Change | %Coverage Level Current/Change | % Price Election, Proj.Price, or Amt of Ins. | Unit Struct | Options/Endorsements Current - Change | Intended PP Acres Eligibility | SCO Ins Plan | Level | ARC | Remarks/Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☒ Add | Allegan Corn | IRR\|NI GGN | ☐ | ☐ Yes ☐ No | RP | 80% | 100% | EP | 4A\|TA\|PF | 1500 | ☐ Add | ☐ Y ☐ N | | |
| ☒ Add | Allegan Soybeans | IRR\|NI Comm | ☐ | ☐ Yes ☐ No | RP | 80% | 100% | EP | 4A\|TA\|PF | 0 | ☐ Add | ☐ Y ☐ N | | |
| ☒ Add | Barry Corn | IRR\|NI GGN | ☐ | ☐ Yes ☐ No | RP | 80% | 100% | EP | 4A\|TA\|PF | 97 | ☐ Add | ☐ Y ☐ N | | |
| ☒ Add | Barry Soybeans | IRR\|NI Comm | ☐ | ☐ Yes ☐ No | RP | 80% | 100% | EP | 4A\|TA\|PF | 0 | ☐ Add | ☐ Y ☐ N | | |

*I hereby request cancellation of my crop insurance policy for the crop(s) and crop year shown on this cancellation. I understand that if this form is not executed on or before the cancellation date for any crop year listed, the cancellation of insurance on such crop(s) will not become effective until the following crop year. Explain in the remarks column the reason for cancelling - Insured's request, mutual consent, death, incompetence, dissolution or other.

**I certify I have not produced the insured crop in the county for more than two years.

F.18642 (01/19)

| Application/Renewal Form – for the | | Crop Year 2019 | | Policy Number: | | | | | | | | | | Page: 2 of 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Agency: Spartan Insurance- Main 2 | | | | | | | | | | |
| Crop/County Change | County Crop | Type Practice | Des. Cnty | ** New Producer | Plan of Ins. Current/Change | %Coverage Level Current/Change | % Price Election, Proj.Price, or Amt of Ins. | Unit Struct | Options/Endorsements Current - Change | Intended PP Acres Eligibility | SCO Ins Plan | Level | ARC | Remarks/ Comments |
| ☒ Add | Calhoun - Corn | IRR/NI Grain | ☐ | ☐ Yes ☐ No | RP | 80% | 100% | EP | YA /TA /PF | 4600 | ☐ Add | | ☐ Y ☐ N | |
| ☒ Add | Calhoun - Soybeans | IRR/NI Comm | ☐ | ☐ Yes ☐ No | RP | 80% | 100% | EP | YA TA PF | 1200 | ☐ Add | | ☐ Y ☐ N | |
| ☒ Add | Jackson Corn | IRR/NI Grain | ☐ | ☐ Yes ☐ No | RP | 80% | 100% | EP | YA /TA /PF | 500 | ☐ Add | | ☐ Y ☐ N | |
| ☒ Add | Jackson Soybeans | IRR/NI Comm | ☐ | ☐ Yes ☐ No | RP | 80% | 100% | EP | YA /TA /PF | Ø | ☐ Add | | ☐ Y ☐ N | |
| ☒ Add | Ottawa Corn | IRR/NI Grain | ☒ | ☐ Yes ☐ No | RP | 80% | 100% | EP | YA /TA /PF | 1666 | ☐ Add | | ☐ Y ☐ N | |
| ☒ Add | Ottawa Soybeans | IRR/NI Comm | ☒ | ☐ Yes ☐ No | RP | 80% | 100% | EP | YA /TA /PF | Ø | ☐ Add | | ☐ Y ☐ N | |

*I hereby request cancellation of my crop insurance policy for the crop(s) and crop year shown on this cancellation. I understand that if this form is not executed on or before the cancellation date for any crop year listed, the cancellation of insurance on such crop(s) will not become effective until the following crop year. Explain in the remarks column the reason for cancelling - Insured's request, mutual consent, death, incompetence, dissolution or other.

**I certify I have not produced the insured crop in the county for more than two years.

## CONDITIONS OF ACCEPTANCE STATEMENTS

Conditions of Acceptance: The application is accepted and insurance attaches in accordance with the policy unless: (1) The Federal Crop Insurance Corporation determines that, in accordance with the regulations, the risk is excessive; (2) any material fact is omitted, concealed or misrepresented in this application or in the submission of the application; (3) you have failed to provide complete and accurate information required by this application; or (4) the answer to any of the following questions is yes . An answer of yes to these questions does not automatically result in rejection of the application. For example, if you answer yes to question (a) but your debt was discharged in bankruptcy, the application would not be rejected.

☐ Yes ☒ No  (a)   Are you now indebted and the debt is delinquent for insurance coverage under the Federal Crop Insurance Act?

☐ Yes ☒ No  (b)   Have you in the last five years been convicted under federal or state law of planting, cultivating, growing, producing, harvesting, or storing a controlled substance?

☐ Yes ☒ No  (c)   Have you ever had insurance coverage under the authority of the Federal  Crop Insurance Act terminated for violation of the terms of the contract or regulations, or for failure to pay your delinquent debt?

☐ Yes ☒ No  (d)   Are you disqualified or debarred under the Federal Crop Insurance Act, the regulations of the Federal Crop Insurance Corporation, or the United State Department of Agriculture?

☐ Yes ☒ No  (e)   Have you ever entered into an agreement with the Federal Crop Insurance Corporation or with the Department of Justice that you would refrain from participating in programs under the authority of the Federal Crop Insurance Act and that agreement is still effective?

☐ Yes ☒ No  (f)   Do you have like insurance on any of the above crop(s)?

I understand that if coverage for any crop is currently terminated or would have subsequently terminated for indebtedness had this application been filed after the termination date, no coverage can be provided and I am ineligible for any benefits under the Federal Crop Insurance Act and the cause for termination is corrected.

We will notify you of rejection by depositing notification in the United States mail, postage paid, to the applicant s address. Unless rejected or the sales closing date has passed at the time you signed this application, insurance shall be in effect for the crop(s) and crop years specified and shall continue for each succeeding crop year, unless otherwise specified in the policy, until canceled, terminated or voided. The insurance contract, which includes the accepted application, is defined in the regulation published at 7 CFR chapter IV. No term or condition of the contract shall be waived or changed unless such waiver or change is expressly allowed by the contract and is in writing.

F.18642 (01/19)

NHF1-524 Policy 000002

| Application/Renewal Form – for the | Crop Year | Policy Number: | |
|---|---|---|---|
| | | Agency: | Page: 3 of 4 |

## COLLECTION OF INFORMATION AND DATA (PRIVACY ACT) STATEMENT Agents, Loss Adjusters and Policyholders

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information requested on documents established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required or permitted by law, law enforcement agencies, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIPs contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to the public to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures and the denial of program eligibility or benefits derived therefrom. Also, failure to provide true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.

## Supplemental Coverage Option Endorsement Terms and Conditions

"In addition to Section 3B(2) of the Basic Provisions, I hereby elect this Supplemental Coverage Option Endorsement, and by this election I understand:
(1) I must have purchased a policy under the Common Crop Insurance Policy Basic Provisions and applicable Crop Provisions to elect this Endorsement and must also purchase this Endorsement with the same Approved Insurance Provider as my Common Crop Insurance Policy.
(2) I may elect coverage under this Endorsement and the Farm Service Agency's Agriculture Risk Coverage Program, but the same acreage of the crop cannot be covered under both programs.
(3) I may elect coverage under this Endorsement and Stacked Income Protection Plan for the upland cotton, but the same acreage cannot be insured under both.
(4) If at any time my Common Crop Insurance Policy for the crop is cancelled or terminated, coverage under this endorsement is automatically cancelled or terminated.
(5) That by electing this Endorsement, it will continue from year to year unless I or you cancel or change my election by written notice on or before the cancellation date or my coverage is otherwise cancelled or terminated under the terms of my policy.
(6) Separate Administrative Fees will be assessed for each crop insured under this Endorsement."

## NONDISCRIMINATION STATEMENT

**Non-Discrimination Policy**
In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating on the basis of race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). **To File a Program Complaint**
If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at www.ascr.usda.gov/ad-3027-usda-program-discrimination-complaint-form, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410 or email at program.intake@usda.gov.
**Persons with Disabilities**
Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible State or local Agency that administers the program or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English. Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email.

## +Election for Electronic Delivery of Multi-Peril and Private Crop Insurance Policy Provisions

By checking the box for "E-Provisions" on page 1, you agree to receive the MPCI, Crop-Hail, and/or Named-Peril crop insurance policy provisions associated with your Tax ID number (including any changes to the policy provisions) electronically, by accessing them on-line. To access, view, download, and/or print copies of your policies provisions go to www.greatamericancrop.com. By checking the "E-Provisions" box on page 1, you also acknowledge the following:
Withdrawal from Electronic Delivery: You may choose to receive paper copies of applicable provisions mailed to you at any time, at no charge. Simply contact your insurance agent to receive paper copies.
Minimum System Requirements: You have the minimum system requirements to access your policy provisions. This includes: (1) access to a computer or other device which is capable of accessing the internet; (2) software that permits you to receive and access Portable Document Format (PDF) files, such as Adobe Acrobat Reader; (3) hardware or a storage device that can save documents or a printer from which you can print out documents; and (4) an active email address with the ability to receive emails and attachments, in case we need to communicate with you electronically.

F.18642 (01/19)

NHF1-524 Policy 000003

| Application/Renewal Form - for the  2019  Crop Year | Policy Number: | |
|---|---|---|
| | Agency: | Page: 4 of 4 |

## POLICY TRANSFER REQUEST  To be completed only if cancelling previous policy and transferring the experience and insurance coverage from another Approved Insurance Provider.

I hereby request cancellation of my insurance policy with (Ceding Approved Insurance Provider Name) _____ for the crop(s) and crop year(s) shown below because I have applied for insurance with another Approved Insurance Provider. I understand that if this form is not executed on or before the established cancellation date for any crop listed, the cancellation of insurance on such crop(s) will not become effective until the following crop year.

Crop(s) to be cancelled and transferred: _____

Crop Year of crops being cancelled and transferred: _____  Policy Number with Ceding Approved Insurance Provider: _____

I hereby authorize and direct the Ceding Approved Insurance Provider shown above to furnish any information relative to my insurance policy to the Assuming Approved Insurance Provider listed below. I understand that if coverage for any crop(s) is now terminated or would have subsequently terminated for delinquent debt had this transfer not occurred, no coverage can be provided by the (Assuming Approved Insurance Provider) **GREAT AMERICAN INSURANCE COMPANY**

### ***COMPANY USE ONLY***
## AIP POLICY TRANSFER ACCEPTANCE (To be completed if policy is being transferred from another AIP)
### ASSUMING APPROVED INSURANCE PROVIDER: GREAT AMERICAN INSURANCE COMPANY       POLICY ISSUING COMPANY CODE: 084

By submission of this form, we agree to provide crop insurance to this applicant for the crop(s) and crop year specified above unless this form is not executed on or before the established cancellation date for any of the crop(s) shown, in which case insurance will be provided for such crop(s) for the following crop year.

_____

Printed Name and Signature of AIP Representative Authorized to Accept Applications         Date of Acceptance by Assuming AIP

Regional Office Address and Phone Number: _____

### Limited Authorized Representative Statement

I grant the person(s) listed in the Limited Authorized Representative section, the authority to sign any and all crop insurance documents on my behalf. I understand that by authorizing such persons to sign documents on my behalf, I am legally bound by all terms and conditions of such documents and of the crop insurance contract. I also understand that granting the following person(s) the authority to sign on my behalf does not obligate that person(s) to the terms and conditions of my crop insurance contract. I further understand that this authorization may be revoked by me at any time upon written notice, signed and delivered to my Approved Insurance Provider.

### CERTIFICATION STATEMENT
### Applicant/Insured Statement

"I certify that to the best of my knowledge and belief all of the information on this form is correct. I also understand that failure to report completely and accurately may result in sanctions under my policy, including but not limited to voidance of the policy, and in criminal or civil penalties (18 U.S.C. &1006 and &1014; 7 U.S.C. &1506; 31 U.S.C. &3729, &3730 and any other applicable federal statutes).To the best of my knowledge, the Grid ID accurately identifies the location of the insured acreage; and acreage assigned to each Grid ID is accurate."

Stacy Boersen

New Heights Farm I, LLC                    X _____       3/13/19
Applicant's Printed Name                      Signature                                    Date

### Agent Statement

"I certify, for the crop year indicated, that I have neither offered nor promised, directly or indirectly, any benefit, including money, goods, or services for which payment is usually made, rebate, discount, credit, reduction of premium, or any other valuable consideration to this person either as an inducement to procure insurance or in exchange for obtaining insurance after it has been procured. I understand that this prohibition does not include payment of administrative fees, performance based discounts, and any other payment approved by FCIC that are authorized under sections 508(a)(9)(B) and 508(d)(3) of the Federal Crop Insurance Act (Act) (7 U.S.C. §§ 1508(a)(9)(B) and 1508(d)(3)). I understand that a false certification or failure to completely and accurately report any violation may subject me, and all agencies/companies I represent, to sanctions, including but not limited, to criminal and civil penalties and administrative sanctions in accordance with section 515(h) of the Act (7 USC §1515(h)) and all other applicable federal statutes."

Chris Shellenberger                      Chris Shellenberger                        3/13/19        103212
Agent's Printed Name                        Signature                                    Date          Code Number

F.18642 (01/19)

NHF1-524 Policy 000004

**EXHIBIT**

**02**

**NEW HEIGHTS FARM I, LLC**
**6241 RANSOM ST**
**ZEELAND, MI 49464**

**MP-2019-MI-084-1139524**

# Multiple Peril Crop Insurance Policy



Great American Insurance Company





GREAT AMERICAN
INSURANCE GROUP

Crop Division
GreatAmericanCrop.com

Great American Insurance is an equal opportunity provider.

**PLEASE READ YOUR POLICY CAREFULLY.** This policy is signed by the President and Secretary of the company.

President

Secretary

F.18151G (4/17)

NHF1-524 Policy 000006



# Multiple Peril Crop Insurance
## DECLARATION OF COVERAGE
### EFFECTIVE FOR THE 2019 CROP YEAR

Peoria
1315 W. Commerce Drive
Peoria IL, 61615-1462

GREAT AMERICAN
INSURANCE COMPANY
Crop Insurance Division

04/04/2019
Page: 1 of 4

**Policy Number:** 2019-MI-084-1139524

| **INSURED:** | NEW HEIGHTS FARM I, LLC<br>6241 RANSOM ST<br>ZEELAND, MI  49464 | | **Person Type:** | Limited Liability Company (LLC) |
| --- | --- | --- | --- | --- |
| | | | **Tax ID:** | XX-XXX1520 |
| | | | **ID # Type:** | EIN |
| | | | **Phone:** | (616) 875-7880 |
| | | | **Mobile:** | |
| **Spouse's Name:** | | | **Spouse's SSN:** | |
| **Articles of Incorporation are filed in:**  Michigan | | | | |

**Authorized Representative(s):** STACY BOERSEN     **POA(s):**

**Limited Authorized Rep(s):**

## SBI SUMMARY

| Name of Person | Complete Address | Telephone # | Tax ID # | Tax ID Type<br>SSN EIN Other | Person Type | L/T |
| --- | --- | --- | --- | --- | --- | --- |
| STACY BOERSEN | 4678 72ND ST<br>ZEELAND MI 49464 | (616) 875-4452 | XXX-XX-2888 | SSN | Individual (I) | |

## POLICY INFORMATION FOR THE STATE OF MICHIGAN

| County | Crop(s) Insured/Type | Plan | Coverage Level | % Price Election, Proj. Price, or Amt of Ins. | Options/Elections/ Endorsements | Status | Applicable Provisions/Endorsements |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Allegan (5) | Corn | Revenue Protection (02) | 80% | 100% | PFTAYA EP | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>14ceppcorn ENDR 06/26/2013<br>16cepp - Section I ENDR 11/30/2015<br>2019 SPECIAL COUNTY PROVISIONS |
| Allegan (5) | Soybeans | Revenue Protection (02) | 80% | 100% | PFTAYA EP | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>16cepp - Section I ENDR 11/30/2015<br>17-cepp-soybeans ENDR 05/20/2016<br>2019 SPECIAL COUNTY PROVISIONS |
| Barry (15) | Corn | Revenue Protection (02) | 80% | 100% | PFTAYA EP | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>14ceppcorn ENDR 06/26/2013<br>16cepp - Section I ENDR 11/30/2015<br>2019 SPECIAL COUNTY PROVISIONS |

(Form M915)

Declaration Of Coverage - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139524        NEW HEIGHTS FARM I, LLC
    Agency: 102212 SPARTAN INSURANCE-MAIN 2 / PETOSKEY, MI



**POLICY INFORMATION FOR THE STATE OF MICHIGAN**

| County | Crop(s) Insured/Type | Plan | Coverage Level | % Price Election, Proj. Price, or Amt of Ins. | Options/Elections/ Endorsements | Status | Applicable Provisions/Endorsements |
|---|---|---|---|---|---|---|---|
| Barry (15) | Soybeans | Revenue Protection (02) | 80% | 100% | PFTAYA EP | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>16cepp - Section I ENDR 11/30/2015<br>17-cepp-soybeans ENDR 05/20/2016<br>2019 SPECIAL COUNTY PROVISIONS |
| Calhoun (25) | Corn | Revenue Protection (02) | 80% | 100% | PFTAYA EP | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>14ceppcorn ENDR 06/26/2013<br>16cepp - Section I ENDR 11/30/2015<br>2019 SPECIAL COUNTY PROVISIONS |
| Calhoun (25) | Soybeans | Revenue Protection (02) | 80% | 100% | PFTAYA EP | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>16cepp - Section I ENDR 11/30/2015<br>17-cepp-soybeans ENDR 05/20/2016<br>2019 SPECIAL COUNTY PROVISIONS |
| Jackson (75) | Corn | Revenue Protection (02) | 80% | 100% | PFTAYA EP | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>14ceppcorn ENDR 06/26/2013<br>16cepp - Section I ENDR 11/30/2015<br>2019 SPECIAL COUNTY PROVISIONS |

(Form M915)

Declaration Of Coverage - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139524       NEW HEIGHTS FARM I, LLC
Agency: 102212 SPARTAN INSURANCE-MAIN 2 / PETOSKEY, MI

Page: 3 of 4


GREAT AMERICAN
INSURANCE COMPANY
Crop Insurance Division

## POLICY INFORMATION FOR THE STATE OF MICHIGAN

| County | Crop(s) Insured/Type | Plan | Coverage Level | % Price Election, Proj. Price, or Amt of Ins. | Options/Elections/ Endorsements | Status | Applicable Provisions/Endorsements |
|---|---|---|---|---|---|---|---|
| Jackson (75) | Soybeans | Revenue Protection (02) | 80% | 100% | PFTAYA EP | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>16cepp - Section I ENDR 11/30/2015<br>17-cepp-soybeans ENDR 05/20/2016<br>2019 SPECIAL COUNTY PROVISIONS |
| (*)Ottawa (139) | Corn | Revenue Protection (02) | 80% | 100% | PFTAYA EP | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>14ceppcorn ENDR 06/26/2013<br>16cepp - Section I ENDR 11/30/2015<br>2019 SPECIAL COUNTY PROVISIONS |
| (*)Ottawa (139) | Soybeans | Revenue Protection (02) | 80% | 100% | PFTAYA EP | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>16cepp - Section I ENDR 11/30/2015<br>17-cepp-soybeans ENDR 05/20/2016<br>2019 SPECIAL COUNTY PROVISIONS |

ALL STATE/COUNTY OPTION:      Yes
ASSIGNMENT OF INDEMNITY:      None

(* - Denotes Primary County designation for the crop)

## IMPORTANT DATES EFFECTIVE FOR THE 2019 CROP YEAR

| COUNTY | CROP | SALES CLOSING | PRODUCTION REPORTING | ACREAGE REPORTING | PREMIUM BILLING | TERMINATION | CANCELLATION |
|---|---|---|---|---|---|---|---|
| Allegan (5) | Corn | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2020 | 3/15/2020 | 3/15/2019 |
| Allegan (5) | Soybeans | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2020 | 3/15/2020 | 3/15/2019 |
| Barry (15) | Corn | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2020 | 3/15/2020 | 3/15/2019 |
| Barry (15) | Soybeans | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2020 | 3/15/2020 | 3/15/2019 |
| Calhoun (25) | Corn | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2020 | 3/15/2020 | 3/15/2019 |
| Calhoun (25) | Soybeans | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2020 | 3/15/2020 | 3/15/2019 |
| Jackson (75) | Corn | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2020 | 3/15/2020 | 3/15/2019 |
| Jackson (75) | Soybeans | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2020 | 3/15/2020 | 3/15/2019 |
| Ottawa (139) | Corn | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2020 | 3/15/2020 | 3/15/2019 |
| Ottawa (139) | Soybeans | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2020 | 3/15/2020 | 3/15/2019 |

(Form M915)

Declaration Of Coverage - for the 2019 Crop Year

Page: 4 of 4



GREAT AMERICAN
INSURANCE COMPANY
Crop Insurance Division

Policy Number:  2019-MI-084-1139524          NEW HEIGHTS FARM I, LLC
          Agency:  102212 SPARTAN INSURANCE-MAIN 2 / PETOSKEY, MI

| PLEASE REVIEW FOR ACCURACY AND CONTACT YOUR AGENT IF YOU HAVE ANY QUESTIONS. |
|---|

**YOUR AGENT IS:**          CHRISTINE M. SHELLENBARGER
          SPARTAN INSURANCE-MAIN 2
          806 BOTSFORD RD
          PETOSKEY, MI  49770

| | |
|---|---|
| **Code No:** | 102212 |
| **Phone:** | (855) 347-1066 |
| **Fax:** | (231) 347-1067 |
| **E-mail:** | cshell58@hotmail.com |

(Form M915)

## SUMMARY OF CHANGES FOR THE COMMON CROP INSURANCE POLICY
## BASIC PROVISIONS – REINSURED VERSION (18-BR)
## (Released November 2017)

The following is a brief description of the changes to the Common Crop Insurance Policy Basic Provisions that are effective for the 2018 and succeeding crop years for all crops with a 2018 contract change date on or after November 30, 2017, and for the 2019 and succeeding crop years for all crops with a 2018 contract change date prior to November 30, 2017.

- Throughout the policy, changed the phrase:
    - "Web site" and added the word "website" in its place;
    - "FSA farm serial number" and added the phrase "FSA farm number" in its place; and
    - "Replant payment" and added the phrase "replanting payment" in its place.
- Preamble – Revised the order of priority in the preamble to include the actuarial documents.
- Section 1 – Revised the definitions of "Cooperative Extension System," "good farming practices," "price election," "replanted crop."
- Redesignated section 2(e)(2) as section 2(e)(3).
- Section 2(e)(2) – Clarified that with the policyholder's consent the premium and administrative fees can be offset from any prevented planting or indemnity due the policyholder even if the offset occurs before the fees are billed.
- Section 2(f)(2)(i)(D) - Updated the years used in the example.
- Section 2(f)(3)(ii) - Removed the prohibition that does not allow a policyholder to enter into a written payment agreement if they previously failed to make a payment under an agreement to give approved insurance providers the flexibility to enter into these agreements.
- Section 2(f)(5) - Updated the years used in the example.
- Removed section 2(j).
- Section 3(f)(3) – Allow these provisions to be changed in the Special Provisions.
- Section 3(h)(1) – Changed the reference of "valid basis" to "valid agronomic basis."
- Section 6(a)(3) - Added a new paragraph (iii) that provides if the policyholder planted the insured crop on or within five days prior to the final planting date and the final planting date is five or fewer days prior to the acreage reporting date, the policyholder must submit an acreage report no later than five days after the acreage reporting date.
- Section 7(h) - Revised the conservation compliance provisions to remove the certification deadline of June 1.
- Section 9(a)(2)(viii)(A) - Changed the reference to the "Group Risk Protection Plan of Insurance" to "Area Risk Protection Insurance."
- Section 17(f)(9) - Changed the reference to "manpower" to "labor."
- Section 18 – Modified this section to:
    - Provide minor clarifications, as well as removing language that is no longer needed due to program modifications, changes via Special Provisions, or unnecessary duplication.
    - Remove section 18(e)(3).
    - Revise section 18(f)(1)(ii) to remove language regarding the information needed to determine the approved yield. The APH already contains the information needed to determine the approved yield so this language is no longer needed. Also revised to remove the unnecessary signature requirement on the submitted actual production history documents.
    - Revise section 18(f)(1)(iii) to add "the crop" as an option for evidence of adaptability.
    - Revise 18(f)(2)(i) to allow an entity to use verifiable and insurance records from substantial beneficial interests of that entity to qualify for a written agreement request for counties without actuarial documents.
    - Remove section 18(f)(1)(vi).
    - Revise section 18(f)(2)(i) to clarify this section is also applicable to perennial crops that have previously produced a crop. Also revised to allow "you" to include anyone with a substantial beneficial interest in "you."

- o Revise section 18(f)(2)(i)(A) to remove the requirement of the policyholder's signature on the completed APH submitted with the written agreement request and also to state the completed APH is based on verifiable production records of actual yields for the crop to be consistent with the APH requirement for other written agreement request types.
- o Revise section 18(f)(2)(i)(B) to clarify this section is also applicable to perennial crops that have previously produced a crop.
- o Revise section 18(f)(2)(i)(B)(2) to remove the requirement that the policyholder must insure the crop for the three previous crop years before they can substitute a year of insurance experience for a year of verifiable records, and also revised to allow an entity to use the production history from a substantial beneficial interest in the entity that has a history of growing the crop to qualify for a written agreement.
- o Add new section 18(f)(2)(i)(B)(3) to limit a year that counts as producing the crop to the most recent ten crop years, unless the producer can provide verifiable production records or insured the crop outside of the most recent ten crop years.
- o Revise section 18(f)(2)(ii) to clarify this section is also applicable to perennial crops that have previously produced a crop.  Also revised to allow "you" to include anyone with a substantial beneficial interest in "you."
- o Revise section 18(f)(2)(ii)(A) to remove the requirement of the policyholder's signature on the completed APH submitted with the written agreement request and also state the completed APH is based on verifiable production records of actual yields for the similar crop to be consistent with the APH requirement for other written agreement request types.  Also revised to remove the order or precedence that the similar crop records must come from the county, if produced in the county, prior to using any area similar crop records, to be consistent with the requirements for the requested crop.
- o Revise section 18(f)(2)(ii)(B) to clarify this section is also applicable to perennial crops that have previously produced a crop.
- o Revise section 18(f)(2)(ii)(B)(2) to remove the requirement that the policyholder must insure the similar crop for the three previous crop years before they can substitute a year of insurance experience for a year of verifiable records, and also revised to allow an entity to use the production history from a substantial beneficial interest in the entity that has a history of growing the similar crop to qualify for a written agreement.
- o Add new section 18(f)(2)(ii)(B)(3) to limit a year that counts as producing the similar crop to the most recent ten crop years, unless the producer can provide verifiable production records or insured the similar crop outside of the most recent ten crop years.
- o Revise section 18(f)(2)(ii)(C) to allow an entity to use the production history from a substantial beneficial interest in the entity that has a history of growing the crop or similar crop to qualify for a written agreement, and to clarify this section is also applicable to perennial crops that have previously produced a crop.
- o Remove section 18(f)(2)(vi).
- o Remove section 18(g)(3).
- o Revise section 18(h)(2) to clarify the APH history used to determine 50 percent of the transitional yield for the crop, type, and practice can be from either the county or a similar county and to clarify that this provision only applies when the crop has been previously grown.
- o Revise section 18(h)(4) to clarify this provision is also applicable if a similar crop was not previously grown in the area and to allow the crop or similar crop to be grown in the area, as growing the crop or similar crop in the area can qualify a policyholder in the county even if they have not grown the crop in the requested county.  Also revised to remove the phrase "based on sales receipts, contemporaneous feeding records or a contract for the crop."
- o Revise section 18(h)(5) to allow a written agreement request to be denied for a particular practice or type if that practice or type is not adapted to the county.
- Section 21(b)(2) - Updated the years used in the example.
- Sections 34(a)(4)(viii), (viii)(A)-(D) – Revised to allow a policyholder to select an enterprise unit for either irrigated or non-irrigated practice and choose the most appropriate unit structure on the other practice, be it a separate enterprise unit or optional or basic units.

**18-BR**

**(Released Nov 2017)**

## COMMON CROP INSURANCE POLICY
### (This is a continuous policy.  Refer to section 2.)



This insurance policy is reinsured by the Federal Crop Insurance Corporation (FCIC) under the provisions of the Federal Crop Insurance Act (Act) (7 U.S.C. 1501 et seq.).  All provisions of the policy and rights and responsibilities of the parties are specifically subject to the Act.  The provisions of the policy may not be waived or varied in any way by us, our insurance agent or any other contractor or employee of ours or any employee of USDA unless the policy specifically authorizes a waiver or modification by written agreement.  We will use the procedures (handbooks, manuals, memoranda and bulletins), as issued by FCIC and published on RMA's website at http://www.rma.usda.gov/ or a successor website, in the administration of this policy, including the adjustment of any loss or claim submitted hereunder.  In the event that we cannot pay your loss because we are insolvent or are otherwise unable to perform our duties under our reinsurance agreement with FCIC, your claim will be settled in accordance with the provisions of this policy and FCIC will be responsible for any amounts owed.  No state guarantee fund will be liable for your loss.

Throughout this policy, "you" and "your" refer to the named insured shown on the accepted application and "we," "us," and "our" refer to the insurance company providing insurance.  Unless the context indicates otherwise, use of the plural form of a word includes the singular and use of the singular form of the word includes the plural.

AGREEMENT TO INSURE:  In return for the payment of the premium, and subject to all of the provisions of this policy, we agree with you to provide the insurance as stated in this policy.  If there is a conflict between the Act, the regulations published at 7 CFR chapter IV, and the procedures as issued by FCIC, the order of priority is: (1) the Act; (2) the regulations; and (3) the procedures as issued by FCIC, with (1) controlling (2), etc.  If there is a conflict between the policy provisions published at 7 CFR part 457 and the administrative regulations published at 7 CFR part 400, the policy provisions published at 7 CFR part 457 control.  If a conflict exists among the policy, the order of priority is:  (1) the Catastrophic Risk Protection Endorsement, as applicable; (2) the Special Provisions; (3) the actuarial documents; (4) the Commodity Exchange Price Provisions, as applicable; (5) the Crop Provisions; and (6) these Basic Provisions, with (1) controlling (2), etc.

### TERMS AND CONDITIONS
### BASIC PROVISIONS

**1. Definitions.**

**Abandon** - Failure to continue to care for the crop, providing care so insignificant as to provide no benefit to the crop, or failure to harvest in a timely manner, unless an insured cause of loss prevents you from properly caring for or harvesting the crop or causes damage to it to the extent that most producers of the crop on acreage with similar characteristics in the area would not normally further care for or harvest it.

**Acreage report** - A report required by section 6 of these Basic Provisions that contains, in addition to other required information, your report of your share of all acreage of an insured crop in the county, whether insurable or not insurable.

**Acreage reporting date** - The date contained in the Special Provisions or as provided in section 6 by which you are required to submit your acreage report.

**Act** - The Federal Crop Insurance Act (7 U.S.C. 1501 et seq.).

**Actual Production History (APH)** - A process used to determine production guarantees in accordance with 7 CFR part 400, subpart G.

**Actual yield** - The yield per acre for a crop year calculated from the production records or claims for indemnities.  The actual yield is determined by dividing total production (which includes harvested and appraised production) by planted acres.

**Actuarial documents** - The information for the crop year which is available for public inspection in your agent's office and published on RMA's website and which shows available crop insurance policies, coverage levels, information needed to determine amounts of insurance,

prices, premium rates, premium adjustment percentages, practices, particular types or varieties of the insurable crop, insurable acreage, and other related information regarding crop insurance in the county.

**Additional coverage** - A level of coverage greater than catastrophic risk protection.

**Administrative fee** - An amount you must pay for catastrophic risk protection, and additional coverage for each crop year as specified in section 7 and the Catastrophic Risk Protection Endorsement.

**Agricultural commodity** - Any crop or other commodity produced, regardless of whether or not it is insurable.

**Agricultural experts** - Persons who are employed by the Cooperative Extension System or the agricultural departments of universities, or other persons approved by FCIC, whose research or occupation is related to the specific crop or practice for which such expertise is sought.

**Annual crop** - An agricultural commodity that normally must be planted each year.

**Application** - The form required to be completed by you and accepted by us before insurance coverage will commence.  This form must be completed and filed in your agent's office not later than the sales closing date of the initial insurance year for each crop for which insurance coverage is requested.  If cancellation or termination of insurance coverage occurs for any reason, including but not limited to indebtedness, suspension, debarment, disqualification, cancellation by you or us or violation of the controlled substance provisions of the Food Security Act of 1985, a new application must be filed for the crop.  Insurance coverage will not be provided if you are

NHF1-524 Policy 000013

ineligible under the contract or under any Federal statute or regulation.

**Approved yield** - The actual production history (APH) yield, calculated and approved by the verifier, used to determine the production guarantee by summing the yearly actual, assigned, adjusted or unadjusted transitional yields and dividing the sum by the number of yields contained in the database, which will always contain at least four yields.  The database may contain up to 10 consecutive crop years of actual or assigned yields.  The approved yield may have yield exclusions elected under section 5, yield adjustments elected under section 36, revisions according to section 3, or other limitations according to FCIC approved procedures applied when calculating the approved yield.

**Area** - Land surrounding the insured acreage with geographic characteristics, topography, soil types and climatic conditions similar to the insured acreage.

**Assignment of indemnity** - A transfer of policy rights, made on our form, and effective when approved by us in writing, whereby you assign your right to an indemnity payment for the crop year only to creditors or other persons to whom you have a financial debt or other pecuniary obligation.

**Average yield** - The yield calculated by totaling the yearly actual yields, assigned yields in accordance with sections 3(f)(1) (failure to provide production report), 3(h)(1) (excessive yields), and 3(i) (second crop planted without double cropping history on prevented planted acreage), and adjusted or unadjusted transitional yields, and dividing the total by the number of yields contained in the database.

**Basic unit** - All insurable acreage of the insured crop in the county on the date coverage begins for the crop year:

(1)  In which you have 100 percent crop share; or

(2)  Which is owned by one person and operated by another person on a share basis.  (Example: If, in addition to the land you own, you rent land from five landlords, three on a crop share basis and two on a cash basis, you would be entitled to four units; one for each crop share lease and one that combines the two cash leases and the land you own.)  Land which would otherwise be one unit may, in certain instances, be divided according to guidelines contained in section 34 of these Basic Provisions and in the applicable Crop Provisions.

**Beginning farmer or rancher** – An individual who has not actively operated and managed a farm or ranch in any state, with an insurable interest in a crop or livestock as an owner-operator, landlord, tenant, or sharecropper for more than five crop years, as determined in accordance with FCIC procedures.  Any crop year's insurable interest may, at your election, be excluded if earned while under the age of 18, while in full-time military service of the United States, or while in post-secondary education, in accordance with FCIC procedures.  A person other than an individual may be eligible for beginning farmer or rancher benefits if there is at least one individual substantial beneficial interest holder and all individual substantial beneficial interest holders qualify as a beginning farmer or rancher.

**Buffer zone** - A parcel of land, as designated in your organic plan, that separates agricultural commodities grown under organic practices from agricultural commodities grown under non-organic practices, and used to minimize the possibility of unintended contact by prohibited substances or organisms.

**Cancellation date** - The calendar date specified in the Crop Provisions on which coverage for the crop will automatically renew unless canceled in writing by either you or us or terminated in accordance with the policy terms.

**Catastrophic risk protection** - The minimum level of coverage offered by FCIC.  Catastrophic risk protection is not available with revenue protection.

**Catastrophic Risk Protection Endorsement** - The part of the crop insurance policy that contains provisions of insurance that are specific to catastrophic risk protection.

**Certified organic acreage** - Acreage in the certified organic farming operation that has been certified by a certifying agent as conforming to organic standards in accordance with 7 CFR part 205.

**Certifying agent** - A private or governmental entity accredited by the USDA Secretary of Agriculture for the purpose of certifying a production, processing or handling operation as organic.

**Claim for indemnity** - A claim made on our form that contains the information necessary to pay the indemnity, as specified in the applicable FCIC issued procedures, and complies with the requirements in section 14.

**Code of Federal Regulations (CFR)** - The codification of general and permanent rules published in the Federal Register by the Executive departments and agencies of the Federal Government.  Rules published in the Federal Register by FCIC are contained in 7 CFR chapter IV.  The full text of the CFR is available in electronic format at http://www.access.gpo.gov/ or a successor website.

**Commodity Exchange Price Provisions (CEPP)** – A part of the policy that is used for all crops for which revenue protection is available, regardless of whether you elect revenue protection or yield protection for such crops.  This document includes the information necessary to derive the projected price and the harvest price for the insured crop, as applicable.

**Consent** - Approval in writing by us allowing you to take a specific action.

**Contract** - (See "policy").

**Contract change date** - The calendar date by which changes to the policy, if any, will be made available in accordance with section 4 of these Basic Provisions.

**Conventional farming practice** - A system or process that is necessary to produce an agricultural commodity, excluding organic farming practices.

**Cooperative Extension System** – A nationwide network consisting of a State office located at each State's land-grant university, and local or regional offices.  These offices are staffed by one or more agricultural experts, who work in cooperation with the National Institute of Food and Agriculture, and who provide information to agricultural producers and others.

**County** - Any county, parish, or other political subdivision of a state shown on your accepted application, including

acreage in a field that extends into an adjoining county if the county boundary is not readily discernible.

**Cover crop** - A crop generally recognized by agricultural experts as agronomically sound for the area for erosion control or other purposes related to conservation or soil improvement.  A cover crop may be considered to be a second crop (see the definition of "second crop").

**Coverage** - The insurance provided by this policy, against insured loss of production or value, by unit as shown on your summary of coverage.

**Coverage begins, date** - The calendar date insurance begins on the insured crop, as contained in the Crop Provisions, or the date planting begins on the unit (see section 11 of these Basic Provisions for specific provisions relating to prevented planting).

**Crop Provisions** - The part of the policy that contains the specific provisions of insurance for each insured crop.

**Crop year** - The period within which the insured crop is normally grown, regardless of whether or not it is actually grown, and designated by the calendar year in which the insured crop is normally harvested, unless otherwise specified in the Crop Provisions.

**Damage** - Injury, deterioration, or loss of production of the insured crop due to insured or uninsured causes.

**Days** - Calendar days.

**Deductible** - The amount determined by subtracting the coverage level percentage you choose from 100 percent. For example, if you elected a 65 percent coverage level, your deductible would be 35 percent (100% - 65% = 35%).

**Delinquent debt** - Has the same meaning as the term defined in 7 CFR part 400, subpart U.

**Disinterested third party** - A person that does not have any familial relationship (parents, brothers, sisters, children, spouse, grandchildren, aunts, uncles, nieces, nephews, first cousins, or grandparents, related by blood, adoption or marriage, are considered to have a familial relationship) with you or who will not benefit financially from the sale of the insured crop.  Persons who are authorized to conduct quality analysis in accordance with the Crop Provisions are considered disinterested third parties unless there is a familial relationship.

**Double crop** - Producing two or more crops for harvest on the same acreage in the same crop year.

**Earliest planting date** - The initial planting date contained in the Special Provisions, which is the earliest date you may plant an insured agricultural commodity and qualify for a replanting payment if such payments are authorized by the Crop Provisions.

**End of insurance period, date of** - The date upon which your crop insurance coverage ceases for the crop year (see Crop Provisions and section 11).

**Enterprise unit** - All insurable acreage of the same insured crop or all insurable irrigated or non-irrigated acreage of the same insured crop in the county in which you have a share on the date coverage begins for the crop year, provided the requirements of section 34 are met.

**Field** - All acreage of tillable land within a natural or artificial boundary (*e.g.*, roads, waterways, fences, etc.). Different planting patterns or planting different crops do not create separate fields.

**Final planting date** - The date contained in the Special Provisions for the insured crop by which the crop must

initially be planted in order to be insured for the full production guarantee or amount of insurance per acre.

**First insured crop** - With respect to a single crop year and any specific crop acreage, the first instance that an agricultural commodity is planted for harvest or prevented from being planted and is insured under the authority of the Act.  For example, if winter wheat that is not insured is planted on acreage that is later planted to soybeans that are insured, the first insured crop would be soybeans.  If the winter wheat was insured, it would be the first insured crop.

**FSA** - The Farm Service Agency, an agency of the USDA, or a successor agency.

**FSA farm number** - The number assigned to the farm by the local FSA office.

**Generally recognized** - When agricultural experts or organic agricultural experts, as applicable, are aware of the production method or practice and there is no genuine dispute regarding whether the production method or practice allows the crop to make normal progress toward maturity and produce at least the yield used to determine the production guarantee or amount of insurance.

**Good farming practices** - The production methods utilized to produce the insured crop and allow it to make normal progress toward maturity and produce at least the yield used to determine the production guarantee or amount of insurance, including any adjustments for late planted acreage, which are those generally recognized by agricultural experts or organic agricultural experts, depending on the practice, for the area.  We may, or you may request us to, contact FCIC to determine if production methods will be considered "good farming practices."

**Harvest price** - A price determined in accordance with the Commodity Exchange Price Provisions and used to value production to count for revenue protection.

**Harvest price exclusion** - Revenue protection with the use of the harvest price excluded when determining your revenue protection guarantee.  This election is continuous unless canceled by the cancellation date.

**Household** - A domestic establishment including the members of a family (parents, brothers, sisters, children, spouse, grandchildren, aunts, uncles, nieces, nephews, first cousins, or grandparents, related by blood, adoption or marriage, are considered to be family members) and others who live under the same roof.

**Insurable interest** - Your percentage of the insured crop that is at financial risk.

**Insurable loss** - Damage for which coverage is provided under the terms of your policy, and for which you accept an indemnity payment.

**Insured** - The named person as shown on the application accepted by us.  This term does not extend to any other person having a share or interest in the crop (for example, a partnership, landlord, or any other person) unless specifically indicated on the accepted application.

**Insured crop** - The crop in the county for which coverage is available under your policy as shown on the application accepted by us.

**Intended acreage report** - A report of the acreage you intend to plant, by crop, for the current crop year and used solely for the purpose of establishing eligible prevented planting acreage, as required in section 17.

**Interplanted** - Acreage on which two or more crops are planted in a manner that does not permit separate agronomic maintenance or harvest of the insured crop.

**Irrigated practice** - A method of producing a crop by which water is artificially applied during the growing season by appropriate systems and at the proper times, with the intention of providing the quantity of water needed to produce at least the yield used to establish the irrigated production guarantee or amount of insurance on the irrigated acreage planted to the insured crop.

**Late planted** - Acreage initially planted to the insured crop after the final planting date.

**Late planting period** - The period that begins the day after the final planting date for the insured crop and ends 25 days after the final planting date, unless otherwise specified in the Crop Provisions or Special Provisions.

**Liability** - Your total amount of insurance, value of your production guarantee, or revenue protection guarantee for the unit determined in accordance with the Settlement of Claim provisions of the applicable Crop Provisions.

**Limited resource farmer** - Has the same meaning as the term defined by USDA at http://lrftool.sc.egov.usda.gov/LRP_Definition.aspx or successor website.

**Native sod** - Acreage that has no record of being tilled (determined in accordance with information collected and maintained by an agency of the USDA or other verifiable records that you provide and are acceptable to us) for the production of an annual crop on or before February 7, 2014, and on which the plant cover is composed principally of native grasses, grass-like plants, forbs, or shrubs suitable for grazing and browsing.

**Negligence** - The failure to use such care as a reasonably prudent and careful person would use under similar circumstances.

**Non-contiguous** - Acreage of an insured crop that is separated from other acreage of the same insured crop by land that is neither owned by you nor rented by you for cash or a crop share.  However, acreage separated by only a public or private right-of-way, waterway, or an irrigation canal will be considered as contiguous.

**Offset** - The act of deducting one amount from another amount.

**Organic agricultural experts** - Persons who are employed by the following organizations: Appropriate Technology Transfer for Rural Areas, Sustainable Agriculture Research and Education or the Cooperative Extension System, the agricultural departments of universities, or other persons approved by FCIC, whose research or occupation is related to the specific organic crop or practice for which such expertise is sought.

**Organic crop -** An agricultural commodity that is organically produced consistent with section 2103 of the Organic Foods Production Act of 1990 (7 U.S.C. 6502).

**Organic farming practice** - A system of plant production practices used to produce an organic crop that is approved by a certifying agent in accordance with 7 CFR part 205.

**Organic plan** - A written plan, in accordance with the National Organic Program published in 7 CFR part 205, that describes the organic farming practices that you and

a certifying agent agree upon annually or at such other times as prescribed by the certifying agent.

**Organic standards** - Standards in accordance with the Organic Foods Production Act of 1990 (7 U.S.C. 6501 et seq.) and 7 CFR part 205.

**Perennial crop** - A plant, bush, tree or vine crop that has a life span of more than one year.

**Person** - An individual, partnership, association, corporation, estate, trust, or other legal entity, and wherever applicable, a State or a political subdivision or agency of a State.  "Person" does not include the United States Government or any agency thereof.

**Planted acreage** - Land in which seed, plants, or trees have been placed, appropriate for the insured crop and planting method, at the correct depth, in a seedbed that has been properly prepared for the planting method and production practice.

**Policy** - The agreement between you and us to insure an agricultural commodity and consisting of the accepted application, these Basic Provisions, the Crop Provisions, the Special Provisions, the Commodity Exchange Price Provisions, if applicable, other applicable endorsements or options, the actuarial documents for the insured agricultural commodity, the Catastrophic Risk Protection Endorsement, if applicable, and the applicable regulations published in 7 CFR chapter IV.  Insurance for each agricultural commodity in each county will constitute a separate policy.

**Practical to replant** - Our determination, after loss or damage to the insured crop, that you are able to replant to the same crop in such areas and under such circumstances as it is customary to replant and that replanting the insured crop will allow the crop to attain maturity prior to the calendar date for the end of the insurance period.  We may consider circumstances as to whether: (1) it is physically possible to replant the acreage; (2) seed germination, emergence, and formation of a healthy plant is likely; (3) field, soil, and growing conditions allow for proper planting and growth of the replanted crop to reach maturity; or (4) other conditions exist, as provided by the Crop Provisions or Special Provisions.  Unless we determine it is not practical to replant, based on the circumstances listed above, it will be considered practical to replant through: (1) the final planting date if no late planting period is applicable; (2) the end of the late planting period if the late planting period is less than 10 days; or (3) the 10th day after the final planting date if the crop has a late planting period of 10 days or more.  We will consider it practical to replant regardless of the availability of seed or plants, or the input costs necessary to produce the insured crop such as seed or plants, irrigation water, etc.

**Premium billing date** - The earliest date upon which you will be billed for insurance coverage based on your acreage report.  The premium billing date is contained in the Special Provisions.

**Prevented planting** - Failure to plant the insured crop by the final planting date designated in the Special Provisions for the insured crop in the county, or within any applicable late planting period, due to an insured cause of loss that is general to the surrounding area and that prevents other producers from planting acreage with similar

characteristics. Failure to plant because of uninsured causes such as lack of proper equipment or labor to plant acreage, or use of a particular production method, is not considered prevented planting.

**Price election** - The amount contained in the actuarial documents that is the value per pound, bushel, ton, carton, or other applicable unit of measure for the purposes of determining premium and indemnity under the policy. A price election is not applicable for crops for which revenue protection is available.

**Production guarantee (per acre)** - The number of pounds, bushels, tons, cartons, or other applicable units of measure determined by multiplying the approved yield per acre by the coverage level percentage you elect.

**Production report** - A written record showing your annual production and used by us to determine your yield for insurance purposes in accordance with section 3. The report contains yield information for previous years, including planted acreage and production. This report must be supported by written verifiable records from a warehouseman or buyer of the insured crop, by measurement of farm-stored production, or by other records of production approved by us on an individual case basis in accordance with FCIC approved procedures.

**Prohibited substance** - Any biological, chemical, or other agent that is prohibited from use or is not included in the organic standards for use on any certified organic, transitional or buffer zone acreage. Lists of such substances are contained at 7 CFR part 205.

**Projected price** - The price for each crop determined in accordance with the Commodity Exchange Price Provisions. The applicable projected price is used for each crop for which revenue protection is available, regardless of whether you elect to obtain revenue protection or yield protection for such crop.

**Replanted crop** –

(1) The same agricultural commodity replanted on the same acreage as the insured crop for harvest in the same crop year if:

    (i) The replanting is specifically made optional by the policy and you elect to replant the crop and insure it under the policy covering the first insured crop; or

    (ii) Replanting is required by the policy.

(2) Unless otherwise specified in the Special Provisions, the crop will be considered an insured replanted crop and no replanting payment will be paid if we have determined it is not practical to replant the insured crop and you choose to plant the acreage to the same insured crop within or prior to the late planting period or after the final planting date if no late planting period is applicable. If we determine it is not practical to replant and you plant the acreage to the same insured crop, any indemnity will be based on the greater of:

    (i) Our appraised production on the initially planted crop;

    (ii) Our subsequent appraisal of the replanted crop if the replanted crop is not harvested; or

    (iii) The harvested production from the replanted crop.

**Replanting** - Performing the cultural practices necessary to prepare the land to replace the seed or plants of the damaged or destroyed insured crop and then replacing the seed or plants of the same crop in the same insured acreage. The same crop does not necessarily mean the same type or variety of the crop unless different types or varieties constitute separate crops or it is otherwise specified in the policy.

**Representative sample** - Portions of the insured crop that must remain in the field for examination and review by our loss adjuster when making a crop appraisal, as specified in the Crop Provisions. In certain instances we may allow you to harvest the crop and require only that samples of the crop residue be left in the field.

**Revenue protection** - A plan of insurance that provides protection against loss of revenue due to a production loss, price decline or increase, or a combination of both. If the harvest price exclusion is elected, the insurance coverage provides protection only against loss of revenue due to a production loss, price decline, or a combination of both.

**Revenue protection guarantee (per acre)** - For revenue protection only, the amount determined by multiplying the production guarantee (per acre) by the greater of your projected price or your harvest price. If the harvest price exclusion is elected, the production guarantee (per acre) is only multiplied by your projected price.

**RMA's website** - A website hosted by RMA and located at http://www.rma.usda.gov/ or a successor website.

**Sales closing date** - A date contained in the Special Provisions by which an application must be filed. The last date by which you may change your crop insurance coverage for a crop year.

**Second crop** - With respect to a single crop year, the next occurrence of planting any agricultural commodity for harvest following a first insured crop on the same acreage. The second crop may be the same or a different agricultural commodity as the first insured crop, except the term does not include a replanted crop. A cover crop, planted after a first insured crop and planted for the purpose of haying, grazing or otherwise harvesting in any manner or that is hayed or grazed during the crop year, or that is otherwise harvested is considered to be a second crop. A cover crop that is covered by FSA's noninsured crop disaster assistance program (NAP) or receives other USDA benefits associated with forage crops will be considered as planted for the purpose of haying, grazing or otherwise harvesting. A crop meeting the conditions stated herein will be considered to be a second crop regardless of whether or not it is insured. Notwithstanding the references to haying and grazing as harvesting in these Basic Provisions, for the purpose of determining the end of the insurance period, harvest of the crop will be as defined in the applicable Crop Provisions.

**Section** - For the purposes of unit structure, a unit of measure under a rectangular survey system describing a tract of land usually one mile square and usually containing approximately 640 acres.

**Share** - Your insurable interest in the insured crop as an owner, operator, or tenant at the time insurance attaches. However, only for the purpose of determining the amount

of indemnity, your share will not exceed your share at the earlier of the time of loss or the beginning of harvest.

**Special Provisions** - The part of the policy that contains specific provisions of insurance for each insured crop that may vary by geographic area.

**State** - The state shown on your accepted application.

**Substantial beneficial interest** - An interest held by any person of at least 10 percent in you (*e.g.*, there are two partnerships that each have a 50 percent interest in you and each partnership is made up of two individuals, each with a 50 percent share in the partnership. In this case, each individual would be considered to have a 25 percent interest in you, and both the partnerships and the individuals would have a substantial beneficial interest in you. The spouses of the individuals would not be considered to have a substantial beneficial interest unless the spouse was one of the individuals that made up the partnership. However, if each partnership is made up of six individuals with equal interests, then each would only have an 8.33 percent interest in you and although the partnership would still have a substantial beneficial interest in you, the individuals would not for the purposes of reporting in section 2). The spouse of any individual applicant or individual insured will be presumed to have a substantial beneficial interest in the applicant or insured unless the spouses can prove they are legally separated or otherwise legally separate under the applicable State dissolution of marriage laws. Any child of an individual applicant or individual insured will not be considered to have a substantial beneficial interest in the applicant or insured unless the child has a separate legal interest in such person.

**Summary of coverage** - Our statement to you, based upon your acreage report, specifying the insured crop and the guarantee or amount of insurance coverage provided by unit.

**Sustainable farming practice** - A system or process for producing an agricultural commodity, excluding organic farming practices, that is necessary to produce the crop and is generally recognized by agricultural experts for the area to conserve or enhance natural resources and the environment.

**Tenant** - A person who rents land from another person for a share of the crop or a share of the proceeds of the crop (see the definition of "share" above).

**Termination date** - The calendar date contained in the Crop Provisions upon which your insurance ceases to be in effect because of nonpayment of any amount due us under the policy, including premium.

**Tilled** - The termination of existing plants by plowing, disking, burning, application of chemicals, or by other means to prepare acreage for the production of an annual crop.

**Timely planted** - Planted on or before the final planting date designated in the Special Provisions for the insured crop in the county.

**Transitional acreage** - Acreage on which organic farming practices are being followed that does not yet qualify to be designated as organic acreage.

**USDA** - United States Department of Agriculture.

**Verifiable records** - Has the same meaning as the term defined in 7 CFR part 400, subpart G.

**Void** - When the policy is considered not to have existed for a crop year.

**Whole-farm unit** - All insurable acreage of all the insured crops planted in the county in which you have a share on the date coverage begins for each crop for the crop year and for which the whole-farm unit structure is available in accordance with section 34.

**Written agreement** - A document that alters designated terms of a policy as authorized under these Basic Provisions, the Crop Provisions, or the Special Provisions for the insured crop (see section 18).

**Yield protection** - A plan of insurance that only provides protection against a production loss and is available only for crops for which revenue protection is available.

**Yield protection guarantee (per acre)** - When yield protection is selected for a crop that has revenue protection available, the amount determined by multiplying the production guarantee by your projected price.

2.  **Life of Policy, Cancellation, and Termination.**
    (a) This is a continuous policy and will remain in effect for each crop year following the acceptance of the original application until canceled by you in accordance with the terms of the policy or terminated by operation of the terms of the policy or by us. In accordance with section 4, FCIC may change the coverage provided from year to year.
    (b) With respect to your application for insurance:
        (1) You must include your social security number (SSN) if you are an individual (if you are an individual applicant operating as a business, you may provide an employer identification number (EIN) but you must also provide your SSN); or
        (2) You must include your EIN if you are a person other than an individual;
        (3) In addition to the requirements of section 2(b)(1) or (2), you must include the following for all persons who have a substantial beneficial interest in you:
            (i) The SSN for individuals; or
            (ii) The EIN for persons other than individuals and the SSNs for all individuals that comprise the person with the EIN if such individuals also have a substantial beneficial interest in you;
        (4) You must include:
            (i) Your election of revenue protection, yield protection, or other available plan of insurance; coverage level; percentage of price election or percentage of projected price, as applicable; crop, type, variety, or class; and any other material information required on the application to insure the crop; and
            (ii) All the information required in section 2(b)(4)(i) or your application will not be accepted and no coverage will be provided;
        (5) Your application will not be accepted and no insurance will be provided for the year of application if the application does not contain your SSN or EIN. If your application contains an incorrect SSN or EIN for you, your application will be considered not to have been accepted, no

insurance will be provided for the year of application and for any subsequent crop years, as applicable, and such policies will be void if:

(i)   Such number is not corrected by you; or

(ii)  You correct the SSN or EIN but:

(A)  You cannot prove that any error was inadvertent (Simply stating the error was inadvertent is not sufficient to prove the error was inadvertent); or

(B)  It is determined that the incorrect number would have allowed you to obtain disproportionate benefits under the crop insurance program, you are determined to be ineligible for insurance or you could avoid an obligation or requirement under any State or Federal law;

(6)  With respect to persons with a substantial beneficial interest in you:

(i)   The insurance coverage for all crops included on your application will be reduced proportionately by the percentage interest in you of persons with a substantial beneficial interest in you (presumed to be 50 percent for spouses of individuals) if the SSNs or EINs of such persons are included on your application, the SSNs or EINs are correct, and the persons with a substantial beneficial interest in you are ineligible for insurance;

(ii)  Your policies for all crops included on your application, and for all applicable crop years, will be void if the SSN or EIN of any person with a substantial beneficial interest in you is incorrect or is not included on your application and:

(A)  Such number is not corrected or provided by you, as applicable;

(B)  You cannot prove that any error or omission was inadvertent (Simply stating the error or omission was inadvertent is not sufficient to prove the error or omission was inadvertent); or

(C)  Even after the correct SSN or EIN is provided by you, it is determined that the incorrect or omitted SSN or EIN would have allowed you to obtain disproportionate benefits under the crop insurance program, the person with a substantial beneficial interest in you is determined to be ineligible for insurance, or you or the person with a substantial beneficial interest in you could avoid an obligation or requirement under any State or Federal law; or

(iii) Except as provided in sections 2(b)(6)(ii)(B) and (C), your policies will not be voided if you subsequently provide the correct SSN or EIN for persons with a substantial beneficial interest in you and the persons are eligible for insurance;

(7)  When any of your policies are void under sections 2(b)(5) or (6):

(i)   You must repay any indemnity, prevented planting payment or replanting payment that may have been paid for all applicable crops and crop years;

(ii)  Even though the policies are void, you will still be required to pay an amount equal to 20 percent of the premium that you would otherwise be required to pay; and

(iii) If you previously paid premium or administrative fees, any amount in excess of the amount required in section 2(b)(7)(ii) will be returned to you;

(8)  Notwithstanding any of the provisions in this section, if you certify to an incorrect SSN or EIN, or receive an indemnity, prevented planting payment or replanting payment and the SSN or EIN was not correct, you may be subject to civil, criminal or administrative sanctions;

(9)  If any of the information regarding persons with a substantial beneficial interest in you changes after the sales closing date for the previous crop year, you must revise your application by the sales closing date for the current crop year to reflect the correct information.  However, if such information changed less than 30 days before the sales closing date for the current crop year, you must revise your application by the sales closing date for the next crop year.  If you fail to provide the required revisions, the provisions in section 2(b)(6) will apply; and

(10) If you are, or a person with a substantial beneficial interest in you is, not eligible to obtain a SSN or EIN, whichever is required, you must request an assigned number for the purposes of this policy from us:

(i)   A number will be provided only if you can demonstrate you are, or a person with a substantial beneficial interest in you is, eligible to receive Federal benefits;

(ii)  If a number cannot be provided for you in accordance with section 2(b)(10)(i), your application will not be accepted; or

(iii) If a number cannot be provided for any person with a substantial beneficial interest in you in accordance with section 2(b)(10)(i), the amount of coverage for all crops on the application will be reduced proportionately by the percentage interest of such person in you.

(c)  After acceptance of the application, you may not cancel this policy for the initial crop year. Thereafter, the policy will continue in force for each succeeding crop year unless canceled or terminated as provided below.

(d)  Either you or we may cancel this policy after the initial crop year by providing written notice to the other on or before the cancellation date shown in the Crop Provisions.

(e)  Any amount due to us for any policy authorized under the Act will be offset from any indemnity or prevented

NHF1-524 Policy 000019

planting payment due you for this or any other crop insured with us under the authority of the Act.

(1) Even if your claim has not yet been paid, you must still pay the premium and administrative fee on or before the termination date for you to remain eligible for insurance.

(2) If you and we agree, your premium and administrative fees can be offset from any indemnity or prevented planting payment due you even if it is prior to the billing date of the premium and administrative fees.

(3) If we offset any amount due us from an indemnity or prevented planting payment owed to you, the date of payment for the purpose of determining whether you have a delinquent debt will be the date that you submit the claim for indemnity in accordance with section 14(e) (Your Duties).

(f) A delinquent debt for any policy will make you ineligible to obtain crop insurance authorized under the Act for any subsequent crop year and result in termination of all policies in accordance with section 2(f)(2).

(1) With respect to ineligibility:

   (i) Ineligibility for crop insurance will be effective on:

      (A) The date that a policy was terminated in accordance with section 2(f)(2) for the crop for which you failed to pay premium, an administrative fee, or any related interest owed, as applicable;

      (B) The payment due date contained in any notification of indebtedness for any overpaid indemnity, prevented planting payment or replanting payment, if you fail to pay the amount owed, including any related interest owed, as applicable, by such due date; or

      (C) The termination date for the crop year prior to the crop year in which a scheduled payment is due under a written payment agreement if you fail to pay the amount owed by any payment date in any agreement to pay the debt.

   (ii) If you are ineligible and a policy has been terminated in accordance with section 2(f)(2), you will not receive any indemnity, prevented planting payment or replanting payment, if applicable, and such ineligibility and termination of the policy may affect your eligibility for benefits under other USDA programs. Any indemnity, prevented planting payment or replanting payment that may be owed for the policy before it has been terminated will remain owed to you, but may be offset in accordance with section 2(e), unless your policy was terminated in accordance with sections 2(f)(2)(i)(A), (B), or (D).

(2) With respect to termination:

   (i) Termination will be effective on:

      (A) For a policy with unpaid administrative fees or premiums, the termination date immediately subsequent to the billing date for the crop year (For policies for which the sales closing date is prior to the termination date, such policies will terminate for the current crop year even if insurance attached prior to the termination date. Such termination will be considered effective as of the sales closing date and no insurance will be considered to have attached for the crop year and no indemnity, prevented planting or replanting payment will be owed);

      (B) For a policy with other amounts due, the termination date immediately following the date you have a delinquent debt (For policies for which the sales closing date is prior to the termination date, such policies will terminate for the current crop year even if insurance attached prior to the termination date. Such termination will be considered effective as of the sales closing date and no insurance will be considered to have attached for the crop year and no indemnity, prevented planting or replanting payment will be owed);

      (C) For all other policies that are issued by us under the authority of the Act, the termination date that coincides with the termination date for the policy with the delinquent debt or, if there is no coincidental termination date, the termination date immediately following the date you become ineligible; or

      (D) For execution of a written payment agreement and failure to make any scheduled payment, the termination date for the crop year prior to the crop year in which you failed to make the scheduled payment (for this purpose only, the crop year will start the day after the termination date and end on the next termination date, *e.g.*, if the termination date is November 30 and you fail to make a payment on November 15, 2019, your policy will terminate on November 30, 2018, for the 2019 crop year).

   (ii) For all policies terminated under sections 2(f)(2)(i)(A), (B), or (D), any indemnities, prevented planting payments or replanting payments paid subsequent to the termination date must be repaid.

   (iii) Once the policy is terminated, it cannot be reinstated for the current crop year unless:

      (A) The termination was in error;

      (B) The Administrator of the Risk Management Agency, at his or her sole discretion, determines that the following are met:

(*1*)  In accordance with 7 CFR part 400, subpart U, and FCIC issued procedures, you provide documentation that your failure to pay your debt is due to an unforeseen or unavoidable event or an extraordinary weather event that created an impossible situation for you to make timely payment;

(*2*)  You remit full payment of the delinquent debt owed to us or FCIC with your request submitted in accordance with section 2(f)(2)(iii)(B)(*3*); and

(*3*)  You submit a written request for reinstatement of your policy to us no later than 60 days after the termination date or the missed payment date of a previously executed written payment agreement, or in the case of overpaid indemnity or any amount that became due after the termination date, the due date specified in the notice to you of the amount due, if applicable.

(*i*)  If authorization for reinstatement, as defined in 7 CFR part 400, subpart U, is granted, your policies will be reinstated effective at the beginning of the crop year for which you were determined ineligible, and you will be entitled to all applicable benefits under such policies, provided you meet all eligibility requirements and comply with the terms of the policy; and

(*ii*)  There is no evidence of fraud or misrepresentation; or

(C)  We determine that, in accordance with 7 CFR part 400, subpart U, and FCIC issued procedures, the following are met:

(*1*)  You can demonstrate:

(*i*)  You made timely payment for the amount of premium owed but you inadvertently omitted some small amount, such as the most recent month's interest or a small administrative fee;

(*ii*)  The amount of the payment was clearly transposed from the amount that was otherwise due (For example, you owed $892 but you paid $829); or

(*iii*)  You timely made the full payment of the amount owed but the delivery of that payment was delayed, and was postmarked no more than seven calendar days after the termination date or the missed payment date of a previously executed written payment agreement, or in the case of overpaid indemnity or any amount that became due after the termination date, the due date specified in a notice to you of an amount due, as applicable.

(*2*)  You remit full payment of the delinquent debt owed to us; and

(*3*)  You submit a written request for reinstatement of your policy to us in accordance with 7 CFR part 400, subpart U, and applicable procedures no later than 30 days after the termination date or the missed payment date of a previously executed written payment agreement, or in the case of overpaid indemnity or any amount that became due after the termination date, the due date specified in the notice to you of the amount due, if applicable; and

(*4*)  If authorization for reinstatement, as defined in 7 CFR part 400, subpart U, is granted, your policies will be reinstated effective at the beginning of the crop year for which you were determined ineligible, and you will be entitled to all applicable benefits under such policies, provided you meet all eligibility requirements and comply with the terms of the policy; and

(*5*)  There is no evidence of fraud or misrepresentation.

(iv)  A determination made under:

(A)  Section 2(f)(2)(iii)(B) may only be appealed to the National Appeals Division in accordance with 7 CFR part 11; and

(B)  Section 2(f)(2)(iii)(C) may only be appealed in accordance with section 20.

(3)  To regain eligibility, you must:

(i)  Repay the delinquent debt in full;

(ii)  Execute a written payment agreement, in accordance with 7 CFR part 400, subpart U, and make payments in accordance with the agreement; or

(iii)  Have your debts discharged in bankruptcy.

(4)  After you become eligible for crop insurance, if you want to obtain coverage for your crops, you must submit a new application on or before the sales closing date for the crop (Since applications

for crop insurance cannot be accepted after the sales closing date, if you make any payment after the sales closing date, you cannot apply for insurance until the next crop year).

(5) For example, for the 2019 crop year, if crop A, with a termination date of October 31, 2018, and crop B, with a termination date of March 15, 2019, are insured and you do not pay the premium for crop A by the termination date, you are ineligible for crop insurance as of October 31, 2018, and crop A's policy is terminated as of that date.  Crop B's policy does not terminate until March 15, 2019, and an indemnity for the 2018 crop year may still be owed.  If you enter into a written payment agreement on September 25, 2019, the earliest date by which you can obtain crop insurance for crop A is to apply for crop insurance by the October 31, 2019, sales closing date and for crop B is to apply for crop insurance by the March 15, 2020, sales closing date.  If you fail to make a payment that was scheduled to be made on April 1, 2020, your policy will terminate as of October 31, 2019, for crop A, and March 15, 2020, for crop B, and no indemnity, prevented planting payment or replanting payment will be due for that crop year for either crop.  You will not be eligible to apply for crop insurance for any crop until after the amounts owed are paid in full or you have your debts discharged in bankruptcy.

(6) If you are determined to be ineligible under section 2(f), persons with a substantial beneficial interest in you may also be ineligible until you become eligible again.

(g) In cases where there has been a death, disappearance, judicially declared incompetence, or dissolution of any insured person:

(1) If any married individual insured dies, disappears, or is judicially declared incompetent, the named insured on the policy will automatically convert to the name of the spouse if:

    (i) The spouse was included on the policy as having a substantial beneficial interest in the named insured; and

    (ii) The spouse has a share of the crop.

(2) The provisions in section 2(g)(3) will be applicable if:

    (i) Any partner, member, shareholder, etc., of an insured entity dies, disappears, or is judicially declared incompetent, and such event automatically dissolves the entity; or

    (ii) An individual, whose estate is left to a beneficiary other than a spouse or left to the spouse and the criteria in section 2(g)(1) are not met, dies, disappears, or is judicially declared incompetent.

(3) If section 2(g)(2) applies and the death, disappearance, or judicially declared incompetence occurred:

    (i) More than 30 days before the cancellation date, the policy is automatically canceled as of the cancellation date and a new application must be submitted; or

(ii) Thirty days or less before the cancellation date, or after the cancellation date, the policy will continue in effect through the crop year immediately following the cancellation date and be automatically canceled as of the cancellation date immediately following the end of the insurance period for the crop year, unless canceled by the cancellation date prior to the start of the insurance period:

    (A) A new application for insurance must be submitted prior to the sales closing date for coverage for the subsequent crop year; and

    (B) Any indemnity, replanting payment or prevented planting payment will be paid to the person or persons determined to be beneficially entitled to the payment and such person or persons must comply with all policy provisions and pay the premium.

(4) If any insured entity is dissolved for reasons other than death, disappearance, or judicially declared incompetence:

    (i) Before the cancellation date, the policy is automatically canceled as of the cancellation date and a new application must be submitted; or

    (ii) On or after the cancellation date, the policy will continue in effect through the crop year immediately following the cancellation date and be automatically canceled as of the cancellation date immediately following the end of the insurance period for the crop year, unless canceled by the cancellation date prior to the start of the insurance period:

    (A) A new application for insurance must be submitted prior to the sales closing date for coverage for the subsequent crop year; and

    (B) Any indemnity, replanting payment or prevented planting payment will be paid to the person or persons determined to be beneficially entitled to the payment and such person or persons must comply with all policy provisions and pay the premium.

(5) If section 2(g)(2) or (4) applies, a remaining member of the insured person or the beneficiary is required to report to us the death, disappearance, judicial incompetence, or other event that causes dissolution not later than the next cancellation date, except if section 2(g)(3)(ii) applies, notice must be provided by the cancellation date for the next crop year.  If notice is not provided timely, the provisions of section 2(g)(2) or (4) will apply retroactive to the date such notice should have been provided and any payments made after the date the policy should have been canceled must be returned.

(h) We may cancel your policy if no premium is earned for 3 consecutive years.

(i) The cancellation and termination dates are contained in the Crop Provisions.

(j) Any person may sign any document relative to crop insurance coverage on behalf of any other person covered by such a policy, provided that the person has a properly executed power of attorney or such other legally sufficient document authorizing such person to sign. You are still responsible for the accuracy of all information provided on your behalf and may be subject to the consequences in section 6(g), and any other applicable consequences, if any information has been misreported.

**3. Insurance Guarantees, Coverage Levels, and Prices.**

(a) Unless adjusted or limited in accordance with your policy, the production guarantee or amount of insurance, coverage level, and price at which an indemnity will be determined for each unit will be those used to calculate your summary of coverage for each crop year.

(b) With respect to the insurance choices:

(1) For all acreage of the insured crop in the county, unless one of the conditions in section 3(b)(2) exists, you must select the same:

(i) Plan of insurance (*e.g.*, yield protection, revenue protection, actual production history, amount of insurance, etc.);

(ii) Level of coverage (all catastrophic risk protection or the same level of additional coverage); and

(iii) Percentage of the available price election, or projected price for yield protection. For revenue protection, the percentage of price is specified in section 3(c)(2). If different prices are provided by type or variety, insurance will be based on the price provided for each type or variety and the same price percentage will apply to all types or varieties.

(2) You do not have to select the same plan of insurance, level of coverage or percentage of available price election or projected price if:

(i) The applicable Crop Provisions allow you the option to separately insure individual crop types or varieties. In this case, each individual type or variety insured by you will be subject to separate administrative fees. For example, if two grape varieties in California are insured under the Catastrophic Risk Protection Endorsement and two varieties are insured under an additional coverage policy, a separate administrative fee will be charged for each of the four varieties; or

(ii) You have additional coverage for the crop in the county and the acreage has been designated as "high-risk" by FCIC. In such case, you will be able to exclude coverage for the high-risk land under the additional coverage policy and insure such acreage under a separate Catastrophic Risk

Protection Endorsement, provided the Catastrophic Risk Protection Endorsement is obtained from the same insurance provider from which the additional coverage was obtained. If you have revenue protection and exclude high-risk land, the catastrophic risk protection coverage will be yield protection only for the excluded high-risk land.

(iii) You have additional coverage for the crop in the county, and the actuarial documents provide for separate coverage by irrigated and non-irrigated practices for the crop.

(A) You may select one coverage level for all irrigated acreage and one coverage level for all non-irrigated acreage. For example: you may choose a 65 percent coverage level for all irrigated acreage (corn irrigated practice) and an 80 percent coverage level for all non-irrigated acreage (corn non-irrigated practice).

(B) If the Crop Provisions allow the option to separately insure individual crop types or varieties, and the actuarial documents provide for separate coverage, you may select coverage levels by irrigated and non-irrigated practice for each separate type or variety.

(c) With respect to revenue protection, if available for the crop:

(1) You may change to another plan of insurance and change your coverage level or elect the harvest price exclusion by giving written notice to us not later than the sales closing date for the insured crop;

(2) Your projected price and harvest price will be 100 percent of the projected price and harvest price issued by FCIC;

(3) If the harvest price exclusion is:

(i) Not elected, your projected price is used to initially determine the revenue protection guarantee (per acre), and if the harvest price is greater than the projected price, the revenue protection guarantee (per acre) will be recomputed using your harvest price; or

(ii) Elected, your projected price is used to compute your revenue protection guarantee (per acre);

(4) Your projected price is used to calculate your premium, any replanting payment, and any prevented planting payment; and

(5) If the projected price or harvest price cannot be calculated for the current crop year under the provisions contained in the Commodity Exchange Price Provisions:

(i) For the projected price:

(A) Revenue protection will not be provided and you will automatically be covered under the yield protection plan of insurance for the current crop year

unless you cancel your coverage by the cancellation date or change your plan of insurance by the sales closing date;

(B) Notice will be provided on RMA's website by the date specified in the applicable projected price definition contained in the Commodity Exchange Price Provisions;

(C) The projected price will be determined by FCIC and will be released by the date specified in the applicable projected price definition contained in the Commodity Exchange Price Provisions; and

(D) Your coverage will automatically revert to revenue protection for the next crop year that revenue protection is available unless you cancel your coverage by the cancellation date or change your coverage by the sales closing date; or

(ii) For the harvest price:

(A) Revenue protection will continue to be available; and

(B) The harvest price will be determined and announced by FCIC.

(d) With respect to yield protection, if available for the crop:

(1) You may change to another plan of insurance and change your percentage of price and your coverage level by giving written notice to us not later than the sales closing date for the insured crop;

(2) The percentage of the projected price selected by you multiplied by the projected price issued by FCIC is your projected price that is used to compute the value of your production guarantee (per acre) and the value of the production to count; and

(3) Since the projected price may change each year, if you do not select a new percentage of the projected price on or before the sales closing date, we will assign a percentage which bears the same relationship to the percentage that was in effect for the preceding year (*e.g.*, if you selected 100 percent of the projected price for the previous crop year and you do not select a new percentage for the current crop year, we will assign 100 percent for the current crop year).

(e) With respect to all plans of insurance other than revenue protection and yield protection (*e.g.*, APH, dollar amount plans of insurance, etc.):

(1) In addition to the price election or amount of insurance available on the contract change date, we may provide an additional price election or amount of insurance no later than 15 days prior to the sales closing date.

(i) You must select the additional price election or amount of insurance on or before the sales closing date for the insured crop.

(ii) These additional price elections or amounts of insurance will not be less than those available on the contract change date.

(iii) If you elect the additional price election or amount of insurance, any claim settlement and amount of premium will be based on your additional price election or amount of insurance.

(2) You may change to another plan of insurance or change your coverage level, amount of insurance or percentage of the price election, as applicable, for the following crop year by giving written notice to us not later than the sales closing date for the insured crop.

(3) Your amount of insurance will be the amount of insurance issued by FCIC multiplied by the coverage level percentage you elected. Your price election will be the price election issued by FCIC multiplied by the percentage of price you elected.

(4) Since the amount of insurance or price election may change each year, if you do not select a new amount of insurance or percentage of the price election on or before the sales closing date, we will assign an amount of insurance or percentage of the price election which bears the same relationship to the amount of insurance or percentage of the price election that was in effect for the preceding year (*e.g.*, if you selected 100 percent of the price election for the previous crop year and you do not select a new percentage of the price election for the current crop year, we will assign 100 percent of the price election for the current crop year).

(f) You must report all production of the crop (insured and uninsured) to us for the previous crop year by the earlier of the acreage reporting date or 45 days after the cancellation date, unless otherwise stated in the Special Provisions or as specified in section 18:

(1) If you do not provide the required production report, we will assign a yield for the previous crop year. The yield assigned by us will not be more than 75 percent of the yield used by us to determine your coverage for the previous crop year. The production report or assigned yield will be used to compute your approved yield for the purpose of determining your coverage for the current crop year.

(2) If you have filed a claim for any crop year, the documents signed by you which state the amount of production used to complete the claim for indemnity will be the production report for that year unless otherwise specified by FCIC.

(3) Production and acreage for the prior crop year must be reported for each proposed optional unit by the production reporting date, unless otherwise specified in the Special Provisions. If you do not provide the information stated above, the optional units will be combined into the basic unit.

(4) Appraisals obtained from only a portion of the acreage in a field that remains unharvested after the remainder of the crop within the field has been destroyed or put to another use will not be used to establish your actual yield unless

representative samples are required to be left by you in accordance with the Crop Provisions.

(g) It is your responsibility to accurately report all information that is used to determine your approved yield.

   (1) You must certify to the accuracy of this information on your production report.

   (2) If you fail to accurately report any information or if you do not provide any required records, you will be subject to the provisions regarding misreporting contained in section 6(g), unless the information is corrected:

      (i) On or before the production reporting date; or

      (ii) Because the incorrect information was the result of our error or the error of someone from USDA.

   (3) If you do not have written verifiable records to support the information on your production report, you will receive an assigned yield in accordance with section 3(f)(1) and 7 CFR part 400, subpart G for those crop years for which you do not have such records.

   (4) At any time we discover you have misreported any material information used to determine your approved yield or your approved yield is not correct, the following actions will be taken, as applicable:

      (i) We will correct your approved yield for the crop year such information is not correct, and all subsequent crop years;

      (ii) We will correct the unit structure, if necessary;

      (iii) Any overpaid or underpaid indemnity or premium must be repaid; and

      (iv) You will be subject to the provisions regarding misreporting contained in section 6(g)(1), unless the incorrect information was the result of our error or the error of someone from USDA.

(h) In addition to any consequences in section 3(g), at any time the circumstances described below are discovered, your approved yield will be adjusted:

   (1) By including an assigned yield determined in accordance with section 3(f)(1) and 7 CFR part 400, subpart G, if the actual yield reported in the database is excessive for any crop year, as determined by FCIC under its procedures, and you do not provide verifiable records to support the yield in the database (If there are verifiable records for the yield in your database, the yield is significantly different from the other yields in the county or your other yields for the crop and you cannot prove there is a valid agronomic basis to support the differences in the yields, the yield will be the average of the yields for the crop or the applicable county transitional yield if you have no other yields for the crop);

   (2) By reducing it to an amount consistent with the average of the approved yields for other databases for your farming operation with the same crop, type, and practice or the county transitional yield, as applicable, if:

      (i) The approved APH yield is greater than 115 percent of the average of the approved yields of all applicable databases for your farming operation that have actual yields in them or it is greater than 115 percent of the county transitional yield if no applicable databases exist for comparison;

      (ii) The current year's insurable acreage (including applicable prevented planting acreage) is greater than 400 percent of the average number of acres in the database or the acres contained in two or more individual years in the database are each less than 10 percent of the current year's insurable acreage in the unit (including applicable prevented planting acreage); and

      (iii) We determine there is no valid agronomic basis to support the approved yield; or

   (3) To an amount consistent with the production methods actually carried out for the crop year if you use a different production method than was previously used and the production method actually carried out is likely to result in a yield lower than the average of your previous actual yields. The yield will be adjusted based on your other units where such production methods were carried out or to the applicable county transitional yield for the production methods if other such units do not exist. You must notify us of changes in your production methods by the acreage reporting date. If you fail to notify us, in addition to the reduction of your approved yield described herein, you will be considered to have misreported information and you will be subject to the consequences in section 6(g). For example, for a non-irrigated unit, your yield is based upon acreage of the crop that is watered once prior to planting, and the crop is not watered prior to planting for the current crop year. Your approved APH yield will be reduced to an amount consistent with the actual production history of your other non-irrigated units where the crop has not been watered prior to planting or limited to the non-irrigated transitional yield for the unit if other such units do not exist.

(i) Unless you meet the double cropping requirements contained in section 17(f)(4), if you elect to plant a second crop on acreage where the first insured crop was prevented from being planted, you will receive a yield equal to 60 percent of the approved yield for the first insured crop to calculate your average yield for subsequent crop years (Not applicable to crops if the APH is not the basis for the insurance guarantee). If the unit contains both prevented planting and planted acreage of the same crop, the yield for such acreage will be determined by:

   (1) Multiplying the number of insured prevented planting acres by 60 percent of the approved yield for the first insured crop;

(2) Adding the totals from section 3(i)(1) to the amount of appraised or harvested production for all of the insured planted acreage; and

(3) Dividing the total in section 3(i)(2) by the total number of acres in the unit.

(j) Hail and fire coverage may be excluded from the covered causes of loss for an insured crop only if you select additional coverage of not less than 65 percent of the approved yield indemnified at the 100 percent price election, or an equivalent coverage as established by FCIC, and you have purchased the same or a higher dollar amount of coverage for hail and fire from us or any other source.  If you elected a whole-farm unit, you may exclude hail and fire coverage only if allowed by the Special Provisions.

(k) The applicable premium rate, or formula to calculate the premium rate, and transitional yield will be those contained in the actuarial documents except, in the case of high-risk land, a written agreement may be requested to change such transitional yield or premium rate.

(l) Notwithstanding any other provision, if you qualify as a beginning farmer or rancher and were previously involved in a farming or ranching operation, including involvement in the decision-making or physical involvement in the production of the crop or livestock on the farm, for any acreage obtained by you, you may receive a yield that is the higher of:

(1) The actual production history of the previous producer of the crop or livestock on the acreage you were previously involved with; or

(2) Your actual production history.

**4.   Contract Changes.**

(a) We may change the terms of your coverage under this policy from year to year.

(b) Any changes in policy provisions, amounts of insurance, premium rates, program dates, price elections or the Commodity Exchange Price Provisions, if applicable, can be viewed on RMA's website not later than the contract change date contained in the Crop Provisions (except as allowed herein or as specified in section 3).  We may only revise this information after the contract change date to correct clear errors (*e.g.*, the price for oats was announced at $25.00 per bushel instead of $2.50 per bushel or the final planting date should be May 10 but the final planting date in the Special Provisions states August 10).

(c) After the contract change date, all changes specified in section 4(b) will also be available upon request from your crop insurance agent.  You will be provided, in writing, a copy of the changes to the Basic Provisions, Crop Provisions, Commodity Exchange Price Provisions, if applicable, and Special Provisions not later than 30 days prior to the cancellation date for the insured crop.  If available from us, you may elect to receive these documents and changes electronically.  Acceptance of the changes will be conclusively presumed in the absence of notice from you to change or cancel your insurance coverage.

**5.   Exclusion of Yields.**

If provided in the actuarial documents, you may elect to exclude any actual yield for any crop year when FCIC determines for a county, or its contiguous counties, the per planted acre yield was at least 50 percent below the simple average of the per planted acre yield for the crop in the county for the previous 10 consecutive crop years.

**6.   Report of Acreage.**

(a) An annual acreage report must be submitted to us on our form for each insured crop in the county on or before the acreage reporting date contained in the Special Provisions, except as follows:

(1) If you insure multiple crops with us that have final planting dates on or after August 15 but before December 31, you must submit an acreage report for all such crops on or before the latest applicable acreage reporting date for such crops; and

(2) If you insure multiple crops with us that have final planting dates on or after December 31 but before August 15, you must submit an acreage report for all such crops on or before the latest applicable acreage reporting date for such crops.

(3) Notwithstanding the provisions in sections 6(a)(1) and (2):

(i) If the Special Provisions designate separate planting periods for a crop, you must submit an acreage report for each planting period on or before the acreage reporting date contained in the Special Provisions for the planting period;

(ii) If planting of the insured crop continues after the final planting date or you are prevented from planting during the late planting period, the acreage reporting date will be the later of:

(A) The acreage reporting date contained in the Special Provisions;

(B) The date determined in accordance with sections (a)(1) or (2); or

(C) Five days after the end of the late planting period for the insured crop, if applicable; and

(iii) If you plant the insured crop on or within five days prior to the final planting date and the final planting date is five or fewer days prior to the acreage reporting date, you must submit an acreage report no later than five days after the acreage reporting date (for example, if the final planting date contained in the Special Provisions is July 10, the acreage reporting date contained in the Special Provisions is July 15 and you plant the insured crop on July 9, you have until July 20 to submit an acreage report for the insured crop).

(b) If you do not have a share in an insured crop in the county for the crop year, you must submit an acreage report, on or before the acreage reporting date, so indicating.

(c) Your acreage report must include the following information, if applicable:

(1) The amount of acreage of the crop in the county (insurable and not insurable) in which you have a share and the date the insured crop was planted on the unit as follows:

   (i) The last date any timely planted acreage was planted and the number of acres planted by such date; and

   (ii) The date of planting and the number of acres planted per day for acreage planted during the late planting period (If you fail to report the number of acres planted on a daily basis, all acreage planted in the late planting period will be presumed to have been planted on the last day planting took place in the late planting period for the purposes of section 16);

(2) Your share at the time coverage begins;

(3) The practice;

(4) The type; and

(5) The land identifier for the crop acreage (*e.g.*, legal description, FSA farm number or common land unit number if provided to you by FSA, etc.) as required on our form.

(d) Regarding the ability to revise an acreage report you have submitted to us:

(1) For planted acreage, you cannot revise any information pertaining to the planted acreage after the acreage reporting date without our consent (Consent may only be provided when no cause of loss has occurred; our appraisal has determined that the insured crop will produce at least 90 percent of the yield used to determine your guarantee or the amount of insurance for the unit (including reported and unreported acreage), except when there are unreported units (see section 6(f)); the information on the acreage report is clearly transposed; you provide adequate evidence that we or someone from USDA have committed an error regarding the information on your acreage report; or if expressly permitted by the policy);

(2) For prevented planting acreage:

   (i) On or before the acreage reporting date, you can change any information on any initially submitted acreage report, except as provided in section 6(d)(2)(iii) (*e.g.*, you can correct the reported share, add acreage of the insured crop that was prevented from being planted, etc.);

   (ii) After the acreage reporting date, you cannot revise any information on the acreage report (*e.g.*, if you have failed to report prevented planting acreage on or before the acreage reporting date, you cannot revise it after the acreage reporting date to include prevented planting acreage) but we will revise information that is clearly transposed or you provide adequate evidence that we or someone from USDA have committed an error regarding the information on your acreage report; and

   (iii) You cannot revise your initially submitted acreage report at any time to change the insured crop, or type, that was reported as prevented from being planted;

(3) You may request an acreage measurement from FSA or a business that provides such measurement service prior to the acreage reporting date, submit documentation of such request and an acreage report with estimated acreage by the acreage reporting date, and if the acreage measurement shows the estimated acreage was incorrect, we will revise your acreage report to reflect the correct acreage:

   (i) If an acreage measurement is only requested for a portion of the acreage within a unit, you must separately designate the acreage for which an acreage measurement has been requested;

   (ii) If an acreage measurement is not provided to us by the time we receive a notice of loss, we may:

     (A) Defer finalization of the claim until the measurement is completed, and:

       (*1*) Make all necessary loss determinations, except the acreage measurement; and

       (*2*) Finalize the claim in accordance with applicable policy provisions after you provide the acreage measurement to us (If you fail to provide the measurement, your claim will not be paid); or

     (B) Elect to measure the acreage, and:

       (*1*) Finalize your claim in accordance with applicable policy provisions; and

       (*2*) Estimated acreage under this section will not be accepted from you for any subsequent acreage report; and

   (iii) Premium will still be due in accordance with sections 2(e) and 7. If the acreage is not measured as specified in section 6(d)(3)(ii) and the acreage measurement is not provided to us at least 15 days prior to the premium billing date, your premium will be based on the estimated acreage and will be revised, if necessary, when the acreage measurement is provided. If the acreage measurement is not provided by the termination date, you will be precluded from providing any estimated acreage for all subsequent crop years.

(4) If there is an irreconcilable difference between:

   (i) The acreage measured by FSA or a measuring service and our on-farm measurement, our on-farm measurement will be used; or

   (ii) The acreage measured by a measuring service, other than our on-farm measurement, and FSA, the FSA measurement will be used; and

(5) If the acreage report has been revised in accordance with section 6(d)(1), (2), or (3), the information on the initial acreage report will not be considered misreported for the purposes of section 6(g).

(e) We may elect to determine all premiums and indemnities based on the information you submit on the acreage report or upon the factual circumstances we determine to have existed, subject to the provisions contained in section 6(g).

(f) If you do not submit an acreage report by the acreage reporting date, or if you fail to report all units, we may elect to determine by unit the insurable crop acreage, share, type and practice, or to deny liability on such units.  If we deny liability for the unreported units, your share of any production from the unreported units will be allocated, for loss purposes only, as production to count to the reported units in proportion to the liability on each reported unit.  However, such production will not be allocated to prevented planting acreage or otherwise affect any prevented planting payment.

(g) You must provide all required reports and you are responsible for the accuracy of all information contained in those reports.  You should verify the information on all such reports prior to submitting them to us.

(1) Except as provided in section 6(g)(2), if you submit information on any report that is different than what is determined to be correct and such information results in:

(i) A lower liability than the actual liability determined, the production guarantee or amount of insurance on the unit will be reduced to an amount consistent with the reported information (In the event the insurable acreage is under-reported for any unit, all production or value from insurable acreage in that unit will be considered production or value to count in determining the indemnity); or

(ii) A higher liability than the actual liability determined, the information contained in the acreage report will be revised to be consistent with the correct information.

(2) If your share is misreported and the share is:

(i) Under-reported, any claim will be determined using the share you reported; or

(ii) Over-reported, any claim will be determined using the share we determine to be correct.

(h) If we discover you have incorrectly reported any information on the acreage report for any crop year, you may be required to provide documentation in subsequent crop years substantiating your report of acreage for those crop years, including, but not limited to, an acreage measurement service at your own expense.  If the correction of any misreported information would affect an indemnity, prevented planting payment or replanting payment that was paid in a prior crop year, such claim will be adjusted and you will be required to repay any overpaid amounts.

(i) Errors in reporting units may be corrected by us at the time of adjusting a loss to reduce our liability and to conform to applicable unit division guidelines.

**7. Annual Premium and Administrative Fees.**

(a) The annual premium is earned and payable at the time coverage begins.  You will be billed for the premium and administrative fee not earlier than the premium billing date specified in the Special Provisions.

(b) Premium or administrative fees owed by you will be offset from an indemnity or prevented planting payment due you in accordance with section 2(e).

(c) The annual premium amount is determined, as applicable, by either:

(1) Multiplying the production guarantee per acre times your price election or your projected price, as applicable, times the premium rate, times the insured acreage, times your share at the time coverage begins, and times any premium adjustment percentages that may apply; or

(2) Multiplying your amount of insurance per acre times the premium rate, times the insured acreage, times your share at the time coverage begins, and times any premium adjustment percentages that may apply.

(d) The information needed to determine the premium rate and any premium adjustment percentages that may apply are contained in the actuarial documents or an approved written agreement.

(e) In addition to the premium charged:

(1) You, unless otherwise authorized in 7 CFR part 400, must pay an administrative fee each crop year of $30 per crop per county for all levels of coverage in excess of catastrophic risk protection.

(2) The administrative fee must be paid no later than the time premium is due.

(3) Payment of an administrative fee will not be required if you file a bona fide zero acreage report on or before the acreage reporting date for the crop.  If you falsely file a zero acreage report you may be subject to criminal and administrative sanctions.

(4) The administrative fee will be waived if you request it and:

(i) You qualify as a beginning farmer or rancher;

(ii) You qualify as a limited resource farmer; or

(iii) You were insured prior to the 2005 crop year or for the 2005 crop year and your administrative fee was waived for one or more of those crop years because you qualified as a limited resource farmer under a policy definition previously in effect, and you remain qualified as a limited resource farmer under the definition that was in effect at the time the administrative fee was waived.

(5) Failure to pay the administrative fees when due may make you ineligible for certain other USDA benefits.

(f)  If the amount of premium (gross premium less premium subsidy paid on your behalf by FCIC) and administrative fee you are required to pay for any acreage exceeds the liability for the acreage, coverage for those acres will not be provided (no premium or administrative fee will be due and no indemnity will be paid for such acreage).

(g)  If you qualify as a beginning farmer or rancher, your premium subsidy will be 10 percentage points greater than the premium subsidy that you would otherwise receive, unless otherwise specified in the Special Provisions.

(h)  You will be ineligible for any premium subsidy paid on your behalf by FCIC for any policy issued by us if:

(1)  USDA determines you have committed a violation of the highly erodible land conservation or wetland conservation provisions of 7 CFR part 12 as amended by the Agricultural Act of 2014; or

(2)  You have not filed form AD-1026 with FSA for the reinsurance year by the premium billing date.

(i)  Notwithstanding section 7(h)(2), you may be eligible for premium subsidy without having a timely filed form AD-1026.

(A)  For the initial reinsurance year if you certify by the premium billing date for your policy that you meet the qualifications as outlined in FCIC approved procedures for producers who are new to farming, new to crop insurance, a new entity, or have not previously been required to file form AD-1026; or

(B)  If FSA approves relief for failure to timely file due to circumstances beyond your control or failure to timely provide adequate information to complete form AD-1026 in accordance with the provisions contained in 7 CFR part 12.

(ii)  To be eligible for premium subsidy paid on your behalf by FCIC, it is your responsibility to assure you meet all the requirements for:

(A)  Compliance with the conservation provisions specified in section 7(h)(1) of this section; and

(B)  Filing form AD-1026 to be properly identified as in compliance with the conservation provisions specified in section 7(h)(1) of this section.

**8.  Insured Crop.**

(a)  The insured crop will be that shown on your accepted application and as specified in the Crop Provisions or Special Provisions and must be grown on insurable acreage.

(b)  A crop which will NOT be insured will include, but will not be limited to, any crop:

(1)  That is not grown on planted acreage (except for the purposes of prevented planting coverage), or that is a type, class or variety or where the conditions under which the crop is planted are not generally recognized for the area (For example, where agricultural experts determine that planting a non-irrigated corn crop after a failed small grain

crop on the same acreage in the same crop year is not appropriate for the area);

(2)  For which the information necessary for insurance (price election, amount of insurance, projected price and harvest price, as applicable, premium rate, etc.) is not included in the actuarial documents, unless such information is provided by a written agreement in accordance with section 18;

(3)  That is a volunteer crop;

(4)  Planted following the same crop on the same acreage and the first planting of the crop has been harvested in the same crop year unless specifically permitted by the Crop Provisions or the Special Provisions (For example, the second planting of grain sorghum would not be insurable if grain sorghum had already been planted and harvested on the same acreage during the crop year);

(5)  That is planted for the development or production of hybrid seed or for experimental purposes, unless permitted by the Crop Provisions or by written agreement to insure such crop; or

(6)  That is used solely for wildlife protection or management.  If the lease states that specific acreage must remain unharvested, only that acreage is uninsurable.  If the lease specifies that a percentage of the crop must be left unharvested, your share will be reduced by such percentage.

(c)  Although certain policy documents may state that a crop type, class, variety or practice is not insurable, it does not mean all other crop types, classes, varieties or practices are insurable.  To be insurable the crop type, class, variety and practice must meet all the conditions in this section.

**9.  Insurable Acreage.**

(a)  All acreage planted to the insured crop in the county in which you have a share:

(1)  Except as provided in section 9(a)(2), is insurable if the acreage has been planted and harvested or insured (including insured acreage that was prevented from being planted) in any one of the three previous crop years.  Acreage that has not been planted and harvested (grazing is not considered harvested for the purposes of section 9(a)(1)) or insured in at least one of the three previous crop years may still be insurable if:

(i)  Such acreage was not planted:

(A)  In at least two of the three previous crop years to comply with any other USDA program;

(B)  Due to the crop rotation, the acreage would not have been planted in the previous three years (e.g., a crop rotation of corn, soybeans, and alfalfa; and the alfalfa remained for four years before the acreage was planted to corn again); or

(C)  Because a perennial tree, vine, or bush crop was on the acreage in at least two of the previous three crop years;

(ii) Such acreage constitutes five percent or less of the insured planted acreage in the unit;

(iii) Such acreage was not planted or harvested because it was pasture or rangeland, the crop to be insured is also pasture or rangeland, and the Crop Provisions, Special Provisions, or a written agreement specifically allow insurance for such acreage; or

(iv) The Crop Provisions, Special Provisions, or a written agreement specifically allow insurance for such acreage; or

(2) Is not insurable if:

(i) The only crop that has been planted and harvested on the acreage in the three previous crop years is a cover, hay (except wheat harvested for hay) or forage crop (except insurable silage). However, such acreage may be insurable only if:

(A) The crop to be insured is a hay or forage crop and the Crop Provisions, Special Provisions, or a written agreement specifically allow insurance for such acreage; or

(B) The hay or forage crop was part of a crop rotation;

(ii) The acreage has been strip-mined. However, such acreage may be insurable only if:

(A) An agricultural commodity, other than a cover, hay (except wheat harvested for hay), or forage crop (except insurable silage) has been harvested from the acreage for at least five crop years after the strip-mined land was reclaimed; or

(B) A written agreement specifically allows insurance for such acreage;

(iii) The actuarial documents do not provide the information necessary to determine the premium rate, unless insurance is allowed by a written agreement;

(iv) The insured crop is damaged and it is practical to replant the insured crop, but the insured crop is not replanted;

(v) The acreage is interplanted, unless insurance is allowed by the Crop Provisions;

(vi) The acreage is otherwise restricted by the Crop Provisions or Special Provisions;

(vii) The acreage is planted in any manner other than as specified in the policy provisions for the crop unless a written agreement specifically allows insurance for such planting;

(viii) The acreage is of a second crop, if you elect not to insure such acreage when an indemnity for a first insured crop may be subject to reduction in accordance with the provisions of section 15 and you intend to collect an indemnity payment that is equal to 100 percent of the insurable loss for the first insured crop acreage. This election

must be made on a first insured crop unit basis (e.g., if the first insured crop unit contains 40 planted acres that may be subject to an indemnity reduction, then no second crop can be insured on any of the 40 acres). In this case:

(A) If the first insured crop is insured under this policy, you must provide written notice to us of your election not to insure acreage of a second crop at the time the first insured crop acreage is released by us (if no acreage in the first insured crop unit is released, this election must be made by the earlier of the acreage reporting date for the second crop or when you sign the claim for indemnity for the first insured crop) or, if the first insured crop is insured under Area Risk Protection Insurance (7 CFR part 407), this election must be made before the second crop insured under this policy is planted, and if you fail to provide such notice, the second crop acreage will be insured in accordance with the applicable policy provisions and you must repay any overpaid indemnity for the first insured crop;

(B) In the event a second crop is planted and insured with a different insurance provider, or planted and insured by a different person, you must provide written notice to each insurance provider that a second crop was planted on acreage on which you had a first insured crop; and

(C) You must report the crop acreage that will not be insured on the applicable acreage report; or

(ix) The acreage is of a crop planted following a second crop or following an insured crop that is prevented from being planted after a first insured crop, unless it is a practice that is generally recognized by agricultural experts or organic agricultural experts for the area to plant three or more crops for harvest on the same acreage in the same crop year, and additional coverage insurance provided under the authority of the Act is offered for the third or subsequent crop in the same crop year. Insurance will only be provided for a third or subsequent crop as follows:

(A) You must provide records acceptable to us that show:

(1) You have produced and harvested the insured crop following two other crops harvested on the same acreage in the same crop year in at least two of the last four years in which you produced the insured crop; or

(18 of 42)

(2) The applicable acreage has had three or more crops produced and harvested on it in the same crop year in at least two of the last four years in which the insured crop was grown on the acreage; and

(B) The amount of insurable acreage will not exceed 100 percent of the greatest number of acres for which you provide the records required in section 9(a)(2)(ix)(A).

(b) If insurance is provided for an irrigated practice, you must report as irrigated only that acreage for which you have adequate facilities and adequate water, or the reasonable expectation of receiving adequate water at the time coverage begins, to carry out a good irrigation practice. If you knew or had reason to know that your water may be reduced before coverage begins, no reasonable expectation exists.

(c) Notwithstanding the provisions in section 8(b)(2), if acreage is irrigated and a premium rate is not provided for an irrigated practice, you may either report and insure the irrigated acreage as "non-irrigated," or report the irrigated acreage as not insured (If you elect to insure such acreage under a non-irrigated practice, your irrigated yield will only be used to determine your approved yield if you continue to use a good irrigation practice. If you do not use a good irrigation practice, you will receive a yield determined in accordance with section 3(h)(3)).

(d) We may restrict the amount of acreage that we will insure to the amount allowed under any acreage limitation program established by the United States Department of Agriculture if we notify you of that restriction prior to the sales closing date.

(e) Except as provided in section 9(f), in the states of Iowa, Minnesota, Montana, Nebraska, North Dakota, or South Dakota, during the first four crop years of planting on native sod acreage that has been tilled after February 7, 2014, such acreage may be insured if the requirements of section 9(a) have been met but will:

(1) Notwithstanding the provisions in section 3 regarding your production guarantee, receive a production guarantee (per acre) that is based on 65 percent of the transitional yield for the county; and

(2) For additional coverage policies, receive a premium subsidy that is 50 percentage points less than would otherwise be provided on acreage not qualifying as native sod. If the premium subsidy applicable to these acres is less than 50 percent before the reduction, you will receive no premium subsidy.

(f) Section 9(e) is not applicable to cumulative native sod acreage that is five acres or less in the county.

**10. Share Insured.**

(a) Insurance will attach:

(1) Only if the person completing the application has a share in the insured crop; and

(2) Only to that person's share, except that insurance may attach to another person's share of the

insured crop if the other person has a share of the crop and:

(i) The application clearly states the insurance is requested for a person other than an individual (e.g., a partnership or a joint venture); or

(ii) The application clearly states you as landlord will insure your tenant's share, or you as tenant will insure your landlord's share. If you as a landlord will insure your tenant's share, or you as a tenant will insure your landlord's share, you must provide evidence of the other party's approval (lease, power of attorney, etc.) and such evidence will be retained by us:

(A) You also must clearly set forth the percentage shares of each person on the acreage report; and

(B) For each landlord or tenant, you must report the landlord's or tenant's social security number, employer identification number, or other identification number we assigned for the purposes of this policy, as applicable.

(b) With respect to your share:

(1) We will consider to be included in your share under your policy, any acreage or interest reported by or for:

(i) Your spouse, unless such spouse can prove he/she has a separate farming operation, which includes, but is not limited to, separate land (transfers of acreage from one spouse to another is not considered separate land), separate capital, separate inputs, separate accounting, and separate maintenance of proceeds; or

(ii) Your child who resides in your household or any other member of your household, unless such child or other member of the household can demonstrate such person has a separate share in the crop (Children who do not reside in your household are not included in your share); and

(2) If it is determined that the spouse, child or other member of the household has a separate policy but does not have a separate farming operation or share of the crop, as applicable:

(i) The policy for one spouse or child or other member of the household will be void and the policy remaining in effect will be determined in accordance with section 22(a)(1) and (2);

(ii) The acreage or share reported under the policy that is voided will be included under the remaining policy; and

(iii) No premium will be due and no indemnity will be paid for the voided policy.

(c) Acreage rented for a percentage of the crop, or a lease containing provisions for **BOTH** a minimum payment (such as a specified amount of cash,

bushels, pounds, etc.,) **AND** a crop share will be considered a crop share lease.

(d) Acreage rented for cash, or a lease containing provisions for **EITHER** a minimum payment **OR** a crop share (such as a 50/50 share or $100.00 per acre, whichever is greater) will be considered a cash lease.

**11. Insurance Period.**

(a) Except for prevented planting coverage (see section 17), coverage begins on each unit or part of a unit at the later of:

    (1) The date we accept your application (For the purposes of this paragraph, the date of acceptance is the date that you submit a properly executed application in accordance with section 2);

    (2) The date the insured crop is planted; or

    (3) The calendar date contained in the Crop Provisions for the beginning of the insurance period.

(b) Coverage ends on each unit or part of a unit at the earliest of:

    (1) Total destruction of the insured crop;

    (2) Harvest of the insured crop;

    (3) Final adjustment of a loss on a unit;

    (4) The calendar date contained in the Crop Provisions or Special Provisions for the end of the insurance period;

    (5) Abandonment of the insured crop; or

    (6) As otherwise specified in the Crop Provisions.

(c) Except as provided in the Crop Provisions or applicable endorsement, in addition to the requirements of section 11(b), coverage ends on any acreage within a unit once any event specified in section 11(b) occurs on that acreage. Coverage only remains in effect on acreage that has not been affected by an event specified in section 11(b).

**12. Causes of Loss.**

Insurance is provided only to protect against unavoidable, naturally occurring events. A list of the covered naturally occurring events is contained in the applicable Crop Provisions. All other causes of loss, including but not limited to the following, are NOT covered:

(a) Any act by any person that affects the yield, quality or price of the insured crop (*e.g.*, chemical drift, fire, terrorism, etc.);

(b) Failure to follow recognized good farming practices for the insured crop;

(c) Water that is contained by or within structures that are designed to contain a specific amount of water, such as dams, locks or reservoir projects, etc., on any acreage when such water stays within the designed limits (For example, a dam is designed to contain water to an elevation of 1,200 feet but you plant a crop on acreage at an elevation of 1,100 feet. A storm causes the water behind the dam to rise to an elevation of 1,200 feet. Under such circumstances, the resulting damage would not be caused by an insurable cause of loss. However, if you planted on acreage that was above 1,200 feet elevation, any damage caused by water that exceeded that elevation would be caused by an insurable cause of loss);

(d) Failure or breakdown of the irrigation equipment or facilities, or the inability to prepare the land for irrigation using your established irrigation method (*e.g.*, furrow irrigation), unless the failure, breakdown or inability is due to a cause of loss specified in the Crop Provisions.

    (1) You must make all reasonable efforts to restore the equipment or facilities to proper working order within a reasonable amount of time unless we determine it is not practical to do so.

    (2) Cost will not be considered when determining whether it is practical to restore the equipment or facilities;

(e) Failure to carry out a good irrigation practice for the insured crop, if applicable; or

(f) Any cause of loss that results in damage that is not evident or would not have been evident during the insurance period, including, but not limited to, damage that only becomes evident after the end of the insurance period unless expressly authorized in the Crop Provisions. Even though we may not inspect the damaged crop until after the end of the insurance period, damage due to insured causes that would have been evident during the insurance period will be covered.

**13. Replanting Payment.**

(a) If allowed by the Crop Provisions, a replanting payment may be made on an insured crop replanted after we have given consent and the acreage replanted is at least the lesser of 20 acres or 20 percent of the insured planted acreage for the unit (as determined on the final planting date or within the late planting period if a late planting period is applicable). If the crops to be replanted are in a whole-farm unit, the 20 acres or 20 percent requirement is to be applied separately to each crop to be replanted in the whole-farm unit.

(b) No replanting payment will be made on acreage:

    (1) On which our appraisal establishes that production will exceed the level set by the Crop Provisions;

    (2) Initially planted prior to the earliest planting date established by the Special Provisions; or

    (3) On which one replanting payment has already been allowed for the crop year.

(c) The replanting payment per acre will be:

    (1) The lesser of your actual cost for replanting or the amount specified in the Crop Provisions or Special Provisions; or

    (2) If the Crop Provisions or Special Provisions specify that your actual cost will not be used to determine your replanting payment, the amount determined in accordance with the Crop Provisions or Special Provisions.

(d) No replanting payment will be paid if we determine it is not practical to replant.

**14. Duties in the Event of Damage, Loss, Abandonment, Destruction, or Alternative Use of Crop or Acreage.**

Your Duties:

(a) In case of damage or loss of production or revenue to any insured crop, you must protect the crop from further damage by providing sufficient care.

NHF1-524 Policy 000032

(b)  Notice provisions:
 (1)  For a planted crop, when there is damage or loss of production, you must give us notice, by unit, within 72 hours of your initial discovery of damage or loss of production (but not later than 15 days after the end of the insurance period, even if you have not harvested the crop).
 (2)  For crops for which revenue protection is elected, if there is no damage or loss of production, you must give us notice not later than 45 days after the latest date the harvest price is released for any crop in the unit where there is a revenue loss.
 (3)  In the event you are prevented from planting an insured crop that has prevented planting coverage, you must notify us within 72 hours after:
  (i)   The final planting date, if you do not intend to plant the insured crop during the late planting period or if a late planting period is not applicable; or
  (ii)  You determine you will not be able to plant the insured crop within any applicable late planting period.
 (4)  All notices required in this section that must be received by us within 72 hours may be made by telephone or in person to your crop insurance agent but must be confirmed in writing within 15 days.
 (5)  If you fail to comply with these notice requirements, any loss or prevented planting claim will be considered solely due to an uninsured cause of loss for the acreage for which such failure occurred, unless we determine that we have the ability to accurately adjust the loss. If we determine that we do not have the ability to accurately adjust the loss:
  (i)   For any prevented planting claim, no prevented planting coverage will be provided and no premium will be owed or prevented planting payment will be paid; or
  (ii)  For any claim for indemnity, no indemnity will be paid but you will still be required to pay all premiums owed.
(c)  Representative samples:
 (1)  If representative samples are required by the Crop Provisions, you must leave representative samples of the unharvested crop intact:
  (i)   If you report damage less than 15 days before the time you will begin harvest or during harvest of the damaged unit; or
  (ii)  At any time when required by us.
 (2)  The samples must be left intact until we inspect them or until 15 days after completion of harvest on the remainder of the unit, whichever is earlier.
 (3)  Unless otherwise specified in the Crop Provisions or Special Provisions, the samples of the crop in each field in the unit must be 10 feet wide and extend the entire length of the rows, if the crop is planted in rows, or if the crop is not planted in rows, the longest dimension of the field.
 (4)  The period to retain representative samples may be extended if it is necessary to accurately determine the loss.  You will be notified in writing of any such extension.
(d)  Consent:
 (1)  You must obtain consent from us before, and notify us after you:
  (i)   Destroy any of the insured crop that is not harvested;
  (ii)  Put the insured crop to an alternative use;
  (iii) Put the acreage to another use; or
  (iv)  Abandon any portion of the insured crop.
 (2)  We will not give consent for any of the actions in section 14(d)(1)(i) through (iv) if it is practical to replant the crop or until we have made an appraisal of the potential production of the crop.
 (3)  Failure to obtain our consent will result in the assignment of an amount of production or value to count in accordance with the Settlement of Claim provisions of the applicable Crop Provisions.
(e)  Claims:
 (1)  Except as otherwise provided in your policy, you must submit a claim declaring the amount of your loss by the dates shown in section 14(e)(3), unless you:
  (i)   Request an extension in writing by such date and we agree to such request (Extensions will only be granted if the amount of the loss cannot be determined within such time period because the information needed to determine the amount of the loss is not available); or
  (ii)  Have harvested farm-stored grain production and elect, in writing, to delay measurement of your farm-stored production and settlement of any potential associated claim for indemnity (Extensions will be granted for this purpose up to 180 days after the end of the insurance period).
   (A)  For policies that require APH, if such extension continues beyond the date you are required to submit your production report, you will be assigned the previous year's approved yield as a temporary yield in accordance with applicable procedures.
   (B)  Any extension does not extend any date specified in the policy by which premiums, administrative fees, or other debts owed must be paid.
   (C)  Damage that occurs after the end of the insurance period (for example, while the harvested crop production is in storage) is not covered; and
 (2)  Failure to timely submit a claim or provide the required information necessary to determine the amount of the claim will result in no indemnity, prevented planting payment or replanting payment:
  (i)   Even though no indemnity or replanting payment is due, you will still be required to pay the premium due under the policy for the unit; or

(ii) Failure to timely submit a prevented planting claim will result in no prevented planting coverage and no premium will be due.

(3) You must submit a claim not later than:

(i) For policies other than revenue protection, 60 days after the date the insurance period ends for all acreage in the unit (When there is acreage in the unit where the insurance period ended on different dates, it is the last date the insurance period ends on the unit. For example, if a unit has corn acreage that was put to another use on July 15 and corn acreage where harvest was completed on September 30, the claim must be submitted not later than 60 days after September 30); or

(ii) For revenue protection, the later of:

(A) 60 days after the last date the harvest price is released for any crop in the unit; or

(B) The date determined in accordance with section 14(e)(3)(i).

(4) To receive any indemnity (or receive the rest of an indemnity in the case of acreage that is planted to a second crop), prevented planting payment or replanting payment, you must, if applicable:

(i) Provide:

(A) A complete harvesting, production, and marketing record of each insured crop by unit including separate records showing the same information for production from any acreage not insured.

(B) Records as indicated below if you insure any acreage that may be subject to an indemnity reduction as specified in section 15(e)(2):

(1) Separate records of production from such acreage for all insured crops planted on the acreage (*e.g.*, if you have an insurable loss on 10 acres of wheat and subsequently plant cotton on the same 10 acres, you must provide records of the wheat and cotton production on the 10 acres separate from any other wheat and cotton production that may be planted in the same unit). If you fail to provide separate records for such acreage, we will allocate the production of each crop to the acreage in proportion to our liability for the acreage; or

(2) If there is no loss on the unit that includes acreage of the second crop, no separate records need to be submitted for the second crop and you can receive the rest of the indemnity for the first insured crop.

(C) Any other information we may require to settle the claim.

(ii) Cooperate with us in the investigation or settlement of the claim, and, as often as we reasonably require:

(A) Show us the damaged crop;

(B) Allow us to remove samples of the insured crop; and

(C) Provide us with records and documents we request and permit us to make copies.

(iii) Establish:

(A) The total production or value received for the insured crop on the unit;

(B) That any loss occurred during the insurance period;

(C) That the loss was caused by one or more of the insured causes specified in the Crop Provisions; and

(D) That you have complied with all provisions of this policy.

(iv) Upon our request, or that of any USDA employee authorized to conduct investigations of the crop insurance program, submit to an examination under oath.

(5) Failure to comply with any requirement contained in section 14(e)(4) will result in denial of the claim and any premium will still be owed, unless the claim denied is for prevented planting.

Our Duties:

(f) If you have complied with all the policy provisions, we will pay your loss within 30 days after the later of:

(1) We reach agreement with you;

(2) Completion of arbitration, reconsideration of determinations regarding good farming practices or any other appeal that results in an award in your favor, unless we exercise our right to appeal such decision;

(3) Completion of any investigation by USDA, if applicable, of your current or any past claim for indemnity if no evidence of wrongdoing has been found (If any evidence of wrongdoing has been discovered, the amount of any indemnity, prevented planting or replant overpayment as a result of such wrongdoing may be offset from any indemnity or prevented planting payment owed to you); or

(4) The entry of a final judgment by a court of competent jurisdiction.

(g) In the event we are unable to pay your loss within 30 days, we will give you notice of our intentions within the 30-day period.

(h) We may defer the adjustment of a loss until the amount of loss can be accurately determined. We will not pay for additional damage resulting from your failure to provide sufficient care for the crop during the deferral period.

(i) We recognize and apply the loss adjustment procedures established or approved by the Federal Crop Insurance Corporation.

(j) For revenue protection, we may make preliminary indemnity payments for crop production losses prior to the release of the harvest price if you have not elected the harvest price exclusion.

(1) First, we may pay an initial indemnity based upon your projected price, in accordance with the applicable Crop Provisions provided that your production to count and share have been established; and

(2) Second, after the harvest price is released, and if it is not equal to the projected price, we will recalculate the indemnity payment and pay any additional indemnity that may be due.

**15. Production Included in Determining an Indemnity and Payment Reductions.**

(a) The total production to be counted for a unit will include all production determined in accordance with the policy.

(b) Appraised production will be used to calculate your claim if you are not going to harvest your acreage. Such appraisals may be conducted after the end of the insurance period. If you harvest the crop after the crop has been appraised:

(1) You must provide us with the amount of harvested production (If you fail to provide verifiable records of harvested production, no indemnity will be paid and you will be required to return any previously paid indemnity for the unit that was based on an appraised amount of production); and

(2) If the harvested production exceeds the appraised production, claims will be adjusted using the harvested production, and you will be required to repay any overpaid indemnity; or

(3) If the harvested production is less than the appraised production, and:

   (i) You harvest after the end of the insurance period, your appraised production will be used to adjust the loss unless you can prove that no additional causes of loss or deterioration of the crop occurred after the end of the insurance period; or

   (ii) You harvest before the end of the insurance period, your harvested production will be used to adjust the loss.

(c) If you elect to exclude hail and fire as insured causes of loss and the insured crop is damaged by hail or fire, appraisals will be made as described in our form used to exclude hail and fire.

(d) The amount of an indemnity that may be determined under the applicable provisions of your policy may be reduced by an amount, determined in accordance with the Crop Provisions or Special Provisions, to reflect out-of-pocket expenses that were not incurred by you as a result of not planting, caring for, or harvesting the crop. Indemnities paid for acreage prevented from being planted will be based on a reduced guarantee as provided for in the policy and will not be further reduced to reflect expenses not incurred.

(e) With respect to acreage where you have suffered an insurable loss to planted acreage of your first insured crop in the crop year, except in the case of double cropping described in section 15(h):

(1) You may elect to not plant or to plant and not insure a second crop on the same acreage for

harvest in the same crop year and collect an indemnity payment that is equal to 100 percent of the insurable loss for the first insured crop; or

(2) You may elect to plant and insure a second crop on the same acreage for harvest in the same crop year (you will pay the full premium and, if there is an insurable loss to the second crop, receive the full amount of indemnity that may be due for the second crop, regardless of whether there is a subsequent crop planted on the same acreage) and:

   (i) Collect an indemnity payment that is 35 percent of the insurable loss for the first insured crop;

   (ii) Be responsible for premium that is 35 percent of the premium that you would otherwise owe for the first insured crop; and

   (iii) If the second crop does not suffer an insurable loss:

     (A) Collect an indemnity payment for the other 65 percent of insurable loss that was not previously paid under section 15(e)(2)(i); and

     (B) Be responsible for the remainder of the premium for the first insured crop that you did not pay under section 15(e)(2)(ii).

(f) With respect to acreage where you were prevented from planting the first insured crop in the crop year, except in the case of double cropping described in section 15(h):

(1) If a second crop is not planted on the same acreage for harvest in the same crop year, you may collect a prevented planting payment that is equal to 100 percent of the prevented planting payment for the acreage for the first insured crop; or

(2) If a second crop is planted on the same acreage for harvest in the same crop year (you will pay the full premium and, if there is an insurable loss to the second crop, receive the full amount of indemnity that may be due for the second crop, regardless of whether there is a subsequent crop planted on the same acreage) and:

   (i) Provided the second crop is not planted on or before the final planting date or during the late planting period (as applicable) for the first insured crop, you may collect a prevented planting payment that is 35 percent of the prevented planting payment for the first insured crop; and

   (ii) Be responsible for premium that is 35 percent of the premium that you would otherwise owe for the first insured crop.

(g) The reduction in the amount of indemnity or prevented planting payment and premium specified in sections 15(e) and 15(f), as applicable, will apply:

(1) Notwithstanding the priority contained in the Agreement to Insure section, which states that the Crop Provisions have priority over the Basic Provisions when a conflict exists, to any premium owed or indemnity or prevented planting payment

(23 of 42)

made in accordance with the Crop Provisions, and any applicable endorsement.

(2) Even if another person plants the second crop on any acreage where the first insured crop was planted or was prevented from being planted, as applicable.

(3) For prevented planting only:

   (i) If a volunteer crop or cover crop is hayed or grazed from the same acreage, after the late planting period (or after the final planting date if a late planting period is not applicable) for the first insured crop in the same crop year, or is otherwise harvested anytime after the late planting period (or after the final planting date if a late planting period is not applicable); or

   (ii) If you receive cash rent for any acreage on which you were prevented from planting.

(h) You may receive a full indemnity, or a full prevented planting payment for a first insured crop when a second crop is planted on the same acreage in the same crop year, if each of the following conditions are met, regardless of whether or not the second crop is insured or sustains an insurable loss:

(1) Planting two or more crops for harvest in the same crop year in the area is generally recognized by agricultural experts or organic agricultural experts;

(2) The second or more crops are customarily planted after the first insured crop for harvest on the same acreage in the same crop year in the area;

(3) Additional coverage insurance offered under the authority of the Act is available in the county on the two or more crops that are double cropped;

(4) In the case of prevented planting, the second crop is not planted on or prior to the final planting date or, if applicable, prior to the end of the late planting period for the first insured crop;

(5) You provide records, acceptable to us, of acreage and production specific to the double cropped acreage proving that:

   (i) You have double cropped acreage in at least two of the last four crop years in which the first insured crop was planted and incur an insurable loss or the first insured crop is prevented from being planted and a second crop is planted. If you acquired additional land for the current crop year you may apply the percentage of acres that you have previously double cropped to the total cropland acres that you are farming this year (if greater) using the following calculation:

      (A) Determine the number of acres of the first insured crop that were double cropped in each of the years for which double cropping records are provided (For example, records are provided showing: 100 acres of wheat planted in 2016 and 50 of those acres were double cropped with soybeans; and 100

acres of wheat planted in 2017 and 70 of those acres were double cropped with soybeans);

      (B) Divide each result of section 15(h)(5)(i)(A) by the number of acres of the first insured crop that were planted in each respective year (In the example above, 50 divided by 100 equals 50 percent of the first insured crop acres that were double cropped in 2016 and 70 divided by 100 equals 70 percent of the first insured crop acres that were double cropped in 2017);

      (C) Add the results of section 15(h)(5)(i)(B) and divide by the number of years the first insured crop was double cropped (In the example above, 50 plus 70 equals 120 divided by 2 equals 60 percent); and

      (D) Multiply the result of 15(h)(5)(i)(C) by the number of insured acres of the first insured crop (In the example above, 60 percent multiplied by the number of wheat acres insured in 2018); or

   (ii) The applicable acreage was double cropped (by one or more other producers, and the producer(s) will allow you to use their records) for at least two of the last four crop years in which the first insured crop was grown on it; and

(6) If you do not have records of acreage and production specific to the double cropped acreage, as required in section 15(h)(5), but instead have records that combine production from acreage you double cropped with records of production from acreage you did not double crop, we will allocate the first and second crop production to the specific acreage in proportion to the liability for the acreage that was and was not double cropped.

(i) If you provided acceptable records in accordance with section 15(h), your double cropping history is based on the acres historically cropped:

(1) If the records you provided are from acreage you double cropped in at least two of the last four crop years, you may apply your history of double cropping to any acreage of the insured crop in the county (*e.g.*, if you have double cropped 100 acres of wheat and soybeans in the county and you acquire an additional 100 acres in the county, you can apply that history of double cropped acreage to any of the 200 acres in the county as long as it does not exceed 100 acres); or

(2) If the records you provided are from acreage that one or more other producers double cropped in at least two of the last four crop years, you may only use the history of double cropping for the same physical acres from which double cropping records were provided (*e.g.*, if a neighbor has double cropped 100 acres of wheat and soybeans in the county and you acquire your neighbor's 100 double cropped acres and an

NHF1-524 Policy 000036

additional 100 acres in the county, you can only apply your neighbor's history of double cropped acreage to the same 100 acres that your neighbor double cropped).

(j) If any Federal or State agency requires destruction of any insured crop or crop production, as applicable, because it contains levels of a substance, or has a condition, that is injurious to human or animal health in excess of the maximum amounts allowed by the Food and Drug Administration, other public health organizations of the United States or an agency of the applicable State, you must destroy the insured crop or crop production, as applicable, and certify that such insured crop or crop production has been destroyed prior to receiving an indemnity payment. Failure to destroy the insured crop or crop production, as applicable, will result in you having to repay any indemnity paid and you may be subject to administrative sanctions in accordance with section 515(h) of the Act and 7 CFR part 400, subpart R, and any applicable civil or criminal sanctions.

## 16. Late Planting.

Unless limited by the Crop Provisions, insurance will be provided for acreage planted to the insured crop after the final planting date in accordance with the following:

(a) The production guarantee or amount of insurance for each acre planted to the insured crop during the late planting period will be reduced by 1 percent per day for each day planted after the final planting date.

(b) Acreage planted after the late planting period (or after the final planting date for crops that do not have a late planting period) may be insured as follows:

    (1) The production guarantee or amount of insurance for each acre planted as specified in this subsection will be determined by multiplying the production guarantee or amount of insurance that is provided for acreage of the insured crop that is timely planted by the prevented planting coverage level percentage you elected, or that is contained in the Crop Provisions if you did not elect a prevented planting coverage level percentage;

    (2) Planting on such acreage must have been prevented by the final planting date (or during the late planting period, if applicable) by an insurable cause occurring within the insurance period for prevented planting coverage; and

    (3) All production from insured acreage as specified in this section will be included as production to count for the unit.

(c) The premium amount for insurable acreage specified in this section will be the same as that for timely planted acreage. If the amount of premium you are required to pay (gross premium less our subsidy) for such acreage exceeds the liability, coverage for those acres will not be provided (no premium will be due and no indemnity will be paid).

(d) Any acreage on which an insured cause of loss is a material factor in preventing completion of planting, as specified in the definition of "planted acreage" (*e.g.*, seed is broadcast on the soil surface but cannot be incorporated) will be considered as acreage planted

after the final planting date and the production guarantee will be calculated in accordance with section 16(b)(1).

## 17. Prevented Planting.

(a) Unless limited by the policy provisions, a prevented planting payment may be made to you for eligible acreage if:

    (1) You are prevented from planting the insured crop on insurable acreage by an insured cause of loss that occurs:

        (i) On or after the sales closing date contained in the Special Provisions for the insured crop in the county for the crop year the application for insurance is accepted; or

        (ii) For any subsequent crop year, on or after the sales closing date for the previous crop year for the insured crop in the county, provided insurance has been in force continuously since that date. Cancellation for the purpose of transferring the policy to a different insurance provider for the subsequent crop year will not be considered a break in continuity for the purpose of the preceding sentence;

    (2) You include on your acreage report any insurable acreage of the insured crop that was prevented from being planted; and

    (3) You did not plant the insured crop during or after the late planting period. Acreage planted to the insured crop during or after the late planting period is covered under the late planting provisions.

(b) The actuarial documents may contain additional levels of prevented planting coverage that you may purchase for the insured crop:

    (1) Such purchase must be made on or before the sales closing date.

    (2) If you do not purchase one of those additional levels by the sales closing date, you will receive the prevented planting coverage specified in the Crop Provisions.

    (3) If you have a Catastrophic Risk Protection Endorsement for any crop, the additional levels of prevented planting coverage will not be available for that crop.

    (4) You cannot increase your elected or assigned prevented planting coverage level for any crop year if a cause of loss that could prevent planting (even though it is not known whether such cause will actually prevent planting) has occurred during the prevented planting insurance period specified in section 17(a)(1)(i) or (ii) and prior to your request to change your prevented planting coverage level.

(c) The premium amount for acreage that is prevented from being planted will be the same as that for timely planted acreage except as specified in section 15(f). If the amount of premium you are required to pay (gross premium less the subsidy) for acreage that is prevented from being planted exceeds the liability on such acreage, coverage for those acres will not be

NHF1-524 Policy 000037

provided (no premium will be due and no indemnity will be paid for such acreage).

(d) Prevented planting coverage will be provided against:

(1) Drought, failure of the irrigation water supply, failure or breakdown of irrigation equipment or facilities, or the inability to prepare the land for irrigation using your established irrigation method, due to an insured cause of loss only if, on the final planting date (or within the late planting period if you elect to try to plant the crop), you provide documentation acceptable to us to establish:

(i) For non-irrigated acreage, the area that is prevented from being planted has insufficient soil moisture for germination of seed or progress toward crop maturity due to a prolonged period of dry weather. The documentation for prolonged period of dry weather must be verifiable using information collected by sources whose business it is to record and study the weather, including, but not limited to, local weather reporting stations of the National Weather Service; or

(ii) For irrigated acreage:

(A) Due to an insured cause of loss, there is not a reasonable expectation of having adequate water to carry out an irrigated practice or you are unable to prepare the land for irrigation using your established irrigation method:

(1) If you knew or had reason to know on the final planting date or during the late planting period that your water will be reduced, no reasonable expectation exists; and

(2) Available water resources will be verified using information from State Departments of Water Resources, U.S. Bureau of Reclamation, Natural Resources Conservation Service or other sources whose business includes collection of water data or regulation of water resources; or

(B) The irrigation equipment or facilities have failed or broken down if such failure or breakdown is due to an insured cause of loss specified in section 12(d).

(2) Causes other than drought, failure of the irrigation water supply, failure or breakdown of the irrigation equipment or facilities, or your inability to prepare the land for irrigation using your established irrigation method, provided the cause of loss is specified in the Crop Provisions. However, if it is possible for you to plant on or prior to the final planting date when other producers in the area are planting and you fail to plant, no prevented planting payment will be made.

(e) The maximum number of acres that may be eligible for a prevented planting payment for any crop will be determined as follows:

(1) The total number of acres eligible for prevented planting coverage for all crops cannot exceed the number of acres of cropland in your farming operation for the crop year, unless you are eligible for prevented planting coverage on double cropped acreage in accordance with section 17(f)(4). The eligible acres for each insured crop will be determined as follows:

(i) If you have planted any crop in the county for which prevented planting insurance was available (you will be considered to have planted if your APH database contains actual planted acres) or have received a prevented planting insurance guarantee in any one or more of the four most recent crop years, and the insured crop is not required to be contracted with a processor to be insured:

(A) The number of eligible acres will be the maximum number of acres certified for APH purposes, or insured acres reported, for the crop in any one of the four most recent crop years (not including reported prevented planting acreage that was planted to a second crop unless you meet the double cropping requirements in section 17(f)(4)).

(B) If you acquire additional land for the current crop year, the number of eligible acres determined in section 17(e)(1)(i)(A) for a crop may be increased by multiplying it by the ratio of the total cropland acres that you are farming this year (if greater) to the total cropland acres that you farmed in the previous year, provided that:

(1) You submit proof to us that you acquired additional acreage for the current crop year by any of the methods specified in section 17(f)(12);

(2) The additional acreage was acquired in time to plant it for the current crop year using good farming practices; and

(3) No cause of loss has occurred at the time you acquire the acreage that may prevent planting (except acreage you leased the previous year and continue to lease in the current crop year).

(C) If you add adequate irrigation facilities to your existing non-irrigated acreage or if you acquire additional land for the current crop year that has adequate irrigation facilities, the number of eligible acres determined in section 17(e)(1)(i)(A) for irrigated acreage of a

crop may be increased by multiplying it by the ratio of the total irrigated acres that you are farming this year (if greater) to the total irrigated acres that you farmed in the previous year, provided the conditions in sections 17(e)(1)(i)(B)(*1*), (*2*) and (*3*) are met. If there were no irrigated acres in the previous year, the eligible irrigated acres for a crop will be limited to the lesser of the number of eligible non-irrigated acres of the crop or the number of acres on which adequate irrigation facilities were added.

(ii) If you have not planted any crop in the county for which prevented planting insurance was available (you will be considered to have planted if your APH database contains actual planted acres) or have not received a prevented planting insurance guarantee in all of the four most recent crop years, and the insured crop is not required to be contracted with a processor to be insured:

(A) The number of eligible acres will be:

(*1*) The number of acres specified on your intended acreage report, which must be submitted to us by the sales closing date for all crops you insure for the crop year and that is accepted by us; or

(*2*) The number of acres specified on your intended acreage report, which must be submitted to us within 10 days of the time you acquire the acreage and that is accepted by us, if, on the sales closing date, you do not have any acreage in a county and you subsequently acquire acreage through a method described in section 17(f)(12) in time to plant it using good farming practices.

(B) The total number of acres listed on the intended acreage report may not exceed the number of acres of cropland in your farming operation at the time you submit the intended acreage report.

(C) If you acquire additional acreage after we accept your intended acreage report, the number of acres determined in section 17(e)(1)(ii)(A) may be increased in accordance with section 17(e)(1)(i)(B) and (C).

(D) Prevented planting coverage will not be provided for any acreage included on the intended acreage report or any increased amount of acreage determined in accordance with section 17(e)(1)(ii)(C) if a cause of loss that may prevent planting occurred before

the acreage was acquired, as determined by us.

(iii) For any crop that must be contracted with a processor to be insured:

(A) The number of eligible acres will be:

(*1*) The number of acres of the crop specified in the processor contract, if the contract specifies a number of acres contracted for the crop year;

(*2*) The result of dividing the quantity of production stated in the processor contract by your approved yield, if the processor contract specifies a quantity of production that will be accepted (for the purposes of establishing the number of prevented planting acres, any reductions applied to the transitional yield for failure to certify acreage and production for four prior years will not be used); or

(*3*) Notwithstanding sections 17(e)(1)(iii)(A)(*1*) and (*2*), if a minimum number of acres or amount of production is specified in the processor contract, this amount will be used to determine the eligible acres.

(B) If a processor cancels or does not provide contracts, or reduces the contracted acreage or production from what would have otherwise been allowed, solely because the acreage was prevented from being planted due to an insured cause of loss, we will determine the number of eligible acres based on the number of acres or amount of production you had contracted in the county in the previous crop year. If the applicable Crop Provisions require that the price election be based on a contract price, and a contract is not in force for the current year, the price election will be based on the contract price in place for the previous crop year. If you did not have a processor contract in place for the previous crop year, you will not have any eligible prevented planting acreage for the applicable processor crop. The total eligible prevented planting acres in all counties cannot exceed the total number of acres or amount of production contracted in all counties in the previous crop year.

(2) Any eligible acreage determined in accordance with section 17(e)(1) will be reduced by subtracting the number of acres of the crop (insured and uninsured) that are timely and late planted, including acreage specified in section 16(b).

(f) Regardless of the number of eligible acres determined in section 17(e), prevented planting coverage will not be provided for any acreage:

(1) That does not constitute at least 20 acres or 20 percent of the insurable crop acreage in the unit, whichever is less (If the crop is in a whole-farm unit, the 20 acre or 20 percent requirement will be applied separately to each crop in the whole-farm unit).  Any prevented planting acreage within a field that contains planted acreage will be considered to be acreage of the same crop, type, and practice that is planted in the field unless:

(i) The acreage that was prevented from being planted constitutes at least 20 acres or 20 percent of the total insurable acreage in the field and you produced both crops, crop types, or followed both practices in the same field in the same crop year within any one of the four most recent crop years;

(ii) You were prevented from planting a first insured crop and you planted a second crop in the field (There can only be one first insured crop in a field unless the requirements in section 17(f)(1)(i) or (iii) are met); or

(iii) The insured crop planted in the field would not have been planted on the remaining prevented planting acreage (e.g., where rotation requirements would not be met or you already planted the total number of acres specified in the processor contract);

(2) For which the actuarial documents do not provide the information needed to determine the premium rate, unless a written agreement designates such premium rate;

(3) Used for conservation purposes, intended to be left unplanted under any program administered by the USDA or other government agency, or required to be left unharvested under the terms of the lease or any other agreement (The number of acres eligible for prevented planting will be limited to the number of acres specified in the lease for which you are required to pay either cash or share rent);

(4) On which the insured crop is prevented from being planted, if you or any other person receives a prevented planting payment for any crop for the same acreage in the same crop year, excluding share arrangements, unless:

(i) It is a practice that is generally recognized by agricultural experts or organic agricultural experts in the area to plant the insured crop for harvest following harvest of the first insured crop, and additional coverage insurance offered under the authority of the Act is available in the county for both crops in the same crop year;

(ii) For the insured crop that is prevented from being planted, you provide records acceptable to us of acreage and production that shows, in at least two of the last four crop years:

(A) You have double cropped acreage on which the insured crop that is prevented from being planted in the current crop year was grown (You may apply your history of double cropping to any acreage of the insured crop in the county (e.g., if you have double cropped 100 acres of wheat and soybeans in the county and you acquire an additional 100 acres in the county, you can apply that history of double cropped acreage to any of the 200 acres in the county as long as it does not exceed 100 acres)); or

(B) The acreage you are prevented from planting in the current crop year was double cropped with the insured crop that is prevented from being planted (You may only use the history of double cropping for the same physical acres from which double cropping records were provided (e.g., if a neighbor has double cropped 100 acres of wheat and soybeans in the county and you acquire your neighbor's 100 double cropped acres and an additional 100 acres in the county, you can only apply your neighbor's history of double cropped acreage to the same 100 acres that your neighbor double cropped)); and

(iii) The amount of acreage you are double cropping in the current crop year does not exceed the number of acres for which you provided the records required in section 17(f)(4)(ii);

(5) On which the insured crop is prevented from being planted, if:

(i) Any crop is planted within or prior to the late planting period or on or prior to the final planting date if no late planting period is applicable, unless:

(A) You meet the double cropping requirements in section 17(f)(4);

(B) The crop planted was a cover crop; or

(C) No benefit, including any benefit under any USDA program, was derived from the crop; or

(ii) Any volunteer or cover crop is hayed, grazed or otherwise harvested within or prior to the late planting period or on or prior to the final planting date if no late planting period is applicable;

(6) For which planting history or conservation plans indicate the acreage would have remained fallow for crop rotation purposes or on which any pasture or forage crop is in place on the acreage during the time planting of the insured crop generally occurs in the area.  Cover plants that are seeded, transplanted, or that volunteer:

(i) More than 12 months prior to the final planting date for the insured crop that was prevented from being planted will be considered pasture or a forage crop that is in place (e.g., the cover crop is planted 15 months prior to the final planting date and remains in place during the time the insured crop would normally be planted); or

(ii)    Less than 12 months prior to the final planting date for the insured crop that was prevented from being planted will not be considered pasture or a forage crop that is in place;

(7)  That exceeds the number of acres eligible for a prevented planting payment;

(8)  That exceeds the number of eligible acres physically available for planting;

(9)  For which you cannot provide proof that you had the inputs (including, but not limited to, sufficient equipment and labor) available to plant and produce a crop with the expectation of producing at least the yield used to determine your production guarantee or amount of insurance. Evidence that you previously had planted the crop on the unit will be considered adequate proof unless:

(i)    There has been a change in the availability of inputs since the crop was last planted that could affect your ability to plant and produce the insured crop;

(ii)    We determine you have insufficient inputs to plant the total number of insured crop acres (*e.g.*, you will not receive a prevented planting payment if you have sufficient inputs to plant only 80 acres but you have already planted 80 acres and are claiming prevented planting on an additional 100 acres); or

(iii)    Your planting practices or rotational requirements show the acreage would have remained fallow or been planted to another crop;

(10) Based on an irrigated practice production guarantee or amount of insurance unless adequate irrigation facilities were in place to carry out an irrigated practice on the acreage prior to the insured cause of loss that prevented you from planting.    Acreage with an irrigated practice production guarantee will be limited to the number of acres allowed for that practice under sections 17(e) and (f);

(11) Based on a crop type that you did not plant, or did not receive a prevented planting insurance guarantee for, in at least one of the four most recent crop years:

(i)    Types for which separate projected prices or price elections, as applicable, amounts of insurance, or production guarantees are available must be included in your APH database in at least one of the four most recent crop years (Crops for which the insurance guarantee is not based on APH must be reported on your acreage report in at least one of the four most recent crop years) except as allowed in section 17(e)(1)(ii) or (iii); and

(ii)    We will limit prevented planting payments based on a specific crop type to the number of acres allowed for that crop type as specified in sections 17(e) and (f); or

(12) If a cause of loss has occurred that may prevent planting at the time:

(i)    You lease the acreage (except acreage you leased the previous crop year and continue to lease in the current crop year);

(ii)    You buy the acreage;

(iii)    The acreage is released from a USDA program which prohibits harvest of a crop;

(iv)    You request a written agreement to insure the acreage; or

(v)    You acquire the acreage through means other than lease or purchase (such as inherited or gifted acreage).

(g)  If you purchased an additional coverage policy for a crop, and you executed a High-Risk Land Exclusion Option that separately insures acreage which has been designated as "high-risk" land by FCIC under a Catastrophic Risk Protection Endorsement for that crop, the maximum number of acres eligible for a prevented planting payment will be limited for each policy as specified in sections 17(e) and (f).

(h)  If you are prevented from planting a crop for which you do not have an adequate base of eligible prevented planting acreage, as determined in accordance with section 17(e)(1), we will use acreage from another crop insured for the current crop year for which you have remaining eligible prevented planting acreage.

(1)  The crop first used for this purpose will be the insured crop that would have a prevented planting payment most similar to the payment for the crop that was prevented from being planted.

(i)    If there are still insufficient eligible prevented planting acres, the next crop used will be the insured crop that would have the next closest prevented planting payment.

(ii)    In the event payment amounts based on other crops are an equal amount above and below the payment amount for the crop that was prevented from being planted, eligible acres for the crop with the higher payment amount will be used first.

(2)  The prevented planting payment and premium will be based on:

(i)    The crop that was prevented from being planted if the insured crop with remaining eligible acreage would have resulted in a higher prevented planting payment than would have been paid for the crop that was prevented from being planted; or

(ii)    The crop from which eligible acres are being used if the insured crop with remaining eligible acreage will result in a lower prevented planting payment than would have been paid for the crop that was prevented from being planted.

(3)  For example, assume you were prevented from planting 200 acres of corn and have 100 acres eligible for a corn prevented planting guarantee that would result in a payment of $40 per acre. You also had 50 acres of potato eligibility that would result in a $100 per acre payment and 90 acres of grain sorghum eligibility that would result in a $30 per acre payment.  Your prevented planting coverage will be based on 100 acres of

NHF1-524 Policy 000041

corn ($40 per acre), 90 acres of grain sorghum ($30 per acre), and an additional 10 acres of corn (using potato eligible acres and paid as corn at $40 per acre).  Your prevented planting payment would be $7,100 ($4,000 + $2,700 + $400).

(4) Prevented planting coverage will be allowed as specified in section 17(h) only if the crop that was prevented from being planted meets all policy provisions, except for having an adequate base of eligible prevented planting acreage. Payment may be made based on crops other than those that were prevented from being planted even though other policy provisions, including but not limited to, processor contract and rotation requirements, have not been met for the crop whose eligible acres are being used.

(5) An additional administrative fee will not be due as a result of using eligible prevented planting acreage as specified in section 17(h).

(i) The prevented planting payment for any eligible acreage within a unit will be determined by:

(1) Multiplying the prevented planting coverage level percentage you elected, or that is contained in the Crop Provisions if you did not elect a prevented planting coverage level percentage, by:
  (i) Your amount of insurance per acre; or
  (ii) The amount determined by multiplying the production guarantee (per acre) for timely planted acreage of the insured crop (or type, if applicable) by your price election or your projected price, whichever is applicable;

(2) Multiplying the result of section 17(i)(1) by the number of eligible prevented planting acres in the unit; and

(3) Multiplying the result of section 17(i)(2) by your share.

**18. Written Agreements.**

Terms of this policy which are specifically designated for the use of written agreements may be altered by written agreement in accordance with the following:

(a) You must apply in writing for each written agreement (including renewal of a written agreement) no later than the sales closing date, except as provided in section 18(e);

(b) The application for a written agreement must contain all variable terms of the contract between you and us that will be in effect if the written agreement is not approved;

(c) If approved by FCIC, the written agreement will include all variable terms of the contract, including, but not limited to, the crop; practice, type or variety; guarantee; premium rate; and projected price, harvest price, price election or amount of insurance, as applicable, or the information needed to determine such variable terms.  If the written agreement is for a county:

(1) That has a price election or amount of insurance stated in the actuarial documents for the crop, practice, type or variety, the written agreement will contain the price election or amount of insurance stated in the actuarial documents for the crop, practice, type or variety;

(2) That does not have price elections or amounts of insurance stated in the actuarial documents for

the crop, practice, type or variety, the written agreement will contain a price election or amount of insurance that does not exceed the price election or amount of insurance contained in the actuarial documents for the county that is used to establish the other terms of the written agreement, unless otherwise authorized by the Crop Provisions;

(3) For which revenue protection is not available for the crop, but revenue protection is available in the State for the crop, the written agreement will contain the information used to establish the projected price and harvest price, as applicable, for that State; or

(4) In a State for which revenue protection is not available for the crop, but revenue protection is available for the crop in another State, the written agreement is available for yield protection only, and will contain the information needed to determine the projected price for the crop from another State as determined by FCIC;

(d) Each written agreement will only be valid for the number of crop years specified in the written agreement, and a multi-year written agreement:

(1) Will only apply for any particular crop year designated in the written agreement if all terms and conditions in the written agreement are still applicable for the crop year and the conditions under which the written agreement has been provided have not changed prior to the beginning of the insurance period (If conditions change during or prior to the crop year, the written agreement will not be effective for that crop year but may still be effective for a subsequent crop year if conditions under which the written agreement has been provided exist for such year);

(2) May be canceled in writing by:
  (i) FCIC not less than 30 days before the cancellation date if it discovers that any term or condition of the written agreement, including the premium rate, is not appropriate for the crop; or
  (ii) You or us on or before the cancellation date;

(3) That is not renewed in writing after it expires, is not applicable for a crop year, or is canceled, then insurance coverage will be in accordance with the terms and conditions stated in this policy, without regard to the written agreement; and

(4) Will be automatically canceled if you transfer your policy to another insurance provider (No notice will be provided to you and for any subsequent crop year, for a written agreement to be effective, you must timely request renewal of the written agreement in accordance with this section);

(e) A request for a written agreement may be submitted:

(1) After the sales closing date, but on or before the acreage reporting date, if you demonstrate your physical inability to submit the request on or before the sales closing date (e.g., you have been hospitalized or a blizzard has made it impossible to submit the written agreement request in person or by mail); or

(2) For the first year the written agreement is requested:
  (i) On or before the acreage reporting date to:
    (A) Insure unrated land, or an unrated practice, type or variety of a crop; although, if required by FCIC, such written agreements may be approved only after appraisal of the acreage by us and:
      (1) The crop's potential is equal to or exceeds 90 percent of the yield used to determine your production guarantee or amount of insurance; and
      (2) You sign the written agreement no later than the date the first field is appraised or by the expiration date for you to accept the offer, whichever comes first; or
    (B) Establish optional units in accordance with FCIC procedures that otherwise would not be allowed or change the premium rate or transitional yield for designated high-risk land;
  (ii) On or before the cancellation date to insure a crop in a county that does not have actuarial documents for the crop (If the Crop Provisions do not provide a cancellation date for the county, the cancellation date for other insurable crops in the same State that have similar final planting and harvesting dates will be applicable); or
  (iii) On or before the date specified in the Crop Provisions or Special Provisions;
(f) A request for a written agreement must contain:
  (1) For all written agreement requests:
    (i) A completed "Request for Actuarial Change" form;
    (ii) A completed APH (only for crop policies that require APH) based on verifiable records of actual yields for the crop and county for which the written agreement is being requested (the actual yields do not necessarily have to be from the same physical acreage for which you are requesting a written agreement), and verifiable records of actual yields if required by FCIC;
    (iii) Evidence from agricultural experts or organic agricultural experts, as applicable, that the crop can be produced in the area if the request is to provide insurance for the crop, practices, types, or varieties that are not insurable, unless we are notified in writing by FCIC that such evidence is not required by FCIC;
    (iv) The legal description of the land (in areas where legal descriptions are available) and the FSA farm number including tract and field numbers, if available. The submission must also include an FSA aerial photograph, or field boundaries derived by a Geographic Information System or Global Positioning System, or other legible maps

delineating field boundaries where you intend to plant the crop for which insurance is requested; and
    (v) For any perennial crop, an inspection report completed by us;
  (2) For written agreement requests for counties without actuarial documents for the crop, the requirements in section 18(f)(1) (except section 18(f)(1)(ii)) and:
    (i) For a crop you (or anyone with a substantial beneficial interest in you) have previously planted (or produced a crop if the crop is a perennial crop) in the county or area for at least three years:
      (A) A completed APH (only for crop policies that require APH) based on verifiable production records of actual yields for the crop; and
      (B) Verifiable production records for at least the three most recent crop years in which the crop was planted (or produced a crop if the crop is a perennial crop):
        (1) The verifiable production records do not necessarily have to be from the same physical acreage for which you are requesting a written agreement;
        (2) Verifiable production records do not have to be submitted for any year you (or anyone with a substantial beneficial interest in you) have insured the crop in the county or area and have certified the yields on the applicable production reports or the yields are based on your insurance claim (although you are not required to submit production records, you still must maintain production records in accordance with section 21); and
        (3) FCIC will not consider any crop year in which the crop was planted (or produced a crop if the crop is a perennial crop) outside of the most recent ten crop years as a year of previously planting the crop (or having produced a crop if the crop is a perennial crop), unless verifiable production records are provided, or the crop was insured for that crop year;
    (ii) For a crop you (or anyone with a substantial beneficial interest in you) have not previously planted (or produced a crop if the crop is a perennial crop) in the county or area for at least three years:
      (A) A completed APH (only for crop policies that require APH) based on verifiable production records of actual yields for the similar crop;
      (B) Verifiable production records for at least the three most recent crop years in which the similar crop was planted (or

(31 of 42)

produced a crop if the crop is a perennial crop) in the county or area:

(*1*) The verifiable production records for the similar crop do not necessarily have to be from the same physical acreage for which you are requesting a written agreement;

(*2*) Verifiable production records do not have to be submitted for any crop year you (or anyone with a substantial beneficial interest in you) have insured the similar crop in the county or area and have certified the yields on the applicable production reports or the yields are based on your insurance claim (although you are not required to submit production records, you still must maintain production records in accordance with section 21); and

(*3*) FCIC will not consider any crop year in which the similar crop was planted (or produced a crop if the crop is a perennial crop) outside of the most recent ten crop years as a year of previously planting the similar crop (or having produced a crop if the crop is a perennial crop), unless verifiable production records are provided, or the similar crop was insured, for that crop year;

(C) If you (or anyone with a substantial beneficial interest in you) have at least one year of production records, but less than three years of production records, for the crop in the county or area but have production records for a similar crop in the county or area such that the combination of both sets of records results in at least three years of production records, you must provide the information required in sections 18(f)(2)(i)(A) and (B) for the years you (or anyone with a substantial beneficial interest in you) planted the crop (or produced a crop if the crop is a perennial crop) in the county or area and the information required in sections 18(f)(2)(ii)(A) and (B) regarding the similar crop for the remaining years; and

(D) A similar crop to the crop for which a written agreement is being requested must:

(*1*) Be included in the same category of crops, *e.g.*, row crops (including, but not limited to, small grains, coarse grains, and oil seed crops), vegetable crops grown in rows, tree crops, vine crops, bush crops, etc., as defined by FCIC;

(*2*) Have substantially the same growing season (i.e., normally planted around the same dates and harvested around the same dates);

(*3*) Require comparable agronomic conditions (*e.g.*, comparable needs for water, soil, etc.); and

(*4*) Be subject to substantially the same risks (frequency and severity of loss would be expected to be comparable from the same cause of loss);

(iii) The dates you and other growers in the area normally plant and harvest the crop, if applicable;

(iv) The name, location of, and approximate distance to the place the crop will be sold or used by you; and

(v) For any irrigated practice, the water source, method of irrigation, and the amount of water needed for an irrigated practice for the crop; and

(3) Such other information as specified in the Special Provisions or required by FCIC;

(g) A request for a written agreement will not be accepted if:

(1) The request is submitted to us after the applicable deadline contained in sections 18(a) or (e);

(2) All the information required in section 18(f) is not submitted to us with the request for a written agreement (The request for a written agreement may be accepted if any missing information is available from other acceptable sources); or

(3) The request is not authorized by the policy;

(h) A request for a written agreement will be denied if:

(1) FCIC determines the risk is excessive;

(2) Your APH history demonstrates you have not produced at least 50 percent of the transitional yield for the crop, type, and practice obtained from the county, or a county with similar agronomic conditions and risk exposure, when previously grown;

(3) There is not adequate information available to establish an actuarially sound premium rate and insurance coverage for the crop and acreage;

(4) The crop, or a similar crop, was not previously grown in the county or area, or there is no evidence of a market for the crop (applicable only for counties without actuarial documents); or

(5) Agricultural experts or organic agricultural experts determine the crop, practice, or type is not adapted to the county;

(i) A written agreement will be denied unless:

(1) FCIC approves the written agreement;

(2) The original written agreement is signed by you and delivered to us, or postmarked, not later than the expiration date for you to accept the offer;

(3) We accept the written agreement offer; and

(4) The crop meets the minimum appraisal amount specified in section 18(e)(2)(i)(A)(*1*), if applicable;

(j) Multi-year written agreements may be canceled and requests for renewal may be rejected if the severity or frequency of your loss experience under the written agreement is significantly worse than expected based

on the information provided by you or used to establish your premium rate and the loss experience of other crops with similar risks in the area;

(k)  With respect to your and our ability to reject an offer for a written agreement:

(1)  When a single Request for Actuarial Change form is submitted, regardless of how many requests for changes are contained on the form, you and we can only accept or reject the written agreement in its entirety (you cannot reject specific terms of the written agreement and accept others);

(2)  When multiple Request for Actuarial Change forms are submitted, regardless of when the forms are submitted, for the same condition or for the same crop (i.e., to insure corn on ten legal descriptions where there are no actuarial documents in the county or the request is to change the premium rates from the high-risk rates) all these forms may be treated as one request and you and we will only have the option of accepting or rejecting the written agreement in its entirety (you cannot reject specific terms of the written agreement and accept others);

(3)  When multiple Request for Actuarial Change forms are submitted, regardless of when the forms are submitted, for the different conditions or for different crops, separate agreements may be issued and you and we will have the option to accept or reject each written agreement; and

(4)  If we reject an offer for a written agreement approved by FCIC, you may seek arbitration or mediation of our decision to reject the offer in accordance with section 20;

(l)  Any information that is submitted by you after the applicable deadlines in sections 18(a) and (e) will not be considered, unless such information is specifically requested in accordance with section 18(f)(3);

(m)  If the written agreement or the policy is canceled for any reason, or the period for which an existing written agreement is in effect ends, a request for renewal of the written agreement must contain all the information required by this section and be submitted in accordance with section 18(a), unless otherwise specified by FCIC;

(n)  If a request for a written agreement is not approved by FCIC, a request for a written agreement for any subsequent crop year that fails to address the stated basis for the denial will not be accepted (If the request for a written agreement contains the same information that was previously rejected or denied, you will not have any right to arbitrate, mediate or appeal the non-acceptance of your request); and

(o)  If you disagree with any determination made by FCIC under section 18, you may obtain administrative review in accordance with 7 CFR part 400, subpart J or appeal in accordance with 7 CFR part 11, unless you have failed to comply with the provisions contained in section 18(g) or section 18(i)(2) or (4).

**19.  Crops as Payment.**
You must not abandon any crop to us.  We will not accept any crop as compensation for payments due us.

**20.  Mediation, Arbitration, Appeal, Reconsideration, and Administrative and Judicial Review.**
(a)  If you and we fail to agree on any determination made

by us except those specified in section 20(d) or (e), the disagreement may be resolved through mediation in accordance with section 20(g).  If resolution cannot be reached through mediation, or you and we do not agree to mediation, the disagreement must be resolved through arbitration in accordance with the rules of the American Arbitration Association (AAA), except as provided in sections 20(c) and (f), and unless rules are established by FCIC for this purpose.  Any mediator or arbitrator with a familial, financial or other business relationship to you or us, or our agent or loss adjuster, is disqualified from hearing the dispute.

(1)  All disputes involving determinations made by us, except those specified in section 20(d) or (e), are subject to mediation or arbitration.  However, if the dispute in any way involves a policy or procedure interpretation, regarding whether a specific policy provision or procedure is applicable to the situation, how it is applicable, or the meaning of any policy provision or procedure, either you or we must obtain an interpretation from FCIC in accordance with 7 CFR part 400, subpart X or such other procedures as established by FCIC.

(i)  Any interpretation by FCIC will be binding in any mediation or arbitration.

(ii)  Failure to obtain any required interpretation from FCIC will result in the nullification of any agreement or award.

(iii)  An interpretation by FCIC of a policy provision is considered a determination that is a matter of general applicability.

(iv)  An interpretation by FCIC of a procedure may be appealed to the National Appeals Division in accordance with 7 CFR part 11.

(2)  Unless the dispute is resolved through mediation, the arbitrator must provide to you and us a written statement describing the issues in dispute, the factual findings, the determinations and the amount and basis for any award and breakdown by claim for any award.  The statement must also include any amounts awarded for interest.  Failure of the arbitrator to provide such written statement will result in the nullification of all determinations of the arbitrator.  All agreements reached through settlement, including those resulting from mediation, must be in writing and contain at a minimum a statement of the issues in dispute and the amount of the settlement.

(b)  Regardless of whether mediation is elected:

(1)  The initiation of arbitration proceedings must occur within one year of the date we denied your claim or rendered the determination with which you disagree, whichever is later;

(2)  If you fail to initiate arbitration in accordance with section 20(b)(1) and complete the process, you will not be able to resolve the dispute through judicial review;

(3)  If arbitration has been initiated in accordance with section 20(b)(1) and completed, and judicial review is sought, suit must be filed not later than one year after the date the arbitration decision was rendered; and

NHF1-524 Policy 000045

(4) In any suit, if the dispute in any way involves a policy or procedure interpretation, regarding whether a specific policy provision or procedure is applicable to the situation, how it is applicable, or the meaning of any policy provision or procedure, an interpretation must be obtained from FCIC in accordance with 7 CFR part 400, subpart X or such other procedures as established by FCIC.  Such interpretation will be binding.

(c) Any decision rendered in arbitration is binding on you and us unless judicial review is sought in accordance with section 20(b)(3).  Notwithstanding any provision in the rules of the AAA, you and we have the right to judicial review of any decision rendered in arbitration.

(d) With respect to good farming practices:

(1) We will make decisions regarding what constitutes a good farming practice and determinations of assigned production for uninsured causes for your failure to use good farming practices.

   (i)   If you disagree with our decision of what constitutes a good farming practice, you must request a determination from FCIC of what constitutes a good farming practice before filing any suit against FCIC.

   (ii)  If you disagree with our determination of the amount of assigned production, you must use the arbitration or mediation process contained in this section.

   (iii) You may not sue us for our decisions regarding whether good farming practices were used by you.

(2) FCIC will make determinations regarding what constitutes a good farming practice.  If you do not agree with any determination made by FCIC:

   (i)   You may request reconsideration by FCIC of this determination in accordance with the reconsideration process established for this purpose and published at 7 CFR part 400, subpart J; or

   (ii)  You may file suit against FCIC.

      (A) You are not required to request reconsideration from FCIC before filing suit.

      (B) Any suit must be brought against FCIC in the United States district court for the district in which the insured acreage is located.

      (C) Suit must be filed against FCIC not later than one year after the date:

         (1) Of the determination; or

         (2) Reconsideration is completed, if reconsideration was requested under section 20(d)(2)(i).

(e) Except as provided in sections 18(n) or (o), or 20(d) or (k), if you disagree with any other determination made by FCIC or any claim where FCIC is directly involved in the claims process or directs us in the resolution of the claim, you may obtain an administrative review in accordance with 7 CFR part 400, subpart J (administrative review) or appeal in accordance with 7 CFR part 11 (appeal).

(1) If you elect to bring suit after completion of any appeal, such suit must be filed against FCIC not later than one year after the date of the decision rendered in such appeal.

(2) Such suit must be brought in the United States district court for the district in which the insured acreage is located.

(3) Under no circumstances can you recover any attorney fees or other expenses, or any punitive, compensatory or any other damages from FCIC.

(f) In any mediation, arbitration, appeal, administrative review, reconsideration or judicial process, the terms of this policy, the Act, and the regulations published at 7 CFR chapter IV, including the provisions of 7 CFR part 400, subpart P, are binding.  Conflicts between this policy and any state or local laws will be resolved in accordance with section 31.  If there are conflicts between any rules of the AAA and the provisions of your policy, the provisions of your policy will control.

(g) To resolve any dispute through mediation, you and we must both:

(1) Agree to mediate the dispute;

(2) Agree on a mediator; and

(3) Be present, or have a designated representative who has authority to settle the case present, at the mediation.

(h) Except as provided in section 20(i), no award or settlement in mediation, arbitration, appeal, administrative review or reconsideration process or judicial review can exceed the amount of liability established or which should have been established under the policy, except for interest awarded in accordance with section 26.

(i) In a judicial review only, you may recover attorneys fees or other expenses, or any punitive, compensatory or any other damages from us only if you obtain a determination from FCIC that we, our agent or loss adjuster failed to comply with the terms of this policy or procedures issued by FCIC and such failure resulted in you receiving a payment in an amount that is less than the amount to which you were entitled.  Requests for such a determination should be addressed to the following: USDA/RMA/Deputy Administrator of Compliance/ Stop 0806, 1400 Independence Avenue, SW., Washington, D.C. 20250-0806.

(j) If FCIC elects to participate in the adjustment of your claim, or modifies, revises or corrects your claim, prior to payment, you may not bring an arbitration, mediation or litigation action against us.  You must request administrative review or appeal in accordance with section 20(e).

(k) Any determination made by FCIC that is a matter of general applicability is not subject to administrative review under 7 CFR part 400, subpart J or appeal under 7 CFR part 11.  If you want to seek judicial review of any FCIC determination that is a matter of general applicability, you must request a determination of non-appealability from the Director of the National Appeals Division in accordance with 7 CFR 11.6 before seeking judicial review.

**21. Access to Insured Crop and Records, and Record Retention.**

(a) We, and any employee of USDA authorized to investigate or review any matter relating to crop

insurance, have the right to examine the insured crop and all records related to the insured crop and any mediation, arbitration or litigation involving the insured crop as often as reasonably required during the record retention period.

(b) You must retain, and provide upon our request, or the request of any employee of USDA authorized to investigate or review any matter relating to crop insurance:

   (1) Complete records of the planting, replanting, inputs, production, harvesting, and disposition of the insured crop on each unit for three years after the end of the crop year (This requirement also applies to all such records for acreage that is not insured);

   (2) All records used to establish the amount of production you certified on your production reports used to compute your approved yield for three years after the calendar date for the end of the insurance period for the crop year for which you initially certified such records, unless such records have already been provided to us (*e.g.*, if you are a new insured and you certify 2015 through 2018 crop year production records in 2019 to determine your approved yield for the 2019 crop year, you must retain all records from the 2015 through 2018 crop years through the 2022 crop year.  If you subsequently certify records of the 2019 crop year in 2020 to determine your approved yield for the 2020 crop year, you must retain the 2019 crop year records through the 2023 crop year and so forth for each subsequent year of production records certified); and

   (3) While you are not required to maintain records beyond the record retention period specified in section 21(b)(2), at any time, if we or FCIC have evidence that you, or anyone assisting you, knowingly misreported any information related to any yield you have certified, we or FCIC will replace all yields in your APH database determined to be incorrect with the lesser of an assigned yield determined in accordance with section 3 or the yield determined to be correct:

      (i) If an overpayment has been made to you, you will be required to repay the overpaid amount; and

      (ii) Replacement of yields in accordance with section 21(b)(3) does not exempt you from other sanctions applicable under the terms of the policy or any applicable law.

(c) We, or any employee of USDA authorized to investigate or review any matter relating to crop insurance, may extend the record retention period beyond three years by notifying you of such extension in writing.

(d) By signing the application for insurance authorized under the Act or by continuing insurance for which you have previously applied, you authorize us or USDA, or any person acting for us or USDA authorized to investigate or review any matter relating to crop insurance, to obtain records relating to the planting, replanting, inputs, production, harvesting, and disposition of the insured crop from any person who

may have custody of such records, including but not limited to, FSA offices, banks, warehouses, gins, cooperatives, marketing associations, and accountants.  You must assist in obtaining all records we or any employee of USDA authorized to investigate or review any matter relating to crop insurance request from third parties.

(e) Failure to provide access to the insured crop or the farm, authorize access to the records maintained by third parties or assist in obtaining such records will result in a determination that no indemnity is due for the crop year in which such failure occurred.

(f) Failure to maintain or provide records will result in:

   (1) The imposition of an assigned yield in accordance with section 3(f)(1) and 7 CFR part 400, subpart G for those crop years for which you do not have the required production records to support a certified yield;

   (2) A determination that no indemnity is due if you fail to provide records necessary to determine your loss;

   (3) Combination of the optional units into the applicable basic unit;

   (4) Assignment of production to the units by us if you fail to maintain separate records:

      (i) For your basic units; or

      (ii) For any uninsurable acreage; and

   (5) The imposition of consequences specified in section 6(g), as applicable.

(g) If the imposition of an assigned yield under section 21(f)(1) would affect an indemnity, prevented planting payment or replanting payment that was paid in a prior crop year, such claim will be adjusted and you will be required to repay any overpaid amounts.

**22. Other Insurance.**

(a) **Other Like Insurance** - Nothing in this section prevents you from obtaining other insurance not authorized under the Act.  However, unless specifically required by policy provisions, you must not obtain any other crop insurance authorized under the Act on your share of the insured crop.  If you cannot demonstrate that you did not intend to have more than one policy in effect, you may be subject to the consequences authorized under this policy, the Act, or any other applicable statute.  If you can demonstrate that you did not intend to have more than one policy in effect (For example, an application to transfer your policy or written notification to an insurance provider that states you want to purchase, or transfer, insurance and you want any other policies for the crop canceled would demonstrate you did not intend to have duplicate policies), and:

   (1) One is an additional coverage policy and the other is a Catastrophic Risk Protection policy:

      (i) The additional coverage policy will apply if both policies are with the same insurance provider or, if not, both insurance providers agree; or

      (ii) The policy with the earliest date of application will be in force if both insurance providers do not agree; or

   (2) Both are additional coverage policies or both are Catastrophic Risk Protection policies, the policy with the earliest date of application will be in force

and the other policy will be void, unless both policies are with:
  (i)  The same insurance provider and the insurance provider agrees otherwise; or
  (ii)  Different insurance providers and both insurance providers agree otherwise.
(b) **Other Insurance Against Fire** - If you have other insurance, whether valid or not, against damage to the insured crop by fire during the insurance period, and you have not excluded coverage for fire from this policy, we will be liable for loss due to fire caused by a naturally occurring event only for the smaller of:
  (1)  The amount of indemnity determined pursuant to this policy without regard to such other insurance; or
  (2)  The amount by which the loss from fire is determined to exceed the indemnity paid or payable under such other insurance.
(c) For the purpose of section 22(b), the amount of loss from fire will be the difference between the total value of the insured crop before the fire and the total value of the insured crop after the fire.  This amount will be determined in accordance with the provisions in section 35.

23. **Conformity to Food Security Act.**
Although your violation of a number of federal statutes, including the Act, may cause cancellation, termination, or voidance of your insurance contract, you should be specifically aware that your policy will be canceled if you are determined to be ineligible to receive benefits under the Act due to violation of the controlled substance provisions (title XVII) of the Food Security Act of 1985 (Pub. L. 99-198) and the regulations promulgated under the Act by USDA.  Your insurance policy will be canceled if you are determined, by the appropriate Agency, to be in violation of these provisions.  We will recover any and all monies paid to you or received by you during your period of ineligibility, and your premium will be refunded, less an amount for expenses and handling equal to 20 percent of the premium paid or to be paid by you.

24. **Amounts Due Us.**
(a) Interest will accrue at the rate of 1.25 percent simple interest per calendar month on any unpaid amount owed to us or on any unpaid administrative fees owed to FCIC.  For the purpose of premium amounts owed to us or administrative fees owed to FCIC, interest will start to accrue on the first day of the month following the issuance of the notice by us, provided that a minimum of 30 days have passed from the premium billing date specified in the Special Provisions.  We will collect any unpaid amounts owed to us and any interest owed thereon and, prior to the termination date, we will collect any administrative fees and interest owed thereon to FCIC.  After the termination date, FCIC will collect any unpaid administrative fees and any interest owed thereon for any catastrophic risk protection policy and we will collect any unpaid administrative fees and any interest owed thereon for additional coverage policies.
(b) For the purpose of any other amounts due us, such as repayment of indemnities found not to have been earned, interest will start to accrue on the date that notice is issued to you for the collection of the unearned amount.  Amounts found due under this

paragraph will not be charged interest if payment is made within 30 days of issuance of the notice by us.  The amount will be considered delinquent if not paid within 30 days of the date the notice is issued by us.
(c) All amounts paid will be applied first to expenses of collection (see subsection (d) of this section) if any, second to the reduction of accrued interest, and then to the reduction of the principal balance.
(d) If we determine that it is necessary to contract with a collection agency or to employ an attorney to assist in collection, you agree to pay all of the expenses of collection.
(e) The portion of the amounts owed by you for a policy authorized under the Act that are owed to FCIC may be collected in part through administrative offset from payments you receive from United States government agencies in accordance with 31 U.S.C. chapter 37.  Such amounts include all administrative fees, and the share of the overpaid indemnities and premiums retained by FCIC plus any interest owed thereon.

25. **Correction of Errors**
(a) In addition to any other corrections allowed in your policy subject to section 25(b), we may correct:
  (1)  Within 60 days after the sales closing date, any incorrect information on your application or provided by the sales closing date, including identification numbers for you and any person with an substantial beneficial interest in you, to ensure that the eligibility information is correct and consistent with information reported by you to any USDA agency;
  (2)  Within 30 days after the acreage reporting date, information reported to reconcile errors in the information with correct information that has been determined by any USDA agency;
  (3)  Within 30 days of any subsequent correction of data by FSA, erroneous information corrected as a result of verification of information; and
  (4)  At any time, any incorrect information if the incorrect information was caused by electronic transmission errors by us or errors made by any agency within USDA in transmitting the information provided by you for purposes of other USDA programs.
(b) Corrections may be made but will not take effect for the current crop year if the correction would allow you to:
  (1)  Avoid ineligibility requirements for insurance or obtain a disproportionate benefit under the crop insurance program or any related program administered by the Secretary;
  (2)  Obtain, enhance, or increase an insurance guarantee or indemnity if a cause of loss exists or has occurred before any correction has been made, or avoid premium owed if no loss is likely to occur; or
  (3)  Avoid an obligation or requirement under any Federal or State law.

26. **Interest Limitations.**
We will pay simple interest computed on the net indemnity ultimately found to be due by us or by a final judgment of a court of competent jurisdiction, from and including the 61st day after the date you sign, date, and submit to us the properly completed claim on our form.  Interest will be

paid only if the reason for our failure to timely pay is NOT due to your failure to provide information or other material necessary for the computation or payment of the indemnity.  The interest rate will be that established by the Secretary of the Treasury under section 12 of the Contract Disputes Act of 1978 (41 U.S.C. 611) and published in the *Federal Register* semiannually on or about January 1 and July 1 of each year, and may vary with each publication.

**27.  Concealment, Misrepresentation or Fraud.**

(a)  If you have falsely or fraudulently concealed the fact that you are ineligible to receive benefits under the Act or if you or anyone assisting you has intentionally concealed or misrepresented any material fact relating to this policy:

(1)  This policy will be voided; and

(2)  You may be subject to remedial sanctions in accordance with 7 CFR part 400, subpart R.

(b)  Even though the policy is void, you will still be required to pay 20 percent of the premium that you would otherwise be required to pay to offset costs incurred by us in the service of this policy.  If previously paid, the balance of the premium will be returned.

(c)  Voidance of this policy will result in you having to reimburse all indemnities paid for the crop year in which the voidance was effective.

(d)  Voidance will be effective on the first day of the insurance period for the crop year in which the act occurred and will not affect the policy for subsequent crop years unless a violation of this section also occurred in such crop years.

(e)  If you willfully and intentionally provide false or inaccurate information to us or FCIC or you fail to comply with a requirement of FCIC, in accordance with 7 CFR part 400, subpart R, FCIC may impose on you:

(1)  A civil fine for each violation in an amount not to exceed the greater of:

(i)  The amount of the pecuniary gain obtained as a result of the false or inaccurate information provided or the noncompliance with a requirement of FCIC; or

(ii)  $10,000; and

(2)  A disqualification for a period of up to 5 years from receiving any monetary or non-monetary benefit provided under each of the following:

(i)  Any crop insurance policy offered under the Act;

(ii)  The Farm Security and Rural Investment Act of 2002 (7 U.S.C. 7333 et seq.);

(iii)  The Agricultural Act of 1949 (7 U.S.C. 1421 et seq.);

(iv)  The Commodity Credit Corporation Charter Act (15 U.S.C. 714 et seq.);

(v)  The Agricultural Adjustment Act of 1938 (7 U.S.C. 1281 et seq.);

(vi)  Title XII of the Food Security Act of 1985 (16 U.S.C. 3801 et seq.);

(vii)  The Consolidated Farm and Rural Development Act (7 U.S.C. 1921 et seq.); and

(viii)  Any federal law that provides assistance to a producer of an agricultural commodity affected by a crop loss or a decline in the prices of agricultural commodities.

**28.  Transfer of Coverage and Right to Indemnity.**

If you transfer any part of your share during the crop year, you may transfer your coverage rights, if the transferee is eligible for crop insurance.  We will not be liable for any more than the liability determined in accordance with your policy that existed before the transfer occurred.  The transfer of coverage rights must be on our form and will not be effective until approved by us in writing.  Both you and the transferee are jointly and severally liable for the payment of the premium and administrative fees.  The transferee has all rights and responsibilities under this policy consistent with the transferee's interest.

**29.  Assignment of Indemnity.**

(a)  You may assign your right to an indemnity for the crop year only to creditors or other persons to whom you have a financial debt or other pecuniary obligation.  You may be required to provide proof of the debt or other pecuniary obligation before we will accept the assignment of indemnity.

(b)  All assignments must be on our form and must be provided to us.  Each assignment form may contain more than one creditor or other person to whom you have a financial debt or other pecuniary obligation.

(c)  Unless you have provided us with a properly executed assignment of indemnity, we will not make any payment to a lienholder or other person to whom you have a financial debt or other pecuniary obligation even if you may have a lien or other assignment recorded elsewhere.  Under no circumstances will we be liable:

(1)  To any lienholder or other person to whom you have a financial debt or other pecuniary obligation where you have failed to include such lienholder or person on a properly executed assignment of indemnity provided to us; or

(2)  To pay to all lienholders or other persons to whom you have a financial debt or other pecuniary obligation any amount greater than the total amount of indemnity owed under the policy.

(d)  If we have received the properly executed assignment of indemnity form:

(1)  Only one payment will be issued jointly in the names of all assignees and you; and

(2)  Any assignee will have the right to submit all loss notices and forms as required by the policy.

(e)  If you have suffered a loss from an insurable cause and fail to file a claim for indemnity within the period specified in section 14(e), the assignee may submit the claim for indemnity not later than 30 days after the period for filing a claim has expired.  We will honor the terms of the assignment only if we can accurately determine the amount of the claim.  However, no action will lie against us for failure to do so.

**30.  [Reserved]**

**31.  Applicability of State and Local Statutes.**

If the provisions of this policy conflict with statutes of the State or locality in which this policy is issued, the policy provisions will prevail.   State and local laws and regulations in conflict with federal statutes, this policy, and the applicable regulations do not apply to this policy.

**32.  Descriptive Headings.**

The descriptive headings of the various policy provisions are formulated for convenience only and are not intended to affect the construction or meaning of any of the policy provisions.

**33. Notices.**

(a) All notices required to be given by you must be in writing and received by your crop insurance agent within the designated time unless otherwise provided by the notice requirement.  Notices required to be given immediately may be by telephone or in person and confirmed in writing.  Time of the notice will be determined by the time of our receipt of the written notice. If the date by which you are required to submit a report or notice falls on Saturday, Sunday, or a Federal holiday, or if your agent's office is, for any reason, not open for business on the date you are required to submit such notice or report, such notice or report must be submitted on the next business day.

(b) All notices and communications required to be sent by us to you will be mailed to the address contained in your records located with your crop insurance agent. Notice sent to such address will be conclusively presumed to have been received by you.  You should advise us immediately of any change of address.

**34. Units.**

(a) You may elect an enterprise unit or whole-farm unit in accordance with the following:

(1) For crops for which revenue protection is available, you may elect:

  (i) An enterprise unit if you elected revenue protection or yield protection; or

  (ii) A whole-farm unit if you elected:

    (A) Revenue protection and revenue protection is provided unless limited by the Special Provisions; or

    (B) Yield protection only if whole-farm units are allowed by the Special Provisions;

(2) For crops for which revenue protection is not available, enterprise units or whole-farm units are available only if allowed by the Special Provisions;

(3) You must make such election on or before the earliest sales closing date for the insured crops in the unit and report such unit structure on your acreage report:

  (i) For counties in which the actuarial documents specify a fall or winter sales closing date and a spring sales closing date, you may change your unit selection on or before the spring sales closing date (earliest spring sales closing date for crops in the unit if electing a whole-farm unit) if you do not have any insured fall planted acreage of the insured crop;

  (ii) Your unit selection will remain in effect from year to year unless you notify us in writing by the earliest sales closing date for the crop year for which you wish to change this election; and

  (iii) These units may not be further divided except as specified herein;

(4) For an enterprise unit:

(i) To qualify, an enterprise unit must contain all of the insurable acreage of the same insured crop in:

  (A) Two or more sections, if sections are the basis for optional units where the insured acreage is located;

  (B) Two or more section equivalents determined in accordance with FCIC issued procedures, if section equivalents are the basis for optional units where the insured acreage is located or are applicable to the insured acreage;

  (C) Two or more FSA farm numbers, if FSA farm numbers are the basis for optional units where the insured acreage is located;

  (D) Any combination of two or more sections, section equivalents, or FSA farm numbers, if more than one of these are the basis for optional units where the acreage is located or are applicable to the insured acreage (*e.g.*, if a portion of your acreage is located where sections are the basis for optional units and another portion of your acreage is located where FSA farm numbers are the basis for optional units, you may qualify for an enterprise unit based on a combination of these two parcels;

  (E) One section, section equivalent, or FSA farm number that contains at least 660 planted acres of the insured crop.  You may qualify under this paragraph based only on the type of parcel that is utilized to establish optional units where your insured acreage is located (*e.g.*, if having two or more sections is the basis for optional units where the insured acreage is located, you may qualify for an enterprise unit if you have at least 660 planted acres of the insured crop in one section); or

  (F) Two or more units established by written agreement; and

(ii) At least two of the sections, section equivalents, FSA farm numbers, or units established by written agreement in section 34(a)(4)(i)(A), (B), (C), (D), or (F) must each have planted acreage that constitutes at least the lesser of 20 acres or 20 percent of the insured crop acreage in the enterprise unit.  If there is planted acreage in more than two sections, section equivalents, FSA farm numbers or units established by written agreement in section 34(a)(4)(i)(A), (B), (C), (D), or (F), these can be aggregated to form at least two parcels to meet this requirement.  For example, if sections are the basis for optional units where the insured acreage is located and you have 80 planted acres in section one, 10 planted acres in section two, and 10 planted acres in section three, you may aggregate

sections two and three to meet this requirement.

(iii) The crop must be insured under revenue protection or yield protection, unless otherwise specified in the Special Provisions;

(iv) If you want to change your unit structure from enterprise units to basic or optional units in any subsequent crop year, you must maintain separate records of acreage and production:

    (A) For each basic unit, to be eligible to use records to establish the production guarantee for the basic unit; or

    (B) For optional units, to qualify for optional units and to be eligible to use such records to establish the production guarantee for the optional units;

(v) If you do not comply with the production reporting provisions in section 3(f) for the enterprise unit, your yield for the enterprise unit will be determined in accordance with section 3(f)(1);

(vi) You must separately designate on the acreage report each section or other basis in section 34(a)(4)(i) you used to qualify for an enterprise unit; and

(vii) If we discover you do not qualify for an enterprise unit and such discovery is made:

    (A) On or before the acreage reporting date, your unit division will be based on the basic or optional units, whichever you report on your acreage report and qualify for; or

    (B) At any time after the acreage reporting date, we will assign the basic unit structure; and

(viii) If allowed by the actuarial documents, you may elect separate enterprise units for irrigated or non-irrigated practices.

    (A) You may elect one enterprise unit for all irrigated practices or one enterprise unit for all non-irrigated practices or enterprise units for both.

    (B) You must separately meet the requirements in section 34(a)(4) for each enterprise unit.

    (C) If you elected separate enterprise units for both irrigated and non-irrigated practices and we discover you do not qualify for an enterprise unit for the irrigated or non-irrigated practice and such discovery is made:

        (1) On or before the acreage reporting date, you may elect to insure all acreage of the crop in the county in one enterprise unit provided you meet the requirements in section 34(a)(4), or your unit division will be based on basic or optional units, whichever you report on your acreage report and qualify for; or

        (2) At any time after the acreage reporting date, your unit structure will be one enterprise unit provided you meet the requirements in section 34(a)(4). Otherwise, we will assign the basic unit structure.

    (D) If you elected an enterprise unit on one practice (irrigated or non-irrigated) and a different unit structure on the other practice and we discover you do not qualify for an enterprise unit for the irrigated or non-irrigated practice and such discovery is made:

        (1) On or before the acreage reporting date, your unit division will be based on basic or optional units, whichever you report on your acreage report and qualify for; or

        (2) At any time after the acreage reporting date, we will assign the basic unit structure.

(5) For a whole-farm unit:

  (i) To qualify:

    (A) All crops in the whole-farm unit must be insured:

        (1) Under revenue protection (if you elected the harvest price exclusion for any crop, you must elect it for all crops in the whole-farm unit), unless the Special Provisions allow whole-farm units for another plan of insurance and you insure all crops in the whole-farm unit under such plan (e.g., if you plant corn and soybeans for which you have elected revenue protection and you plant canola for which you have elected yield protection, the corn, soybeans and canola would be assigned the unit structure in accordance with section 34(a)(5)(v));

        (2) With us (e.g., if you insure your corn and canola with us and your soybeans with a different insurance provider, the corn, soybeans and canola would be assigned the unit structure in accordance with section 34(a)(5)(v)); and

        (3) At the same coverage level (e.g., if you elect to insure your corn and canola at the 65 percent coverage level and your soybeans at the 75 percent coverage level, the corn, soybeans and canola would be assigned the unit structure in accordance with section 34(a)(5)(v) unless you can elect separate coverage levels for all irrigated and all non-irrigated crops in accordance with section 3(b)(2)(iii) (e.g., if you elect to insure your irrigated corn at the 65 percent coverage level you must insure your irrigated canola at the 65 percent coverage level. If you elect to insure your non-irrigated corn at the 70 percent coverage

NHF1-524 Policy 000051

level you must insure your non-irrigated canola at the 70 percent coverage level. If you elect to insure your irrigated corn at the 65 percent coverage level and your irrigated canola at the 70 percent coverage level your unit structure will be assigned in accordance with section 34(a)(5)(v));

(B) A whole-farm unit must contain all of the insurable acreage of at least two crops; and

(C) At least two of the insured crops must each have planted acreage that constitutes 10 percent or more of the total planted acreage liability of all insured crops in the whole-farm unit (For crops for which revenue protection is available, liability will be based on the applicable projected price only for the purpose of section 34(a)(5)(i)(C));

(ii) You will be required to pay separate administrative fees for each crop included in the whole-farm unit;

(iii) You must separately designate on the acreage report each basic unit for each crop in the whole-farm unit;

(iv) If you want to change your unit structure from a whole-farm unit to basic or optional units in any subsequent crop year, you must maintain separate records of acreage and production:

(A) For each basic unit, to be eligible to use such records to establish the production guarantee for the basic units; or

(B) For optional units, to qualify for optional units and to be eligible to use such records to establish the production guarantee for the optional units; and

(v) If we discover that you do not qualify for a whole-farm unit for at least one insured crop because, even though you elected revenue protection for all your crops:

(A) You do not meet all of the other requirements in section 34(a)(5)(i), and such discovery is made:

(1) On or before the acreage reporting date, your unit division for all crops for which you elected a whole-farm unit will be based on basic or optional units, whichever you report on your acreage report and qualify for; or

(2) At any time after the acreage reporting date, we will assign the basic unit structure for all crops for which you elected a whole-farm unit; or

(B) It was not possible to establish a projected price for at least one of your crops, your unit division will be based on the unit structure you report on your acreage report and qualify for only for the crop for which a projected price could not be established unless the

remaining crop in the unit would no longer qualify for a whole-farm unit, in such case your unit division for the remaining crops will be based on the unit structure you report on your acreage report and qualify for.

(b) Unless limited by the Crop Provisions or Special Provisions, a basic unit as defined in section 1 of the Basic Provisions may be divided into optional units if, for each optional unit, you meet the following:

(1) You must plant the crop in a manner that results in a clear and discernible break in the planting pattern at the boundaries of each optional unit;

(2) All optional units you select for the crop year are identified on the acreage report for that crop year (Units will be determined when the acreage is reported but may be adjusted or combined to reflect the actual unit structure when adjusting a loss. No further unit division may be made after the acreage reporting date for any reason);

(3) You have records, that are acceptable to us, for at least the previous crop year for all optional units that you will report in the current crop year (You may be required to produce the records for all optional units for the previous crop year); and

(4) You have records of marketed or stored production from each optional unit maintained in such a manner that permits us to verify the production from each optional unit, or the production from each optional unit is kept separate until loss adjustment is completed by us.

(c) Each optional unit must meet one or more of the following, unless otherwise specified in the Crop Provisions or allowed by written agreement:

(1) Optional units may be established if each optional unit is located in a separate section where the boundaries are readily discernible:

(i) In the absence of sections, we may consider parcels of land legally identified by other methods of measure, such as Spanish grants, provided the boundaries are readily discernible, if such parcels can be considered as the equivalent of sections for unit purposes in accordance with FCIC issued procedures; or

(ii) In the absence of sections as described in section 34(c)(1) or other methods of measure used to establish section equivalents as described in section 34(c)(1)(i), optional units may be established if each optional unit is located in a separate FSA farm number in accordance with FCIC issued procedure;

(2) In addition to, or instead of, establishing optional units by section, section equivalent or FSA farm number, optional units may be based on irrigated and non-irrigated acreage. To qualify as separate irrigated and non-irrigated optional units, the non-irrigated acreage may not continue into the irrigated acreage in the same rows or planting pattern. The irrigated acreage may not extend beyond the point at which the irrigation system can deliver the quantity of water needed to produce the yield on which the guarantee is based, except the corners of a field in which a

NHF1-524 Policy 000052

center-pivot irrigation system is used may be considered as irrigated acreage if the corners of a field in which a center-pivot irrigation system is used do not qualify as a separate non-irrigated optional unit. In this case, production from both practices will be used to determine your approved yield; and

   (3) In addition to, or instead of, establishing optional units by section, section equivalent or FSA farm number, or irrigated and non-irrigated acreage, separate optional units may be established for acreage of the insured crop grown and insured under an organic farming practice. Certified organic, transitional and buffer zone acreages do not individually qualify as separate units. (See section 37 for additional provisions regarding acreage insured under an organic farming practice).

(d) Optional units are not available for crops insured under a Catastrophic Risk Protection Endorsement.

(e) If you do not comply fully with the provisions in this section, we will combine all optional units that are not in compliance with these provisions into the basic unit from which they were formed. We will combine the optional units at any time we discover that you have failed to comply with these provisions. If failure to comply with these provisions is determined by us to be inadvertent, and the optional units are combined into a basic unit, that portion of the additional premium paid for the optional units that have been combined will be refunded to you for the units combined.

**35. Multiple Benefits.**

(a) If you are eligible to receive an indemnity and are also eligible to receive benefits for the same loss under any other USDA program, you may receive benefits under both programs, unless specifically limited by the crop insurance contract or by law.

(b) Any amount received for the same loss from any USDA program, in addition to the crop insurance payment, will not exceed the difference between the crop insurance payment and the actual amount of the loss, unless otherwise provided by law. The amount of the actual loss is the difference between the total value of the insured crop before the loss and the total value of the insured crop after the loss.

   (1) For crops for which revenue protection is not available:

     (i) If you have an approved yield, the total value of the crop before the loss is your approved yield times the highest price election for the crop; and

     (ii) If you have an approved yield, the total value of the crop after the loss is your production to count times the highest price election for the crop; or

     (iii) If you have an amount of insurance, the total value of the crop before the loss is the highest amount of insurance available for the crop; and

     (iv) If you have an amount of insurance, the total value of the crop after the loss is your production to count times the price contained in the Crop Provisions for valuing production to count.

   (2) For crops for which revenue protection is

available and:

     (i) You elect yield protection:

       (A) The total value of the crop before the loss is your approved yield times the applicable projected price (at the 100 percent price level) for the crop; and

       (B) The total value of the crop after the loss is your production to count times the applicable projected price (at the 100 percent price level) for the crop; or

     (ii) You elect revenue protection:

       (A) The total value of the crop before the loss is your approved yield times the higher of the applicable projected price or harvest price for the crop (If you have elected the harvest price exclusion, the applicable projected price for the crop will be used); and

       (B) The total value of the crop after the loss is your production to count times the harvest price for the crop.

(c) FSA or another USDA agency, as applicable, will determine and pay the additional amount due you for any applicable USDA program, after first considering the amount of any crop insurance indemnity.

**36. Substitution of Yields.**

(a) When you have actual yields in your production history database that, due to an insurable cause of loss, are less than 60 percent of the applicable transitional yield you may elect, on an individual actual yield basis, to calculate and replace one or more of any such yields within each database.

(b) Each election made in section 36(a) must be made on or before the production reporting date for the insured crop and each such election will remain in effect for succeeding years unless canceled by the production reporting date for the succeeding crop year. If you cancel an election, the actual yield will be used in the database. For example, if you elected to substitute yields in your database for the 1998 and 2000 crop year, for any subsequent crop year, you can elect to cancel the substitution for either or both years.

(c) Each excluded actual yield will be replaced with a yield equal to 60 percent of the applicable transitional yield for the crop year in which the yield is being replaced, unless you qualify as a beginning farmer or rancher, in which case the excluded actual yield will be replaced with a yield equal to 80 percent of the applicable transitional yield for the crop year in which the yield is being replaced. (For example, if you elect to exclude a 2001 crop year actual yield, the transitional yield in effect for the 2001 crop year in the county will be used. If you also elect to exclude a 2002 crop year actual yield, the transitional yield in effect for the 2002 crop year in the county will be used). The replacement yields will be used in the same manner as actual yields for the purpose of calculating the approved yield.

(d) Once you have elected to exclude an actual yield from the database, the replacement yield will remain in effect until such time as that crop year is no longer included in the database unless this election is canceled in accordance with section 36(b).

(e) Although your approved yield will be used to determine your amount of premium owed, the

NHF1-524 Policy 000053

premium rate will be increased to cover the additional risk associated with the substitution of higher yields.

**37. Organic Farming Practices.**

(a) In accordance with section 8(b)(2), insurance will not be provided for any crop grown using an organic farming practice, unless the information needed to determine a premium rate for an organic farming practice is specified on the actuarial table, or insurance is allowed by a written agreement.

(b) If insurance is provided for an organic farming practice as specified in section 37(a), only the following acreage will be insured under such practice:

(1) Certified organic acreage;

(2) Transitional acreage being converted to certified organic acreage in accordance with an organic plan; and

(3) Buffer zone acreage.

(c) On the date you report your acreage, you must have:

(1) For certified organic acreage, a written certification in effect from a certifying agent indicating the name of the entity certified, effective date of certification, certificate number, types of commodities certified, and name and address of the certifying agent (A certificate issued to a tenant may be used to qualify a landlord or other similar arrangement);

(2) For transitional acreage, a certificate as described in section 37(c)(1), or written documentation from a certifying agent indicating an organic plan is in effect for the acreage; and

(3) Records from the certifying agent showing the specific location of each field of certified organic, transitional, buffer zone, and acreage not maintained under organic management.

(d) If you claim a loss on any acreage insured under an organic farming practice, you must provide us with copies of the records required in section 37(c).

(e) If any acreage qualifies as certified organic or transitional acreage on the date you report such acreage, and such certification is subsequently revoked by the certifying agent, or the certifying agent no longer considers the acreage as transitional acreage for the remainder of the crop year, that acreage will remain insured under the reported practice for which it qualified at the time the acreage was reported.  Any loss due to failure to comply with organic standards will be considered an uninsured cause of loss.

(f) Contamination by application or drift of prohibited substances onto land on which crops are grown using organic farming practices will not be an insured peril on any certified organic, transitional or buffer zone acreage.

(g) In addition to the provisions contained in section 17(f), prevented planting coverage will not be provided for any acreage based on an organic farming practice in excess of the number of acres that will be grown under an organic farming practice and shown as such in the records required in section 37(c).

(h) In lieu of the provisions contained in section 17(f)(1) that specify prevented planting acreage within a field that contains planted acreage will be considered to be acreage of the same practice that is planted in the field, prevented planting acreage will be considered

as organic practice acreage if it is identified as certified organic, transitional, or buffer zone acreage in the organic plan.

**18-CCIP-Replant and Double Crop**
(June 2017)



## UNITED STATES DEPARTMENT OF AGRICULTURE
## FEDERAL CROP INSURANCE CORPORATION
## COMMON CROP INSURANCE POLICY BASIC PROVISIONS
## REPLANT AND DOUBLE CROPPING AMENDMENT

_____
(This is a Continuous Amendment)

This amendment modifies the provisions of the Common Crop Insurance Policy Basic Provisions (CCIP) for the 2018 and succeeding crop years for all crops with a 2018 contract change date on or after June 30, 2017, and for the 2019 and succeeding crop years for all crops with a 2018 contract change date prior to June 30, 2017.

The changes to the above policies are required as the result of changes made in the Final Rule to the Common Crop Insurance Policy Basic Provisions published in the Federal Register on June 27, 2017.

The revised provisions are as follows:

| In lieu of section: | The following provisions will apply: |
|---|---|
| 1 – definition of "practical to replant" | **Practical to replant** - Our determination, after loss or damage to the insured crop, that you are able to replant to the same crop in such areas and under such circumstances as it is customary to replant and that replanting the insured crop will allow the crop to attain maturity prior to the calendar date for the end of the insurance period. We may consider circumstances as to whether: (1) it is physically possible to replant the acreage; (2) seed germination, emergence, and formation of a healthy plant is likely; (3) field, soil, and growing conditions allow for proper planting and growth of the replanted crop to reach maturity; or (4) other conditions exist, as provided by the Crop Provisions or Special Provisions. Unless we determine it is not practical to replant, based on the circumstances listed above, it will be considered practical to replant through: (1) the final planting date if no late planting period is applicable; (2) the end of the late planting period if the late planting period is less than 10 days; or (3) the 10th day after the final planting date if the crop has a late planting period of 10 days or more. We will consider it practical to replant regardless of the availability of seed or plants, or the input costs necessary to produce the insured crop such as seed or plants, irrigation water, etc. |
| 1 – definition of "replanted crop" | **Replanted crop** - The same agricultural commodity replanted on the same acreage as the insured crop for harvest in the same crop year if: 1) the replanting is specifically made optional by the policy and you elect to replant the crop and insure it under the policy covering the insured crop; or 2) replanting is required by the policy. The crop will be considered a replanted insured crop and no replanting payment will be paid if we have determined it is not practical to replant the insured crop and you choose to plant the acreage to the same insured crop. |
| 15(h) | You may receive a full indemnity, or a full prevented planting payment for a first insured crop when a second crop is planted on the same acreage in the same crop year, if each of the following conditions are met, regardless of whether or not the second crop is insured or sustains an insurable loss:<br>(1) Planting two or more crops for harvest in the same crop year in the area is generally recognized by agricultural experts or organic agricultural experts;<br>(2) The second or more crops are customarily planted after the first insured crop for harvest on the same acreage in the same crop year in the area;<br>(3) Additional coverage insurance offered under the authority of the Act is available in the county on the two or more crops that are double cropped;<br>(4) In the case of prevented planting, the second crop is not planted on or prior to the final planting date or, if applicable, prior to the end of the late planting period for the first insured crop; |

NHF1-524 Policy 000055

**18-CCIP-Replant and Double Cropping**
(June 2017)

(5) You provide records, acceptable to us, of acreage and production specific to the double cropped acreage proving that:

  (i) You have double cropped acreage in at least two of the last four crop years in which the first insured crop was planted and incur an insurable loss or the first insured crop is prevented from being planted and a second crop is planted.  If you acquired additional land for the current crop year you may apply the percentage of acres that you have previously double cropped to the total cropland acres that you are farming this year (if greater) using the following calculation:

   (A) Determine the number of acres of the first insured crop that were double cropped in each of the years for which double cropping records are provided (For example, records are provided showing: 100 acres of wheat planted in 2016 and 50 of those acres were double cropped with soybeans; and 100 acres of wheat planted in 2017 and 70 of those acres were double cropped with soybeans);

   (B) Divide each result of section 15(h)(5)(i)(A) by the number of acres of the first insured crop that were planted in each respective year (In the example above, 50 divided by 100 equals 50 percent of the first insured crop acres that were double cropped in 2016 and 70 divided by 100 equals 70 percent of the first insured crop acres that were double cropped in 2017);

   (C) Add the results of section 15(h)(5)(i)(B) and divide by the number of years the first insured crop was double cropped (In the example above, 50 plus 70 equals 120 divided by 2 equals 60 percent); and

   (D) Multiply the result of 15(h)(5)(i)(C) by the number of insured acres of the first insured crop (In the example above, 60 percent multiplied by the number of wheat acres insured in 2018); or

  (ii) The applicable acreage was double cropped (by one or more other producers, and the producer(s) will allow you to use their records) for at least two of the last four crop years in which the first insured crop was grown on it; and

(6) If you do not have records of acreage and production specific to the double cropped acreage, as required in section 15(h)(5), but instead have records that combine production from acreage you double cropped with records of production from acreage you did not double crop, we will allocate the first and second crop production to the specific acreage in proportion to the liability for the acreage that was and was not double cropped.

NHF1-524 Policy 000056

**SUMMARY OF CHANGES FOR THE COARSE GRAINS CROP PROVISIONS (17-0041)**
**(Released November 2016)**

The following is a brief description of the changes to the Coarse Grains Crop Provisions that will be effective for the 2017 crop year.  Please refer to the Crop Provisions for complete information.

Section 12 – Removed the prevented planting coverage level percent specified in the Crop Provisions to specify the percent in the actuarial documents to allow updates as needed.

**17-0041**
**(Released November 2016)**

**UNITED STATES DEPARTMENT OF AGRICULTURE**
**Federal Crop Insurance Corporation**
**COARSE GRAINS CROP PROVISIONS**



# 1. Definitions

**Coarse grains** - Corn, grain sorghum, and soybeans.

**Grain sorghum** - The crop defined as sorghum under the United States Grain Standards Act.

**Harvest** - Combining, threshing, or picking the insured crop for grain, or cutting for hay, silage, or fodder.

**Local market price** - The cash grain price per bushel for the U.S. No. 2 yellow corn, U.S. No. 2 grain sorghum, or U.S. No. 1 soybeans, offered by buyers in the area in which you normally market the insured crop. The local market price will reflect the maximum limits of quality deficiencies allowable for the U.S. No. 2 grade for yellow corn and grain sorghum, or U.S. No. 1 grade for soybeans.  Factors not associated with grading under the Official United States Standards for Grain, including but not limited to protein and oil, will not be considered.

**Planted acreage** - In addition to the definition contained in the Basic Provisions, coarse grains must initially be planted in rows, unless otherwise provided by the Special Provisions, actuarial documents, or by written agreement.

**Production guarantee (per acre)** – In lieu of the definition contained in the Basic Provisions, the number of bushels (tons for corn insured as silage) determined by multiplying the approved yield per acre by the coverage level percentage you elect.

**Silage** - A product that results from severing the plant from the land and chopping it for the purpose of livestock feed.

**Ton** - Two thousand (2000) pounds avoirdupois.

# 2. Insurance Guarantees, Coverage Levels, and Prices for Determining Indemnities

In addition to the requirements of section 3 of the Basic Provisions, you must elect to insure your corn, grain sorghum, or soybeans with either revenue protection or yield protection by the sales closing date.

# 3. Contract Changes

In accordance with section 4 of the Basic Provisions, the contract change date is November 30 preceding the cancellation date.

# 4. Cancellation and Termination Dates

In accordance with section 2 of the Basic Provisions, the cancellation and termination dates are:

| State and County | Cancellation and Termination Dates |
|---|---|
| **(a)** **For corn and grain sorghum:** | |
| Val Verde, Edwards, Kerr, Kendall, Bexar, Wilson, Karnes, Goliad, Victoria, and Jackson Counties, Texas, and all Texas counties lying south thereof | January 31. |
| El Paso, Hudspeth, Culberson, Reeves, Loving, Winkler, Ector, Upton, Reagan, Sterling, Coke, Tom Green, Concho, McCulloch, San Saba, Mills, Hamilton, Bosque, Johnson, Tarrant, Wise, Cooke Counties, Texas, and all Texas counties lying south and east thereof to and including Terrell, Crockett, Sutton, Kimble, Gillespie, Blanco, Comal, Guadalupe, Gonzales, De Witt, Lavaca, Colorado, Wharton, and Matagorda Counties, Texas | February 15. |
| Alabama; Arizona; Arkansas; California; Florida; Georgia; Louisiana; Mississippi; Nevada; North Carolina; and South Carolina | February 28. |
| All other Texas counties and all other states | March 15. |
| **(b)** **For soybeans:** | |
| Jackson, Victoria, Goliad, Bee, Live Oak, McMullen, LaSalle, and Dimmit Counties, Texas and all Texas counties lying south thereof | January 31. |
| Alabama; Arizona; Arkansas; California; Florida; Georgia; Louisiana; Mississippi; Nevada; North Carolina; and South Carolina; and El Paso, Hudspeth, Culberson, Reeves, Loving, Winkler, Ector, Upton, Reagan, Sterling, Coke, Tom Green, Concho, McCulloch, San Saba, Mills, Hamilton, Bosque, Johnson, Tarrant, Wise, Cooke Counties, Texas, and all Texas counties lying south and east thereof to and including Maverick, Zavala, Frio, Atascosa, Karnes, De Witt, Lavaca, Colorado, Wharton, and Matagorda Counties, Texas | February 28. |
| All other Texas counties and all other states | March 15. |

# 5. Insured Crop

(a) In accordance with section 8 of the Basic Provisions, the crop insured will be each coarse grain crop you elect to insure for which premium rates are provided by the actuarial documents:

(1) In which you have a share;

(2) That is adapted to the area based on days to maturity and is compatible with agronomic and weather conditions in the area; and

(3) That is not (unless allowed by the Special Provisions or by written agreement):

(i) Interplanted with another crop except as allowed in section 5(b)(1); or

NHF1-524 Policy 000058

(ii) Planted into an established grass or legume.

(b) For corn only, in addition to the provisions of section 5(a), the corn crop insured will be all corn that is:

(1) Planted for harvest either as grain or as silage (see section 5(c)). A mixture of corn and sorghum (grain or forage-type) will be insured as corn silage if the sorghum does not constitute more than twenty percent (20%) of the plants;

(2) Yellow dent or white corn, including mixed yellow and white, waxy or high-lysine corn, high-oil corn blends containing mixtures of at least 90 percent high yielding yellow dent female plants with high-oil male pollinator plants, or commercial varieties of high-protein hybrids, and excluding:

(i) High-amylose, high-oil or high-protein (except as authorized in section 5(b)(2)), flint, flour, Indian, or blue corn, or a variety genetically adapted to provide forage for wildlife or any other open pollinated corn, unless a written agreement allows insurance of such excluded crops.

(ii) A variety of corn adapted for silage use only when the corn is reported for insurance as grain.

(c) For corn only, if the actuarial documents for the county provide a premium rate for:

(1) **Both grain and silage**, all insurable acreage will be insured as the type or types reported by you on or before the acreage reporting date;

(2) **Grain but not silage**, all insurable acreage will be insured as grain unless a written agreement allows insurance on all or a portion of the insurable acreage as silage; or

(3) **Silage but not grain**, all insurable corn acreage will be insured as silage unless a written agreement allows insurance on all or a portion of the insurable acreage as grain.

(d) For grain sorghum only, in addition to the provisions of section 5(a), the grain sorghum crop insured will be all of the grain sorghum in the county:

(1) That is planted for harvest as grain;

(2) That is a combine-type hybrid grain sorghum (grown from hybrid seed); and

(3) That is not a dual-purpose type of grain sorghum (a type used for both grain and forage), unless a written agreement allows insurance of such grain sorghum.

(e) For soybeans only, in addition to the provisions of section 5(a), the soybean crop insured will be all of the soybeans in the county that are planted for harvest as beans.

6. **Insurable Acreage**

In addition to the provisions of section 9 of the Basic Provisions, any acreage of the insured crop damaged before the final planting date, to the extent that a majority of producers in the area would not normally further care for the crop, must be replanted unless we agree that it is not practical to replant.

7. **Insurance Period**

In accordance with the provisions of section 11 of the Basic Provisions, the calendar date for the end of the insurance period is the date immediately following planting as follows:

(a) **For corn insured as grain:**

(1) Val Verde, Edwards, Kerr, Kendall, Bexar, Wilson, Karnes, Goliad, Victoria, and Jackson Counties, Texas, and all Texas counties lying south thereof. September 30.

(2) Clark, Cowlitz, Grays Harbor, Island, Jefferson, King, Kitsap, Lewis, Pierce, Skagit, Snohomish, Thurston, Wahkiakum, and Whatcom Counties, Washington. October 31.

(3) All other counties and states December 10.

(b) **For corn insured as silage:**

(1) Connecticut, Delaware, Idaho, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and West Virginia. October 20.

(2) All other states. September 30.

(c) **For grain sorghum:**

(1) Val Verde, Edwards, Kerr, Kendall, Bexar, Wilson, Karnes, Goliad, Victoria, and Jackson Counties, Texas, and all Texas counties lying south thereof September 30.

(2) All other Texas counties and all other states December 10.

(d) **For soybeans:**

All states December 10.

8. **Causes of Loss**

In accordance with the provisions of section 12 of the Basic Provisions, insurance is provided only against the following causes of loss which occur within the insurance period:

(a) Adverse weather conditions;

(b) Fire;

(c) Insects, but not damage due to insufficient or improper application of pest control measures;

(d) Plant disease, but not damage due to insufficient or improper application of disease control measures;

(e) Wildlife;

(f) Earthquake;

(g) Volcanic eruption;

(h) Failure of the irrigation water supply due to a

cause of loss specified in sections 8(a) through (g) that also occurs during the insurance period; or

(i) For revenue protection, a change in the harvest price from the projected price, unless FCIC can prove the price change was the direct result of an uninsured cause of loss specified in section 12(a) of the Basic Provisions.

**9.  Replanting Payments**

(a) A replanting payment is allowed as follows:

(1) In lieu of provisions in section 13 of the Basic Provisions that limit the amount of a replant payment to the actual cost of replanting, the amount of any replanting payment will be determined in accordance with these Crop Provisions;

(2) Except as specified in section 9(a)(1), you must comply with all requirements regarding replanting payments contained in section 13 of the Basic Provisions; and

(3) The insured crop must be damaged by an insurable cause of loss to the extent that the remaining stand will not produce at least 90 percent of the production guarantee for the acreage.

(b) Unless otherwise specified in the Special Provisions, the amount of the replanting payment per acre will be the lesser of 20 percent of the production guarantee or the number of bushels (tons for corn insured as silage) for the applicable crop specified below, multiplied by your projected price, multiplied by your share:

(1) 8 bushels for corn grain;
(2) 1 ton for corn silage;
(3) 7 bushels for grain sorghum; and
(4) 3 bushels for soybeans.

(c) When the crop is replanted using a practice that is uninsurable for an original planting, the liability on the unit will be reduced by the amount of the replanting payment.  The premium amount will not be reduced.

(d) If the acreage is replanted to an insured crop type that is different than the insured crop type originally planted on the acreage:

(1) The production guarantee, premium, and projected price and harvest price, as applicable, will be adjusted based on the replanted type;

(2) Replanting payments will be calculated using your projected price and production guarantee for the crop type that is replanted and insured; and

(3) A revised acreage report will be required to reflect the replanted type, as applicable.

**10. Duties in the Event of Damage or Loss**

(a) Representative samples are required in accordance with section 14 of the Basic Provisions.

(b) For any corn unit that has separate dates for the

end of the insurance period (grain and silage), in lieu of the requirement contained in section 14 of the Basic Provisions to provide notice within 72 hours of your initial discovery of damage (but not later than 15 days after the end of the insurance period), you must provide notice within 72 hours of your initial discovery of damage (but not later than 15 days after the latest end of the insurance period applicable to the unit).

(c) If you will harvest any acreage in a manner other than as you reported it for coverage (*e.g.*, you reported planting it to harvest as grain but will harvest the acreage for silage, or you reported planting it to harvest as silage but will harvest the acreage for grain), you must notify us before harvest begins.  Failure to timely provide notice will result in production to count determined in accordance with section 11(c)(1)(i)(E).

**11. Settlement of Claim**

(a) We will determine your loss on a unit basis.  In the event you are unable to provide records of production that are acceptable to us for any:

(1) Optional unit, we will combine all optional units for which acceptable records of production were not provided; or

(2) Basic unit, we will allocate any commingled production to such units in proportion to our liability on the harvested acreage for each unit.

(b) In the event of loss or damage covered by this policy, we will settle your claim by:

(1) Multiplying the number of insured acres of each insured crop or type, as applicable, by your respective:

(i) Yield protection guarantee (per acre) if you elected yield protection; or

(ii) Revenue protection guarantee (per acre) if you elected revenue protection;

(2) Totaling the results of section 11(b)(1)(i) or 11(b)(1)(ii), whichever is applicable;

(3) Multiplying the production to count of each insured crop or type, as applicable, by your respective:

(i) Projected price if you elected yield protection; or

(ii) Harvest price if you elected revenue protection;

(4) Totaling the results of section 11(b)(3)(i) or 11(b)(3)(ii), whichever is applicable;

(5) Subtracting the result of section 11(b)(4) from the result of section 11(b)(2); and

(6) Multiplying the result of section (11)(b)(5) by your share.

For example:

You have 100 percent share in 50 acres of corn in the unit with a production guarantee (per acre) of 115 bushels, your projected price is $2.25, your harvest price is $2.20, and your production to count is 5,000 bushels.

If you elected yield protection:

(1) 50 acres x (115 bushel production guarantee x $2.25 projected price) = $12,937.50 value of the production guarantee

(3) 5,000 bushel production to count x $2.25 projected price = $11,250.00 value of the production to count

(5) $12,937.50 - $11,250.00 = $1,687.50

(6) $1,687.50 x 1.000 share = $1,688.00 indemnity; or

If you elected revenue protection:

(1) 50 acres x (115 bushel production guarantee x $2.25 projected price) = $12,937.50 revenue protection guarantee

(3) 5,000 bushel production to count x $2.20 harvest price = $11,000.00 value of the production to count

(5) $12,937.50 - $11,000.00 = $1,937.50

(6) $1,937.50 x 1.000 share = $1,938.00 indemnity.

(c) The total production to count (in bushels for corn insured as grain or in tons for corn insured as silage) from all insurable acreage on the unit will include:

(1) All appraised production as follows:

(i) For yield protection, not less than the production guarantee, or for revenue protection, not less than the amount of production that when multiplied by the harvest price equals the revenue protection guarantee (per acre) for acreage:

(A) That is abandoned;

(B) Put to another use without our consent;

(C) Damaged solely by uninsured causes;

(D) For which you fail to provide records of production that are acceptable to us; or

(E) For which you fail to give us notice before harvest begins if you report planting the corn to harvest as grain but harvest it as silage or you report planting the corn to harvest as silage but harvest it as grain.

(ii) Production lost due to uninsured causes;

(iii) Unharvested production (mature unharvested production may be adjusted for quality deficiencies and excess moisture in accordance with section 11(d)); and

(iv) Potential production on insured acreage you will put to another use or abandon, if you and we agree on the appraised amount of production. Upon such agreement the insurance period for that acreage will end when you put the acreage to another use or abandon the

crop. If agreement on the appraised amount of production is not reached:

(A) If you do not elect to continue to care for the crop we may give you consent to put the acreage to another use if you agree to leave intact, and provide sufficient care for, representative samples of the crop in locations acceptable to us (The amount of production to count for such acreage will be based on the harvested production or appraisals from the samples at the time harvest should have occurred. If you do not leave the required samples intact, or you fail to provide sufficient care for the samples, our appraisal made prior to giving you consent to put the acreage to another use will be used to determine the amount of production to count.); or

(B) If you elect to continue to care for the crop, the amount of production to count for the acreage will be the harvested production, or our reappraisal if additional damage occurs and the crop is not harvested; and

(2) All harvested production from the insurable acreage.

(d) Mature coarse grain production (excluding corn insured as silage) may be adjusted for excess moisture and quality deficiencies. If moisture adjustment is applicable it will be made prior to any adjustment for quality. Corn insured as silage will be adjusted for excess moisture and quality only as specified in section 11(e).

(1) Production will be reduced by 0.12 percent for each 0.1 percentage point of moisture in excess of:

(i) Fifteen percent (15%) for corn (If moisture exceeds 30 percent (30%), production will be reduced 0.2 percent for each 0.1 percentage point above 30 percent (30%));

(ii) Fourteen percent (14%) for grain sorghum; and

(iii) Thirteen percent (13%) for soybeans.

We may obtain samples of the production to determine the moisture content.

(2) Production will be eligible for quality adjustment if:

(i) Deficiencies in quality, in accordance with the Official United States Standards for Grain, result in:

(A) Corn not meeting the grade requirements for U.S. No. 4 (grades U.S. No. 5 or worse) because of test weight or kernel damage (excluding

heat damage) or having a musty, sour, or commercially objectionable foreign odor;

(B) Grain sorghum not meeting the grade requirements for U.S. No. 4 (grades U.S. Sample grade) because of test weight or kernel damage (excluding heat damage) or having a musty, sour, or commercially objectionable foreign odor (except smut odor), or meets the special grade requirements for smutty grain sorghum; or

(C) Soybeans not meeting the grade requirements for U.S. No. 4 (grades U.S. Sample grade) because of test weight or kernel damage (excluding heat damage) or having a musty, sour, or commercially objectionable foreign odor (except garlic odor), or which meet the special grade requirements for garlicky soybeans; or

(ii) Substances or conditions are present that are identified by the Food and Drug Administration or other public health organizations of the United States as being injurious to human or animal health.

(3) Quality will be a factor in determining your loss only if:

(i) The deficiencies, substances, or conditions resulted from a cause of loss against which insurance is provided under these crop provisions;

(ii) All determinations of these deficiencies, substances, or conditions are made using samples of the production obtained by us or by a disinterested third party approved by us;

(iii) With regard to deficiencies in quality (except test weight, which may be determined by our loss adjuster), the samples are analyzed by:

(A) A grain grader licensed under the United States Grain Standards Act or the United States Warehouse Act;

(B) A grain grader licensed under State law and employed by a warehouse operator who has a storage agreement with the Commodity Credit Corporation; or

(C) A grain grader not licensed under State law, but who is employed by a warehouse operator who has a commodity storage agreement with the Commodity Credit Corporation and is in compliance with State law regarding warehouses; and

(iv) With regard to substances or conditions injurious to human or animal health, the samples are analyzed by a laboratory approved by us.

(4) Coarse grain production that is eligible for quality adjustment, as specified in sections 11(d)(2) and (3), will be reduced by the quality adjustment factor contained in the Special Provisions.

(e) For corn insured as silage:

(1) Whenever our appraisal of grain content is less than 4.5 bushels of grain per ton of silage, the silage production will be reduced by 1 percentage point for each 0.1 (1/10) of a bushel less than 4.5 bushels per ton (If we cannot make a grain appraisal before harvest and you do not leave a representative unharvested sample, in accordance with the policy no reduction for grain-deficient silage will be made.); and

(2) If the normal silage harvesting period has ended, or for any acreage harvested as silage or appraised as silage after the calendar date for the end of the insurance period as specified in section 7(b), we may increase the silage production to count to a 65 percent moisture equivalent to reflect the normal moisture content of silage harvested during the normal silage harvesting period.

(f) Any production harvested from plants growing in the insured crop may be counted as production of the insured crop on a weight basis.

**12. Prevented Planting**

Your prevented planting coverage will be a percentage specified in the actuarial documents of your production guarantee for timely planted acreage. If you have additional coverage and pay an additional premium, you may increase your prevented planting coverage if such additional coverage is specified in the actuarial documents.

NHF1-524 Policy 000062

**REQUIREMENT TO REPORT FIELD LOCATION ON THE ACREAGE REPORT**

Please be advised that the Risk Management Agency has issued the following guidelines.

Beginning with the 2017 reinsurance year, insureds must report field location on the acreage report as required by section 6(c)(5) and 8(c)(5), respectively, of the Basic Provisions for the following insurance plans under CCIP and ARPI:

01      Yield Protection
02      Revenue Protection
03      Revenue Protection with Harvest Price Exclusion
04      Area Yield Protection
05      Area Revenue Protection
06      Area Revenue Protection with Harvest Price Exclusion

The insured can meet the acreage reporting requirement for field location identification by:

If known and accurate, providing the FSA Farm, Tract, and Field Number, including the FSA administrative State and County; or otherwise

Clearly identifying the field location(s) and associated boundaries using AIP map-based reporting or other mapping resources which clearly delineates the field's location.

If an insured does not provide the field location as required, on the acreage report for a CCIP or ARPI policy under insurance plans 01-06, any and all applicable unreported or misreported information penalties would apply, including rejection of the acreage report and subsequent denial of liability to the insured.

Great American Insurance Company has map-based reporting forms and mapping resources available for insureds to comply with this requirement.  If you have any questions, please contact your crop insurance agent.

NHF1-524 Policy 000064



# IRRIGATED PRACTICE GUIDELINES

The following guidelines are provided to enable insureds to properly report planted or perennial crop acreage to be insured under the irrigated practice in order to receive maximum protection under their crop insurance policy. It is very important that these guidelines be utilized to document whether, at the time insurances attaches; there is a reasonable expectation of receiving adequate water to carry out a good irrigation practice for acreage reported under the irrigated practice. The guidelines, in entirety, are substantive and are to be given to the insured in administration of their crop insurance policy.

## 1 DEFINITIONS

The following definitions are provided to facilitate a uniform understanding of the standards and guidelines for insuring an irrigated practice for planted or perennial crop acreage.

A  Adequacy of Irrigation Facilities – Irrigation facilities are considered adequate if it is determined that, at the time insurance attaches to planted or perennial acreage, they will be available and usable at the times needed and have the capacity to timely deliver water in sufficient quantities to carry out a good irrigation practice for the acreage insured under the irrigated practice.

B  Efficient Irrigation – Carrying out a good irrigation practice using a lesser amount of irrigation water than historically applied, but still achieving the irrigated APH yield by implementing approved or enhanced management practices to increase efficiency of irrigation water use.

Enhanced management practices to increase efficiency of irrigation water use include, but are not limited to, the following:

- Irrigation Method – Employing an irrigation water distribution technique or technology that has demonstrated greater efficiency (e.g. converting gravity flood irrigation to a center pivot or underground drip tape).

- Converting high pressure impact sprinklers to low pressure impacts under center pivot irrigation.

- Soil Moisture Monitors – Using soil moisture monitor output to set the schedule and amount of irrigation water applied.

C  Good Irrigation Practice – The application of adequate water in an acceptable manner, at the proper times, to allow production of a normal crop which is often identified as the approved APH yield for crops.

D  Irrigation Equipment and Facilities – The physical resources, other than water, used to regulate the flow of water from a water source to the acreage. This includes pumps, valves, sprinkler heads, and other control devices. It also includes pipes or pipelines which: (1) are under the control of the insured or (2) routinely deliver water only to acreage which is owned or operated by the insured. A center pivot system is considered irrigation equipment and facilities.

E  Irrigation Water Supply – The water source and means for supplying irrigation water, without regard to the equipment or facilities. This includes the water source and dams, canals, ditches, pipelines, etc., which contain the water for movement from the source to the acreage and (1) are not under the control of the insured or (2) routinely deliver water to acreage in addition to that which is owned or operated by the insured. It DOES NOT INCLUDE any irrigation equipment or facilities.

F  Reasonable Expectation of Adequate Water – The insured had no reason to know at the time coverage began the amount of irrigation water may be limited or reduced. No reasonable expectation exists if the insured knew, or had reason to know, the amount of irrigation water may be reduced before coverage begins.

G  Water Source – The source from which water is made available. This includes wells, lakes, reservoirs, streams, aquifers, etc.

## 2 REQUIREMENTS

For planted or perennial acreage to be insured under and irrigated practice, the insured must:

1  be able to document and demonstrate that there is a reasonable expectation of adequate water (refer to section 3);

2  be able to document and demonstrate good irrigation practices;

3  be able to demonstrate that they have adequate irrigation equipment and facilities;

4    provide verifiable documentation to their AIP by the ARD that the irrigation water supply has replenished after a failure of the irrigation water supply prevented the insured from planting or the insured had a failure of irrigation water supply; and

5    keep separate production records for acreage insured under an irrigated practice from acreage insured under a practice other than irrigated (or with no practice applicable) and uninsured acreage.

**3    DETERMINATION OF REASONABLE EXPECTATION OF ADEQUATE WATER**

Factors to be considered (applicable to both the AIP and the insured) when determining and documenting whether a reasonable expectation of adequate water existed include, but are not limited to the following: Substantive

1    Most recent 10-year historical average of available water and any applicable forecasting data from a credible authority responsible for monitoring and forecasting such conditions such as Irrigation Districts, State Department of Water Resources, Bureau of Reclamation, Water Boards, etc.

   **Examples:**    Current Federal, state, or local water district allocations, historical inflows, current water levels, expected inflows resulting from snowpack, expected rainfall, etc.;

2    Water supply availability, quality, and usage;

3    Pump efficiency and capacity;

4    Water requirements (amount and timing) for all irrigated crops;

5    Water rights available to the insured (primary, secondary, urban versus agricultural use, etc.);

6    Contingency plans to handle water shortages;

7    Acres to be irrigated;

8    Ownership of the water source including the legal entitlement or rights to the water (state or Federal versus landowner or other private party);

9    Meters, measuring devices, and methods used to monitor good irrigation practice;

10   Soil types, soil moisture levels, and pre-plant irrigation needs;

11   Water conservation methods, devices used, and plans utilized (if applicable);

12   Past crop planting history and tillage methods;

13   Supplemental water availability and usage including return flow or any precipitation which would normally be received, after insurance attaches;

14   Recommendations from local Cooperative Extension Service (CES), National Resource Conservation Service (NRCS), or other source recognized by CES or NRCS to be an expert in the area regarding irrigation and crop production;

15   Decreased water allocation resulting from the diversion of water for environmental, public use or priority, or other reasons.

   **Note:**    Not an insurable cause of loss (COL) unless the diversion is made necessary due to an insured COL; and

16   Management practices used or to be used to carry out efficient irrigation, as applicable.

**4    FAILURE TO QUALIFY OR CARRY OUT A GOOD IRRIGATION PRACTICE**

A    If the acreage fails to qualify for insurance under the irrigated practice, it will result in such acreage being insured under a practice other than irrigated.  If no other appropriate practice is available for the acreage, insurance will not be considered to have attached on the acreage.

B    Failure to carry out a good irrigation practice on acreage properly insured under the irrigated practice will result in an appraisal for uninsured causes on such acreage, unless:

1    the failure was caused by unavoidable failure of the irrigation water supply after insurance attached; or

2    failure or breakdown of the irrigation equipment or facilities due to an insured COL, provided all reasonable efforts to restore the irrigation equipment facilities to proper working order within a reasonable amount of time, unless the AIP determines it is not practical to do so.

   **Note:**    Cost will not be considered when determining whether it is practical to restore the equipment or facilities.

C    If a loss is evident, any reported acreage qualifying as an irrigated practice at the time insurance attaches cannot be revised to a non-irrigated practice after the acreage reporting date, even if liability stays the same or decreases or if the insured failed to carry out a good irrigation practice.

**5   PREVENTED PLANTING COVERAGE**

A   Insureds may be eligible for a prevented planting payment for acreage historically grown under an irrigated practice for which the insured had no reasonable expectation of adequate water by the final planting date (or within the late planting period, if applicable). This applies even if the acreage could have been planted with a non-irrigated practice and the insured elects not to plant,  provided all other prevented planting provisions have been met, including that an insured COL must have occurred within the PP insurance period.

B   Insureds must provide, upon the AIP's request, documentation of the factors which were considered in reporting that there was no reasonable expectation of adequate water for the acreage reported as prevented planting under an irrigated practice.

NHF1-524 Policy 000068

# IMPORTANT NOTICE TO POLICYHOLDERS



**Use of Precision Farming Records for a Crop Insurance Claim**

Great American Insurance Company (GAIC) may allow Precision Farming records, for those policyholders utilizing Precision Farming Technology Systems, to satisfy the claim documentation requirements under your crop insurance policy.  In an effort to effectively service your policy and provide you with the most up-to-date information, we've outlined the allowance and requirements below.

It is important to point out that the Multiple Peril Crop Insurance (MPCI) program is very specific in what qualifies as Precision Farming.  We encourage you to discuss your Precision Farming Technology System with your Agent early in the year.  If questions arise as a result of these discussions, the GAIC Claims Department will be happy to assist in determining how your system best fits within the framework of crop insurance claim reporting and record requirements.

**What is Precision Farming?**

For crop insurance purposes, the USDA's Risk Management Agency has defined Precision Farming as follows:

> The utilization of systems' technologies and agronomic principles to manage variability within and between fields and/or over time that is associated with all aspects of agricultural production.  It requires the use of technologies, such as global positioning system (GPS) and geographic information systems (GIS) management tools for the purpose of improving crop management.  Precision farming may include the combination of variable seeding and fertilizer rates, minimizing seed and chemical overlaps, and the use of GPS/GIS yield mapping technology (i.e. a Precision Farming producer using variable seeding, cutting planting rate from 36,000 to 18,000 seeds/acre for non-irrigated corners, indicating a discernible break in yield with the use of GPS/GIS mapping).

Specifically, a Precision Farming Technology System must include at least the following components:

- GPS technology integrated with planter monitors, combine monitors and yield mapping software.
- The ability to produce reports summarizing planted acres, harvested acres & harvested production.
- The ability to provide evidence, by crop, that the system was properly calibrated according to the manufacturer's requirements, for the current crop year.  If your system is capable of producing a calibration report, we will accept that as evidence of calibration.  If not, you should maintain a hard-copy Annual Calibration Report, which your Agent can provide.

**I believe my system qualifies.  What does this mean for me?**

By utilizing a Precision Farming Technology System that meets the above standard, GAIC may allow use of your planted acreage records to be acceptable as "determined" acres and use of your harvested production records to establish your total production (in lieu of settlement sheets, bin measurements, etc.).  In other words, your crop insurance claim may be based on the data and reports collected from your Precision Farming Technology System.

# IMPORTANT NOTICE TO POLICYHOLDERS (Cont'd)



**If I wish to use my Precision Farming Technology as described above, what is required?**
In addition to utilizing a Precision Farming Technology System that qualifies, there are several requirements that must be met, and those requirements differ for planted acreage records vs. harvested production records.  We have outlined the requirements for both categories below:

<u>Planted Acreage Records</u>
- For planted acreage records to be acceptable as evidence of determined acres, the following information must be provided <u>in conjunction with the Harvested Production Records:</u>
  - Insured's Name
  - Unit Number
  - FSA farm/tract/field ID number (optional)
  - Legal description of the acreage; and
  - A print out from the Precision Farming Technology System that includes the crop name, acres planted, and electronically produced maps of planted acreage and summary records. These records must illustrate any required discernable breaks between units or practices.
  - If overlapping rows were planted on the acreage, the system must account for this overlap.  If the system does not account for the overlapping rows, we will determine acres as if the Precision Farming technology was not being used.

<u>Harvested Production Records</u>
- For harvested production records to be acceptable as production evidence for a claim, the following information must be provided <u>in conjunction with the Planted Acreage Records:</u>
  - The system must be calibrated for each insured crop and crop year, in accordance with the owner's manual specifications.  The calibration must be within 3% of the actual weight of the production harvested during the calibration test.
  - The Annual Calibration Report must include all calibrations and adjustments performed, by crop, for the crop year.  The report must also include the date of each calibration/adjustment, and the amount of adjustment from the previous setting.
  - Insured's Name
  - Unit Number
  - FSA farm/tract/field ID number (optional)
  - Legal description of the acreage; and
  - A print out from the Precision Farming Technology System that includes the crop name, acres harvested, date harvested, total production (unadjusted for moisture), average moisture content; and
  - Yield maps and acreage/production summary records, which illustrate that separate production records were maintained by unit and/or practice.

**What else should I consider regarding Precision Farming Technology and my crop insurance?**
In the event your Precision Farming records are deemed unacceptable, we will make our claim determinations as if you did not utilize a Precision Farming Technology System.  In this case, we may use the combine monitor record as a load record when allocating production to the appropriate unit.

Should you have any questions on how Precision Farming fits within the structure of your crop insurance policy, please contact your Agent.

Great American appreciates your business and the opportunity to service your policy.

# IMPORTANT NOTICE TO ALL POLICYHOLDERS



So that Great American Insurance Company can continue to provide prompt service to your MPCI policy/claim, please review the following requirements:

**CRITERIA FOR THE USE OF LOAD RECORDS, STRUCTURE MARKINGS OR COMBINE MONITOR RECORDS FOR PRODUCTION THAT IS TO BE KEPT SEPARATE**

It is a requirement of the Multiple Peril Crop Insurance (MPCI) program that production must be kept separate by unit. Consequently, when commingled production has not been pre-measured by an Approved Insurance Provider (AIP), the Risk Management Agency (RMA) requires policyholders to follow certain requirements when documenting that production of two or more units have been commingled. For your review and so that we can better service your policy, the applicable requirements are provided below.

Please note that failure to adhere to these requirements may result in our inability to allocate the production we determine through measurements, settlement sheet verification, etc. to the appropriate unit, and may ultimately result in the collapsing of units; proration of production and loss of optional units for the following year.

<u>Criteria Needed to Accept Insured's Production Records or Storage-structure Markings</u>

- If load records or combine monitor records are used to keep production separate, the loads are recorded as outlined below.

- If structure markings are used, the structure is marked and identified as outlined below.

- There is no production from prior years in the structure, unless the production has been measured by the AIP or another USDA agency just prior to the current year's production being added. If another USDA agency's measurements are used, you must determine whether the grain was leveled.

- The total production within the structure must be accounted for; i.e., all production stored in the storage structure can be identified separately by unit number or field I.D., uninsured acreage, etc.

<u>Acceptable Load Records, Storage Structure Markings, Printed Records from Combine Monitors</u>

1. Load Records

   Maintain a contemporaneous ledger, by crop, recording loads of production for the crop identified by unit and/or field identification, date of harvest, identity of the conveyance used to transport the grain to the bin and the estimated bushel volume per conveyance. The adjuster must verify that the field identification can be correlated with the unit numbers for the crop for the current crop year. If field identification cannot be correlated to a unit number for the crop, the production must be considered commingled. Policyholders are permitted to adjust their load records for excess moisture, and if they have done so, this is what will be used to compare against the adjuster measured and calculated production (including adjustments for moisture if the adjuster's moisture test shows excess moisture).

2. Storage Structure Markings

   Identify the depth of such production by marking the storage structure with a permanent marker. Write the unit number(s) and/or field identification from which the production was harvested, and date and initial the mark. Also, on the storage structure, identify and mark the depth of uninsured-acreage production separately from insured-acreage production when the storage structure will contain both. The adjuster must verify that the field identification numbers can be correlated with the unit numbers for the crop for the current crop year. If field identification cannot be correlated to a unit number for the crop, the production must be considered commingled.

3.  Records From Combine Monitors that do NOT qualify as a Precision Farming Technology System

   Printed records from combine monitors must show the location of field (field identification), name of crop, date, and number of pounds or bushels of the crop. Policyholders must also identify the unit number that correlates with the field identification on the records. The adjuster must verify that the field identification can be correlated with the unit numbers for the crop for the current crop year. If field identification cannot be correlated to a unit number for the crop, the production must be considered commingled. If production from the combine monitor records has been adjusted for moisture by the insured or automatically by the combine monitor, this recorded amount will be the amount compared against the adjuster's measured and calculated production, (including adjustments for moisture if the adjuster's moisture test shows excess moisture).

Contemporaneous and Conveyance, as used in the above paragraphs, are defined as follows:

   Contemporaneous – Occurring or originating during the same time.

   Conveyance – Anything in which agricultural commodities are transported. This may include combine hoppers, commodity bins, grain carts, grain wagons, farm truck, semi trailer, railcar, or barge. The term "transported" does not include all forms of grain movement; e.g., the following are not conveyances: grain augers, grain dryers, elevator legs, or picking lines.

## ACCEPTABLE WEIGHT TICKETS / RECORDS CRITERIA FOR PRODUCTION THAT IS TO BE WEIGHED AND FARM-STORED

To be acceptable, each individual scale weight ticket/record for each load must be available and must provide at least the following information:

- Policyholder Name
- Crop
- Per Load; the gross weight of the conveyance with production and the gross weight of the conveyance without production. However, the following exceptions apply:
  - If the production is weighed using a grain cart that prints out tickets showing the gross weight of production in the cart, only the gross weight per grain cart of the production is required
  - If the production is weighed using a grain cart that has an integrated panel showing the gross weight of the production in the cart from which the policyholder documents the weight, only the gross weight per grain cart of the production is required
  - If the production is weighed using a grain cart that is equipped with scales integrated with Bluetooth (or other wired/wireless) interface capable of electronically recording and storing weight records on a load by load basis from which the insured can print all individual load tickets and detailed summary, by unit, which includes all of the required information, only the gross weight per grain cart of the production is required.
- Date Weighed
- Load Number (if the scale does not print a number, the policyholder must apply a number)
- Identification and location of farm-storage structure in which the load(s) from each field are stored and/or satisfactory explanation of disposition of the production if any of the production is no longer stored at the time of inspection; and
- Unit and/or field identification from which the production was harvested that can be correlated to the unit numbers for the crop stored. To be acceptable, the adjuster must verify that the field identification can be correlated with the unit numbers for the crop for the current crop year. If field identification cannot be correlated to a unit number for the crop, the production must be considered commingled.

A summary record of scale weight tickets/records is not acceptable.

Policyholder must hand-write any of the required information listed above if the scale that is being used is not capable of printing the required information.

Should you have any questions and/or concerns regarding this information, please contact your agent immediately. Thank you and we appreciate your business!

**14-CEPP (Released June 2013)**

**COMMODITY EXCHANGE PRICE PROVISIONS (CEPP)**

**2014 AND SUCCEEDING CROP YEARS**

**Section II:  Price Definitions**

*(See Section I for General Information applicable to all crops.)*

**Corn (0041)**

**Grain Type**

Projected price – The harvest year's average daily settlement price for the projected price discovery period for the harvest year's futures contract, as shown in the tables below, rounded to the nearest whole cent.  The projected price will be released no later than three business days following the end of the projected price discovery period.

Harvest price - The harvest year's average daily settlement price for the harvest price discovery period for the harvest year's futures contract, as shown in the tables below, rounded to the nearest whole cent.  The harvest price will be released no later than three business days following the end of the harvest price discovery period.

NHF1-524 Policy 000073

| CORN – January 31 Sales Closing Date | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date | Beginning Date | Ending Date |
| Texas | CBOT | Corn | September | Dec 15 | Jan 14 | Aug 1 | Aug 31 |

| CORN – February 15 Sales Closing Date | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date | Beginning Date | Ending Date |
| Texas | CBOT | Corn | December | Jan 1 | Jan 31 | Sep 1 | Sep 30 |

| CORN – February 28 Sales Closing Date | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date | Beginning Date | Ending Date |
| Alabama | CBOT | Corn | September | Jan 15 | Feb 14 | Aug 1 | Aug 31 |
| Arizona | CBOT | Corn | December | Jan 15 | Feb 14 | Oct 1 | Oct 31 |
| Arkansas | CBOT | Corn | December | Jan 15 | Feb 14 | Aug 15 | Sep 14 |
| California | CBOT | Corn | December | Jan 15 | Feb 14 | Oct 1 | Oct 31 |
| Florida | CBOT | Corn | September | Jan 15 | Feb 14 | Aug 1 | Aug 31 |
| Georgia | CBOT | Corn | September | Jan 15 | Feb 14 | Aug 1 | Aug 31 |
| Louisiana | CBOT | Corn | September | Jan 15 | Feb 14 | Aug 1 | Aug 31 |
| Mississippi | CBOT | Corn | December | Jan 15 | Feb 14 | Aug 15 | Sep 14 |
| Nevada | CBOT | Corn | December | Jan 15 | Feb 14 | Oct 1 | Oct 31 |
| North Carolina | CBOT | Corn | December | Jan 15 | Feb 14 | Sep 1 | Sep 30 |
| South Carolina | CBOT | Corn | September | Jan 15 | Feb 14 | Aug 1 | Aug 31 |

**CEPP - Section II:  Corn (Released June 2013)**                                              2

NHF1-524 Policy 000074

| CORN – March 15 Sales Closing Date | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date* | Beginning Date | Ending Date |
| Colorado | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Connecticut | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Delaware | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Idaho | CBOT | Corn | December | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Illinois | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Indiana | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Iowa | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Kansas | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Kentucky | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Maine | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Maryland | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Massachusetts | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Michigan | CBOT | Corn | December | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Minnesota | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Missouri | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Montana | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Nebraska | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| New Hampshire | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| New Jersey | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| New Mexico | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| New York | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| North Dakota | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Ohio | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Oklahoma | CBOT | Corn | December | Feb 1 | Feb 28 | Sep 1 | Sep 30 |
| Oregon | CBOT | Corn | December | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Pennsylvania | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Rhode Island | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| South Dakota | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Tennessee | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Texas | CBOT | Corn | December | Feb 1 | Feb 28 | Sep 1 | Sep 30 |
| Utah | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Vermont | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Virginia | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Washington | CBOT | Corn | December | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| West Virginia | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Wisconsin | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Wyoming | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| *February 28 Ending Date is extended to February 29 in leap years. | | | | | | | |

**CEPP - Section II:  Corn (Released June 2013)**                                              3

**Corn (0041)**

**Silage Type**

Corn for silage is not traded on any Commodity Exchange.  However, revenue protection is still considered to be available in counties where silage is an insurable type and the projected and harvest prices will be determined by RMA in accordance with this CEPP.  The result of this action will allow the producer to insure both the silage and grain types of corn under revenue protection.  With both types of corn insured under revenue protection the producer may qualify for a whole-farm unit. However, corn insured as silage will not have the benefit of the projected price and the harvest price moving as the price on the Commodity Exchange moves for corn for grain.

Projected price – A price determined by RMA and released by January 31 of the harvest year.

Harvest price -- A price equal to the silage type projected price.

**Corn (0041)**

**Organic (Certified) Practice**

Projected price – The corn (grain type) projected price as determined above, multiplied by a factor determined by RMA, rounded to the nearest whole cent.  The factor will be available in the Price Discovery Reporting application located at http://www.rma.usda.gov.  The method used for calculating the factor will be available at http://www.rma.usda.gov/pubs/.   The organic (certified) practice projected price will be released no later than three business days following the end of the corn (grain type) projected price discovery period.

Harvest price – The corn (grain type) harvest price as determined above, multiplied by the same factor determined for the organic (certified) practice projected price, rounded to the nearest whole cent.  The organic (certified) practice harvest price will be released no later than three business days following the end of the corn (grain type) harvest price discovery period.

NHF1-524 Policy 000077

NHF1-524 Policy 000078

**16-CEPP (Released November 2015)**

## COMMODITY EXCHANGE PRICE PROVISIONS (CEPP)

## 2016 AND SUCCEEDING CROP YEARS

**Section I:  General Information**

*The CEPP applies only to crops for which revenue protection (including area revenue protection) and yield protection (including area yield protection) are available.  See Section II, by crop specification, for price definitions.*

1. Definitions

   **Average Daily Settlement Price** – The sum of all daily settlement prices divided by the total number of daily settlement prices included in the sum.  All daily settlement prices during the price discovery period for the contract specified in the applicable crop's projected price or harvest price definition will be included in the sum, provided the threshold requirements, as defined below, are met.  If the threshold requirements are not met for the specified contract, see the terms under the substitute average daily settlement price definition.  If the threshold requirements are not met under the terms of the substitute average daily settlement price definition, the applicable projected price and harvest price will be established in accordance with I.2(c), I.2(e)(1), or I.2(f).

   **CBOT** – Chicago Board of Trade.

   **CME** – Chicago Mercantile Exchange.

   **Daily Settlement Price** – A price established in accordance with the CEPP which is available for the crop at the end of a trading day.

   **Full Active Trading Day** – For all exchanges **except** the Portland Merchants Exchange, any trading day on which a minimum of 1 open interest contract for the

**CEPP - Section I:  General Information (Released November 2015)**                    **1**

NHF1-524 Policy 000079

relevant futures contract is available at the close of trading.  For the Portland

Merchants Exchange, there is **no** open interest requirement.

**Harvest Price** – See the definition in section II.

**Harvest Year** – The calendar year in which the crop is normally harvested.

**ICE** –  InterContinentalExchange.

**KCBT** – Kansas City Board of Trade.

**MGE** – Minneapolis Grain Exchange.

**NASS** – The National Agricultural Statistics Service, an agency within USDA.

**Projected Price** – See the definition in section II.

**Substitute Average Daily Settlement Price** – An average daily settlement price used

when the threshold requirements for the contract specified in the applicable crop's

projected or harvest price definition are not met.  The substitute average daily

settlement price is generally obtained from the contract immediately prior to the

contract specified in the applicable insured crop's projected price or harvest price

definition, or another contract as determined by RMA.  It must represent the same

crop year as the insured crop.  Threshold requirements must be met for the substitute

average daily settlement price.  If threshold requirements are not met, the applicable

projected price and harvest price will be established in accordance with I.2(c),

I.2(e)(1), or I.2(f).

**Threshold Requirements** – The minimum number of full active trading day(s) and

the minimum trading volume that must occur during the price discovery period for

the contract specified in the applicable crop's projected price or harvest price

definition for revenue protection coverage to be offered.  There must be one full

**CEPP - Section I:  General Information (Released November 2015)** 2

NHF1-524 Policy 000080

active trading day during the price discovery period.  The contract must also trade at least once during the discovery period, i.e., there must be one trading day with a volume of at least one.

**USDA** – United States Department of Agriculture.

2.  Price Determinations

(a) In accordance with either section 1 of the Common Crop Insurance Policy Basic Provisions or section 1 of the Area Risk Protection Insurance Basic Provisions, these Commodity Exchange Price Provisions specify how and when the projected price and harvest price will be determined by crop.

(1) These provisions are a part of the policy **for all crops for which revenue protection is available**, regardless of whether the producer elects revenue protection or yield protection for such crops.

(2) This document includes the information necessary to derive the projected price and the harvest price for the insured crop, as applicable.

(b) The CEPP will be used to determine:

(1) The projected price and harvest price for insured crops for which revenue protection is selected; or

(2) The projected price for insured crops for which yield protection is selected.

(c) RMA reserves the right to omit any daily settlement price or substitute daily settlement price used to compute the average daily settlement price or substitute average daily settlement price if market conditions are different than those used to rate or price revenue protection.

(d) RMA reserves the right to set the projected price for yield protection.

**CEPP - Section I:  General Information (Released November 2015)**                    **3**

(e) If the projected price cannot be calculated by the procedures outlined in these

Commodity Exchange Price Provisions:

(1) No revenue protection will be available;

(2) If revenue protection is not available, notice will be provided on RMA's Web

site at http://www.rma.usda.gov/ by the date specified in the applicable

projected price definition;

(3) Yield protection will continue to be available; and

(4) The projected price for yield protection will be determined by RMA and

released by the date specified in the applicable projected price definition in the

CEPP.

(f) If the harvest price cannot be calculated by the procedures outlined in this CEPP,

the harvest price will be determined by RMA.

(g) The harvest price will not be greater than the projected price multiplied by 2.00.

(h) Projected prices, harvest prices and associated factors and adjustments for all

crops, except the corn silage type, can be found at

http://www.rma.usda.gov/tools/pricediscovery.html.  The methods used for

calculating the factors and adjustments can be found at

http://www.rma.usda.gov/pubs/.

(i) In counties with a fall sales closing date for which insurance is provided on both

the spring and fall/winter types, the projected price for spring types will be

released after the fall sales closing date at the time specified in the applicable

definition of projected price.

NHF1-524 Policy 000082

(j)  For each insurance offer, if the actuarial documents specify that contract pricing is available, and procedures for establishing contract pricing are not specified in the crop provisions or special provisions, the Contract Price Addendum (CPA), found at http://www.rma.usda.gov, outlines the procedures for using a contract price to determine your projected price and, if applicable, harvest price.

(k)  For revenue protection coverage to be offered, implied volatilities must be available for the option contract corresponding to the futures contract specified in the applicable crop's projected price or harvest price definition.  The implied volatility requirements are specified in the volatility factor calculation methodology paper, which is found at http://www.rma.usda.gov/pubs/.

NHF1-524 Policy 000083

NHF1-524 Policy 000084

**17-CEPP (Released May 2016)**

## COMMODITY EXCHANGE PRICE PROVISIONS (CEPP)
## 2017 AND SUCCEEDING CROP YEARS

### Section II:  Price Definitions

*(See Section I for General Information applicable to all crops.)*

### Soybeans (0081)

Projected price – The harvest year's average daily settlement price for the projected price discovery period for *either* the harvest year's futures contract (November), *or* the post-harvest year's futures contract (January), as shown in the tables below, rounded to the nearest whole cent.  The projected price will be released no later than three business days following the end of the projected price discovery period.

Harvest price - The harvest year's average daily settlement price for the harvest price discovery period for *either* the harvest year's futures contract (November), *or* the post-harvest year's futures contract (January), as shown in the tables below, rounded to the nearest whole cent.  The harvest price will be released no later than three business days following the end of the harvest price discovery period.

| SOYBEANS – January 31 Sales Closing Date | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date | Beginning Date | Ending Date |
| Texas | CBOT | Soybeans | November | Dec 15 | Jan 14 | Sep 1 | Sep 30 |

| SOYBEANS – February 28 Sales Closing Date | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date | Beginning Date | Ending Date |
| Alabama | CBOT | Soybeans | January | Jan 15 | Feb 14 | Nov 1 | Nov 30 |
| Arkansas | CBOT | Soybeans | November | Jan 15 | Feb 14 | Oct 1 | Oct 31 |
| Florida | CBOT | Soybeans | January | Jan 15 | Feb 14 | Nov 1 | Nov 30 |
| Georgia | CBOT | Soybeans | January | Jan 15 | Feb 14 | Nov 1 | Nov 30 |
| Louisiana | CBOT | Soybeans | November | Jan 15 | Feb 14 | Oct 1 | Oct 31 |
| Mississippi | CBOT | Soybeans | November | Jan 15 | Feb 14 | Oct 1 | Oct 31 |
| North Carolina | CBOT | Soybeans | January | Jan 15 | Feb 14 | Nov 1 | Nov 30 |
| South Carolina | CBOT | Soybeans | January | Jan 15 | Feb 14 | Nov 1 | Nov 30 |
| Texas | CBOT | Soybeans | November | Jan 15 | Feb 14 | Oct 1 | Oct 31 |

NHF1-524 Policy 000085

| SOYBEANS – March 15 Sales Closing Date | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date* | Beginning Date | Ending Date |
| Colorado | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Delaware | CBOT | Soybeans | January | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Illinois | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Indiana | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Iowa | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Kansas | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Kentucky | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Maryland | CBOT | Soybeans | January | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Michigan | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Minnesota | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Missouri | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Nebraska | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| New Jersey | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| New York | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| North Dakota | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Ohio | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Oklahoma | CBOT | Soybeans | January | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Oregon | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Pennsylvania | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| South Dakota | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Tennessee | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Texas | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Vermont | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Virginia | CBOT | Soybeans | January | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Washington | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| West Virginia | CBOT | Soybeans | January | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Wisconsin | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| *February 28 Ending Date is extended to February 29 in leap years. | | | | | | | |

**CEPP - Section II:  Soybeans (Released May 2016)**                                                     **2**

**Soybeans (0081)**

**Organic (Certified) Practice**

Projected price – The soybeans projected price as determined above, multiplied by a factor determined by RMA, rounded to the nearest whole cent.  The factor will be available in the Price Discovery Reporting application located at http://www.rma.usda.gov.  The method for calculating the factor will be available at http://www.rma.usda.gov/pubs/.  The organic (certified) practice projected price will be released no later than three business days following the end of the soybeans projected price discovery period.

Harvest price – The soybeans harvest price as determined above, multiplied by the same factor determined for the organic (certified) practice projected price, rounded to the nearest whole cent.  The organic (certified) practice harvest price will be released no later than three business days following the end of the soybeans harvest price discovery period.

NHF1-524 Policy 000087

NHF1-524 Policy 000088

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Ottawa (139) |

### Program Dates for Insurable Types and Practices

| Sales Closing Date | Earliest Planting Date | Final Planting Date | End of Late Planting Period Date | Acreage Reporting Date | Premium Billing Date |
|---|---|---|---|---|---|
| 3/15/2019 | 4/15/2019 | 6/5/2019 | 6/25/2019 | 7/15/2019 | 8/15/2019 |

| TP | Type | Practice |
|---|---|---|
| T/P 01 | Grain 016 | Non-Irrigated 003 |
| T/P 02 | Silage 026 | Non-Irrigated 003 |
| T/P 03 | Grain 016 | Irrigated 002 |
| T/P 04 | Silage 026 | Irrigated 002 |
| T/P 05 | Grain 016 | Organic(Certified) Non-Irr. 713 *4 |
| T/P 06 | Silage 026 | Organic(Certified) Non-Irr. 713 *4 |
| T/P 07 | Grain 016 | Organic(Certified) Irr. 702 *4 |
| T/P 08 | Silage 026 | Organic(Certified) Irr. 702 *4 |
| T/P 09 | Grain 016 | Organic(Transitional) Non-Irr. 714 |
| T/P 10 | Silage 026 | Organic(Transitional) Non-Irr. 714 |
| T/P 11 | Grain 016 | Organic(Transitional) Irr. 712 |
| T/P 12 | Silage 026 | Organic(Transitional) Irr. 712 |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Date**

In lieu of the definition of late planting period in section 1 of the Basic Provisions, please refer to the End Of Late Planting Period Date.

NHF1-524 Policy 000089

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Ottawa (139) |

**Price**

*4    For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

**Insurance Availability**

In addition to the types listed in section 5(b)(2) of the Coarse Grains Crop Provisions, purple and pink hybrid corn varieties may be insurable by written agreement.

Insurance shall not attach or be considered to have attached without a written agreement to a planted crop on acreage from which, in the same calendar year:

1.   A perennial hay crop was harvested; or

2.   A crop (other than a cover crop) reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. To qualify for a written agreement, you must provide a minimum of the most recent three years of your double cropping actual production history for the crop in the county. A cover crop is one that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Ottawa (139) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

3

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Ottawa (139) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to corn grain production for the insured crop.

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold prior to 60 days after the calendar date for the EOIP, we will adjust your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

a.  Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

b.  Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Ottawa (139) |
|  | Revenue Protection (02) |  |
|  | Revenue Prot with Harvest Price Exclusion (03) |  |

c.  Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.

1.  OPTION TO DELAY CLAIM SETTLEMENT:

   a.  On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

   b.  If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

   c.  At any time during this delay in settlement, you may request  to settle your claim for any unsold production using the applicable DFs.

   d.  For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

   e.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

   f.  If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

   g.  This option will not apply to any production qualifying under section C3.

2.  SECTION 14(e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.

3.  EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.

If the production is not sold within this period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not

NHF1-524 Policy 000093

5

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:   Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Ottawa (139) |

later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.

4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP , otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.

5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

6.   ZERO MARKET VALUE

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value*** , such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:   Yield Protection (01) | County: Ottawa (139) |
|  | Revenue Protection (02) |  |
|  | Revenue Prot with Harvest Price Exclusion (03) |  |

i.    RIVs cannot be used in combination with chart DFs.

ii.   If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

iii.  If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

iv.   The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Corn will be discounted for grade as follows:

| Grade | DF |
| --- | --- |
| U.S. Sample Grade | 0.085 |

TEST WEIGHT DISCOUNT

Discounts for low test weight as follows (U.S. Grade No.5 for Test Weight –     .    lbs. to 46 lbs.; U.S. Sample Grade –     .    lbs. and below:

| Test Weight Pounds | DF |
| --- | --- |
| 49 and above | None |
| 48-48.99 | 0.041 |
| 47-47.99 | 0.051 |
| 46-46.99 | 0.062 |
| 45-45.99 | 0.072 |
| 44-44.99 | 0.082 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows (U.S. Grade No. 5 for Damage - 10.01% to 15%; U.S. Sample Grade - 15.01% and above):

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

Year: 2019      Commodity: Corn (0041)      State:   Michigan (26)

Date: 11/27/2018      Plan:     Yield Protection (01)      County: Ottawa (139)
                                              Revenue Protection (02)
                                              Revenue Prot with Harvest Price Exclusion (03)

| Damage % | DF | Damage % | DF | Damage % | DF |
|---|---|---|---|---|---|
| 10 and below | None | 18.01-19 | 0.164 | 27.01-28 | 0.303 |
| 10.01-11 | 0.062 | 19.01-20 | 0.179 | 28.01-29 | 0.318 |
| 11.01-12 | 0.072 | 20.01-21 | 0.195 | 29.01-30 | 0.333 |
| 12.01-13 | 0.082 | 21.01-22 | 0.210 | 30.01-31 | 0.349 |
| 13.01-14 | 0.092 | 22.01-23 | 0.226 | 31.01-32 | 0.364 |
| 14.01-15 | 0.103 | 23.01-24 | 0.241 | 32.01-33 | 0.379 |
| 15.01-16 | 0.118 | 24.01-25 | 0.256 | 33.01-34 | 0.395 |
| 16.01-17 | 0.133 | 25.01-26 | 0.272 | 34.01-35 | 0.410 |
| 17.01-18 | 0.149 | 26.01-27 | 0.287 | Above 35 | See section B |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| Musty Odor | 0.051 |
|---|---|
| Sour Odor | 0.051 |
| COFO | 0.051 |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, on the date of final inspection for the unit adjust production in the following manner:

1.  If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3.  If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01)<br>          Revenue Protection (02)<br>          Revenue Prot with Harvest Price Exclusion (03) | County: Ottawa (139) |

health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

    a.   The action or advisory level of the Food and Drug Administration; or

    b.   Another public health organization of the United States; or

    c.   A public health agency of the applicable State in which the insured crop is grown.

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

    1.   For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

    a.   Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price.

    b.   For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

    c.   Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Ottawa (139) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| Vomitoxin Range | DF |
| --- | --- |
| .1 −  .   ppm | .000 |
| .1 − 1  .   ppm | .225 |
| 10.1 ppm & above | See C3 below |

2. For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

   a. If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

      i. For production sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

      ii. For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

      iii. For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

      iv. For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

      v. For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

   b. If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

      i. For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

      ii. For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

      iii. For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

      iv. For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26)
Date: 11/27/2018 | Plan:   Yield Protection (01) | County: Ottawa (139)
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

DFs for Aflatoxin:

| Aflatoxin Range | DF |
|---|---|
| .1 – 2  .   ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1    .   ppb | .200 |
| 1   .1 – 2   .   ppb | .300 |
| 2   .1 – 3   .   ppb | .400 |
| 300.1 ppb & above | See C3 below |

DFs for Fumonisin:

| Fumonisin Range | DF |
|---|---|
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3.  For production that has Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

a.  For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

i.  The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

ii.  .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

b.  For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

i.  The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| 2019 and Succeeding Crop Years | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Ottawa (139) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

    ii.  .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from section A or B will be included.

    c.  If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

    1.  The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

    2.  If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value and will be adjusted as follows:

        a.  For production in section A – the pre-established DFs.

        b.  For production in section B – .    .

        c.  For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

    3.  If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| | |
| --- | --- |
| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:  Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Program Dates for Insurable Types and Practices

| Sales Closing Date 3/15/2019 | Earliest Planting Date 4/15/2019 | Final Planting Date 6/5/2019 | End of Late Planting Period Date 6/25/2019 | Acreage Reporting Date 7/15/2019 | Premium Billing Date 8/15/2019 |
|---|---|---|---|---|---|

| TP | Type | Practice |
|---|---|---|
| T/P 01 | Blue 383 *3 | Non-Irrigated 003 |
| T/P 02 | Blue 383 *3 | Irrigated 002 |
| T/P 03 | Grain 016 | Non-Irrigated 003 |
| T/P 04 | Silage 026 | Non-Irrigated 003 |
| T/P 05 | Grain 016 | Irrigated 002 |
| T/P 06 | Silage 026 | Irrigated 002 |
| T/P 07 | Blue 383 *3 | Organic(Certified) Non-Irr. 713 *5 |
| T/P 08 | Blue 383 *3 | Organic(Certified) Irr. 702 *5 |
| T/P 09 | Grain 016 | Organic(Certified) Non-Irr. 713 *5 |
| T/P 10 | Silage 026 | Organic(Certified) Non-Irr. 713 *5 |
| T/P 11 | Grain 016 | Organic(Certified) Irr. 702 *5 |
| T/P 12 | Silage 026 | Organic(Certified) Irr. 702 *5 |
| T/P 13 | Blue 383 *3 | Organic(Transitional) Non-Irr. 714 |
| T/P 14 | Blue 383 *3 | Organic(Transitional) Irr. 712 |
| T/P 15 | Grain 016 | Organic(Transitional) Non-Irr. 714 |
| T/P 16 | Silage 026 | Organic(Transitional) Non-Irr. 714 |
| T/P 17 | Grain 016 | Organic(Transitional) Irr. 712 |
| T/P 18 | Silage 026 | Organic(Transitional) Irr. 712 |

### Statement

NHF1-524 Policy 000101

1

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

*3     If you produce any of the following specialty corn type(s) for which yields and rates are available in the actuarial documents:

a.   High amylase – Corn that has been genetically modified to increase its content of the enzyme amylase and that is used primarily for the production of ethanol.

b.   Blue – Corn grown on a plant that produces ears with blue colored kernels or with a mixture of blue and white colored kernels and that is used for the production of tortilla chips, tortillas, and other food products for human consumption.

c.   White – Corn that is white-kernelled and contains not more than 2.0 percent of corn of other colors. White kernels of corn with a slight tinge of light straw or pink color are considered White corn.

d.   Waxy – Corn that consists of 95 percent or more waxy corn, according to procedures prescribed in FGIS instructions.

You may elect to use the price contained in your production contract (contract price) by the acreage reporting date to determine your projected price and harvest price, as applicable, for each specialty type only if the total number of insured acres of the specialty type does not exceed 110 percent of insured specialty type acreage under the contract (the number of acres under contract is determined as indicated below).  The acreage must be under contract with a business enterprise equipped with facilities appropriate to handle and store specialty type corn production. The contract must be executed by you and the business enterprise, in effect for the crop year, and you must provide a copy to us no later than the acreage reporting date.

In lieu of the requirement contained in section 5(b)(2)(i) of the Crop Provisions, blue corn produced under a contract that meets the conditions specified in these Special Provisions is insurable without a written agreement.

To be considered a contract, the executed document must contain:

a.   A requirement that you plant, grow and deliver specialty type corn to the business enterprise;

b.   The amount of production that will be accepted or a statement that all production from a specified number of acres will be accepted.

To determine the number of acres under contract:

1.   For acreage only based contracts and, acreage and production based contracts which specify a maximum number of acres, the lesser of:

i.   The insured acres (planted acreage and acreage that is prevented from being planted); or

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| | | |
| :--- | :--- | :--- |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

ii.  The maximum number of acres specified in the contract.

2.   For production only based contracts, the lesser of:

i.      The number of acres determined by dividing the production stated in the contract by the approved yield; or

ii.     The insured acres (planted acreage and acreage that is prevented from being planted).

c.    The price to be paid for the contracted production or a method to determine such price:

1.   For yield protection:

i.      If the contract provides a fixed price for the contracted production, the projected price will be the contract price.  A contract that provides for a premium amount that is priced on or before the acreage reporting date will be considered to be a fixed price contract.

ii.     If the contract provides for a premium amount over a price to be determined and it is not priced by the acreage reporting date, the contract price will be the result of adding the premium amount to the CEPP projected price.

2.   For revenue protection:

i.      If the contract provides a fixed price for the contracted production:

A.    The projected price will be the contract price.

B.    For high amylase type, the harvest price will be the result of the CEPP projected price subtracted from the contract price and the difference shall be added to the CEPP harvest price.

C.    For blue type, the harvest price shall equal the projected price.

ii.     If the contract provides for a premium amount over a price to be determined and it is not priced by the acreage reporting date:

A.    The projected price will be the result of adding the premium amount to the CEPP projected price.

B.    For high amylase type, the harvest price will be the result of the CEPP projected price subtracted from the projected price and the difference shall be added to the CEPP harvest price.

C.    For blue type, the harvest price shall be equal to the projected price.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

      iii.   A contract that provides for a premium amount over a market price to be determined but that is priced on or before the acreage reporting date will be considered to be a fixed price contract.

    3.   The price used will be the price in the contract without regard to incentives or discounts.

    4.   In no case will the contract price exceed the amount determined by multiplying the CEPP projected price, as applicable, by the maximum contract price factor in the Prices tab of these actuarial documents.

    5.   If you have more than one contract price for any one specialty type, the price used will be the weighted average of the contract prices. Each contract price is subject to the limits referred to in (c)(4).

d.   Other such terms that establish the obligations of each party to the contract; and

e.   The contract must clearly indicate the specific specialty type or verification must be provided that the contracted variety is one of the specialty types listed above.

For specialty type corn the following replant rules apply:

a.   In addition to the definition of practical to replant in the Basic Provisions, for specialty type corn under contract it will not be considered practical to replant unless production from the replanted acreage can be delivered under the terms of the specialty type contract or the business enterprise agrees to accept such contracted production.

b.   In addition to section 9 of the Coarse Grains Crop Provisions when it is practical to replant the specialty type originally planted, you must replant to the specialty type originally planted on the acreage.

c.    When it is not practical to replant the specialty type originally planted on the acreage:

    1.   You may choose to:

        i.     Not replant and may receive an indemnity;

        ii.   Not replant the specialty type originally planted on the acreage and plant to another crop in which case the first/second crop rules in section 15 of the Basic Provisions apply; or

        iii.   Replant to another specialty type or commodity type, provided it is practical to replant such type.  The replanted type will be considered a replanted crop.

    2.   If it is not practical to replant to another specialty type or commodity type and you plant any type of corn, the crop planted will be considered a second crop.

For high amylase, quality adjustment will be provided as specified in the Crop Provisions and Special Provisions.  Blue type is not eligible for the quality adjustment

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Barry (015) |

specified in the Crop Provisions and Special Provisions.  No additional quality adjustment will be made for any specialty type.

White and waxy contract price values will not increase replanting or prevented planting payments.  Those payments will be calculated using the grain corn Commodity Exchange Price Provisions (CEPP) values and Basic Provisions and Coarse Grains Crop Provisions payment formula.

White and waxy corn, insured as white or waxy, grown under organic certified and organic transitional practices is not eligible for the organic Projected Price and Harvest Price defined within the Commodity Exchange Price Provisions (CEPP) or the Contract Price Addendum.

White and waxy corn grown under organic certified and organic transitional practices may be insured as grain and is eligible for the Projected Price and Harvest Price defined within the Commodity Exchange Price Provisions (CEPP), and may be insured under the Contract Price Addendum, as allowed by Section I(2)(j) of the CEPP.

**Date**

In lieu of the definition of late planting period in section 1 of the Basic Provisions, please refer to the End Of Late Planting Period Date.

**Price**

*5  For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

**Insurance Availability**

In addition to the types listed in section 5(b)(2) of the Coarse Grains Crop Provisions, purple and pink hybrid corn varieties may be insurable by written agreement.

Insurance shall not attach or be considered to have attached without a written agreement to a planted crop on acreage from which, in the same calendar year:

1.  A perennial hay crop was harvested; or

2.  A crop (other than a cover crop) reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. To qualify for a written agreement, you must provide a minimum of the most recent three years of your double cropping actual production history for the crop in the county. A cover crop is one that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

NHF1-524 Policy 000106

6

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

Any acreage in this county without a rate or designated as uninsurable or unclassified on the actuarial map will be insurable only by written agreement, unless such acreage is otherwise classified in the actuarial documents.  Contact your crop insurance agent by the sales closing date to determine eligibility requirements.

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to corn grain production for the insured crop.

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold prior to 60 days after the calendar date for the EOIP, we will adjust your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

  a.   Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

| Special Provisions of Insurance |
| --- |
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:   Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Barry (015) |

   b.   Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

   c.   Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.

1.   OPTION TO DELAY CLAIM SETTLEMENT:

   a.   On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

   b.   If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

   c.   At any time during this delay in settlement, you may request  to settle your claim for any unsold production using the applicable DFs.

   d.   For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

   e.   If the production is later sold, we will not recalculate or adjust your claim for indemnity.

   f.   If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

   g.   This option will not apply to any production qualifying under section C3.

2.   SECTION 14(e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.

3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Barry (015) |

If the production is not sold within this period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.

4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP , otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.

5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

6.   ZERO MARKET VALUE

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value\*\*\*, such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

| Special Provisions of Insurance |
|---|
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

i.   RIVs cannot be used in combination with chart DFs.

ii.   If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

iii.   If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

iv.   The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Corn will be discounted for grade as follows:

| Grade | DF |
|---|---|
| U.S. Sample Grade | 0.085 |

TEST WEIGHT DISCOUNT

Discounts for low test weight as follows (U.S. Grade No.5 for Test Weight –    .    lbs. to 46 lbs.; U.S. Sample Grade –    .    lbs. and below:

| Test Weight Pounds | DF |
|---|---|
| 49 and above | None |
| 48-48.99 | 0.041 |
| 47-47.99 | 0.051 |
| 46-46.99 | 0.062 |
| 45-45.99 | 0.072 |
| 44-44.99 | 0.082 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:   Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

Discounts for excessive kernel damage (excluding heat damage) as follows (U.S. Grade No. 5 for Damage - 10.01% to 15%; U.S. Sample Grade - 15.01% and above):

| Damage % | DF | Damage % | DF | Damage % | DF |
|---|---|---|---|---|---|
| 10 and below | None | 18.01-19 | 0.164 | 27.01-28 | 0.303 |
| 10.01-11 | 0.062 | 19.01-20 | 0.179 | 28.01-29 | 0.318 |
| 11.01-12 | 0.072 | 20.01-21 | 0.195 | 29.01-30 | 0.333 |
| 12.01-13 | 0.082 | 21.01-22 | 0.210 | 30.01-31 | 0.349 |
| 13.01-14 | 0.092 | 22.01-23 | 0.226 | 31.01-32 | 0.364 |
| 14.01-15 | 0.103 | 23.01-24 | 0.241 | 32.01-33 | 0.379 |
| 15.01-16 | 0.118 | 24.01-25 | 0.256 | 33.01-34 | 0.395 |
| 16.01-17 | 0.133 | 25.01-26 | 0.272 | 34.01-35 | 0.410 |
| 17.01-18 | 0.149 | 26.01-27 | 0.287 | Above 35 | See section B |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| | |
|---|---|
| Musty Odor | 0.051 |
| Sour Odor | 0.051 |
| COFO | 0.051 |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, on the date of final inspection for the unit adjust production in the following manner:

1.  If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3.  If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

    a.   The action or advisory level of the Food and Drug Administration; or

    b.   Another public health organization of the United States; or

    c.   A public health agency of the applicable State in which the insured crop is grown.

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

    1.   For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

        a.   Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price.

        b.   For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

        c.   Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Barry (015) |
|  | Revenue Protection (02) |  |
|  | Revenue Prot with Harvest Price Exclusion (03) |  |

DFs for Vomitoxin:

| Vomitoxin Range | DF |
| --- | --- |
| .1 – .   ppm | .000 |
| .1 – 1 .  ppm | .225 |
| 10.1 ppm & above | See C3 below |

2.  For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

   a.  If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

      i.   For production sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

      ii.  For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

      iii. For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

      iv.  For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

      v.   For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

   b.  If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

      i.   For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

      ii.  For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

      iii. For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Barry (015) |
|  |             Revenue Protection (02) |  |
|  |             Revenue Prot with Harvest Price Exclusion (03) |  |

     iv.  For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

DFs for Aflatoxin:

| Aflatoxin Range | DF |
|---|---|
| .1 – 2  .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .  ppb | .200 |
| 1   .1 – 2   .  ppb | .300 |
| 2   .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

DFs for Fumonisin:

| Fumonisin Range | DF |
|---|---|
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3.  For production that has Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

    a.  For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

      i.  The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

      ii.  .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

    b.  For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01)<br>              Revenue Protection (02)<br>              Revenue Prot with Harvest Price Exclusion (03) | County: Barry (015) |

i.  The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

ii.  .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold other than a disinterested third party.  No other DF from section A or B will be included.

c.  If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

1.  The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

2.  If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value and will be adjusted as follows:

a.  For production in section A – the pre-established DFs.

b.  For production in section B – .      .

c.  For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

3.  If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| | |
|---|---|
| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

NHF1-524 Policy 000116

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:   Yield Protection (01) | County: Calhoun (025) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Program Dates for Insurable Types and Practices

| Sales Closing Date | Earliest Planting Date | Final Planting Date | End of Late Planting Period Date | Acreage Reporting Date | Premium Billing Date |
|---|---|---|---|---|---|
| 3/15/2019 | 4/10/2019 | 6/5/2019 | 6/25/2019 | 7/15/2019 | 8/15/2019 |

| TP | Type | Practice |
|---|---|---|
| T/P 1 | Grain 016 | Non-Irrigated 003 |
| T/P 2 | Grain 016 | Irrigated 002 |
| T/P 3 | Grain 016 | Organic(Certified) Non-Irr. 713 *4 |
| T/P 4 | Grain 016 | Organic(Certified) Irr. 702 *4 |
| T/P 5 | Grain 016 | Organic(Transitional) Non-Irr. 714 |
| T/P 6 | Grain 016 | Organic(Transitional) Irr. 712 |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Date**

In lieu of the definition of late planting period in section 1 of the Basic Provisions, please refer to the End Of Late Planting Period Date.

**Price**

For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

**Insurance Availability**

In addition to the types listed in section 5(b)(2) of the Coarse Grains Crop Provisions, purple and pink hybrid corn varieties may be insurable by written agreement.

Insurance shall not attach or be considered to have attached without a written agreement to a planted crop on acreage from which, in the same calendar year:

*4

1

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Calhoun (025) |

1.  A perennial hay crop was harvested; or

2.  A crop (other than a cover crop) reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. To qualify for a written agreement, you must provide a minimum of the most recent three years of your double cropping actual production history for the crop in the county. A cover crop is one that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Calhoun (025) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Calhoun (025) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to corn grain production for the insured crop.

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold prior to 60 days after the calendar date for the EOIP, we will adjust your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

a.   Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

b.   Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Calhoun (025) |
|  |              Revenue Protection (02) |  |
|  |              Revenue Prot with Harvest Price Exclusion (03) |  |

    c.   Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.

1.   OPTION TO DELAY CLAIM SETTLEMENT:

    a.   On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

    b.   If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

    c.   At any time during this delay in settlement, you may request  to settle your claim for any unsold production using the applicable DFs.

    d.   For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

    e.   If the production is later sold, we will not recalculate or adjust your claim for indemnity.

    f.   If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

    g.   This option will not apply to any production qualifying under section C3.

2.   SECTION 14(e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.

3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.

If the production is not sold within this period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not

NHF1-524 Policy 000121

5

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Calhoun (025) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.

4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP , otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.

5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

6.   ZERO MARKET VALUE

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value*** such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

| Special Provisions of Insurance |
|---|
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:   Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Calhoun (025) |

i.  RIVs cannot be used in combination with chart DFs.

ii.  If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

iii.  If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

iv.  The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Corn will be discounted for grade as follows:

| Grade | DF |
|---|---|
| U.S. Sample Grade | 0.085 |

TEST WEIGHT DISCOUNT

Discounts for low test weight as follows (U.S. Grade No.5 for Test Weight –    .   lbs. to 46 lbs.; U.S. Sample Grade –    .   lbs. and below:

| Test Weight Pounds | DF |
|---|---|
| 49 and above | None |
| 48-48.99 | 0.041 |
| 47-47.99 | 0.051 |
| 46-46.99 | 0.062 |
| 45-45.99 | 0.072 |
| 44-44.99 | 0.082 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows (U.S. Grade No. 5 for Damage - 10.01% to 15%; U.S. Sample Grade - 15.01% and above):

| Special Provisions of Insurance |
| --- |
| 2019 and Succeeding Crop Years |

Year: 2019                    Commodity: Corn (0041)                                        State:   Michigan (26)

Date: 11/27/2018         Plan:      Yield Protection (01)                              County: Calhoun (025)
                                             Revenue Protection (02)
                                             Revenue Prot with Harvest Price Exclusion (03)

| Damage % | DF | Damage % | DF | Damage % | DF |
| --- | --- | --- | --- | --- | --- |
| 10 and below | None | 18.01-19 | 0.164 | 27.01-28 | 0.303 |
| 10.01-11 | 0.062 | 19.01-20 | 0.179 | 28.01-29 | 0.318 |
| 11.01-12 | 0.072 | 20.01-21 | 0.195 | 29.01-30 | 0.333 |
| 12.01-13 | 0.082 | 21.01-22 | 0.210 | 30.01-31 | 0.349 |
| 13.01-14 | 0.092 | 22.01-23 | 0.226 | 31.01-32 | 0.364 |
| 14.01-15 | 0.103 | 23.01-24 | 0.241 | 32.01-33 | 0.379 |
| 15.01-16 | 0.118 | 24.01-25 | 0.256 | 33.01-34 | 0.395 |
| 16.01-17 | 0.133 | 25.01-26 | 0.272 | 34.01-35 | 0.410 |
| 17.01-18 | 0.149 | 26.01-27 | 0.287 | Above 35 | See section B |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| Musty Odor | 0.051 |
| --- | --- |
| Sour Odor | 0.051 |
| COFO | 0.051 |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, on the date of final inspection for the unit adjust production in the following manner:

1.  If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3.  If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public

| Special Provisions of Insurance | | |
| :--: | :--: | :--: |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Calhoun (025) |

health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

    a.   The action or advisory level of the Food and Drug Administration; or

    b.   Another public health organization of the United States; or

    c.   A public health agency of the applicable State in which the insured crop is grown.

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

    1.   For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

    a.   Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price.

    b.   For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

    c.   Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Special Provisions of Insurance 2019 and Succeeding Crop Years | | |
| --- | --- | --- |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/27/2018 | Plan:    Yield Protection (01) Revenue Protection (02) Revenue Prot with Harvest Price Exclusion (03) | County: Calhoun (025) |

| Vomitoxin Range | DF |
| --- | --- |
| .1 − .  ppm | .000 |
| .1 − 1 .  ppm | .225 |
| 10.1 ppm & above | See C3 below |

2. For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

   a. If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

      i. For production sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

      ii. For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

      iii. For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

      iv. For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

      v. For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

   b. If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

      i. For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

      ii. For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

      iii. For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

      iv. For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Calhoun (025) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

DFs for Aflatoxin:

| Aflatoxin Range | DF |
|---|---|
| .1 – 2 .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .  ppb | .200 |
| 1  .1 – 2   .  ppb | .300 |
| 2  .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

DFs for Fumonisin:

| Fumonisin Range | DF |
|---|---|
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3. For production that has Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

a. For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

i. The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

ii. .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

b. For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

i. The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:    Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Calhoun (025) |

    ii.   .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from section A or B will be included.

    c.   If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

    1.   The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

    2.   If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value and will be adjusted as follows:

        a.   For production in section A – the pre-established DFs.

        b.   For production in section B – .    .

        c.   For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

    3.   If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| | |
|---|---|
| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Allegan (005) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Program Dates for Insurable Types and Practices

| Sales Closing Date 3/15/2019 | Earliest Planting Date 4/10/2019 | Final Planting Date 6/5/2019 | End of Late Planting Period Date 6/25/2019 | Acreage Reporting Date 7/15/2019 | Premium Billing Date 8/15/2019 |
|---|---|---|---|---|---|

| TP | Type | Practice |
|---|---|---|
| T/P 1 | Grain 016 | Non-Irrigated 003 |
| T/P 2 | Grain 016 | Irrigated 002 |
| T/P 3 | Grain 016 | Organic(Certified) Non-Irr. 713 *4 |
| T/P 4 | Grain 016 | Organic(Certified) Irr. 702 *4 |
| T/P 5 | Grain 016 | Organic(Transitional) Non-Irr. 714 |
| T/P 6 | Grain 016 | Organic(Transitional) Irr. 712 |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Date**

In lieu of the definition of late planting period in section 1 of the Basic Provisions, please refer to the End Of Late Planting Period Date.

**Price**

For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

**Insurance Availability**

In addition to the types listed in section 5(b)(2) of the Coarse Grains Crop Provisions, purple and pink hybrid corn varieties may be insurable by written agreement.

Insurance shall not attach or be considered to have attached without a written agreement to a planted crop on acreage from which, in the same calendar year:

| Special Provisions of Insurance |
| --- |
| **2019 and Succeeding Crop Years** |

Year: 2019                    Commodity: Corn (0041)                                        State:   Michigan (26)

Date: 11/27/2018          Plan:        Yield Protection (01)                          County: Allegan (005)
                                              Revenue Protection (02)
                                              Revenue Prot with Harvest Price Exclusion (03)

   1.  A perennial hay crop was harvested; or

   2.  A crop (other than a cover crop) reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. To qualify for a written agreement, you must provide a minimum of the most recent three years of your double cropping actual production history for the crop in the county. A cover crop is one that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance.

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Allegan (005) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Allegan (005) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to corn grain production for the insured crop.

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold prior to 60 days after the calendar date for the EOIP, we will adjust your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

   a.   Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

   b.   Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Allegan (005) |
|  |              Revenue Protection (02) |  |
|  |              Revenue Prot with Harvest Price Exclusion (03) |  |

   c.   Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.


1.   OPTION TO DELAY CLAIM SETTLEMENT:

   a.    On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

   b.   If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

   c.   At any time during this delay in settlement, you may request  to settle your claim for any unsold production using the applicable DFs.

   d.   For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

   e.   If the production is later sold, we will not recalculate or adjust your claim for indemnity.

   f.   If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

   g.   This option will not apply to any production qualifying under section C3.


2.   SECTION 14(e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.


3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.

If the production is not sold within this period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Allegan (005) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.

4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP , otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.

5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

6.   ZERO MARKET VALUE

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value\*\*\*, such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

NHF1-524 Policy 000134

| Special Provisions of Insurance |
| --- |
| **2019 and Succeeding Crop Years** |

| | | |
| --- | --- | --- |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:       Yield Protection (01) | County: Allegan (005) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

i.   RIVs cannot be used in combination with chart DFs.

ii.  If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

iii. If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

iv.  The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Corn will be discounted for grade as follows:

| Grade | DF |
| --- | --- |
| U.S. Sample Grade | 0.085 |

TEST WEIGHT DISCOUNT

Discounts for low test weight as follows (U.S. Grade No.5 for Test Weight –    .    lbs. to 46 lbs.; U.S. Sample Grade –    .    lbs. and below:

| Test Weight Pounds | DF |
| --- | --- |
| 49 and above | None |
| 48-48.99 | 0.041 |
| 47-47.99 | 0.051 |
| 46-46.99 | 0.062 |
| 45-45.99 | 0.072 |
| 44-44.99 | 0.082 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows (U.S. Grade No. 5 for Damage - 10.01% to 15%; U.S. Sample Grade - 15.01% and above):

| Special Provisions of Insurance |
| --- |
| 2019 and Succeeding Crop Years |

Year: 2019                         Commodity: Corn (0041)                                                  State:   Michigan (26)
Date: 11/27/2018                 Plan:      Yield Protection (01)                                       County: Allegan (005)
                                                     Revenue Protection (02)
                                                     Revenue Prot with Harvest Price Exclusion (03)

| Damage % | DF | Damage % | DF | Damage % | DF |
| --- | --- | --- | --- | --- | --- |
| 10 and below | None | 18.01-19 | 0.164 | 27.01-28 | 0.303 |
| 10.01-11 | 0.062 | 19.01-20 | 0.179 | 28.01-29 | 0.318 |
| 11.01-12 | 0.072 | 20.01-21 | 0.195 | 29.01-30 | 0.333 |
| 12.01-13 | 0.082 | 21.01-22 | 0.210 | 30.01-31 | 0.349 |
| 13.01-14 | 0.092 | 22.01-23 | 0.226 | 31.01-32 | 0.364 |
| 14.01-15 | 0.103 | 23.01-24 | 0.241 | 32.01-33 | 0.379 |
| 15.01-16 | 0.118 | 24.01-25 | 0.256 | 33.01-34 | 0.395 |
| 16.01-17 | 0.133 | 25.01-26 | 0.272 | 34.01-35 | 0.410 |
| 17.01-18 | 0.149 | 26.01-27 | 0.287 | Above 35 | See section B |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| Musty Odor | 0.051 |
| --- | --- |
| Sour Odor | 0.051 |
| COFO | 0.051 |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, on the date of final inspection for the unit adjust production in the following manner:

1.  If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3.  If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:   Yield Protection (01) | County: Allegan (005) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

    a.   The action or advisory level of the Food and Drug Administration; or

    b.   Another public health organization of the United States; or

    c.   A public health agency of the applicable State in which the insured crop is grown.

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

    1.   For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

    a.   Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price.

    b.   For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

    c.   Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| **Special Provisions of Insurance** | | |
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Allegan (005) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| Vomitoxin Range | DF |
|---|---|
| .1 – .  ppm | .000 |
| .1 – 1 .  ppm | .225 |
| 10.1 ppm & above | See C3 below |

2.  For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

    a.  If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

        i.  For production sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

        ii.  For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

        iii.  For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

        iv.  For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

        v.  For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

    b.  If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

        i.  For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

        ii.  For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

        iii.  For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

        iv.  For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

Year: 2019     Commodity: Corn (0041)     State:   Michigan (26)

Date: 11/27/2018    Plan:      Yield Protection (01)     County: Allegan (005)

                                          Revenue Protection (02)

                                          Revenue Prot with Harvest Price Exclusion (03)

DFs for Aflatoxin:

| Aflatoxin Range | DF |
|---|---|
| .1 – 2 .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .  ppb | .200 |
| 1   .1 – 2   .  ppb | .300 |
| 2   .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

DFs for Fumonisin:

| Fumonisin Range | DF |
|---|---|
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3.  For production that has Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

a.  For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

i.  The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

ii.  .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

b.  For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

i.  The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Allegan (005) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

    ii.   .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from section A or B will be included.

    c.   If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

    1.   The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

    2.   If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value and will be adjusted as follows:

        a.   For production in section A – the pre-established DFs.

        b.   For production in section B – .        .

        c.   For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

    3.   If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| | |
| --- | --- |
| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Jackson (075) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Program Dates for Insurable Types and Practices

| Sales Closing Date | Earliest Planting Date | Final Planting Date | End of Late Planting Period Date | Acreage Reporting Date | Premium Billing Date |
|---|---|---|---|---|---|
| 3/15/2019 | 4/10/2019 | 6/5/2019 | 6/25/2019 | 7/15/2019 | 8/15/2019 |

| TP | Type | Practice |
|---|---|---|
| T/P 1 | Grain 016 | Non-Irrigated 003 |
| T/P 2 | Grain 016 | Irrigated 002 |
| T/P 3 | Grain 016 | Organic(Certified) Non-Irr. 713 *4 |
| T/P 4 | Grain 016 | Organic(Certified) Irr. 702 *4 |
| T/P 5 | Grain 016 | Organic(Transitional) Non-Irr. 714 |
| T/P 6 | Grain 016 | Organic(Transitional) Irr. 712 |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Date**

In lieu of the definition of late planting period in section 1 of the Basic Provisions, please refer to the End Of Late Planting Period Date.

**Price**

For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

**Insurance Availability**

In addition to the types listed in section 5(b)(2) of the Coarse Grains Crop Provisions, purple and pink hybrid corn varieties may be insurable by written agreement.

Insurance shall not attach or be considered to have attached without a written agreement to a planted crop on acreage from which, in the same calendar year:

NHF1-524 Policy 000141

*4

1

| Special Provisions of Insurance |
| :---: |
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Jackson (075) |

1. A perennial hay crop was harvested; or

2. A crop (other than a cover crop) reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. To qualify for a written agreement, you must provide a minimum of the most recent three years of your double cropping actual production history for the crop in the county. A cover crop is one that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Jackson (075) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/27/2018 | Plan:       Yield Protection (01) | County: Jackson (075) |
|  |               Revenue Protection (02) |  |
|  |               Revenue Prot with Harvest Price Exclusion (03) |  |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to corn grain production for the insured crop.

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold prior to 60 days after the calendar date for the EOIP, we will adjust your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

   a.  Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

   b.  Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

| Special Provisions of Insurance | | |
|---|---|---|
| 2019 and Succeeding Crop Years | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Jackson (075) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

   c.  Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.

1. OPTION TO DELAY CLAIM SETTLEMENT:

   a.   On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

   b.  If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

   c.  At any time during this delay in settlement, you may request  to settle your claim for any unsold production using the applicable DFs.

   d.  For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

   e.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

   f.  If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

   g.  This option will not apply to any production qualifying under section C3.

2. SECTION 14(e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.

3. EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.

If the production is not sold within this period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not

NHF1-524 Policy 000145

5

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Jackson (075) |

later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.

4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP , otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.

5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

6.   ZERO MARKET VALUE

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value*** , such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

| Special Provisions of Insurance |
|---|
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Jackson (075) |
|  |         Revenue Protection (02) |  |
|  |         Revenue Prot with Harvest Price Exclusion (03) |  |

i.   RIVs cannot be used in combination with chart DFs.

ii.  If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

iii. If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

iv.  The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Corn will be discounted for grade as follows:

| Grade | DF |
|---|---|
| U.S. Sample Grade | 0.085 |

TEST WEIGHT DISCOUNT

Discounts for low test weight as follows (U.S. Grade No.5 for Test Weight –    .   lbs. to 46 lbs.; U.S. Sample Grade –    .   lbs. and below:

| Test Weight Pounds | DF |
|---|---|
| 49 and above | None |
| 48-48.99 | 0.041 |
| 47-47.99 | 0.051 |
| 46-46.99 | 0.062 |
| 45-45.99 | 0.072 |
| 44-44.99 | 0.082 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows (U.S. Grade No. 5 for Damage - 10.01% to 15%; U.S. Sample Grade - 15.01% and above):

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | | |
|---|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:   Yield Protection (01) | | County: Jackson (075) |
| | Revenue Protection (02) | | |
| | Revenue Prot with Harvest Price Exclusion (03) | | |

| Damage % | DF | Damage % | DF | Damage % | DF |
|---|---|---|---|---|---|
| 10 and below | None | 18.01-19 | 0.164 | 27.01-28 | 0.303 |
| 10.01-11 | 0.062 | 19.01-20 | 0.179 | 28.01-29 | 0.318 |
| 11.01-12 | 0.072 | 20.01-21 | 0.195 | 29.01-30 | 0.333 |
| 12.01-13 | 0.082 | 21.01-22 | 0.210 | 30.01-31 | 0.349 |
| 13.01-14 | 0.092 | 22.01-23 | 0.226 | 31.01-32 | 0.364 |
| 14.01-15 | 0.103 | 23.01-24 | 0.241 | 32.01-33 | 0.379 |
| 15.01-16 | 0.118 | 24.01-25 | 0.256 | 33.01-34 | 0.395 |
| 16.01-17 | 0.133 | 25.01-26 | 0.272 | 34.01-35 | 0.410 |
| 17.01-18 | 0.149 | 26.01-27 | 0.287 | Above 35 | See section B |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| | |
|---|---|
| Musty Odor | 0.051 |
| Sour Odor | 0.051 |
| COFO | 0.051 |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, on the date of final inspection for the unit adjust production in the following manner:

1.  If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3.  If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Jackson (075) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

   a.   The action or advisory level of the Food and Drug Administration; or

   b.   Another public health organization of the United States; or

   c.   A public health agency of the applicable State in which the insured crop is grown.

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

   1.   For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

   a.   Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price.

   b.   For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

   c.   Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/27/2018 | Plan:   Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Jackson (075) |

| Vomitoxin Range | DF |
| --- | --- |
| .1 − .   ppm | .000 |
| .1 − 1 .  ppm | .225 |
| 10.1 ppm & above | See C3 below |

2.  For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

   a.  If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

      i.  For production sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

      ii.  For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

      iii.  For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

      iv.  For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

      v.  For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

   b.  If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

      i.  For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

      ii.  For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

      iii.  For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

      iv.  For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Jackson (075) |
|  |          Revenue Protection (02) |  |
|  |          Revenue Prot with Harvest Price Exclusion (03) |  |

DFs for Aflatoxin:

| Aflatoxin Range | DF |
|---|---|
| .1 – 2 .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .   ppb | .200 |
| 1   .1 – 2   .  ppb | .300 |
| 2   .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

DFs for Fumonisin:

| Fumonisin Range | DF |
|---|---|
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3.  For production that has Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

   a.  For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

      i.   The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

      ii.  .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

   b.  For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

      i.   The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| | | |
| :--- | :--- | :--- |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Jackson (075) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

    ii.   .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from section A or B will be included.

  c.  If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

  1.  The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

  2.  If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value and will be adjusted as follows:

    a.  For production in section A – the pre-established DFs.

    b.  For production in section B – .      .

    c.  For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

  3.  If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| | |
| :--- | :--- |
| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Ottawa (139) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Program Dates for Insurable Types and Practices

| Sales Closing Date 3/15/2019 | Earliest Planting Date 4/29/2019 | Final Planting Date 6/15/2019 | End of Late Planting Period Date 7/10/2019 | Acreage Reporting Date 7/15/2019 | Premium Billing Date 8/15/2019 |
|---|---|---|---|---|---|

| TP | Type | Practice |
|---|---|---|
| T/P 01 | Commodity 091 | Nfac (Non-Irrigated) 053 *3 |
| T/P 02 | Commodity 091 | Nfac (Irrigated) 094 *3 |
| T/P 03 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 04 | All Other Food Grades 128 *7 | Nfac (Irrigated) 094 *3 |
| T/P 05 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 06 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated) 094 *3 |
| T/P 07 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 08 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated) 094 *3 |
| T/P 09 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 10 | Low Linolenic Acid 884 *7 | Nfac (Irrigated) 094 *3 |
| T/P 11 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 12 | Low Saturated Fat 885 *7 | Nfac (Irrigated) 094 *3 |
| T/P 13 | High Protein 886 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 14 | High Protein 886 *7 | Nfac (Irrigated) 094 *3 |
| T/P 15 | Commodity 091 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 16 | Commodity 091 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 17 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 18 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 19 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |

NHFI-524 Policy 000153

1

| Special Provisions of Insurance | | |
|---|---|---|
| 2019 and Succeeding Crop Years | | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Ottawa (139) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| TP | Type | Practice |
|---|---|---|
| T/P 20 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 21 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 22 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 23 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 24 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 25 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 26 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 27 | High Protein 886 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 28 | High Protein 886 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 29 | Commodity 091 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 30 | Commodity 091 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 31 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 32 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 33 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 34 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 35 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 36 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 37 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 38 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 39 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 40 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 41 | High Protein 886 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 42 | High Protein 886 *7 | Nfac (Irrigated)(OT) 740 *3 |

NHF1-524 Policy 000154

2

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Ottawa (139) |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Practice**

*3   NFAC (Not Following Another Crop): A planted crop not following:

1. A perennial hay crop that was harvested in the same calendar year; and

2. A crop (other than a cover crop) that has reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. A crop that follows a cover crop that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance, is considered NFAC.

**Price**

*4   For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Ottawa (139) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

**Insurance Availability**

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |

| | | |
| --- | --- | --- |
| Year: 2019 | Commodity: Soybeans (0081) | State:  Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Ottawa (139) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

*7     If you produce any of the following specialty soybean type(s) (including specialty type(s) grown for seed):

  a.   Large seeded food grade –Food grade soybeans commonly used for human food products which generally have a minimum seed size of 18 g/100 seeds (2,520 seeds/lb).

  b.   Small seeded food grade –Food grade varieties of soybeans commonly used for human food products which generally have a maximum seed size of 12 g/100 seeds (3,780 seeds/lb).

  c.   Low linolenic acid – Soybeans commonly used to produce soybean oil with a linolenic acid level of three percent or less.

  d.   Low saturated fat - Soybeans containing 50 percent less saturated fat than commodity soybeans and are used to produce soybean oil with eight percent or less total saturated fats.

  e.   High protein –Food grade varieties of soybeans containing protein levels of 42 percent or greater on a dry matter basis (36.5 percent on a 13 percent moisture basis).

  f.   All other food grades – Any food grade varieties of soybeans not identified by large seeded food grade, small seeded food grade, low linolenic acid, low saturated fat, and high protein types.

You may elect to use the price contained in your production contract (contract price) by the acreage reporting date to determine your projected price and harvest price, as applicable, for each specialty type only if the total number of insured acres of the specialty type does not exceed 110 percent of insured specialty type acreage under the contract (the number of acres under contract is determined as indicated below).  The acreage must be under contract with a business enterprise equipped with facilities appropriate to handle and store specialty type soybean production.  The contract must be executed by you and the business enterprise, in effect for the crop year, and you must provide a copy to us no later than the acreage reporting date.

To be considered a contract, the executed document must contain:

(a) A requirement that you plant, grow and deliver specialty type soybeans to the business enterprise;

(b) The amount of production that will be accepted or a statement that all production from a specified number of acres will be accepted.

To determine the number of acres under contract:

  1.   For acreage only based contracts and, acreage and production based contracts which specify a maximum number of acres, the lesser of:

    i.   The insured acres (planted acreage and acreage that is prevented from being planted); or

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Ottawa (139) |

    ii.   The maximum number of acres specified in the contract.

  2.  For production only based contracts, the lesser of:

    i.   The number of acres determined by dividing the production stated in the contract by the approved yield; or

    ii.   The insured acres (planted acreage and acreage that is prevented from being planted).

(c) The price to be paid for the contracted production or a method to determine such price:

  1.  For yield protection:

    i.   If the contract provides a fixed price for the contracted production, the projected price will be the contract price.

    ii.   If the contract provides for a premium amount over a price determined after the acreage reporting date, the projected price will be the result of adding the premium amount to the CEPP projected price.

  2.  For revenue protection:

    i.   If the contract provides a fixed price for the contracted production:

       A.   The projected price will be the contract price.

       B.   The harvest price will be the result of the CEPP projected price subtracted from the contract price and the difference shall be added to the CEPP harvest price.

    ii.   If the contract provides a premium amount over a price determined after the acreage reporting date:

       A.   The projected price will be the result of adding the premium amount to the CEPP projected price.

       B.   The harvest price will be the result of the CEPP projected price subtracted from the projected price and the difference shall be added to the CEPP harvest price.

  3.  The price used will be the price in the contract without regard to incentives or discounts.

  4.  In no case will the contract price exceed the amount determined by multiplying the CEPP projected price, as applicable, by the maximum contract price factor shown in the Prices tab of these actuarial documents.

  5.  If you have more than one contract price for any one specialty type, the price used will be the weighted average of the contract prices.  Each contract price is subject to the limits referred to in (c)(4).

(d) Other such terms that establish the obligations of each party to the contract; and

(e) The contract must clearly indicate the specific specialty type or verification must be provided that the contracted variety is one of the specialty types listed above.

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| | | |
| :--- | :--- | :--- |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Ottawa (139) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

For specialty type soybeans the following replant rules apply:

(a) In addition to the definition of practical to replant in the Basic Provisions, for specialty type soybeans under contract it will not be considered practical to replant unless production from the replanted acreage can be delivered under the terms of the specialty type contract or the business enterprise agrees to accept such contracted production.

(b) In addition to section 9 of the Coarse Grains Crop Provisions when it **is** practical to replant the specialty type originally planted, you must replant to the specialty type originally planted on the acreage.

(c) When it is **not** practical to replant the specialty type originally planted on the acreage:

1. You may choose to:

    i.    Not replant and may receive an indemnity;

    ii.   Not replant the specialty type originally planted on the acreage and plant to another crop in which case the first/second crop rules in section 15 of the Basic Provisions apply; or

    iii.  Replant to another specialty type or commodity type, provided it is practical to replant such type.  The replanted type will be considered a replanted crop.

2. If it is not practical to replant to another specialty type or commodity type and you plant any type of soybeans, the crop planted will be considered a second crop.

Note: Quality adjustment will be provided as specified in the crop provisions and special provisions.  No additional quality adjustment will be made for any specialty type.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to soybean grain production for the insured crop

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under

| Special Provisions of Insurance | | |
| 2019 and Succeeding Crop Years | | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Ottawa (139) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

    a.   Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

    b.   Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

    c.   Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.

1.   OPTION TO DELAY CLAIM SETTLEMENT:

    a.   On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

    b.   If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

    c.   At any time during this delay in settlement, you may request to settle your claim for any unsold production using the applicable DFs.

    d.   For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

    e.   If the production is later sold, we will not recalculate or adjust your claim for indemnity.

    f.   If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| 2019 and Succeeding Crop Years | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:       Yield Protection (01) | County: Ottawa (139) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

g.   This option will not apply to any production qualifying under section C3.


2.   SECTION 14 (e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.


3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.  If the production is not sold within this 30 day period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.


4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP, otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.


5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f  ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only  for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.


6.   ZERO MARKET VALUE

| Special Provisions of Insurance |
| --- |
| **2019 and Succeeding Crop Years** |

| | | |
| --- | --- | --- |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Ottawa (139) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value***, such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.  Moisture content;

b.  Damage due to uninsured causes;

c.  Drying;

d.  Handling;

e.  Processing; or

f.  Any other costs associated with normal harvesting, handling, and marketing of your production.

   i.   RIVs cannot be used in combination with chart DFs.

   ii.  If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

   iii. If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

   iv.  The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Soybeans will be discounted for grade as follows:

| Grade | DF |
| --- | --- |
| U.S. Sample Grade | 0.030 |

| Special Provisions of Insurance |
|---|
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Ottawa (139) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

TEST WEIGHT DISCOUNT:

Discounts for low test weight as follows:

| Test Weight Pounds | DF |
|---|---|
| 49 and above | None |
| 48-48.99 | 0.007 |
| 47-47.99 | 0.009 |
| 46-46.99 | 0.011 |
| 45-45.99 | 0.013 |
| 44-44.99 | 0.015 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows U.S. Sample Grade for Damage –  . 1   and above:

| Damage % | DF | Damage % | DF | Damage % | DF |
|---|---|---|---|---|---|
| 08 and below | None | 17.01-18 | 0.116 | 27.01-28 | 0.196 |
| 08.01-9 | 0.044 | 18.01-19 | 0.124 | 28.01-29 | 0.204 |
| 09.01-10 | 0.052 | 19.01-20 | 0.132 | 29.01-30 | 0.212 |
| 10.01-11 | 0.060 | 20.01-21 | 0.140 | 30.01-31 | 0.220 |
| 11.01-12 | 0.068 | 21.01-22 | 0.148 | 31.01-32 | 0.228 |
| 12.01-13 | 0.076 | 22.01-23 | 0.156 | 32.01-33 | 0.236 |
| 13.01-14 | 0.084 | 23.01-24 | 0.164 | 33.01-34 | 0.244 |
| 14.01-15 | 0.092 | 24.01-25 | 0.172 | 34.01-35 | 0.252 |
| 15.01-16 | 0.100 | 25.01-26 | 0.180 | Above 35 | See section B |
| 16.01-17 | 0.108 | 26.01-27 | 0.188 | | |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| Musty Odor | 0.020 |
|---|---|
| Sour Odor | 0.020 |
| COFO | 0.040 |

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:       Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Ottawa (139) |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, a garlicky grade on the date of final inspection for the unit adjust production in the following manner:

1.  If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3.  If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

a.  The action or advisory level of the Food and Drug Administration; or

b.  Another public health organization of the United States; or

c.  A public health agency of the applicable State in which the insured crop is grown.

NHFI-524 Policy 000164

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| :--- | :--- | :--- |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Ottawa (139) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

1. For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

   a. Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

   b. For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

   c. Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Vomitoxin Range | DF |
| :--- | :--- |
| .1 − .   ppm | .000 |
| .1 − 1  .  ppm | .450 |
| 10.1 ppm & above | See C3 below |

2. For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

   a. If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

      i. For production sold to a disinterested third partyprior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

      ii. For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

      iii. For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

| Special Provisions of Insurance |||
| **2019 and Succeeding Crop Years** |||
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Ottawa (139) |

    iv.  For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

    v.  For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

  b.  If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

    i.  For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

    ii.  For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

    iii.  For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

    iv.  For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

DFs for Aflatoxin:

| Aflatoxin Range | DF |
| --- | --- |
| .1 – 2 .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .  ppb | .200 |
| 1   .1 – 2   .  ppb | .300 |
| 2   .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

| Special Provisions of Insurance 2019 and Succeeding Crop Years | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) Revenue Protection (02) Revenue Prot with Harvest Price Exclusion (03) | County: Ottawa (139) |

| Fumonisin Range | DF |
|---|---|
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3. For production that has an Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

   a. For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

      i. The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

      ii. .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

   b. For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

      i. The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

      ii. .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from sections A or B will be included.

   c. If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

1. The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

2. If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value

| Special Provisions of Insurance |
| --- |
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/14/2018 | Plan:     Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Ottawa (139) |

and will be adjusted as follows:

   a.  For production in section A – the pre-established DFs.

   b.  For production in section B – .    .

   c.  For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

  3.  If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| | |
| --- | --- |
| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| Program Dates for Insurable Types and Practices |
|---|

| Sales Closing Date | Earliest Planting Date | Final Planting Date | End of Late Planting Period Date | Acreage Reporting Date | Premium Billing Date |
|---|---|---|---|---|---|
| 3/15/2019 | 4/29/2019 | 6/15/2019 | 7/10/2019 | 7/15/2019 | 8/15/2019 |

| TP | Type | Practice |
|---|---|---|
| T/P 01 | Commodity 091 | Nfac (Non-Irrigated) 053 *3 |
| T/P 02 | Commodity 091 | Nfac (Irrigated) 094 *3 |
| T/P 03 | All Other Food Grades 128 *8 | Nfac (Non-Irrigated) 053 *3 |
| T/P 04 | All Other Food Grades 128 *8 | Nfac (Irrigated) 094 *3 |
| T/P 05 | Large Seeded Food Grade 882 *8 | Nfac (Non-Irrigated) 053 *3 |
| T/P 06 | Large Seeded Food Grade 882 *8 | Nfac (Irrigated) 094 *3 |
| T/P 07 | Small Seeded Food Grade 883 *8 | Nfac (Non-Irrigated) 053 *3 |
| T/P 08 | Small Seeded Food Grade 883 *8 | Nfac (Irrigated) 094 *3 |
| T/P 09 | Low Linolenic Acid 884 *8 | Nfac (Non-Irrigated) 053 *3 |
| T/P 10 | Low Linolenic Acid 884 *8 | Nfac (Irrigated) 094 *3 |
| T/P 11 | Low Saturated Fat 885 *8 | Nfac (Non-Irrigated) 053 *3 |
| T/P 12 | Low Saturated Fat 885 *8 | Nfac (Irrigated) 094 *3 |
| T/P 13 | High Protein 886 *8 | Nfac (Non-Irrigated) 053 *3 |
| T/P 14 | High Protein 886 *8 | Nfac (Irrigated) 094 *3 |
| T/P 15 | Commodity 091 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 16 | Commodity 091 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 17 | All Other Food Grades 128 *8 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 18 | All Other Food Grades 128 *8 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 19 | Large Seeded Food Grade 882 *8 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |

NHF1-524 Policy 000169

| Special Provisions of Insurance |
| --- |
| 2019 and Succeeding Crop Years |

Year: 2019   Commodity: Soybeans (0081)   State:   Michigan (26)

Date: 11/14/2018   Plan:   Yield Protection (01)   County: Barry (015)

Revenue Protection (02)

Revenue Prot with Harvest Price Exclusion (03)

| TP | Type | Practice |
| --- | --- | --- |
| T/P 20 | Large Seeded Food Grade 882 *8 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 21 | Small Seeded Food Grade 883 *8 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 22 | Small Seeded Food Grade 883 *8 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 23 | Low Linolenic Acid 884 *8 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 24 | Low Linolenic Acid 884 *8 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 25 | Low Saturated Fat 885 *8 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 26 | Low Saturated Fat 885 *8 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 27 | High Protein 886 *8 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 28 | High Protein 886 *8 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 29 | Commodity 091 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 30 | Commodity 091 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 31 | All Other Food Grades 128 *8 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 32 | All Other Food Grades 128 *8 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 33 | Large Seeded Food Grade 882 *8 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 34 | Large Seeded Food Grade 882 *8 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 35 | Small Seeded Food Grade 883 *8 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 36 | Small Seeded Food Grade 883 *8 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 37 | Low Linolenic Acid 884 *8 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 38 | Low Linolenic Acid 884 *8 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 39 | Low Saturated Fat 885 *8 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 40 | Low Saturated Fat 885 *8 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 41 | High Protein 886 *8 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 42 | High Protein 886 *8 | Nfac (Irrigated)(OT) 740 *3 |

NHF1-524 Policy 000170

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Practice**

*3    NFAC (Not Following Another Crop): A planted crop not following:

1. A perennial hay crop that was harvested in the same calendar year; and

2. A crop (other than a cover crop) that has reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. A crop that follows a cover crop that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance, is considered NFAC.

**Price**

*4    For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |

| | | |
| --- | --- | --- |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Barry (015) |

**Insurance Availability**

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

Any acreage in this county without a rate or designated as uninsurable or unclassified on the actuarial map will be insurable only by written agreement, unless such acreage is otherwise classified in the actuarial documents.  Contact your crop insurance agent by the sales closing date to determine eligibility requirements.

*8      If you produce any of the following specialty soybean type(s) (including specialty type(s) grown for seed):

    a.    Large seeded food grade –Food grade soybeans commonly used for human food products which generally have a minimum seed size of 18 g/100 seeds (2,520 seeds/lb).

    b.    Small seeded food grade –Food grade varieties of soybeans commonly used for human food products which generally have a maximum seed size of 12 g/100 seeds (3,780 seeds/lb).

    c.    Low linolenic acid – Soybeans commonly used to produce soybean oil with a linolenic acid level of three percent or less.

    d.    Low saturated fat - Soybeans containing 50 percent less saturated fat than commodity soybeans and are used to produce soybean oil with eight percent or less total saturated fats.

    e.    High protein –Food grade varieties of soybeans containing protein levels of 42 percent or greater on a dry matter basis (36.5 percent on a 13 percent moisture basis).

    f.    All other food grades – Any food grade varieties of soybeans not identified by large seeded food grade, small seeded food grade, low linolenic acid, low saturated fat, and high protein types.

You may elect to use the price contained in your production contract (contract price) by the acreage reporting date to determine your projected price and harvest price, as applicable, for each specialty type only if the total number of insured acres of the specialty type does not exceed 110 percent of insured specialty type acreage under the contract (the number of acres under contract is determined as indicated below).  The acreage must be under contract with a business enterprise equipped with facilities appropriate to handle and store specialty type soybean production.  The contract must be executed by you and the business enterprise, in effect for the crop year, and you must provide a copy to us no later than the acreage reporting date.

To be considered a contract, the executed document must contain:

(a) A requirement that you plant, grow and deliver specialty type soybeans to the business enterprise;

(b) The amount of production that will be accepted or a statement that all production from a specified number of acres will be accepted.

To determine the number of acres under contract:

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

1. For acreage only based contracts and, acreage and production based contracts which specify a maximum number of acres, the lesser of:

    i.   The insured acres (planted acreage and acreage that is prevented from being planted); or

    ii.  The maximum number of acres specified in the contract.

2. For production only based contracts, the lesser of:

    i.   The number of acres determined by dividing the production stated in the contract by the approved yield; or

    ii.  The insured acres (planted acreage and acreage that is prevented from being planted).

(c) The price to be paid for the contracted production or a method to determine such price:

1. For yield protection:

    i.   If the contract provides a fixed price for the contracted production, the projected price will be the contract price.

    ii.  If the contract provides for a premium amount over a price determined after the acreage reporting date, the projected price will be the result of adding the premium amount to the CEPP projected price.

2. For revenue protection:

    i.   If the contract provides a fixed price for the contracted production:

        A.  The projected price will be the contract price.

        B.  The harvest price will be the result of the CEPP projected price subtracted from the contract price and the difference shall be added to the CEPP harvest price.

    ii.  If the contract provides a premium amount over a price determined after the acreage reporting date:

        A.  The projected price will be the result of adding the premium amount to the CEPP projected price.

        B.  The harvest price will be the result of the CEPP projected price subtracted from the projected price and the difference shall be added to the CEPP harvest price.

3. The price used will be the price in the contract without regard to incentives or discounts.

4. In no case will the contract price exceed the amount determined by multiplying the CEPP projected price, as applicable, by the maximum contract price factor shown in the Prices tab of these actuarial documents.

5. If you have more than one contract price for any one specialty type, the price used will be the weighted average of the contract prices.  Each contract price is subject to the limits referred to in (c)(4).

| Special Provisions of Insurance | | |
| :--: | :--: | :--: |
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

(d) Other such terms that establish the obligations of each party to the contract; and

(e) The contract must clearly indicate the specific specialty type or verification must be provided that the contracted variety is one of the specialty types listed above.

For specialty type soybeans the following replant rules apply:

(a) In addition to the definition of practical to replant in the Basic Provisions, for specialty type soybeans under contract it will not be considered practical to replant unless production from the replanted acreage can be delivered under the terms of the specialty type contract or the business enterprise agrees to accept such contracted production.

(b) In addition to section 9 of the Coarse Grains Crop Provisions when it **is** practical to replant the specialty type originally planted, you must replant to the specialty type originally planted on the acreage.

(c) When it is **not** practical to replant the specialty type originally planted on the acreage:

1. You may choose to:

    i.   Not replant and may receive an indemnity;

    ii.  Not replant the specialty type originally planted on the acreage and plant to another crop in which case the first/second crop rules in section 15 of the Basic Provisions apply; or

    iii. Replant to another specialty type or commodity type, provided it is practical to replant such type.  The replanted type will be considered a replanted crop.

2. If it is not practical to replant to another specialty type or commodity type and you plant any type of soybeans, the crop planted will be considered a second crop.

Note: Quality adjustment will be provided as specified in the crop provisions and special provisions.  No additional quality adjustment will be made for any specialty type.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to soybean grain production for the insured crop

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

   a.   Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

   b.   Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

   c.   Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.

1.   OPTION TO DELAY CLAIM SETTLEMENT:

   a.   On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

   b.   If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

   c.   At any time during this delay in settlement, you may request to settle your claim for any unsold production using the applicable DFs.

   d.   For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

   e.   If the production is later sold, we will not recalculate or adjust your claim for indemnity.

NHF1-524 Policy 000176

8

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Barry (015) |

     f.   If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

     g.   This option will not apply to any production qualifying under section C3.


   2.   SECTION 14 (e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.


   3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.  If the production is not sold within this 30 day period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.


   4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP, otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.


   5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f  ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only  for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

6.   ZERO MARKET VALUE

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value***, such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.


7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

  i.   RIVs cannot be used in combination with chart DFs.

 ii.   If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

iii.   If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

iv.   The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Soybeans will be discounted for grade as follows:

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| Grade | DF |
|---|---|
| U.S. Sample Grade | 0.030 |

TEST WEIGHT DISCOUNT:

Discounts for low test weight as follows:

| Test Weight Pounds | DF |
|---|---|
| 49 and above | None |
| 48-48.99 | 0.007 |
| 47-47.99 | 0.009 |
| 46-46.99 | 0.011 |
| 45-45.99 | 0.013 |
| 44-44.99 | 0.015 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows U.S. Sample Grade for Damage –  . 1   and above:

| Damage % | DF | Damage % | DF | Damage % | DF |
|---|---|---|---|---|---|
| 08 and below | None | 17.01-18 | 0.116 | 27.01-28 | 0.196 |
| 08.01-9 | 0.044 | 18.01-19 | 0.124 | 28.01-29 | 0.204 |
| 09.01-10 | 0.052 | 19.01-20 | 0.132 | 29.01-30 | 0.212 |
| 10.01-11 | 0.060 | 20.01-21 | 0.140 | 30.01-31 | 0.220 |
| 11.01-12 | 0.068 | 21.01-22 | 0.148 | 31.01-32 | 0.228 |
| 12.01-13 | 0.076 | 22.01-23 | 0.156 | 32.01-33 | 0.236 |
| 13.01-14 | 0.084 | 23.01-24 | 0.164 | 33.01-34 | 0.244 |
| 14.01-15 | 0.092 | 24.01-25 | 0.172 | 34.01-35 | 0.252 |
| 15.01-16 | 0.100 | 25.01-26 | 0.180 | Above 35 | See section B |
| 16.01-17 | 0.108 | 26.01-27 | 0.188 | | |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| | |
| --- | --- |
| Musty Odor | 0.020 |
| Sour Odor | 0.020 |
| COFO | 0.040 |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, a garlicky grade on the date of final inspection for the unit adjust production in the following manner:

1.  If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3.  If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

a.  The action or advisory level of the Food and Drug Administration; or

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| | | |
| :--- | :--- | :--- |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

   b.  Another public health organization of the United States; or

   c.  A public health agency of the applicable State in which the insured crop is grown.

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

   1.  For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

     a.  Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

     b.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

     c.  Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Vomitoxin Range | DF |
| :--- | :--- |
| .1 −  .   ppm | .000 |
| .1 − 1 .  ppm | .450 |
| 10.1 ppm & above | See C3 below |

   2.  For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

     a.  If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

       i.  For production sold to a disinterested third partyprior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

       ii.  For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

     iii.  For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

     iv.  For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

     v.  For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

  b.  If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

     i.  For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

     ii.  For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

     iii.  For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

     iv.  For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

DFs for Aflatoxin:

| Aflatoxin Range | DF |
| --- | --- |
| .1 – 2  .   ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1  .    ppb | .200 |
| 1   .1 – 2  .   ppb | .300 |
| 2   .1 – 3  .   ppb | .400 |
| 300.1 ppb & above | See C3 below |

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| Fumonisin Range | DF |
|---|---|
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3.  For production that has an Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

a.  For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

i.  The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

ii.  .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

b.  For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

i.  The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

ii.  .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from sections A or B will be included.

c.  If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

1.  The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

2.  If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Barry (015) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

and will be adjusted as follows:

a.  For production in section A – the pre-established DFs.

b.  For production in section B – .        .

c.  For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

3.  If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
|---|---|
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| | | |
| :--- | :--- | ---: |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Calhoun (025) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| Program Dates for Insurable Types and Practices |
| :---: |

| Sales Closing Date 3/15/2019 | Earliest Planting Date 4/24/2019 | Final Planting Date 6/15/2019 | End of Late Planting Period Date 7/10/2019 | Acreage Reporting Date 7/15/2019 | Premium Billing Date 8/15/2019 |
| :---: | :---: | :---: | :---: | :---: | :---: |

| TP | Type | Practice |
| :--- | :---: | :---: |
| T/P 01 | Commodity 091 | Nfac (Non-Irrigated) 053 *3 |
| T/P 02 | Commodity 091 | Nfac (Irrigated) 094 *3 |
| T/P 03 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 04 | All Other Food Grades 128 *7 | Nfac (Irrigated) 094 *3 |
| T/P 05 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 06 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated) 094 *3 |
| T/P 07 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 08 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated) 094 *3 |
| T/P 09 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 10 | Low Linolenic Acid 884 *7 | Nfac (Irrigated) 094 *3 |
| T/P 11 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 12 | Low Saturated Fat 885 *7 | Nfac (Irrigated) 094 *3 |
| T/P 13 | High Protein 886 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 14 | High Protein 886 *7 | Nfac (Irrigated) 094 *3 |
| T/P 15 | Commodity 091 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 16 | Commodity 091 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 17 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 18 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 19 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |

NHF1-524 Policy 000185

1

| Special Provisions of Insurance | | |
| :---: | :---: | :---: |
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| :--- | :--- | :--- |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Calhoun (025) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| TP | Type | Practice |
| :--- | :---: | :---: |
| T/P 20 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 21 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 22 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 23 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 24 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 25 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 26 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 27 | High Protein 886 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 28 | High Protein 886 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 29 | Commodity 091 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 30 | Commodity 091 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 31 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 32 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 33 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 34 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 35 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 36 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 37 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 38 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 39 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 40 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 41 | High Protein 886 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 42 | High Protein 886 *7 | Nfac (Irrigated)(OT) 740 *3 |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Calhoun (025) |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Practice**

*3     NFAC (Not Following Another Crop): A planted crop not following:

1. A perennial hay crop that was harvested in the same calendar year; and

2. A crop (other than a cover crop) that has reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. A crop that follows a cover crop that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance, is considered NFAC.

**Price**

*4     For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:   Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Calhoun (025) |

**Insurance Availability**

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

| Special Provisions of Insurance | | |
|---|---|---|
| 2019 and Succeeding Crop Years | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Calhoun (025) |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

*7      If you produce any of the following specialty soybean type(s) (including specialty type(s) grown for seed):

    a.   Large seeded food grade –Food grade soybeans commonly used for human food products which generally have a minimum seed size of 18 g/100 seeds (2,520 seeds/lb).

    b.   Small seeded food grade –Food grade varieties of soybeans commonly used for human food products which generally have a maximum seed size of 12 g/100 seeds (3,780 seeds/lb).

    c.   Low linolenic acid – Soybeans commonly used to produce soybean oil with a linolenic acid level of three percent or less.

    d.   Low saturated fat - Soybeans containing 50 percent less saturated fat than commodity soybeans and are used to produce soybean oil with eight percent or less total saturated fats.

    e.   High protein –Food grade varieties of soybeans containing protein levels of 42 percent or greater on a dry matter basis (36.5 percent on a 13 percent moisture basis).

    f.   All other food grades – Any food grade varieties of soybeans not identified by large seeded food grade, small seeded food grade, low linolenic acid, low saturated fat, and high protein types.

You may elect to use the price contained in your production contract (contract price) by the acreage reporting date to determine your projected price and harvest price, as applicable, for each specialty type only if the total number of insured acres of the specialty type does not exceed 110 percent of insured specialty type acreage under the contract (the number of acres under contract is determined as indicated below).  The acreage must be under contract with a business enterprise equipped with facilities appropriate to handle and store specialty type soybean production.  The contract must be executed by you and the business enterprise, in effect for the crop year, and you must provide a copy to us no later than the acreage reporting date.

To be considered a contract, the executed document must contain:

(a) A requirement that you plant, grow and deliver specialty type soybeans to the business enterprise;

(b) The amount of production that will be accepted or a statement that all production from a specified number of acres will be accepted.

To determine the number of acres under contract:

    1.   For acreage only based contracts and, acreage and production based contracts which specify a maximum number of acres, the lesser of:

        i.    The insured acres (planted acreage and acreage that is prevented from being planted); or

NHF1-524 Policy 000189

5

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:        Yield Protection (01) | County: Calhoun (025) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

      ii.   The maximum number of acres specified in the contract.

    2.   For production only based contracts, the lesser of:

      i.   The number of acres determined by dividing the production stated in the contract by the approved yield; or

      ii.   The insured acres (planted acreage and acreage that is prevented from being planted).

(c) The price to be paid for the contracted production or a method to determine such price:

    1.   For yield protection:

      i.   If the contract provides a fixed price for the contracted production, the projected price will be the contract price.

      ii.   If the contract provides for a premium amount over a price determined after the acreage reporting date, the projected price will be the result of adding the premium amount to the CEPP projected price.

    2.   For revenue protection:

      i.   If the contract provides a fixed price for the contracted production:

        A.   The projected price will be the contract price.

        B.   The harvest price will be the result of the CEPP projected price subtracted from the contract price and the difference shall be added to the CEPP harvest price.

      ii.   If the contract provides a premium amount over a price determined after the acreage reporting date:

        A.   The projected price will be the result of adding the premium amount to the CEPP projected price.

        B.   The harvest price will be the result of the CEPP projected price subtracted from the projected price and the difference shall be added to the CEPP harvest price.

    3.   The price used will be the price in the contract without regard to incentives or discounts.

    4.   In no case will the contract price exceed the amount determined by multiplying the CEPP projected price, as applicable, by the maximum contract price factor shown in the Prices tab of these actuarial documents.

    5.   If you have more than one contract price for any one specialty type, the price used will be the weighted average of the contract prices.  Each contract price is subject to the limits referred to in (c)(4).

(d) Other such terms that establish the obligations of each party to the contract; and

(e) The contract must clearly indicate the specific specialty type or verification must be provided that the contracted variety is one of the specialty types listed above.

NHF1-524 Policy 000190

6

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Calhoun (025) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

For specialty type soybeans the following replant rules apply:

(a) In addition to the definition of practical to replant in the Basic Provisions, for specialty type soybeans under contract it will not be considered practical to replant unless production from the replanted acreage can be delivered under the terms of the specialty type contract or the business enterprise agrees to accept such contracted production.

(b) In addition to section 9 of the Coarse Grains Crop Provisions when it **is** practical to replant the specialty type originally planted, you must replant to the specialty type originally planted on the acreage.

(c) When it is **not** practical to replant the specialty type originally planted on the acreage:

1. You may choose to:

   i.   Not replant and may receive an indemnity;

   ii.  Not replant the specialty type originally planted on the acreage and plant to another crop in which case the first/second crop rules in section 15 of the Basic Provisions apply; or

   iii. Replant to another specialty type or commodity type, provided it is practical to replant such type.  The replanted type will be considered a replanted crop.

2. If it is not practical to replant to another specialty type or commodity type and you plant any type of soybeans, the crop planted will be considered a second crop.

Note: Quality adjustment will be provided as specified in the crop provisions and special provisions.  No additional quality adjustment will be made for any specialty type.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to soybean grain production for the insured crop

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Calhoun (025) |

sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

   a.   Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

   b.   Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

   c.   Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.


   1.   OPTION TO DELAY CLAIM SETTLEMENT:

   a.   On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

   b.   If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

   c.   At any time during this delay in settlement, you may request to settle your claim for any unsold production using the applicable DFs.

   d.   For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

   e.   If the production is later sold, we will not recalculate or adjust your claim for indemnity.

   f.   If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Calhoun (025) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

g.   This option will not apply to any production qualifying under section C3.

2.   SECTION 14 (e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.

3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.  If the production is not sold within this 30 day period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.

4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP, otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.

5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f  ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only  for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

6.   ZERO MARKET VALUE

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Calhoun (025) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value\*\*\*, such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

    i.   RIVs cannot be used in combination with chart DFs.

    ii.   If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

    iii.   If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

    iv.   The RIV and local market price\* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Soybeans will be discounted for grade as follows:

| Grade | DF |
| --- | --- |
| U.S. Sample Grade | 0.030 |

| Special Provisions of Insurance |
|---|
| 2019 and Succeeding Crop Years |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Calhoun (025) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

TEST WEIGHT DISCOUNT:

Discounts for low test weight as follows:

| Test Weight Pounds | DF |
|---|---|
| 49 and above | None |
| 48-48.99 | 0.007 |
| 47-47.99 | 0.009 |
| 46-46.99 | 0.011 |
| 45-45.99 | 0.013 |
| 44-44.99 | 0.015 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows U.S. Sample Grade for Damage –  . 1   and above:

| Damage % | DF | Damage % | DF | Damage % | DF |
|---|---|---|---|---|---|
| 08 and below | None | 17.01-18 | 0.116 | 27.01-28 | 0.196 |
| 08.01-9 | 0.044 | 18.01-19 | 0.124 | 28.01-29 | 0.204 |
| 09.01-10 | 0.052 | 19.01-20 | 0.132 | 29.01-30 | 0.212 |
| 10.01-11 | 0.060 | 20.01-21 | 0.140 | 30.01-31 | 0.220 |
| 11.01-12 | 0.068 | 21.01-22 | 0.148 | 31.01-32 | 0.228 |
| 12.01-13 | 0.076 | 22.01-23 | 0.156 | 32.01-33 | 0.236 |
| 13.01-14 | 0.084 | 23.01-24 | 0.164 | 33.01-34 | 0.244 |
| 14.01-15 | 0.092 | 24.01-25 | 0.172 | 34.01-35 | 0.252 |
| 15.01-16 | 0.100 | 25.01-26 | 0.180 | Above 35 | See section B |
| 16.01-17 | 0.108 | 26.01-27 | 0.188 | | |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| Musty Odor | 0.020 |
|---|---|
| Sour Odor | 0.020 |
| COFO | 0.040 |

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Calhoun (025) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, a garlicky grade on the date of final inspection for the unit adjust production in the following manner:

1.  If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3.  If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

a.  The action or advisory level of the Food and Drug Administration; or

b.  Another public health organization of the United States; or

c.  A public health agency of the applicable State in which the insured crop is grown.

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| :--- | :--- | :--- |
| Date: 11/14/2018 | Plan:     Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Calhoun (025) |

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

1. For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

   a. Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

   b. For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

   c. Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Vomitoxin Range | DF |
| :--- | :--- |
| .1 –  .   ppm | .000 |
| .1 – 1  .   ppm | .450 |
| 10.1 ppm & above | See C3 below |

2. For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

   a. If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

      i. For production sold to a disinterested third partyprior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

      ii. For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

      iii. For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Calhoun (025) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

   iv.  For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

   v.  For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

  b.  If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

   i.  For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

   ii.  For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

   iii.  For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

   iv.  For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

DFs for Aflatoxin:

| Aflatoxin Range | DF |
| --- | --- |
| .1 – 2 .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .  ppb | .200 |
| 1  .1 – 2   .  ppb | .300 |
| 2  .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |

Year: 2019 · Commodity: Soybeans (0081) · State:   Michigan (26)

Date: 11/14/2018 · Plan:    Yield Protection (01) · County: Calhoun (025)
Revenue Protection (02)
Revenue Prot with Harvest Price Exclusion (03)

| Fumonisin Range | DF |
| --- | --- |
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3. For production that has an Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

   a. For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

      i. The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

      ii. .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

   b. For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

      i. The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

      ii. .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from sections A or B will be included.

   c. If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

1. The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

2. If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value

| **Special Provisions of Insurance** |
|:---:|
| **2019 and Succeeding Crop Years** |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Calhoun (025) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

and will be adjusted as follows:

a.  For production in section A – the pre-established DFs.

b.  For production in section B – .        .

c.  For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

3.  If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| | |
|---|---|
| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Allegan (005) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Program Dates for Insurable Types and Practices

| Sales Closing Date 3/15/2019 | Earliest Planting Date 4/24/2019 | Final Planting Date 6/15/2019 | End of Late Planting Period Date 7/10/2019 | Acreage Reporting Date 7/15/2019 | Premium Billing Date 8/15/2019 |
|---|---|---|---|---|---|

| TP | Type | Practice |
|---|---|---|
| T/P 01 | Commodity 091 | Nfac (Non-Irrigated) 053 *3 |
| T/P 02 | Commodity 091 | Nfac (Irrigated) 094 *3 |
| T/P 03 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 04 | All Other Food Grades 128 *7 | Nfac (Irrigated) 094 *3 |
| T/P 05 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 06 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated) 094 *3 |
| T/P 07 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 08 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated) 094 *3 |
| T/P 09 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 10 | Low Linolenic Acid 884 *7 | Nfac (Irrigated) 094 *3 |
| T/P 11 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 12 | Low Saturated Fat 885 *7 | Nfac (Irrigated) 094 *3 |
| T/P 13 | High Protein 886 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 14 | High Protein 886 *7 | Nfac (Irrigated) 094 *3 |
| T/P 15 | Commodity 091 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 16 | Commodity 091 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 17 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 18 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 19 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |

NHFI-524 Policy 000201

| Special Provisions of Insurance |
|:-:|
| **2019 and Succeeding Crop Years** |

Year: 2019     Commodity: Soybeans (0081)     State:  Michigan (26)

Date: 11/14/2018     Plan:     Yield Protection (01)     County: Allegan (005)
                                    Revenue Protection (02)
                                    Revenue Prot with Harvest Price Exclusion (03)

| TP | Type | Practice |
|:--|:--:|:--:|
| T/P 20 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 21 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 22 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 23 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 24 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 25 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 26 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 27 | High Protein 886 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 28 | High Protein 886 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 29 | Commodity 091 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 30 | Commodity 091 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 31 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 32 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 33 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 34 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 35 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 36 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 37 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 38 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 39 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 40 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 41 | High Protein 886 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 42 | High Protein 886 *7 | Nfac (Irrigated)(OT) 740 *3 |

NHF1-524 Policy 000202

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Allegan (005) |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Practice**

*3    NFAC (Not Following Another Crop): A planted crop not following:

1.  A perennial hay crop that was harvested in the same calendar year; and

2.  A crop (other than a cover crop) that has reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. A crop that follows a cover crop that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance, is considered NFAC.

**Price**

*4    For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Allegan (005) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

**Insurance Availability**

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Allegan (005) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

*7      If you produce any of the following specialty soybean type(s) (including specialty type(s) grown for seed):

   a.   Large seeded food grade –Food grade soybeans commonly used for human food products which generally have a minimum seed size of 18 g/100 seeds (2,520 seeds/lb).

   b.   Small seeded food grade –Food grade varieties of soybeans commonly used for human food products which generally have a maximum seed size of 12 g/100 seeds (3,780 seeds/lb).

   c.   Low linolenic acid – Soybeans commonly used to produce soybean oil with a linolenic acid level of three percent or less.

   d.   Low saturated fat - Soybeans containing 50 percent less saturated fat than commodity soybeans and are used to produce soybean oil with eight percent or less total saturated fats.

   e.   High protein –Food grade varieties of soybeans containing protein levels of 42 percent or greater on a dry matter basis (36.5 percent on a 13 percent moisture basis).

   f.   All other food grades – Any food grade varieties of soybeans not identified by large seeded food grade, small seeded food grade, low linolenic acid, low saturated fat, and high protein types.

You may elect to use the price contained in your production contract (contract price) by the acreage reporting date to determine your projected price and harvest price, as applicable, for each specialty type only if the total number of insured acres of the specialty type does not exceed 110 percent of insured specialty type acreage under the contract (the number of acres under contract is determined as indicated below).  The acreage must be under contract with a business enterprise equipped with facilities appropriate to handle and store specialty type soybean production.  The contract must be executed by you and the business enterprise, in effect for the crop year, and you must provide a copy to us no later than the acreage reporting date.

To be considered a contract, the executed document must contain:

(a) A requirement that you plant, grow and deliver specialty type soybeans to the business enterprise;

(b) The amount of production that will be accepted or a statement that all production from a specified number of acres will be accepted.

To determine the number of acres under contract:

   1.   For acreage only based contracts and, acreage and production based contracts which specify a maximum number of acres, the lesser of:

      i.    The insured acres (planted acreage and acreage that is prevented from being planted); or

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:       Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Allegan (005) |

     ii.   The maximum number of acres specified in the contract.

   2.   For production only based contracts, the lesser of:

     i.   The number of acres determined by dividing the production stated in the contract by the approved yield; or

     ii.   The insured acres (planted acreage and acreage that is prevented from being planted).

(c) The price to be paid for the contracted production or a method to determine such price:

   1.   For yield protection:

     i.   If the contract provides a fixed price for the contracted production, the projected price will be the contract price.

     ii.   If the contract provides for a premium amount over a price determined after the acreage reporting date, the projected price will be the result of adding the premium amount to the CEPP projected price.

   2.   For revenue protection:

     i.   If the contract provides a fixed price for the contracted production:

       A.   The projected price will be the contract price.

       B.   The harvest price will be the result of the CEPP projected price subtracted from the contract price and the difference shall be added to the CEPP harvest price.

     ii.   If the contract provides a premium amount over a price determined after the acreage reporting date:

       A.   The projected price will be the result of adding the premium amount to the CEPP projected price.

       B.   The harvest price will be the result of the CEPP projected price subtracted from the projected price and the difference shall be added to the CEPP harvest price.

   3.   The price used will be the price in the contract without regard to incentives or discounts.

   4.   In no case will the contract price exceed the amount determined by multiplying the CEPP projected price, as applicable, by the maximum contract price factor shown in the Prices tab of these actuarial documents.

   5.   If you have more than one contract price for any one specialty type, the price used will be the weighted average of the contract prices.  Each contract price is subject to the limits referred to in (c)(4).

(d) Other such terms that establish the obligations of each party to the contract; and

(e) The contract must clearly indicate the specific specialty type or verification must be provided that the contracted variety is one of the specialty types listed above.

NHF1-524 Policy 000206

6

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Allegan (005) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

For specialty type soybeans the following replant rules apply:

(a) In addition to the definition of practical to replant in the Basic Provisions, for specialty type soybeans under contract it will not be considered practical to replant unless production from the replanted acreage can be delivered under the terms of the specialty type contract or the business enterprise agrees to accept such contracted production.

(b) In addition to section 9 of the Coarse Grains Crop Provisions when it **is** practical to replant the specialty type originally planted, you must replant to the specialty type originally planted on the acreage.

(c) When it is **not** practical to replant the specialty type originally planted on the acreage:

1.  You may choose to:

    i.   Not replant and may receive an indemnity;

    ii.  Not replant the specialty type originally planted on the acreage and plant to another crop in which case the first/second crop rules in section 15 of the Basic Provisions apply; or

    iii. Replant to another specialty type or commodity type, provided it is practical to replant such type.  The replanted type will be considered a replanted crop.

2.  If it is not practical to replant to another specialty type or commodity type and you plant any type of soybeans, the crop planted will be considered a second crop.

Note: Quality adjustment will be provided as specified in the crop provisions and special provisions.  No additional quality adjustment will be made for any specialty type.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to soybean grain production for the insured crop

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under

| Special Provisions of Insurance | | |
| :---: | :---: | :---: |
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:       Yield Protection (01) | County: Allegan (005) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

   a.  Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

   b.  Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

   c.  Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.


1.  OPTION TO DELAY CLAIM SETTLEMENT:

   a.  On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

   b.  If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

   c.  At any time during this delay in settlement, you may request to settle your claim for any unsold production using the applicable DFs.

   d.  For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

   e.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

   f.  If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Allegan (005) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

g.   This option will not apply to any production qualifying under section C3.

2.   SECTION 14 (e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.

3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.  If the production is not sold within this 30 day period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.

4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP, otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.

5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f  ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only  for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

6.   ZERO MARKET VALUE

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Allegan (005) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value***, such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

   i.   RIVs cannot be used in combination with chart DFs.

   ii.   If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

   iii.   If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

   iv.   The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Soybeans will be discounted for grade as follows:

| Grade | DF |
|---|---|
| U.S. Sample Grade | 0.030 |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Allegan (005) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

TEST WEIGHT DISCOUNT:

Discounts for low test weight as follows:

| Test Weight Pounds | DF |
|---|---|
| 49 and above | None |
| 48-48.99 | 0.007 |
| 47-47.99 | 0.009 |
| 46-46.99 | 0.011 |
| 45-45.99 | 0.013 |
| 44-44.99 | 0.015 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows U.S. Sample Grade for Damage –  . 1   and above:

| Damage % | DF | Damage % | DF | Damage % | DF |
|---|---|---|---|---|---|
| 08 and below | None | 17.01-18 | 0.116 | 27.01-28 | 0.196 |
| 08.01-9 | 0.044 | 18.01-19 | 0.124 | 28.01-29 | 0.204 |
| 09.01-10 | 0.052 | 19.01-20 | 0.132 | 29.01-30 | 0.212 |
| 10.01-11 | 0.060 | 20.01-21 | 0.140 | 30.01-31 | 0.220 |
| 11.01-12 | 0.068 | 21.01-22 | 0.148 | 31.01-32 | 0.228 |
| 12.01-13 | 0.076 | 22.01-23 | 0.156 | 32.01-33 | 0.236 |
| 13.01-14 | 0.084 | 23.01-24 | 0.164 | 33.01-34 | 0.244 |
| 14.01-15 | 0.092 | 24.01-25 | 0.172 | 34.01-35 | 0.252 |
| 15.01-16 | 0.100 | 25.01-26 | 0.180 | Above 35 | See section B |
| 16.01-17 | 0.108 | 26.01-27 | 0.188 | | |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| | |
|---|---|
| Musty Odor | 0.020 |
| Sour Odor | 0.020 |
| COFO | 0.040 |

| Special Provisions of Insurance | | |
| :-- | :-: | --: |
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| :-- | :-- | --: |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Allegan (005) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, a garlicky grade on the date of final inspection for the unit adjust production in the following manner:

1.  If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3.  If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

a.  The action or advisory level of the Food and Drug Administration; or

b.  Another public health organization of the United States; or

c.  A public health agency of the applicable State in which the insured crop is grown.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Allegan (005) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

1.  For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

    a.  Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

    b.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

    c.  Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Vomitoxin Range | DF |
| --- | --- |
| .1 –  .   ppm | .000 |
| .1 – 1  .   ppm | .450 |
| 10.1 ppm & above | See C3 below |

2.  For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

    a.  If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

        i.   For production sold to a disinterested third partyprior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

        ii.  For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

        iii. For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Allegan (005) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

    iv. For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

    v. For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

  b. If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

    i. For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

    ii. For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

    iii. For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

    iv. For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

DFs for Aflatoxin:

| Aflatoxin Range | DF |
|---|---|
| .1 – 2 .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .  ppb | .200 |
| 1   .1 – 2   .  ppb | .300 |
| 2   .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

| **Special Provisions of Insurance** | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Allegan (005) |
|  |            Revenue Protection (02) |  |
|  |            Revenue Prot with Harvest Price Exclusion (03) |  |

| Fumonisin Range | DF |
|---|---|
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3. For production that has an Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

   a. For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

      i. The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

      ii. .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

   b. For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

      i. The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

      ii. .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from sections A or B will be included.

   c. If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

1. The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

2. If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| | | |
| :--- | :--- | :--- |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Allegan (005) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

and will be adjusted as follows:

    a.  For production in section A – the pre-established DFs.

    b.  For production in section B – .       .

    c.  For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

3.  If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| | |
| :--- | :--- |
| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Jackson (075) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Program Dates for Insurable Types and Practices

| Sales Closing Date 3/15/2019 | Earliest Planting Date 4/24/2019 | Final Planting Date 6/15/2019 | End of Late Planting Period Date 7/10/2019 | Acreage Reporting Date 7/15/2019 | Premium Billing Date 8/15/2019 |
|---|---|---|---|---|---|

| TP | Type | Practice |
|---|---|---|
| T/P 01 | Commodity 091 | Nfac (Non-Irrigated) 053 *3 |
| T/P 02 | Commodity 091 | Nfac (Irrigated) 094 *3 |
| T/P 03 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 04 | All Other Food Grades 128 *7 | Nfac (Irrigated) 094 *3 |
| T/P 05 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 06 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated) 094 *3 |
| T/P 07 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 08 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated) 094 *3 |
| T/P 09 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 10 | Low Linolenic Acid 884 *7 | Nfac (Irrigated) 094 *3 |
| T/P 11 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 12 | Low Saturated Fat 885 *7 | Nfac (Irrigated) 094 *3 |
| T/P 13 | High Protein 886 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 14 | High Protein 886 *7 | Nfac (Irrigated) 094 *3 |
| T/P 15 | Commodity 091 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 16 | Commodity 091 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 17 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 18 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 19 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |

NHF1-524 Policy 000217

1

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:       Yield Protection (01) | County: Jackson (075) |
|  |           Revenue Protection (02) |  |
|  |           Revenue Prot with Harvest Price Exclusion (03) |  |

| TP | Type | Practice |
|---|---|---|
| T/P 20 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 21 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 22 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 23 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 24 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 25 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 26 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 27 | High Protein 886 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 28 | High Protein 886 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 29 | Commodity 091 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 30 | Commodity 091 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 31 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 32 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 33 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 34 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 35 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 36 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 37 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 38 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 39 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 40 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 41 | High Protein 886 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 42 | High Protein 886 *7 | Nfac (Irrigated)(OT) 740 *3 |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Jackson (075) |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Practice**

*3    NFAC (Not Following Another Crop): A planted crop not following:

1. A perennial hay crop that was harvested in the same calendar year; and

2. A crop (other than a cover crop) that has reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. A crop that follows a cover crop that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance, is considered NFAC.

**Price**

*4    For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Jackson (075) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

**Insurance Availability**

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Jackson (075) |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

*7     If you produce any of the following specialty soybean type(s) (including specialty type(s) grown for seed):

a.   Large seeded food grade –Food grade soybeans commonly used for human food products which generally have a minimum seed size of 18 g/100 seeds (2,520 seeds/lb).

b.   Small seeded food grade –Food grade varieties of soybeans commonly used for human food products which generally have a maximum seed size of 12 g/100 seeds (3,780 seeds/lb).

c.   Low linolenic acid – Soybeans commonly used to produce soybean oil with a linolenic acid level of three percent or less.

d.   Low saturated fat - Soybeans containing 50 percent less saturated fat than commodity soybeans and are used to produce soybean oil with eight percent or less total saturated fats.

e.   High protein –Food grade varieties of soybeans containing protein levels of 42 percent or greater on a dry matter basis (36.5 percent on a 13 percent moisture basis).

f.   All other food grades – Any food grade varieties of soybeans not identified by large seeded food grade, small seeded food grade, low linolenic acid, low saturated fat, and high protein types.

You may elect to use the price contained in your production contract (contract price) by the acreage reporting date to determine your projected price and harvest price, as applicable, for each specialty type only if the total number of insured acres of the specialty type does not exceed 110 percent of insured specialty type acreage under the contract (the number of acres under contract is determined as indicated below).  The acreage must be under contract with a business enterprise equipped with facilities appropriate to handle and store specialty type soybean production.  The contract must be executed by you and the business enterprise, in effect for the crop year, and you must provide a copy to us no later than the acreage reporting date.

To be considered a contract, the executed document must contain:

(a) A requirement that you plant, grow and deliver specialty type soybeans to the business enterprise;

(b) The amount of production that will be accepted or a statement that all production from a specified number of acres will be accepted.

To determine the number of acres under contract:

1.   For acreage only based contracts and, acreage and production based contracts which specify a maximum number of acres, the lesser of:

i.    The insured acres (planted acreage and acreage that is prevented from being planted); or

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Jackson (075) |

     ii.   The maximum number of acres specified in the contract.

   2.   For production only based contracts, the lesser of:

     i.   The number of acres determined by dividing the production stated in the contract by the approved yield; or

     ii.   The insured acres (planted acreage and acreage that is prevented from being planted).

(c) The price to be paid for the contracted production or a method to determine such price:

   1.   For yield protection:

     i.   If the contract provides a fixed price for the contracted production, the projected price will be the contract price.

     ii.   If the contract provides for a premium amount over a price determined after the acreage reporting date, the projected price will be the result of adding the premium amount to the CEPP projected price.

   2.   For revenue protection:

     i.   If the contract provides a fixed price for the contracted production:

       A.   The projected price will be the contract price.

       B.   The harvest price will be the result of the CEPP projected price subtracted from the contract price and the difference shall be added to the CEPP harvest price.

     ii.   If the contract provides a premium amount over a price determined after the acreage reporting date:

       A.   The projected price will be the result of adding the premium amount to the CEPP projected price.

       B.   The harvest price will be the result of the CEPP projected price subtracted from the projected price and the difference shall be added to the CEPP harvest price.

   3.   The price used will be the price in the contract without regard to incentives or discounts.

   4.   In no case will the contract price exceed the amount determined by multiplying the CEPP projected price, as applicable, by the maximum contract price factor shown in the Prices tab of these actuarial documents.

   5.   If you have more than one contract price for any one specialty type, the price used will be the weighted average of the contract prices.  Each contract price is subject to the limits referred to in (c)(4).

(d) Other such terms that establish the obligations of each party to the contract; and

(e) The contract must clearly indicate the specific specialty type or verification must be provided that the contracted variety is one of the specialty types listed above.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Jackson (075) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

For specialty type soybeans the following replant rules apply:

(a) In addition to the definition of practical to replant in the Basic Provisions, for specialty type soybeans under contract it will not be considered practical to replant unless production from the replanted acreage can be delivered under the terms of the specialty type contract or the business enterprise agrees to accept such contracted production.

(b) In addition to section 9 of the Coarse Grains Crop Provisions when it **is** practical to replant the specialty type originally planted, you must replant to the specialty type originally planted on the acreage.

(c) When it is **not** practical to replant the specialty type originally planted on the acreage:

1.  You may choose to:

    i.    Not replant and may receive an indemnity;

    ii.   Not replant the specialty type originally planted on the acreage and plant to another crop in which case the first/second crop rules in section 15 of the Basic Provisions apply; or

    iii.  Replant to another specialty type or commodity type, provided it is practical to replant such type.  The replanted type will be considered a replanted crop.

2.  If it is not practical to replant to another specialty type or commodity type and you plant any type of soybeans, the crop planted will be considered a second crop.

Note: Quality adjustment will be provided as specified in the crop provisions and special provisions.  No additional quality adjustment will be made for any specialty type.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to soybean grain production for the insured crop

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:        Yield Protection (01)<br>                 Revenue Protection (02)<br>                 Revenue Prot with Harvest Price Exclusion (03) | County: Jackson (075) |

sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

   a.   Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

   b.   Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

   c.   Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.

  1.   OPTION TO DELAY CLAIM SETTLEMENT:

   a.   On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

   b.   If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

   c.   At any time during this delay in settlement, you may request to settle your claim for any unsold production using the applicable DFs.

   d.   For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

   e.   If the production is later sold, we will not recalculate or adjust your claim for indemnity.

   f.   If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Jackson (075) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

     g.   This option will not apply to any production qualifying under section C3.

    2.   SECTION 14 (e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.

    3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.  If the production is not sold within this 30 day period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.

    4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP, otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.

    5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f  ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only  for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

    6.   ZERO MARKET VALUE

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Jackson (075) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value***, such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

   i.   RIVs cannot be used in combination with chart DFs.

   ii.   If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

   iii.   If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

   iv.   The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Soybeans will be discounted for grade as follows:

| Grade | DF |
|---|---|
| U.S. Sample Grade | 0.030 |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Jackson (075) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

TEST WEIGHT DISCOUNT:

Discounts for low test weight as follows:

| Test Weight Pounds | DF |
|---|---|
| 49 and above | None |
| 48-48.99 | 0.007 |
| 47-47.99 | 0.009 |
| 46-46.99 | 0.011 |
| 45-45.99 | 0.013 |
| 44-44.99 | 0.015 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows U.S. Sample Grade for Damage – . 1   and above:

| Damage % | DF | Damage % | DF | Damage % | DF |
|---|---|---|---|---|---|
| 08 and below | None | 17.01-18 | 0.116 | 27.01-28 | 0.196 |
| 08.01-9 | 0.044 | 18.01-19 | 0.124 | 28.01-29 | 0.204 |
| 09.01-10 | 0.052 | 19.01-20 | 0.132 | 29.01-30 | 0.212 |
| 10.01-11 | 0.060 | 20.01-21 | 0.140 | 30.01-31 | 0.220 |
| 11.01-12 | 0.068 | 21.01-22 | 0.148 | 31.01-32 | 0.228 |
| 12.01-13 | 0.076 | 22.01-23 | 0.156 | 32.01-33 | 0.236 |
| 13.01-14 | 0.084 | 23.01-24 | 0.164 | 33.01-34 | 0.244 |
| 14.01-15 | 0.092 | 24.01-25 | 0.172 | 34.01-35 | 0.252 |
| 15.01-16 | 0.100 | 25.01-26 | 0.180 | Above 35 | See section B |
| 16.01-17 | 0.108 | 26.01-27 | 0.188 | | |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| Musty Odor | 0.020 |
|---|---|
| Sour Odor | 0.020 |
| COFO | 0.040 |

NHF1-524 Policy 000227

11

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Jackson (075) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, a garlicky grade on the date of final inspection for the unit adjust production in the following manner:

1. If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2. For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3. If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

a. The action or advisory level of the Food and Drug Administration; or

b. Another public health organization of the United States; or

c. A public health agency of the applicable State in which the insured crop is grown.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Jackson (075) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

1. For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

   a. Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

   b. For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

   c. Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Vomitoxin Range | DF |
| --- | --- |
| .1 –  .   ppm | .000 |
| .1 – 1  .  ppm | .450 |
| 10.1 ppm & above | See C3 below |

2. For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

   a. If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

      i. For production sold to a disinterested third partyprior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

      ii. For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

      iii. For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

| Special Provisions of Insurance |
| --- |
| 2019 and Succeeding Crop Years |

| | | |
| --- | --- | --- |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Jackson (075) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

    iv.  For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

    v.  For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

  b.  If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

    i.  For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

    ii.  For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

    iii.  For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

    iv.  For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

DFs for Aflatoxin:

| Aflatoxin Range | DF |
| --- | --- |
| .1 – 2 .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1  .  ppb | .200 |
| 1   .1 – 2   .  ppb | .300 |
| 2   .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Jackson (075) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| Fumonisin Range | DF |
|---|---|
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3.  For production that has an Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

   a.  For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

      i.   The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

      ii.  .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

   b.  For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

      i.   The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

      ii.  .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from sections A or B will be included.

   c.  If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

1.  The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

2.  If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Jackson (075) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

and will be adjusted as follows:

   a.  For production in section A – the pre-established DFs.

   b.  For production in section B – .      .

   c.  For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

3.  If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| | |
| --- | --- |
| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

**EXHIBIT 03**

10/10/2019
Page: 1 of 24

# Multiple Peril Crop Insurance
# Schedule of Insurance with Production Report
for the 2019 Crop Year

**GREAT AMERICAN INSURANCE COMPANY** — Crop Insurance Division

Peoria
1315 W. Commerce Drive
Peoria, IL 61615-1462

Policy Number: 2019-MI-084-1139524

| INSURED: | | |
|---|---|---|
| NEW HEIGHTS FARM I, LLC<br>6241 RANSOM ST<br>ZEELAND, MI 49464 | **Person Type:** Limited Liability Company (LLC)<br>**Identification Number:** XX-XXX1520<br>**ID # Type:** ☐ SSN ☑ EIN ☐ Assigned Number<br>**Phone:** (616) 875-7880<br>**2nd Phone:** (616) 836-0273 | **AGENT:** SPARTAN INSURANCE -MAIN 3<br>806 BOTSFORD RD<br>PETOSKEY, MI 49770<br>**Code No:** 236132<br>**Phone:** (855) 347-1066<br>**Fax:** (231) 347-1067 |

**SBI Name:**
**SBI Identification #:**
**Authorized Representative(s):** STACY BOERSEN
**Limited Authorized Rep(s):**
**POA(s):**
**Added Acreage (CL):**

**INSURED CROP SUMMARY FOR STATE: Michigan**  Assignment of Indemnity to: WILMINGTON TRUST, N.A.  All Counties Option: Yes

| Name of County | Name of Crop(s) | BFR | EU DNQ | EP DNQ | Unit Structure | ***New Producer | Plan | | Cov Level | % Price Elect, Proj. Price, or Amt of Ins. | Fee | Options/ Elections/ Endorsements | Named Peril Endorsement | Insured Premium | Liability | Acres |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Allegan (5) | Corn | ☐ | ☐ | ☐ | EP | ☐ | RP (02) | | 80% | 100% of Max | $30 | PF/TA/YA | None | $ 26,641 | $ 846,896 | 1,457.23 |
| Allegan (5) | Soybeans | ☐ | ☐ | ☐ | EP | ☐ | RP (02) | | 80% | 100% of Max | $0 | PF/TA/YA | None | $ 0 | $ 0 | 0.00 |
| Barry (15) | Corn | ☐ | ☐ | ☑ | EP | ☐ | RP (02) | | 80% | 100% of Max | $30 | PF/TA/YA | None | $ 1,372 | $ 60,837 | 96.74 |
| Barry (15) | Soybeans | ☐ | ☐ | ☐ | EP | ☐ | RP (02) | | 80% | 100% of Max | $0 | PF/TA/YA | None | $ 0 | $ 0 | 0.00 |
| Calhoun (25) | Corn | ☐ | ☐ | ☐ | EP | ☐ | RP (02) | | 80% | 100% of Max | $30 | PF/TA/YA | None | $ 40,872 | $ 2,401,632 | 3,716.60 |
| Calhoun (25) | Soybeans | ☐ | ☐ | ☐ | EP | ☐ | RP (02) | | 80% | 100% of Max | $0 | PF/TA/YA | None | $ 0 | $ 0 | 0.00 |
| Eaton (45) | Corn | ☐ | ☐ | ☐ | EP | ☐ | RP (02) | | 80% | 100% of Max | $0 | PF/TA/YA | None | $ 0 | $ 0 | 0.00 |
| Eaton (45) | Soybeans | ☐ | ☐ | ☑ | EP | ☐ | RP (02) | | 80% | 100% of Max | $30 | PF/TA/YA | None | $ 3,648 | $ 158,789 | 458.48 |
| Ingham (65) | Corn | ☐ | ☐ | ☐ | EP | ☐ | RP (02) | | 80% | 100% of Max | $0 | PF/TA/YA | None | $ 0 | $ 0 | 0.00 |
| Ingham (65) | Soybeans | ☐ | ☐ | ☑ | EP | ☐ | RP (02) | | 80% | 100% of Max | $30 | PF/TA/YA | None | $ 5,702 | $ 292,058 | 855.87 |
| Jackson (75) | Corn | ☐ | ☐ | ☐ | EP | ☐ | RP (02) | | 80% | 100% of Max | $30 | PF/TA/YA | None | $ 4,490 | $ 233,180 | 461.44 |
| Jackson (75) | Soybeans | ☐ | ☐ | ☐ | EP | ☐ | RP (02) | | 80% | 100% of Max | $0 | PF/TA/YA | None | $ 0 | $ 0 | 0.00 |
| Ottawa (139) | Corn | ☐ | ☐ | ☑ | EP | ☐ | RP (02) | | 80% | 100% of Max | $30 | PF/TA/YA | None | $ 33,112 | $ 921,988 | 1,689.37 |
| Ottawa (139) | Soybeans | ☐ | ☐ | ☐ | EP | ☐ | RP (02) | | 80% | 100% of Max | $0 | PF/TA/YA | None | $ 0 | $ 0 | 0.00 |
| | | | | | | | | | | | | Grand Total: | | $ 115,837 | $ 4,915,380 | 8,735.73 |

**CROP ACREAGE SUMMARY (Review information for accuracy and report errors immediately. Revisions are subject to approval by company.)**

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage, (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP Production (ARPI only)., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For FCIP policies only., (Y)Appraisal (non-loss). For CCIP policies only., (Z)Zero Planted Acres

**Insurability:** (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
* I certify I have not produced the insured crop in the county for more than two years.

(Form M205)  See Signature Page for Required Statements

# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139524    NEW HEIGHTS FARM I, LLC

Agency: 236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note / Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * / Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | 0001-0003-EP Corn 80% | Irr/Grain Allegan (5) 01-Insured | GUN PLAIN #2 IRR / 2-1N-11W / 10189-2557-3 | 1.00 / 1.00 PFTAYA 1.020 / 0.66 | 0.04356849 No | 187 BU 170 BU 172 BU | 149.6 BU $110,566 27,642 BU | 4.00 E 110,566 | 1.0000 | 184.77 5/25/2019 | $9,533 $3,051 | ☐ Commingled Prod |
| 12 | 0001-0011-EP Corn 80% | Irr/Grain Allegan (5) 01-Insured | MARTIN #23 IRR / 23-2N-11W / 10189-2563-1 | 1.00 / 1.00 PFTAYA 1.020 / 0.66 | 0.04301392 No | 191 BU 173 BU 176 BU | 152.8 BU $30,114 7,528 BU | 4.00 E 30,114 | 1.0000 | 49.27 5/29/2019 | $2,574 $824 | ☐ Commingled Prod |
| 15 | 0001-0014-EP Corn 80% | Irr/Grain Allegan (5) 01-Insured | GUN PLAIN 10 IRR / 10-1N-11W / 15-1N-11W / 10184-9995-12 / 10185-9996-13,14,5 | 1.00 / 1.00 PFTAYA 1.020 / 0.66 | 0.04444405 No | 181 BU 165 BU 168 BU | 144.8 BU $47,222 11,806 BU | 4.00 E 47,222 | 1.0000 | 81.53 5/26/2019 | $3,987 $1,276 | ☐ Commingled Prod |
| 17 | 0001-0017-EP Corn 80% | Irr/Grain Allegan (5) 01-Insured | MARTIN #35 IRR / 35-2N-11W / 10189-2566-1 | 1.00 / 1.00 PFTAYA 1.020 / 0.66 | 0.04743842 No | 164 BU 148 BU 151 BU | 131.2 BU $80,646 20,162 BU | 4.00 E 80,646 | 1.0000 | 153.67 6/4/2019 | $7,374 $2,360 | ☐ Commingled Prod |
| 51 | 0001-0050-EP Corn 80% | Irr/Grain Allegan (5) 01-Insured | GUN PLAIN 4 IRR / 4-1N-11W / 10189-7952-1 | 1.00 / 1.00 PFTAYA 1.020 / 0.66 | 0.0463726 No | 166 BU 153 BU 157 BU | 132.8 BU $21,418 5,354 BU | 4.00 E 21,418 | 1.0000 | 40.32 5/25/2019 | $1,797 $575 | ☐ Commingled Prod |
| 52 | 0001-0051-EP Corn 80% | Irr/Grain Allegan (5) 01-Insured | GUN PLAIN 5 IRR / 5-1N-11W / 10176-7953-10,9 | 1.00 / 1.00 PFTAYA 1.020 / 0.66 | 0.0463726 No | 165 BU 153 BU 157 BU | 132.0 BU $20,471 5,118 BU | 4.00 E 20,471 | 1.0000 | 38.77 5/25/2019 | $1,657 $530 | ☐ Commingled Prod |
| 58 | 0001-0056-EP Corn 80% | Irr/Grain Allegan (5) 01-Insured | Martin #20 / 20-2N-11W / 10176-7957-10 / 10182-9993-21 / 10189-7956-2 | 1.00 / 1.00 PFTA 1.020 / 0.65 | 0.0412354 No | 195 BU 187 BU 187 BU | 156.0 BU $140,094 35,024 BU | 4.00 E 140,094 | 1.0000 | 224.51 5/26/2019 | $10,071 $3,223 | ☐ Commingled Prod |
| 59 | 0001-0057-EP Corn 80% | Irr/Grain Allegan (5) 01-Insured | MARTIN #27 IRR / 27-2N-11W / 10189-2564-1 | 1.00 / 1.00 PFTA 1.020 / 0.65 | 0.03967339 No | 209 BU 200 BU 200 BU | 167.2 BU $63,603 15,901 BU | 4.00 E 63,603 | 1.0000 | 95.10 5/26/2019 | $4,625 $1,480 | ☐ Commingled Prod |
| 60 | 0001-0058-EP Corn 80% | Irr/Grain Allegan (5) 01-Insured | MARTIN #30 IRR / 30-2N-11W / 10176-2565-10,6,9 | 1.00 / 1.00 PFTA 1.020 / 0.65 | 0.04054191 No | 201 BU 193 BU 193 BU | 160.8 BU $48,079 12,020 BU | 4.00 E 48,079 | 1.0000 | 74.75 6/4/2019 | $3,416 $1,093 | ☐ Commingled Prod |
| 20 | 0001-0019-EP Corn 80% | Non-Irr/Grain Allegan (5) 01-Insured | MARTIN #36 / 36-2N-11W / 10189-9998-3,8 | 1.00 / 1.00 PFTAYA 1.020 / 0.67 | 0.097884 No | 169 BU 154 BU 156 BU | 135.2 BU $1,779 445 BU | 4.00 E 1,779 | 1.0000 | 3.29 6/4/2019 | $240 $77 | ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: pick/daily sales records., (C)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only)., (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage. (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

** Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)    See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number:  2019-MI-084-1139524     NEW HEIGHTS FARM I, LLC

Agency:  236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 22 | 0001-0020-EP Corn 80% | Non-Irr/Grain Allegan (5) 01-Insured | GUN PLAIN #10/#15 10-1N-11W / 10185-9996-13,14,5 | 1.00 / 1.00 PFTA 1.020 / 0.69 | 0.09335986 No | 188 BU 164 BU 164 BU | 150.4 BU $51,750 12,937 BU | 4.00 E 51,750 | 1.0000 | 86.02 5/26/2019 | $7,435 $2,379 | ☐ Commingled Prod |
| 33 | 0001-0031-EP Corn 80% | Non-Irr/Grain Allegan (5) 01-Insured | GUN PLAIN #5 5-1N-11W / 10176-7953-10,9 | 1.00 / 1.00 PFTAYA 1.020 / 0.67 | 0.10223565 No | 161 BU 145 BU 148 BU | 128.8 BU $12,092 3,023 BU | 4.00 E 12,092 | 1.0000 | 23.47 5/25/2019 | $1,686 $540 | ☐ Commingled Prod |
| 46 | 0001-0044-EP Corn 80% | Non-Irr/Grain Allegan (5) 01-Insured | MARTIN #28 28-2N-11W / 10182-9993-16,2 | 1.00 / 1.00 PFTA 1.020 / 0.67 | 0.09928187 No | 165 BU 151 BU 151 BU | 132.0 BU $32,667 8,167 BU | 4.00 E 32,667 | 1.0000 | 61.87 5/29/2019 | $4,450 $1,424 | ☐ Commingled Prod |
| 47 | 0001-0045-EP Corn 80% | Non-Irr/Grain Allegan (5) 01-Insured | MARTIN #29 29-2N-11W / 10182-9993-10,6 | 1.00 / 1.00 PFTAYA 1.020 / 0.67 | 0.10379783 No | 157 BU 141 BU 144 BU | 125.6 BU $50,481 12,620 BU | 4.00 E 50,481 | 1.0000 | 100.48 5/25/2019 | $7,127 $2,281 | ☐ Commingled Prod |
| 48 | 0001-0046-EP Corn 80% | Non-Irr/Grain Allegan (5) 01-Insured | MARTIN #22 22-2N-11W / 9843-9699-1 | 1.00 / 1.00 PFTA 1.020 / 0.68 | 0.09523232 No | 176 BU 160 BU 160 BU | 140.8 BU $18,394 4,599 BU | 4.00 E 18,394 | 1.0000 | 32.66 5/26/2019 | $2,476 $792 | ☐ Commingled Prod |
| 50 | 0001-0049-EP Corn 80% | Non-Irr/Grain Allegan (5) 01-Insured | HOPKINS 12/13 12-3N-12W / 13-3N-12W / 1369-1549-1,2 / 7036-7250-6 / 7036-7251-1 / 8908-8414-1,2,3 | 1.00 / 1.00 PFTAYA 1.020 / 0.67 | 0.09459758 No | 181 BU 161 BU 168 BU | 144.8 BU $103,057 25,764 BU | 4.00 E 103,057 | 1.0000 | 177.93 5/31/2019 | $13,221 $4,231 | ☐ Commingled Prod |
| 64 | 0001-0061-EP Corn 80% | Non-Irr/Grain Allegan (5) 01-Insured | HOPKINS #1 1-3N-12W / 1211-1528-1,2 | 1.00 / 1.00 PFTA 1.020 / 0.66 | 0.09653502 No | 157 BU 157 BU 157 BU | 125.6 BU $12,017 3,004 BU | 4.00 E 12,017 | 1.0000 | 23.92 5/31/2019 | $1,313 $420 | ☐ Commingled Prod |
| 456 | 0001-0062-EP Corn 80% | Non-Irr/Grain Allegan (5) 01-Insured | 12-2N-11W / 8818-8493-3 | 1.00 / 1.00 PF 1.020 / 0.66 | 0.09653502 No | 156 BU 156 BU | 124.8 BU $2,446 612 BU | 4.00 E 2,446 | 1.0000 | 4.90 5/26/2019 | $267 $85 | ☐ Commingled Prod |
| **Total for Allegan, Corn** | | | | **Acres: 1,457.23** | | **Guarantee: Amt. of Cov.: 846,897 DOL** | | **Liability: $846,896** | | | **$83,249** | **$26,641** |
| 66 | 0001-0002-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Allegan (5) 15-ZC | MARTIN #36 36-2N-11W / 10189-9998-3,8 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.08132417 No | 52 BU 48 BU 49 BU | 41.6 BU $0 0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 67 | 0001-0003-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Allegan (5) 15-ZC | GUN PLAIN #10 10-1N-11W / 15-1N-11W / 10184-9995-12 / 10185-9996-13,14,5 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.07560784 No | 56 BU 51 BU 52 BU | 44.8 BU $0 0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage, (B)Harvested Production: farm stored/measured by insured, (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system, (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)        See Signature Page for Required Statements



**Schedule of Insurance with Production Report - for the 2019 Crop Year**

10/10/2019
Page: 4 of 24

Policy Number: 2019-MI-084-1139524    NEW HEIGHTS FARM I, LLC
Agency: 236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note / Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * / Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 77 | 0001-0013-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Allegan (5) 15-ZC | MARTIN #22 22-2N-11W / 9843-9699-1 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0635493 No | 62 BU 60 BU 60 BU | 49.6 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 80 | 0001-0016-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Allegan (5) 15-ZC | MARTIN #28 28-2N-11W / 10182-9993-16,2 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.07715638 No | 52 BU 50 BU 50 BU | 41.6 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 82 | 0001-0018-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Allegan (5) 15-ZC | GUN PLAIN #5 5-1N-11W / 10176-7953-10,9 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.07877061 No | 50 BU 49 BU 49 BU | 40.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 89 | 0001-0025-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Allegan (5) 15-ZC | MARTIN #29 29-2N-11W / 10182-9993-10,6 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.07877061 No | 50 BU 49 BU 49 BU | 40.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 90 | 0001-0026-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Allegan (5) 15-ZC | HOPKINS 12/13 12-3N-12W / 13-3N-12W / 1369-1549-1,2 / 7036-7250-6 / 7036-7251-1 / 8908-8414-1,2,3 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.06005036 No | 65 BU 63 BU 63 BU | 52.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 98 | 0001-0035-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Allegan (5) 15-ZC | 1-3N-12W / 1211-1528-1,2 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.06690667 No | 57 BU 57 BU 57 BU | 45.6 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 96 | 0001-0033-EP Soybeans 80% | Nfac (Irr)/Commodity Allegan (5) 15-ZC | 2-1N-11W / 4-1N-11W / 5-1N-11W / 15-1N-11W / 20-2N-11W / 23-2N-11W / 27-2N-11W / 30-2N-11W / 35-2N-11W / 28-2N-11W / 10176-2565-10,6,9 / 10176-7953-10,9 / 10176-7957-10 / 10182-9993-16,2,21 / 10184-9995-12 / 10189-2557-3 / 10189-2563-1 / 10189-2564-1 / 10189-2566-1 / 10189-7952-1 / 10189-7956-2 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.06935712 No | 55 BU 55 BU 55 BU | 44.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

**Total for Allegan, Soybeans**    Acres: 0.00    Guarantee/Amt. of Cov.: 0 DOL    Liability: $0    $0    $0

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note / Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * / Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 463 | 0001-0001-EU Corn 80% | Non-Irr/Grain Barry (15) 14-ZU | GENERIC LINE | 1.00 / 1.00 PF 1.020 / 1.00 | 0.06796438 | 138 BU 138 BU | 110.4 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage, (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested production appraised by AIP (ARPI Only), (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability:** (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)    See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139524   NEW HEIGHTS FARM I, LLC

Agency: 236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note / Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * / Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 101 | 0001-0002-EU Corn 80% | Irr/Grain Barry (15) 01-Insured | | 1.00 / 1.00 PFTA | 0.02948136 | 204 BU 192 BU 192 BU | 163.2 BU $46,290 | 4.00 E | 1.0000 | 70.91 5/28/2019 | $3,391 | ☐ Commingled Prod |
| | | | 7-2N-10W / 6703-12595-5 / 6705-1854-7,8 | 1.020 / 0.74 | No | | 11,573 BU | 46,290 | | | $1,085 | |
| 102 | 0001-0003-EU Corn 80% | Irr/Grain Barry (15) 01-Insured | ORANGEVILLE #18 | 1.00 / 1.00 PF | 0.031 | 176 BU 176 BU | 140.8 BU $14,547 | 4.00 E | 1.0000 | 25.83 5/28/2019 | $897 | ☐ Commingled Prod |
| | | | 18-2N-10W / 6705-12596-6 | 1.020 / 0.73 | No | | 3,637 BU | 14,547 | | | $287 | |

| **Total for Barry, Corn** | | Acres: 96.74 | | Guarantee/Amt. of Cov.: 60,838 DOL | | Liability: $60,837 | | | | $4,288 | $1,372 |

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note / Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * / Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 112 | 0001-0001-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Barry (15) 15-ZC | ORANGEVILLE # 7 & 18 | 1.00 / 1.00 PFTAYA | 0.03881981 | 47 BU 42 BU 43 BU | 37.6 BU $0 | 9.54 E | 1.0000 | 0.00 | $0 | ☐ Commingled Prod |
| | | | 7-2N-10W / 18-2N-10W / 6703-12595-5 / 6705-12596-6 / 6705-1854-7,8 | 1.020 / 1.00 | No | | 0 | | | | $0 | |
| 464 | 0001-0002-EP Soybeans 80% | Nfac (Irr)/Commodity Barry (15) 15-ZC | GENERIC LINE | 1.00 / 1.00 PF | 0.040124 | 41 BU 41 BU | 32.8 BU $0 | 9.54 E | 1.0000 | 0.00 | $0 | ☐ Commingled Prod |
| | | | | 1.020 / 1.00 | No | | 0 | | | | $0 | |

| **Total for Barry, Soybeans** | | Acres: 0.00 | | Guarantee/Amt. of Cov.: 0 DOL | | Liability: $0 | | | | $0 | $0 |

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note / Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * / Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 160 | 0001-0045-EP Corn 80% | Irr/Grain Calhoun (25) 14-ZU | PEINFIELD #36 IRR | 1.00 / 1.00 PFTA | 0.0205015 | 222 BU 214 BU 214 BU | 177.6 BU $0 | 4.00 E | 1.0000 | 0.00 | $0 | ☐ Commingled Prod |
| | | | 36-1S-7W / 8550-10816-42 | 1.020 / 1.00 | No | | 0 | | | | $0 | |
| 161 | 0001-0046-EP Corn 80% | Irr/Grain Calhoun (25) 01-Insured | EMMETT #31/32 IRR | 1.00 / 1.00 PFTAYA | 0.0217625 | 205 BU 191 BU 196 BU | 164.0 BU $113,777 | 4.00 E | 1.0000 | 173.44 5/28/2019 | $6,358 | ☐ Commingled Prod |
| | | | 31-2S-7W / 32-2S-7W / 8066-11440-1,10,21,22,3 | 1.020 / 0.65 | No | | 28,444 BU | 113,777 | | | $2,035 | |
| 167 | 0001-0052-EP Corn 80% | Irr/Grain Calhoun (25) 01-Insured | EMMETT 1 IRR | 1.00 / 1.00 PFTAYA | 0.02224652 | 197 BU 185 BU 189 BU | 157.6 BU $102,030 | 4.00 E | 1.0000 | 161.85 5/13/2019 | $5,526 | ☐ Commingled Prod |
| | | | 1-2S-7W / 8550-10816-43 | 1.020 / 0.65 | No | | 25,508 BU | 102,030 | | | $1,768 | |
| 168 | 0001-0053-EP Corn 80% | Irr/Grain Calhoun (25) 14-ZU | EMMETT 2 IRR | 1.00 / 1.00 PFTAYA | 0.02224652 | 197 BU 185 BU 189 BU | 157.6 BU $0 | 4.00 E | 1.0000 | 0.00 | $0 | ☐ Commingled Prod |
| | | | 2-2S-7W / 8550-10134-55,57,61,62 | 1.020 / 1.00 | No | | 0 | | | | $0 | |
| 171 | 0001-0056-EP Corn 80% | Irr/Grain Calhoun (25) 01-Insured | MARSHALL 28/29 | 1.00 / 1.00 PFTA | 0.02040752 | 223 BU 216 BU 216 BU | 178.4 BU $469,756 | 4.00 E | 1.0000 | 658.29 5/28/2019 | $24,168 | ☐ Commingled Prod |
| | | | 28-2S-6W / 29-2S-6W / 7583-11007-39,40 | 1.020 / 0.65 | No | | 117,439 BU | 469,756 | | | $7,734 | |

* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: pick/daily sales records., (C)Harvested Production: automated yield monitoring system., (D)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only). (J)Unharvested and put to another use. (ARPI only). (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only)., (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage. (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production w/o claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

** Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal

** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)          See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139524    NEW HEIGHTS FARM I, LLC

Agency: 236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 176 | 0001-0060-EP Corn 80% | Irr/Grain Calhoun (25) 01-Insured | MARENGO 36 | 1.00 / 1.00 PFTA 1.020 / 0.65 | 0.0207929 No | 215 BU 209 BU 209 BU | 172.0 BU $191,305 47,826 BU | 4.00 E 191,305 | 1.0000 | 278.06 6/3/2019 | $9,514 $3,044 | ☐ Commingled Prod |
| | | | 36-2S-5W / 7900-11640-2,20 / 7900-9798-8 | | | | | | | | | |
| 182 | 0001-0066-EP Corn 80% | Irr/Grain Calhoun (25) 01-Insured | MARENGO 35 | 1.00 / 1.00 PFTA 1.020 / 0.65 | 0.0207929 No | 215 BU 209 BU 209 BU | 172.0 BU $97,166 24,292 BU | 4.00 E 97,166 | 1.0000 | 141.23 6/3/2019 | $4,832 $1,546 | ☐ Commingled Prod |
| | | | 35-2S-5W / 7900-11640-19 | | | | | | | | | |
| 184 | 0001-0068-EP Corn 80% | Irr/Grain Calhoun (25) 01-Insured | SHERIDAN 31 | 1.00 / 1.00 PFTA 1.020 / 0.65 | 0.02131263 No | 206 BU 200 BU 200 BU | 164.8 BU $203,198 50,800 BU | 4.00 E 203,198 | 1.0000 | 308.25 6/5/2019 | $10,254 $3,281 | ☐ Commingled Prod |
| | | | 31-2S-4W / 7900-11639-21 | | | | | | | | | |
| 186 | 0001-0070-EP Corn 80% | Irr/Grain Calhoun (25) 01-Insured | SHERIDAN 32 | 1.00 / 1.00 PFTA 1.020 / 0.65 | 0.0207929 No | 215 BU 209 BU 209 BU | 172.0 BU $268,967 67,242 BU | 4.00 E 268,967 | 1.0000 | 390.94 6/5/2019 | $13,376 $4,280 | ☐ Commingled Prod |
| | | | 32-2S-4W / 7900-10444-19,20 / 7900-11639-24 / 7900-1281-2 | | | | | | | | | |
| 187 | 0001-0071-EP Corn 80% | Irr/Grain Calhoun (25) 01-Insured | MARENGO 30 | 1.00 / 1.00 PFTA 1.020 / 0.65 | 0.02089332 No | 210 BU 206 BU 206 BU | 168.0 BU $102,769 25,692 BU | 4.00 E 102,769 | 1.0000 | 152.93 5/16/2019 | $5,125 $1,640 | ☐ Commingled Prod |
| | | | 30-2S-5W / 6993-2647-27,8 | | | | | | | | | |
| 189 | 0001-0073-EP Corn 80% | Irr/Grain Calhoun (25) 01-Insured | MARSHALL 8/9, MARENGO 15/29 | 1.00 / 1.00 PFTA 1.020 / 0.65 | 0.02164698 No | 197 BU 194 BU 194 BU | 157.6 BU $121,932 30,483 BU | 4.00 E 121,932 | 1.0000 | 193.42 5/25/2019 | $5,931 $1,898 | ☐ Commingled Prod |
| | | | 8-2S-6W / 9-2S-6W / 15-2S-5W / 29-2S-5W / 743-2909-1,13,17,2,20,26,3 / 8073-11447-25 | | | | | | | | | |
| 194 | 0001-0077-EP Corn 80% | Irr/Grain Calhoun (25) 01-Insured | MARSHALL 16 | 1.00 / 1.00 PFTA 1.020 / 0.65 | 0.022 No | 191 BU 188 BU 188 BU | 152.8 BU $183,262 45,816 BU | 4.00 E 183,262 | 1.0000 | 299.84 5/15/2019 | $9,004 $2,881 | ☐ Commingled Prod |
| | | | 16-2S-6W / 8011-11375-16 / 8011-11377-3 / 8011-11379-19 / 8011-11383-19 | | | | | | | | | |
| 199 | 0001-0082-EP Corn 80% | Irr/Grain Calhoun (25) 14-ZU | MARSHALL 5 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0217625 No | 193 BU 192 BU 192 BU | 154.4 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| | | | 5-2S-6W / 7585-11011-2,21,23,24 / 8639-11389-1,2,25,3 | | | | | | | | | |
| 143 | 0001-0027-EP Corn 80% | Non-Irr/Grain Calhoun (25) 14-ZU | MARSHALL #5 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.036989 No | 178 BU 166 BU 166 BU | 142.4 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| | | | 5-2S-6W / 7585-11011-2,21,23,24 / 8639-11389-1,2,25,3 | | | | | | | | | |
| 145 | 0001-0029-EP Corn 80% | Non-Irr/Grain Calhoun (25) 14-ZU | PENNFIELD #36 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.03987705 No | 164 BU 148 BU 152 BU | 131.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| | | | 36-1S-7W / 8550-10816-42 | | | | | | | | | |
| 147 | 0001-0031-EP Corn 80% | Non-Irr/Grain Calhoun (25) 01-Insured | CONVIS #32 | 1.00 / 1.00 PFTA 1.020 / 0.66 | 0.03760276 No | 175 BU 161 BU 161 BU | 140.0 BU $73,052 18,263 BU | 4.00 E 73,052 | 1.0000 | 130.45 5/23/2019 | $5,518 $1,766 | ☐ Commingled Prod |
| | | | 32-1S-6W / 5019-1149-35,39 | | | | | | | | | |

* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / F=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)        See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139524    NEW HEIGHTS FARM I, LLC

Agency: 236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 151 | 0001-0035-EP Corn 80% | Non-Irr/Grain Calhoun (25) 01-Insured | LEROY #28 | 1.00 / 1.00 PFTAYA | 0.03963215 | 166 BU 149 BU | 132.8 BU $42,905 | 4.00 E | 1.0000 | 80.77 5/27/2019 | $3,237 | ☐ Commingled Prod |
| | | | 28-3S-8W / 4831-320-8 | 1.020 / 0.66 | No | 154 BU | 10,726 BU | 42,905 | | | $1,036 | |
| 165 | 0001-0050-EP Corn 80% | Non-Irr/Grain Calhoun (25) 01-Insured | EMMETT #31/32 | 1.00 / 1.00 PFTAYA | 0.03530673 | 191 BU 178 BU | 152.8 BU $6,363 | 4.00 E | 1.0000 | 10.41 5/28/2019 | $416 | ☐ Commingled Prod |
| | | | 31-2S-7W / 32-2S-7W / 8066-11440-15,16 | 1.020 / 0.65 | No | 181 BU | 1,591 BU | 6,363 | | | $133 | |
| 170 | 0001-0055-EP Corn 80% | Non-Irr/Grain Calhoun (25) 14-ZU | BATTLE CREEK 28 | 1.00 / 1.00 PFTAYA | 0.03963215 | 162 BU 149 BU | 129.6 BU $0 | 4.00 E | 1.0000 | 0.00 | $0 | ☐ Commingled Prod |
| | | | 28-2S-8W / 3320-8238-1 / 5139-8952-1,2 | 1.020 / 1.00 | No | 157 BU | 0 | | | | $0 | |
| 177 | 0001-0061-EP Corn 80% | Non-Irr/Grain Calhoun (25) 01-Insured | SHERIDAN 16 | 1.00 / 1.00 PFTA | 0.0339838 | 192 BU 189 BU | 153.6 BU $42,400 | 4.00 E | 1.0000 | 69.01 5/28/2019 | $2,401 | ☐ Commingled Prod |
| | | | 16-2S-4W / 7900-10445-2 | 1.020 / 0.65 | No | 189 BU | 10,600 BU | 42,400 | | | $768 | |
| 178 | 0001-0062-EP Corn 80% | Non-Irr/Grain Calhoun (25) 01-Insured | SHERIDAN 17 | 1.00 / 1.00 PFTA | 0.0339838 | 192 BU 189 BU | 153.6 BU $39,100 | 4.00 E | 1.0000 | 63.64 6/4/2019 | $2,214 | ☐ Commingled Prod |
| | | | 17-2S-4W / 7883-11269-14,25,8 / 7900-10445-1 | 1.020 / 0.65 | No | 189 BU | 9,775 BU | 39,100 | | | $708 | |
| 179 | 0001-0063-EP Corn 80% | Non-Irr/Grain Calhoun (25) 01-Insured | SHERIDAN 28 | 1.00 / 1.00 PFTA | 0.0339838 | 192 BU 189 BU | 153.6 BU $10,113 | 4.00 E | 1.0000 | 16.46 6/4/2019 | $573 | ☐ Commingled Prod |
| | | | 28-2S-4W / 7900-9799-6 | 1.020 / 0.65 | No | 189 BU | 2,528 BU | 10,113 | | | $183 | |
| 180 | 0001-0064-EP Corn 80% | Non-Irr/Grain Calhoun (25) 01-Insured | SHERIDAN 29 | 1.00 / 1.00 PFTA | 0.0339838 | 192 BU 189 BU | 153.6 BU $123,015 | 4.00 E | 1.0000 | 200.22 6/5/2019 | $6,965 | ☐ Commingled Prod |
| | | | 29-2S-4W / 7900-9799-1,2,3,5,7 | 1.020 / 0.65 | No | 189 BU | 30,754 BU | 123,015 | | | $2,229 | |
| 183 | 0001-0067-EP Corn 80% | Non-Irr/Grain Calhoun (25) 01-Insured | SHERIDAN 20/21 | 1.00 / 1.00 PFTA | 0.0339838 | 192 BU 189 BU | 153.6 BU $53,576 | 4.00 E | 1.0000 | 87.20 6/4/2019 | $3,033 | ☐ Commingled Prod |
| | | | 20-2S-4W / 21-2S-4W / 7900-11286-16,18,20,30 | 1.020 / 0.65 | No | 189 BU | 13,394 BU | 53,576 | | | $971 | |
| 185 | 0001-0069-EP Corn 80% | Non-Irr/Grain Calhoun (25) 01-Insured | LEE 27 | 1.00 / 1.00 PFTA | 0.0339838 | 192 BU 189 BU | 153.6 BU $23,110 | 4.00 E | 1.0000 | 39.17 6/9/2019 (4 L2 - 0.960) | $1,363 | ☐ Commingled Prod |
| | | | 27-1S-5W / 7736-11165-1 | 1.020 / 0.65 | No | 189 BU | 5,778 BU | 23,110 | | | $436 | |
| 188 | 0001-0072-EP Corn 80% | Non-Irr/Grain Calhoun (25) 01-Insured | LEE 35 | 1.00 / 1.00 PFTA | 0.0339838 | 192 BU 189 BU | 153.6 BU $29,494 | 4.00 E | 1.0000 | 49.99 6/9/2019 (4 L2 - 0.960) | $1,739 | ☐ Commingled Prod |
| | | | 35-1S-5W / 7736-11165-2 | 1.020 / 0.65 | No | 189 BU | 7,374 BU | 29,494 | | | $556 | |
| 190 | 0001-0074-EP Corn 80% | Non-Irr/Grain Calhoun (25) 14-ZU | MARSHALL 9 | 1.00 / 1.00 PFTA | 0.0356615 | 176 BU 175 BU | 140.8 BU $0 | 4.00 E | 1.0000 | 0.00 | $0 | ☐ Commingled Prod |
| | | | 9-2S-6W | 1.020 / 1.00 | No | 175 BU | 0 | | | | $0 | |

---

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage, (B)Harvested Production: farm stored/measured by insured, (C)Harvested Production: pick/daily sales records., (D)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production with no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

** Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)    See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number:  2019-MI-084-1139524     NEW HEIGHTS FARM I, LLC

Agency:  236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Legal Description, FSA Farm/Tract/Field — Line Note | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 195 | 0001-0077-EP Corn 80% | Non-Irr/Grain Calhoun (25) 01-Insured | MARENGO 29 — 29-2S-5W / 743-2909-1,13,17,2,20,26,3 / 7783-11199-72,74 | 1.00 / 1.00 PFTA 1.020 / 0.64 | No | 163 BU 163 BU 163 BU | 130.4 BU $43,340 10,835 BU 43,340 | 4.00 E | 1.0000 | 83.09 5/16/2019 | $2,509 $803 | ☐ Commingled Prod |
| 198 | 0001-0081-EP Corn 80% | Non-Irr/Grain Calhoun (25) 01-Insured | ALBION 10 — 10-3S-4W / 8156-11490-10,11,2,3,4,5,6,7,8,9 | 1.00 / 1.00 PFTA 1.020 / 0.64 | No | 149 BU 149 BU 149 BU | 119.2 BU $61,002 15,250 BU 61,002 | 4.00 E | 1.0000 | 127.94 5/27/2019 | $3,674 $1,176 | ☐ Commingled Prod |
| 202 | 0001-0085-EP Corn 80% | Non-Irr/Grain Calhoun (25) 14-ZU | BATTLE CREEK 33 — 33-2S-8W / 5138-8951-1 | 1.00 / 1.00 PF 1.020 / 1.00 | No | 161 BU 161 BU | 128.8 BU $0 0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

**Total for Calhoun, Corn**     Acres: 3,716.60     Guarantee/Amt. of Cov.: 2,401,632 DOL     Liability: $2,401,632     **$127,730**     **$40,872**

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Legal Description, FSA Farm/Tract/Field — Line Note | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 226 | 0001-0023-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Calhoun (25) 15-ZC | MARSHALL #5 — 5-2S-6W / 7585-11011-2,21,23,24 / 8639-11389-1,2,25,3 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | No | 40 BU 36 BU 38 BU | 32.0 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 229 | 0001-0026-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Calhoun (25) 15-ZC | CONVIS # 32 — 32-1S-6W / 5019-1149-35,39 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | No | 53 BU 50 BU 51 BU | 42.4 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 231 | 0001-0028-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Calhoun (25) 15-ZC | LEROY #28 — 28-3S-7W / 28-3S-8W / 4831-320-8 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | No | 55 BU 52 BU 52 BU | 44.0 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 240 | 0001-0037-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Calhoun (25) 15-ZC | BATTLE CREEK #28 — 28-2S-8W / 3320-8238-1 / 5139-8952-1,2 | 1.00 / 1.00 PFTA 1.020 / 1.00 | No | 61 BU 59 BU 59 BU | 48.8 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 250 | 0001-0063-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Calhoun (25) 15-ZC | SHERIDAN 28 — 28-2S-4W / 29-2S-4W / 7900-9799-1,2,3,5,6,7 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | No | 40 BU 39 BU 40 BU | 32.0 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 251 | 0001-0064-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Calhoun (25) 15-ZC | SHERIDAN 29 — 29-2S-4W / 7900-9799-1,2,3,5,7 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | No | 44 BU 43 BU 44 BU | 35.2 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 254 | 0001-0067-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Calhoun (25) 15-ZC | SHERIDAN 20/21 — 20-2S-4W / 21-2S-4W / 7900-11286-16,18,20,30 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | No | 40 BU 39 BU 40 BU | 32.0 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / M=Market / N=Non-Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage, (B)Harvested Production: farm stored/measured by insured , (C)Harvested Production: pick/daily sales records, (D)Harvested Production: automated yield monitoring system, (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other , (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only)., (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

** Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)     See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139524    NEW HEIGHTS FARM I, LLC

Agency: 236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

Page: 9 of 24

| 256 | 0001-0069-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Calhoun (25) 15-ZC | LEE 27 / 27-1S-5W / 7736-11165-1 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.04335524 No | 40 BU 39 BU 40 BU | 32.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 258 | 0001-0072-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Calhoun (25) 15-ZC | LEE 35 / 35-1S-5W / 7736-11165-2 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.04335524 No | 40 BU 39 BU 40 BU | 32.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 262 | 0001-0075-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Calhoun (25) 15-ZC | MARENGO 29 / 29-2S-5W / 743-2909-1,13,17,2,20,26,3 / 7783-11199-72,74 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.04129967 No | 43 BU 41 BU 43 BU | 34.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 269 | 0001-0081-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Calhoun (25) 15-ZC | SHERIDAN 16/17 / 16-2S-4W / 17-2S-4W / 7883-11269-14,25,8 / 7900-10445-1,2 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.04335524 No | 40 BU 39 BU 39 BU | 32.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 274 | 0001-0086-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Calhoun (25) 15-ZC | EMMETT 32, ALBION 10, MARENGO 23/24 / 10-3S-4W / 23-2S-5W / 24-2S-5W / 32-2S-7W / 9-2S-6W / 30-2S-5W / 6993-2647-27,8 / 8066-11440-15,16,21,22,3 / 8156-11490-10,11,2,3,4,5,6,7,8,9 / 8360-2491-1,2,3,4,5 / 8644-10165-5 / 8644-11386-15 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.05257514 No | 34 BU 33 BU 34 BU | 27.2 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 276 | 0001-0088-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Calhoun (25) 15-ZC | BATTLE CREEK 33 / 33-2S-8W / 5138-8951-1 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03380141 No | 49 BU 49 BU 49 BU | 39.2 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 247 | 0001-0060-EP Soybeans 80% | Nfac (Irr)/Commodity Calhoun (25) 15-ZC | MARENGO 36 / 36-2S-5W / 7900-11640-2,20 / 7900-9798-8 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0311829 No | 53 BU 53 BU 53 BU | 42.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 253 | 0001-0066-EP Soybeans 80% | Nfac (Irr)/Commodity Calhoun (25) 15-ZC | MARENGO 35 / 35-2S-5W / 7900-11640-19 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0311829 No | 53 BU 53 BU 53 BU | 42.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 255 | 0001-0068-EP Soybeans 80% | Nfac (Irr)/Commodity Calhoun (25) 15-ZC | SHERIDAN 31 / 31-2S-4W / 7900-11639-21 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0311829 No | 53 BU 53 BU 53 BU | 42.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 257 | 0001-0070-EP Soybeans 80% | Nfac (Irr)/Commodity Calhoun (25) 15-ZC | SHERIDAN 32 / 32-2S-4W / 7900-10444-19,20 / 7900-1281-2 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0311829 No | 53 BU 53 BU 53 BU | 42.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage, (B)Harvested Production: farm stored/measured by insured, (C)Harvested Production: pick/daily sales records, (D)Harvested Production: automated yield monitoring system, (E)Harvested Production: farm stored/measured by authorized representative,, (F)Harvested Production: livestock feeding records,, (G)Harvested Production: field harvest records,, (H)Harvested Production: other,, (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only),, (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only,, (N)Appraisal (non-loss). For CCIP policies only,, (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only),, (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only,, (Z)Zero Planted Acres

**Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
* I certify I have not produced the insured crop in the county for more than two years.

(Form M205)    See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139524     NEW HEIGHTS FARM I, LLC

Agency: 236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| 260 | 0001-0073-EP Soybeans 80% | Nfac (Irr)/Commodity | MARSHALL 8/9 | | | | 35.2 BU $0 | | 1.0000 | | $0 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Calhoun (25) 15-ZC | 8-2S-6W / 9-2S-6W / 29-2S-5W / 743-2909-1,13,17,2,20,26,3 / 7783-11199-72,74 / 8643-11791-28,35,5 / 8643-9769-26,28 / 8644-10165-5 / 8644-11386-15 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03815401 No | 44 BU 44 BU 44 BU | | 9.54 E 0 | | 0.00 | $0 | ☐ Commingled Prod |
| 265 | 0001-0077-EP Soybeans 80% | Nfac (Irr)/Commodity | MARSHALL 16 | | | | 39.2 BU $0 | | 1.0000 | | $0 | |
| | | Calhoun (25) 15-ZC | 16-2S-6W / 8011-11375-16 / 8011-11377-3 / 8011-11379-19 / 8011-11383-19 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03380141 No | 49 BU 49 BU 49 BU | | 9.54 E 0 | | 0.00 | $0 | ☐ Commingled Prod |
| 275 | 0001-0087-EP Soybeans 80% | Nfac (Irr)/Commodity | MARSHALL 5, MARENGO 15, EMMETT 31/32 | | | | 29.6 BU $0 | | 1.0000 | | $0 | |
| | | Calhoun (25) 15-ZC | 5-2S-6W / 15-2S-5W / 31-2S-7W / 32-2S-7W / 7585-11011-2,21,23,24 / 8066-11440-1,10,15,16,21,22,3 / 8073-11447-25 / 8639-11389-1,2,25,3 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.04624403 No | 37 BU 37 BU 37 BU | | 9.54 E 0 | | 0.00 | $0 | ☐ Commingled Prod |
| 277 | 0001-0089-EP Soybeans 80% | Nfac (Irr)/Commodity | EMMETT 1/2, PENNFIELD 36 | | | | 35.2 BU $0 | | 1.0000 | | $0 | |
| | | Calhoun (25) 15-ZC | 1-2S-7W / 2-2S-7W / 36-1S-7W / 32-1S-6W / 5019-1149-35,39 / 8550-10134-55,57,61,62 / 8550-10816-42,43 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03815401 No | 44 BU 44 BU 44 BU | | 9.54 E 0 | | 0.00 | $0 | ☐ Commingled Prod |
| 411 | 0001-0090-EP Soybeans 80% | Nfac (Irr)/Commodity | MARSHALL 28/29, MARENGO 29/30 | | | | 39.2 BU $0 | | 1.0000 | | $0 | |
| | | Calhoun (25) 15-ZC | 28-2S-6W / 29-2S-5W / 29-2S-6W / 30-2S-5W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03380141 No | 49 BU 49 BU 49 BU | | 9.54 E 0 | | 0.00 | $0 | ☐ Commingled Prod |

| **Total for Calhoun, Soybeans** | | | | Acres: 0.00 | | Guarantee/Amt. of Cov.: 0 DOL | | Liability: $0 | | $0 | $0 |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 465 | 0001-0011-EP Corn 80% | Irr/Grain Eaton (45) 15-ZC | GENERIC LINE | 1.00 / 1.00 PF 1.020 / 1.00 | 0.03219639 | 147 BU 147 BU | 117.6 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 | ☐ Commingled Prod |
| 414 | 0001-0001-EP Corn 80% | Non-Irr/Grain Eaton (45) 15-ZC | 13-2N-4W / 14-2N-3W | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.0297407 | 181 BU 169 BU 173 BU | 144.8 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 | ☐ Commingled Prod |
| 415 | 0001-0002-EP Corn 80% | Non-Irr/Grain Eaton (45) 15-ZC | 33-1N-3W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.02857453 | 184 BU 180 BU 180 BU | 147.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 | ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage, (B)Harvested Production: farm stored/measured by insured , (C)Harvested Production: pick/daily sales records, (D)Harvested Production: automated yield monitoring system, (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other , (I)Unharvested and destroyed  (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest Incomplete. (ARPI only)., (Q)Zero production with no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

** Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)     See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

10/10/2019

Policy Number: 2019-MI-084-1139524  NEW HEIGHTS FARM I, LLC

Agency: 236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

Page: 11 of 24

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 416 | 0001-0003-EP Corn 80% | Non-Irr/Grain Eaton (45) 15-ZC | 23-2N-4W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0288525 No | 181 BU 177 BU 177 BU | 144.8 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |
| 417 | 0001-0004-EP Corn 80% | Non-Irr/Grain Eaton (45) 15-ZC | 23-2N-4W / 24-2N-4W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0288525 No | 181 BU 177 BU 177 BU | 144.8 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |
| 418 | 0001-0005-EP Corn 80% | Non-Irr/Grain Eaton (45) 15-ZC | 18-3N-3W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0297407 No | 171 BU 169 BU 169 BU | 136.8 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |
| 419 | 0001-0006-EP Corn 80% | Non-Irr/Grain Eaton (45) 15-ZC | 7-1N-3W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.02943513 No | 174 BU 172 BU 172 BU | 139.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |
| 420 | 0001-0007-EP Corn 80% | Non-Irr/Grain Eaton (45) 15-ZC | 9-1N-3W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.02943513 No | 174 BU 172 BU 172 BU | 139.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |
| 421 | 0001-0008-EP Corn 80% | Non-Irr/Grain Eaton (45) 15-ZC | 24-3N-4W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.02943513 No | 174 BU 172 BU 172 BU | 139.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |
| 422 | 0001-0009-EP Corn 80% | Non-Irr/Grain Eaton (45) 15-ZC | 22-1N-3W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0308937 No | 159 BU 158 BU 158 BU | 127.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |
| 423 | 0001-0010-EP Corn 80% | Non-Irr/Grain Eaton (45) 15-ZC | 21-2N-3W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0308937 No | 158 BU 158 BU 158 BU | 126.4 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |

**Total for Eaton, Corn** — Acres: 0.00  Guarantee/Amt. of Cov: 0 DOL  Liability: $0  $0  $0

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 424 | 0001-0001-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Eaton (45) 01-Insured | 13-2N-4W / 14-2N-3W / 9034-7927-1,2,3,4,5 | 1.00 / 1.00 PFTA 1.020 / 0.78 | 0.03146766 No | 52 BU 50 BU 50 BU | 41.6 BU $17,736 1,859 BU | 9.54 E 17,736 | 1.0000 | 44.69 6/9/2019 | $1,188 $380 | Commingled Prod |
| 425 | 0001-0002-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Eaton (45) 01-Insured | 7-1N-3W / 9038-7932-1 / 9039-7933-1,2 | 1.00 / 1.00 PFTA 1.020 / 0.78 | 0.03422171 No | 48 BU 46 BU 46 BU | 38.4 BU $20,804 2,181 BU | 9.54 E 20,804 | 1.0000 | 56.79 6/9/2019 | $1,486 $476 | Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: pick/daily sales records., (C)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and put to another use. (ARPI only). (J)Unharvested and destroyed. (ARPI only). (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only). (M)Claim for indemnity. For CCIP policies only. (N)(Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)  See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number:  2019-MI-084-1139524    NEW HEIGHTS FARM I, LLC

Agency:  236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

Page: 12 of 24

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 426 | 0001-0003-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Eaton (45) 01-Insured | 22-1N-3W / 2408-3809-2,3,4 | 1.00 / 1.00 PFTAYA 1.020 / 0.78 | 0.03526465 No | 46 BU 45 BU 45 BU | 36.8 BU $13,211 1,385 BU | 9.54 E 13,211 | 1.0000 | 37.63 6/15/2019 | $930 $298 | ☐ Commingled Prod |
| 427 | 0001-0004-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Eaton (45) 01-Insured | 9-1N-3W / 3714-3757-1 | 1.00 / 1.00 PFTA 1.020 / 0.78 | 0.03422171 No | 48 BU 46 BU 46 BU | 38.4 BU $26,856 2,815 BU | 9.54 E 26,856 | 1.0000 | 74.87 6/17/2019 (2 L2 - 0.980) | $1,959 $627 | ☐ Commingled Prod |
| 428 | 0001-0005-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Eaton (45) 01-Insured | 18-3N-3W / 9044-7678-1,2,3,4 | 1.00 / 1.00 PFTA 1.020 / 0.78 | 0.03526465 No | 46 BU 45 BU 45 BU | 36.8 BU $16,135 1,691 BU | 9.54 E 16,135 | 1.0000 | 45.96 6/9/2019 | $1,136 $364 | ☐ Commingled Prod |
| 429 | 0001-0006-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Eaton (45) 01-Insured | 23-2N-4W / 8116-6198-16 / 8116-7206-10 | 1.00 / 1.00 PFTA 1.020 / 0.78 | 0.03422171 No | 47 BU 46 BU 46 BU | 37.6 BU $21,041 2,206 BU | 9.54 E 21,041 | 1.0000 | 59.29 6/16/2019 (1 L2 - 0.990) | $1,462 $468 | ☐ Commingled Prod |
| 430 | 0001-0007-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Eaton (45) 01-Insured | 24-2N-4W / 8116-7206-13,2 | 1.00 / 1.00 PFTA 1.020 / 0.78 | 0.03422171 No | 47 BU 46 BU 46 BU | 37.6 BU $13,734 1,440 BU | 9.54 E 13,734 | 1.0000 | 38.70 6/16/2019 (1 L2 - 0.990) | $954 $305 | ☐ Commingled Prod |
| 431 | 0001-0008-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Eaton (45) 01-Insured | 33-1N-3W / 7420-6641-1 | 1.00 / 1.00 PFTAYA 1.020 / 0.78 | 0.03886219 No | 42 BU 41 BU 41 BU | 33.6 BU $6,889 722 BU | 9.54 E 6,889 | 1.0000 | 23.37 6/23/2019 (8 L2 - 0.920) | $569 $182 | ☐ Commingled Prod |
| 432 | 0001-0009-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Eaton (45) 14-ZU | 24-3N-4W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03422171 No | 47 BU 46 BU 46 BU | 37.6 BU $0 0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 433 | 0001-0010-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Eaton (45) 01-Insured | 21-2N-3W / 8808-7696-1 | 1.00 / 1.00 PFTAYA 1.020 / 0.77 | 0.04335865 No | 38 BU 37 BU 38 BU | 30.4 BU $22,383 2,346 BU | 9.54 E 22,383 | 1.0000 | 77.18 6/9/2019 | $1,714 $548 | ☐ Commingled Prod |
| 466 | 0001-0011-EU Soybeans 80% | Nfac (Irr)/Commodity Eaton (45) 14-ZU | GENERIC LINE | 1.00 / 1.00 PF 1.020 / 1.00 | 0.03676993 | 43 BU 43 BU | 34.4 BU $0 0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

| Total for Eaton, Soybeans | | | | Acres: 458.48 | | Guarantee/Amt. of Cov.: 158,790 DOL | | Liability: $158,789 | | $11,398 | $3,648 |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 467 | 0001-0012-EP Corn 80% | Irr/Grain Ingham (65) 15-ZC | GENERIC LINE | 1.00 / 1.00 PF 1.020 / 1.00 | 0.03722203 | 145 BU 145 BU | 116.0 BU $0 0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)    See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number:  2019-MI-084-1139524    NEW HEIGHTS FARM I, LLC

Agency:  236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

Page: 13 of 24

| # | Unit | Type/Location | Share | Price | Code | Yields | Guar | Class | Factor | Added | Value | Commingled |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 434 | 0001-0001-EP Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 11-1N-2W / 14-1N-1W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03275399 No | 181 BU 177 BU 177 BU | 144.8 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 435 | 0001-0002-EP Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 14-1N-2W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0336746 No | 172 BU 170 BU 170 BU | 137.6 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 436 | 0001-0003-EP Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 5-1N-2W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03348435 No | 173 BU 171 BU 171 BU | 138.4 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 437 | 0001-0004-EP Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 7-1N-2W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03348435 No | 173 BU 171 BU 171 BU | 138.4 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 438 | 0001-0005-EP Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 9-1N-2W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03348435 No | 173 BU 171 BU 171 BU | 138.4 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 439 | 0001-0006-EP Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 21-1N-2W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03348435 No | 173 BU 171 BU 171 BU | 138.4 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 440 | 0001-0007-EP Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 26-1N-2W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03348435 No | 173 BU 171 BU 171 BU | 138.4 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 441 | 0001-0008-EP Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 27-1N-2W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03348435 No | 173 BU 171 BU 171 BU | 138.4 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 442 | 0001-0009-EP Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 1-1N-2W / 6-1N-1W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03386806 No | 171 BU 169 BU 169 BU | 136.8 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 443 | 0001-0010-EP Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 29-2N-2W / 30-2N-2W / 31-2N-2W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0355425 No | 156 BU 156 BU 156 BU | 124.8 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 444 | 0001-0011-EP Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 15-1N-2W / 28-1N-2W / 32-2N-2W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0362352 No | 152 BU 152 BU 152 BU | 121.6 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

**Total for Ingham, Corn** — Acres: 0.00   Guarantee/Amt. of Cov.: 0 DOL   Liability: $0   $0   $0

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage,, (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system, (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. ARPI only) (J)Unharvested and put to another use. (ARPI only). (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only). (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability:** (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
* I certify I have not produced the insured crop in the county for more than two years.

(Form M205)    See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139524     NEW HEIGHTS FARM I, LLC

Agency: 236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * / Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 445 | 0001-0001-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 01-Insured | 5-1N-2W / 8373-4675-13,2,4 | 1.00 / 1.00 PFTAYA 1.020 / 0.76 | 0.02915177 No | 46 BU 44 BU 45 BU | 36.8 BU $15,117 1,585 BU | 9.54 E 15,117 | 1.0000 | 47.30 6/24/2019 (9 L2 - 0.910) | $1,054 $337 | ☐ Commingled Prod |
| 446 | 0001-0002-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 01-Insured | 7-1N-2W / 7487-6337-1 | 1.00 / 1.00 PFTAYA 1.020 / 0.76 | 0.02915177 No | 46 BU 44 BU 45 BU | 36.8 BU $11,288 1,183 BU | 9.54 E 11,288 | 1.0000 | 35.32 6/24/2019 (9 L2 - 0.910) | $787 $252 | ☐ Commingled Prod |
| 447 | 0001-0003-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 01-Insured | 9-1N-2W / 8130-3942-1 | 1.00 / 1.00 PFTAYA 1.020 / 0.76 | 0.02915177 No | 46 BU 44 BU 45 BU | 36.8 BU $5,538 581 BU | 9.54 E 5,538 | 1.0000 | 17.33 6/24/2019 (9 L2 - 0.910) | $386 $124 | ☐ Commingled Prod |
| 448 | 0001-0004-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 01-Insured | 21-1N-2W / 7070-1744-2 / 8130-3188-6 | 1.00 / 1.00 PFTAYA 1.020 / 0.76 | 0.02915177 No | 46 BU 44 BU 45 BU | 36.8 BU $25,902 2,715 BU | 9.54 E 25,902 | 1.0000 | 74.59 6/16/2019 (1 L2 - 0.990) | $1,662 $532 | ☐ Commingled Prod |
| 449 | 0001-0005-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 01-Insured | 26-1N-2W / 27-1N-2W / 8130-5106-7 / 8130-5121-2 | 1.00 / 1.00 PFTAYA 1.020 / 0.76 | 0.02915177 No | 46 BU 44 BU 45 BU | 36.8 BU $34,605 3,627 BU | 9.54 E 34,605 | 1.0000 | 98.57 6/15/2019 | $2,197 $703 | ☐ Commingled Prod |
| 458 | 0001-0005-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 01-Insured | 26-1N-2W / 27-1N-2W / 8130-5121-1,2 | 1.00 / 1.00 PFTAYA 1.020 / 0.76 | 0.02915177 No | 46 BU 44 BU 45 BU | 36.8 BU $6,216 652 BU | 9.54 E 6,216 | 1.0000 | 17.90 6/16/2019 (1 L2 - 0.990) | $399 $128 | ☐ Commingled Prod |
| 450 | 0001-0006-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 01-Insured | 11-1N-2W / 8130-5588-26,27 | 1.00 / 1.00 PFTAYA 1.020 / 0.76 | 0.02856232 No | 46 BU 45 BU 46 BU | 36.8 BU $56,512 5,924 BU | 9.54 E 56,512 | 1.0000 | 160.97 6/14/2019 | $3,244 $1,038 | ☐ Commingled Prod |
| 451 | 0001-0007-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 01-Insured | 14-1N-2W / 8130-5588-10 | 1.00 / 1.00 PFTAYA 1.020 / 0.76 | 0.02856232 No | 46 BU 45 BU 46 BU | 36.8 BU $97,802 10,252 BU | 9.54 E 97,802 | 1.0000 | 278.58 6/14/2019 | $5,614 $1,796 | ☐ Commingled Prod |
| 452 | 0001-0008-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 14-ZU | 1-1N-2W / 6-1N-1W | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.03297403 No | 41 BU 39 BU 40 BU | 32.8 BU $0 0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 453 | 0001-0009-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 01-Insured | 15-1N-2W / 32-2N-2W / 5309-4617-1 / 6421-4683-3,8 / 6421-5117-5 | 1.00 / 1.00 PFTAYA 1.020 / 0.76 | 0.03145779 No | 42 BU 41 BU 42 BU | 33.6 BU $27,423 2,874 BU | 9.54 E 27,423 | 1.0000 | 85.55 6/15/2019 | $1,694 $542 | ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: pick/daily sales records., (C)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

** Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)     See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number:  2019-MI-084-1139524     NEW HEIGHTS FARM I, LLC
Agency:  236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note / Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 457 | 0001-0009-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 01-Insured | | 1.00 / 1.00 PFTAYA 1.020 / 0.76 | 0.03145779 No | 42 BU 41 BU 42 BU | 33.6 BU $6,638 696 BU | 9.54 E 6,638 | 1.0000 | 22.74 6/24/2019 (9 L2 - 0.910) | $450 $144 | ☐ Commingled Prod |
| | | | 15-1N-2W / 32-2N-2W / 5309-4617-1 | | | | | | | | | |
| 454 | 0001-0010-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 01-Insured | | 1.00 / 1.00 PFTAYA 1.020 / 0.76 | 0.0337957 No | 39 BU 38 BU 39 BU | 31.2 BU $5,017 526 BU | 9.54 E 5,017 | 1.0000 | 17.02 6/16/2019 (1 L2 - 0.990) | $331 $106 | ☐ Commingled Prod |
| | | | 28-1N-2W / 6421-2555-2 | | | | | | | | | |
| 455 | 0001-0011-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 14-ZU | | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.03606428 No | 37 BU 36 BU 37 BU | 29.6 BU $0 0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| | | | 29-2N-2W / 30-2N-2W / 31-2N-2W | | | | | | | | | |
| 468 | 0001-0012-EU Soybeans 80% | Nfac (Irr)/Commodity Ingham (65) 14-ZU | GENERIC LINE | 1.00 / 1.00 PF 1.020 / 1.00 | 0.03009105 | 43 BU 43 BU | 34.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

| Total for Ingham, Soybeans | | Acres: 855.87 | Guarantee/Amt. of Cov.: 292,058 DOL | Liability: $292,058 | $17,818 | $5,702 |
|---|---|---|---|---|---|---|

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note / Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 278 | 0001-0001-EP Corn 80% | Irr/Grain Jackson (75) 14-ZU | PARMA 10/11/18 IRR | 1.00 / 1.00 PF 1.020 / 1.00 | 0.02903651 No | 148 BU 148 BU | 118.4 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| | | | 10-2S-3W / 11-2S-3W / 18-2S-3W | | | | | | | | | |
| 280 | 0001-0002-EP Corn 80% | Irr/Grain Jackson (75) 14-ZU | PARMA 14 15 22 23 27 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.02615136 No | 189 BU 176 BU 178 BU | 151.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| | | | 14-2S-3W / 15-2S-3W / 22-2S-3W / 23-2S-3W / 27-2S-3W | | | | | | | | | |
| 285 | 0001-0007-EP Corn 80% | Irr/Grain Jackson (75) 14-ZU | CONCORD 26 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.02570566 No | 184 BU 182 BU 182 BU | 147.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| | | | 26-3S-3W / 1370-1023-4 | | | | | | | | | |
| 459 | 0001-0008-EP Corn 80% | Irr/Grain Jackson (75) 01-Insured | | 1.00 / 1.00 PF 1.020 / 0.69 | 0.02678675 No | 169 BU 169 BU | 135.2 BU $173,997 43,499 BU | 4.00 E 173,997 | 1.0000 | 321.74 6/4/2019 | $9,504 $3,041 | ☐ Commingled Prod |
| | | | 23-3S-3W / 28-2S-2E / 1370-1023-1 / 9083-12692-1,4 | | | | | | | | | |
| 279 | 0001-0001-EP Corn 80% | Non-Irr/Grain Jackson (75) 14-ZU | PARMA 6 | 1.00 / 1.00 PF 1.020 / 1.00 | 0.0536068 No | 129 BU 129 BU | 103.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| | | | 6-2S-3W | | | | | | | | | |
| 286 | 0001-0007-EP Corn 80% | Non-Irr/Grain Jackson (75) 01-Insured | CONCORD 26 | 1.00 / 1.00 PF 1.020 / 0.70 | 0.04847849 No | 149 BU 149 BU | 119.2 BU $11,286 2,821 BU | 4.00 E 11,286 | 1.0000 | 23.67 6/4/2019 | $814 $260 | ☐ Commingled Prod |
| | | | 26-3S-3W / 1370-1023-4 | | | | | | | | | |

* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only). (J)Unharvested and put to another use. (ARPI only). (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only). (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Harvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)     See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139524  NEW HEIGHTS FARM I, LLC
Agency: 236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 460 | 0001-0009-EP Corn 80% | Non-Irr/Grain Jackson (75) 01-Insured | 25-3S-3W / 28-2S-2E / 8944-12544-1,2,3,4 / 9083-12692-4 | 1.00 / 1.00 PF 1.020 / 0.70 | 0.0536068 No | 129 BU 129 BU | 103.2 BU $47,897 11,974 BU | 4.00 E 47,897 | 1.0000 | 116.03 6/4/2019 | $3,716 $1,189 | ☐ Commingled Prod |

**Total for Jackson, Corn** — Acres: 461.44 — Guarantee/Amt. of Cov.: 233,180 DOL — Liability: $233,180 — $14,034 — $4,490

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 299 | 0001-0006-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Jackson (75) 15-ZC | CONCORD 26 26-3S-3W / 1370-1023-4 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03899453 No | 45 BU 45 BU 45 BU | 36.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 307 | 0001-0012-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Jackson (75) 15-ZC | CONCORD 25 25-3S-3W / 8944-12544-1,2,3,4 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03641408 No | 48 BU 48 BU 48 BU | 38.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 412 | 0001-0013-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Jackson (75) 15-ZC | GRASS LAKE 28 28-2S-2E | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.04446527 No | 40 BU 40 BU 40 BU | 32.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 413 | 0001-0014-EP Soybeans 80% | Nfac (Irr)/Commodity Jackson (75) 15-ZC | 23-3S-3W / 28-2S-2E | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.042 No | 42 BU 42 BU 42 BU | 33.6 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

**Total for Jackson, Soybeans** — Acres: 0.00 — Guarantee/Amt. of Cov.: 0 DOL — Liability: $0 — $0 — $0

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 309 | 0001-0001-EU Corn 80% | Irr/Grain Ottawa (139) 14-ZU | ZEELAND #2 IRR 2-5N-14W / 3203-3416-1 / 3231-3390-1 / 6683-3412-1,2 / 7379-8305-1 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.0428818 No | 181 BU 162 BU 164 BU | 144.8 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 311 | 0001-0005-EU Corn 80% | Non-Irr/Grain Ottawa (139) 01-Insured | JAMESTOWN #17 17-5N-13W / 4229-6309-1,2,3,4,5,8 | 1.00 / 1.00 PFTAYA 1.020 / 0.66 | 0.07834032 No | 184 BU 156 BU 158 BU | 147.2 BU $35,232 8,808 BU | 4.00 E 35,232 | 1.0000 | 61.04 6/7/2019 (2 L2 - 0.980) | $4,547 $1,455 | ☐ Commingled Prod |
| 314 | 0001-0011-EU Corn 80% | Non-Irr/Grain Ottawa (139) 01-Insured | BLENDON #34 34-6N-14W / 2485-2909-1,2 / 4431-2910-1 / 4976-6657-2 / 4976-6729-1 / 5824-7138-5 / 6683-5301-5,7 / 7061-8042-2 / 7466-5302-6 | 1.00 / 1.00 PFTAYA 1.020 / 0.65 | 0.0774181 No | 174 BU 159 BU 161 BU | 139.2 BU $107,808 26,952 BU | 4.00 E 107,808 | 1.0000 | 193.62 6/5/2019 | $11,644 $3,726 | ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / P=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage, (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI Only), (K)Unharvested and production appraised by AIP (ARPI Only), (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)  See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

10/10/2019

Policy Number:  2019-MI-084-1139524      NEW HEIGHTS FARM I, LLC

Agency:  236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

Page: 17 of 24

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 316 | 0001-0013-EU Corn 80% | Non-Irr/Grain Ottawa (139) 01-Insured | ZEELAND #2 2-5N-14W / 3203-3416-1 / 3231-3390-1 / 6683-3412-1,2 / 7379-8305-1 | 1.00 / 1.00 PFTAYA 1.020 / 0.65 | 0.07929288 No | 168 BU 154 BU 156 BU | 134.4 BU $77,877 19,469 BU | 4.00 E 77,877 | 1.0000 | 144.86 6/3/2019 | $8,564 $2,740 ☐ Commingled Prod |
| 317 | 0001-0014-EU Corn 80% | Non-Irr/Grain Ottawa (139) 01-Insured | ZEELAND #3 3-5N-14W / 2890-2948-1,2,3,4,6 / 3662-2934-1,3,4 | 1.00 / 1.00 PFTAYA 1.020 / 0.66 | 0.08288961 No | 164 BU 144 BU 146 BU | 131.2 BU $13,283 3,321 BU | 4.00 E 13,283 | 1.0000 | 25.31 5/28/2019 | $1,648 $527 ☐ Commingled Prod |
| 461 | 0001-0014-EU Corn 80% | Non-Irr/Grain Ottawa (139) 01-Insured | ZEELAND #3 3-5N-14W / 2890-2948-1,2,3,4,6 / 3662-2934-1,3,4 / 3802-2944-2 | 1.00 / 1.00 PFTAYA 1.020 / 0.66 | 0.08288961 No | 164 BU 144 BU 146 BU | 131.2 BU $18,693 4,673 BU | 4.00 E 18,693 | 1.0000 | 36.34 6/7/2019 (2 L2 - 0.980) | $2,366 $757 ☐ Commingled Prod |
| 320 | 0001-0018-EU Corn 80% | Non-Irr/Grain Ottawa (139) 01-Insured | JAMESTOWN #8 8-5N-13W / 3442-3976-1,2 | 1.00 / 1.00 PFTAYA 1.020 / 0.66 | 0.0774181 No | 187 BU 160 BU 161 BU | 149.6 BU $44,377 11,094 BU | 4.00 E 44,377 | 1.0000 | 74.91 6/6/2019 (1 L2 - 0.990) | $5,622 $1,799 ☐ Commingled Prod |
| 322 | 0001-0021-EU Corn 80% | Non-Irr/Grain Ottawa (139) 01-Insured | BLENDON #26 26-6N-14W / 25-6N-14W / 2200-3339-13,3,4,6,7 | 1.00 / 1.00 PFTAYA 1.020 / 0.66 | 0.07834032 No | 175 BU 156 BU 158 BU | 140.0 BU $38,758 9,689 BU | 4.00 E 38,758 | 1.0000 | 69.21 5/15/2019 | $4,513 $1,444 ☐ Commingled Prod |
| 325 | 0001-0026-EU Corn 80% | Non-Irr/Grain Ottawa (139) 14-ZU | ZEELAND #5 5-5N-14W / 5001-6686-7 / 6683-2507-4 / 6683-2508-3 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.07244536 | 191 BU 176 BU 176 BU | 152.8 BU $0 0 | 4.00 E | 1.0000 | 0.00 | $0 $0 ☐ Commingled Prod |
| 327 | 0001-0028-EU Corn 80% | Non-Irr/Grain Ottawa (139) 01-Insured | ZEELAND #8 8-5N-14W / 7328-2534-1,2,3 | 1.00 / 1.00 PFTA 1.020 / 0.66 | 0.08027735 No | 174 BU 151 BU 151 BU | 139.2 BU $26,364 6,591 BU | 4.00 E 26,364 | 1.0000 | 47.35 5/20/2019 | $3,328 $1,065 ☐ Commingled Prod |
| 328 | 0001-0029-EU Corn 80% | Non-Irr/Grain Ottawa (139) 01-Insured | BLENDON #27 27-6N-14W / 2193-2902-1 / 2852-2901-1,10,11,18,19,2,3,4,5,7,8,9 | 1.00 / 1.00 PFTAYA 1.020 / 0.66 | 0.07440872 No | 189 BU 169 BU 171 BU | 151.2 BU $97,379 24,345 BU | 4.00 E 97,379 | 1.0000 | 161.01 6/5/2019 | $10,675 $3,416 ☐ Commingled Prod |
| 331 | 0001-0034-EU Corn 80% | Non-Irr/Grain Ottawa (139) 01-Insured | BLENDON #25 25-6N-14W / 2497-6494-1,2,3,4 / 2497-6495-1,2,3,4,5,6 | 1.00 / 1.00 PFTAYA 1.020 / 0.66 | 0.09160499 No | 146 BU 124 BU 127 BU | 116.8 BU $46,328 11,582 BU | 4.00 E 46,328 | 1.0000 | 100.19 6/6/2019 (1 L2 - 0.990) | $6,527 $2,089 ☐ Commingled Prod |
| 332 | 0001-0035-EU Corn 80% | Non-Irr/Grain Ottawa (139) 14-ZU | BLENDON #32 32-6N-14W / 6884-6505-1,7 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0740044 | 188 BU 171 BU 171 BU | 150.4 BU $0 0 | 4.00 E | 1.0000 | 0.00 | $0 $0 ☐ Commingled Prod |
| 334 | 0001-0037-EU Corn 80% | Non-Irr/Grain Ottawa (139) 01-Insured | BLENDON #35 35-6N-14W / 2890-2947-1,2 | 1.00 / 1.00 PFTAYA 1.020 / 0.66 | 0.07929288 No | 175 BU 153 BU 156 BU | 140.0 BU $27,489 6,872 BU | 4.00 E 27,489 | 1.0000 | 50.09 6/7/2019 (2 L2 - 0.980) | $3,366 $1,077 ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / O=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage, (B)Harvested Production: farm stored/measured by insured, (C)Harvested Production: pick/daily sales records, (D)Harvested Production: automated yield monitoring system, (E)Harvested Production: farm stored/measured by authorized representative, (F)Harvested Production: livestock feeding records, (G)Harvested Production: field harvest records, (H)Harvested Production: other, (I)Unharvested and destroyed (ARPI only), (J)Unharvested and put to another use (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only), (L)Unreported production (ARPI only), (M)Claim for indemnity. For CCIP policies only, (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)      See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number:  2019-MI-084-1139524     NEW HEIGHTS FARM I, LLC
Agency:  236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 338 | 0001-0042-EU Corn 80% | Non-Irr/Grain Ottawa (139) 01-Insured | ZEELAND #17 17-5N-14W / 7328-2535-1,2,3 | 1.00 / 1.00 PFTA 1.020 / 0.66 | 0.08288961 No | 165 BU 144 BU 144 BU | 132.0 BU $39,494 9,874 BU | 4.00 E 39,494 | 1.0000 | 74.80 5/28/2019 | $5,106 $1,634 | Commingled Prod |
| 341 | 0001-0045-EU Corn 80% | Non-Irr/Grain Ottawa (139) 01-Insured | GEORGETOWN #7 7-6N-13W / 6983-8275-30 / 6983-8276-15,29 | 1.00 / 1.00 PFTAYA 1.020 / 0.65 | 0.07978102 No | 171 BU 152 BU 155 BU | 136.8 BU $22,758 5,690 BU | 4.00 E 22,758 | 1.0000 | 41.59 6/4/2019 | $2,628 $841 | Commingled Prod |
| 344 | 0001-0048-EU Corn 80% | Non-Irr/Grain Ottawa (139) 14-ZU | BLENDON #9 9-6N-14W / 2923-2828-1,2 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.08343987 No | 163 BU 142 BU 150 BU | 130.4 BU $0 0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |
| 347 | 0001-0052-EU Corn 80% | Non-Irr/Grain Ottawa (139) 01-Insured | GEORGETOWN #28 28-6N-13W / 6404-7600-1,27,8 | 1.00 / 1.00 PFTA 1.020 / 0.64 | 0.07834032 No | 163 BU 156 BU 156 BU | 130.4 BU $48,952 12,238 BU | 4.00 E 48,952 | 1.0000 | 93.85 6/4/2019 | $5,076 $1,624 | Commingled Prod |
| 350 | 0001-0057-EU Corn 80% | Non-Irr/Grain Ottawa (139) 01-Insured | BLENDON 20 20-6N-14W / 2253-2452-11,2 | 1.00 / 1.00 PFTAYA 1.020 / 0.64 | 0.07834032 No | 173 BU 156 BU 167 BU | 138.4 BU $9,699 2,425 BU | 4.00 E 9,699 | 1.0000 | 19.26 6/14/2019 (9 L2 - 0.910) | $1,075 $344 | Commingled Prod |
| 351 | 0001-0058-EU Corn 80% | Non-Irr/Grain Ottawa (139) | GEORGETOWN 6 20-6N-13W / 6-6N-13W / 4548-6474-1 / 6126-7311-12,6,7 / 6267-3770-1,2,3,4,5,6,7,8 | 1.00 / 1.00 PFTAYA 1.020 / 0.64 | 0.07834032 No | 173 BU 156 BU 167 BU | 138.4 BU $78,545 19,636 BU | 4.00 E 78,545 | 1.0000 | 141.88 6/3/2019 | $7,920 $2,534 | Commingled Prod |
| 352 | 0001-0059-EU Corn 80% | Non-Irr/Grain Ottawa (139) 01-Insured | ZEELAND 15 15-5N-14W / 6916-2989-1,5 / 6916-2999-6 / 6916-7916-15,7 | 1.00 / 1.00 PFTAYA 1.020 / 0.64 | 0.08078208 No | 164 BU 150 BU 156 BU | 131.2 BU $34,558 8,640 BU | 4.00 E 34,558 | 1.0000 | 65.85 6/5/2019 | $3,668 $1,174 | Commingled Prod |
| 462 | 0001-0059-EU Corn 80% | Non-Irr/Grain Ottawa (139) 01-Insured | ZEELAND 15 15-5N-14W / 6916-2989-1,5 / 6916-2999-6 / 6916-7916-15,7 | 1.00 / 1.00 PFTAYA 1.020 / 0.64 | 0.08078208 No | 164 BU 150 BU 156 BU | 131.2 BU $19,352 4,838 BU | 4.00 E 19,352 | 1.0000 | 37.62 6/7/2019 (2 L2 - 0.980) | $2,096 $671 | Commingled Prod |
| 353 | 0001-0060-EU Corn 80% | Non-Irr/Grain Ottawa (139) 01-Insured | BLENDON 12 12-6N-14W / 6907-8170-18,9 / 6907-8171-11,13 | 1.00 / 1.00 PFTAYA 1.020 / 0.64 | 0.07834032 No | 173 BU 156 BU 167 BU | 138.4 BU $42,273 10,568 BU | 4.00 E 42,273 | 1.0000 | 76.36 6/3/2019 | $4,262 $1,364 | Commingled Prod |
| 354 | 0001-0061-EU Corn 80% | Irr/Grain Ottawa (139) 14-ZU | BLENDON 26 IRR 26-6N-14W / 2200-3339-13,3,4 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.04239719 No | 177 BU 165 BU 168 BU | 141.6 BU $0 0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |
| 356 | 0001-0063-EU Corn 80% | Non-Irr/Grain Ottawa (139) 01-Insured | JAMESTOWN 10 10-5N-13W / 7381-8307-1 | 1.00 / 1.00 PFTA 1.020 / 0.64 | 0.08078208 No | 152 BU 149 BU 149 BU | 121.6 BU $26,968 6,742 BU | 4.00 E 26,968 | 1.0000 | 56.56 6/7/2019 (2 L2 - 0.980) | $2,762 $884 | Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage, (B)Harvested Production: farm stored/measured by insured, (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only)., (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)          See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139524     NEW HEIGHTS FARM I, LLC

Agency: 236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 360 | 0001-0066-EU Corn 80% | Non-Irr/Grain Ottawa (139) 01-Insured | BLENDON 1 1-6N-14W / 6931-3270-8 / 7005-8006-18,21 | 1.00 / 1.00 PFTA 1.020 / 0.64 | 0.07133366 No | 182 BU 180 BU 180 BU | 145.6 BU $65,801 16,450 BU | 4.00 E 65,801 | 1.0000 | 117.67 6/9/2019 (4 L2 - 0.960) | $6,085 $1,947 | ☐ Commingled Prod |
| 361 | 0001-0067-EU Corn 80% | Irr/Grain Ottawa (139) 14-ZU | BLENDON 27 27-6N-14W / 2193-2902-1 / 2852-2901-1,10,11,18,19,2,3,4,5,7,8,9 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03624456 No | 222 BU 215 BU 215 BU | 177.6 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

**Total for Ottawa, Corn**     Acres: 1,689.37     Guarantee/Amt. of Cov.: 921,988 DOL     Liability: $921,988     $103,478     $33,112

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 370 | 0001-0009-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | BLENDON #27 27-6N-14W / 2193-2902-1 / 2852-2901-1,10,11,18,19,2,3,4,5,7,8,9 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.07840369 No | 47 BU 42 BU 42 BU | 37.6 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 371 | 0001-0010-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | BLENDON #32 32-6N-14W / 6884-6505-1,7 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.08232608 No | 45 BU 40 BU 40 BU | 36.0 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 372 | 0001-0011-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | ZEELAND #2 2-5N-14W / 3203-3416-1 / 3231-3390-1 / 6683-3412-1,2 / 7379-8305-1 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.08031685 No | 46 BU 41 BU 41 BU | 36.8 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 373 | 0001-0012-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | ZEELAND #3 3-5N-14W / 2890-2948-1,2,3,4,6 / 3662-2934-1,3,4 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.07007078 No | 53 BU 46 BU 46 BU | 42.4 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 374 | 0001-0014-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | JAMESTOWN #8 8-5N-13W / 3442-3976-1,2 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.07840369 No | 47 BU 42 BU 42 BU | 37.6 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 377 | 0001-0025-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | ZEELAND #5 5-5N-14W / 5001-6686-7 / 6683-2507-4 / 6683-2508-3 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.07840369 No | 46 BU 42 BU 42 BU | 36.8 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 379 | 0001-0027-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | ZEELAND #8 8-5N-14W / 7328-2534-1,2,3 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.063978 No | 56 BU 50 BU 50 BU | 44.8 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 381 | 0001-0030-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | JAMESTOWN #17 17-5N-13W / 4229-6309-1,2,3,4,5,8 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.074 No | 50 BU 44 BU 44 BU | 40.0 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage, (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)     See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number:  2019-MI-084-1139524     NEW HEIGHTS FARM I, LLC

Agency:  236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

Page: 20 of 24

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 383 | 0001-0033-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | BLENDON #34 34-6N-14W / 4431-2910-1 / 4976-6657-2 / 4976-6729-1 / 5824-7138-5 / 6683-5301-5,7 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.06276951 No | 54 BU 51 BU 51 BU | 43.2 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |
| 385 | 0001-0036-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | BLENDON #26 26-6N-14W / 2200-3339-13,3,4 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.07570009 No | 50 BU 43 BU 44 BU | 40.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |
| 386 | 0001-0037-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | BLENDON #25 25-6N-14W / 2200-3339-6,7 / 2497-6494-1,2,3,4 / 2497-6495-1,2,3,4,5,6 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.06722135 No | 52 BU 48 BU 48 BU | 41.6 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |
| 388 | 0001-0039-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | BLENDON #35 35-6N-14W / 2890-2947-1,2 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.07840369 No | 45 BU 42 BU 42 BU | 36.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |
| 389 | 0001-0040-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | GEORGETOWN #6 6-6N-13W / 4548-6474-1 / 6126-7311-12,6,7 / 6267-3770-1,2,3,4,5,6,7,8 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.07570009 No | 46 BU 43 BU 43 BU | 36.8 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |
| 390 | 0001-0041-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | GEORGETOWN #7 7-6N-13W / 6983-8275-30 / 6983-8276-15,29 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.07570009 No | 46 BU 43 BU 43 BU | 36.8 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |
| 392 | 0001-0046-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | ZEELAND #17 17-5N-14W / 7328-2535-1,2,3 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.07840369 No | 47 BU 42 BU 42 BU | 37.6 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |
| 395 | 0001-0050-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | BLENDON #9 9-6N-14W / 2923-2828-1,2 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.06722135 No | 51 BU 48 BU 48 BU | 40.8 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |
| 397 | 0001-0052-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | GEORGETOWN 28 28-6N-13W / 6404-7600-1,27,8 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.06588406 No | 51 BU 49 BU 49 BU | 40.8 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |
| 404 | 0001-0060-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | BLENDON 12 12-6N-14W / 6907-8170-18,9 / 6907-8171-11,13 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.07237564 No | 47 BU 45 BU 46 BU | 37.6 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |
| 405 | 0001-0061-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | BLENDON 20 20-6N-14W / 2253-2452-11,2 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.07840369 No | 44 BU 42 BU 42 BU | 35.2 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage, (B)Harvested Production: farm stored/measured by insured, (C)Harvested Production: pick/daily sales records, (D)Harvested Production: automated yield monitoring system, (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other, (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

** Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)     See Signature Page for Required Statements



**Schedule of Insurance with Production Report - for the 2019 Crop Year**

10/10/2019
Page: 21 of 24

Policy Number:  2019-MI-084-1139524     NEW HEIGHTS FARM I, LLC

Agency:  236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| 406 | 0001-0062-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | ZEELAND 15 | 1.00 / 1.00 PFTA | 0.07840369 | 44 BU | 35.2 BU | 9.54 E | 1.0000 | 0.00 | $0 | |
| | | | 15-5N-14W / 6916-2989-1,5 / 6916-2999-6 / 6916-7916-15,7 | 1.020 / 1.00 | No | 42 BU 42 BU | $0 | 0 | | | $0 | ☐ Commingled Prod |
| 407 | 0001-0063-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | BLENDON 1 | 1.00 / 1.00 PFTAYA | 0.07237564 | 47 BU | 37.6 BU | 9.54 E | 1.0000 | 0.00 | $0 | |
| | | | 1-6N-14W / 6931-3270-8 / 7005-8006-18,21 | 1.020 / 1.00 | No | 45 BU 46 BU | $0 | 0 | | | $0 | ☐ Commingled Prod |
| 410 | 0001-0066-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Ottawa (139) 15-ZC | JAMESTOWN 10 | 1.00 / 1.00 PFTA | 0.06588406 | 51 BU | 40.8 BU | 9.54 E | 1.0000 | 0.00 | $0 | |
| | | | 10-5N-13W / 7381-8307-1 | 1.020 / 1.00 | No | 49 BU 49 BU | $0 | 0 | | | $0 | ☐ Commingled Prod |
| 409 | 0001-0065-EP Soybeans 80% | Nfac (Irr)/Commodity Ottawa (139) 15-ZC | ZEELAND 2 | 1.00 / 1.00 PFTA | 0.06276951 | 52 BU | 41.6 BU | 9.54 E | 1.0000 | 0.00 | $0 | |
| | | | 2-5N-14W / 3203-3416-1 / 3231-3390-1 / 6683-3412-1,2 / 7379-8305-1 | 1.020 / 1.00 | No | 51 BU 51 BU | $0 | 0 | | | $0 | ☐ Commingled Prod |
| **Total for Ottawa, Soybeans** | | | | Acres: 0.00 | | Guarantee/Amt. of Cov.: 0 DOL | | Liability: $0 | | $0 | $0 |

---

\* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

\* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed.  (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only), (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)(Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only), (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

\*\* Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal

\*\* I certify I have not produced the insured crop in the county for more than two years.

(Form M205)            See Signature Page for Required Statements



**Schedule of Insurance with Production Report - for the 2019 Crop Year**

Policy Number:  2019-MI-084-1139524    NEW HEIGHTS FARM I, LLC
Agency:  236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ Required Review | ***MPCI POLICY TOTALS:*** | | Base Premium: | **$361,995** - | Risk Subsidy: | **$246,158** = | Insured's Premium: **$115,837** |
| ☐ Required Inspection | Total Acres: | 8,735.73 | | | ***A&O Subsidy: | **$66,968** | Administrative Fees: **$210** |
| | Total Liability: | **$4,915,380** | Total Premium: | **$429,173** = | Total Subsidy: | **$313,126** + | Insured's Premium & Fees: **$116,047** |

***Note:  This amount may increase by 1.15 percent of net book premium (except for group plans of insurance) if the loss ratio in the State exceeds 1.20.  However, the amount of premium the producer must pay will not change.

Remarks:

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only)., (J)Unharvested and put to another use. (ARPI only)., (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only)., (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)        See Signature Page for Required Statements

# Schedule of Insurance with Production Report - for the 2019 Crop Year

10/10/2019
Page: 23 of 24

Policy Number: 2019-MI-084-1139524 NEW HEIGHTS FARM I, LLC
Agency: 236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

## COLLECTION OF INFORMATION AND DATA (PRIVACY ACT) STATEMENT Agents, Loss Adjusters and Policyholders

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information requested on documents established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required or permitted by law, law enforcement agencies, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIPs contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to the public to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures, and the denial of program eligibility or benefits derived therefrom. Also, failure to provide true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.

.

**Non-Discrimination Policy** In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating on the basis of race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs).
**To File a Program Complaint** If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at www.ascr.usda.gov/ad-3027-usda-program-discrimination-complaint-form, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410 or email at program.intake@usda.gov. **Persons with Disabilities** Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible State or local Agency that administers the program or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English. Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email.

---

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only), (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage. (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

** Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205) See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139524   NEW HEIGHTS FARM I, LLC
Agency:  236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| CERTIFICATION STATEMENT | ANTI-REBATING STATEMENT(S) |
|---|---|
| | Applicant/Insured Statement |

"I certify, for the crop year indicated, that I have not directly or indirectly received, accepted, or been paid, offered, promised, or given any benefit, including money, goods, or services for which payment is usually made, rebate, discount, abatement, credit, or reduction of premium, or any other valuable consideration, as an inducement to procure insurance or in exchange for purchasing this insurance policy after it has been procured. I understand that this prohibition does not include payment of administrative fees, performance based discounts, and any other payment approved by FCIC that are authorized under sections 508(a)(9)(B) and 508(d)(3) of the Federal Crop Insurance Act (Act) (7 U.S.C. §§ 1508(a)(9)(B) and 1508(d)(3)). I understand that a false certification or failure to completely and accurately report any information on this form may subject me, and any person with a substantial beneficial interest in me, to sanctions, including but not limited to, criminal and civil penalties and administrative sanctions in accordance with section 515(h) of the Act (7 U.S.C. §1515(h)) and all other applicable federal statutes."

I understand this form may be reviewed or audited and that information inaccurately reported or failure to retain records to support information on this form may result in a recomputation of the approved APH yield.

I certify that to the best of my knowledge and belief all of the information on this form is correct. I also understand that failure to report completely and accurately may result in sanctions under my policy, including but not limited to voidance of the policy, and in criminal or civil penalties (18 U.S.C. ß1006 and ß1014; 7 U.S.C. ß1506; 31 U.S.C. ß3729, ß3730 and any other applicable federal statutes).

**Authorized Representative:** STACY BOERSEN                                    **POA(s):**
**Limited Authorized Rep:**


NEW HEIGHTS FARM I, LLC

_____          _____

*Insured's Printed Name*                          *Signature*                                    *(Date)*

### Agent Statement

"I certify, for the crop year indicated, that I have neither offered nor promised, directly or indirectly, any benefit, including money, goods, or services for which payment is usually made, rebate, discount, credit, reduction of premium, or any other valuable consideration to this person either as an inducement to procure insurance or in exchange for obtaining insurance after it has been procured. I understand that this prohibition does not include payment of administrative fees, performance based discounts, and any other payment approved by FCIC that are authorized under sections 508(a)(9)(B) and 508(d)(3) of the Federal Crop Insurance Act (Act) (7 U.S.C. §§ 1508(a)(9)(B) and 1508(d)(3)). I understand that a false certification or failure to completely and accurately report any violation may subject me, and all agencies/companies I represent, to sanctions, including but not limited, to criminal and civil penalties and administrative sanctions in accordance with section 515(h) of the Act (7 USC §1515(h)) and all other applicable federal statutes."

_____        _____        _____

*Agent's Printed Name*                          *Signature*                          *(Date)*                          *(Agent's Code)*


* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI only)., (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

** Insurability: (A) Insurable, (B) Uninsurable., (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)





**EXHIBIT 04**

507-4-NOL

# MPCI NOTICE OF PP OR DAMAGE OR LOSS

| AGENCY NAME & ADDRESS                102212<br>SPARTAN INSURANCE-MAIN 2<br>806 BOTSFORD RD<br>PETOSKEY, MI  49770<br><br>Phone: (855) 347-1066    Fax: (231) 347-1067 | PROFIT CENTER NAME & ADDRESS      22<br>Peoria<br>1315 W. Commerce Drive<br>Peoria, IL  61615-1462<br><br>Phone:  (800) 345-1065    Fax:    (309) 689-1055 | GREAT AMERICAN INSURANCE COMPANY<br>Crop Insurance Division<br><br>**CROP YEAR** 2019 |

| INSURED NAME & ADDRESS<br>NEW HEIGHTS FARM I, LLC<br>6241 RANSOM ST<br>ZEELAND, MI  49464<br><br>**Best time to contact insured:**  Contact Stacy at 616-836-0273 | **POLICY NO.**  2019-MI-084-1139524<br>**CLAIM NO.**  2019-1139524-01<br>**HOME/OFFICE PHONE**  (616) 875-7880<br>**MOBILE PHONE**  (616) 836-0273<br>**EMAIL** |

| ADJUSTER NAME & PHONE<br>JAMES BRINKMAN<br>Phone:  (989) 928-4712 | SUPERVISOR NAME & PHONE<br>JAMES BRINKMAN<br>Phone:  (989) 928-4712 |

**THIS IS A NOTICE OF:**
- [x] PREVENTED PLANTING
- [ ] REPLANT (if replant on any unit is greater than 50 acres)
- [ ] REPLANT (SELF CERT.<50 ACRES)
- [ ] PROBABLE LOSS
- [ ] DAMAGE ONLY (appears production will exceed guarantee at this time)
- [ ] IMMEDIATE INSPECTION REQUESTED - Reason:

**POLICYHOLDER  INTENTION:**
- [ ] REPLANT
- [ ] TO HARVEST
- [ ] TO CHOP/SILAGE
- [x] LEAVE FOR COVER
- [ ] PLANT TO ANOTHER CROP
- [ ] UNKNOWN AT THIS TIME
- [ ] PASTURE
- [ ] HAY
- [ ] DIRECT MKT.CROP
- [ ] DESTROY
- [ ] OTHER  (explain in Remarks)

| COUNTY | CROP | UNIT | ACRES | LEGAL DESCRIPTION / FSN | EST./ AC. PROD. | CAUSE OF LOSS | DATE OF DAMAGE | DATE OF NOTICE | DATE OF HARVEST |
|---|---|---|---|---|---|---|---|---|---|
| Eaton | Corn (41) | 00010001 | 0.00 | 13-002N-004W / 14-002N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Corn (41) | 00010001 | 0.00 | 11-001N-002W / 14-001N-001W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Soybeans (81) | 00010001 | 0.00 | 13-002N-004W / 14-002N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Soybeans (81) | 00010001 | 0.00 | 05-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Corn (41) | 00010002 | 0.00 | 33-001N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Corn (41) | 00010002 | 0.00 | 14-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Soybeans (81) | 00010002 | 0.00 | 07-001N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Soybeans (81) | 00010002 | 0.00 | 07-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Corn (41) | 00010003 | 0.00 | 23-002N-004W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Corn (41) | 00010003 | 0.00 | 05-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Soybeans (81) | 00010003 | 0.00 | 22-001N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Soybeans (81) | 00010003 | 0.00 | 09-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Corn (41) | 00010004 | 0.00 | 23-002N-004W / 24-002N-004W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Corn (41) | 00010004 | 0.00 | 07-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Soybeans (81) | 00010004 | 0.00 | 09-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Soybeans (81) | 00010004 | 0.00 | 21-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Corn (41) | 00010005 | 0.00 | 18-003N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Corn (41) | 00010005 | 0.00 | 09-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Soybeans (81) | 00010005 | 0.00 | 18-003N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Soybeans (81) | 00010005 | 0.00 | 26-001N-002W / 27-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Corn (41) | 00010006 | 0.00 | 07-001N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Corn (41) | 00010006 | 0.00 | 21-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Soybeans (81) | 00010006 | 0.00 | 23-002N-004W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Soybeans (81) | 00010006 | 0.00 | 11-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Corn (41) | 00010007 | 0.00 | 09-001N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |

F.18417 Rev. (6/11)



507-4-NOL

# MPCI NOTICE OF PP OR DAMAGE OR LOSS

GREAT AMERICAN.
INSURANCE COMPANY
Crop Insurance Division

**INSURED NAME & ADDRESS**
NEW HEIGHTS FARM I, LLC
6241 RANSOM ST
ZEELAND, MI 49464

**Best time to contact insured:** Contact Stacy at 616-836-0273

| | |
|---|---|
| **POLICY NO.** | 2019-MI-084-1139524 |
| **CLAIM NO.** | 2019-1139524-01 |
| **HOME/OFFICE PHONE** | (616) 875-7880 |
| **MOBILE PHONE** | (616) 836-0273 |

**CROP YEAR** 2019

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Ingham | Corn (41) | 00010007 | 0.00 | 26-001N-002W | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Eaton | Soybeans (81) | 00010007 | 0.00 | 24-002N-004W | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Soybeans (81) | 00010007 | 0.00 | 14-001N-002W | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Eaton | Corn (41) | 00010008 | 0.00 | 24-003N-004W | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Corn (41) | 00010008 | 0.00 | 27-001N-002W | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Eaton | Soybeans (81) | 00010008 | 0.00 | 33-001N-003W | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Soybeans (81) | 00010008 | 0.00 | 01-001N-002W / 06-001N-001W | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Eaton | Corn (41) | 00010009 | 0.00 | 22-001N-003W | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Corn (41) | 00010009 | 0.00 | 01-001N-002W / 06-001N-001W | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Eaton | Soybeans (81) | 00010009 | 0.00 | 24-003N-004W | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Soybeans (81) | 00010009 | 0.00 | 15-001N-002W / 32-002N-002W | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Eaton | Corn (41) | 00010010 | 0.00 | 21-002N-003W | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Corn (41) | 00010010 | 0.00 | 29-002N-002W / 30-002N-002W / 31-002N-002W | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Eaton | Soybeans (81) | 00010010 | 0.00 | 21-002N-003W | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Soybeans (81) | 00010010 | 0.00 | 28-001N-002W | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Corn (41) | 00010011 | 0.00 | 15-001N-002W / 28-001N-002W / 32-002N-002W | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Soybeans (81) | 00010011 | 0.00 | 29-002N-002W / 30-002N-002W / 31-002N-002W | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |

**\*\* Unit has more legals. Please refer to APH or SOI forms for all legals.**

NOTE: Refer to Basic Provisions (BP) and the specific Crop Provisions (CP) for more details on notice requirements for acreage prevented
from planting, and notice requirements for damage or loss requirements.

- If you have less than 100% share, is the other share insured under a Federal Crop insurance program?   ☐ YES   ☐ NO   ☑ N/A

  If "Yes" please list the person's name and insurance company
  (AIP) for which they carry Federal Crop insurance and the
  policy number if known.                    Shareholder's Name          Insurance Company          Policy #

- I (the insured) am an agent, employee, or contractor affiliated with Federal Crop insurance and the policy
  number if known?   ☐ YES   ☑ NO

| **REMARKS / COMMENTS** | **COMPANION POLICIES** |
|---|---|
| NOL generated by CSHELLBARGER and received by Great American on 6/27/2019 at 13:21:03 They are still planting but will have some acres of both corn and soybeans that probably will not get planted. | |

_____          _____          _____
Insured's Signature                Date Signed            Date of Notice

F.18417 Rev. (6/11)

507-4-NOL

## MPCI NOTICE OF PP OR DAMAGE OR LOSS



**GREAT AMERICAN**
INSURANCE COMPANY
Crop Insurance Division

| INSURED NAME & ADDRESS | | |
|---|---|---|
| NEW HEIGHTS FARM I, LLC<br>6241 RANSOM ST<br>ZEELAND, MI  49464 | **POLICY NO.** | 2019-MI-084-1139524 |
| | **CLAIM NO.** | 2019-1139524-01 |
| | **HOME/OFFICE PHONE** | (616) 875-7880 |
| | **MOBILE PHONE** | (616) 836-0273 |
| **Best time to contact insured:** Contact Stacy at 616-836-0273 | | |

**CROP YEAR** 2019

### COLLECTION OF INFORMATION AND DATA (PRIVACY ACT) STATEMENT

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information requested on documents established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required or permitted by law, law enforcement agencies, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIPs contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to the public to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures and the denial of program eligibility or benefits derived therefrom. Also, failure to provide true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.

**Non-Discrimination Policy**

In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating on the basis of race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs).

**To File a Program Complaint**

If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at www.ascr.usda.gov/ad-3027-usda-program-discrimination-complaint-form, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410 or email at program.intake@usda.gov.

**Persons with Disabilities**

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible State or local Agency that administers the program or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email.

F.18417 Rev. (6/11)

**EXHIBIT**
**05**

507-4-NOL

## MPCI NOTICE OF PP OR DAMAGE OR LOSS

GREAT AMERICAN
INSURANCE COMPANY
Crop Insurance Division

| AGENCY NAME & ADDRESS          236132 | PROFIT CENTER NAME & ADDRESS          22 |
|---|---|
| SPARTAN INSURANCE -MAIN 3<br>806 BOTSFORD RD<br>PETOSKEY, MI  49770<br><br>Phone: (855) 347-1066          Fax: (231) 347-1067 | Peoria<br>1315 W. Commerce Drive<br>Peoria, IL  61615-1462<br><br>Phone: (800) 345-1065     Fax:   (309) 689-1055 |

**CROP YEAR** 2019

| INSURED NAME & ADDRESS | |
|---|---|
| NEW HEIGHTS FARM I, LLC<br>6241 RANSOM ST<br>ZEELAND, MI  49464 | POLICY NO.    2019-MI-084-1139524<br>CLAIM NO.   2019-1139524-03<br>HOME/OFFICE PHONE   (616) 875-7880<br>MOBILE PHONE   (616) 836-0273<br>EMAIL |
| **Best time to contact insured:**  Contact Stacy Boersen at 616-836-0273 | |

| ADJUSTER NAME & PHONE | SUPERVISOR NAME & PHONE |
|---|---|
| SHARON SHOCK<br>Phone: (260) 341-4412 | SHARON SHOCK<br>Phone:  (260) 341-4412 |

**THIS IS A NOTICE OF:**

- [ ] PREVENTED PLANTING
- [ ] REPLANT (if replant on any unit is greater than 50 acres)
- [ ] REPLANT (SELF CERT.<50 ACRES)
- [x] PROBABLE LOSS
- [ ] DAMAGE ONLY (appears production will exceed guarantee at this time)
- [ ] IMMEDIATE INSPECTION REQUESTED - Reason:

**POLICYHOLDER  INTENTION:**

- [ ] REPLANT
- [x] TO HARVEST
- [ ] TO CHOP/SILAGE
- [ ] LEAVE FOR COVER
- [ ] PLANT TO ANOTHER CROP
- [ ] UNKNOWN AT THIS TIME
- [ ] PASTURE
- [ ] HAY
- [ ] DIRECT MKT.CROP
- [ ] DESTROY
- [ ] OTHER   (explain in Remarks)

| COUNTY | CROP | UNIT | ACRES | LEGAL DESCRIPTION / FSN | EST./ AC. PROD. | CAUSE OF LOSS | DATE OF DAMAGE | DATE OF NOTICE | DATE OF HARVEST |
|---|---|---|---|---|---|---|---|---|---|
| Barry | Corn (41) | 00010001 | 0.00 | | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ottawa | Corn (41) | 00010001 | 0.00 | 02-005N-014W / 02-005N-014W /<br>02-005N-014W** | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Eaton | Soybeans (81) | 00010001 | 44.69 | 13-002N-004W / 14-002N-003W /<br>14-002N-003W** | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010001 | 47.30 | 05-001N-002W / 05-001N-002W /<br>05-001N-002W** | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Barry | Corn (41) | 00010002 | 70.91 | 07-002N-010W / 07-002N-010W /<br>07-002N-010W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Eaton | Soybeans (81) | 00010002 | 56.79 | 07-001N-003W / 07-001N-003W /<br>07-001N-003W** | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010002 | 35.32 | 07-001N-002W / 07-001N-002W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Allegan | Corn (41) | 00010003 | 184.77 | 02-001N-011W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Barry | Corn (41) | 00010003 | 25.83 | 18-002N-010W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Eaton | Soybeans (81) | 00010003 | 37.63 | 22-001N-003W / 22-001N-003W /<br>22-001N-003W** | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010003 | 17.33 | 09-001N-002W / 09-001N-002W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Eaton | Soybeans (81) | 00010004 | 74.87 | 09-001N-003W / 09-001N-003W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010004 | 74.59 | 21-001N-002W / 21-001N-002W /<br>21-001N-002W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ottawa | Corn (41) | 00010005 | 61.04 | 17-005N-013W / 17-005N-013W /<br>17-005N-013W** | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Eaton | Soybeans (81) | 00010005 | 45.96 | 18-003N-003W / 18-003N-003W /<br>18-003N-003W** | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010005 | 116.47 | 26-001N-002W / 26-001N-002W /<br>27-001N-002W** | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Eaton | Soybeans (81) | 00010006 | 59.29 | 23-002N-004W / 23-002N-004W /<br>23-002N-004W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010006 | 160.97 | 11-001N-002W / 11-001N-002W /<br>11-001N-002W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Eaton | Soybeans (81) | 00010007 | 38.70 | 24-002N-004W / 24-002N-004W /<br>24-002N-004W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010007 | 278.58 | 14-001N-002W / 14-001N-002W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Eaton | Soybeans (81) | 00010008 | 23.37 | 33-001N-003W / 33-001N-003W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010008 | 0.00 | 01-001N-001W / 06-001N-001W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Eaton | Soybeans (81) | 00010009 | 0.00 | 24-003N-004W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010009 | 108.29 | 15-001N-002W / 15-001N-002W /<br>32-002N-002W** | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Eaton | Soybeans (81) | 00010010 | 77.18 | 21-002N-003W / 21-002N-003W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |

F.18417 Rev. (6/11)

NH Great American 001584

507-4-NOL

## MPCI NOTICE OF PP OR DAMAGE OR LOSS

**GREAT AMERICAN**
INSURANCE COMPANY
Crop Insurance Division

**INSURED NAME & ADDRESS**
NEW HEIGHTS FARM I, LLC
6241 RANSOM ST
ZEELAND, MI  49464

| | |
|---|---|
| POLICY NO. | 2019-MI-084-1139524 |
| CLAIM NO. | 2019-1139524-03 |
| HOME/OFFICE PHONE | (616) 875-7880 |
| MOBILE PHONE | (616) 836-0273 |

**CROP YEAR** 2019

Best time to contact insured: Contact Stacy Boersen at 616-836-0273

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Ingham | Soybeans (81) | 00010010 | 17.02 | 28-001N-002W / 28-001N-002W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Allegan | Corn (41) | 00010011 | 49.27 | 23-002N-011W / 23-002N-011W / 23-002N-011W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010011 | 193.62 | 34-006N-014W / 34-006N-014W / 34-006N-014W** | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Eaton | Soybeans (81) | 00010011 | 0.00 | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ingham | Soybeans (81) | 00010011 | 0.00 | 29-002N-002W / 30-002N-002W / 31-002N-002W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ingham | Soybeans (81) | 00010012 | 0.00 | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010013 | 144.86 | 02-005N-014W / 02-005N-014W / 02-005N-014W** | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Allegan | Corn (41) | 00010014 | 81.53 | 10-001N-011W / 10-001N-011W / 10-001N-011W** | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010014 | 61.65 | 03-005N-014W / 03-005N-014W** | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Allegan | Corn (41) | 00010017 | 153.67 | 35-002N-011W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010018 | 74.91 | 08-005N-013W / 08-005N-013W / 08-005N-013W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Allegan | Corn (41) | 00010019 | 3.29 | 36-002N-011W / 36-002N-011W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Allegan | Corn (41) | 00010020 | 86.02 | 10-001N-011W / 10-001N-011W / 10-001N-011W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010021 | 69.21 | 26-006N-014W / 25-006N-014W / 25-006N-014W** | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010026 | 0.00 | 05-005N-014W / 05-005N-014W / 05-005N-014W** | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010028 | 47.35 | 08-005N-014W / 08-005N-014W / 08-005N-014W** | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010029 | 161.01 | 27-006N-014W / 27-006N-014W / 27-006N-014W** | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Allegan | Corn (41) | 00010031 | 23.47 | 05-001N-011W / 05-001N-011W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010034 | 100.19 | 25-006N-014W / 25-006N-014W / 25-006N-014W** | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010035 | 0.00 | 32-006N-014W / 32-006N-014W / 32-006N-014W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010037 | 50.09 | 35-006N-014W / 35-006N-014W / 35-006N-014W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010042 | 74.80 | 17-005N-014W / 17-005N-014W / 17-005N-014W** | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Allegan | Corn (41) | 00010044 | 61.87 | 28-002N-011W / 28-002N-011W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Allegan | Corn (41) | 00010045 | 100.48 | 29-002N-011W / 29-002N-011W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010045 | 41.59 | 07-006N-013W / 07-006N-013W / 07-006N-013W** | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Allegan | Corn (41) | 00010046 | 32.66 | 22-002N-011W / 22-002N-011W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010048 | 0.00 | 09-006N-014W / 09-006N-014W / 09-006N-014W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Allegan | Corn (41) | 00010049 | 177.93 | 12-003N-012W / 13-003N-012W / 13-003N-012W** | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Allegan | Corn (41) | 00010050 | 40.32 | 04-001N-011W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Allegan | Corn (41) | 00010051 | 38.77 | 05-001N-011W / 05-001N-011W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010052 | 93.85 | 28-006N-013W / 28-006N-013W / 28-006N-013W** | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Allegan | Corn (41) | 00010056 | 224.51 | 20-002N-011W / 20-002N-011W / 20-002N-011W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Allegan | Corn (41) | 00010057 | 95.10 | 27-002N-011W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010057 | 19.26 | 20-006N-014W / 20-006N-014W / 20-006N-014W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Allegan | Corn (41) | 00010058 | 74.75 | 30-002N-011W / 30-002N-011W / 30-002N-011W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010058 | 141.88 | 20-006N-013W / 06-006N-013W / 06-006N-013W** | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010059 | 103.47 | 15-005N-014W / 15-005N-014W / 15-005N-014W** | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010060 | 76.36 | 12-006N-014W / 12-006N-014W / 12-006N-014W** | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Allegan | Corn (41) | 00010061 | 23.92 | 01-003N-012W / 01-003N-012W / 01-003N-012W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010061 | 0.00 | 26-006N-014W / 26-006N-014W / 26-006N-014W** | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Allegan | Corn (41) | 00010062 | 4.90 | 12-002N-011W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010063 | 56.56 | 10-005N-013W / 10-005N-013W | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |
| Ottawa | Corn (41) | 00010066 | 117.67 | 01-006N-014W / 01-006N-014W** | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 |

F.18417 Rev. (6/11)

507-4-NOL

## MPCI NOTICE OF PP OR DAMAGE OR LOSS

**GREAT AMERICAN**
INSURANCE COMPANY
Crop Insurance Division

| INSURED NAME & ADDRESS | |
|---|---|
| NEW HEIGHTS FARM I, LLC | |
| 6241 RANSOM ST | |
| ZEELAND, MI  49464 | |

| | |
|---|---|
| **POLICY NO.** | 2019-MI-084-1139524 |
| **CLAIM NO.** | 2019-1139524-03 |
| **HOME/OFFICE PHONE** | (616) 875-7880 |
| **MOBILE PHONE** | (616) 836-0273 |

**CROP YEAR** 2019

**Best time to contact insured:** Contact Stacy Boersen at 616-836-0273

| Ottawa | Corn (41) | 00010067 | 0.00 | 27-006N-014W / 27-006N-014W / 27-006N-014W** | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
|---|---|---|---|---|---|---|---|---|---|

** Unit has more legals. Please refer to APH or SOI forms for all legals.

NOTE: Refer to Basic Provisions (BP) and the specific Crop Provisions (CP) for more details on notice requirements for acreage prevented from planting, and notice requirements for damage or loss requirements.

● If you have less than 100% share, is the other share insured under a Federal Crop insurance program?  ☐ YES  ☐ NO  ☑ N/A

   If "Yes" please list the person's name and insurance company
   (AIP) for which they carry Federal Crop insurance and the
   policy number if known.

   Shareholder's Name          Insurance Company          Policy #

● I (the insured) am an agent, employee, or contractor affiliated with Federal Crop insurance and the policy
   number if known?  ☐ YES  ☑ NO

| REMARKS / COMMENTS | COMPANION POLICIES |
|---|---|
| NOL generated by CSHELLENBARGER and received by Great American on 12/11/2019 at 11:54:15
Insured has completed soybean harvest and all have been sold and delivered.  Corn harvest is still in progress and extension of time to harvest has been filed for counties not covered on this claim. | |

_____          _____          _____
Insured's Signature                      Date Signed                   Date of Notice

### COLLECTION OF INFORMATION AND DATA (PRIVACY ACT) STATEMENT

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information requested on documents established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required or permitted by law, law enforcement agencies, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIPs contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to the public to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures and the denial of program eligibility or benefits derived therefrom. Also, failure to provide true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.

**Non-Discrimination Policy** In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating on the basis of race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs).
**To File a Program Complaint** If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at www.ascr.usda.gov/ad-3027-usda-program-discrimination-complaint-form, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410 or email at program.intake@usda.gov. **Persons with Disabilities** Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible State or local Agency that administers the program or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English. Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email.

F.18417 Rev. (6/11)



**EXHIBIT 06**



3/10/2020

Great American Insurance Group Inc
301 E Fourth Street 25th
Cincinnati, OH 45202-4201
rcombs@gaig.com
greatamericaninsurancegroup.com

New Heights Farm LLC
6241 Ransom St
Zeeland, MI 49464

Policy Number 1139524-2019
Balance Due:    $124,743.00

Dear policyholder:

Great American Insurance (GAI) has agreed to your request for a payment plan for the balance due on your MPCI policy. The following is an outline of the scheduled installments to be made. **Please be advised that these payments are aproximate; your account will continue to accrue interest until the balance has been paid in full. ** If the payment is not received or postmarked on or before the scheduled due date, this agreement will be considered in default and the entire balance will be due immediately. At that time, your name will be added to the Ineligible Tracking System with an ineligiblity date of 03/15/20. If Great American Insurance processes any indemnity claim while any debt referred to in this agreement is still outstanding, the indemnity will not be paid to you, but will be applied as payment toward the next scheduled installment(s) against this debt.
Please sign the form below and return it by 03/15/20.

|  | Current Balance: | $124,743.00 |
|---|---|---|
| Due Date: | | |
| 3/15/2020 | $35,000.00 | Balance: $89,743.00 |
| 5/1/2020 | $13,475.00 | Balance: $77,389.00 |
| 6/1/2020 | $13,475.00 | Balance: $64,881.00 |
| 7/1/2020 | $13,475.00 | Balance: $52,217.00 |
| 8/1/2020 | $13,475.00 | Balance: $39,394.00 |
| 9/1/2020 | $13,475.00 | Balance: $26,411.00 |
| 10/1/2020 | $13,475.00 | Balance: $13,266.00 (plus interest) |
| 11/1/2020 | $13,431.00 | Balance    $0.00 |

I accept the terms of this repayment agreement. The monthly payment must be received or postmarked on or before the scheduled due date. Payment may be paid online at greatamericancrop.com or by phone 800-341-5546

Signature: _____  Date: _____

Signature: _____  Date: 3/10/2020

Rebecca Combs
Great American Insurance
Agency Collection Representative III
513-763-8424
513-246-0612 fax
rcombs@gaig.com

Payment Information for
Insured:            **New Heights Farm** 6241 Ransom St
Policy Number:      **1139524-2019**        Zeeland, MI 49464
Type:               **MPCI**

Send payments to:
Great American Insurance Company
Crop Division
3923 Solutions Center
Chicago, IL 60677

|   | |
|---|---|
| Premium | $116,047.00 |
| - Payment/Loss Credit | 0.00 |
| + Interest | 8,696.00 |
| Amount due | $124,743.00 |

| | | Beginning Balance | Payment | Applied to Principal | Applied to Interest | Ending Balance | Additional Interest |
|---|---|---|---|---|---|---|---|
| Payment 1 | 3/15/2020 | $124,743.00 | $35,000.00 | $26,304.00 | $8,696.00 | $89,743.00 + | $1,121.00 |
| Payment 2 | 5/1/2020 | $90,864.00 | $13,475.00 | $12,354.00 | $1,121.00 | $77,389.00 + | $967.00 |
| Payment 3 | 6/1/2020 | $78,356.00 | $13,475.00 | $12,508.00 | $967.00 | $64,881.00 + | $811.00 |
| Payment 4 | 7/1/2020 | $65,692.00 | $13,475.00 | $12,664.00 | $811.00 | $52,217.00 + | $652.00 |
| Payment 5 | 8/1/2020 | $52,869.00 | $13,475.00 | $12,823.00 | $652.00 | $39,394.00 + | $492.00 |
| Payment 6 | 9/1/2020 | $39,886.00 | $13,475.00 | $12,983.00 | $492.00 | $26,411.00 + | $330.00 |
| Payment 7 | 10/1/2020 | $26,741.00 | $13,475.00 | $13,145.00 | $330.00 | $13,266.00 + | $165.00 |
| Payment 8 | 11/1/2020 | $13,431.00 | $13,431.00 | $13,266.00 | $165.00 | $0.00 | |

Please enclose remittance form with each payment

---

**PLEASE CALL 1-888-410-0468 FOR PAYOFF AMOUNT**

**Payment 8 of 8**              **$13,431.00**

**Payment Agreement**

Due Date:       11/1/2020
Insured:        New Heights Farm LLC
Policy Number:  1139524-2019

**Payment 7 of 8**              **$13,475.00**

**Payment Agreement**

Due Date:       10/1/2020
Insured:        New Heights Farm LLC
Policy Number:  1139524-2019

**Payment 6 of 8**              **$13,475.00**

**Payment Agreement**

Due Date:       9/1/2020
Insured:        New Heights Farm LLC
Policy Number:  1139524-2019

**Payment 5 of 8**              **$13,475.00**

**Payment Agreement**

Due Date:       8/1/2020
Insured:        New Heights Farm LLC
Policy Number:  1139524-2019



**EXHIBIT**
**07**



**GREAT AMERICAN.**
INSURANCE GROUP

1315 W Commerce Drive
Peoria IL 61615-1462

GreatAmericanInsurance.com

Crop Insurance Division
800.345.1065 toll-free
309.689.1055 fax
309.689.1065 ph

August 21, 2020

Mrs. Stacy Boersen
New Heights Farm I, LLC
6241 Ransom Street
Zeeland, MI 49464

      Re:    Notification of USDA Investigation
              RMA Case Number: SIS-2020-00024
              Policy: New Heights Farm I Policy No. 2019-MI-084-1139524

Dear Mrs. Boersen:

Your policy provisions and binding USDA Risk Management Agency (RMA) policy interpretations prohibit Great American Insurance Company from paying or otherwise determining your 2019 crop year claims at this time. We are also deferring further adjustment of your loss claim until RMA and the USDA Office of Inspector General (OIG) completes ongoing investigations. Our explanation for those actions follows below.

RMA formally notified Great American that RMA's Special Investigations Staff (SIS) has opened an investigation of suspected fraud in regard to your policy and claims, and also that OIG has opened its own investigation of suspected wrongdoing in relation to the same.

Our notice to you concerning these circumstances was delayed at the behest of RMA and other federal agency investigators, who had until now indicated that we should withhold this notice. We are mindful of the inconvenience which that unavoidably caused.

As you know, Great American has been investigating and adjusting your crop year 2019 claims, and we appreciate the cooperation you provided as that process unfolded. We have not made any determinations as of this date in relation to any of your claims because we have been unable to accurately determine whether there is, or the correct amount of, any loss. And in light of the pending RMA and OIG investigation processes and the fact that their findings are likely to affect our loss determination, Great American remains unable to do so at this time. In such circumstances, the policy terms and other applicable authorities instruct us to defer further adjustment and to otherwise withhold any payment which might be due while any USDA investigation is ongoing.

Great American Insurance Company I American Empire Group I Mid-Continent Group I Republic Indemnity Group    great american001561

NHF1 Claims 000493

Notification of USDA Investigation
August 21, 2020
Page 2

Specifically, section 14(h) of the Basic Provisions of your policy terms instructs that Great American should "*defer adjustment of a loss until the amount of loss can be accurately determined.*"  In addition, Basic Provisions section 14(f)(3) prohibits Great American from paying any losses determined to exist until the "*Completion of any investigation by USDA, if applicable, of your current or any past claim for indemnity if no evidence of wrongdoing has been found.*"

Prior Federal Crop Insurance Corporation (FCIC) interpretative directives also govern in this situation.  In Final Agency Determination No. FAD-270 (2016), FCIC indicated:

> … *Section 14(f)(3) (Our Duties) … requires withholding payment pending an investigation of a current or any past claim for indemnity when there is evidence of wrongdoing on the part of the policyholder. FAD-78 further explains that delay in paying any claim applies if the USDA Office of Inspector General (OIG) investigates a policyholder's current or past claim because of such suspected wrongdoing, the AIP is prohibited from paying a current year's replanting, prevented planting payment, or claim for indemnity until the investigation is complete. … likewise, if the RMA Compliance Office provides written notification to the AIP not to initiate payment pending an investigation, the AIP is prohibited from making payment. Therefore, if either of these criteria are met, the AIP is prohibited from making payment.*
>
> *There is nothing within the policy or subsequent FADs that states the specificity of the nature of the suspected wrongdoing must be provided to withhold payment. In fact, in most investigations of wrongdoing, FCIC does not discuss the nature of the specific wrongdoing in order to protect the integrity of the investigation. …*
>
> … *The policy is clear that until the investigation is complete, no indemnity or other payment can be made.*
>
> … *Once all investigations are concluded, an indemnity or other payment can be made if no evidence of wrongdoing has been found.*
>
> (See https://legacy.rma.usda.gov/regs/533/2016/fad-270.html)

Also, FAD-190 (2013) specifies that commencement of an investigation is not itself a determination which is subject to the policy's appeal processes:

> … *In order for there to be an arbitration or request for reconsideration there must be a decision or determination in which the insured disagrees. The fact that a claim is under investigation does not in and of itself constitute a decision or determination that is subject to arbitration or reconsideration. However, if there has been a decision or determination unrelated to the investigation, the insured is entitled to seek arbitration or reconsideration of the determination within the timeframes specified in the policy. …*

great american001562

Notification of USDA Investigation
August 21, 2020
Page 3

(See https://legacy.rma.usda.gov/regs/533/2013/fad-190.html)

FCIC's Final Agency Determinations, including those above, are "*binding on all participants in the Federal crop insurance program for the crop years the policy provisions are in effect.*" See 7 CFR §400.766(b)(2) (2020 edition).

We therefore must await the completion and results of the ongoing RMA and OIG investigations before we can make any determinations in relation to your 2019 claims.

**If and when the company makes a determination which you dispute, you have the right to resolve your disagreement through arbitration in accordance with Basic Provisions ¶20.** I have enclosed a copy of "*Your Right to Resolve Crop Insurance Disputes,*" which contains a complete overview of your rights.

Section 21(b) of the Basic Provisions normally requires you as a policyholder to retain the originals of all of the records in your possession which pertain to your insured and uninsured crops, your APH certification, or to any claim for a 3-year period (see section 21(b)(1) and (2) for the particulars of those requirements). However, **we hereby notify you that you should retain such records until the later of the end of that 3-year period or when you are notified by us or USDA that the USDA investigation processes have concluded.** Section 21(c) permits us to extend that record retention period in this manner.

By way of background, the United States Department of Agriculture, Risk Management Agency (RMA) governs federally reinsured crop insurance policies. RMA authors or approves the policy provisions, which are federal law, as well as underwriting and claims adjusting procedures. The policy terms and conditions preempt any contrary state laws. Neither Great American Insurance Company nor any of its adjusters, employees, or agents have the power to waive any provisions of the policy terms (see the introductory paragraphs to your policy's Basic Provisions). All companies issuing federally reinsured policies must abide by RMA's rules, regulations, practices, and procedures in the administration of the federal crop insurance program and in the determination of all claims, and Great American has undertaken the actions herein in compliance with those RMA requirements. Great American and RMA also have the right to review and audit your policy, application, acreage report, production history, guarantee, and any claims you have made, in order to ensure compliance with RMA requirements.

We greatly value our business relationship with all of our customers and agents and are committed to administering all Multi-Peril Crop Insurance policies and claims in accordance with the Risk Management Agency's policy language and procedural requirements.

Notification of USDA Investigation
August 21, 2020
Page 4

Sincerely,

Craig Eversole
Senior Claims Manager
Great American Insurance

cc:     Agent
        Loss file

Attachment:  *Your Right to Resolve Crop Insurance Disputes*

great american001564

**EXHIBIT 08**

| GREAT AMERICAN INSURANCE COMPANY | Regional Office | **Application/Renewal Form** for the 2019 Crop Year | | Page: 1 of 4 |
|---|---|---|---|---|

Policy Number: 1139527

**INSURED**

New Heights Farm II, LLC
6241 Kenson St
Zeeland, MI 49464

Person Type: LLC
ID#: 83-4161610   Type: ☐ SSN ☒ EIN ☐ RAN
Indicate State where articles are filed: Michigan

Is applicant at least 18 years old? ☒ YES ☐ NO
Phone: 616-875-7880  Mobile: 616-610-2886
E-Provisions: ☐  Email:

Spouse's Name:
Spouse's ID#:
Change: ☐ Name ☐ ID#

**AGENCY**

Spartan Insurance - Main 2
806 Botsford
Petoskey, MI 49770

Code: 102212
Phone: 855-347-1066
Fax: 231-347-1067
Agency Email: cshel1586@hotmail.com

Agent: Chris Shellenberger
Agent Phone: 517-749-8928
Agent Email: cshel1586@hotmail.com

Authorized Representative(s): Nicholas Boersen

Power Of Attorney:

Limited Authorized Representative(s):
Refer to the LAR Statement

☐ Add Authority    For designated person(s) to sign crop
☐ Remove Authority  insurance documents on behalf of the insured.

☐ I authorize all individuals listed as SBI to have authority as a Limited Authorized Representative.

**Substantial Beneficial Interest Information:** - List all person(s) with a substantial beneficial interest in you as defined in the applicable policy provisions (include landlords or tenants insured under the applicant).
If none, state NONE. Attach SBI Reporting Form if additional space is needed and check box ☐ (SBI Reporting Form is attached.)

| | Name | Address | Telephone Number | ID Number | ID No Type (Check One) | Person Type |
|---|---|---|---|---|---|---|
| ☒ Add | Nicholas Boersen | 4678 72nd St Zeeland, MI 49464 | 616 610-2886 | 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 | ☒ SSN ☐ EIN ☐ RAN | Individual |
| ☐ Add | | | | | ☐ SSN ☐ EIN ☐ RAN | |
| ☐ Add | | | | | ☐ SSN ☐ EIN ☐ RAN | |

**Landlord/Tenant:**  In addition to my share on this policy, I am also insuring shares for my: ☐ Landlord ☐ Tenant  (Add L/T as an SBI)
By signing this form I, L/T hereby authorize the above named insured to insure my share under this policy. Otherwise, attach evidence of L/T approval.

L/T Name:                                  Signature:                                Date:

**Effective Year:**
State: 2019
☐ Cancel Entire Policy

**Added County Election**
☐ YES ☒ NO ☐ Cancel

I request insurance coverage for my share of the Category B crops (except forage production) specified below with a designated county in all added counties where the crops are insurable. If your designated plan of insurance, level of coverage or price is not available in the added county, coverage will be provided through the Catastrophic Risk Protection Endorsement, if the crop is insurable in the actuarial documents for an added county.

| Crop/County Change | County Crop | Type Practice | Des. Cnty | ** New Producer | Plan of Ins. Current/Change | %Coverage Level Current/Change | % Price Election, Proj.Price, or Amt of Ins. | Unit Struct | Options/Endorsements Current - Change | Intended PP Acres Eligibility | SCO Ins Plan | Level | ARC | Remarks/Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☒ Add | Eaton Corn | NI Grain | ☐ | ☒ Yes ☐ No | RP | 80% | 100% | EU | YA TA PF MC | 150 | ☐ Add | | ☐ Y ☐ N | |
| ☒ Add | Eaton Soybeans | NI Comm | ☐ | ☒ Yes ☐ No | RP | 80% | 100% | EU | YA TA PF MC | 0 | ☐ Add | | ☐ Y ☐ N | |
| ☒ Add | Ingham Corn | NI Grain | ☐ | ☒ Yes ☐ No | RP | 80% | 100% | EU | YA TA PF MC | 145 | ☐ Add | | ☐ Y ☐ N | |
| ☒ Add | Ingham Soybeans | NI Comm | ☐ | ☒ Yes ☐ No | RP | 80% | 100% | EU | YA TA PF MC | 0 | ☐ Add | | ☐ Y ☐ N | |

*I hereby request cancellation of my crop insurance policy for the crop(s) and crop year shown on this cancellation. I understand that if this form is not executed on or before the cancellation date for any crop year listed, the cancellation of insurance on such crop(s) will not become effective until the following crop year. Explain in the remarks column the reason for cancelling - Insured's request, mutual consent, death, incompetence, dissolution or other.

**I certify I have not produced the insured crop in the county for more than two years.

F.18642 (01/19)

| Application/Renewal Form – for the | | Crop Year | | | Policy Number:<br>Agency: | | | | | | | | Page: 2 of 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Crop/County<br>Change | County<br>Crop | Type<br>Practice | Des.<br>Cnty | ** New<br>Producer | Plan of Ins.<br>Current/Change | %Coverage Level<br>Current/Change | % Price Election,<br>Proj.Price, or<br>Amt of Ins. | Unit<br>Struct | Options/Endorsements<br>Current - Change | Intended PP<br>Acres Eligibility | SCO<br>Ins Plan | Level   ARC | Remarks/<br>Comments |
| ☒ Add | Washtenaw Corn | IRR/N1 Grain | ☐ | ☒ Yes<br>☒ No | RP | 80% | 100% | EP | YA PF | 195D | ☐ Add | ☐ Y<br>☐ N | |
| ☒ Add | Washtenaw Soys | IRR/N1 Comm | ☐ | ☒ Yes<br>☐ No | RP | 80% | 100% | EP | YA PF | 8 | ☐ Add | ☐ Y<br>☐ N | |
| ☐ Add | | | ☐ | ☐ Yes<br>☐ No | | | | | | | ☐ Add | ☐ Y<br>☐ N | |
| ☐ Add | | | ☐ | ☐ Yes<br>☐ No | | | | | | | ☐ Add | ☐ Y<br>☐ N | |
| ☐ Add | | | ☐ | ☐ Yes<br>☐ No | | | | | | | ☐ Add | ☐ Y<br>☐ N | |
| ☐ Add | | | ☐ | ☐ Yes<br>☐ No | | | | | | | ☐ Add | ☐ Y<br>☐ N | |

*I hereby request cancellation of my crop insurance policy for the crop(s) and crop year shown on this cancellation. I understand that if this form is not executed on or before the cancellation date for any crop year listed, the cancellation of insurance on such crop(s) will not become effective until the following crop year. Explain in the remarks column the reason for cancelling - Insured's request, mutual consent, death, incompetence, dissolution or other.

**I certify I have not produced the insured crop in the county for more than two years.

## CONDITIONS OF ACCEPTANCE STATEMENTS

Conditions of Acceptance: The application is accepted and insurance attaches in accordance with the policy unless: (1) The Federal Crop Insurance Corporation determines that, in accordance with the regulations, the risk is excessive; (2) any material fact is omitted, concealed or misrepresented in this application or in the submission of the application; (3) you have failed to provide complete and accurate information required by this application; or (4) the answer to any of the following questions is  yes . An answer of  yes  to these questions does not automatically result in rejection of the application. For example, if you answer  yes  to question (a) but your debt was discharged in bankruptcy, the application would not be rejected.

☐ Yes ☒ No  (a)    Are you now indebted and the debt is delinquent for insurance coverage under the Federal Crop Insurance Act?

☐ Yes ☒ No  (b)    Have you in the last five years been convicted under federal or state law of planting, cultivating, growing, producing, harvesting, or storing a controlled substance?

☐ Yes ☒ No  (c)    Have you ever had insurance coverage under the authority of the Federal  Crop Insurance Act terminated for violation of the terms of the contract or regulations, or for failure to pay your delinquent debt?

☐ Yes ☒ No  (d)    Are you disqualified or debarred under the Federal Crop Insurance Act, the regulations of the Federal Crop Insurance Corporation, or the United State Department of Agriculture?

☐ Yes ☒ No  (e)    Have you ever entered into an agreement with the Federal Crop Insurance Corporation or with the Department of Justice that you would refrain from participating in programs under the authority of the Federal Crop Insurance Act and that agreement is still effective?

☐ Yes ☒ No  (f)    Do you have like insurance on any of the above crop(s)?

I understand that if coverage for any crop is currently terminated or would have subsequently terminated for indebtedness had this application been filed after the termination date, no coverage can be provided and I am ineligible for any benefits under the Federal Crop Insurance Act until the cause for termination is corrected.

We will notify you of rejection by depositing notification in the United States mail, postage paid, to the applicant s address. Unless rejected or the sales closing date has passed at the time you signed this application, insurance shall be in effect for the crop(s) and crop years specified and shall continue for each succeeding crop year, unless otherwise specified in the policy, until canceled, terminated or voided. The insurance contract, which includes the accepted application, is defined in the regulation published at 7 CFR chapter IV. No term or condition of the contract shall be waived or changed unless such waiver or change is expressly allowed by the contract and is in writing.

F.18642 (01/19)

| Application/Renewal Form – for the | Crop Year | Policy Number:<br>Agency: | Page: 3 of 4 |
|---|---|---|---|

## COLLECTION OF INFORMATION AND DATA (PRIVACY ACT) STATEMENT Agents, Loss Adjusters and Policyholders

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information requested on documents established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required or permitted by law, law enforcement agencies, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIPs contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to the public to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures and the denial of program eligibility or benefits derived therefrom. Also, failure to provide true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.

## Supplemental Coverage Option Endorsement Terms and Conditions

"In addition to Section 3B(2) of the Basic Provisions, I hereby elect this Supplemental Coverage Option Endorsement, and by this election I understand:
(1) I must have purchased a policy under the Common Crop Insurance Policy Basic Provisions and applicable Crop Provisions to elect this Endorsement and must also purchase this Endorsement with the same Approved Insurance Provider as my Common Crop Insurance Policy.
(2) I may elect coverage under this Endorsement and the Farm Service Agency's Agriculture Risk Coverage Program, but the same acreage of the crop cannot be covered under both programs.
(3) I may elect coverage under this Endorsement and Stacked Income Protection Plan for the upland cotton, but the same acreage cannot be insured under both.
(4) If at any time my Common Crop Insurance Policy for the crop is cancelled or terminated, coverage under this endorsement is automatically cancelled or terminated.
(5) That by electing this Endorsement, it will continue from year to year unless I or you cancel or change my election by written notice on or before the cancellation date or my coverage is otherwise cancelled or terminated under the terms of my policy.
(6) Separate Administrative Fees will be assessed for each crop insured under this Endorsement."

## NONDISCRIMINATION STATEMENT

**Non-Discrimination Policy**
In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating on the basis of race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). **To File a Program Complaint**
If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at www.ascr.usda.gov/ad-3027-usda-program-discrimination-complaint-form, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410 or email at program.intake@usda.gov.
**Persons with Disabilities**
Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible State or local Agency that administers the program or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English. Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email.

## +Election for Electronic Delivery of Multi-Peril and Private Crop Insurance Policy Provisions

By checking the box for "E-Provisions" on page 1, you agree to receive the MPCI, Crop-Hail, and/or Named-Peril crop insurance policy provisions associated with your Tax ID number (including any changes to the policy provisions) electronically, by accessing them on-line.  To access, view, download, and/or print copies of your policies provisions go to www.greatamericancrop.com.  By checking the "E-Provisions" box on page 1, you also acknowledge the following:
Withdrawal from Electronic Delivery:  You may choose to receive paper copies of applicable provisions mailed to you at any time, at no charge.  Simply contact your insurance agent to receive paper copies.
Minimum System Requirements:  You have the minimum system requirements to access your policy provisions.  This includes: (1) access to a computer or other device which is capable of accessing the internet; (2) software that permits you to receive and access Portable Document Format (PDF) files, such as Adobe Acrobat Reader; (3) hardware or a storage device that can save documents or a printer from which you can print out documents; and (4) an active email address with the ability to receive emails and attachments, in case we need to communicate with you electronically.

| Application/Renewal Form - for the | Crop Year | Policy Number:<br>Agency: | Page: 4 of 4 |
|---|---|---|---|

**POLICY TRANSFER REQUEST**  To be completed only if cancelling previous policy and transferring the experience and insurance coverage from another Approved Insurance Provider.

I hereby request cancellation of my insurance policy with (Ceding Approved Insurance Provider Name) _____ for the crop(s) and crop year(s) shown below because I have applied for insurance with another Approved Insurance Provider. I understand that if this form is not executed on or before the established cancellation date for any crop listed, the cancellation of insurance on such crop(s) will not become effective until the following crop year.

Crop(s) to be cancelled and transferred: _____

Crop Year  of crops being cancelled and transferred: _____  Policy Number  with Ceding Approved Insurance Provider: _____

I hereby authorize and direct the Ceding Approved Insurance Provider shown above to furnish any information relative to my insurance policy to the Assuming Approved Insurance Provider listed below. I understand that if coverage for any crop(s) is now terminated or would have subsequently terminated for delinquent debt had this transfer not occurred, no coverage can be provided by the (Assuming Approved Insurance Provider) **GREAT AMERICAN INSURANCE COMPANY**

**\*\*\*COMPANY USE ONLY\*\*\***
**AIP POLICY TRANSFER ACCEPTANCE (To be completed if policy is being transferred from another AIP)**
**ASSUMING APPROVED INSURANCE PROVIDER: GREAT AMERICAN INSURANCE COMPANY**     **POLICY ISSUING COMPANY CODE: 084**

By submission of this form, we agree to provide crop insurance to this applicant for the crop(s) and crop year specified above unless this form is not executed on or before the established cancellation date for any of the crop(s) shown, in which case insurance will be provided for such crop(s) for the following crop year.

Printed Name and Signature of AIP Representative Authorized to Accept Applications      Date of Acceptance by Assuming AIP

Regional Office Address and Phone Number: _____

**Limited Authorized Representative Statement**

I grant the person(s) listed in the Limited Authorized Representative section, the authority to sign any and all crop insurance documents on my behalf. I understand that by authorizing such persons to sign documents on my behalf, I am legally bound by all terms and conditions of such documents and of the crop insurance contract. I also understand that granting the following person(s) the authority to sign on my behalf does not obligate that person(s) to the terms and conditions of my crop insurance contract. I further understand that this authorization may be revoked by me at any time upon written notice, signed and delivered to my Approved Insurance Provider.

**CERTIFICATION STATEMENT**
**Applicant/Insured Statement**

"I certify that to the best of my knowledge and belief all of the information on this form is correct. I also understand that failure to report completely and accurately may result in sanctions under my policy, including but not limited to voidance of the policy, and in criminal or civil penalties (18 U.S.C. §1006 and §1014; 7 U.S.C. §1506; 31 U.S.C. §3729, §3730 and any other applicable federal statutes). To the best of my knowledge, the Grid ID accurately identifies the location of the insured acreage; and acreage assigned to each Grid ID is accurate."

Nes Heights Farm II, LLC
Nicholas Boeisen       X  Wick          3/12/19

Applicant's Printed Name        Signature        Date

**Agent Statement**

"I certify, for the crop year indicated, that I have neither offered nor promised, directly or indirectly, any benefit, including money, goods, or services for which payment is usually made, rebate, discount, credit, reduction of premium, or any other valuable consideration to this person either as an inducement to procure insurance or in exchange for obtaining insurance after it has been procured. I understand that this prohibition does not include payment of administrative fees, performance based discounts, and any other payment approved by FCIC that are authorized under sections 508(a)(9)(B) and 508(d)(3) of the Federal Crop Insurance Act (Act) (7 U.S.C. §§ 1508(a)(9)(B) and 1508(d)(3)). I understand that a false certification or failure to completely and accurately report any violation may subject me, and all agencies/companies I represent, to sanctions, including but not limited, to criminal and civil penalties and administrative sanctions in accordance with section 515(h) of the Act (7 USC §1515(h)) and all other applicable federal statutes."

Chris Shellenbarger      Chris Shellenbarger      3/13/19      102212

Agent's Printed Name        Signature        Date        Code Number

F.18642 (01/19)

**EXHIBIT 09**

Page: 1 of 4

GREAT AMERICAN INSURANCE COMPANY — Crop Insurance

Regional Office

# Application/Renewal Form
### for the 2019 Crop Year

**Policy Number:** 1139526

**INSURED:**
New Heights Farm II, LLC
6241 Ransom St
Zeeland, MI 49464

Person Type: LLC
ID#: 83-4161610   Type: ☐ SSN ☒ EIN ☐ RAN
Indicate State where articles are filed: Michigan

Is applicant at least 18 years old? ☒ YES ☐ NO
Phone: 616 875-7880   Mobile: 616 610 2886
E-Provisions:* ☐   Email:
Spouse's Name: _____
Spouse's ID#: _____
Change: ☐ Name ☐ ID#

**AGENCY:**
Spartan Insurance - Shell
806 Botsford
Petoskey, MI 49770
Agent: Chris Shellenberger
Agent Phone: 517-749-8928
Agent Email: cshell58@hotmail.com

Code: 102214
Phone: 855-347-1066
Fax: 231-347-1067
Agency Email: cshell58@hotmail.com

**Authorized Representative(s):** Nicholas Boersen

**Power Of Attorney:**

**Limited Authorized Representative(s):**
Refer to the LAR Statement
☐ Add Authority   For designated person(s) to sign crop   ☐ I authorize all individuals listed as SBI to have
☐ Remove Authority   insurance documents on behalf of the insured.   authority as a Limited Authorized Representative.

**Substantial Beneficial Interest Information:** - List all person(s) with a substantial beneficial interest in you as defined in the applicable policy provisions (include landlords or tenants insured under the applicant).
If none, state NONE. Attach SBI Reporting Form if additional space is needed and check box ☐ (SBI Reporting Form is attached).

| | Name | Address | Telephone Number | ID Number | ID No Type (Check One) | Person Type |
|---|---|---|---|---|---|---|
| ☒ Add | Nicholas Boersen | 4678 72nd St Zeeland, MI 49464 | 616 610-2886 | 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 | ☒ SSN ☐ EIN ☐ RAN | Individual |
| ☐ Add | | | | | ☐ SSN ☐ EIN ☐ RAN | |
| ☐ Add | | | | | ☐ SSN ☐ EIN ☐ RAN | |

**Landlord/Tenant:** In addition to my share on this policy, I am also insuring shares for my: ☐ Landlord ☐ Tenant (Add L/T as an SBI)
By signing this form I, L/T hereby authorize the above named insured to insure my share under this policy. Otherwise, attach evidence of L/T approval.

L/T Name: _____   Signature: _____   Date: _____

**Effective Year:** 2019
State: _____
☐ Cancel Entire Policy *

**Added County Election** ☒ YES ☐ NO ☐ Cancel

I request insurance coverage for my share of the Category B crops (except forage production) specified below with a designated county in all added counties where the crops are insurable. If your designated plan of insurance, level of coverage or price is not available in the added county, coverage will be provided through the Catastrophic Risk Protection Endorsement, if the crop is insurable in the actuarial documents for an added county.

| Crop/County Change | County Crop | Type Practice | Des. Cnty | ** New Producer | Plan of Ins. Current/Change | %Coverage Level Current/Change | % Price Election, Proj.Price, or Amt of Ins. | Unit Struct | Options/Endorsements Current - Change | Intended PP Acres Eligibility | SCO Ins Plan | Level | ARC | Remarks/ Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☒ Add | Berrien Corn | IRR/NI Grain | ☐ | ☒ Yes ☐ No | RP | 80% | 100% | EP | YA/TA/PF | 250 | ☐ Add | ☐ Y ☐ N | | |
| ☒ Add | Berrien Sys | IRR/NI CBMN | ☐ | ☒ Yes ☐ No | RP | 80% | 100% | EP | YA/TA/PF | 0 | ☐ Add | ☐ Y ☐ N | | |
| ☒ Add | Branch Corn | NI Grain | ☐ | ☒ Yes ☐ No | RP | 80% | 100% | EU | YA/TA/PF | 60 | ☐ Add | ☐ Y ☐ N | | |
| ☒ Add | Branch Sys | NI Comm | ☐ | ☒ Yes ☐ No | RP | 80% | 100% | EU | YA/TA/PF | 0 | ☐ Add | ☐ Y ☐ N | | |

*I hereby request cancellation of my crop insurance policy for the crop(s) and crop year shown on this cancellation. I understand that if this form is not executed on or before the cancellation date for any crop year listed, the cancellation of insurance on such crop(s) will not become effective until the following crop year. Explain in the remarks column the reason for cancelling - Insured's request, mutual consent, death, incompetence, dissolution or other.

**I certify I have not produced the insured crop in the county for more than two years.

F.18642 (01/19)

NHF2-5999 America 003145

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Application/Renewal Form - for the | | | **Crop Year** | | **Policy Number:** **Agency:** | | | | | | | | | Page: 2 of 4 |
| Crop/County Change | County Crop | Type Practice | Des. Cnty | ** New Producer | Plan of Ins. Current/Change | %Coverage Level Current/Change | % Price Election, Proj.Price, or Amt of Ins. | Unit Struct | Options/Endorsements Current - Change | Intended PP Acres Eligibility | SCO Ins Plan | Level | ARC | Remarks/ Comments |
| ☒ Add | Cass Corn | Irr/NI Grain | ☐ | ☒ Yes ☐ No | RP | 80% | 100% | EP | YA/TA/PF | 1150 | ☐ Add | ☐ Y ☐ N | | |
| ☒ Add | Cass Soys | Irr/NI Comm | ☐ | ☒ Yes ☐ No | RP | 80% | 100% | EP | YA/TA/PF | ∅ | ☐ Add | ☐ Y ☐ N | | |
| ☒ Add | Hillsdale Corn | Irr/NI Grain | ☐ | ☒ Yes ☐ No | RP | 80% | 100% | EP | YA/TA/PF | 488 | ☐ Add | ☐ Y ☐ N | | |
| ☒ Add | Hillsdale Soys | Irr/NI Comm | ☐ | ☒ Yes ☐ No | RP | 80% | 100% | EP | YA/TA/PF | ∅ | ☐ Add | ☐ Y ☐ N | | |
| ☒ Add | Van Buren Corn | Irr/NI Grain | ☒ | ☒ Yes ☐ No | RP | 80% | 100% | EP | YA/TA/PF | 5236 | ☐ Add | ☐ Y ☐ N | | |
| ☒ Add | Van Buren Soys | Irr/NI Comm | ☒ | ☒ Yes ☐ No | RP | 80% | 100% | EP | YA/TA/PF | 450 | ☐ Add | ☐ Y ☐ N | | |

*I hereby request cancellation of my crop insurance policy for the crop(s) and crop year shown on this cancellation. I understand that if this form is not executed on or before the cancellation date for any crop year listed, the cancellation of insurance on such crop(s) will not become effective until the following crop year. Explain in the remarks column the reason for cancelling - Insured's request, mutual consent, death, incompetence, dissolution or other.

**I certify I have not produced the insured crop in the county for more than two years.

### CONDITIONS OF ACCEPTANCE STATEMENTS

Conditions of Acceptance: The application is accepted and insurance attaches in accordance with the policy unless: (1) The Federal Crop Insurance Corporation determines that, in accordance with the regulations, the risk is excessive; (2) any material fact is omitted, concealed or misrepresented in this application or in the submission of the application; (3) you have failed to provide complete and accurate information required by this application; or (4) the answer to any of the following questions is  yes . An answer of  yes  to these questions does not automatically result in rejection of the application. For example, if you answer  yes  to question (a) but your debt was discharged in bankruptcy, the application would not be rejected.

☐ Yes ☒ No (a)    Are you now indebted and the debt is delinquent for insurance coverage under the Federal Crop Insurance Act?

☐ Yes ☒ No (b)    Have you in the last five years been convicted under federal or state law of planting, cultivating, growing, producing, harvesting, or storing a controlled substance?

☐ Yes ☒ No (c)    Have you ever had insurance coverage under the authority of the Federal  Crop Insurance Act terminated for violation of the terms of the contract or regulations, or for failure to pay your delinquent debt?

☐ Yes ☒ No (d)    Are you disqualified or debarred under the Federal Crop Insurance Act, the regulations of the Federal Crop Insurance Corporation, or the United State Department of Agriculture?

☐ Yes ☐ No (e)    Have you ever entered into an agreement with the Federal Crop Insurance Corporation or with the Department of Justice that you would refrain from participating in programs under the authority of the Federal Crop Insurance Act and that agreement is still effective?

☐ Yes ☒ No (f)    Do you have like insurance on any of the above crop(s)?

I understand that if coverage for any crop is currently terminated or would have subsequently terminated for indebtedness had this application been filed after the termination date, no coverage can be provided and I am ineligible for any benefits under the Federal Crop Insurance Act until the cause for termination is corrected.

We will notify you of rejection by depositing notification in the United States mail, postage paid, to the applicant s address. Unless rejected or the sales closing date has passed at the time you signed this application, insurance shall be in effect for the crop(s) and crop years specified and shall continue for each succeeding crop year, unless otherwise specified in the policy, until canceled, terminated or voided. The insurance contract, which includes the accepted application, is defined in the regulation published at 7 CFR chapter IV. No term or condition of the contract shall be waived or changed unless such waiver or change is expressly allowed by the contract and is in writing.

F.18642 (01/19)

| Appfication/Renewal Form - for the | Crop Year | Policy Number: Agency: | |
|---|---|---|---|
| | | | Page: 3 of 4 |

## COLLECTION OF INFORMATION AND DATA (PRIVACY ACT) STATEMENT Agents, Loss Adjusters and Policyholders

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information requested on documents established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required or permitted by law, law enforcement agencies, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIPs contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to the public to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures and the denial of program eligibility or benefits derived therefrom. Also, failure to provide true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.

## Supplemental Coverage Option Endorsement Terms and Conditions

"In addition to Section 3B(2) of the Basic Provisions, I hereby elect this Supplemental Coverage Option Endorsement, and by this election I understand:
(1) I must have purchased a policy under the Common Crop Insurance Policy Basic Provisions and applicable Crop Provisions to elect this Endorsement and must also purchase this Endorsement with the same Approved Insurance Provider as my Common Crop Insurance Policy.
(2) I may elect coverage under this Endorsement and the Farm Service Agency's Agriculture Risk Coverage Program, but the same acreage of the crop cannot be covered under both programs.
(3) I may elect coverage under this Endorsement and Stacked Income Protection Plan for the upland cotton, but the same acreage cannot be insured under both.
(4) If at any time my Common Crop Insurance Policy for the crop is cancelled or terminated, coverage under this endorsement is automatically cancelled or terminated.
(5) That by electing this Endorsement, it will continue from year to year unless I or you cancel or change my election by written notice on or before the cancellation date or my coverage is otherwise cancelled or terminated under the terms of my policy.
(6) Separate Administrative Fees will be assessed for each crop insured under this Endorsement."

## NONDISCRIMINATION STATEMENT

**Non-Discrimination Policy**
In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating on the basis of race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). **To File a Program Complaint**
If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at www.ascr.usda.gov/ad-3027-usda-program-discrimination-complaint-form, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410 or email at program.intake@usda.gov.
**Persons with Disabilities**
Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible State or local Agency that administers the program or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English. Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email.

## +Election for Electronic Delivery of Multi-Peril and Private Crop Insurance Policy Provisions

By checking the box for "E-Provisions" on page 1, you agree to receive the MPCI, Crop-Hail, and/or Named-Peril crop insurance policy provisions associated with your Tax ID number (including any changes to the policy provisions) electronically, by accessing them on-line.  To access, view, download, and/or print copies of your policies provisions go to www.greatamericancrop.com.  By checking the "E-Provisions" box on page 1, you also acknowledge the following:
Withdrawal from Electronic Delivery:  You may choose to receive paper copies of applicable provisions mailed to you at any time, at no charge.  Simply contact your insurance agent to receive paper copies.
Minimum System Requirements:  You have the minimum system requirements to access your policy provisions.  This includes: (1) access to a computer or other device which is capable of accessing the internet; (2) software that permits you to receive and access Portable Document Format (PDF) files, such as Adobe Acrobat Reader; (3) hardware or a storage device that can save documents or a printer from which you can print out documents; and (4) an active email address with the ability to receive emails and attachments, in case we need to communicate with you electronically.

F.18642 (01/19)

| Application/Renewal Form - for the | Crop Year | Policy Number: | |
|---|---|---|---|
| | | Agency: | Page: 4 of 4 |

**POLICY TRANSFER REQUEST**   To be completed only if cancelling previous policy and transferring the experience and insurance coverage from another Approved Insurance Provider.

I hereby request cancellation of my insurance policy with (Ceding Approved Insurance Provider Name) _____ for the crop(s) and crop year(s) shown below because I have applied for insurance with another Approved Insurance Provider. I understand that if this form is not executed on or before the established cancellation date for any crop listed, the cancellation of insurance on such crop(s) will not become effective until the following crop year.

Crop(s)  to be cancelled and transferred: _____

Crop Year  of crops being cancelled and transferred: _____   Policy Number  with Ceding Approved Insurance Provider: _____

I hereby authorize and direct the Ceding Approved Insurance Provider shown above to furnish any information relative to my insurance policy to the Assuming Approved Insurance Provider listed below. I understand that if coverage for any crop(s) is now terminated or would have subsequently terminated for delinquent debt had this transfer not occurred, no coverage can be provided by the (Assuming Approved Insurance Provider) **GREAT AMERICAN INSURANCE COMPANY**

**\*\*\*COMPANY USE ONLY\*\*\***
**AIP POLICY TRANSFER ACCEPTANCE (To be completed if policy is being transferred from another AIP)**
**ASSUMING APPROVED INSURANCE PROVIDER: GREAT AMERICAN INSURANCE COMPANY**        **POLICY ISSUING COMPANY CODE: 084**

By submission of this form, we agree to provide crop insurance to this applicant for the crop(s) and crop year specified above unless this form is not executed on or before the established cancellation date for any of the crop(s) shown, in which case insurance will be provided for such crop(s) for the following crop year.

_____        _____
Printed Name and Signature of AIP Representative Authorized to Accept Applications         Date of Acceptance by Assuming AIP

Regional Office Address and Phone Number: _____

**Limited Authorized Representative Statement**

I grant the person(s) listed in the Limited Authorized Representative section, the authority to sign any and all crop insurance documents on my behalf. I understand that by authorizing such persons to sign documents on my behalf, I am legally bound by all terms and conditions of such documents and of the crop insurance contract. I also understand that granting the following person(s) the authority to sign on my behalf does not obligate that person(s) to the terms and conditions of my crop insurance contract. I further understand that this authorization may be revoked by me at any time upon written notice, signed and delivered to my Approved Insurance Provider.

**CERTIFICATION STATEMENT**
**Applicant/Insured Statement**

"I certify that to the best of my knowledge and belief all of the information on this form is correct. I also understand that failure to report completely and accurately may result in sanctions under my policy, including but not limited to voidance of the policy, and in criminal or civil penalties (18 U.S.C. ß1006 and ß1014; 7 U.S.C. ß1506; 31 U.S.C. ß3729, ß3730 and any other applicable federal statutes). To the best of my knowledge, the Grid ID accurately identifies the location of the insured acreage; and acreage assigned to each Grid ID is accurate."

New Heights Farm II, LLC
Nicholas Boersen                        X  Nick                           3/13/19
Applicant's Printed Name                        Signature                        Date

**Agent Statement**

"I certify, for the crop year indicated, that I have neither offered nor promised, directly or indirectly, any benefit, including money, goods, or services for which payment is usually made, rebate, discount, credit, reduction of premium, or any other valuable consideration to this person either as an inducement to procure insurance or in exchange for obtaining insurance after it has been procured. I understand that this prohibition does not include payment of administrative fees, performance based discounts, and any other payment approved by FCIC that are authorized under sections 508(a)(9)(B) and 508(d)(3) of the Federal Crop Insurance Act (Act) (7 U.S.C. §§ 1508(a)(9)(B) and 1508(d)(3)). I understand that a false certification or failure to completely and accurately report any violation may subject me, and all agencies/companies I represent, to sanctions, including but not limited, to criminal and civil penalties and administrative sanctions in accordance with section 515(h) of the Act (7 USC §1515(h)) and all other applicable federal statutes."

Chris Shellenberger                        Chris Shellenberger           3/13/19        103214
Agent's Printed Name                        Signature                        Date          Code Number

F.18642 (01/19)

EXHIBIT
**10**

**NEW HEIGHTS FARM II, LLC**
**6241 RANSOM ST**
**ZEELAND, MI 49464**

**MP-2019-MI-084-1139526**

# Multiple Peril Crop Insurance Policy



Great American Insurance Company





GREAT AMERICAN®
INSURANCE GROUP

Crop Division
GreatAmericanCrop.com

Great American Insurance is an equal opportunity provider.

**PLEASE READ YOUR POLICY CAREFULLY.** This policy is signed by the President and Secretary of the company.

President

Secretary

F.18151G (4/17)

NHF2-526 Policy 000006



**GREAT AMERICAN**
INSURANCE COMPANY
Crop Insurance Division

Peoria
1315 W. Commerce Drive
Peoria IL, 61615-1462

# Multiple Peril Crop Insurance
## DECLARATION OF COVERAGE
**EFFECTIVE FOR THE 2019 CROP YEAR**

04/04/2019
Page: 1 of 4

**Policy Number:** 2019-MI-084-1139526

| **INSURED:** | NEW HEIGHTS FARM II, LLC<br>6241 RANSOM ST<br>ZEELAND, MI 49464 | | |
|---|---|---|---|

| | | |
|---|---|---|
| **Person Type:** | Limited Liability Company (LLC) |
| **Tax ID:** | XX-XXX1610 |
| **ID # Type:** | EIN |
| **Phone:** | (616) 875-7880 |
| **Mobile:** | |

**Spouse's Name:**
**Articles of Incorporation are filed in:**  Michigan

**Spouse's SSN:**

**Authorized Representative(s):**  NICHOLAS BOERSEN                    **POA(s):**
**Limited Authorized Rep(s):**

## SBI SUMMARY

| Name of Person | Complete Address | Telephone # | Tax ID # | Tax ID Type<br>SSN EIN Other | Person Type | L/T |
|---|---|---|---|---|---|---|
| NICHOLAS BOERSEN | 4678 72ND ST<br>ZEELAND MI 49464 | (616) 610-2886 | XXX-XX-0951 | SSN | Individual (I) | |

## POLICY INFORMATION FOR THE STATE OF MICHIGAN

| County | Crop(s) Insured/Type | Plan | Coverage Level | % Price Election, Proj. Price, or Amt of Ins. | Options/Elections/ Endorsements | Status | Applicable Provisions/Endorsements |
|---|---|---|---|---|---|---|---|
| Berrien (21) | Corn | Revenue Protection (02) | 80% | 100% | PFTAYA EP | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>14ceppcorn ENDR 06/26/2013<br>16cepp - Section I ENDR 11/30/2015<br>2019 SPECIAL COUNTY PROVISIONS |
| Berrien (21) | Soybeans | Revenue Protection (02) | 80% | 100% | PFTAYA EP | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>16cepp - Section I ENDR 11/30/2015<br>17-cepp-soybeans ENDR 05/20/2016<br>2019 SPECIAL COUNTY PROVISIONS |
| Branch (23) | Corn | Revenue Protection (02) | 80% | 100% | PFTAYA EU | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>14ceppcorn ENDR 06/26/2013<br>16cepp - Section I ENDR 11/30/2015<br>2019 SPECIAL COUNTY PROVISIONS |

(Form M915)

Declaration Of Coverage - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139526        NEW HEIGHTS FARM II, LLC
        Agency: 102214 SPARTAN INSURANCE-SHELL / PETOSKEY, MI



**POLICY INFORMATION FOR THE STATE OF MICHIGAN**

| County | Crop(s) Insured/Type | Plan | Coverage Level | % Price Election, Proj. Price, or Amt of Ins. | Options/Elections/ Endorsements | Status | Applicable Provisions/Endorsements |
|---|---|---|---|---|---|---|---|
| Branch (23) | Soybeans | Revenue Protection (02) | 80% | 100% | PFTAYA EU | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>16cepp - Section I ENDR 11/30/2015<br>17-cepp-soybeans ENDR 05/20/2016<br>2019 SPECIAL COUNTY PROVISIONS |
| Cass (27) | Corn | Revenue Protection (02) | 80% | 100% | PFTAYA EP | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>14ceppcorn ENDR 06/26/2013<br>16cepp - Section I ENDR 11/30/2015<br>2019 SPECIAL COUNTY PROVISIONS |
| Cass (27) | Soybeans | Revenue Protection (02) | 80% | 100% | PFTAYA EP | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>16cepp - Section I ENDR 11/30/2015<br>17-cepp-soybeans ENDR 05/20/2016<br>2019 SPECIAL COUNTY PROVISIONS |
| Hillsdale (59) | Corn | Revenue Protection (02) | 80% | 100% | PFTAYA EP | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>14ceppcorn ENDR 06/26/2013<br>16cepp - Section I ENDR 11/30/2015<br>2019 SPECIAL COUNTY PROVISIONS |

(Form M915)

Declaration Of Coverage - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139526          NEW HEIGHTS FARM II, LLC
Agency: 102214 SPARTAN INSURANCE-SHELL / PETOSKEY, MI



### POLICY INFORMATION FOR THE STATE OF MICHIGAN

| County | Crop(s) Insured/Type | Plan | Coverage Level | % Price Election, Proj. Price, or Amt of Ins. | Options/Elections/ Endorsements | Status | Applicable Provisions/Endorsements |
|---|---|---|---|---|---|---|---|
| Hillsdale (59) | Soybeans | Revenue Protection (02) | 80% | 100% | PFTAYA EP | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>16cepp - Section I ENDR 11/30/2015<br>17-cepp-soybeans ENDR 05/20/2016<br>2019 SPECIAL COUNTY PROVISIONS |
| (*)Van Buren (159) | Corn | Revenue Protection (02) | 80% | 100% | PFTAYA EP | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>14ceppcorn ENDR 06/26/2013<br>16cepp - Section I ENDR 11/30/2015<br>2019 SPECIAL COUNTY PROVISIONS |
| (*)Van Buren (159) | Soybeans | Revenue Protection (02) | 80% | 100% | PFTAYA EP | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>16cepp - Section I ENDR 11/30/2015<br>17-cepp-soybeans ENDR 05/20/2016<br>2019 SPECIAL COUNTY PROVISIONS |

ALL STATE/COUNTY OPTION:     Yes
ASSIGNMENT OF INDEMNITY:     None

(* - Denotes Primary County designation for the crop)

### IMPORTANT DATES EFFECTIVE FOR THE 2019 CROP YEAR

| COUNTY | CROP | SALES CLOSING | PRODUCTION REPORTING | ACREAGE REPORTING | PREMIUM BILLING | TERMINATION | CANCELLATION |
|---|---|---|---|---|---|---|---|
| Berrien (21) | Corn | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2019 | 3/15/2020 | 3/15/2019 |
| Berrien (21) | Soybeans | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2019 | 3/15/2020 | 3/15/2019 |
| Branch (23) | Corn | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2019 | 3/15/2020 | 3/15/2019 |
| Branch (23) | Soybeans | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2019 | 3/15/2020 | 3/15/2019 |
| Cass (27) | Corn | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2019 | 3/15/2020 | 3/15/2019 |
| Cass (27) | Soybeans | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2019 | 3/15/2020 | 3/15/2019 |
| Hillsdale (59) | Corn | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2019 | 3/15/2020 | 3/15/2019 |
| Hillsdale (59) | Soybeans | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2019 | 3/15/2020 | 3/15/2019 |
| Van Buren (159) | Corn | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2019 | 3/15/2020 | 3/15/2019 |
| Van Buren (159) | Soybeans | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2019 | 3/15/2020 | 3/15/2019 |

(Form M915)

Declaration Of Coverage - for the 2019 Crop Year



Policy Number: 2019-MI-084-1139526        NEW HEIGHTS FARM II, LLC

Agency: 102214 SPARTAN INSURANCE-SHELL / PETOSKEY, MI

**PLEASE REVIEW FOR ACCURACY AND CONTACT YOUR AGENT IF YOU HAVE ANY QUESTIONS.**

**YOUR AGENT IS:**

SPARTAN INSURANCE-SHELL

806 BOTSFORD RD

PETOSKEY, MI  49770

| | |
|---|---|
| **Code No:** | 102214 |
| **Phone:** | (855) 347-1066 |
| **Fax:** | (231) 347-1067 |
| **E-mail:** | cshell58@hotmail.com |

(Form M915)

## SUMMARY OF CHANGES FOR THE COMMON CROP INSURANCE POLICY
## BASIC PROVISIONS – REINSURED VERSION (18-BR)
### (Released November 2017)

The following is a brief description of the changes to the Common Crop Insurance Policy Basic Provisions that are effective for the 2018 and succeeding crop years for all crops with a 2018 contract change date on or after November 30, 2017, and for the 2019 and succeeding crop years for all crops with a 2018 contract change date prior to November 30, 2017.

- Throughout the policy, changed the phrase:
  - "Web site" and added the word "website" in its place;
  - "FSA farm serial number" and added the phrase "FSA farm number" in its place; and
  - "Replant payment" and added the phrase "replanting payment" in its place.
- Preamble – Revised the order of priority in the preamble to include the actuarial documents.
- Section 1 – Revised the definitions of "Cooperative Extension System," "good farming practices," "price election," "replanted crop."
- Redesignated section 2(e)(2) as section 2(e)(3).
- Section 2(e)(2) – Clarified that with the policyholder's consent the premium and administrative fees can be offset from any prevented planting or indemnity due the policyholder even if the offset occurs before the fees are billed.
- Section 2(f)(2)(i)(D) - Updated the years used in the example.
- Section 2(f)(3)(ii) - Removed the prohibition that does not allow a policyholder to enter into a written payment agreement if they previously failed to make a payment under an agreement to give approved insurance providers the flexibility to enter into these agreements.
- Section 2(f)(5) - Updated the years used in the example.
- Removed section 2(j).
- Section 3(f)(3) – Allow these provisions to be changed in the Special Provisions.
- Section 3(h)(1) – Changed the reference of "valid basis" to "valid agronomic basis."
- Section 6(a)(3) - Added a new paragraph (iii) that provides if the policyholder planted the insured crop on or within five days prior to the final planting date and the final planting date is five or fewer days prior to the acreage reporting date, the policyholder must submit an acreage report no later than five days after the acreage reporting date.
- Section 7(h) - Revised the conservation compliance provisions to remove the certification deadline of June 1.
- Section 9(a)(2)(viii)(A) - Changed the reference to the "Group Risk Protection Plan of Insurance" to "Area Risk Protection Insurance."
- Section 17(f)(9) - Changed the reference to "manpower" to "labor."
- Section 18 – Modified this section to:
  - Provide minor clarifications, as well as removing language that is no longer needed due to program modifications, changes via Special Provisions, or unnecessary duplication.
  - Remove section 18(e)(3).
  - Revise section 18(f)(1)(ii) to remove language regarding the information needed to determine the approved yield.  The APH already contains the information needed to determine the approved yield so this language is no longer needed.  Also revised to remove the unnecessary signature requirement on the submitted actual production history documents.
  - Revise section 18(f)(1)(iii) to add "the crop" as an option for evidence of adaptability.
  - Revise 18(f)(2)(i) to allow an entity to use verifiable and insurance records from substantial beneficial interests of that entity to qualify for a written agreement request for counties without actuarial documents.
  - Remove section 18(f)(1)(vi).
  - Revise section 18(f)(2)(i) to clarify this section is also applicable to perennial crops that have previously produced a crop.  Also revised to allow "you" to include anyone with a substantial beneficial interest in "you."

- o Revise section 18(f)(2)(i)(A) to remove the requirement of the policyholder's signature on the completed APH submitted with the written agreement request and also to state the completed APH is based on verifiable production records of actual yields for the crop to be consistent with the APH requirement for other written agreement request types.
- o Revise section 18(f)(2)(i)(B) to clarify this section is also applicable to perennial crops that have previously produced a crop.
- o Revise section 18(f)(2)(i)(B)(2) to remove the requirement that the policyholder must insure the crop for the three previous crop years before they can substitute a year of insurance experience for a year of verifiable records, and also revised to allow an entity to use the production history from a substantial beneficial interest in the entity that has a history of growing the crop to qualify for a written agreement.
- o Add new section 18(f)(2)(i)(B)(3) to limit a year that counts as producing the crop to the most recent ten crop years, unless the producer can provide verifiable production records or insured the crop outside of the most recent ten crop years.
- o Revise section 18(f)(2)(ii) to clarify this section is also applicable to perennial crops that have previously produced a crop.  Also revised to allow "you" to include anyone with a substantial beneficial interest in "you."
- o Revise section 18(f)(2)(ii)(A) to remove the requirement of the policyholder's signature on the completed APH submitted with the written agreement request and also state the completed APH is based on verifiable production records of actual yields for the similar crop to be consistent with the APH requirement for other written agreement request types.  Also revised to remove the order or precedence that the similar crop records must come from the county, if produced in the county, prior to using any area similar crop records, to be consistent with the requirements for the requested crop.
- o Revise section 18(f)(2)(ii)(B) to clarify this section is also applicable to perennial crops that have previously produced a crop.
- o Revise section 18(f)(2)(ii)(B)(2) to remove the requirement that the policyholder must insure the similar crop for the three previous crop years before they can substitute a year of insurance experience for a year of verifiable records, and also revised to allow an entity to use the production history from a substantial beneficial interest in the entity that has a history of growing the similar crop to qualify for a written agreement.
- o Add new section 18(f)(2)(ii)(B)(3) to limit a year that counts as producing the similar crop to the most recent ten crop years, unless the producer can provide verifiable production records or insured the similar crop outside of the most recent ten crop years.
- o Revise section 18(f)(2)(ii)(C) to allow an entity to use the production history from a substantial beneficial interest in the entity that has a history of growing the crop or similar crop to qualify for a written agreement, and to clarify this section is also applicable to perennial crops that have previously produced a crop.
- o Remove section 18(f)(2)(vi).
- o Remove section 18(g)(3).
- o Revise section 18(h)(2) to clarify the APH history used to determine 50 percent of the transitional yield for the crop, type, and practice can be from either the county or a similar county and to clarify that this provision only applies when the crop has been previously grown.
- o Revise section 18(h)(4) to clarify this provision is also applicable if a similar crop was not previously grown in the area and to allow the crop or similar crop to be grown in the area, as growing the crop or similar crop in the area can qualify a policyholder in the county even if they have not grown the crop in the requested county.  Also revised to remove the phrase "based on sales receipts, contemporaneous feeding records or a contract for the crop."
- o Revise section 18(h)(5) to allow a written agreement request to be denied for a particular practice or type if that practice or type is not adapted to the county.
- Section 21(b)(2) - Updated the years used in the example.
- Sections 34(a)(4)(viii), (viii)(A)-(D) – Revised to allow a policyholder to select an enterprise unit for either irrigated or non-irrigated practice and choose the most appropriate unit structure on the other practice, be it a separate enterprise unit or optional or basic units.

**18-BR**
**(Released Nov 2017)**

## COMMON CROP INSURANCE POLICY
### (This is a continuous policy. Refer to section 2.)



This insurance policy is reinsured by the Federal Crop Insurance Corporation (FCIC) under the provisions of the Federal Crop Insurance Act (Act) (7 U.S.C. 1501 et seq.). All provisions of the policy and rights and responsibilities of the parties are specifically subject to the Act. The provisions of the policy may not be waived or varied in any way by us, our insurance agent or any other contractor or employee of ours or any employee of USDA unless the policy specifically authorizes a waiver or modification by written agreement. We will use the procedures (handbooks, manuals, memoranda and bulletins), as issued by FCIC and published on RMA's website at http://www.rma.usda.gov/ or a successor website, in the administration of this policy, including the adjustment of any loss or claim submitted hereunder. In the event that we cannot pay your loss because we are insolvent or are otherwise unable to perform our duties under our reinsurance agreement with FCIC, your claim will be settled in accordance with the provisions of this policy and FCIC will be responsible for any amounts owed. No state guarantee fund will be liable for your loss.

Throughout this policy, "you" and "your" refer to the named insured shown on the accepted application and "we", "us," and "our" refer to the insurance company providing insurance. Unless the context indicates otherwise, use of the plural form of a word includes the singular and use of the singular form of the word includes the plural.

AGREEMENT TO INSURE: In return for the payment of the premium, and subject to all of the provisions of this policy, we agree with you to provide the insurance as stated in this policy. If there is a conflict between the Act, the regulations published at 7 CFR chapter IV, and the procedures as issued by FCIC, the order of priority is: (1) the Act; (2) the regulations; and (3) the procedures as issued by FCIC, with (1) controlling (2), etc. If there is a conflict between the policy provisions published at 7 CFR part 457 and the administrative regulations published at 7 CFR part 400, the policy provisions published at 7 CFR part 457 control. If a conflict exists among the policy, the order of priority is: (1) the Catastrophic Risk Protection Endorsement, as applicable; (2) the Special Provisions; (3) the actuarial documents; (4) the Commodity Exchange Price Provisions, as applicable; (5) the Crop Provisions; and (6) these Basic Provisions, with (1) controlling (2), etc.

## TERMS AND CONDITIONS
### BASIC PROVISIONS

**1. Definitions.**

**Abandon** - Failure to continue to care for the crop, providing care so insignificant as to provide no benefit to the crop, or failure to harvest in a timely manner, unless an insured cause of loss prevents you from properly caring for or harvesting the crop or causes damage to it to the extent that most producers of the crop on acreage with similar characteristics in the area would not normally further care for or harvest it.

**Acreage report** - A report required by section 6 of these Basic Provisions that contains, in addition to other required information, your report of your share of all acreage of an insured crop in the county, whether insurable or not insurable.

**Acreage reporting date** - The date contained in the Special Provisions or as provided in section 6 by which you are required to submit your acreage report.

**Act** - The Federal Crop Insurance Act (7 U.S.C. 1501 et seq.).

**Actual Production History (APH)** - A process used to determine production guarantees in accordance with 7 CFR part 400, subpart G.

**Actual yield** - The yield per acre for a crop year calculated from the production records or claims for indemnities. The actual yield is determined by dividing total production (which includes harvested and appraised production) by planted acres.

**Actuarial documents** - The information for the crop year which is available for public inspection in your agent's office and published on RMA's website and which shows available crop insurance policies, coverage levels, information needed to determine amounts of insurance,

prices, premium rates, premium adjustment percentages, practices, particular types or varieties of the insurable crop, insurable acreage, and other related information regarding crop insurance in the county.

**Additional coverage** - A level of coverage greater than catastrophic risk protection.

**Administrative fee** - An amount you must pay for catastrophic risk protection, and additional coverage for each crop year as specified in section 7 and the Catastrophic Risk Protection Endorsement.

**Agricultural commodity** - Any crop or other commodity produced, regardless of whether or not it is insurable.

**Agricultural experts** - Persons who are employed by the Cooperative Extension System or the agricultural departments of universities, or other persons approved by FCIC, whose research or occupation is related to the specific crop or practice for which such expertise is sought.

**Annual crop** - An agricultural commodity that normally must be planted each year.

**Application** - The form required to be completed by you and accepted by us before insurance coverage will commence. This form must be completed and filed in your agent's office not later than the sales closing date of the initial insurance year for each crop for which insurance coverage is requested. If cancellation or termination of insurance coverage occurs for any reason, including but not limited to indebtedness, suspension, debarment, disqualification, cancellation by you or us or violation of the controlled substance provisions of the Food Security Act of 1985, a new application must be filed for the crop. Insurance coverage will not be provided if you are

ineligible under the contract or under any Federal statute or regulation.

**Approved yield** - The actual production history (APH) yield, calculated and approved by the verifier, used to determine the production guarantee by summing the yearly actual, assigned, adjusted or unadjusted transitional yields and dividing the sum by the number of yields contained in the database, which will always contain at least four yields.  The database may contain up to 10 consecutive crop years of actual or assigned yields.  The approved yield may have yield exclusions elected under section 5, yield adjustments elected under section 36, revisions according to section 3, or other limitations according to FCIC approved procedures applied when calculating the approved yield.

**Area** - Land surrounding the insured acreage with geographic characteristics, topography, soil types and climatic conditions similar to the insured acreage.

**Assignment of indemnity** - A transfer of policy rights, made on our form, and effective when approved by us in writing, whereby you assign your right to an indemnity payment for the crop year only to creditors or other persons to whom you have a financial debt or other pecuniary obligation.

**Average yield** - The yield calculated by totaling the yearly actual yields, assigned yields in accordance with sections 3(f)(1) (failure to provide production report), 3(h)(1) (excessive yields), and 3(i) (second crop planted without double cropping history on prevented planted acreage), and adjusted or unadjusted transitional yields, and dividing the total by the number of yields contained in the database.

**Basic unit** - All insurable acreage of the insured crop in the county on the date coverage begins for the crop year:
(1)   In which you have 100 percent crop share; or
(2)   Which is owned by one person and operated by another person on a share basis.  (Example: If, in addition to the land you own, you rent land from five landlords, three on a crop share basis and two on a cash basis, you would be entitled to four units; one for each crop share lease and one that combines the two cash leases and the land you own.)  Land which would otherwise be one unit may, in certain instances, be divided according to guidelines contained in section 34 of these Basic Provisions and in the applicable Crop Provisions.

**Beginning farmer or rancher** – An individual who has not actively operated and managed a farm or ranch in any state, with an insurable interest in a crop or livestock as an owner-operator, landlord, tenant, or sharecropper for more than five crop years, as determined in accordance with FCIC procedures.  Any crop year's insurable interest may, at your election, be excluded if earned while under the age of 18, while in full-time military service of the United States, or while in post-secondary education, in accordance with FCIC procedures.  A person other than an individual may be eligible for beginning farmer or rancher benefits if there is at least one individual substantial beneficial interest holder and all individual substantial beneficial interest holders qualify as a beginning farmer or rancher.

**Buffer zone** - A parcel of land, as designated in your organic plan, that separates agricultural commodities grown under organic practices from agricultural commodities grown under non-organic practices, and used to minimize the possibility of unintended contact by prohibited substances or organisms.

**Cancellation date** - The calendar date specified in the Crop Provisions on which coverage for the crop will automatically renew unless canceled in writing by either you or us or terminated in accordance with the policy terms.

**Catastrophic risk protection** - The minimum level of coverage offered by FCIC.  Catastrophic risk protection is not available with revenue protection.

**Catastrophic Risk Protection Endorsement** - The part of the crop insurance policy that contains provisions of insurance that are specific to catastrophic risk protection.

**Certified organic acreage** - Acreage in the certified organic farming operation that has been certified by a certifying agent as conforming to organic standards in accordance with 7 CFR part 205.

**Certifying agent** - A private or governmental entity accredited by the USDA Secretary of Agriculture for the purpose of certifying a production, processing or handling operation as organic.

**Claim for indemnity** - A claim made on our form that contains the information necessary to pay the indemnity, as specified in the applicable FCIC issued procedures, and complies with the requirements in section 14.

**Code of Federal Regulations (CFR)** - The codification of general and permanent rules published in the <u>Federal Register</u> by the Executive departments and agencies of the Federal Government.  Rules published in the <u>Federal Register</u> by FCIC are contained in 7 CFR chapter IV.  The full text of the CFR is available in electronic format at <u>http://www.access.gpo.gov/</u> or a successor website.

**Commodity Exchange Price Provisions (CEPP)** – A part of the policy that is used for all crops for which revenue protection is available, regardless of whether you elect revenue protection or yield protection for such crops.  This document includes the information necessary to derive the projected price and the harvest price for the insured crop, as applicable.

**Consent** - Approval in writing by us allowing you to take a specific action.

**Contract** - (See "policy").

**Contract change date** - The calendar date by which changes to the policy, if any, will be made available in accordance with section 4 of these Basic Provisions.

**Conventional farming practice** - A system or process that is necessary to produce an agricultural commodity, excluding organic farming practices.

**Cooperative Extension System** – A nationwide network consisting of a State office located at each State's land-grant university, and local or regional offices.  These offices are staffed by one or more agricultural experts, who work in cooperation with the National Institute of Food and Agriculture, and who provide information to agricultural producers and others.

**County** - Any county, parish, or other political subdivision of a state shown on your accepted application, including

acreage in a field that extends into an adjoining county if the county boundary is not readily discernible.

**Cover crop** - A crop generally recognized by agricultural experts as agronomically sound for the area for erosion control or other purposes related to conservation or soil improvement. A cover crop may be considered to be a second crop (see the definition of "second crop").

**Coverage** - The insurance provided by this policy, against insured loss of production or value, by unit as shown on your summary of coverage.

**Coverage begins, date** - The calendar date insurance begins on the insured crop, as contained in the Crop Provisions, or the date planting begins on the unit (see section 11 of these Basic Provisions for specific provisions relating to prevented planting).

**Crop Provisions** - The part of the policy that contains the specific provisions of insurance for each insured crop.

**Crop year** - The period within which the insured crop is normally grown, regardless of whether or not it is actually grown, and designated by the calendar year in which the insured crop is normally harvested, unless otherwise specified in the Crop Provisions.

**Damage** - Injury, deterioration, or loss of production of the insured crop due to insured or uninsured causes.

**Days** - Calendar days.

**Deductible** - The amount determined by subtracting the coverage level percentage you choose from 100 percent. For example, if you elected a 65 percent coverage level, your deductible would be 35 percent (100% - 65% = 35%).

**Delinquent debt** - Has the same meaning as the term defined in 7 CFR part 400, subpart U.

**Disinterested third party** - A person that does not have any familial relationship (parents, brothers, sisters, children, spouse, grandchildren, aunts, uncles, nieces, nephews, first cousins, or grandparents, related by blood, adoption or marriage, are considered to have a familial relationship) with you or who will not benefit financially from the sale of the insured crop. Persons who are authorized to conduct quality analysis in accordance with the Crop Provisions are considered disinterested third parties unless there is a familial relationship.

**Double crop** - Producing two or more crops for harvest on the same acreage in the same crop year.

**Earliest planting date** - The initial planting date contained in the Special Provisions, which is the earliest date you may plant an insured agricultural commodity and qualify for a replanting payment if such payments are authorized by the Crop Provisions.

**End of insurance period, date of** - The date upon which your crop insurance coverage ceases for the crop year (see Crop Provisions and section 11).

**Enterprise unit** - All insurable acreage of the same insured crop or all insurable irrigated or non-irrigated acreage of the same insured crop in the county in which you have a share on the date coverage begins for the crop year, provided the requirements of section 34 are met.

**Field** - All acreage of tillable land within a natural or artificial boundary (*e.g.*, roads, waterways, fences, etc.). Different planting patterns or planting different crops do not create separate fields.

**Final planting date** - The date contained in the Special Provisions for the insured crop by which the crop must

initially be planted in order to be insured for the full production guarantee or amount of insurance per acre.

**First insured crop** - With respect to a single crop year and any specific crop acreage, the first instance that an agricultural commodity is planted for harvest or prevented from being planted and is insured under the authority of the Act. For example, if winter wheat that is not insured is planted on acreage that is later planted to soybeans that are insured, the first insured crop would be soybeans. If the winter wheat was insured, it would be the first insured crop.

**FSA** - The Farm Service Agency, an agency of the USDA, or a successor agency.

**FSA farm number** - The number assigned to the farm by the local FSA office.

**Generally recognized** - When agricultural experts or organic agricultural experts, as applicable, are aware of the production method or practice and there is no genuine dispute regarding whether the production method or practice allows the crop to make normal progress toward maturity and produce at least the yield used to determine the production guarantee or amount of insurance.

**Good farming practices** - The production methods utilized to produce the insured crop and allow it to make normal progress toward maturity and produce at least the yield used to determine the production guarantee or amount of insurance, including any adjustments for late planted acreage, which are those generally recognized by agricultural experts or organic agricultural experts, depending on the practice, for the area. We may, or you may request us to, contact FCIC to determine if production methods will be considered "good farming practices."

**Harvest price** - A price determined in accordance with the Commodity Exchange Price Provisions and used to value production to count for revenue protection.

**Harvest price exclusion** - Revenue protection with the use of the harvest price excluded when determining your revenue protection guarantee. This election is continuous unless canceled by the cancellation date.

**Household** - A domestic establishment including the members of a family (parents, brothers, sisters, children, spouse, grandchildren, aunts, uncles, nieces, nephews, first cousins, or grandparents, related by blood, adoption or marriage, are considered to be family members) and others who live under the same roof.

**Insurable interest** - Your percentage of the insured crop that is at financial risk.

**Insurable loss** - Damage for which coverage is provided under the terms of your policy, and for which you accept an indemnity payment.

**Insured** - The named person as shown on the application accepted by us. This term does not extend to any other person having a share or interest in the crop (for example, a partnership, landlord, or any other person) unless specifically indicated on the accepted application.

**Insured crop** - The crop in the county for which coverage is available under your policy as shown on the application accepted by us.

**Intended acreage report** - A report of the acreage you intend to plant, by crop, for the current crop year and used solely for the purpose of establishing eligible prevented planting acreage, as required in section 17.

**Interplanted** - Acreage on which two or more crops are planted in a manner that does not permit separate agronomic maintenance or harvest of the insured crop.

**Irrigated practice** - A method of producing a crop by which water is artificially applied during the growing season by appropriate systems and at the proper times, with the intention of providing the quantity of water needed to produce at least the yield used to establish the irrigated production guarantee or amount of insurance on the irrigated acreage planted to the insured crop.

**Late planted** - Acreage initially planted to the insured crop after the final planting date.

**Late planting period** - The period that begins the day after the final planting date for the insured crop and ends 25 days after the final planting date, unless otherwise specified in the Crop Provisions or Special Provisions.

**Liability** - Your total amount of insurance, value of your production guarantee, or revenue protection guarantee for the unit determined in accordance with the Settlement of Claim provisions of the applicable Crop Provisions.

**Limited resource farmer** - Has the same meaning as the term defined by USDA at http://lrftool.sc.egov.usda.gov/LRP_Definition.aspx or successor website.

**Native sod** - Acreage that has no record of being tilled (determined in accordance with information collected and maintained by an agency of the USDA or other verifiable records that you provide and are acceptable to us) for the production of an annual crop on or before February 7, 2014, and on which the plant cover is composed principally of native grasses, grass-like plants, forbs, or shrubs suitable for grazing and browsing.

**Negligence** - The failure to use such care as a reasonably prudent and careful person would use under similar circumstances.

**Non-contiguous** - Acreage of an insured crop that is separated from other acreage of the same insured crop by land that is neither owned by you nor rented by you for cash or a crop share. However, acreage separated by only a public or private right-of-way, waterway, or an irrigation canal will be considered as contiguous.

**Offset** - The act of deducting one amount from another amount.

**Organic agricultural experts** - Persons who are employed by the following organizations: Appropriate Technology Transfer for Rural Areas, Sustainable Agriculture Research and Education or the Cooperative Extension System, the agricultural departments of universities, or other persons approved by FCIC, whose research or occupation is related to the specific organic crop or practice for which such expertise is sought.

**Organic crop -** An agricultural commodity that is organically produced consistent with section 2103 of the Organic Foods Production Act of 1990 (7 U.S.C. 6502).

**Organic farming practice** - A system of plant production practices used to produce an organic crop that is approved by a certifying agent in accordance with 7 CFR part 205.

**Organic plan** - A written plan, in accordance with the National Organic Program published in 7 CFR part 205, that describes the organic farming practices that you and a certifying agent agree upon annually or at such other times as prescribed by the certifying agent.

**Organic standards** - Standards in accordance with the Organic Foods Production Act of 1990 (7 U.S.C. 6501 et seq.) and 7 CFR part 205.

**Perennial crop** - A plant, bush, tree or vine crop that has a life span of more than one year.

**Person** - An individual, partnership, association, corporation, estate, trust, or other legal entity, and wherever applicable, a State or a political subdivision or agency of a State. "Person" does not include the United States Government or any agency thereof.

**Planted acreage** - Land in which seed, plants, or trees have been placed, appropriate for the insured crop and planting method, at the correct depth, into a seedbed that has been properly prepared for the planting method and production practice.

**Policy** - The agreement between you and us to insure an agricultural commodity and consisting of the accepted application, these Basic Provisions, the Crop Provisions, the Special Provisions, the Commodity Exchange Price Provisions, if applicable, other applicable endorsements or options, the actuarial documents for the insured agricultural commodity, the Catastrophic Risk Protection Endorsement, if applicable, and the applicable regulations published in 7 CFR chapter IV. Insurance for each agricultural commodity in each county will constitute a separate policy.

**Practical to replant** - Our determination, after loss or damage to the insured crop, that you are able to replant to the same crop in such areas and under such circumstances as it is customary to replant and that replanting the insured crop will allow the crop to attain maturity prior to the calendar date for the end of the insurance period. We may consider circumstances as to whether: (1) it is physically possible to replant the acreage; (2) seed germination, emergence, and formation of a healthy plant is likely; (3) field, soil, and growing conditions allow for proper planting and growth of the replanted crop to reach maturity; or (4) other conditions exist, as provided by the Crop Provisions or Special Provisions. Unless we determine it is not practical to replant, based on the circumstances listed above, it will be considered practical to replant through: (1) the final planting date if no late planting period is applicable; (2) the end of the late planting period if the late planting period is less than 10 days; or (3) the 10th day after the final planting date if the crop has a late planting period of 10 days or more. We will consider it practical to replant regardless of the availability of seed or plants, or the input costs necessary to produce the insured crop such as seed or plants, irrigation water, etc.

**Premium billing date** - The earliest date upon which you will be billed for insurance coverage based on your acreage report. The premium billing date is contained in the Special Provisions.

**Prevented planting** - Failure to plant the insured crop by the final planting date designated in the Special Provisions for the insured crop in the county, or within any applicable late planting period, due to an insured cause of loss that is general to the surrounding area and that prevents other producers from planting acreage with similar

(4 of 42)

characteristics. Failure to plant because of uninsured causes such as lack of proper equipment or labor to plant acreage, or use of a particular production method, is not considered prevented planting.

**Price election** - The amount contained in the actuarial documents that is the value per pound, bushel, ton, carton, or other applicable unit of measure for the purposes of determining premium and indemnity under the policy. A price election is not applicable for crops for which revenue protection is available.

**Production guarantee (per acre)** - The number of pounds, bushels, tons, cartons, or other applicable units of measure determined by multiplying the approved yield per acre by the coverage level percentage you elect.

**Production report** - A written record showing your annual production and used by us to determine your yield for insurance purposes in accordance with section 3. The report contains yield information for previous years, including planted acreage and production. This report must be supported by written verifiable records from a warehouseman or buyer of the insured crop, by measurement of farm-stored production, or by other records of production approved by us on an individual case basis in accordance with FCIC approved procedures.

**Prohibited substance** - Any biological, chemical, or other agent that is prohibited from use or is not included in the organic standards for use on any certified organic, transitional or buffer zone acreage. Lists of such substances are contained at 7 CFR part 205.

**Projected price** - The price for each crop determined in accordance with the Commodity Exchange Price Provisions. The applicable projected price is used for each crop for which revenue protection is available, regardless of whether you elect to obtain revenue protection or yield protection for such crop.

**Replanted crop** –
(1) The same agricultural commodity replanted on the same acreage as the insured crop for harvest in the same crop year if:
 (i) The replanting is specifically made optional by the policy and you elect to replant the crop and insure it under the policy covering the first insured crop; or
 (ii) Replanting is required by the policy.
(2) Unless otherwise specified in the Special Provisions, the crop will be considered an insured replanted crop and no replanting payment will be paid if we have determined it is not practical to replant the insured crop and you choose to plant the acreage to the same insured crop within or prior to the late planting period or after the final planting date if no late planting period is applicable. If we determine it is not practical to replant and you plant the acreage to the same insured crop, any indemnity will be based on the greater of:
 (i) Our appraised production on the initially planted crop;
 (ii) Our subsequent appraisal of the replanted crop if the replanted crop is not harvested; or
 (iii) The harvested production from the replanted crop.

**Replanting** - Performing the cultural practices necessary to prepare the land to replace the seed or plants of the damaged or destroyed insured crop and then replacing the seed or plants of the same crop in the same insured acreage. The same crop does not necessarily mean the same type or variety of the crop unless different types or varieties constitute separate crops or it is otherwise specified in the policy.

**Representative sample** - Portions of the insured crop that must remain in the field for examination and review by our loss adjuster when making a crop appraisal, as specified in the Crop Provisions. In certain instances we may allow you to harvest the crop and require only that samples of the crop residue be left in the field.

**Revenue protection** - A plan of insurance that provides protection against loss of revenue due to a production loss, price decline or increase, or a combination of both. If the harvest price exclusion is elected, the insurance coverage provides protection only against loss of revenue due to a production loss, price decline, or a combination of both.

**Revenue protection guarantee (per acre)** - For revenue protection only, the amount determined by multiplying the production guarantee (per acre) by the greater of your projected price or your harvest price. If the harvest price exclusion is elected, the production guarantee (per acre) is only multiplied by your projected price.

**RMA's website** - A website hosted by RMA and located at http://www.rma.usda.gov/ or a successor website.

**Sales closing date** - A date contained in the Special Provisions by which an application must be filed. The last date by which you may change your crop insurance coverage for a crop year.

**Second crop** - With respect to a single crop year, the next occurrence of planting any agricultural commodity for harvest following a first insured crop on the same acreage. The second crop may be the same or a different agricultural commodity as the first insured crop, except the term does not include a replanted crop. A cover crop, planted after a first insured crop and planted for the purpose of haying, grazing or otherwise harvesting in any manner or that is hayed or grazed during the crop year, or that is otherwise harvested is considered to be a second crop. A cover crop that is covered by FSA's noninsured crop disaster assistance program (NAP) or receives other USDA benefits associated with forage crops will be considered as planted for the purpose of haying, grazing or otherwise harvesting. A crop meeting the conditions stated herein will be considered to be a second crop regardless of whether or not it is insured. Notwithstanding the references to haying and grazing as harvesting in these Basic Provisions, for the purpose of determining the end of the insurance period, harvest of the crop will be as defined in the applicable Crop Provisions.

**Section** - For the purposes of unit structure, a unit of measure under a rectangular survey system describing a tract of land usually one mile square and usually containing approximately 640 acres.

**Share** - Your insurable interest in the insured crop as an owner, operator, or tenant at the time insurance attaches. However, only for the purpose of determining the amount

(5 of 42)

of indemnity, your share will not exceed your share at the earlier of the time of loss or the beginning of harvest.

**Special Provisions** - The part of the policy that contains specific provisions of insurance for each insured crop that may vary by geographic area.

**State** - The state shown on your accepted application.

**Substantial beneficial interest** - An interest held by any person of at least 10 percent in you (*e.g.*, there are two partnerships that each have a 50 percent interest in you and each partnership is made up of two individuals, each with a 50 percent share in the partnership. In this case, each individual would be considered to have a 25 percent interest in you, and both the partnerships and the individuals would have a substantial beneficial interest in you. The spouses of the individuals would not be considered to have a substantial beneficial interest unless the spouse was one of the individuals that made up the partnership. However, if each partnership is made up of six individuals with equal interests, then each would only have an 8.33 percent interest in you and although the partnership would still have a substantial beneficial interest in you, the individuals would not for the purposes of reporting in section 2). The spouse of any individual applicant or individual insured will be presumed to have a substantial beneficial interest in the applicant or insured unless the spouses can prove they are legally separated or otherwise legally separate under the applicable State dissolution of marriage laws. Any child of an individual applicant or individual insured will not be considered to have a substantial beneficial interest in the applicant or insured unless the child has a separate legal interest in such person.

**Summary of coverage** - Our statement to you, based upon your acreage report, specifying the insured crop and the guarantee or amount of insurance coverage provided by unit.

**Sustainable farming practice** - A system or process for producing an agricultural commodity, excluding organic farming practices, that is necessary to produce the crop and is generally recognized by agricultural experts for the area to conserve or enhance natural resources and the environment.

**Tenant** - A person who rents land from another person for a share of the crop or a share of the proceeds of the crop (see the definition of "share" above).

**Termination date** - The calendar date contained in the Crop Provisions upon which your insurance ceases to be in effect because of nonpayment of any amount due us under the policy, including premium.

**Tilled** - The termination of existing plants by plowing, disking, burning, application of chemicals, or by other means to prepare acreage for the production of an annual crop.

**Timely planted** - Planted on or before the final planting date designated in the Special Provisions for the insured crop in the county.

**Transitional acreage** - Acreage on which organic farming practices are being followed that does not yet qualify to be designated as organic acreage.

**USDA** - United States Department of Agriculture.

**Verifiable records** - Has the same meaning as the term defined in 7 CFR part 400, subpart G.

**Void** - When the policy is considered not to have existed for a crop year.

**Whole-farm unit** - All insurable acreage of all the insured crops planted in the county in which you have a share on the date coverage begins for each crop for the crop year and for which the whole-farm unit structure is available in accordance with section 34.

**Written agreement** - A document that alters designated terms of a policy as authorized under these Basic Provisions, the Crop Provisions, or the Special Provisions for the insured crop (see section 18).

**Yield protection** - A plan of insurance that only provides protection against a production loss and is available only for crops for which revenue protection is available.

**Yield protection guarantee (per acre)** - When yield protection is selected for a crop that has revenue protection available, the amount determined by multiplying the production guarantee by your projected price.

2.  **Life of Policy, Cancellation, and Termination.**

(a) This is a continuous policy and will remain in effect for each crop year following the acceptance of the original application until canceled by you in accordance with the terms of the policy or terminated by operation of the terms of the policy or by us. In accordance with section 4, FCIC may change the coverage provided from year to year.

(b) With respect to your application for insurance:

(1) You must include your social security number (SSN) if you are an individual (if you are an individual applicant operating as a business, you may provide an employer identification number (EIN) but you must also provide your SSN); or

(2) You must include your EIN if you are a person other than an individual;

(3) In addition to the requirements of section 2(b)(1) or (2), you must include the following for all persons who have a substantial beneficial interest in you:

(i) The SSN for individuals; or

(ii) The EIN for persons other than individuals and the SSNs for all individuals that comprise the person with the EIN if such individuals also have a substantial beneficial interest in you;

(4) You must include:

(i) Your election of revenue protection, yield protection, or other available plan of insurance; coverage level; percentage of price election or percentage of projected price, as applicable; crop, type, variety, or class; and any other material information required on the application to insure the crop; and

(ii) All the information required in section 2(b)(4)(i) or your application will not be accepted and no coverage will be provided;

(5) Your application will not be accepted and no insurance will be provided for the year of application if the application does not contain your SSN or EIN. If your application contains an incorrect SSN or EIN for you, your application will be considered not to have been accepted, no

(6 of 42)

insurance will be provided for the year of application and for any subsequent crop years, as applicable, and such policies will be void if:

(i)    Such number is not corrected by you; or

(ii)   You correct the SSN or EIN:

    (A)  You cannot prove that any error was inadvertent (Simply stating the error was inadvertent is not sufficient to prove the error was inadvertent); or

    (B)  It is determined that the incorrect number would have allowed you to obtain disproportionate benefits under the crop insurance program, you are determined to be ineligible for insurance or you could avoid an obligation or requirement under any State or Federal law;

(6) With respect to persons with a substantial beneficial interest in you:

(i)    The insurance coverage for all crops included on your application will be reduced proportionately by the percentage interest in you of persons with a substantial beneficial interest in you (presumed to be 50 percent for spouses of individuals) if the SSNs or EINs of such persons are included on your application, the SSNs or EINs are correct, and the persons with a substantial beneficial interest in you are ineligible for insurance;

(ii)   Your policies for all crops included on your application, and for all applicable crop years, will be void if the SSN or EIN of any person with a substantial beneficial interest in you is incorrect or is not included on your application and:

    (A)  Such number is not corrected or provided by you, as applicable;

    (B)  You cannot prove that any error or omission was inadvertent (Simply stating the error or omission was inadvertent is not sufficient to prove the error or omission was inadvertent); or

    (C)  Even after the correct SSN or EIN is provided by you, it is determined that the incorrect or omitted SSN or EIN would have allowed you to obtain disproportionate benefits under the crop insurance program, the person with a substantial beneficial interest in you is determined to be ineligible for insurance, or you or the person with a substantial beneficial interest in you could avoid an obligation or requirement under any State or Federal law; or

(iii)  Except as provided in sections 2(b)(6)(ii)(B) and (C), your policies will not be voided if you subsequently provide the correct SSN or EIN for persons with a substantial beneficial interest in you and the persons are eligible for insurance;

(7) When any of your policies are void under sections 2(b)(5) or (6):

(i)    You must repay any indemnity, prevented planting payment or replanting payment that may have been paid for all applicable crops and crop years;

(ii)   Even though the policies are void, you will still be required to pay an amount equal to 20 percent of the premium that you would otherwise be required to pay; and

(iii)  If you previously paid premium or administrative fees, any amount in excess of the amount required in section 2(b)(7)(ii) will be returned to you;

(8) Notwithstanding any of the provisions in this section, if you certify to an incorrect SSN or EIN, or receive an indemnity, prevented planting payment or replanting payment and the SSN or EIN was not correct, you may be subject to civil, criminal or administrative sanctions;

(9) If any of the information regarding persons with a substantial beneficial interest in you changes after the sales closing date for the previous crop year, you must revise your application by the sales closing date for the current crop year to reflect the correct information.  However, if such information changed less than 30 days before the sales closing date for the current crop year, you must revise your application by the sales closing date for the next crop year.  If you fail to provide the required revisions, the provisions in section 2(b)(6) will apply; and

(10) If you are, or a person with a substantial beneficial interest in you is, not eligible to obtain a SSN or EIN, whichever is required, you must request an assigned number for the purposes of this policy from us:

(i)    A number will be provided only if you can demonstrate you are, or a person with a substantial beneficial interest in you is, eligible to receive Federal benefits;

(ii)   If a number cannot be provided for you in accordance with section 2(b)(10)(i), your application will not be accepted; or

(iii)  If a number cannot be provided for any person with a substantial beneficial interest in you in accordance with section 2(b)(10)(i), the amount of coverage for all crops on the application will be reduced proportionately by the percentage interest of such person in you.

(c) After acceptance of the application, you may not cancel this policy for the initial crop year.  Thereafter, the policy will continue in force for each succeeding crop year unless canceled or terminated as provided below.

(d) Either you or we may cancel this policy after the initial crop year by providing written notice to the other on or before the cancellation date shown in the Crop Provisions.

(e) Any amount due to us for any policy authorized under the Act will be offset from any indemnity or prevented

planting payment due you for this or any other crop insured with us under the authority of the Act.

(1) Even if your claim has not yet been paid, you must still pay the premium and administrative fee on or before the termination date for you to remain eligible for insurance.

(2) If you and we agree, your premium and administrative fees can be offset from any indemnity or prevented planting payment due you even if it is prior to the billing date of the premium and administrative fees.

(3) If we offset any amount due us from an indemnity or prevented planting payment owed to you, the date of payment for the purpose of determining whether you have a delinquent debt will be the date that you submit the claim for indemnity in accordance with section 14(e) (Your Duties).

(f) A delinquent debt for any policy will make you ineligible to obtain crop insurance authorized under the Act for any subsequent crop year and result in termination of all policies in accordance with section 2(f)(2).

(1) With respect to ineligibility:

(i) Ineligibility for crop insurance will be effective on:

(A) The date that a policy was terminated in accordance with section 2(f)(2) for the crop for which you failed to pay premium, an administrative fee, or any related interest owed, as applicable;

(B) The payment due date contained in any notification of indebtedness for any overpaid indemnity, prevented planting payment or replanting payment, if you fail to pay the amount owed, including any related interest owed, as applicable, by such due date; or

(C) The termination date for the crop year prior to the crop year in which a scheduled payment is due under a written payment agreement if you fail to pay the amount owed by any payment date in any agreement to pay the debt.

(ii) If you are ineligible and a policy has been terminated in accordance with section 2(f)(2), you will not receive any indemnity, prevented planting payment or replanting payment, if applicable, and such ineligibility and termination of the policy may affect your eligibility for benefits under other USDA programs. Any indemnity, prevented planting payment or replanting payment that may be owed for the policy before it has been terminated will remain owed to you, but may be offset in accordance with section 2(e), unless your policy was terminated in accordance with sections 2(f)(2)(i)(A), (B), or (D).

(2) With respect to termination:

(i) Termination will be effective on:

(A) For a policy with unpaid administrative fees or premiums, the termination date

immediately subsequent to the billing date for the crop year (For policies for which the sales closing date is prior to the termination date, such policies will terminate for the current crop year even if insurance attached prior to the termination date. Such termination will be considered effective as of the sales closing date and no insurance will be considered to have attached for the crop year and no indemnity, prevented planting or replanting payment will be owed);

(B) For a policy with other amounts due, the termination date immediately following the date you have a delinquent debt (For policies for which the sales closing date is prior to the termination date, such policies will terminate for the current crop year even if insurance attached prior to the termination date. Such termination will be considered effective as of the sales closing date and no insurance will be considered to have attached for the crop year and no indemnity, prevented planting or replanting payment will be owed);

(C) For all other policies that are issued by us under the authority of the Act, the termination date that coincides with the termination date for the policy with the delinquent debt or, if there is no coincidental termination date, the termination date immediately following the date you become ineligible; or

(D) For execution of a written payment agreement and failure to make any scheduled payment, the termination date for the crop year prior to the crop year in which you failed to make the scheduled payment (for this purpose only, the crop year will start the day after the termination date and end on the next termination date, *e.g.*, if the termination date is November 30 and you fail to make a payment on November 15, 2019, your policy will terminate on November 30, 2018, for the 2019 crop year).

(ii) For all policies terminated under sections 2(f)(2)(i)(A), (B), or (D), any indemnities, prevented planting payments or replanting payments paid subsequent to the termination date must be repaid.

(iii) Once the policy is terminated, it cannot be reinstated for the current crop year unless:

(A) The termination was in error;

(B) The Administrator of the Risk Management Agency, at his or her sole discretion, determines that the following are met:

(*1*)  In accordance with 7 CFR part 400, subpart U, and FCIC issued procedures, you provide documentation that your failure to pay your debt is due to an unforeseen or unavoidable event or an extraordinary weather event that created an impossible situation for you to make timely payment;

(*2*)  You remit full payment of the delinquent debt owed to us or FCIC with your request submitted in accordance with section 2(f)(2)(iii)(B)(*3*); and

(*3*)  You submit a written request for reinstatement of your policy to us no later than 60 days after the termination date or the missed payment date of a previously executed written payment agreement, or in the case of overpaid indemnity or any amount that became due after the termination date, the due date specified in the notice to you of the amount due, if applicable.

  (*i*)  If authorization for reinstatement, as defined in 7 CFR part 400, subpart U, is granted, your policies will be reinstated effective at the beginning of the crop year for which you were determined ineligible, and you will be entitled to all applicable benefits under such policies, provided you meet all eligibility requirements and comply with the terms of the policy; and

  (*ii*)  There is no evidence of fraud or misrepresentation; or

(C)  We determine that, in accordance with 7 CFR part 400, subpart U, and FCIC issued procedures, the following are met:

  (*1*)  You can demonstrate:

   (*i*)  You made timely payment for the amount of premium owed but you inadvertently omitted some small amount, such as the most recent month's interest or a small administrative fee;

   (*ii*)  The amount of the payment was clearly transposed from the amount that was otherwise due (For example, you owed $892 but you paid $829); or

   (*iii*)  You timely made the full payment of the amount owed

but the delivery of that payment was delayed, and was postmarked no more than seven calendar days after the termination date or the missed payment date of a previously executed written payment agreement, or in the case of overpaid indemnity or any amount that became due after the termination date, the due date specified in a notice to you of an amount due, as applicable.

  (*2*)  You remit full payment of the delinquent debt owed to us; and

  (*3*)  You submit a written request for reinstatement of your policy to us in accordance with 7 CFR part 400, subpart U, and applicable procedures no later than 30 days after the termination date or the missed payment date of a previously executed written payment agreement, or in the case of overpaid indemnity or any amount that became due after the termination date, the due date specified in the notice to you of the amount due, if applicable; and

  (*4*)  If authorization for reinstatement, as defined in 7 CFR part 400, subpart U, is granted, your policies will be reinstated effective at the beginning of the crop year for which you were determined ineligible, and you will be entitled to all applicable benefits under such policies, provided you meet all eligibility requirements and comply with the terms of the policy; and

  (*5*)  There is no evidence of fraud or misrepresentation.

  (iv)  A determination made under:

   (A)  Section 2(f)(2)(iii)(B) may only be appealed to the National Appeals Division in accordance with 7 CFR part 11; and

   (B)  Section 2(f)(2)(iii)(C) may only be appealed in accordance with section 20.

(3)  To regain eligibility, you must:

  (i)  Repay the delinquent debt in full;

  (ii)  Execute a written payment agreement, in accordance with 7 CFR part 400, subpart U, and make payments in accordance with the agreement; or

  (iii)  Have your debts discharged in bankruptcy.

(4)  After you become eligible for crop insurance, if you want to obtain coverage for your crops, you must submit a new application on or before the sales closing date for the crop (Since applications

for crop insurance cannot be accepted after the sales closing date, if you make any payment after the sales closing date, you cannot apply for insurance until the next crop year).

(5) For example, for the 2019 crop year, if crop A, with a termination date of October 31, 2018, and crop B, with a termination date of March 15, 2019, are insured and you do not pay the premium for crop A by the termination date, you are ineligible for crop insurance as of October 31, 2018, and crop A's policy is terminated as of that date. Crop B's policy does not terminate until March 15, 2019, and an indemnity for the 2018 crop year may still be owed. If you enter into a written payment agreement on September 25, 2019, the earliest date by which you can obtain crop insurance for crop A is to apply for crop insurance by the October 31, 2019, sales closing date and for crop B is to apply for crop insurance by the March 15, 2020, sales closing date. If you fail to make a payment that was scheduled to be made on April 1, 2020, your policy will terminate as of October 31, 2019, for crop A, and March 15, 2020, for crop B, and no indemnity, prevented planting payment or replanting payment will be due for that crop year for either crop. You will not be eligible to apply for crop insurance for any crop until after the amounts owed are paid in full or you have your debts discharged in bankruptcy.

(6) If you are determined to be ineligible under section 2(f), persons with a substantial beneficial interest in you may also be ineligible until you become eligible again.

(g) In cases where there has been a death, disappearance, judicially declared incompetence, or dissolution of any insured person:

(1) If any married individual insured dies, disappears, or is judicially declared incompetent, the named insured on the policy will automatically convert to the name of the spouse if:

(i) The spouse was included on the policy as having a substantial beneficial interest in the named insured; and

(ii) The spouse has a share of the crop.

(2) The provisions in section 2(g)(3) will be applicable if:

(i) Any partner, member, shareholder, etc., of an insured entity dies, disappears, or is judicially declared incompetent, and such event automatically dissolves the entity; or

(ii) An individual, whose estate is left to a beneficiary other than a spouse or left to the spouse and the criteria in section 2(g)(1) are not met, dies, disappears, or is judicially declared incompetent.

(3) If section 2(g)(2) applies and the death, disappearance, or judicially declared incompetence occurred:

(i) More than 30 days before the cancellation date, the policy is automatically canceled as of the cancellation date and a new application must be submitted; or

(ii) Thirty days or less before the cancellation date, or after the cancellation date, the policy will continue in effect through the crop year immediately following the cancellation date and be automatically canceled as of the cancellation date immediately following the end of the insurance period for the crop year, unless canceled by the cancellation date prior to the start of the insurance period:

(A) A new application for insurance must be submitted prior to the sales closing date for coverage for the subsequent crop year; and

(B) Any indemnity, replanting payment or prevented planting payment will be paid to the person or persons determined to be beneficially entitled to the payment and such person or persons must comply with all policy provisions and pay the premium.

(4) If any insured entity is dissolved for reasons other than death, disappearance, or judicially declared incompetence:

(i) Before the cancellation date, the policy is automatically canceled as of the cancellation date and a new application must be submitted; or

(ii) On or after the cancellation date, the policy will continue in effect through the crop year immediately following the cancellation date and be automatically canceled as of the cancellation date immediately following the end of the insurance period for the crop year, unless canceled by the cancellation date prior to the start of the insurance period:

(A) A new application for insurance must be submitted prior to the sales closing date for coverage for the subsequent crop year; and

(B) Any indemnity, replanting payment or prevented planting payment will be paid to the person or persons determined to be beneficially entitled to the payment and such person or persons must comply with all policy provisions and pay the premium.

(5) If section 2(g)(2) or (4) applies, a remaining member of the insured person or the beneficiary is required to report to us the death, disappearance, judicial incompetence, or other event that causes dissolution not later than the next cancellation date, except if section 2(g)(3)(ii) applies, notice must be provided by the cancellation date for the next crop year. If notice is not provided timely, the provisions of section 2(g)(2) or (4) will apply retroactive to the date such notice should have been provided and any payments made after the date the policy should have been canceled must be returned.

NHF2-526 Policy 000022

(h) We may cancel your policy if no premium is earned for 3 consecutive years.

(i) The cancellation and termination dates are contained in the Crop Provisions.

(j) Any person may sign any document relative to crop insurance coverage on behalf of any other person covered by such a policy, provided that the person has a properly executed power of attorney or such other legally sufficient document authorizing such person to sign.  You are still responsible for the accuracy of all information provided on your behalf and may be subject to the consequences in section 6(g), and any other applicable consequences, if any information has been misreported.

3. **Insurance Guarantees, Coverage Levels, and Prices.**

(a) Unless adjusted or limited in accordance with your policy, the production guarantee or amount of insurance, coverage level, and price at which an indemnity will be determined for each unit will be those used to calculate your summary of coverage for each crop year.

(b) With respect to the insurance choices:

(1) For all acreage of the insured crop in the county, unless one of the conditions in section 3(b)(2) exists, you must select the same:

   (i) Plan of insurance (*e.g.*, yield protection, revenue protection, actual production history, amount of insurance, etc.);

   (ii) Level of coverage (all catastrophic risk protection or the same level of additional coverage); and

   (iii) Percentage of the available price election, or projected price for yield protection.  For revenue protection, the percentage of price is specified in section 3(c)(2).  If different prices are provided by type or variety, insurance will be based on the price provided for each type or variety and the same price percentage will apply to all types or varieties.

(2) You do not have to select the same plan of insurance, level of coverage or percentage of available price election or projected price if:

   (i) The applicable Crop Provisions allow you the option to separately insure individual crop types or varieties.  In this case, each individual type or variety insured by you will be subject to separate administrative fees.  For example, if two grape varieties in California are insured under the Catastrophic Risk Protection Endorsement and two varieties are insured under an additional coverage policy, a separate administrative fee will be charged for each of the four varieties; or

   (ii) You have additional coverage for the crop in the county and the acreage has been designated as "high-risk" by FCIC.  In such case, you will be able to exclude coverage for the high-risk land under the additional coverage policy and insure such acreage under a separate Catastrophic Risk

Protection Endorsement, provided the Catastrophic Risk Protection Endorsement is obtained from the same insurance provider from which the additional coverage was obtained.  If you have revenue protection and exclude high-risk land, the catastrophic risk protection coverage will be yield protection only for the excluded high-risk land.

(iii) You have additional coverage for the crop in the county, and the actuarial documents provide for separate coverage by irrigated and non-irrigated practices for the crop.

   (A) You may select one coverage level for all irrigated acreage and one coverage level for all non-irrigated acreage.  For example: you may choose a 65 percent coverage level for all irrigated acreage (corn irrigated practice) and an 80 percent coverage level for all non-irrigated acreage (corn non-irrigated practice).

   (B) If the Crop Provisions allow the option to separately insure individual crop types or varieties, and the actuarial documents provide for separate coverage, you may select coverage levels by irrigated and non-irrigated practice for each separate type or variety.

(c) With respect to revenue protection, if available for the crop:

(1) You may change to another plan of insurance and change your coverage level or elect the harvest price exclusion by giving written notice to us not later than the sales closing date for the insured crop;

(2) Your projected price and harvest price will be 100 percent of the projected price and harvest price issued by FCIC;

(3) If the harvest price exclusion is:

   (i) Not elected, your projected price is used to initially determine the revenue protection guarantee (per acre), and if the harvest price is greater than the projected price, the revenue protection guarantee (per acre) will be recomputed using your harvest price; or

   (ii) Elected, your projected price is used to compute your revenue protection guarantee (per acre);

(4) Your projected price is used to calculate your premium, any replanting payment, and any prevented planting payment; and

(5) If the projected price or harvest price cannot be calculated for the current crop year under the provisions contained in the Commodity Exchange Price Provisions:

   (i) For the projected price:

     (A) Revenue protection will not be provided and you will automatically be covered under the yield protection plan of insurance for the current crop year

unless you cancel your coverage by the cancellation date or change your plan of insurance by the sales closing date;

(B) Notice will be provided on RMA's website by the date specified in the applicable projected price definition contained in the Commodity Exchange Price Provisions;

(C) The projected price will be determined by FCIC and will be released by the date specified in the applicable projected price definition contained in the Commodity Exchange Price Provisions; and

(D) Your coverage will automatically revert to revenue protection for the next crop year that revenue protection is available unless you cancel your coverage by the cancellation date or change your coverage by the sales closing date; or

(ii) For the harvest price:

(A) Revenue protection will continue to be available; and

(B) The harvest price will be determined and announced by FCIC.

(d) With respect to yield protection, if available for the crop:

(1) You may change to another plan of insurance and change your percentage of price and your coverage level by giving written notice to us not later than the sales closing date for the insured crop;

(2) The percentage of the projected price selected by you multiplied by the projected price issued by FCIC is your projected price that is used to compute the value of your production guarantee (per acre) and the value of the production to count; and

(3) Since the projected price may change each year, if you do not select a new percentage of the projected price on or before the sales closing date, we will assign a percentage which bears the same relationship to the percentage that was in effect for the preceding year (*e.g.*, if you selected 100 percent of the projected price for the previous crop year and you do not select a new percentage for the current crop year, we will assign 100 percent for the current crop year).

(e) With respect to all plans of insurance other than revenue protection and yield protection (*e.g.*, APH, dollar amount plans of insurance, etc.):

(1) In addition to the price election or amount of insurance available on the contract change date, we may provide an additional price election or amount of insurance no later than 15 days prior to the sales closing date.

(i) You must select the additional price election or amount of insurance on or before the sales closing date for the insured crop.

(ii) These additional price elections or amounts of insurance will not be less than those available on the contract change date.

(iii) If you elect the additional price election or amount of insurance, any claim settlement and amount of premium will be based on your additional price election or amount of insurance.

(2) You may change to another plan of insurance or change your coverage level, amount of insurance or percentage of the price election, as applicable, for the following crop year by giving written notice to us not later than the sales closing date for the insured crop.

(3) Your amount of insurance will be the amount of insurance issued by FCIC multiplied by the coverage level percentage you elected. Your price election will be the price election issued by FCIC multiplied by the percentage of price you elected.

(4) Since the amount of insurance or price election may change each year, if you do not select a new amount of insurance or percentage of the price election on or before the sales closing date, we will assign an amount of insurance or percentage of the price election which bears the same relationship to the amount of insurance or percentage of the price election that was in effect for the preceding year (*e.g.*, if you selected 100 percent of the price election for the previous crop year and you do not select a new percentage of the price election for the current crop year, we will assign 100 percent of the price election for the current crop year).

(f) You must report all production of the crop (insured and uninsured) to us for the previous crop year by the earlier of the acreage reporting date or 45 days after the cancellation date, unless otherwise stated in the Special Provisions or as specified in section 18:

(1) If you do not provide the required production report, we will assign a yield for the previous crop year. The yield assigned by us will not be more than 75 percent of the yield used by us to determine your coverage for the previous crop year. The production report or assigned yield will be used to compute your approved yield for the purpose of determining your coverage for the current crop year.

(2) If you have filed a claim for any crop year, the documents signed by you which state the amount of production used to complete the claim for indemnity will be the production report for that year unless otherwise specified by FCIC.

(3) Production and acreage for the prior crop year must be reported for each proposed optional unit by the production reporting date, unless otherwise specified in the Special Provisions. If you do not provide the information stated above, the optional units will be combined into the basic unit.

(4) Appraisals obtained from only a portion of the acreage in a field that remains unharvested after the remainder of the crop within the field has been destroyed or put to another use will not be used to establish your actual yield unless

(12 of 42)

representative samples are required to be left by you in accordance with the Crop Provisions.

(g) It is your responsibility to accurately report all information that is used to determine your approved yield.

   (1) You must certify to the accuracy of this information on your production report.

   (2) If you fail to accurately report any information or if you do not provide any required records, you will be subject to the provisions regarding misreporting contained in section 6(g), unless the information is corrected:

      (i) On or before the production reporting date; or

      (ii) Because the incorrect information was the result of our error or the error of someone from USDA.

   (3) If you do not have written verifiable records to support the information on your production report, you will receive an assigned yield in accordance with section 3(f)(1) and 7 CFR part 400, subpart G for those crop years for which you do not have such records.

   (4) At any time we discover you have misreported any material information used to determine your approved yield or your approved yield is not correct, the following actions will be taken, as applicable:

      (i) We will correct your approved yield for the crop year such information is not correct, and all subsequent crop years;

      (ii) We will correct the unit structure, if necessary;

      (iii) Any overpaid or underpaid indemnity or premium must be repaid; and

      (iv) You will be subject to the provisions regarding misreporting contained in section 6(g)(1), unless the incorrect information was the result of our error or the error of someone from USDA.

(h) In addition to any consequences in section 3(g), at any time the circumstances described below are discovered, your approved yield will be adjusted:

   (1) By including an assigned yield determined in accordance with section 3(f)(1) and 7 CFR part 400, subpart G, if the actual yield reported in the database is excessive for any crop year, as determined by FCIC under its procedures, and you do not provide verifiable records to support the yield in the database (If there are verifiable records for the yield in your database, the yield is significantly different from the other yields in the county or your other yields for the crop and you cannot prove there is a valid agronomic basis to support the differences in the yields, the yield will be the average of the yields for the crop or the applicable county transitional yield if you have no other yields for the crop);

   (2) By reducing it to an amount consistent with the average of the approved yields for other databases for your farming operation with the same crop, type, and practice or the county transitional yield, as applicable, if:

      (i) The approved APH yield is greater than 115 percent of the average of the approved yields of all applicable databases for your farming operation that have actual yields in them or it is greater than 115 percent of the county transitional yield if no applicable databases exist for comparison;

      (ii) The current year's insurable acreage (including applicable prevented planting acreage) is greater than 400 percent of the average number of acres in the database or the acres contained in two or more individual years in the database are each less than 10 percent of the current year's insurable acreage in the unit (including applicable prevented planting acreage); and

      (iii) We determine there is no valid agronomic basis to support the approved yield; or

   (3) To an amount consistent with the production methods actually carried out for the crop year if you use a different production method than was previously used and the production method actually carried out is likely to result in a yield lower than the average of your previous actual yields. The yield will be adjusted based on your other units where such production methods were carried out or to the applicable county transitional yield for the production methods if other such units do not exist. You must notify us of changes in your production methods by the acreage reporting date. If you fail to notify us, in addition to the reduction of your approved yield described herein, you will be considered to have misreported information and you will be subject to the consequences in section 6(g). For example, for a non-irrigated unit, your yield is based upon acreage of the crop that is watered once prior to planting, and the crop is not watered prior to planting for the current crop year. Your approved APH yield will be reduced to an amount consistent with the actual production history of your other non-irrigated units where the crop has not been watered prior to planting or limited to the non-irrigated transitional yield for the unit if other such units do not exist.

(i) Unless you meet the double cropping requirements contained in section 17(f)(4), if you elect to plant a second crop on acreage where the first insured crop was prevented from being planted, you will receive a yield equal to 60 percent of the approved yield for the first insured crop to calculate your average yield for subsequent crop years (Not applicable to crops if the APH is not the basis for the insurance guarantee). If the unit contains both prevented planting and planted acreage of the same crop, the yield for such acreage will be determined by:

   (1) Multiplying the number of insured prevented planting acres by 60 percent of the approved yield for the first insured crop;

NHF2-526 Policy 000025

(2) Adding the totals from section 3(i)(1) to the amount of appraised or harvested production for all of the insured planted acreage; and

(3) Dividing the total in section 3(i)(2) by the total number of acres in the unit.

(j) Hail and fire coverage may be excluded from the covered causes of loss for an insured crop only if you select additional coverage of not less than 65 percent of the approved yield indemnified at the 100 percent price election, or an equivalent coverage as established by FCIC, and you have purchased the same or a higher dollar amount of coverage for hail and fire from us or any other source.  If you elected a whole-farm unit, you may exclude hail and fire coverage only if allowed by the Special Provisions.

(k) The applicable premium rate, or formula to calculate the premium rate, and transitional yield will be those contained in the actuarial documents except, in the case of high-risk land, a written agreement may be requested to change such transitional yield or premium rate.

(l) Notwithstanding any other provision, if you qualify as a beginning farmer or rancher and were previously involved in a farming or ranching operation, including involvement in the decision-making or physical involvement in the production of the crop or livestock on the farm, for any acreage obtained by you, you may receive a yield that is the higher of:

(1) The actual production history of the previous producer of the crop or livestock on the acreage you were previously involved with; or

(2) Your actual production history.

**4.   Contract Changes.**

(a) We may change the terms of your coverage under this policy from year to year.

(b) Any changes in policy provisions, amounts of insurance, premium rates, program dates, price elections or the Commodity Exchange Price Provisions, if applicable, can be viewed on RMA's website not later than the contract change date contained in the Crop Provisions (except as allowed herein or as specified in section 3).  We may only revise this information after the contract change date to correct clear errors (*e.g.*, the price for oats was announced at $25.00 per bushel instead of $2.50 per bushel or the final planting date should be May 10 but the final planting date in the Special Provisions states August 10).

(c) After the contract change date, all changes specified in section 4(b) will also be available upon request from your crop insurance agent.  You will be provided, in writing, a copy of the changes to the Basic Provisions, Crop Provisions, Commodity Exchange Price Provisions, if applicable, and Special Provisions not later than 30 days prior to the cancellation date for the insured crop.  If available from us, you may elect to receive these documents and changes electronically.  Acceptance of the changes will be conclusively presumed in the absence of notice from you to change or cancel your insurance coverage.

**5.   Exclusion of Yields.**

If provided in the actuarial documents, you may elect to exclude any actual yield for any crop year when FCIC determines for a county, or its contiguous counties, the per planted acre yield was at least 50 percent below the simple average of the per planted acre yield for the crop in the county for the previous 10 consecutive crop years.

**6.   Report of Acreage.**

(a) An annual acreage report must be submitted to us on our form for each insured crop in the county on or before the acreage reporting date contained in the Special Provisions, except as follows:

(1) If you insure multiple crops with us that have final planting dates on or after August 15 but before December 31, you must submit an acreage report for all such crops on or before the latest applicable acreage reporting date for such crops; and

(2) If you insure multiple crops with us that have final planting dates on or after December 31 but before August 15, you must submit an acreage report for all such crops on or before the latest applicable acreage reporting date for such crops.

(3) Notwithstanding the provisions in sections 6(a)(1) and (2):

(i) If the Special Provisions designate separate planting periods for a crop, you must submit an acreage report for each planting period on or before the acreage reporting date contained in the Special Provisions for the planting period;

(ii) If planting of the insured crop continues after the final planting date or you are prevented from planting during the late planting period, the acreage reporting date will be the later of:

(A) The acreage reporting date contained in the Special Provisions;

(B) The date determined in accordance with sections (a)(1) or (2); or

(C) Five days after the end of the late planting period for the insured crop, if applicable; and

(iii) If you plant the insured crop on or within five days prior to the final planting date and the final planting date is five or fewer days prior to the acreage reporting date, you must submit an acreage report no later than five days after the acreage reporting date (for example, if the final planting date contained in the Special Provisions is July 10, the acreage reporting date contained in the Special Provisions is July 15 and you plant the insured crop on July 9, you have until July 20 to submit an acreage report for the insured crop).

(b) If you do not have a share in an insured crop in the county for the crop year, you must submit an acreage report, on or before the acreage reporting date, so indicating.

(c) Your acreage report must include the following information, if applicable:

(1) The amount of acreage of the crop in the county (insurable and not insurable) in which you have a share and the date the insured crop was planted on the unit as follows:

  (i) The last date any timely planted acreage was planted and the number of acres planted by such date; and

  (ii) The date of planting and the number of acres planted per day for acreage planted during the late planting period (If you fail to report the number of acres planted on a daily basis, all acreage planted in the late planting period will be presumed to have been planted on the last day planting took place in the late planting period for the purposes of section 16);

(2) Your share at the time coverage begins;

(3) The practice;

(4) The type; and

(5) The land identifier for the crop acreage (*e.g.*, legal description, FSA farm number or common land unit number if provided to you by FSA, etc.) as required on our form.

(d) Regarding the ability to revise an acreage report you have submitted to us:

(1) For planted acreage, you cannot revise any information pertaining to the planted acreage after the acreage reporting date without our consent (Consent may only be provided when no cause of loss has occurred; our appraisal has determined that the insured crop will produce at least 90 percent of the yield used to determine your guarantee or the amount of insurance for the unit (including reported and unreported acreage), except when there are unreported units (see section 6(f)); the information on the acreage report is clearly transposed; you provide adequate evidence that we or someone from USDA have committed an error regarding the information on your acreage report; or if expressly permitted by the policy);

(2) For prevented planting acreage:

  (i) On or before the acreage reporting date, you can change any information on any initially submitted acreage report, except as provided in section 6(d)(2)(iii) (*e.g.*, you can correct the reported share, add acreage of the insured crop that was prevented from being planted, etc.);

  (ii) After the acreage reporting date, you cannot revise any information on the acreage report (*e.g.*, if you have failed to report prevented planting acreage on or before the acreage reporting date, you cannot revise it after the acreage reporting date to include prevented planting acreage) but we will revise information that is clearly transposed or you provide adequate evidence that we or someone from USDA have committed an error regarding the information on your acreage report; and

  (iii) You cannot revise your initially submitted acreage report at any time to change the insured crop, or type, that was reported as prevented from being planted;

(3) You may request an acreage measurement from FSA or a business that provides such measurement service prior to the acreage reporting date, submit documentation of such request and an acreage report with estimated acreage by the acreage reporting date, and if the acreage measurement shows the estimated acreage was incorrect, we will revise your acreage report to reflect the correct acreage:

  (i) If an acreage measurement is only requested for a portion of the acreage within a unit, you must separately designate the acreage for which an acreage measurement has been requested;

  (ii) If an acreage measurement is not provided to us by the time we receive a notice of loss, we may:

    (A) Defer finalization of the claim until the measurement is completed, and:

      (1) Make all necessary loss determinations, except the acreage measurement; and

      (2) Finalize the claim in accordance with applicable policy provisions after you provide the acreage measurement to us (If you fail to provide the measurement, your claim will not be paid); or

    (B) Elect to measure the acreage, and:

      (1) Finalize your claim in accordance with applicable policy provisions; and

      (2) Estimated acreage under this section will not be accepted from you for any subsequent acreage report; and

  (iii) Premium will still be due in accordance with sections 2(e) and 7.  If the acreage is not measured as specified in section 6(d)(3)(ii) and the acreage measurement is not provided to us at least 15 days prior to the premium billing date, your premium will be based on the estimated acreage and will be revised, if necessary, when the acreage measurement is provided.  If the acreage measurement is not provided by the termination date, you will be precluded from providing any estimated acreage for all subsequent crop years.

(4) If there is an irreconcilable difference between:

  (i) The acreage measured by FSA or a measuring service and our on-farm measurement, our on-farm measurement will be used; or

  (ii) The acreage measured by a measuring service, other than our on-farm measurement, and FSA, the FSA measurement will be used; and

(5) If the acreage report has been revised in accordance with section 6(d)(1), (2),  or (3), the information on the initial acreage report will not be considered misreported for the purposes of section 6(g).

(e) We may elect to determine all premiums and indemnities based on the information you submit on the acreage report or upon the factual circumstances we determine to have existed, subject to the provisions contained in section 6(g).

(f) If you do not submit an acreage report by the acreage reporting date, or if you fail to report all units, we may elect to determine by unit the insurable crop acreage, share, type and practice, or to deny liability on such units.  If we deny liability for the unreported units, your share of any production from the unreported units will be allocated, for loss purposes only, as production to count to the reported units in proportion to the liability on each reported unit.  However, such production will not be allocated to prevented planting acreage or otherwise affect any prevented planting payment.

(g) You must provide all required reports and you are responsible for the accuracy of all information contained in those reports.  You should verify the information on all such reports prior to submitting them to us.

(1) Except as provided in section 6(g)(2), if you submit information on any report that is different than what is determined to be correct and such information results in:

(i) A lower liability than the actual liability determined, the production guarantee or amount of insurance on the unit will be reduced to an amount consistent with the reported information (In the event the insurable acreage is under-reported for any unit, all production or value from insurable acreage in that unit will be considered production or value to count in determining the indemnity); or

(ii) A higher liability than the actual liability determined, the information contained in the acreage report will be revised to be consistent with the correct information.

(2) If your share is misreported and the share is:

(i) Under-reported, any claim will be determined using the share you reported; or

(ii) Over-reported, any claim will be determined using the share we determine to be correct.

(h) If we discover you have incorrectly reported any information on the acreage report for any crop year, you may be required to provide documentation in subsequent crop years substantiating your report of acreage for those crop years, including, but not limited to, an acreage measurement service at your own expense.  If the correction of any misreported information would affect an indemnity, prevented planting payment or replanting payment that was paid in a prior crop year, such claim will be adjusted and you will be required to repay any overpaid amounts.

(i) Errors in reporting units may be corrected by us at the time of adjusting a loss to reduce our liability and to conform to applicable unit division guidelines.

7. **Annual Premium and Administrative Fees.**

(a) The annual premium is earned and payable at the time coverage begins.  You will be billed for the premium and administrative fee not earlier than the premium billing date specified in the Special Provisions.

(b) Premium or administrative fees owed by you will be offset from an indemnity or prevented planting payment due you in accordance with section 2(e).

(c) The annual premium amount is determined, as applicable, by either:

(1) Multiplying the production guarantee per acre times your price election or your projected price, as applicable, times the premium rate, times the insured acreage, times your share at the time coverage begins, and times any premium adjustment percentages that may apply; or

(2) Multiplying your amount of insurance per acre times the premium rate, times the insured acreage, times your share at the time coverage begins, and times any premium adjustment percentages that may apply.

(d) The information needed to determine the premium rate and any premium adjustment percentages that may apply are contained in the actuarial documents or an approved written agreement.

(e) In addition to the premium charged:

(1) You, unless otherwise authorized in 7 CFR part 400, must pay an administrative fee each crop year of $30 per crop per county for all levels of coverage in excess of catastrophic risk protection.

(2) The administrative fee must be paid no later than the time premium is due.

(3) Payment of an administrative fee will not be required if you file a bona fide zero acreage report on or before the acreage reporting date for the crop.  If you falsely file a zero acreage report you may be subject to criminal and administrative sanctions.

(4) The administrative fee will be waived if you request it and:

(i) You qualify as a beginning farmer or rancher;

(ii) You qualify as a limited resource farmer; or

(iii) You were insured prior to the 2005 crop year or for the 2005 crop year and your administrative fee was waived for one or more of those crop years because you qualified as a limited resource farmer under a policy definition previously in effect, and you remain qualified as a limited resource farmer under the definition that was in effect at the time the administrative fee was waived.

(5) Failure to pay the administrative fees when due may make you ineligible for certain other USDA benefits.

(f) If the amount of premium (gross premium less premium subsidy paid on your behalf by FCIC) and administrative fee you are required to pay for any acreage exceeds the liability for the acreage, coverage for those acres will not be provided (no premium or administrative fee will be due and no indemnity will be paid for such acreage).

(g) If you qualify as a beginning farmer or rancher, your premium subsidy will be 10 percentage points greater than the premium subsidy that you would otherwise receive, unless otherwise specified in the Special Provisions.

(h) You will be ineligible for any premium subsidy paid on your behalf by FCIC for any policy issued by us if:

    (1) USDA determines you have committed a violation of the highly erodible land conservation or wetland conservation provisions of 7 CFR part 12 as amended by the Agricultural Act of 2014; or

    (2) You have not filed form AD-1026 with FSA for the reinsurance year by the premium billing date.

        (i) Notwithstanding section 7(h)(2), you may be eligible for premium subsidy without having a timely filed form AD-1026:

            (A) For the initial reinsurance year if you certify by the premium billing date for your policy that you meet the qualifications as outlined in FCIC approved procedures for producers who are new to farming, new to crop insurance, a new entity, or have not previously been required to file form AD-1026; or

            (B) If FSA approves relief for failure to timely file due to circumstances beyond your control or failure to timely provide adequate information to complete form AD-1026 in accordance with the provisions contained in 7 CFR part 12.

        (ii) To be eligible for premium subsidy paid on your behalf by FCIC, it is your responsibility to assure you meet all the requirements for:

            (A) Compliance with the conservation provisions specified in section 7(h)(1) of this section; and

            (B) Filing form AD-1026 to be properly identified as in compliance with the conservation provisions specified in section 7(h)(1) of this section.

**8. Insured Crop.**

(a) The insured crop will be that shown on your accepted application and as specified in the Crop Provisions or Special Provisions and must be grown on insurable acreage.

(b) A crop which will NOT be insured will include, but will not be limited to, any crop:

    (1) That is not grown on planted acreage (except for the purposes of prevented planting coverage), or that is a type, class or variety or where the conditions under which the crop is planted are not generally recognized for the area (For example, where agricultural experts determine that planting a non-irrigated corn crop after a failed small grain crop on the same acreage in the same crop year is not appropriate for the area);

    (2) For which the information necessary for insurance (price election, amount of insurance, projected price and harvest price, as applicable, premium rate, etc.) is not included in the actuarial documents, unless such information is provided by a written agreement in accordance with section 18;

    (3) That is a volunteer crop;

    (4) Planted following the same crop on the same acreage and the first planting of the crop has been harvested in the same crop year unless specifically permitted by the Crop Provisions or the Special Provisions (For example, the second planting of grain sorghum would not be insurable if grain sorghum had already been planted and harvested on the same acreage during the crop year);

    (5) That is planted for the development or production of hybrid seed or for experimental purposes, unless permitted by the Crop Provisions or by written agreement to insure such crop; or

    (6) That is used solely for wildlife protection or management. If the lease states that specific acreage must remain unharvested, only that acreage is uninsurable. If the lease specifies that a percentage of the crop must be left unharvested, your share will be reduced by such percentage.

(c) Although certain policy documents may state that a crop type, class, variety or practice is not insurable, it does not mean all other crop types, classes, varieties or practices are insurable. To be insurable the crop type, class, variety or practice must meet all the conditions in this section.

**9. Insurable Acreage.**

(a) All acreage planted to the insured crop in the county in which you have a share:

    (1) Except as provided in section 9(a)(2), is insurable if the acreage has been planted and harvested or insured (including insured acreage that was prevented from being planted) in any one of the three previous crop years. Acreage that has not been planted and harvested (grazing is not considered harvested for the purposes of section 9(a)(1)) or insured in at least one of the three previous crop years may still be insurable if:

        (i) Such acreage was not planted:

            (A) In at least two of the three previous crop years to comply with any other USDA program;

            (B) Due to the crop rotation, the acreage would not have been planted in the previous three years (e.g., a crop rotation of corn, soybeans, and alfalfa; and the alfalfa remained for four years before the acreage was planted to corn again); or

            (C) Because a perennial tree, vine, or bush crop was on the acreage in at least two of the previous three crop years;

(ii) Such acreage constitutes five percent or less of the insured planted acreage in the unit;

(iii) Such acreage was not planted or harvested because it was pasture or rangeland, the crop to be insured is also pasture or rangeland, and the Crop Provisions, Special Provisions, or a written agreement specifically allow insurance for such acreage; or

(iv) The Crop Provisions, Special Provisions, or a written agreement specifically allow insurance for such acreage; or

(2) Is not insurable if:

(i) The only crop that has been planted and harvested on the acreage in the three previous crop years is a cover, hay (except wheat harvested for hay) or forage crop (except insurable silage). However, such acreage may be insurable only if:

(A) The crop to be insured is a hay or forage crop and the Crop Provisions, Special Provisions, or a written agreement specifically allow insurance for such acreage; or

(B) The hay or forage crop was part of a crop rotation;

(ii) The acreage has been strip-mined. However, such acreage may be insurable only if:

(A) An agricultural commodity, other than a cover, hay (except wheat harvested for hay), or forage crop (except insurable silage) has been harvested from the acreage for at least five crop years after the strip-mined land was reclaimed; or

(B) A written agreement specifically allows insurance for such acreage;

(iii) The actuarial documents do not provide the information necessary to determine the premium rate, unless insurance is allowed by a written agreement;

(iv) The insured crop is damaged and it is practical to replant the insured crop, but the insured crop is not replanted;

(v) The acreage is interplanted, unless insurance is allowed by the Crop Provisions;

(vi) The acreage is otherwise restricted by the Crop Provisions or Special Provisions;

(vii) The acreage is planted in any manner other than as specified in the policy provisions for the crop unless a written agreement specifically allows insurance for such planting;

(viii) The acreage is of a second crop, if you elect not to insure such acreage when an indemnity for a first insured crop may be subject to reduction in accordance with the provisions of section 15 and you intend to collect an indemnity payment that is equal to 100 percent of the insurable loss for the first insured crop acreage.  This election

must be made on a first insured crop unit basis (e.g., if the first insured crop unit contains 40 planted acres that may be subject to an indemnity reduction, then no second crop can be insured on any of the 40 acres).  In this case:

(A) If the first insured crop is insured under this policy, you must provide written notice to us of your election not to insure acreage of a second crop at the time the first insured crop acreage is released by us (if no acreage in the first insured crop unit is released, this election must be made by the earlier of the acreage reporting date for the second crop or when you sign the claim for indemnity for the first insured crop) or, if the first insured crop is insured under Area Risk Protection Insurance (7 CFR part 407), this election must be made before the second crop insured under this policy is planted, and if you fail to provide such notice, the second crop acreage will be insured in accordance with the applicable policy provisions and you must repay any overpaid indemnity for the first insured crop;

(B) In the event a second crop is planted and insured with a different insurance provider, or planted and insured by a different person, you must provide written notice to each insurance provider that a second crop was planted on acreage on which you had a first insured crop; and

(C) You must report the crop acreage that will not be insured on the applicable acreage report; or

(ix) The acreage is of a crop planted following a second crop or following an insured crop that is prevented from being planted after a first insured crop, unless it is a practice that is generally recognized by agricultural experts or organic agricultural experts for the area to plant three or more crops for harvest on the same acreage in the same crop year, and additional coverage insurance provided under the authority of the Act is offered for the third or subsequent crop in the same crop year.  Insurance will only be provided for a third or subsequent crop as follows:

(A) You must provide records acceptable to us that show:

(1) You have produced and harvested the insured crop following two other crops harvested on the same acreage in the same crop year in at least two of the last four years in which you produced the insured crop; or

NHF2-526 Policy 000030

(2) The applicable acreage has had three or more crops produced and harvested on it in the same crop year in at least two of the last four years in which the insured crop was grown on the acreage; and

(B) The amount of insurable acreage will not exceed 100 percent of the greatest number of acres for which you provide the records required in section 9(a)(2)(ix)(A).

(b) If insurance is provided for an irrigated practice, you must report as irrigated only that acreage for which you have adequate facilities and adequate water, or the reasonable expectation of receiving adequate water at the time coverage begins, to carry out a good irrigation practice. If you knew or had reason to know that your water may be reduced before coverage begins, no reasonable expectation exists.

(c) Notwithstanding the provisions in section 8(b)(2), if acreage is irrigated and a premium rate is not provided for an irrigated practice, you may either report and insure the irrigated acreage as "non-irrigated," or report the irrigated acreage as not insured (If you elect to insure such acreage under a non-irrigated practice, your irrigated yield will only be used to determine your approved yield if you continue to use a good irrigation practice. If you do not use a good irrigation practice, you will receive a yield determined in accordance with section 3(h)(3)).

(d) We may restrict the amount of acreage that we will insure to the amount allowed under any acreage limitation program established by the United States Department of Agriculture if we notify you of that restriction prior to the sales closing date.

(e) Except as provided in section 9(f), in the states of Iowa, Minnesota, Montana, Nebraska, North Dakota, or South Dakota, during the first four crop years of planting on native sod acreage that has been tilled after February 7, 2014, such acreage may be insured if the requirements of section 9(a) have been met but will:

(1) Notwithstanding the provisions in section 3 regarding your production guarantee, receive a production guarantee (per acre) that is based on 65 percent of the transitional yield for the county; and

(2) For additional coverage policies, receive a premium subsidy that is 50 percentage points less than would otherwise be provided on acreage not qualifying as native sod. If the premium subsidy applicable to these acres is less than 50 percent before the reduction, you will receive no premium subsidy.

(f) Section 9(e) is not applicable to cumulative native sod acreage that is five acres or less in the county.

**10. Share Insured.**

(a) Insurance will attach:

(1) Only if the person completing the application has a share in the insured crop; and

(2) Only to that person's share, except that insurance may attach to another person's share of the insured crop if the other person has a share of the crop and:

(i) The application clearly states the insurance is requested for a person other than an individual (e.g., a partnership or a joint venture); or

(ii) The application clearly states you as landlord will insure your tenant's share, or you as tenant will insure your landlord's share. If you as a landlord will insure your tenant's share, or you as a tenant will insure your landlord's share, you must provide evidence of the other party's approval (lease, power of attorney, etc.) and such evidence will be retained by us:

(A) You also must clearly set forth the percentage shares of each person on the acreage report; and

(B) For each landlord or tenant, you must report the landlord's or tenant's social security number, employer identification number, or other identification number we assigned for the purposes of this policy, as applicable.

(b) With respect to your share:

(1) We will consider to be included in your share under your policy, any acreage or interest reported by or for:

(i) Your spouse, unless such spouse can prove he/she has a separate farming operation, which includes, but is not limited to, separate land (transfers of acreage from one spouse to another is not considered separate land), separate capital, separate inputs, separate accounting, and separate maintenance of proceeds; or

(ii) Your child who resides in your household or any other member of your household, unless such child or other member of the household can demonstrate such person has a separate share in the crop (Children who do not reside in your household are not included in your share); and

(2) If it is determined that the spouse, child or other member of the household has a separate policy but does not have a separate farming operation or share of the crop, as applicable:

(i) The policy for one spouse or child or other member of the household will be void and the policy remaining in effect will be determined in accordance with section 22(a)(1) and (2);

(ii) The acreage or share reported under the policy that is voided will be included under the remaining policy; and

(iii) No premium will be due and no indemnity will be paid for the voided policy.

(c) Acreage rented for a percentage of the crop, or a lease containing provisions for **BOTH** a minimum payment (such as a specified amount of cash,

bushels, pounds, etc.,) **AND** a crop share will be considered a crop share lease.

(d) Acreage rented for cash, or a lease containing provisions for **EITHER** a minimum payment **OR** a crop share (such as a 50/50 share or $100.00 per acre, whichever is greater) will be considered a cash lease.

**11. Insurance Period.**

(a) Except for prevented planting coverage (see section 17), coverage begins on each unit or part of a unit at the later of:

(1) The date we accept your application (For the purposes of this paragraph, the date of acceptance is the date that you submit a properly executed application in accordance with section 2);

(2) The date the insured crop is planted; or

(3) The calendar date contained in the Crop Provisions for the beginning of the insurance period.

(b) Coverage ends on each unit or part of a unit at the earliest of:

(1) Total destruction of the insured crop;

(2) Harvest of the insured crop;

(3) Final adjustment of a loss on a unit;

(4) The calendar date contained in the Crop Provisions or Special Provisions for the end of the insurance period;

(5) Abandonment of the insured crop; or

(6) As otherwise specified in the Crop Provisions.

(c) Except as provided in the Crop Provisions or applicable endorsement, in addition to the requirements of section 11(b), coverage ends on any acreage within a unit once any event specified in section 11(b) occurs on that acreage. Coverage only remains in effect on acreage that has not been affected by an event specified in section 11(b).

**12. Causes of Loss.**

Insurance is provided only to protect against unavoidable, naturally occurring events. A list of the covered naturally occurring events is contained in the applicable Crop Provisions. All other causes of loss, including but not limited to the following, are NOT covered:

(a) Any act by any person that affects the yield, quality or price of the insured crop (*e.g.*, chemical drift, fire, terrorism, etc.);

(b) Failure to follow recognized good farming practices for the insured crop;

(c) Water that is contained by or within structures that are designed to contain a specific amount of water, such as dams, locks or reservoir projects, etc., on any acreage when such water stays within the designed limits (For example, a dam is designed to contain water to an elevation of 1,200 feet but you plant a crop on acreage at an elevation of 1,100 feet. A storm causes the water behind the dam to rise to an elevation of 1,200 feet. Under such circumstances, the resulting damage would not be caused by an insurable cause of loss. However, if you planted on acreage that was above 1,200 feet elevation, any damage caused by water that exceeded that elevation would be caused by an insurable cause of loss);

(d) Failure or breakdown of the irrigation equipment or facilities, or the inability to prepare the land for irrigation using your established irrigation method (*e.g.*, furrow irrigation), unless the failure, breakdown or inability is due to a cause of loss specified in the Crop Provisions.

(1) You must make all reasonable efforts to restore the equipment or facilities to proper working order within a reasonable amount of time unless we determine it is not practical to do so.

(2) Cost will not be considered when determining whether it is practical to restore the equipment or facilities;

(e) Failure to carry out a good irrigation practice for the insured crop, if applicable; or

(f) Any cause of loss that results in damage that is not evident or would not have been evident during the insurance period, including, but not limited to, damage that only becomes evident after the end of the insurance period unless expressly authorized in the Crop Provisions. Even though we may not inspect the damaged crop until after the end of the insurance period, damage due to insured causes that would have been evident during the insurance period will be covered.

**13. Replanting Payment.**

(a) If allowed by the Crop Provisions, a replanting payment may be made on an insured crop replanted after we have given consent and the acreage replanted is at least the lesser of 20 acres or 20 percent of the insured planted acreage for the unit (as determined on the final planting date or within the late planting period if a late planting period is applicable). If the crops to be replanted are in a whole-farm unit, the 20 acres or 20 percent requirement is to be applied separately to each crop to be replanted in the whole-farm unit.

(b) No replanting payment will be made on acreage:

(1) On which our appraisal establishes that production will exceed the level set by the Crop Provisions;

(2) Initially planted prior to the earliest planting date established by the Special Provisions; or

(3) On which one replanting payment has already been allowed for the crop year.

(c) The replanting payment per acre will be:

(1) The lesser of your actual cost for replanting or the amount specified in the Crop Provisions or Special Provisions; or

(2) If the Crop Provisions or Special Provisions specify that your actual cost will not be used to determine your replanting payment, the amount determined in accordance with the Crop Provisions or Special Provisions.

(d) No replanting payment will be paid if we determine it is not practical to replant.

**14. Duties in the Event of Damage, Loss, Abandonment, Destruction, or Alternative Use of Crop or Acreage.**
Your Duties:

(a) In case of damage or loss of production or revenue to any insured crop, you must protect the crop from further damage by providing sufficient care.

(20 of 42)

(b) Notice provisions:
  (1) For a planted crop, when there is damage or loss of production, you must give us notice, by unit, within 72 hours of your initial discovery of damage or loss of production (but not later than 15 days after the end of the insurance period, even if you have not harvested the crop).
  (2) For crops for which revenue protection is elected, if there is no damage or loss of production, you must give us notice not later than 45 days after the latest date the harvest price is released for any crop in the unit where there is a revenue loss.
  (3) In the event you are prevented from planting an insured crop that has prevented planting coverage, you must notify us within 72 hours after:
    (i) The final planting date, if you do not intend to plant the insured crop during the late planting period or if a late planting period is not applicable; or
    (ii) You determine you will not be able to plant the insured crop within any applicable late planting period.
  (4) All notices required in this section that must be received by us within 72 hours may be made by telephone or in person to your crop insurance agent but must be confirmed in writing within 15 days.
  (5) If you fail to comply with these notice requirements, any loss or prevented planting claim will be considered solely due to an uninsured cause of loss for the acreage for which such failure occurred, unless we determine that we have the ability to accurately adjust the loss. If we determine that we do not have the ability to accurately adjust the loss:
    (i) For any prevented planting claim, no prevented planting coverage will be provided and no premium will be owed or prevented planting payment will be paid; or
    (ii) For any claim for indemnity, no indemnity will be paid but you will still be required to pay all premiums owed.
(c) Representative samples:
  (1) If representative samples are required by the Crop Provisions, you must leave representative samples of the unharvested crop intact:
    (i) If you report damage less than 15 days before the time you will begin harvest or during harvest of the damaged unit; or
    (ii) At any time when required by us.
  (2) The samples must be left intact until we inspect them or until 15 days after completion of harvest on the remainder of the unit, whichever is earlier.
  (3) Unless otherwise specified in the Crop Provisions or Special Provisions, the samples of the crop in each field in the unit must be 10 feet wide and extend the entire length of the rows, if the crop is planted in rows, or if the crop is not planted in rows, the longest dimension of the field.
  (4) The period to retain representative samples may be extended if it is necessary to accurately determine the loss. You will be notified in writing of any such extension.
(d) Consent:
  (1) You must obtain consent from us before, and notify us after you:
    (i) Destroy any of the insured crop that is not harvested;
    (ii) Put the insured crop to an alternative use;
    (iii) Put the acreage to another use; or
    (iv) Abandon any portion of the insured crop.
  (2) We will not give consent for any of the actions in section 14(d)(1)(i) through (iv) if it is practical to replant the crop or until we have made an appraisal of the potential production of the crop.
  (3) Failure to obtain our consent will result in the assignment of an amount of production or value to count in accordance with the Settlement of Claim provisions of the applicable Crop Provisions.
(e) Claims:
  (1) Except as otherwise provided in your policy, you must submit a claim declaring the amount of your loss by the dates shown in section 14(e)(3), unless you:
    (i) Request an extension in writing by such date and we agree to such request (Extensions will only be granted if the amount of the loss cannot be determined within such time period because the information needed to determine the amount of the loss is not available); or
    (ii) Have harvested farm-stored grain production and elect, in writing, to delay measurement of your farm-stored production and settlement of any potential associated claim for indemnity (Extensions will be granted for this purpose up to 180 days after the end of the insurance period).
      (A) For policies that require APH, if such extension continues beyond the date you are required to submit your production report, you will be assigned the previous year's approved yield as a temporary yield in accordance with applicable procedures.
      (B) Any extension does not extend any date specified in the policy by which premiums, administrative fees, or other debts owed must be paid.
      (C) Damage that occurs after the end of the insurance period (for example, while the harvested crop production is in storage) is not covered; and
  (2) Failure to timely submit a claim or provide the required information necessary to determine the amount of the claim will result in no indemnity, prevented planting payment or replanting payment:
    (i) Even though no indemnity or replanting payment is due, you will still be required to pay the premium due under the policy for the unit; or

(ii) Failure to timely submit a prevented planting claim will result in no prevented planting coverage and no premium will be due.

(3) You must submit a claim not later than:

(i) For policies other than revenue protection, 60 days after the date the insurance period ends for all acreage in the unit (When there is acreage in the unit where the insurance period ended on different dates, it is the last date the insurance period ends on the unit. For example, if a unit has corn acreage that was put to another use on July 15 and corn acreage where harvest was completed on September 30, the claim must be submitted not later than 60 days after September 30); or

(ii) For revenue protection, the later of:

(A) 60 days after the last date the harvest price is released for any crop in the unit; or

(B) The date determined in accordance with section 14(e)(3)(i).

(4) To receive any indemnity (or receive the rest of an indemnity in the case of acreage that is planted to a second crop), prevented planting payment or replanting payment, you must, if applicable:

(i) Provide:

(A) A complete harvesting, production, and marketing record of each insured crop by unit including separate records showing the same information for production from any acreage not insured.

(B) Records as indicated below if you insure any acreage that may be subject to an indemnity reduction as specified in section 15(e)(2):

(1) Separate records of production from such acreage for all insured crops planted on the acreage (*e.g.*, if you have an insurable loss on 10 acres of wheat and subsequently plant cotton on the same 10 acres, you must provide records of the wheat and cotton production on the 10 acres separate from any other wheat and cotton production that may be planted in the same unit). If you fail to provide separate records for such acreage, we will allocate the production of each crop to the acreage in proportion to our liability for the acreage; or

(2) If there is no loss on the unit that includes acreage of the second crop, no separate records need to be submitted for the second crop and you can receive the rest of the indemnity for the first insured crop.

(C) Any other information we may require to settle the claim.

(ii) Cooperate with us in the investigation or settlement of the claim, and, as often as we reasonably require:

(A) Show us the damaged crop;

(B) Allow us to remove samples of the insured crop; and

(C) Provide us with records and documents we request and permit us to make copies.

(iii) Establish:

(A) The total production or value received for the insured crop on the unit;

(B) That any loss occurred during the insurance period;

(C) That the loss was caused by one or more of the insured causes specified in the Crop Provisions; and

(D) That you have complied with all provisions of this policy.

(iv) Upon our request, or that of any USDA employee authorized to conduct investigations of the crop insurance program, submit to an examination under oath.

(5) Failure to comply with any requirement contained in section 14(e)(4) will result in denial of the claim and any premium will still be owed, unless the claim denied is for prevented planting.

Our Duties:

(f) If you have complied with all the policy provisions, we will pay your loss within 30 days after the later of:

(1) We reach agreement with you;

(2) Completion of arbitration, reconsideration of determinations regarding good farming practices or any other appeal that results in an award in your favor, unless we exercise our right to appeal such decision;

(3) Completion of any investigation by USDA, if applicable, of your current or any past claim for indemnity if no evidence of wrongdoing has been found (If any evidence of wrongdoing has been discovered, the amount of any indemnity, prevented planting or replant overpayment as a result of such wrongdoing may be offset from any indemnity or prevented planting payment owed to you); or

(4) The entry of a final judgment by a court of competent jurisdiction.

(g) In the event we are unable to pay your loss within 30 days, we will give you notice of our intentions within the 30-day period.

(h) We may defer the adjustment of a loss until the amount of loss can be accurately determined. We will not pay for additional damage resulting from your failure to provide sufficient care for the crop during the deferral period.

(i) We recognize and apply the loss adjustment procedures established or approved by the Federal Crop Insurance Corporation.

(j) For revenue protection, we may make preliminary indemnity payments for crop production losses prior to the release of the harvest price if you have not elected the harvest price exclusion.

(22 of 42)

(1) First, we may pay an initial indemnity based upon your projected price, in accordance with the applicable Crop Provisions provided that your production to count and share have been established; and

(2) Second, after the harvest price is released, and if it is not equal to the projected price, we will recalculate the indemnity payment and pay any additional indemnity that may be due.

**15. Production Included in Determining an Indemnity and Payment Reductions.**

(a) The total production to be counted for a unit will include all production determined in accordance with the policy.

(b) Appraised production will be used to calculate your claim if you are not going to harvest your acreage. Such appraisals may be conducted after the end of the insurance period. If you harvest the crop after the crop has been appraised:

   (1) You must provide us with the amount of harvested production (If you fail to provide verifiable records of harvested production, no indemnity will be paid and you will be required to return any previously paid indemnity for the unit that was based on an appraised amount of production); and

   (2) If the harvested production exceeds the appraised production, claims will be adjusted using the harvested production, and you will be required to repay any overpaid indemnity; or

   (3) If the harvested production is less than the appraised production, and:

     (i) You harvest after the end of the insurance period, your appraised production will be used to adjust the loss unless you can prove that no additional causes of loss or deterioration of the crop occurred after the end of the insurance period; or

     (ii) You harvest before the end of the insurance period, your harvested production will be used to adjust the loss.

(c) If you elect to exclude hail and fire as insured causes of loss and the insured crop is damaged by hail or fire, appraisals will be made as described in our form used to exclude hail and fire.

(d) The amount of an indemnity that may be determined under the applicable provisions of your policy may be reduced by an amount, determined in accordance with the Crop Provisions or Special Provisions, to reflect out-of-pocket expenses that were not incurred by you as a result of not planting, caring for, or harvesting the crop. Indemnities paid for acreage prevented from being planted will be based on a reduced guarantee as provided for in the policy and will not be further reduced to reflect expenses not incurred.

(e) With respect to acreage where you have suffered an insurable loss to planted acreage of your first insured crop in the crop year, except in the case of double cropping described in section 15(h):

   (1) You may elect to not plant or to plant and not insure a second crop on the same acreage for harvest in the same crop year and collect an indemnity payment that is equal to 100 percent of the insurable loss for the first insured crop; or

   (2) You may elect to plant and insure a second crop on the same acreage for harvest in the same crop year (you will pay the full premium and, if there is an insurable loss to the second crop, receive the full amount of indemnity that may be due for the second crop, regardless of whether there is a subsequent crop planted on the same acreage) and:

     (i) Collect an indemnity payment that is 35 percent of the insurable loss for the first insured crop;

     (ii) Be responsible for premium that is 35 percent of the premium that you would otherwise owe for the first insured crop; and

     (iii) If the second crop does not suffer an insurable loss:

       (A) Collect an indemnity payment for the other 65 percent of insurable loss that was not previously paid under section 15(e)(2)(i); and

       (B) Be responsible for the remainder of the premium for the first insured crop that you did not pay under section 15(e)(2)(ii).

(f) With respect to acreage where you were prevented from planting the first insured crop in the crop year, except in the case of double cropping described in section 15(h):

   (1) If a second crop is not planted on the same acreage for harvest in the same crop year, you may collect a prevented planting payment that is equal to 100 percent of the prevented planting payment for the acreage for the first insured crop; or

   (2) If a second crop is planted on the same acreage for harvest in the same crop year (you will pay the full premium and, if there is an insurable loss to the second crop, receive the full amount of indemnity that may be due for the second crop, regardless of whether there is a subsequent crop planted on the same acreage) and:

     (i) Provided the second crop is not planted on or before the final planting date or during the late planting period (as applicable) for the first insured crop, you may collect a prevented planting payment that is 35 percent of the prevented planting payment for the first insured crop; and

     (ii) Be responsible for premium that is 35 percent of the premium that you would otherwise owe for the first insured crop.

(g) The reduction in the amount of indemnity or prevented planting payment and premium specified in sections 15(e) and 15(f), as applicable, will apply:

   (1) Notwithstanding the priority contained in the Agreement to Insure section, which states that the Crop Provisions have priority over the Basic Provisions when a conflict exists, to any premium owed or indemnity or prevented planting payment

made in accordance with the Crop Provisions, and any applicable endorsement.

(2) Even if another person plants the second crop on any acreage where the first insured crop was planted or was prevented from being planted, as applicable.

(3) For prevented planting only:

    (i) If a volunteer crop or cover crop is hayed or grazed from the same acreage, after the late planting period (or after the final planting date if a late planting period is not applicable) for the first insured crop in the same crop year, or is otherwise harvested anytime after the late planting period (or after the final planting date if a late planting period is not applicable); or

    (ii) If you receive cash rent for any acreage on which you were prevented from planting.

(h) You may receive a full indemnity, or a full prevented planting payment for a first insured crop when a second crop is planted on the same acreage in the same crop year, if each of the following conditions are met, regardless of whether or not the second crop is insured or sustains an insurable loss:

(1) Planting two or more crops for harvest in the same crop year in the area is generally recognized by agricultural experts or organic agricultural experts;

(2) The second or more crops are customarily planted after the first insured crop for harvest on the same acreage in the same crop year in the area;

(3) Additional coverage insurance offered under the authority of the Act is available in the county on the two or more crops that are double cropped;

(4) In the case of prevented planting, the second crop is not planted on or prior to the final planting date or, if applicable, prior to the end of the late planting period for the first insured crop;

(5) You provide records, acceptable to us, of acreage and production specific to the double cropped acreage proving that:

    (i) You have double cropped acreage in at least two of the last four crop years in which the first insured crop was planted and incur an insurable loss or the first insured crop is prevented from being planted and a second crop is planted. If you acquired additional land for the current crop year you may apply the percentage of acres that you have previously double cropped to the total cropland acres that you are farming this year (if greater) using the following calculation:

    (A) Determine the number of acres of the first insured crop that were double cropped in each of the years for which double cropping records are provided (For example, records are provided showing: 100 acres of wheat planted in 2016 and 50 of those acres were double cropped with soybeans; and 100

acres of wheat planted in 2017 and 70 of those acres were double cropped with soybeans);

    (B) Divide each result of section 15(h)(5)(i)(A) by the number of acres of the first insured crop that were planted in each respective year (In the example above, 50 divided by 100 equals 50 percent of the first insured crop acres that were double cropped in 2016 and 70 divided by 100 equals 70 percent of the first insured crop acres that were double cropped in 2017);

    (C) Add the results of section 15(h)(5)(i)(B) and divide by the number of years the first insured crop was double cropped (In the example above, 50 plus 70 equals 120 divided by 2 equals 60 percent); and

    (D) Multiply the result of 15(h)(5)(i)(C) by the number of insured acres of the first insured crop (In the example above, 60 percent multiplied by the number of wheat acres insured in 2018); or

    (ii) The applicable acreage was double cropped (by one or more other producers, and the producer(s) will allow you to use their records) for at least two of the last four crop years in which the first insured crop was grown on it; and

(6) If you do not have records of acreage and production specific to the double cropped acreage, as required in section 15(h)(5), but instead have records that combine production from acreage you double cropped with records of production from acreage you did not double crop, we will allocate the first and second crop production to the specific acreage in proportion to the liability for the acreage that was and was not double cropped.

(i) If you provided acceptable records in accordance with section 15(h), your double cropping history is based on the acres historically cropped:

(1) If the records you provided are from acreage you double cropped in at least two of the last four crop years, you may apply your history of double cropping to any acreage of the insured crop in the county (*e.g.*, if you have double cropped 100 acres of wheat and soybeans in the county and you acquire an additional 100 acres in the county, you can apply that history of double cropped acreage to any of the 200 acres in the county as long as it does not exceed 100 acres); or

(2) If the records you provided are from acreage that one or more other producers double cropped in at least two of the last four crop years, you may only use the history of double cropping for the same physical acres from which double cropping records were provided (*e.g.*, if a neighbor has double cropped 100 acres of wheat and soybeans in the county and you acquire your neighbor's 100 double cropped acres and an

additional 100 acres in the county, you can only apply your neighbor's history of double cropped acreage to the same 100 acres that your neighbor double cropped).

(j)  If any Federal or State agency requires destruction of any insured crop or crop production, as applicable, because it contains levels of a substance, or has a condition, that is injurious to human or animal health in excess of the maximum amounts allowed by the Food and Drug Administration, other public health organizations of the United States or an agency of the applicable State, you must destroy the insured crop or crop production, as applicable, and certify that such insured crop or crop production has been destroyed prior to receiving an indemnity payment.  Failure to destroy the insured crop or crop production, as applicable, will result in you having to repay any indemnity paid and you may be subject to administrative sanctions in accordance with section 515(h) of the Act and 7 CFR part 400, subpart R, and any applicable civil or criminal sanctions.

**16. Late Planting.**

Unless limited by the Crop Provisions, insurance will be provided for acreage planted to the insured crop after the final planting date in accordance with the following:

(a)  The production guarantee or amount of insurance for each acre planted to the insured crop during the late planting period will be reduced by 1 percent per day for each day planted after the final planting date.

(b)  Acreage planted after the late planting period (or after the final planting date for crops that do not have a late planting period) may be insured as follows:

(1)  The production guarantee or amount of insurance for each acre planted as specified in this subsection will be determined by multiplying the production guarantee or amount of insurance that is provided for acreage of the insured crop that is timely planted by the prevented planting coverage level percentage you elected, or that is contained in the Crop Provisions if you did not elect a prevented planting coverage level percentage;

(2)  Planting on such acreage must have been prevented by the final planting date (or during the late planting period, if applicable) by an insurable cause occurring within the insurance period for prevented planting coverage; and

(3)  All production from insured acreage as specified in this section will be included as production to count for the unit.

(c)  The premium amount for insurable acreage specified in this section will be the same as that for timely planted acreage.  If the amount of premium you are required to pay (gross premium less our subsidy) for such acreage exceeds the liability, coverage for those acres will not be provided (no premium will be due and no indemnity will be paid).

(d)  Any acreage on which an insured cause of loss is a material factor in preventing completion of planting, as specified in the definition of "planted acreage" (*e.g.*, seed is broadcast on the soil surface but cannot be incorporated) will be considered as acreage planted

after the final planting date and the production guarantee will be calculated in accordance with section 16(b)(1).

**17. Prevented Planting.**

(a)  Unless limited by the policy provisions, a prevented planting payment may be made to you for eligible acreage if:

(1)  You are prevented from planting the insured crop on insurable acreage by an insured cause of loss that occurs:

(i)  On or after the sales closing date contained in the Special Provisions for the insured crop in the county for the crop year the application for insurance is accepted; or

(ii)  For any subsequent crop year, on or after the sales closing date for the previous crop year for the insured crop in the county, provided insurance has been in force continuously since that date.  Cancellation for the purpose of transferring the policy to a different insurance provider for the subsequent crop year will not be considered a break in continuity for the purpose of the preceding sentence;

(2)  You include on your acreage report any insurable acreage of the insured crop that was prevented from being planted; and

(3)  You did not plant the insured crop during or after the late planting period.  Acreage planted to the insured crop during or after the late planting period is covered under the late planting provisions.

(b)  The actuarial documents may contain additional levels of prevented planting coverage that you may purchase for the insured crop:

(1)  Such purchase must be made on or before the sales closing date.

(2)  If you do not purchase one of those additional levels by the sales closing date, you will receive the prevented planting coverage specified in the Crop Provisions.

(3)  If you have a Catastrophic Risk Protection Endorsement for any crop, the additional levels of prevented planting coverage will not be available for that crop.

(4)  You cannot increase your elected or assigned prevented planting coverage level for any crop year if a cause of loss that could prevent planting (even though it is not known whether such cause will actually prevent planting) has occurred during the prevented planting insurance period specified in section 17(a)(1)(i) or (ii) and prior to your request to change your prevented planting coverage level.

(c)  The premium amount for acreage that is prevented from being planted will be the same as that for timely planted acreage except as specified in section 15(f). If the amount of premium you are required to pay (gross premium less the subsidy) for acreage that is prevented from being planted exceeds the liability on such acreage, coverage for those acres will not be

provided (no premium will be due and no indemnity will be paid for such acreage).

(d) Prevented planting coverage will be provided against:

(1) Drought, failure of the irrigation water supply, failure or breakdown of irrigation equipment or facilities, or the inability to prepare the land for irrigation using your established irrigation method, due to an insured cause of loss only if, on the final planting date (or within the late planting period if you elect to try to plant the crop), you provide documentation acceptable to us to establish:

(i) For non-irrigated acreage, the area that is prevented from being planted has insufficient soil moisture for germination of seed or progress toward crop maturity due to a prolonged period of dry weather. The documentation for prolonged period of dry weather must be verifiable using information collected by sources whose business it is to record and study the weather, including, but not limited to, local weather reporting stations of the National Weather Service; or

(ii) For irrigated acreage:

(A) Due to an insured cause of loss, there is not a reasonable expectation of having adequate water to carry out an irrigated practice or you are unable to prepare the land for irrigation using your established irrigation method:

(1) If you knew or had reason to know on the final planting date or during the late planting period that your water will be reduced, no reasonable expectation exists; and

(2) Available water resources will be verified using information from State Departments of Water Resources, U.S. Bureau of Reclamation, Natural Resources Conservation Service or other sources whose business includes collection of water data or regulation of water resources; or

(B) The irrigation equipment or facilities have failed or broken down if such failure or breakdown is due to an insured cause of loss specified in section 12(d).

(2) Causes other than drought, failure of the irrigation water supply, failure or breakdown of the irrigation equipment or facilities, or your inability to prepare the land for irrigation using your established irrigation method, provided the cause of loss is specified in the Crop Provisions. However, if it is possible for you to plant on or prior to the final planting date when other producers in the area are planting and you fail to plant, no prevented planting payment will be made.

(e) The maximum number of acres that may be eligible for a prevented planting payment for any crop will be determined as follows:

(1) The total number of acres eligible for prevented planting coverage for all crops cannot exceed the number of acres of cropland in your farming operation for the crop year, unless you are eligible for prevented planting coverage on double cropped acreage in accordance with section 17(f)(4). The eligible acres for each insured crop will be determined as follows:

(i) If you have planted any crop in the county for which prevented planting insurance was available (you will be considered to have planted if your APH database contains actual planted acres) or have received a prevented planting insurance guarantee in any one or more of the four most recent crop years, and the insured crop is not required to be contracted with a processor to be insured:

(A) The number of eligible acres will be the maximum number of acres certified for APH purposes, or insured acres reported, for the crop in any one of the four most recent crop years (not including reported prevented planting acreage that was planted to a second crop unless you meet the double cropping requirements in section 17(f)(4)).

(B) If you acquire additional land for the current crop year, the number of eligible acres determined in section 17(e)(1)(i)(A) for a crop may be increased by multiplying it by the ratio of the total cropland acres that you are farming this year (if greater) to the total cropland acres that you farmed in the previous year, provided that:

(1) You submit proof to us that you acquired additional acreage for the current crop year by any of the methods specified in section 17(f)(12);

(2) The additional acreage was acquired in time to plant it for the current crop year using good farming practices; and

(3) No cause of loss has occurred at the time you acquire the acreage that may prevent planting (except acreage you leased the previous year and continue to lease in the current crop year).

(C) If you add adequate irrigation facilities to your existing non-irrigated acreage or if you acquire additional land for the current crop year that has adequate irrigation facilities, the number of eligible acres determined in section 17(e)(1)(i)(A) for irrigated acreage of a

crop may be increased by multiplying it by the ratio of the total irrigated acres that you are farming this year (if greater) to the total irrigated acres that you farmed in the previous year, provided the conditions in sections 17(e)(1)(i)(B)(*1*), (*2*) and (*3*) are met. If there were no irrigated acres in the previous year, the eligible irrigated acres for a crop will be limited to the lesser of the number of eligible non-irrigated acres of the crop or the number of acres on which adequate irrigation facilities were added.

(ii) If you have not planted any crop in the county for which prevented planting insurance was available (you will be considered to have planted if your APH database contains actual planted acres) or have not received a prevented planting insurance guarantee in all of the four most recent crop years, and the insured crop is not required to be contracted with a processor to be insured:

(A) The number of eligible acres will be:
  (*1*) The number of acres specified on your intended acreage report, which must be submitted to us by the sales closing date for all crops you insure for the crop year and that is accepted by us; or
  (*2*) The number of acres specified on your intended acreage report, which must be submitted to us within 10 days of the time you acquire the acreage and that is accepted by us, if, on the sales closing date, you do not have any acreage in a county and you subsequently acquire acreage through a method described in section 17(f)(12) in time to plant it using good farming practices.

(B) The total number of acres listed on the intended acreage report may not exceed the number of acres of cropland in your farming operation at the time you submit the intended acreage report.

(C) If you acquire additional acreage after we accept your intended acreage report, the number of acres determined in section 17(e)(1)(ii)(A) may be increased in accordance with section 17(e)(1)(i)(B) and (C).

(D) Prevented planting coverage will not be provided for any acreage included on the intended acreage report or any increased amount of acreage determined in accordance with section 17(e)(1)(ii)(C) if a cause of loss that may prevent planting occurred before the acreage was acquired, as determined by us.

(iii) For any crop that must be contracted with a processor to be insured:

(A) The number of eligible acres will be:
  (*1*) The number of acres of the crop specified in the processor contract, if the contract specifies a number of acres contracted for the crop year;
  (*2*) The result of dividing the quantity of production stated in the processor contract by your approved yield, if the processor contract specifies a quantity of production that will be accepted (for the purposes of establishing the number of prevented planting acres, any reductions applied to the transitional yield for failure to certify acreage and production for four prior years will not be used); or
  (*3*) Notwithstanding sections 17(e)(1)(iii)(A)(*1*) and (*2*), if a minimum number of acres or amount of production is specified in the processor contract, this amount will be used to determine the eligible acres.

(B) If a processor cancels or does not provide contracts, or reduces the contracted acreage or production from what would have otherwise been allowed, solely because the acreage was prevented from being planted due to an insured cause of loss, we will determine the number of eligible acres based on the number of acres or amount of production you had contracted in the county in the previous crop year. If the applicable Crop Provisions require that the price election be based on a contract price, and a contract is not in force for the current year, the price election will be based on the contract price in place for the previous crop year. If you did not have a processor contract in place for the previous crop year, you will not have any eligible prevented planting acreage for the applicable processor crop. The total eligible prevented planting acres in all counties cannot exceed the total number of acres or amount of production contracted in all counties in the previous crop year.

(2) Any eligible acreage determined in accordance with section 17(e)(1) will be reduced by subtracting the number of acres of the crop (insured and uninsured) that are timely and late planted, including acreage specified in section 16(b).

(f) Regardless of the number of eligible acres determined in section 17(e), prevented planting coverage will not be provided for any acreage:

(1) That does not constitute at least 20 acres or 20 percent of the insurable crop acreage in the unit, whichever is less (If the crop is in a whole-farm unit, the 20 acre or 20 percent requirement will be applied separately to each crop in the whole-farm unit).  Any prevented planting acreage within a field that contains planted acreage will be considered to be acreage of the same crop, type, and practice that is planted in the field unless:

   (i) The acreage that was prevented from being planted constitutes at least 20 acres or 20 percent of the total insurable acreage in the field and you produced both crops, crop types, or followed both practices in the same field in the same crop year within any one of the four most recent crop years;

   (ii) You were prevented from planting a first insured crop and you planted a second crop in the field (There can only be one first insured crop in a field unless the requirements in section 17(f)(1)(i) or (iii) are met); or

   (iii) The insured crop planted in the field would not have been planted on the remaining prevented planting acreage (e.g., where rotation requirements would not be met or you already planted the total number of acres specified in the processor contract);

(2) For which the actuarial documents do not provide the information needed to determine the premium rate, unless a written agreement designates such premium rate;

(3) Used for conservation purposes, intended to be left unplanted under any program administered by the USDA or other government agency, or required to be left unharvested under the terms of the lease or any other agreement (The number of acres eligible for prevented planting will be limited to the number of acres specified in the lease for which you are required to pay either cash or share rent);

(4) On which the insured crop is prevented from being planted, if you or any other person receives a prevented planting payment for any crop for the same acreage in the same crop year, excluding share arrangements, unless:

   (i) It is a practice that is generally recognized by agricultural experts or organic agricultural experts in the area to plant the insured crop for harvest following harvest of the first insured crop, and additional coverage insurance offered under the authority of the Act is available in the county for both crops in the same crop year;

   (ii) For the insured crop that is prevented from being planted, you provide records acceptable to us of acreage and production that show, in at least two of the last four crop years:

     (A) You have double cropped acreage on which the insured crop that is prevented from being planted in the current crop year was grown (You may apply your history of double cropping to any acreage of the insured crop in the county (e.g., if you have double cropped 100 acres of wheat and soybeans in the county and you acquire an additional 100 acres in the county, you can apply that history of double cropped acreage to any of the 200 acres in the county as long as it does not exceed 100 acres)); or

     (B) The acreage you are prevented from planting in the current crop year was double cropped with the insured crop that is prevented from being planted (You may only use the history of double cropping for the same physical acres from which double cropping records were obtained (e.g., if a neighbor has double cropped 100 acres of wheat and soybeans in the county and you acquire your neighbor's 100 double cropped acres and an additional 100 acres in the county, you can only apply your neighbor's history of double cropped acreage to the same 100 acres that your neighbor double cropped)); and

     (iii) The amount of acreage you are double cropping in the current crop year does not exceed the number of acres for which you provided the records required in section 17(f)(4)(ii);

(5) On which the insured crop is prevented from being planted, if:

   (i) Any crop is planted within or prior to the late planting period or on or prior to the final planting date if no late planting period is applicable, unless:

     (A) You meet the double cropping requirements in section 17(f)(4);

     (B) The crop planted was a cover crop; or

     (C) No benefit, including any benefit under any USDA program, was derived from the crop; or

   (ii) Any volunteer or cover crop is hayed, grazed or otherwise harvested within or prior to the late planting period or on or prior to the final planting date if no late planting period is applicable;

(6) For which planting history or conservation plans indicate the acreage would have remained fallow for crop rotation purposes or on which any pasture or forage crop is in place on the acreage during the time planting of the insured crop generally occurs in the area.  Cover plants that are seeded, transplanted, or that volunteer:

   (i) More than 12 months prior to the final planting date for the insured crop that was prevented from being planted will be considered pasture or a forage crop that is in place (e.g., the cover crop is planted 15 months prior to the final planting date and remains in place during the time the insured crop would normally be planted); or

(ii)   Less than 12 months prior to the final planting date for the insured crop that was prevented from being planted will not be considered pasture or a forage crop that is in place;

(7)  That exceeds the number of acres eligible for a prevented planting payment;

(8)  That exceeds the number of eligible acres physically available for planting;

(9)  For which you cannot provide proof that you had the inputs (including, but not limited to, sufficient equipment and labor) available to plant and produce a crop with the expectation of producing at least the yield used to determine your production guarantee or amount of insurance. Evidence that you previously had planted the crop on the unit will be considered adequate proof unless:

(i)   There has been a change in the availability of inputs since the crop was last planted that could affect your ability to plant and produce the insured crop;

(ii)   We determine you have insufficient inputs to plant the total number of insured crop acres (*e.g.*, you will not receive a prevented planting payment if you have sufficient inputs to plant only 80 acres but you have already planted 80 acres and are claiming prevented planting on an additional 100 acres); or

(iii)   Your planting practices or rotational requirements show the acreage would have remained fallow or been planted to another crop;

(10) Based on an irrigated practice production guarantee or amount of insurance unless adequate irrigation facilities were in place to carry out an irrigated practice on the acreage prior to the insured cause of loss that prevented you from planting.   Acreage with an irrigated practice production guarantee will be limited to the number of acres allowed for that practice under sections 17(e) and (f);

(11) Based on a crop type that you did not plant, or did not receive a prevented planting insurance guarantee for, in at least one of the four most recent crop years:

(i)   Types for which separate projected prices or price elections, as applicable, amounts of insurance, or production guarantees are available must be included in your APH database in at least one of the four most recent crop years (Crops for which the insurance guarantee is not based on APH must be reported on your acreage report in at least one of the four most recent crop years) except as allowed in section 17(e)(1)(ii) or (iii); and

(ii)   We will limit prevented planting payments based on a specific crop type to the number of acres allowed for that crop type as specified in sections 17(e) and (f); or

(12) If a cause of loss has occurred that may prevent planting at the time:

(i)   You lease the acreage (except acreage you leased the previous crop year and continue to lease in the current crop year);

(ii)   You buy the acreage;

(iii)   The acreage is released from a USDA program which prohibits harvest of a crop;

(iv)   You request a written agreement to insure the acreage; or

(v)   You acquire the acreage through means other than lease or purchase (such as inherited or gifted acreage).

(g)  If you purchased an additional coverage policy for a crop, and you executed a High-Risk Land Exclusion Option that separately insures acreage which has been designated as "high-risk" land by FCIC under a Catastrophic Risk Protection Endorsement for that crop, the maximum number of acres eligible for a prevented planting payment will be limited for each policy as specified in sections 17(e) and (f).

(h)  If you are prevented from planting a crop for which you do not have an adequate base of eligible prevented planting acreage, as determined in accordance with section 17(e)(1), we will use acreage from another crop insured for the current crop year for which you have remaining eligible prevented planting acreage.

(1)  The crop first used for this purpose will be the insured crop that would have a prevented planting payment most similar to the payment for the crop that was prevented from being planted.

(i)   If there are still insufficient eligible prevented planting acres, the next crop used will be the insured crop that would have the next closest prevented planting payment.

(ii)   In the event payment amounts based on other crops are an equal amount above and below the payment amount for the crop that was prevented from being planted, eligible acres for the crop with the higher payment amount will be used first.

(2)  The prevented planting payment and premium will be based on:

(i)   The crop that was prevented from being planted if the insured crop with remaining eligible acreage would have resulted in a higher prevented planting payment than would have been paid for the crop that was prevented from being planted; or

(ii)   The crop from which eligible acres are being used if the insured crop with remaining eligible acreage will result in a lower prevented planting payment than would have been paid for the crop that was prevented from being planted.

(3)  For example, assume you were prevented from planting 200 acres of corn and have 100 acres eligible for a corn prevented planting guarantee that would result in a payment of $40 per acre. You also had 50 acres of potato eligibility that would result in a $100 per acre payment and 90 acres of grain sorghum eligibility that would result in a $30 per acre payment.   Your prevented planting coverage will be based on 100 acres of

corn ($40 per acre), 90 acres of grain sorghum ($30 per acre), and an additional 10 acres of corn (using potato eligible acres and paid as corn at $40 per acre).  Your prevented planting payment would be $7,100 ($4,000 + $2,700 + $400).

(4) Prevented planting coverage will be allowed as specified in section 17(h) only if the crop that was prevented from being planted meets all policy provisions, except for having an adequate base of eligible prevented planting acreage. Payment may be made based on crops other than those that were prevented from being planted even though other policy provisions, including but not limited to, processor contract and rotation requirements, have not been met for the crop whose eligible acres are being used.

(5) An additional administrative fee will not be due as a result of using eligible prevented planting acreage as specified in section 17(h).

(i) The prevented planting payment for any eligible acreage within a unit will be determined by:

(1) Multiplying the prevented planting coverage level percentage you elected, or that is contained in the Crop Provisions if you did not elect a prevented planting coverage level percentage, by:

(i) Your amount of insurance per acre; or

(ii) The amount determined by multiplying the production guarantee (per acre) for timely planted acreage of the insured crop (or type, if applicable) by your price election or your projected price, whichever is applicable;

(2) Multiplying the result of section 17(i)(1) by the number of eligible prevented planting acres in the unit; and

(3) Multiplying the result of section 17(i)(2) by your share.

**18. Written Agreements.**

Terms of this policy which are specifically designated for the use of written agreements may be altered by written agreement in accordance with the following:

(a) You must apply in writing for each written agreement (including renewal of a written agreement) no later than the sales closing date, except as provided in section 18(e);

(b) The application for a written agreement must contain all variable terms of the contract between you and us that will be in effect if the written agreement is not approved;

(c) If approved by FCIC, the written agreement will include all variable terms of the contract, including, but not limited to, the crop; practice, type or variety; guarantee; premium rate; and projected price, harvest price, price election or amount of insurance, as applicable, or the information needed to determine such variable terms.  If the written agreement is for a county:

(1) That has a price election or amount of insurance stated in the actuarial documents for the crop, practice, type or variety, the written agreement will contain the price election or amount of insurance stated in the actuarial documents for the crop, practice, type or variety;

(2) That does not have price elections or amounts of insurance stated in the actuarial documents for

the crop, practice, type or variety, the written agreement will contain a price election or amount of insurance that does not exceed the price election or amount of insurance contained in the actuarial documents for the county that is used to establish the other terms of the written agreement, unless otherwise authorized by the Crop Provisions;

(3) For which revenue protection is not available for the crop, but revenue protection is available in the State for the crop, the written agreement will contain the information used to establish the projected price and harvest price, as applicable, for that State; or

(4) In a State for which revenue protection is not available for the crop, but revenue protection is available for the crop in another State, the written agreement is available for yield protection only, and will contain the information needed to determine the projected price for the crop from another State as determined by FCIC;

(d) Each written agreement will only be valid for the number of crop years specified in the written agreement, and a multi-year written agreement:

(1) Will only apply for any particular crop year designated in the written agreement if all terms and conditions in the written agreement are still applicable for the crop year and the conditions under which the written agreement has been provided have not changed prior to the beginning of the insurance period (If conditions change during or prior to the crop year, the written agreement will not be effective for that crop year but may still be effective for a subsequent crop year if conditions under which the written agreement has been provided exist for such year);

(2) May be canceled in writing by:

(i) FCIC not less than 30 days before the cancellation date if it discovers that any term or condition of the written agreement, including the premium rate, is not appropriate for the crop; or

(ii) You or us on or before the cancellation date;

(3) That is not renewed in writing after it expires, is not applicable for a crop year, or is canceled, then insurance coverage will be in accordance with the terms and conditions stated in this policy, without regard to the written agreement; and

(4) Will be automatically canceled if you transfer your policy to another insurance provider (No notice will be provided to you and for any subsequent crop year, for a written agreement to be effective, you must timely request renewal of the written agreement in accordance with this section);

(e) A request for a written agreement may be submitted:

(1) After the sales closing date, but on or before the acreage reporting date, if you demonstrate your physical inability to submit the request on or before the sales closing date (*e.g.*, you have been hospitalized or a blizzard has made it impossible to submit the written agreement request in person or by mail); or

(2) For the first year the written agreement is requested:
  (i) On or before the acreage reporting date to:
    (A) Insure unrated land, or an unrated practice, type or variety of a crop; although, if required by FCIC, such written agreements may be approved only after appraisal of the acreage by us and:
      (1) The crop's potential is equal to or exceeds 90 percent of the yield used to determine your production guarantee or amount of insurance; and
      (2) You sign the written agreement no later than the date the first field is appraised or by the expiration date for you to accept the offer, whichever comes first; or
    (B) Establish optional units in accordance with FCIC procedures that otherwise would not be allowed or change the premium rate or transitional yield for designated high-risk land;
  (ii) On or before the cancellation date to insure a crop in a county that does not have actuarial documents for the crop (If the Crop Provisions do not provide a cancellation date for the county, the cancellation date for other insurable crops in the same State that have similar final planting and harvesting dates will be applicable); or
  (iii) On or before the date specified in the Crop Provisions or Special Provisions;
(f) A request for a written agreement must contain:
  (1) For all written agreement requests:
    (i) A completed "Request for Actuarial Change" form;
    (ii) A completed APH (only for crop policies that require APH) based on verifiable records of actual yields for the crop and county for which the written agreement is being requested (the actual yields do not necessarily have to be from the same physical acreage for which you are requesting a written agreement), and verifiable records of actual yields if required by FCIC;
    (iii) Evidence from agricultural experts or organic agricultural experts, as applicable, that the crop can be produced in the area if the request is to provide insurance for the crop, practices, types, or varieties that are not insurable, unless we are notified in writing by FCIC that such evidence is not required by FCIC;
    (iv) The legal description of the land (in areas where legal descriptions are available) and the FSA farm number including tract and field numbers, if available. The submission must also include an FSA aerial photograph, or field boundaries derived by a Geographic Information System or Global Positioning System, or other legible maps

delineating field boundaries where you intend to plant the crop for which insurance is requested; and
    (v) For any perennial crop, an inspection report completed by us;
  (2) For written agreement requests for counties without actuarial documents for the crop, the requirements in section 18(f)(1) (except section 18(f)(1)(ii)) and:
    (i) For a crop you (or anyone with a substantial beneficial interest in you) have previously planted (or produced a crop if the crop is a perennial crop) in the county or area for at least three years:
      (A) A completed APH (only for crop policies that require APH) based on verifiable production records of actual yields for the crop; and
      (B) Verifiable production records for at least the three most recent crop years in which the crop was planted (or produced a crop if the crop is a perennial crop):
        (1) The verifiable production records do not necessarily have to be from the same physical acreage for which you are requesting a written agreement;
        (2) Verifiable production records do not have to be submitted for any year you (or anyone with a substantial beneficial interest in you) have insured the crop in the county or area and have certified the yields on the applicable production reports or the yields are based on your insurance claim (although you are not required to submit production records, you still must maintain production records in accordance with section 21); and
        (3) FCIC will not consider any crop year in which the crop was planted (or produced a crop if the crop is a perennial crop) outside of the most recent ten crop years as a year of previously planting the crop (or having produced a crop if the crop is a perennial crop), unless verifiable production records are provided, or the crop was insured for that crop year;
    (ii) For a crop you (or anyone with a substantial beneficial interest in you) have not previously planted (or produced a crop if the crop is a perennial crop) in the county or area for at least three years:
      (A) A completed APH (only for crop policies that require APH) based on verifiable production records of actual yields for the similar crop;
      (B) Verifiable production records for at least the three most recent crop years in which the similar crop was planted (or

produced a crop if the crop is a perennial crop) in the county or area:

(*1*) The verifiable production records for the similar crop do not necessarily have to be from the same physical acreage for which you are requesting a written agreement;

(*2*) Verifiable production records do not have to be submitted for any crop year you (or anyone with a substantial beneficial interest in you) have insured the similar crop in the county or area and have certified the yields on the applicable production reports or the yields are based on your insurance claim (although you are not required to submit production records, you still must maintain production records in accordance with section 21); and

(*3*) FCIC will not consider any crop year in which the similar crop was planted (or produced a crop if the crop is a perennial crop) outside of the most recent ten crop years as a year of previously planting the similar crop (or having produced a crop if the crop is a perennial crop), unless verifiable production records are provided, or the similar crop was insured, for that crop year;

(C) If you (or anyone with a substantial beneficial interest in you) have at least one year of production records, but less than three years of production records, for the crop in the county or area but have production records for a similar crop in the county or area such that the combination of both sets of records results in at least three years of production records, you must provide the information required in sections 18(f)(2)(i)(A) and (B) for the years you (or anyone with a substantial beneficial interest in you) planted the crop (or produced a crop if the crop is a perennial crop) in the county or area and the information required in sections 18(f)(2)(ii)(A) and (B) regarding the similar crop for the remaining years; and

(D) A similar crop to the crop for which a written agreement is being requested must:

(*1*) Be included in the same category of crops, *e.g.*, row crops (including, but not limited to, small grains, coarse grains, and oil seed crops), vegetable crops grown in rows, tree crops, vine crops, bush crops, etc., as defined by FCIC;

(*2*) Have substantially the same growing season (i.e., normally planted around the same dates and harvested around the same dates);

(*3*) Require comparable agronomic conditions (*e.g.*, comparable needs for water, soil, etc.); and

(*4*) Be subject to substantially the same risks (frequency and severity of loss would be expected to be comparable from the same cause of loss);

(iii) The dates you and other growers in the area normally plant and harvest the crop, if applicable;

(iv) The name, location of, and approximate distance to the place the crop will be sold or used by you; and

(v) For any irrigated practice, the water source, method of irrigation, and the amount of water needed for an irrigated practice for the crop; and

(3) Such other information as specified in the Special Provisions or required by FCIC;

(g) A request for a written agreement will not be accepted if:

(1) The request is submitted to us after the applicable deadline contained in sections 18(a) or (e);

(2) All the information required in section 18(f) is not submitted to us with the request for a written agreement (The request for a written agreement may be accepted if any missing information is available from other acceptable sources); or

(3) The request is not authorized by the policy;

(h) A request for a written agreement will be denied if:

(1) FCIC determines the risk is excessive;

(2) Your APH history demonstrates you have not produced at least 50 percent of the transitional yield for the crop, type, and practice obtained from the county, or a county with similar agronomic conditions and risk exposure, when previously grown;

(3) There is not adequate information available to establish an actuarially sound premium rate and insurance coverage for the crop and acreage;

(4) The crop, or a similar crop, was not previously grown in the county or area, or there is no evidence of a market for the crop (applicable only for counties without actuarial documents); or

(5) Agricultural experts or organic agricultural experts determine the crop, practice, or type is not adapted to the county;

(i) A written agreement will be denied unless:

(1) FCIC approves the written agreement;

(2) The original written agreement is signed by you and delivered to us, or postmarked, not later than the expiration date for you to accept the offer;

(3) We accept the written agreement offer; and

(4) The crop meets the minimum appraisal amount specified in section 18(e)(2)(i)(A)(*1*), if applicable;

(j) Multi-year written agreements may be canceled and requests for renewal may be rejected if the severity or frequency of your loss experience under the written agreement is significantly worse than expected based

NHF2-526 Policy 000044

on the information provided by you or used to establish your premium rate and the loss experience of other crops with similar risks in the area;

(k) With respect to your and our ability to reject an offer for a written agreement:

(1) When a single Request for Actuarial Change form is submitted, regardless of how many requests for changes are contained on the form, you and we can only accept or reject the written agreement in its entirety (you cannot reject specific terms of the written agreement and accept others);

(2) When multiple Request for Actuarial Change forms are submitted, regardless of when the forms are submitted, for the same condition or for the same crop (i.e., to insure corn on ten legal descriptions where there are no actuarial documents in the county or the request is to change the premium rates from the high-risk rates) all these forms may be treated as one request and you and we will only have the option of accepting or rejecting the written agreement in its entirety (you cannot reject specific terms of the written agreement and accept others);

(3) When multiple Request for Actuarial Change forms are submitted, regardless of when the forms are submitted, for the different conditions or for different crops, separate agreements may be issued and you and we will have the option to accept or reject each written agreement; and

(4) If we reject an offer for a written agreement approved by FCIC, you may seek arbitration or mediation of our decision to reject the offer in accordance with section 20;

(l) Any information that is submitted by you after the applicable deadlines in sections 18(a) and (e) will not be considered, unless such information is specifically requested in accordance with section 18(f)(3);

(m) If the written agreement or the policy is canceled for any reason, or the period for which an existing written agreement is in effect ends, a request for renewal of the written agreement must contain all the information required by this section and be submitted in accordance with section 18(a), unless otherwise specified by FCIC;

(n) If a request for a written agreement is not approved by FCIC, a request for a written agreement for any subsequent crop year that fails to address the stated basis for the denial will not be accepted (If the request for a written agreement contains the same information that was previously rejected or denied, you will not have any right to arbitrate, mediate or appeal the non-acceptance of your request); and

(o) If you disagree with any determination made by FCIC under section 18, you may obtain administrative review in accordance with 7 CFR part 400, subpart J or appeal in accordance with 7 CFR part 11, unless you have failed to comply with the provisions contained in section 18(g) or section 18(i)(2) or (4).

**19. Crops as Payment.**
You must not abandon any crop to us. We will not accept any crop as compensation for payments due us.

**20. Mediation, Arbitration, Appeal, Reconsideration, and Administrative and Judicial Review.**
(a) If you and we fail to agree on any determination made

by us except those specified in section 20(d) or (e), the disagreement may be resolved through mediation in accordance with section 20(g). If resolution cannot be reached through mediation, or you and we do not agree to mediation, the disagreement must be resolved through arbitration in accordance with the rules of the American Arbitration Association (AAA), except as provided in sections 20(c) and (f), and unless rules are established by FCIC for this purpose. Any mediator or arbitrator with a familial, financial or other business relationship to you or us, or our agent or loss adjuster, is disqualified from hearing the dispute.

(1) All disputes involving determinations made by us, except those specified in section 20(d) or (e), are subject to mediation or arbitration. However, if the dispute in any way involves a policy or procedure interpretation, regarding whether a specific policy provision or procedure is applicable to the situation, how it is applicable, or the meaning of any policy provision or procedure, either you or we must obtain an interpretation from FCIC in accordance with 7 CFR part 400, subpart X or such other procedures as established by FCIC.

(i) Any interpretation by FCIC will be binding in any mediation or arbitration.

(ii) Failure to obtain any required interpretation from FCIC will result in the nullification of any agreement or award.

(iii) An interpretation by FCIC of a policy provision is considered a determination that is a matter of general applicability.

(iv) An interpretation by FCIC of a procedure may be appealed to the National Appeals Division in accordance with 7 CFR part 11.

(2) Unless the dispute is resolved through mediation, the arbitrator must provide to you and us a written statement describing the issues in dispute, the factual findings, the determinations and the amount and basis for any award and breakdown by claim for any award. The statement must also include any amounts awarded for interest. Failure of the arbitrator to provide such written statement will result in the nullification of all determinations of the arbitrator. All agreements reached through settlement, including those resulting from mediation, must be in writing and contain at a minimum a statement of the issues in dispute and the amount of the settlement.

(b) Regardless of whether mediation is elected:

(1) The initiation of arbitration proceedings must occur within one year of the date we denied your claim or rendered the determination with which you disagree, whichever is later;

(2) If you fail to initiate arbitration in accordance with section 20(b)(1) and complete the process, you will not be able to resolve the dispute through judicial review;

(3) If arbitration has been initiated in accordance with section 20(b)(1) and completed, and judicial review is sought, suit must be filed not later than one year after the date the arbitration decision was rendered; and

(4) In any suit, if the dispute in any way involves a policy or procedure interpretation, regarding whether a specific policy provision or procedure is applicable to the situation, how it is applicable, or the meaning of any policy provision or procedure, an interpretation must be obtained from FCIC in accordance with 7 CFR part 400, subpart X or such other procedures as established by FCIC.  Such interpretation will be binding.

(c) Any decision rendered in arbitration is binding on you and us unless judicial review is sought in accordance with section 20(b)(3).  Notwithstanding any provision in the rules of the AAA, you and we have the right to judicial review of any decision rendered in arbitration.

(d) With respect to good farming practices:

(1) We will make decisions regarding what constitutes a good farming practice and determinations of assigned production for uninsured causes for your failure to use good farming practices.

(i) If you disagree with our decision of what constitutes a good farming practice, you must request a determination from FCIC of what constitutes a good farming practice before filing any suit against FCIC.

(ii) If you disagree with our determination of the amount of assigned production, you must use the arbitration or mediation process contained in this section.

(iii) You may not sue us for our decisions regarding whether good farming practices were used by you.

(2) FCIC will make determinations regarding what constitutes a good farming practice.  If you do not agree with any determination made by FCIC:

(i) You may request reconsideration by FCIC of this determination in accordance with the reconsideration process established for this purpose and published at 7 CFR part 400, subpart J; or

(ii) You may file suit against FCIC.

(A) You are not required to request reconsideration from FCIC before filing suit.

(B) Any suit must be brought against FCIC in the United States district court for the district in which the insured acreage is located.

(C) Suit must be filed against FCIC not later than one year after the date:

(1) Of the determination; or

(2) Reconsideration is completed, if reconsideration was requested under section 20(d)(2)(i).

(e) Except as provided in sections 18(n) or (o), or 20(d) or (k), if you disagree with any other determination made by FCIC or any claim where FCIC is directly involved in the claims process or directs us in the resolution of the claim, you may obtain an administrative review in accordance with 7 CFR part 400, subpart J (administrative review) or appeal in accordance with 7 CFR part 11 (appeal).

(1) If you elect to bring suit after completion of any appeal, such suit must be filed against FCIC not later than one year after the date of the decision rendered in such appeal.

(2) Such suit must be brought in the United States district court for the district in which the insured acreage is located.

(3) Under no circumstances can you recover any attorney fees or other expenses, or any punitive, compensatory or any other damages from FCIC.

(f) In any mediation, arbitration, appeal, administrative review, reconsideration or judicial process, the terms of this policy, the Act, and the regulations published at 7 CFR chapter IV, including the provisions of 7 CFR part 400, subpart P, are binding.  Conflicts between this policy and any state or local laws will be resolved in accordance with section 31.  If there are conflicts between any rules of the AAA and the provisions of your policy, the provisions of your policy will control.

(g) To resolve any dispute through mediation, you and we must both:

(1) Agree to mediate the dispute;

(2) Agree on a mediator; and

(3) Be present, or have a designated representative who has authority to settle the case present, at the mediation.

(h) Except as provided in section 20(i), no award or settlement in mediation, arbitration, appeal, administrative review or reconsideration process or judicial review can exceed the amount of liability established or which should have been established under the policy, except for interest awarded in accordance with section 26.

(i) In a judicial review only, you may recover attorneys fees or other expenses, or any punitive, compensatory or any other damages from us only if you obtain a determination from FCIC that we, our agent or loss adjuster failed to comply with the terms of this policy or procedures issued by FCIC and such failure resulted in you receiving a payment in an amount that is less than the amount to which you were entitled.  Requests for such a determination should be addressed to the following: USDA/RMA/Deputy Administrator of Compliance/ Stop 0806, 1400 Independence Avenue, SW., Washington, D.C. 20250-0806.

(j) If FCIC elects to participate in the adjustment of your claim, or modifies, revises or corrects your claim, prior to payment, you may not bring an arbitration, mediation or litigation action against us.  You must request administrative review or appeal in accordance with section 20(e).

(k) Any determination made by FCIC that is a matter of general applicability is not subject to administrative review under 7 CFR part 400, subpart J or appeal under 7 CFR part 11.  If you want to seek judicial review of any FCIC determination that is a matter of general applicability, you must request a determination of non-appealability from the Director of the National Appeals Division in accordance with 7 CFR 11.6 before seeking judicial review.

**21. Access to Insured Crop and Records, and Record Retention.**

(a) We, and any employee of USDA authorized to investigate or review any matter relating to crop

insurance, have the right to examine the insured crop and all records related to the insured crop and any mediation, arbitration or litigation involving the insured crop as often as reasonably required during the record retention period.

(b) You must retain, and provide upon our request, or the request of any employee of USDA authorized to investigate or review any matter relating to crop insurance:

    (1) Complete records of the planting, replanting, inputs, production, harvesting, and disposition of the insured crop on each unit for three years after the end of the crop year (This requirement also applies to all such records for acreage that is not insured);

    (2) All records used to establish the amount of production you certified on your production reports used to compute your approved yield for three years after the calendar date for the end of the insurance period for the crop year for which you initially certified such records, unless such records have already been provided to us (*e.g.*, if you are a new insured and you certify 2015 through 2018 crop year production records in 2019 to determine your approved yield for the 2019 crop year, you must retain all records from the 2015 through 2018 crop years through the 2022 crop year.  If you subsequently certify records of the 2019 crop year in 2020 to determine your approved yield for the 2020 crop year, you must retain the 2019 crop year records through the 2023 crop year and so forth for each subsequent year of production records certified); and

    (3) While you are not required to maintain records beyond the record retention period specified in section 21(b)(2), at any time, if we or FCIC have evidence that you, or anyone assisting you, knowingly misreported any information related to any yield you have certified, we or FCIC will replace all yields in your APH database determined to be incorrect with the lesser of an assigned yield determined in accordance with section 3 or the yield determined to be correct:

        (i) If an overpayment has been made to you, you will be required to repay the overpaid amount; and

        (ii) Replacement of yields in accordance with section 21(b)(3) does not exempt you from other sanctions applicable under the terms of the policy or any applicable law.

(c) We, or any employee of USDA authorized to investigate or review any matter relating to crop insurance, may extend the record retention period beyond three years by notifying you of such extension in writing.

(d) By signing the application for insurance authorized under the Act or by continuing insurance for which you have previously applied, you authorize us or USDA, or any person acting for us or USDA authorized to investigate or review any matter relating to crop insurance, to obtain records relating to the planting, replanting, inputs, production, harvesting, and disposition of the insured crop from any person who

may have custody of such records, including but not limited to, FSA offices, banks, warehouses, gins, cooperatives, marketing associations, and accountants.  You must assist in obtaining all records we or any employee of USDA authorized to investigate or review any matter relating to crop insurance request from third parties.

(e) Failure to provide access to the insured crop or the farm, authorize access to the records maintained by third parties or assist in obtaining such records will result in a determination that no indemnity is due for the crop year in which such failure occurred.

(f) Failure to maintain or provide records will result in:

    (1) The imposition of an assigned yield in accordance with section 3(f)(1) and 7 CFR part 400, subpart G for those crop years for which you do not have the required production records to support a certified yield;

    (2) A determination that no indemnity is due if you fail to provide records necessary to determine your loss;

    (3) Combination of the optional units into the applicable basic unit;

    (4) Assignment of production to the units by us if you fail to maintain separate records:

        (i) For your basic units; or

        (ii) For any uninsurable acreage; and

    (5) The imposition of consequences specified in section 6(g), as applicable.

(g) If the imposition of an assigned yield under section 21(f)(1) would affect an indemnity, prevented planting payment or replanting payment that was paid in a prior crop year, such claim will be adjusted and you will be required to repay any overpaid amounts.

**22. Other Insurance.**

(a) **Other Like Insurance** - Nothing in this section prevents you from obtaining other insurance not authorized under the Act.  However, unless specifically required by policy provisions, you must not obtain any other crop insurance authorized under the Act on your share of the insured crop.  If you cannot demonstrate that you did not intend to have more than one policy in effect, you may be subject to the consequences authorized under this policy, the Act, or any other applicable statute.  If you can demonstrate that you did not intend to have more than one policy in effect (For example, an application to transfer your policy or written notification to an insurance provider that states you want to purchase, or transfer, insurance and you want any other policies for the crop canceled would demonstrate you did not intend to have duplicate policies), and:

    (1) One is an additional coverage policy and the other is a Catastrophic Risk Protection policy:

        (i) The additional coverage policy will apply if both policies are with the same insurance provider or, if not, both insurance providers agree; or

        (ii) The policy with the earliest date of application will be in force if both insurance providers do not agree; or

    (2) Both are additional coverage policies or both are Catastrophic Risk Protection policies, the policy with the earliest date of application will be in force

and the other policy will be void, unless both policies are the same:

   (i)    The same insurance provider and the insurance provider agrees otherwise; or

   (ii)   Different insurance providers and both insurance providers agree otherwise.

(b) **Other Insurance Against Fire** - If you have other insurance, whether valid or not, against damage to the insured crop by fire during the insurance period, and you have not excluded coverage for fire from this policy, we will be liable for loss due to fire caused by a naturally occurring event only for the smaller of:

   (1)  The amount of indemnity determined pursuant to this policy without regard to such other insurance; or

   (2)  The amount by which the loss from fire is determined to exceed the indemnity paid or payable under such other insurance.

(c) For the purpose of section 22(b), the amount of loss from fire will be the difference between the total value of the insured crop before the fire and the total value of the insured crop after the fire. This amount will be determined in accordance with the provisions in section 35.

**23. Conformity to Food Security Act.**

Although your violation of a number of federal statutes, including the Act, may cause cancellation, termination, or voidance of your insurance contract, you should be specifically aware that your policy will be canceled if you are determined to be ineligible to receive benefits under the Act due to violation of the controlled substance provisions (title XVII) of the Food Security Act of 1985 (Pub. L. 99-198) and the regulations promulgated under the Act by USDA. Your insurance policy will be canceled if you are determined, by the appropriate Agency, to be in violation of these provisions. We will recover any and all monies paid to you or received by you during your period of ineligibility, and your premium will be refunded, less an amount for expenses and handling equal to 20 percent of the premium paid or to be paid by you.

**24. Amounts Due Us.**

(a) Interest will accrue at the rate of 1.25 percent simple interest per calendar month on any unpaid amount owed to us or on any unpaid administrative fees owed to FCIC. For the purpose of premium amounts owed to us or administrative fees owed to FCIC, interest will start to accrue on the first day of the month following the issuance of the notice by us, provided that a minimum of 30 days have passed from the premium billing date specified in the Special Provisions. We will collect any unpaid amounts owed to us and any interest owed thereon and, prior to the termination date, we will collect any administrative fees and interest owed thereon to FCIC. After the termination date, FCIC will collect any unpaid administrative fees and any interest owed thereon for any catastrophic risk protection policy and we will collect any unpaid administrative fees and any interest owed thereon for additional coverage policies.

(b) For the purpose of any other amounts due us, such as repayment of indemnities found not to have been earned, interest will start to accrue on the date that notice is issued to you for the collection of the unearned amount. Amounts found due under this paragraph will not be charged interest if payment is made within 30 days of issuance of the notice by us. The amount be considered delinquent if not paid within 30 days of the date the notice is issued by us.

(c) All amounts paid will be applied first to expenses of collection (see subsection (d) of this section) if any, second to the reduction of accrued interest, and then to the reduction of the principal balance.

(d) If we determine that it is necessary to contract with a collection agency or to employ an attorney to assist in collection, you agree to pay all of the expenses of collection.

(e) The portion of the amounts owed by you for a policy authorized under the Act that are owed to FCIC may be collected in part through administrative offset from payments you receive from United States government agencies in accordance with 31 U.S.C. chapter 37. Such amounts include all administrative fees, and the share of the overpaid indemnities and premiums retained by FCIC plus any interest owed thereon.

**25. Correction of Errors**

(a) In addition to any other corrections allowed in your policy subject to section 25(b), we may correct:

   (1)  Within 60 days after the sales closing date, any incorrect information on your application or provided by the sales closing date, including identification numbers for you and any person with an substantial beneficial interest in you, to ensure that the eligibility information is correct and consistent with information reported by you to any USDA agency;

   (2)  Within 30 days after the acreage reporting date, information reported to reconcile errors in the information with correct information that has been determined by any USDA agency;

   (3)  Within 30 days of any subsequent correction of data by FSA, erroneous information corrected as a result of verification of information; and

   (4)  At any time, any incorrect information if the incorrect information was caused by electronic transmission errors by us or errors made by any agency within USDA in transmitting the information provided by you for purposes of other USDA programs.

(b) Corrections may be made but will not take effect for the current crop year if the correction would allow you to:

   (1)  Avoid ineligibility requirements for insurance or obtain a disproportionate benefit under the crop insurance program or any related program administered by the Secretary;

   (2)  Obtain, enhance, or increase an insurance guarantee or indemnity if a cause of loss exists or has occurred before any correction has been made, or avoid premium owed if no loss is likely to occur; or

   (3)  Avoid an obligation or requirement under any Federal or State law.

**26. Interest Limitations.**

We will pay simple interest computed on the net indemnity ultimately found to be due by us or by a final judgment of a court of competent jurisdiction, from and including the 61st day after the date you sign, date, and submit to us the properly completed claim on our form. Interest will be

paid only if the reason for our failure to timely pay is NOT due to your failure to provide information or other material necessary for the computation or payment of the indemnity. The interest rate will be that established by the Secretary of the Treasury under section 12 of the Contract Disputes Act of 1978 (41 U.S.C. 611) and published in the *Federal Register* semiannually on or about January 1 and July 1 of each year, and may vary with each publication.

27. **Concealment, Misrepresentation or Fraud.**

(a) If you have falsely or fraudulently concealed the fact that you are ineligible to receive benefits under the Act or if you or anyone assisting you has intentionally concealed or misrepresented any material fact relating to this policy:

(1) This policy will be voided; and

(2) You may be subject to remedial sanctions in accordance with 7 CFR part 400, subpart R.

(b) Even though the policy is void, you will still be required to pay 20 percent of the premium that you would otherwise be required to pay to offset costs incurred by us in the service of this policy. If previously paid, the balance of the premium will be returned.

(c) Voidance of this policy will result in you having to reimburse all indemnities paid for the crop year in which the voidance was effective.

(d) Voidance will be effective on the first day of the insurance period for the crop year in which the act occurred and will not affect the policy for subsequent crop years unless a violation of this section also occurred in such crop years.

(e) If you willfully and intentionally provide false or inaccurate information to us or FCIC or you fail to comply with a requirement of FCIC, in accordance with 7 CFR part 400, subpart R, FCIC may impose on you:

(1) A civil fine for each violation in an amount not to exceed the greater of:

(i) The amount of the pecuniary gain obtained as a result of the false or inaccurate information provided or the noncompliance with a requirement of FCIC; or

(ii) $10,000; and

(2) A disqualification for a period of up to 5 years from receiving any monetary or non-monetary benefit provided under each of the following:

(i) Any crop insurance policy offered under the Act;

(ii) The Farm Security and Rural Investment Act of 2002 (7 U.S.C. 7333 et seq.);

(iii) The Agricultural Act of 1949 (7 U.S.C. 1421 et seq.);

(iv) The Commodity Credit Corporation Charter Act (15 U.S.C. 714 et seq.);

(v) The Agricultural Adjustment Act of 1938 (7 U.S.C. 1281 et seq.);

(vi) Title XII of the Food Security Act of 1985 (16 U.S.C. 3801 et seq.);

(vii) The Consolidated Farm and Rural Development Act (7 U.S.C. 1921 et seq.); and

(viii) Any federal law that provides assistance to a producer of an agricultural commodity affected by a crop loss or a decline in the prices of agricultural commodities.

28. **Transfer of Coverage and Right to Indemnity.**

If you transfer any part of your share during the crop year, you may transfer your coverage rights, if the transferee is eligible for crop insurance. We will not be liable for any more than the liability determined in accordance with your policy that existed before the transfer occurred. The transfer of coverage rights must be on our form and will not be effective until approved by us in writing. Both you and the transferee are jointly and severally liable for the payment of the premium and administrative fees. The transferee has all rights and responsibilities under this policy consistent with the transferee's interest.

29. **Assignment of Indemnity.**

(a) You may assign your right to an indemnity for the crop year only to creditors or other persons to whom you have a financial debt or other pecuniary obligation. You may be required to provide proof of the debt or other pecuniary obligation before we will accept the assignment of indemnity.

(b) All assignments must be on our form and must be provided to us. Each assignment form may contain more than one creditor or other person to whom you have a financial debt or other pecuniary obligation.

(c) Unless you have provided us with a properly executed assignment of indemnity, we will not make any payment to a lienholder or other person to whom you have a financial debt or other pecuniary obligation even if you may have a lien or other assignment recorded elsewhere. Under no circumstances will we be liable:

(1) To any lienholder or other person to whom you have a financial debt or other pecuniary obligation where you have failed to include such lienholder or person on a properly executed assignment of indemnity provided to us; or

(2) To pay to all lienholders or other persons to whom you have a financial debt or other pecuniary obligation any amount greater than the total amount of indemnity owed under the policy.

(d) If we have received the properly executed assignment of indemnity form:

(1) Only one payment will be issued jointly in the names of all assignees and you; and

(2) Any assignee will have the right to submit all loss notices and forms as required by the policy.

(e) If you have suffered a loss from an insurable cause and fail to file a claim for indemnity within the period specified in section 14(e), the assignee may submit the claim for indemnity not later than 30 days after the period for filing a claim has expired. We will honor the terms of the assignment only if we can accurately determine the amount of the claim. However, no action will lie against us for failure to do so.

30. **[Reserved]**

31. **Applicability of State and Local Statutes.**

If the provisions of this policy conflict with statutes of the State or locality in which this policy is issued, the policy provisions will prevail. State and local laws and regulations in conflict with federal statutes, this policy, and the applicable regulations do not apply to this policy.

32. **Descriptive Headings.**

The descriptive headings of the various policy provisions are formulated for convenience only and are not intended to affect the construction or meaning of any of the policy provisions.

**33. Notices.**

(a) All notices required to be given by you must be in writing and received by your crop insurance agent within the designated time unless otherwise provided by the notice requirement.  Notices required to be given immediately may be by telephone or in person and confirmed in writing.  Time of the notice will be determined by the time of our receipt of the written notice.  If the date by which you are required to submit a report or notice falls on Saturday, Sunday, or a Federal holiday, or if your agent's office is, for any reason, not open for business on the date you are required to submit such notice or report, such notice or report must be submitted on the next business day.

(b) All notices and communications required to be sent by us to you will be mailed to the address contained in your records located with your crop insurance agent.  Notice sent to such address will be conclusively presumed to have been received by you.  You should advise us immediately of any change of address.

**34. Units.**

(a) You may elect an enterprise unit or whole-farm unit in accordance with the following:

(1) For crops for which revenue protection is available, you may elect:

   (i) An enterprise unit if you elected revenue protection or yield protection; or

   (ii) A whole-farm unit if you elected:

      (A) Revenue protection and revenue protection is provided unless limited by the Special Provisions; or

      (B) Yield protection only if whole-farm units are allowed by the Special Provisions;

(2) For crops for which revenue protection is not available, enterprise units or whole-farm units are available only if allowed by the Special Provisions;

(3) You must make such election on or before the earliest sales closing date for the insured crops in the unit and report such unit structure on your acreage report:

   (i) For counties in which the actuarial documents specify a fall or winter sales closing date and a spring sales closing date, you may change your unit selection on or before the spring sales closing date (earliest spring sales closing date for crops in the unit if electing a whole-farm unit) if you do not have any insured fall planted acreage of the insured crop;

   (ii) Your unit selection will remain in effect from year to year unless you notify us in writing by the earliest sales closing date for the crop year for which you wish to change this election; and

   (iii) These units may not be further divided except as specified herein;

(4) For an enterprise unit:

(i) To qualify, an enterprise unit must contain all of the insurable acreage of the same insured crop in:

   (A) Two or more sections, if sections are the basis for optional units where the insured acreage is located;

   (B) Two or more section equivalents determined in accordance with FCIC issued procedures, if section equivalents are the basis for optional units where the insured acreage is located or are applicable to the insured acreage;

   (C) Two or more FSA farm numbers, if FSA farm numbers are the basis for optional units where the insured acreage is located;

   (D) Any combination of two or more sections, section equivalents, or FSA farm numbers, if more than one of these are the basis for optional units where the acreage is located or are applicable to the insured acreage (*e.g.*, if a portion of your acreage is located where sections are the basis for optional units and another portion of your acreage is located where FSA farm numbers are the basis for optional units, you may qualify for an enterprise unit based on a combination of these two parcels;

   (E) One section, section equivalent, or FSA farm number that contains at least 660 planted acres of the insured crop.  You may qualify under this paragraph based only on the type of parcel that is utilized to establish optional units where your insured acreage is located (*e.g.*, if having two or more sections is the basis for optional units where the insured acreage is located, you may qualify for an enterprise unit if you have at least 660 planted acres of the insured crop in one section); or

   (F) Two or more units established by written agreement; and

(ii) At least two of the sections, section equivalents, FSA farm numbers, or units established by written agreement in section 34(a)(4)(i)(A), (B), (C), (D), or (F) must each have planted acreage that constitutes at least the lesser of 20 acres or 20 percent of the insured crop acreage in the enterprise unit.  If there is planted acreage in more than two sections, section equivalents, FSA farm numbers or units established by written agreement in section 34(a)(4)(i)(A), (B), (C), (D), or (F), these can be aggregated to form at least two parcels to meet this requirement.  For example, if sections are the basis for optional units where the insured acreage is located and you have 80 planted acres in section one, 10 planted acres in section two, and 10 planted acres in section three, you may aggregate

(38 of 42)

sections two and three to meet this requirement.

(iii) The crop must be insured under revenue protection or yield protection, unless otherwise specified in the Special Provisions;

(iv) If you want to change your unit structure from enterprise units to basic or optional units in any subsequent crop year, you must maintain separate records of acreage and production:

(A) For each basic unit, to be eligible to use records to establish the production guarantee for the basic unit; or

(B) For optional units, to qualify for optional units and to be eligible to use such records to establish the production guarantee for the optional units;

(v) If you do not comply with the production reporting provisions in section 3(f) for the enterprise unit, your yield for the enterprise unit will be determined in accordance with section 3(f)(1);

(vi) You must separately designate on the acreage report each section or other basis in section 34(a)(4)(i) you used to qualify for an enterprise unit; and

(vii) If we discover you do not qualify for an enterprise unit and such discovery is made:

(A) On or before the acreage reporting date, your unit division will be based on the basic or optional units, whichever you report on your acreage report and qualify for; or

(B) At any time after the acreage reporting date, we will assign the basic unit structure; and

(viii) If allowed by the actuarial documents, you may elect separate enterprise units for irrigated or non-irrigated practices.

(A) You may elect one enterprise unit for all irrigated practices or one enterprise unit for all non-irrigated practices or enterprise units for both.

(B) You must separately meet the requirements in section 34(a)(4) for each enterprise unit.

(C) If you elected separate enterprise units for both irrigated and non-irrigated practices and we discover you do not qualify for an enterprise unit for the irrigated or non-irrigated practice and such discovery is made:

(1) On or before the acreage reporting date, you may elect to insure all acreage of the crop in the county in one enterprise unit provided you meet the requirements in section 34(a)(4), or your unit division will be based on basic or optional units, whichever you report on your acreage report and qualify for; or

(2) At any time after the acreage reporting date, your unit structure will be one enterprise unit provided

you meet the requirements in section 34(a)(4). Otherwise, we will assign the basic unit structure.

(D) If you elected an enterprise unit on one practice (irrigated or non-irrigated) and a different unit structure on the other practice and we discover you do not qualify for an enterprise unit for the irrigated or non-irrigated practice and such discovery is made:

(1) On or before the acreage reporting date, your unit division will be based on basic or optional units, whichever you report on your acreage report and qualify for; or

(2) At any time after the acreage reporting date, we will assign the basic unit structure.

(5) For a whole-farm unit:

(i) To qualify:

(A) All crops in the whole-farm unit must be insured:

(1) Under revenue protection (if you elected the harvest price exclusion for any crop, you must elect it for all crops in the whole-farm unit), unless the Special Provisions allow whole-farm units for another plan of insurance and you insure all crops in the whole-farm unit under such plan (e.g., if you plant corn and soybeans for which you have elected revenue protection and you plant canola for which you have elected yield protection, the corn, soybeans and canola would be assigned the unit structure in accordance with section 34(a)(5)(v));

(2) With us (e.g., if you insure your corn and canola with us and your soybeans with a different insurance provider, the corn, soybeans and canola would be assigned the unit structure in accordance with section 34(a)(5)(v)); and

(3) At the same coverage level (e.g., if you elect to insure your corn and canola at the 65 percent coverage level and your soybeans at the 75 percent coverage level, the corn, soybeans and canola would be assigned the unit structure in accordance with section 34(a)(5)(v) unless you can elect separate coverage levels for all irrigated and all non-irrigated crops in accordance with section 3(b)(2)(iii) (e.g., if you elect to insure your irrigated corn at the 65 percent coverage level you must insure your irrigated canola at the 65 percent coverage level. If you elect to insure your non-irrigated corn at the 70 percent coverage

level you must insure your non-irrigated canola at the 70 percent coverage level.  If you elect to insure your irrigated corn at the 65 percent coverage level and your irrigated canola at the 70 percent coverage level your unit structure will be assigned in accordance with section 34(a)(5)(v));

(B) A whole-farm unit must contain all of the insurable acreage of at least two crops; and

(C) At least two of the insured crops must each have planted acreage that constitutes 10 percent or more of the total planted acreage liability of all insured crops in the whole-farm unit (For crops for which revenue protection is available, liability will be based on the applicable projected price only for the purpose of section 34(a)(5)(i)(C));

(ii) You will be required to pay separate administrative fees for each crop included in the whole-farm unit;

(iii) You must separately designate on the acreage report each basic unit for each crop in the whole-farm unit;

(iv) If you want to change your unit structure from a whole-farm unit to basic or optional units in any subsequent crop year, you must maintain separate records of acreage and production:

(A) For each basic unit, to be eligible to use such records to establish the production guarantee for the basic units; or

(B) For optional units, to qualify for optional units and to be eligible to use such records to establish the production guarantee for the optional units; and

(v) If we discover that you do not qualify for a whole-farm unit for at least one insured crop because, even though you elected revenue protection for all your crops:

(A) You do not meet all of the other requirements in section 34(a)(5)(i), and such discovery is made:

(1) On or before the acreage reporting date, your unit division for all crops for which you elected a whole-farm unit will be based on basic or optional units, whichever you report on your acreage report and qualify for; or

(2) At any time after the acreage reporting date, we will assign the basic unit structure for all crops for which you elected a whole-farm unit; or

(B) It was not possible to establish a projected price for at least one of your crops, your unit division will be based on the unit structure you report on your acreage report and qualify for only for the crop for which a projected price could not be established unless the remaining crop in the unit would no longer qualify for a whole-farm unit, in such case your unit division for the remaining crops will be based on the unit structure you report on your acreage report and qualify for.

(b) Unless limited by the Crop Provisions or Special Provisions, a basic unit as defined in section 1 of the Basic Provisions may be divided into optional units if, for each optional unit, you meet the following:

(1) You must plant the crop in a manner that results in a clear and discernible break in the planting pattern at the boundaries of each optional unit;

(2) All optional units you select for the crop year are identified on the acreage report for that crop year (Units will be determined when the acreage is reported but may be adjusted or combined to reflect the actual unit structure when adjusting a loss.  No further unit division may be made after the acreage reporting date for any reason);

(3) You have records, that are acceptable to us, for at least the previous crop year for all optional units that you will report in the current crop year (You may be required to produce the records for all optional units for the previous crop year); and

(4) You have records of marketed or stored production from each optional unit maintained in such a manner that permits us to verify the production from each optional unit, or the production from each optional unit is kept separate until loss adjustment is completed by us.

(c) Each optional unit must meet one or more of the following, unless otherwise specified in the Crop Provisions or allowed by written agreement:

(1) Optional units may be established if each optional unit is located in a separate section where the boundaries are readily discernible:

(i) In the absence of sections, we may consider parcels of land legally identified by other methods of measure, such as Spanish grants, provided the boundaries are readily discernible, if such parcels can be considered as the equivalent of sections for unit purposes in accordance with FCIC issued procedures; or

(ii) In the absence of sections as described in section 34(c)(1) or other methods of measure used to establish section equivalents as described in section 34(c)(1)(i), optional units may be established if each optional unit is located in a separate FSA farm number in accordance with FCIC issued procedure;

(2) In addition to, or instead of, establishing optional units by section, section equivalent or FSA farm number, optional units may be based on irrigated and non-irrigated acreage.   To qualify as separate irrigated and non-irrigated optional units, the non-irrigated acreage may not continue into the irrigated acreage in the same rows or planting pattern.  The irrigated acreage may not extend beyond the point at which the irrigation system can deliver the quantity of water needed to produce the yield on which the guarantee is based, except the corners of a field in which a

center-pivot irrigation system is used may be considered as irrigated acreage if the corners of a field in which a center-pivot irrigation system is used do not qualify as a separate non-irrigated optional unit.  In this case, production from both practices will be used to determine your approved yield; and

(3) In addition to, or instead of, establishing optional units by section, section equivalent or FSA farm number, or irrigated and non-irrigated acreage, separate optional units may be established for acreage of the insured crop grown and insured under an organic farming practice.  Certified organic, transitional and buffer zone acreages do not individually qualify as separate units.  (See section 37 for additional provisions regarding acreage insured under an organic farming practice).

(d) Optional units are not available for crops insured under a Catastrophic Risk Protection Endorsement.

(e) If you do not comply fully with the provisions in this section, we will combine all optional units that are not in compliance without these provisions into the basic unit from which they were formed.  We will combine the optional units at any time we discover that you have failed to comply with these provisions. If failure to comply with these provisions is determined by us to be inadvertent, and the optional units are combined into a basic unit, that portion of the additional premium paid for the optional units that have been combined will be refunded to you for the units combined.

**35. Multiple Benefits.**

(a) If you are eligible to receive an indemnity and are also eligible to receive benefits for the same loss under any other USDA program, you may receive benefits under both programs, unless specifically limited by the crop insurance contract or by law.

(b) Any amount received for the same loss from any USDA program, in addition to the crop insurance payment, will not exceed the difference between the crop insurance payment and the actual amount of the loss, unless otherwise provided by law.  The amount of the actual loss is the difference between the total value of the insured crop before the loss and the total value of the insured crop after the loss.

(1) For crops for which revenue protection is not available:

(i) If you have an approved yield, the total value of the crop before the loss is your approved yield times the highest price election for the crop; and

(ii) If you have an approved yield, the total value of the crop after the loss is your production to count times the highest price election for the crop; or

(iii) If you have an amount of insurance, the total value of the crop before the loss is the highest amount of insurance available for the crop; and

(iv) If you have an amount of insurance, the total value of the crop after the loss is your production to count times the price contained in the Crop Provisions for valuing production to count.

(2) For crops for which revenue protection is

available and:

(i) You elect yield protection:

(A) The total value of the crop before the loss is your approved yield times the applicable projected price (at the 100 percent price level) for the crop; and

(B) The total value of the crop after the loss is your production to count times the applicable projected price (at the 100 percent price level) for the crop; or

(ii) You elect revenue protection:

(A) The total value of the crop before the loss is your approved yield times the higher of the applicable projected price or harvest price for the crop (If you have elected the harvest price exclusion, the applicable projected price for the crop will be used); and

(B) The total value of the crop after the loss is your production to count times the harvest price for the crop.

(c) FSA or another USDA agency, as applicable, will determine and pay the additional amount due you for any applicable USDA program, after first considering the amount of any crop insurance indemnity.

**36. Substitution of Yields.**

(a) When you have actual yields in your production history database that, due to an insurable cause of loss, are less than 60 percent of the applicable transitional yield you may elect, on an individual actual yield basis, to exclude and replace one or more of any such yields within each database.

(b) Each election made in section 36(a) must be made on or before the production reporting date for the insured crop and each such election will remain in effect for succeeding years unless canceled by the production reporting date for the succeeding crop year.  If you cancel an election, the actual yield will be used in the database.  For example, if you elected to substitute yields in your database for the 1998 and 2000 crop year, for any subsequent crop year, you can elect to cancel the substitution for either or both years.

(c) Each excluded actual yield will be replaced with a yield equal to 60 percent of the applicable transitional yield for the crop year in which the yield is being replaced, unless you qualify as a beginning farmer or rancher, in which case the excluded actual yield will be replaced with a yield equal to 80 percent of the applicable transitional yield for the crop year in which the yield is being replaced.  (For example, if you elect to exclude a 2001 crop year actual yield, the transitional yield in effect for the 2001 crop year in the county will be used.  If you also elect to exclude a 2002 crop year actual yield, the transitional yield in effect for the 2002 crop year in the county will be used).  The replacement yields will be used in the same manner as actual yields for the purpose of calculating the approved yield.

(d) Once you elect to exclude an actual yield from the database, the replacement yield will remain in effect until such time as that crop year is no longer included in the database unless this election is canceled in accordance with section 36(b).

(e) Although your approved yield will be used to determine your amount of premium owed, the

premium rate will be increased to cover the additional risk associated with the substitution of higher yields.

**37. Organic Farming Practices.**

(a) In accordance with section 8(b)(2), insurance will not be provided for any crop grown using an organic farming practice, unless the information needed to determine a premium rate for an organic farming practice is specified on the actuarial table, or insurance is allowed by a written agreement.

(b) If insurance is provided for an organic farming practice as specified in section 37(a), only the following acreage will be insured under such practice:
(1) Certified organic acreage;
(2) Transitional acreage being converted to certified organic acreage in accordance with an organic plan; and
(3) Buffer zone acreage.

(c) On the date you report your acreage, you must have:
(1) For certified organic acreage, a written certification in effect from a certifying agent indicating the name of the entity certified, effective date of certification, certificate number, types of commodities certified, and name and address of the certifying agent (A certificate issued to a tenant may be used to qualify a landlord or other similar arrangement);
(2) For transitional acreage, a certificate as described in section 37(c)(1), or written documentation from a certifying agent indicating an organic plan is in effect for the acreage; and
(3) Records from the certifying agent showing the specific location of each field of certified organic, transitional, buffer zone, and acreage not maintained under organic management.

(d) If you claim a loss on any acreage insured under an organic farming practice, you must provide us with copies of the records required in section 37(c).

(e) If any acreage qualifies as certified organic or transitional acreage on the date you report such acreage, and such certification is subsequently revoked by the certifying agent, or the certifying agent no longer considers the acreage as transitional acreage for the remainder of the crop year, that acreage will remain insured under the reported practice for which it qualified at the time the acreage was reported.  Any loss due to failure to comply with organic standards will be considered an uninsured cause of loss.

(f) Contamination by application or drift of prohibited substances onto land on which crops are grown using organic farming practices will not be an insured peril on any certified organic, transitional or buffer zone acreage.

(g) In addition to the provisions contained in section 17(f), prevented planting coverage will not be provided for any acreage based on an organic farming practice in excess of the number of acres that will be grown under an organic farming practice and shown as such in the records required in section 37(c).

(h) In lieu of the provisions contained in section 17(f)(1) that specify prevented planting acreage within a field that contains planted acreage will be considered to be acreage of the same practice that is planted in the field, prevented planting acreage will be considered

as organic practice acreage if it is identified as certified organic, transitional, or buffer zone acreage in the organic plan.

**18-CCIP-Replant and Double Crop**
(June 2017)



## UNITED STATES DEPARTMENT OF AGRICULTURE
## FEDERAL CROP INSURANCE CORPORATION
## COMMON CROP INSURANCE POLICY BASIC PROVISIONS
## REPLANT AND DOUBLE CROPPING AMENDMENT

_____
(This is a Continuous Amendment)

This amendment modifies the provisions of the Common Crop Insurance Policy Basic Provisions (CCIP) for the 2018 and succeeding crop years for all crops with a 2018 contract change date on or after June 30, 2017, and for the 2019 and succeeding crop years for all crops with a 2018 contract change date prior to June 30, 2017.

The changes to the above policies are required as the result of changes made in the Final Rule to the Common Crop Insurance Policy Basic Provisions published in the Federal Register on June 27, 2017.

The revised provisions are as follows:

| In lieu of section: | The following provisions will apply: |
|---|---|
| 1 – definition of "practical to replant" | **Practical to replant** - Our determination, after loss or damage to the insured crop, that you are able to replant to the same crop in such areas and under such circumstances as it is customary to replant and that replanting the insured crop will allow the crop to attain maturity prior to the calendar date for the end of the insurance period.  We may consider circumstances as to whether: (1) it is physically possible to replant the acreage; (2) seed germination, emergence, and formation of a healthy plant is likely; (3) field, soil, and growing conditions allow for proper planting and growth of the replanted crop to reach maturity; or (4) other conditions exist, as provided by the Crop Provisions or Special Provisions.  Unless we determine it is not practical to replant, based on the circumstances listed above, it will be considered practical to replant through: (1) the final planting date if no late planting period is applicable; (2) the end of the late planting period if the late planting period is less than 10 days; or (3) the 10th day after the final planting date if the crop has a late planting period of 10 days or more.  We will consider it practical to replant regardless of the availability of seed or plants, or the input costs necessary to produce the insured crop such as seed or plants, irrigation water, etc. |
| 1 – definition of "replanted crop" | **Replanted crop** - The same agricultural commodity replanted on the same acreage as the insured crop for harvest in the same crop year if:  1) the replanting is specifically made optional by the policy and you elect to replant the crop and insure it under the policy covering the insured crop; or 2) replanting is required by the policy.  The crop will be considered a replanted insured crop and no replanting payment will be paid if we have determined it is not practical to replant the insured crop and you choose to plant the acreage to the same insured crop. |
| 15(h) | You may receive a full indemnity, or a full prevented planting payment for a first insured crop when a second crop is planted on the same acreage in the same crop year, if each of the following conditions are met, regardless of whether or not the second crop is insured or sustains an insurable loss:<br>(1)  Planting two or more crops for harvest in the same crop year in the area is generally recognized by agricultural experts or organic agricultural experts;<br>(2)  The second or more crops are customarily planted after the first insured crop for harvest on the same acreage in the same crop year in the area;<br>(3)  Additional coverage insurance offered under the authority of the Act is available in the county on the two or more crops that are double cropped;<br>(4)  In the case of prevented planting, the second crop is not planted on or prior to the final planting date or, if applicable, prior to the end of the late planting period for the first insured crop; |

NHF2-526 Policy 000055

**18-CCIP-Replant and Double Cropping**
(June 2017)

| | |
|---|---|
| | (5) You provide records, acceptable to us, of acreage and production specific to the double cropped acreage proving that: |
| |    (i) You have double cropped acreage in at least two of the last four crop years in which the first insured crop was planted and incur an insurable loss or the first insured crop is prevented from being planted and a second crop is planted.  If you acquired additional land for the current crop year you may apply the percentage of acres that you have previously double cropped to the total cropland acres that you are farming this year (if greater) using the following calculation: |
| |       (A) Determine the number of acres of the first insured crop that were double cropped in each of the years for which double cropping records are provided (For example, records are provided showing: 100 acres of wheat planted in 2016 and 50 of those acres were double cropped with soybeans; and 100 acres of wheat planted in 2017 and 70 of those acres were double cropped with soybeans); |
| |       (B) Divide each result of section 15(h)(5)(i)(A) by the number of acres of the first insured crop that were planted in each respective year (In the example above, 50 divided by 100 equals 50 percent of the first insured crop acres that were double cropped in 2016 and 70 divided by 100 equals 70 percent of the first insured crop acres that were double cropped in 2017); |
| |       (C) Add the results of section 15(h)(5)(i)(B) and divide by the number of years the first insured crop was double cropped (In the example above, 50 plus 70 equals 120 divided by 2 equals 60 percent); and |
| |       (D) Multiply the result of 15(h)(5)(i)(C) by the number of insured acres of the first insured crop (In the example above, 60 percent multiplied by the number of wheat acres insured in 2018); or |
| |    (ii) The applicable acreage was double cropped (by one or more other producers, and the producer(s) will allow you to use their records) for at least two of the last four crop years in which the first insured crop was grown on it; and |
| | (6) If you do not have records of acreage and production specific to the double cropped acreage, as required in section 15(h)(5), but instead have records that combine production from acreage you double cropped with records of production from acreage you did not double crop, we will allocate the first and second crop production to the specific acreage in proportion to the liability for the acreage that was and was not double cropped. |

(Page 2 of 2)

**SUMMARY OF CHANGES FOR THE COARSE GRAINS CROP PROVISIONS (17-0041)**
**(Released November 2016)**

The following is a brief description of the changes to the Coarse Grains Crop Provisions that will be effective for the 2017 crop year.  Please refer to the Crop Provisions for complete information.

Section 12 – Removed the prevented planting coverage level percent specified in the Crop Provisions to specify the percent in the actuarial documents to allow updates as needed.

**17-0041**
**(Released November 2016)**

**UNITED STATES DEPARTMENT OF AGRICULTURE**
**Federal Crop Insurance Corporation**
**COARSE GRAINS CROP PROVISIONS**



## 1. Definitions

**Coarse grains** - Corn, grain sorghum, and soybeans.

**Grain sorghum** - The crop defined as sorghum under the United States Grain Standards Act.

**Harvest** - Combining, threshing, or picking the insured crop for grain, or cutting for hay, silage, or fodder.

**Local market price** - The cash grain price per bushel for the U.S. No. 2 yellow corn, U.S. No. 2 grain sorghum, or U.S. No. 1 soybeans, offered by buyers in the area in which you normally market the insured crop. The local market price will reflect the maximum limits of quality deficiencies allowable for the U.S. No. 2 grade for yellow corn and grain sorghum, or U.S. No. 1 grade for soybeans.  Factors not associated with grading under the Official United States Standards for Grain, including but not limited to protein and oil, will not be considered.

**Planted acreage** - In addition to the definition contained in the Basic Provisions, coarse grains must initially be planted in rows, unless otherwise provided by the Special Provisions, actuarial documents, or by written agreement.

**Production guarantee (per acre)** – In lieu of the definition contained in the Basic Provisions, the number of bushels (tons for corn insured as silage) determined by multiplying the approved yield per acre by the coverage level percentage you elect.

**Silage** - A product that results from severing the plant from the land and chopping it for the purpose of livestock feed.

**Ton** - Two thousand (2000) pounds avoirdupois.

## 2. Insurance Guarantees, Coverage Levels, and Prices for Determining Indemnities

In addition to the requirements of section 3 of the Basic Provisions, you must elect to insure your corn, grain sorghum, or soybeans with either revenue protection or yield protection by the sales closing date.

## 3. Contract Changes

In accordance with section 4 of the Basic Provisions, the contract change date is November 30 preceding the cancellation date.

## 4. Cancellation and Termination Dates

In accordance with section 2 of the Basic Provisions, the cancellation and termination dates are:

| State and County | Cancellation and Termination Dates |
|---|---|
| **(a)** **For corn and grain sorghum:** | |
| Val Verde, Edwards, Kerr, Kendall, Bexar, Wilson, Karnes, Goliad, Victoria, and Jackson Counties, Texas, and all Texas counties lying south thereof | January 31. |
| El Paso, Hudspeth, Culberson, Reeves, Loving, Winkler, Ector, Upton, Reagan, Sterling, Coke, Tom Green, Concho, McCulloch, San Saba, Mills, Hamilton, Bosque, Johnson, Tarrant, Wise, Cooke Counties, Texas, and all Texas counties lying south and east thereof to and including Terrell, Crockett, Sutton, Kimble, Gillespie, Blanco, Comal, Guadalupe, Gonzales, De Witt, Lavaca, Colorado, Wharton, and Matagorda Counties, Texas | February 15. |
| Alabama; Arizona; Arkansas; California; Florida; Georgia; Louisiana; Mississippi; Nevada; North Carolina; and South Carolina | February 28. |
| All other Texas counties and all other states | March 15. |
| **(b)** **For soybeans:** | |
| Jackson, Victoria, Goliad, Bee, Live Oak, McMullen, LaSalle, and Dimmit Counties, Texas and all Texas counties lying south thereof | January 31. |
| Alabama; Arizona; Arkansas; California; Florida; Georgia; Louisiana; Mississippi; Nevada; North Carolina; and South Carolina; and El Paso, Hudspeth, Culberson, Reeves, Loving, Winkler, Ector, Upton, Reagan, Sterling, Coke, Tom Green, Concho, McCulloch, San Saba, Mills, Hamilton, Bosque, Johnson, Tarrant, Wise, Cooke Counties, Texas, and all Texas counties lying south and east thereof to and including Maverick, Zavala, Frio, Atascosa, Karnes, De Witt, Lavaca, Colorado, Wharton, and Matagorda Counties, Texas | February 28. |
| All other Texas counties and all other states | March 15. |

## 5. Insured Crop

(a) In accordance with section 8 of the Basic Provisions, the crop insured will be each coarse grain crop you elect to insure for which premium rates are provided by the actuarial documents:

(1) In which you have a share;

(2) That is adapted to the area based on days to maturity and is compatible with agronomic and weather conditions in the area; and

(3) That is not (unless allowed by the Special Provisions or by written agreement):

(i) Interplanted with another crop except as allowed in section 5(b)(1); or

NHF2-526 Policy 000058

(ii) Planted into an established grass or legume.

(b) For corn only, in addition to the provisions of section 5(a), the corn crop insured will be all corn that is:

(1) Planted for harvest either as grain or as silage (see section 5(c)).  A mixture of corn and sorghum (grain or forage-type) will be insured as corn silage if the sorghum does not constitute more than twenty percent (20%) of the plants;

(2) Yellow dent or white corn, including mixed yellow and white, waxy or high-lysine corn, high-oil corn blends containing mixtures of at least 90 percent high yielding yellow dent female plants with high-oil male pollinator plants, or commercial varieties of high-protein hybrids, and excluding:

(i) High-amylose, high-oil or high-protein (except as authorized in section 5(b)(2)), flint, flour, Indian, or blue corn, or a variety genetically adapted to provide forage for wildlife or any other open pollinated corn, unless a written agreement allows insurance of such excluded crops.

(ii) A variety of corn adapted for silage use only when the corn is reported for insurance as grain.

(c) For corn only, if the actuarial documents for the county provide a premium rate for:

(1) **Both grain and silage**, all insurable acreage will be insured as the type or types reported by you on or before the acreage reporting date;

(2) **Grain but not silage**, all insurable acreage will be insured as grain unless a written agreement allows insurance on all or a portion of the insurable acreage as silage; or

(3) **Silage but not grain**, all insurable corn acreage will be insured as silage unless a written agreement allows insurance on all or a portion of the insurable acreage as grain.

(d) For grain sorghum only, in addition to the provisions of section 5(a), the grain sorghum crop insured will be all of the grain sorghum in the county:

(1) That is planted for harvest as grain;

(2) That is a combine-type hybrid grain sorghum (grown from hybrid seed); and

(3) That is not a dual-purpose type of grain sorghum (a type used for both grain and forage), unless a written agreement allows insurance of such grain sorghum.

(e) For soybeans only, in addition to the provisions of section 5(a), the soybean crop insured will be all of the soybeans in the county that are planted for harvest as beans.

**6. Insurable Acreage**

In addition to the provisions of section 9 of the Basic Provisions, any acreage of the insured crop damaged before the final planting date, to the extent that a majority of producers in the area would not normally further care for the crop, must be replanted unless we agree that it is not practical to replant.

**7. Insurance Period**

In accordance with the provisions of section 11 of the Basic Provisions, the calendar date for the end of the insurance period is the date immediately following planting as follows:

(a) **For corn insured as grain:**

(1) Val Verde, Edwards, Kerr, Kendall, Bexar, Wilson, Karnes, Goliad, Victoria, and Jackson Counties, Texas, and all Texas counties lying south thereof.                September 30.

(2) Clark, Cowlitz, Grays Harbor, Island, Jefferson, King, Kitsap, Lewis, Pierce, Skagit, Snohomish, Thurston, Wahkiakum, and Whatcom Counties, Washington.                October 31.

(3) All other counties and states        December 10.

(b) **For corn insured as silage:**

(1) Connecticut, Delaware, Idaho, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and West Virginia.                October 20.

(2) All other states.                September 30.

(c) **For grain sorghum:**

(1) Val Verde, Edwards, Kerr, Kendall, Bexar, Wilson, Karnes, Goliad, Victoria, and Jackson Counties, Texas, and all Texas counties lying south thereof                September 30.

(2) All other Texas counties and all other states                December 10.

(d) **For soybeans:**
All states                December 10.

**8. Causes of Loss**

In accordance with the provisions of section 12 of the Basic Provisions, insurance is provided only against the following causes of loss which occur within the insurance period:

(a) Adverse weather conditions;

(b) Fire;

(c) Insects, but not damage due to insufficient or improper application of pest control measures;

(d) Plant disease, but not damage due to insufficient or improper application of disease control measures;

(e) Wildlife;

(f) Earthquake;

(g) Volcanic eruption;

(h) Failure of the irrigation water supply due to a

cause of loss specified in sections 8(a) through (g) that also occurs during the insurance period; or

(i) For revenue protection, a change in the harvest price from the projected price, unless FCIC can prove the price change was the direct result of an uninsured cause of loss specified in section 12(a) of the Basic Provisions.

**9.  Replanting Payments**

(a) A replanting payment is allowed as follows:

(1) In lieu of provisions in section 13 of the Basic Provisions that limit the amount of a replant payment to the actual cost of replanting, the amount of any replanting payment will be determined in accordance with these Crop Provisions;

(2) Except as specified in section 9(a)(1), you must comply with all requirements regarding replanting payments contained in section 13 of the Basic Provisions; and

(3) The insured crop must be damaged by an insurable cause of loss to the extent that the remaining stand will not produce at least 90 percent of the production guarantee for the acreage.

(b) Unless otherwise specified in the Special Provisions, the amount of the replanting payment per acre will be the lesser of 20 percent of the production guarantee or the number of bushels (tons for corn insured as silage) for the applicable crop specified below, multiplied by your projected price, multiplied by your share:

(1) 8 bushels for corn grain;

(2) 1 ton for corn silage;

(3) 7 bushels for grain sorghum; and

(4) 3 bushels for soybeans.

(c) When the crop is replanted using a practice that is uninsurable for an original planting, the liability on the unit will be reduced by the amount of the replanting payment.  The premium amount will not be reduced.

(d) If the acreage is replanted to an insured crop type that is different than the insured crop type originally planted on the acreage:

(1) The production guarantee, premium, and projected price and harvest price, as applicable, will be adjusted based on the replanted type;

(2) Replanting payments will be calculated using your projected price and production guarantee for the crop type that is replanted and insured; and

(3) A revised acreage report will be required to reflect the replanted type, as applicable.

**10. Duties in the Event of Damage or Loss**

(a) Representative samples are required in accordance with section 14 of the Basic Provisions.

(b) For any corn unit that has separate dates for the end of the insurance period (grain and silage), in lieu of the requirement contained in section 14 of the Basic Provisions to provide notice within 72 hours of your initial discovery of damage (but not later than 15 days after the end of the insurance period), you must provide notice within 72 hours of your initial discovery of damage (but not later than 15 days after the latest end of the insurance period applicable to the unit).

(c) If you will harvest any acreage in a manner other than as you reported it for coverage (*e.g.*, you reported planting it to harvest as grain but will harvest the acreage for silage, or you reported planting it to harvest as silage but will harvest the acreage for grain), you must notify us before harvest begins.  Failure to timely provide notice will result in production to count determined in accordance with section 11(c)(1)(i)(E).

**11. Settlement of Claim**

(a) We will determine your loss on a unit basis.  In the event you are unable to provide records of production that are acceptable to us for any:

(1) Optional unit, we will combine all optional units for which acceptable records of production were not provided; or

(2) Basic unit, we will allocate any commingled production to such units in proportion to our liability on the harvested acreage for each unit.

(b) In the event of loss or damage covered by this policy, we will settle your claim by:

(1) Multiplying the number of insured acres of each insured crop or type, as applicable, by your respective:

(i) Yield protection guarantee (per acre) if you elected yield protection; or

(ii) Revenue protection guarantee (per acre) if you elected revenue protection;

(2) Totaling the results of section 11(b)(1)(i) or 11(b)(1)(ii), whichever is applicable;

(3) Multiplying the production to count of each insured crop or type, as applicable, by your respective:

(i) Projected price if you elected yield protection; or

(ii) Harvest price if you elected revenue protection;

(4) Totaling the results of section 11(b)(3)(i) or 11(b)(3)(ii), whichever is applicable;

(5) Subtracting the result of section 11(b)(4) from the result of section 11(b)(2); and

(6) Multiplying the result of section (11)(b)(5) by your share.

For example:

You have 100 percent share in 50 acres of corn in the unit with a production guarantee (per acre) of 115 bushels, your projected price is $2.25, your harvest price is $2.20, and your production to count is 5,000 bushels.

If you elected yield protection:

(1) 50 acres x (115 bushel production guarantee x $2.25 projected price) = $12,937.50 value of the production guarantee

(3) 5,000 bushel production to count x $2.25 projected price = $11,250.00 value of the production to count

(5) $12,937.50 - $11,250.00 = $1,687.50

(6) $1,687.50 x 1.000 share = $1,688.00 indemnity; or

If you elected revenue protection:

(1) 50 acres x (115 bushel production guarantee x $2.25 projected price) = $12,937.50 revenue protection guarantee

(3) 5,000 bushel production to count x $2.20 harvest price = $11,000.00 value of the production to count

(5) $12,937.50 - $11,000.00 = $1,937.50

(6) $1,937.50 x 1.000 share = $1,938.00 indemnity.

(c) The total production to count (in bushels for corn insured as grain or in tons for corn insured as silage) from all insurable acreage on the unit will include:

(1) All appraised production as follows:

(i) For yield protection, not less than the production guarantee, or for revenue protection, not less than the amount of production that when multiplied by the harvest price equals the revenue protection guarantee (per acre) for acreage:

(A) That is abandoned;

(B) Put to another use without our consent;

(C) Damaged solely by uninsured causes;

(D) For which you fail to provide records of production that are acceptable to us; or

(E) For which you fail to give us notice before harvest begins if you report planting the corn to harvest as grain but harvest it as silage or you report planting the corn to harvest as silage but harvest it as grain.

(ii) Production lost due to uninsured causes;

(iii) Unharvested production (mature unharvested production may be adjusted for quality deficiencies and excess moisture in accordance with section 11(d)); and

(iv) Potential production on insured acreage you will put to another use or abandon, if you and we agree on the appraised amount of production. Upon such agreement the insurance period for that acreage will end when you put the acreage to another use or abandon the crop. If agreement on the appraised amount of production is not reached:

(A) If you do not elect to continue to care for the crop we may give you consent to put the acreage to another use if you agree to leave intact, and provide sufficient care for, representative samples of the crop in locations acceptable to us (The amount of production to count for such acreage will be based on the harvested production or appraisals from the samples at the time harvest should have occurred. If you do not leave the required samples intact, or you fail to provide sufficient care for the samples, our appraisal made prior to giving you consent to put the acreage to another use will be used to determine the amount of production to count.); or

(B) If you elect to continue to care for the crop, the amount of production to count for the acreage will be the harvested production, or our reappraisal if additional damage occurs and the crop is not harvested; and

(2) All harvested production from the insurable acreage.

(d) Mature coarse grain production (excluding corn insured as silage) may be adjusted for excess moisture and quality deficiencies. If moisture adjustment is applicable it will be made prior to any adjustment for quality. Corn insured as silage will be adjusted for excess moisture and quality only as specified in section 11(e).

(1) Production will be reduced by 0.12 percent for each 0.1 percentage point of moisture in excess of:

(i) Fifteen percent (15%) for corn (If moisture exceeds 30 percent (30%), production will be reduced 0.2 percent for each 0.1 percentage point above 30 percent (30%));

(ii) Fourteen percent (14%) for grain sorghum; and

(iii) Thirteen percent (13%) for soybeans.

We may obtain samples of the production to determine the moisture content.

(2) Production will be eligible for quality adjustment if:

(i) Deficiencies in quality, in accordance with the Official United States Standards for Grain, result in:

(A) Corn not meeting the grade requirements for U.S. No. 4 (grades U.S. No. 5 or worse) because of test weight or kernel damage (excluding

heat damage) or having a musty, sour, or commercially objectionable foreign odor;

(B) Grain sorghum not meeting the grade requirements for U.S. No. 4 (grades U.S. Sample grade) because of test weight or kernel damage (excluding heat damage) or having a musty, sour, or commercially objectionable foreign odor (except smut odor), or meets the special grade requirements for smutty grain sorghum; or

(C) Soybeans not meeting the grade requirements for U.S. No. 4 (grades U.S. Sample grade) because of test weight or kernel damage (excluding heat damage) or having a musty, sour, or commercially objectionable foreign odor (except garlic odor), or which meet the special grade requirements for garlicky soybeans; or

(ii) Substances or conditions are present that are identified by the Food and Drug Administration or other public health organizations of the United States as being injurious to human or animal health.

(3) Quality will be a factor in determining your loss only if:

(i) The deficiencies, substances, or conditions resulted from a cause of loss against which insurance is provided under these crop provisions;

(ii) All determinations of these deficiencies, substances, or conditions are made using samples of the production obtained by us or by a disinterested third party approved by us;

(iii) With regard to deficiencies in quality (except test weight, which may be determined by our loss adjuster), the samples are analyzed by:

(A) A grain grader licensed under the United States Grain Standards Act or the United States Warehouse Act;

(B) A grain grader licensed under State law and employed by a warehouse operator who has a storage agreement with the Commodity Credit Corporation; or

(C) A grain grader not licensed under State law, but who is employed by a warehouse operator who has a commodity storage agreement with the Commodity Credit Corporation and is in compliance with State law regarding warehouses; and

(iv) With regard to substances or conditions injurious to human or animal health, the samples are analyzed by a laboratory approved by us.

(4) Coarse grain production that is eligible for quality adjustment, as specified in sections 11(d)(2) and (3), will be reduced by the quality adjustment factor contained in the Special Provisions.

(e) For corn insured as silage:

(1) Whenever our appraisal of grain content is less than 4.5 bushels of grain per ton of silage, the silage production will be reduced by 1 percentage point for each 0.1 (1/10) of a bushel less than 4.5 bushels per ton (If we cannot make a grain appraisal before harvest and you do not leave a representative unharvested sample, in accordance with the policy no reduction for grain-deficient silage will be made.); and

(2) If the normal silage harvesting period has ended, or for any acreage harvested as silage or appraised as silage after the calendar date for the end of the insurance period as specified in section 7(b), we may increase the silage production to count to a 65 percent moisture equivalent to reflect the normal moisture content of silage harvested during the normal silage harvesting period.

(f) Any production harvested from plants growing in the insured crop may be counted as production of the insured crop on a weight basis.

**12. Prevented Planting**

Your prevented planting coverage will be a percentage specified in the actuarial documents of your production guarantee for timely planted acreage. If you have additional coverage and pay an additional premium, you may increase your prevented planting coverage if such additional coverage is specified in the actuarial documents.

**REQUIREMENT TO REPORT FIELD LOCATION ON THE ACREAGE REPORT**

Please be advised that the Risk Management Agency has issued the following guidelines.

Beginning with the 2017 reinsurance year, insureds must report field location on the acreage report as required by section 6(c)(5) and 8(c)(5), respectively, of the Basic Provisions for the following insurance plans under CCIP and ARPI:

| | |
|---|---|
| 01 | Yield Protection |
| 02 | Revenue Protection |
| 03 | Revenue Protection with Harvest Price Exclusion |
| 04 | Area Yield Protection |
| 05 | Area Revenue Protection |
| 06 | Area Revenue Protection with Harvest Price Exclusion |

The insured can meet the acreage reporting requirement for field location identification by:

If known and accurate, providing the FSA Farm, Tract, and Field Number, including the FSA administrative State and County; or otherwise

Clearly identifying the field location(s) and associated boundaries using AIP map-based reporting or other mapping resources which clearly delineates the field's location.

If an insured does not provide the field location as required, on the acreage report for a CCIP or ARPI policy under insurance plans 01-06, any and all applicable unreported or misreported information penalties would apply, including rejection of the acreage report and subsequent denial of liability to the insured.

Great American Insurance Company has map-based reporting forms and mapping resources available for insureds to comply with this requirement.  If you have any questions, please contact your crop insurance agent.

NHF2-526 Policy 000064



# IRRIGATED PRACTICE GUIDELINES

The following guidelines are provided to enable insureds to properly report planted or perennial crop acreage to be insured under the irrigated practice in order to receive maximum protection under their crop insurance policy. It is very important that these guidelines be utilized to document whether, at the time insurances attaches; there is a reasonable expectation of receiving adequate water to carry out a good irrigation practice for acreage reported under the irrigated practice. The guidelines, in entirety, are substantive and are to be given to the insured in administration of their crop insurance policy.

## 1   DEFINITIONS

The following definitions are provided to facilitate a uniform understanding of the standards and guidelines for insuring an irrigated practice for planted or perennial crop acreage.

A   <u>Adequacy of Irrigation Facilities</u> – Irrigation facilities are considered adequate if it is determined that, at the time insurance attaches to planted or perennial acreage, they will be available and usable at the times needed and have the capacity to timely deliver water in sufficient quantities to carry out a good irrigation practice for the acreage insured under the irrigated practice.

B   <u>Efficient Irrigation</u> – Carrying out a good irrigation practice using a lesser amount of irrigation water than historically applied, but still achieving the irrigated APH yield by implementing approved or enhanced management practices to increase efficiency of irrigation water use.

Enhanced management practices to increase efficiency of irrigation water use include, but are not limited to, the following:

- Irrigation Method – Employing an irrigation water distribution technique or technology that has demonstrated greater efficiency (e.g. converting gravity flood irrigation to a center pivot or underground drip tape).

- Converting high pressure impact sprinklers to low pressure impacts under center pivot irrigation.

- Soil Moisture Monitors – Using soil moisture monitor output to set the schedule and amount of irrigation water applied.

C   <u>Good Irrigation Practice</u> – The application of adequate water in an acceptable manner, at the proper times, to allow production of a normal crop which is often identified as the approved APH yield for crops.

D   <u>Irrigation Equipment and Facilities</u> – The physical resources, other than water, used to regulate the flow of water from a water source to the acreage. This includes pumps, valves, sprinkler heads, and other control devices. It also includes pipes or pipelines which: (1) are under the control of the insured or (2) routinely deliver water only to acreage which is owned or operated by the insured. A center pivot system is considered irrigation equipment and facilities.

E   <u>Irrigation Water Supply</u> – The water source and means for supplying irrigation water, without regard to the equipment or facilities. This includes the water source and dams, canals, ditches, pipelines, etc., which contain the water for movement from the source to the acreage and (1) are not under the control of the insured or (2) routinely deliver water to acreage in addition to that which is owned or operated by the insured. It DOES NOT INCLUDE any irrigation equipment or facilities.

F   <u>Reasonable Expectation of Adequate Water</u> – The insured had no reason to know at the time coverage began the amount of irrigation water may be limited or reduced. No reasonable expectation exists if the insured knew, or had reason to know, the amount of irrigation water may be reduced before coverage begins.

G   <u>Water Source</u> – The source from which water is made available. This includes wells, lakes, reservoirs, streams, aquifers, etc.

## 2   REQUIREMENTS

For planted or perennial acreage to be insured under and irrigated practice, the insured must:

1   be able to document and demonstrate that there is a reasonable expectation of adequate water (refer to section 3);

2   be able to document and demonstrate good irrigation practices;

3   be able to demonstrate that they have adequate irrigation equipment and facilities;

4    provide verifiable documentation to their AIP by the ARD that the irrigation water supply has replenished after a failure of the irrigation water supply prevented the insured from planting or the insured had a failure of irrigation water supply; and

5    keep separate production records for acreage insured under an irrigated practice from acreage insured under a practice other than irrigated (or with no practice applicable) and uninsured acreage.

## 3   DETERMINATION OF REASONABLE EXPECTATION OF ADEQUATE WATER

Factors to be considered (applicable to both the AIP and the insured) when determining and documenting whether a reasonable expectation of adequate water existed include, but are not limited to the following: Substantive

1    Most recent 10-year historical average of available water and any applicable forecasting data from a credible authority responsible for monitoring and forecasting such conditions such as Irrigation Districts, State Department of Water Resources, Bureau of Reclamation, Water Boards, etc.

   **Examples:**   Current Federal, state, or local water district allocations, historical inflows, current water levels, expected inflows resulting from snowpack, expected rainfall, etc.;

2    Water supply availability, quality, and usage;

3    Pump efficiency and capacity;

4    Water requirements (amount and timing) for all irrigated crops;

5    Water rights available to the insured (primary, secondary, urban versus agricultural use, etc.);

6    Contingency plans to handle water shortages;

7    Acres to be irrigated;

8    Ownership of the water source including the legal entitlement or rights to the water (state or Federal versus landowner or other private party);

9    Meters, measuring devices, and methods used to monitor good irrigation practice;

10   Soil types, soil moisture levels, and pre-plant irrigation needs;

11   Water conservation methods, devices used, and plans utilized (if applicable);

12   Past crop planting history and tillage methods;

13   Supplemental water availability and usage including return flow or any precipitation which would normally be received, after insurance attaches;

14   Recommendations from local Cooperative Extension Service (CES), National Resource Conservation Service (NRCS), or other source recognized by CES or NRCS to be an expert in the area regarding irrigation and crop production;

15   Decreased water allocation resulting from the diversion of water for environmental, public use or priority, or other reasons.

   **Note:**   Not an insurable cause of loss (COL) unless the diversion is made necessary due to an insured COL; and

16   Management practices used or to be used to carry out efficient irrigation, as applicable.

## 4   FAILURE TO QUALIFY OR CARRY OUT A GOOD IRRIGATION PRACTICE

A    If the acreage fails to qualify for insurance under the irrigated practice, it will result in such acreage being insured under a practice other than irrigated.  If no other appropriate practice is available for the acreage, insurance will not be considered to have attached on the acreage.

B    Failure to carry out a good irrigation practice on acreage properly insured under the irrigated practice will result in an appraisal for uninsured causes on such acreage, unless:

   1    the failure was caused by unavoidable failure of the irrigation water supply after insurance attached; or

   2    failure or breakdown of the irrigation equipment or facilities due to an insured COL, provided all reasonable efforts to restore the irrigation equipment facilities to proper working order within a reasonable amount of time, unless the AIP determines it is not practical to do so.

      **Note:**   Cost will not be considered when determining whether it is practical to restore the equipment or facilities.

C    If a loss is evident, any reported acreage qualifying as an irrigated practice at the time insurance attaches cannot be revised to a non-irrigated practice after the acreage reporting date, even if liability stays the same or decreases or if the insured failed to carry out a good irrigation practice.

**5   PREVENTED PLANTING COVERAGE**

A   Insureds may be eligible for a prevented planting payment for acreage historically grown under an irrigated practice for which the insured had no reasonable expectation of adequate water by the final planting date (or within the late planting period, if applicable). This applies even if the acreage could have been planted with a non-irrigated practice and the insured elects not to plant,  provided all other prevented planting provisions have been met, including that an insured COL must have occurred within the PP insurance period.

B   Insureds must provide, upon the AIP's request, documentation of the factors which were considered in reporting that there was no reasonable expectation of adequate water for the acreage reported as prevented planting under an irrigated practice.

NHF2-526 Policy 000068

# IMPORTANT NOTICE TO POLICYHOLDERS



### Use of Precision Farming Records for a Crop Insurance Claim

Great American Insurance Company (GAIC) may allow Precision Farming records, for those policyholders utilizing Precision Farming Technology Systems, to satisfy the claim documentation requirements under your crop insurance policy.  In an effort to effectively service your policy and provide you with the most up-to-date information, we've outlined the allowance and requirements below.

It is important to point out that the Multiple Peril Crop Insurance (MPCI) program is very specific in what qualifies as Precision Farming.  We encourage you to discuss your Precision Farming Technology System with your Agent early in the year.  If questions arise as a result of these discussions, the GAIC Claims Department will be happy to assist in determining how your system best fits within the framework of crop insurance claim reporting and record requirements.

### What is Precision Farming?

For crop insurance purposes, the USDA's Risk Management Agency has defined Precision Farming as follows:

> The utilization of systems' technologies and agronomic principles to manage variability within and between fields and/or over time that is associated with all aspects of agricultural production.  It requires the use of technologies, such as global positioning system (GPS) and geographic information systems (GIS) management tools for the purpose of improving crop management.  Precision farming may include the combination of variable seeding and fertilizer rates, minimizing seed and chemical overlaps, and the use of GPS/GIS yield mapping technology (i.e. a Precision Farming producer using variable seeding, cutting planting rate from 36,000 to 18,000 seeds/acre for non-irrigated corners, indicating a discernible break in yield with the use of GPS/GIS mapping).

Specifically, a Precision Farming Technology System must include at least the following components:

- GPS technology integrated with planter monitors, combine monitors and yield mapping software.
- The ability to produce reports summarizing planted acres, harvested acres & harvested production.
- The ability to provide evidence, by crop, that the system was properly calibrated according to the manufacturer's requirements, for the current crop year.  If your system is capable of producing a calibration report, we will accept that as evidence of calibration.  If not, you should maintain a hard-copy Annual Calibration Report, which your Agent can provide.

### I believe my system qualifies.  What does this mean for me?

By utilizing a Precision Farming Technology System that meets the above standard, GAIC may allow use of your planted acreage records to be acceptable as "determined" acres and use of your harvested production records to establish your total production (in lieu of settlement sheets, bin measurements, etc.).  In other words, your crop insurance claim may be based on the data and reports collected from your Precision Farming Technology System.

# IMPORTANT NOTICE TO POLICYHOLDERS (Cont'd)



**If I wish to use my Precision Farming Technology as described above, what is required?**
In addition to utilizing a Precision Farming Technology System that qualifies, there are several requirements that must be met, and those requirements differ for planted acreage records vs. harvested production records.  We have outlined the requirements for both categories below:

    Planted Acreage Records

- For planted acreage records to be acceptable as evidence of determined acres, the following information must be provided <u>in conjunction with the Harvested Production Records</u>:
  - Insured's Name
  - Unit Number
  - FSA farm/tract/field ID number (optional)
  - Legal description of the acreage; and
  - A print out from the Precision Farming Technology System that includes the crop name, acres planted, and electronically produced maps of planted acreage and summary records. These records must illustrate any required discernable breaks between units or practices.
  - If overlapping rows were planted on the acreage, the system must account for this overlap.  If the system does not account for the overlapping rows, we will determine acres as if the Precision Farming technology was not being used.

    Harvested Production Records

- For harvested production records to be acceptable as production evidence for a claim, the following information must be provided <u>in conjunction with the Planted Acreage Records</u>:
  - The system must be calibrated for each insured crop and crop year, in accordance with the owner's manual specifications.  The calibration must be within 3% of the actual weight of the production harvested during the calibration test.
  - The Annual Calibration Report must include all calibrations and adjustments performed, by crop, for the crop year.  The report must also include the date of each calibration/adjustment, and the amount of adjustment from the previous setting.
  - Insured's Name
  - Unit Number
  - FSA farm/tract/field ID number (optional)
  - Legal description of the acreage; and
  - A print out from the Precision Farming Technology System that includes the crop name, acres harvested, date harvested, total production (unadjusted for moisture), average moisture content; and
  - Yield maps and acreage/production summary records, which illustrate that separate production records were maintained by unit and/or practice.

**What else should I consider regarding Precision Farming Technology and my crop insurance?**
In the event your Precision Farming records are deemed unacceptable, we will make our claim determinations as if you did not utilize a Precision Farming Technology System.  In this case, we may use the combine monitor record as a load record when allocating production to the appropriate unit.

Should you have any questions on how Precision Farming fits within the structure of your crop insurance policy, please contact your Agent.

Great American appreciates your business and the opportunity to service your policy.

# IMPORTANT NOTICE TO ALL POLICYHOLDERS



So that Great American Insurance Company can continue to provide prompt service to your MPCI policy/claim, please review the following requirements:

**CRITERIA FOR THE USE OF LOAD RECORDS, STRUCTURE MARKINGS OR COMBINE MONITOR RECORDS FOR PRODUCTION THAT IS TO BE KEPT SEPARATE**

It is a requirement of the Multiple Peril Crop Insurance (MPCI) program that production must be kept separate by unit. Consequently, when commingled production has not been pre-measured by an Approved Insurance Provider (AIP), the Risk Management Agency (RMA) requires policyholders to follow certain requirements when documenting that production of two or more units have been commingled. For your review and so that we can better service your policy, the applicable requirements are provided below.

Please note that failure to adhere to these requirements may result in our inability to allocate the production we determine through measurements, settlement sheet verification, etc. to the appropriate unit, and may ultimately result in the collapsing of units; proration of production and loss of optional units for the following year.

Criteria Needed to Accept Insured's Production Records or Storage-structure Markings

- If load records or combine monitor records are used to keep production separate, the loads are recorded as outlined below.

- If structure markings are used, the structure is marked and identified as outlined below.

- There is no production from prior years in the structure, unless the production has been measured by the AIP or another USDA agency just prior to the current year's production being added. If another USDA agency's measurements are used, you must determine whether the grain was leveled.

- The total production within the structure must be accounted for; i.e., all production stored in the storage structure can be identified separately by unit number or field I.D., uninsured acreage, etc.

Acceptable Load Records, Storage Structure Markings, Printed Records from Combine Monitors

1. Load Records

   Maintain a contemporaneous ledger, by crop, recording loads of production for the crop identified by unit and/or field identification, date of harvest, identity of the conveyance used to transport the grain to the bin and the estimated bushel volume per conveyance. The adjuster must verify that the field identification can be correlated with the unit numbers for the crop for the current crop year. If field identification cannot be correlated to a unit number for the crop, the production must be considered commingled. Policyholders are permitted to adjust their load records for excess moisture, and if they have done so, this is what will be used to compare against the adjuster measured and calculated production (including adjustments for moisture if the adjuster's moisture test shows excess moisture).

2. Storage Structure Markings

   Identify the depth of such production by marking the storage structure with a permanent marker. Write the unit number(s) and/or field identification from which the production was harvested, and date and initial the mark. Also, on the storage structure, identify and mark the depth of uninsured-acreage production separately from insured-acreage production when the storage structure will contain both. The adjuster must verify that the field identification numbers can be correlated with the unit numbers for the crop for the current crop year. If field identification cannot be correlated to a unit number for the crop, the production must be considered commingled.

3.  Records From Combine Monitors that do NOT qualify as a Precision Farming Technology System

Printed records from combine monitors must show the location of field (field identification), name of crop, date, and number of pounds or bushels of the crop. Policyholders must also identify the unit number that correlates with the field identification on the records. The adjuster must verify that the field identification can be correlated with the unit numbers for the crop for the current crop year. If field identification cannot be correlated to a unit number for the crop, the production must be considered commingled. If production from the combine monitor records has been adjusted for moisture by the insured or automatically by the combine monitor, this recorded amount will be the amount compared against the adjuster's measured and calculated production, (including adjustments for moisture if the adjuster's moisture test shows excess moisture).

Contemporaneous and Conveyance, as used in the above paragraphs, are defined as follows:

Contemporaneous – Occurring or originating during the same time.

Conveyance – Anything in which agricultural commodities are transported. This may include combine hoppers, commodity bins, grain carts, grain wagons, farm truck, semi trailer, railcar, or barge. The term "transported" does not include all forms of grain movement; e.g., the following are not conveyances: grain augers, grain dryers, elevator legs, or picking lines.

## ACCEPTABLE WEIGHT TICKETS / RECORDS CRITERIA FOR PRODUCTION THAT IS TO BE WEIGHED AND FARM-STORED

To be acceptable, each individual scale weight ticket/record for each load must be available and must provide at least the following information:

- Policyholder Name
- Crop
- Per Load; the gross weight of the conveyance with production and the gross weight of the conveyance without production. However, the following exceptions apply:
  - o  If the production is weighed using a grain cart that prints out tickets showing the gross weight of production in the cart, only the gross weight per grain cart of the production is required
  - o  If the production is weighed using a grain cart that has an integrated panel showing the gross weight of the production in the cart from which the policyholder documents the weight, only the gross weight per grain cart of the production is required
  - o  If the production is weighed using a grain cart that is equipped with scales integrated with Bluetooth (or other wired/wireless) interface capable of electronically recording and storing weight records on a load by load basis from which the insured can print all individual load tickets and detailed summary, by unit, which includes all of the required information, only the gross weight per grain cart of the production is required.
- Date Weighed
- Load Number (if the scale does not print a number, the policyholder must apply a number)
- Identification and location of farm-storage structure in which the load(s) from each field are stored and/or satisfactory explanation of disposition of the production if any of the production is no longer stored at the time of inspection; and
- Unit and/or field identification from which the production was harvested that can be correlated to the unit numbers for the crop stored. To be acceptable, the adjuster must verify that the field identification can be correlated with the unit numbers for the crop for the current crop year. If field identification cannot be correlated to a unit number for the crop, the production must be considered commingled.

A summary record of scale weight tickets/records is not acceptable.

Policyholder must hand-write any of the required information listed above if the scale that is being used is not capable of printing the required information.

Should you have any questions and/or concerns regarding this information, please contact your agent immediately. Thank you and we appreciate your business!

**14-CEPP (Released June 2013)**

## COMMODITY EXCHANGE PRICE PROVISIONS (CEPP)

## 2014 AND SUCCEEDING CROP YEARS

**Section II:  Price Definitions**

*(See Section I for General Information applicable to all crops.)*

**Corn (0041)**

**Grain Type**

Projected price – The harvest year's average daily settlement price for the projected price discovery period for the harvest year's futures contract, as shown in the tables below, rounded to the nearest whole cent.  The projected price will be released no later than three business days following the end of the projected price discovery period.

Harvest price - The harvest year's average daily settlement price for the harvest price discovery period for the harvest year's futures contract, as shown in the tables below, rounded to the nearest whole cent.  The harvest price will be released no later than three business days following the end of the harvest price discovery period.

NHF2-526 Policy 000073

| **CORN – January 31 Sales Closing Date** | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date | Beginning Date | Ending Date |
| Texas | CBOT | Corn | September | Dec 15 | Jan 14 | Aug 1 | Aug 31 |

| **CORN – February 15 Sales Closing Date** | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date | Beginning Date | Ending Date |
| Texas | CBOT | Corn | December | Jan 1 | Jan 31 | Sep 1 | Sep 30 |

| **CORN – February 28 Sales Closing Date** | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date | Beginning Date | Ending Date |
| Alabama | CBOT | Corn | September | Jan 15 | Feb 14 | Aug 1 | Aug 31 |
| Arizona | CBOT | Corn | December | Jan 15 | Feb 14 | Oct 1 | Oct 31 |
| Arkansas | CBOT | Corn | December | Jan 15 | Feb 14 | Aug 15 | Sep 14 |
| California | CBOT | Corn | December | Jan 15 | Feb 14 | Oct 1 | Oct 31 |
| Florida | CBOT | Corn | September | Jan 15 | Feb 14 | Aug 1 | Aug 31 |
| Georgia | CBOT | Corn | September | Jan 15 | Feb 14 | Aug 1 | Aug 31 |
| Louisiana | CBOT | Corn | September | Jan 15 | Feb 14 | Aug 1 | Aug 31 |
| Mississippi | CBOT | Corn | December | Jan 15 | Feb 14 | Aug 15 | Sep 14 |
| Nevada | CBOT | Corn | December | Jan 15 | Feb 14 | Oct 1 | Oct 31 |
| North Carolina | CBOT | Corn | December | Jan 15 | Feb 14 | Sep 1 | Sep 30 |
| South Carolina | CBOT | Corn | September | Jan 15 | Feb 14 | Aug 1 | Aug 31 |

**CEPP - Section II:  Corn (Released June 2013)**                                                   **2**

| | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| **CORN – March 15 Sales Closing Date** | | | | | | | |
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date* | Beginning Date | Ending Date |
| Colorado | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Connecticut | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Delaware | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Idaho | CBOT | Corn | December | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Illinois | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Indiana | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Iowa | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Kansas | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Kentucky | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Maine | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Maryland | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Massachusetts | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Michigan | CBOT | Corn | December | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Minnesota | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Missouri | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Montana | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Nebraska | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| New Hampshire | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| New Jersey | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| New Mexico | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| New York | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| North Dakota | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Ohio | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Oklahoma | CBOT | Corn | December | Feb 1 | Feb 28 | Sep 1 | Sep 30 |
| Oregon | CBOT | Corn | December | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Pennsylvania | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Rhode Island | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| South Dakota | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Tennessee | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Texas | CBOT | Corn | December | Feb 1 | Feb 28 | Sep 1 | Sep 30 |
| Utah | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Vermont | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Virginia | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Washington | CBOT | Corn | December | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| West Virginia | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Wisconsin | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Wyoming | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| *February 28 Ending Date is extended to February 29 in leap years. | | | | | | | |

**CEPP - Section II:  Corn (Released June 2013)**                                          3

**Corn (0041)**

**Silage Type**

Corn for silage is not traded on any Commodity Exchange.  However, revenue protection is still considered to be available in counties where silage is an insurable type and the projected and harvest prices will be determined by RMA in accordance with this CEPP.  The result of this action will allow the producer to insure both the silage and grain types of corn under revenue protection.  With both types of corn insured under revenue protection the producer may qualify for a whole-farm unit. However, corn insured as silage will not have the benefit of the projected price and the harvest price moving as the price on the Commodity Exchange moves for corn for grain.

Projected price – A price determined by RMA and released by January 31 of the harvest year.

Harvest price -- A price equal to the silage type projected price.

NHF2-526 Policy 000076

**Corn (0041)**

**Organic (Certified) Practice**

Projected price – The corn (grain type) projected price as determined above, multiplied by a factor determined by RMA, rounded to the nearest whole cent.  The factor will be available in the Price Discovery Reporting application located at http://www.rma.usda.gov.  The method used for calculating the factor will be available at http://www.rma.usda.gov/pubs/.   The organic (certified) practice projected price will be released no later than three business days following the end of the corn (grain type) projected price discovery period.

Harvest price – The corn (grain type) harvest price as determined above, multiplied by the same factor determined for the organic (certified) practice projected price, rounded to the nearest whole cent.  The organic (certified) practice harvest price will be released no later than three business days following the end of the corn (grain type) harvest price discovery period.

**CEPP - Section II:  Corn (Released June 2013)** 5

NHF2-526 Policy 000078

**16-CEPP (Released November 2015)**

## COMMODITY EXCHANGE PRICE PROVISIONS (CEPP)

## 2016 AND SUCCEEDING CROP YEARS

**Section I:  General Information**

*The CEPP applies only to crops for which revenue protection (including area revenue protection) and yield protection (including area yield protection) are available.  See Section II, by crop specification, for price definitions.*

1. Definitions

   **Average Daily Settlement Price** – The sum of all daily settlement prices divided by the total number of daily settlement prices included in the sum.  All daily settlement prices during the price discovery period for the contract specified in the applicable crop's projected price or harvest price definition will be included in the sum, provided the threshold requirements, as defined below, are met.  If the threshold requirements are not met for the specified contract, see the terms under the substitute average daily settlement price definition.  If the threshold requirements are not met under the terms of the substitute average daily settlement price definition, the applicable projected price and harvest price will be established in accordance with I.2(c), I.2(e)(1), or I.2(f).

   **CBOT** – Chicago Board of Trade.

   **CME** – Chicago Mercantile Exchange.

   **Daily Settlement Price** – A price established in accordance with the CEPP which is available for the crop at the end of a trading day.

   **Full Active Trading Day** – For all exchanges **except** the Portland Merchants Exchange, any trading day on which a minimum of 1 open interest contract for the

**CEPP - Section I:  General Information (Released November 2015)**          **1**

NHF2-526 Policy 000079

relevant futures contract is available at the close of trading.  For the Portland

Merchants Exchange, there is **no** open interest requirement.

**Harvest Price** – See the definition in section II.

**Harvest Year** – The calendar year in which the crop is normally harvested.

**ICE** –  InterContinentalExchange.

**KCBT** – Kansas City Board of Trade.

**MGE** – Minneapolis Grain Exchange.

**NASS** – The National Agricultural Statistics Service, an agency within USDA.

**Projected Price** – See the definition in section II.

**Substitute Average Daily Settlement Price** – An average daily settlement price used

when the threshold requirements for the contract specified in the applicable crop's

projected or harvest price definition are not met.  The substitute average daily

settlement price is generally obtained from the contract immediately prior to the

contract specified in the applicable insured crop's projected price or harvest price

definition, or another contract as determined by RMA.  It must represent the same

crop year as the insured crop.  Threshold requirements must be met for the substitute

average daily settlement price.  If threshold requirements are not met, the applicable

projected price and harvest price will be established in accordance with I.2(c),

I.2(e)(1), or I.2(f).

**Threshold Requirements** – The minimum number of full active trading day(s) and

the minimum trading volume that must occur during the price discovery period for

the contract specified in the applicable crop's projected price or harvest price

definition for revenue protection coverage to be offered.  There must be one full

NHF2-526 Policy 000080

active trading day during the price discovery period.  The contract must also trade at least once during the discovery period, i.e., there must be one trading day with a volume of at least one.

**USDA** – United States Department of Agriculture.

2.  Price Determinations

(a) In accordance with either section 1 of the Common Crop Insurance Policy Basic Provisions or section 1 of the Area Risk Protection Insurance Basic Provisions, these Commodity Exchange Price Provisions specify how and when the projected price and harvest price will be determined by crop.

(1) These provisions are a part of the policy **for all crops for which revenue protection is available**, regardless of whether the producer elects revenue protection or yield protection for such crops.

(2) This document includes the information necessary to derive the projected price and the harvest price for the insured crop, as applicable.

(b) The CEPP will be used to determine:

(1) The projected price and harvest price for insured crops for which revenue protection is selected; or

(2) The projected price for insured crops for which yield protection is selected.

(c) RMA reserves the right to omit any daily settlement price or substitute daily settlement price used to compute the average daily settlement price or substitute average daily settlement price if market conditions are different than those used to rate or price revenue protection.

(d) RMA reserves the right to set the projected price for yield protection.

**CEPP - Section I:  General Information (Released November 2015)**                    **3**

(e) If the projected price cannot be calculated by the procedures outlined in these

Commodity Exchange Price Provisions:

(1) No revenue protection will be available;

(2) If revenue protection is not available, notice will be provided on RMA's Web

site at http://www.rma.usda.gov/ by the date specified in the applicable

projected price definition;

(3) Yield protection will continue to be available; and

(4) The projected price for yield protection will be determined by RMA and

released by the date specified in the applicable projected price definition in the

CEPP.

(f) If the harvest price cannot be calculated by the procedures outlined in this CEPP,

the harvest price will be determined by RMA.

(g) The harvest price will not be greater than the projected price multiplied by 2.00.

(h) Projected prices, harvest prices and associated factors and adjustments for all

crops, except the corn silage type, can be found at

http://www.rma.usda.gov/tools/pricediscovery.html.  The methods used for

calculating the factors and adjustments can be found at

http://www.rma.usda.gov/pubs/.

(i) In counties with a fall sales closing date for which insurance is provided on both

the spring and fall/winter types, the projected price for spring types will be

released after the fall sales closing date at the time specified in the applicable

definition of projected price.

**CEPP - Section I:  General Information (Released November 2015)**                    **4**

(j)  For each insurance offer, if the actuarial documents specify that contract pricing is available, <u>and</u> procedures for establishing contract pricing are not specified in the crop provisions or special provisions, the Contract Price Addendum (CPA), found at http://www.rma.usda.gov, outlines the procedures for using a contract price to determine your projected price and, if applicable, harvest price.

(k)  For revenue protection coverage to be offered, implied volatilities must be available for the option contract corresponding to the futures contract specified in the applicable crop's projected price or harvest price definition.  The implied volatility requirements are specified in the volatility factor calculation methodology paper, which is found at http://www.rma.usda.gov/pubs/.

NHF2-526 Policy 000083

NHF2-526 Policy 000084

**17-CEPP (Released May 2016)**

## COMMODITY EXCHANGE PRICE PROVISIONS (CEPP)
## 2017 AND SUCCEEDING CROP YEARS

### Section II:  Price Definitions

*(See Section I for General Information applicable to all crops.)*

### Soybeans (0081)

Projected price – The harvest year's average daily settlement price for the projected price discovery period for *either* the harvest year's futures contract (November), *or* the post-harvest year's futures contract (January), as shown in the tables below, rounded to the nearest whole cent.  The projected price will be released no later than three business days following the end of the projected price discovery period.

Harvest price - The harvest year's average daily settlement price for the harvest price discovery period for *either* the harvest year's futures contract (November), *or* the post-harvest year's futures contract (January), as shown in the tables below, rounded to the nearest whole cent.  The harvest price will be released no later than three business days following the end of the harvest price discovery period.

| SOYBEANS – January 31 Sales Closing Date | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date | Beginning Date | Ending Date |
| Texas | CBOT | Soybeans | November | Dec 15 | Jan 14 | Sep 1 | Sep 30 |

| SOYBEANS – February 28 Sales Closing Date | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date | Beginning Date | Ending Date |
| Alabama | CBOT | Soybeans | January | Jan 15 | Feb 14 | Nov 1 | Nov 30 |
| Arkansas | CBOT | Soybeans | November | Jan 15 | Feb 14 | Oct 1 | Oct 31 |
| Florida | CBOT | Soybeans | January | Jan 15 | Feb 14 | Nov 1 | Nov 30 |
| Georgia | CBOT | Soybeans | January | Jan 15 | Feb 14 | Nov 1 | Nov 30 |
| Louisiana | CBOT | Soybeans | November | Jan 15 | Feb 14 | Oct 1 | Oct 31 |
| Mississippi | CBOT | Soybeans | November | Jan 15 | Feb 14 | Oct 1 | Oct 31 |
| North Carolina | CBOT | Soybeans | January | Jan 15 | Feb 14 | Nov 1 | Nov 30 |
| South Carolina | CBOT | Soybeans | January | Jan 15 | Feb 14 | Nov 1 | Nov 30 |
| Texas | CBOT | Soybeans | November | Jan 15 | Feb 14 | Oct 1 | Oct 31 |

**CEPP - Section II:  Soybeans (Released May 2016)**                                                     **1**

NHF2-526 Policy 000085

| SOYBEANS – March 15 Sales Closing Date | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date* | Beginning Date | Ending Date |
| Colorado | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Delaware | CBOT | Soybeans | January | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Illinois | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Indiana | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Iowa | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Kansas | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Kentucky | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Maryland | CBOT | Soybeans | January | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Michigan | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Minnesota | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Missouri | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Nebraska | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| New Jersey | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| New York | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| North Dakota | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Ohio | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Oklahoma | CBOT | Soybeans | January | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Oregon | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Pennsylvania | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| South Dakota | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Tennessee | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Texas | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Vermont | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Virginia | CBOT | Soybeans | January | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Washington | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| West Virginia | CBOT | Soybeans | January | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Wisconsin | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| *February 28 Ending Date is extended to February 29 in leap years. | | | | | | | |

**CEPP - Section II:  Soybeans (Released May 2016)**                                    **2**

**Soybeans (0081)**

**Organic (Certified) Practice**

Projected price – The soybeans projected price as determined above, multiplied by a factor determined by RMA, rounded to the nearest whole cent.  The factor will be available in the Price Discovery Reporting application located at http://www.rma.usda.gov.  The method for calculating the factor will be available at http://www.rma.usda.gov/pubs/.  The organic (certified) practice projected price will be released no later than three business days following the end of the soybeans projected price discovery period.

Harvest price – The soybeans harvest price as determined above, multiplied by the same factor determined for the organic (certified) practice projected price, rounded to the nearest whole cent.  The organic (certified) practice harvest price will be released no later than three business days following the end of the soybeans harvest price discovery period.

NHF2-526 Policy 000087

NHF2-526 Policy 000088

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Van Buren (159) |

### Program Dates for Insurable Types and Practices

| Sales Closing Date<br>3/15/2019 | Earliest Planting Date<br>4/10/2019 | Final Planting Date<br>6/5/2019 | End of Late Planting Period Date<br>6/25/2019 | Acreage Reporting Date<br>7/15/2019 | Premium Billing Date<br>8/15/2019 |
|---|---|---|---|---|---|

| TP | Type | Practice |
|---|---|---|
| T/P 1 | Grain 016 | Non-Irrigated 003 |
| T/P 2 | Grain 016 | Irrigated 002 |
| T/P 3 | Grain 016 | Organic(Certified) Non-Irr. 713 *4 |
| T/P 4 | Grain 016 | Organic(Certified) Irr. 702 *4 |
| T/P 5 | Grain 016 | Organic(Transitional) Non-Irr. 714 |
| T/P 6 | Grain 016 | Organic(Transitional) Irr. 712 |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Date**

In lieu of the definition of late planting period in section 1 of the Basic Provisions, please refer to the End Of Late Planting Period Date.

**Price**

For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

**Insurance Availability**

In addition to the types listed in section 5(b)(2) of the Coarse Grains Crop Provisions, purple and pink hybrid corn varieties may be insurable by written agreement.

Insurance shall not attach or be considered to have attached without a written agreement to a planted crop on acreage from which, in the same calendar year:

| Special Provisions of Insurance |
| :-: |
| 2019 and Succeeding Crop Years |

| | | |
| :-- | :-- | :-- |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:       Yield Protection (01) | County: Van Buren (159) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

1.  A perennial hay crop was harvested; or

2.  A crop (other than a cover crop) reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. To qualify for a written agreement, you must provide a minimum of the most recent three years of your double cropping actual production history for the crop in the county. A cover crop is one that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Van Buren (159) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

| Special Provisions of Insurance | | |
|---|---|---|
| 2019 and Succeeding Crop Years | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Van Buren (159) |
|  |          Revenue Protection (02) |  |
|  |          Revenue Prot with Harvest Price Exclusion (03) |  |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to corn grain production for the insured crop.

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold prior to 60 days after the calendar date for the EOIP, we will adjust your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

a.  Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

b.  Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:   Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Van Buren (159) |

c.   Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.

1.   OPTION TO DELAY CLAIM SETTLEMENT:

  a.    On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

  b.   If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

  c.   At any time during this delay in settlement, you may request  to settle your claim for any unsold production using the applicable DFs.

  d.   For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

  e.   If the production is later sold, we will not recalculate or adjust your claim for indemnity.

  f.   If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

  g.   This option will not apply to any production qualifying under section C3.

2.   SECTION 14(e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.

3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.

If the production is not sold within this period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Van Buren (159) |

later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.

4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP , otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.

5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

6.   ZERO MARKET VALUE

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value*** , such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

| Special Provisions of Insurance |
| :---: |
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Van Buren (159) |
|  |             Revenue Protection (02) |  |
|  |             Revenue Prot with Harvest Price Exclusion (03) |  |

i.   RIVs cannot be used in combination with chart DFs.

ii.  If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

iii. If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

iv.  The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Corn will be discounted for grade as follows:

| Grade | DF |
| --- | --- |
| U.S. Sample Grade | 0.085 |

TEST WEIGHT DISCOUNT

Discounts for low test weight as follows (U.S. Grade No.5 for Test Weight –    .    lbs. to 46 lbs.; U.S. Sample Grade –    .    lbs. and below:

| Test Weight Pounds | DF |
| --- | --- |
| 49 and above | None |
| 48-48.99 | 0.041 |
| 47-47.99 | 0.051 |
| 46-46.99 | 0.062 |
| 45-45.99 | 0.072 |
| 44-44.99 | 0.082 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows (U.S. Grade No. 5 for Damage - 10.01% to 15%; U.S. Sample Grade - 15.01% and above):

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

Year: 2019                     Commodity: Corn (0041)                                    State:   Michigan (26)

Date: 11/27/2018               Plan:      Yield Protection (01)                          County: Van Buren (159)

                                               Revenue Protection (02)

                                               Revenue Prot with Harvest Price Exclusion (03)

| Damage % | DF | Damage % | DF | Damage % | DF |
| --- | --- | --- | --- | --- | --- |
| 10 and below | None | 18.01-19 | 0.164 | 27.01-28 | 0.303 |
| 10.01-11 | 0.062 | 19.01-20 | 0.179 | 28.01-29 | 0.318 |
| 11.01-12 | 0.072 | 20.01-21 | 0.195 | 29.01-30 | 0.333 |
| 12.01-13 | 0.082 | 21.01-22 | 0.210 | 30.01-31 | 0.349 |
| 13.01-14 | 0.092 | 22.01-23 | 0.226 | 31.01-32 | 0.364 |
| 14.01-15 | 0.103 | 23.01-24 | 0.241 | 32.01-33 | 0.379 |
| 15.01-16 | 0.118 | 24.01-25 | 0.256 | 33.01-34 | 0.395 |
| 16.01-17 | 0.133 | 25.01-26 | 0.272 | 34.01-35 | 0.410 |
| 17.01-18 | 0.149 | 26.01-27 | 0.287 | Above 35 | See section B |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| Musty Odor | 0.051 |
| --- | --- |
| Sour Odor | 0.051 |
| COFO | 0.051 |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, on the date of final inspection for the unit adjust production in the following manner:

1. If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2. For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3. If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:      Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Van Buren (159) |

health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

  a.   The action or advisory level of the Food and Drug Administration; or

  b.   Another public health organization of the United States; or

  c.   A public health agency of the applicable State in which the insured crop is grown.

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

  1.   For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

  a.   Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price.

  b.   For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

  c.   Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

Year: 2019       Commodity: Corn (0041)       State:   Michigan (26)

Date: 11/27/2018       Plan:     Yield Protection (01)       County: Van Buren (159)

                                    Revenue Protection (02)

                                    Revenue Prot with Harvest Price Exclusion (03)

| Vomitoxin Range | DF |
|---|---|
| .1 − .  ppm | .000 |
| .1 − 1 .  ppm | .225 |
| 10.1 ppm & above | See C3 below |

2.  For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

    a.  If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

        i.  For production sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

        ii.  For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

        iii.  For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

        iv.  For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

        v.  For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

    b.  If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

        i.  For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

        ii.  For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

        iii.  For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

        iv.  For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

| **Special Provisions of Insurance** |
| :---: |
| **2019 and Succeeding Crop Years** |

| | | |
| :--- | :--- | :--- |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Van Buren (159) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

DFs for Aflatoxin:

| Aflatoxin Range | DF |
| :--- | :--- |
| .1 – 2  .   ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .   ppb | .200 |
| 1   .1 – 2   .   ppb | .300 |
| 2   .1 – 3   .   ppb | .400 |
| 300.1 ppb & above | See C3 below |

DFs for Fumonisin:

| Fumonisin Range | DF |
| :--- | :--- |
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3.  For production that has Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

a.  For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

   i.  The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

   ii.  .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

b.  For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

   i.  The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Van Buren (159) |

    ii.  .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from section A or B will be included.

  c.  If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

1.  The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

2.  If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value and will be adjusted as follows:

  a.  For production in section A – the pre-established DFs.

  b.  For production in section B – .       .

  c.  For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

3.  If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| | |
|---|---|
| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

## Program Dates for Insurable Types and Practices

| Sales Closing Date 3/15/2019 | Earliest Planting Date 4/10/2019 | Final Planting Date 6/5/2019 | End of Late Planting Period Date 6/25/2019 | Acreage Reporting Date 7/15/2019 | Premium Billing Date 8/15/2019 |
|---|---|---|---|---|---|

| TP | Type | Practice |
|---|---|---|
| T/P 1 | Grain 016 | Non-Irrigated 003 |
| T/P 2 | Grain 016 | Irrigated 002 |
| T/P 3 | Grain 016 | Organic(Certified) Non-Irr. 713 *4 |
| T/P 4 | Grain 016 | Organic(Certified) Irr. 702 *4 |
| T/P 5 | Grain 016 | Organic(Transitional) Non-Irr. 714 |
| T/P 6 | Grain 016 | Organic(Transitional) Irr. 712 |

## Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Date**

In lieu of the definition of late planting period in section 1 of the Basic Provisions, please refer to the End Of Late Planting Period Date.

**Price**

For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

**Insurance Availability**

In addition to the types listed in section 5(b)(2) of the Coarse Grains Crop Provisions, purple and pink hybrid corn varieties may be insurable by written agreement.

Insurance shall not attach or be considered to have attached without a written agreement to a planted crop on acreage from which, in the same calendar year:

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

1. A perennial hay crop was harvested; or

2. A crop (other than a cover crop) reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. To qualify for a written agreement, you must provide a minimum of the most recent three years of your double cropping actual production history for the crop in the county. A cover crop is one that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance.

| **Special Provisions of Insurance** | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:       Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to corn grain production for the insured crop.

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold prior to 60 days after the calendar date for the EOIP, we will adjust your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

a.  Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

b.  Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State: Michigan (26) |
| Date: 11/27/2018 | Plan: Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

 c. Section C3, the DF will be determined under section C3 only. No additional DFs from section A or section B will be included.

1. OPTION TO DELAY CLAIM SETTLEMENT:

 a. On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

 b. If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

 c. At any time during this delay in settlement, you may request to settle your claim for any unsold production using the applicable DFs.

 d. For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

 e. If the production is later sold, we will not recalculate or adjust your claim for indemnity.

 f. If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

 g. This option will not apply to any production qualifying under section C3.

2. SECTION 14(e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.

3. EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended. If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above. If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.

If the production is not sold within this period, the claim will be settled using the applicable pre-established DF. You must complete and submit a claim for indemnity not

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.

4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP , otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.

5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

6.   ZERO MARKET VALUE

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value*** , such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:   Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

i.    RIVs cannot be used in combination with chart DFs.

ii.   If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

iii.  If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

iv.   The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Corn will be discounted for grade as follows:

| Grade | DF |
|---|---|
| U.S. Sample Grade | 0.085 |

TEST WEIGHT DISCOUNT

Discounts for low test weight as follows (U.S. Grade No.5 for Test Weight –    .   lbs. to 46 lbs.; U.S. Sample Grade –    .   lbs. and below:

| Test Weight Pounds | DF |
|---|---|
| 49 and above | None |
| 48-48.99 | 0.041 |
| 47-47.99 | 0.051 |
| 46-46.99 | 0.062 |
| 45-45.99 | 0.072 |
| 44-44.99 | 0.082 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows (U.S. Grade No. 5 for Damage - 10.01% to 15%; U.S. Sample Grade - 15.01% and above):

NHF2-526 Policy 000107

7

| Special Provisions of Insurance |
| :-: |
| **2019 and Succeeding Crop Years** |

Year: 2019      Commodity: Corn (0041)      State:   Michigan (26)

Date: 11/27/2018      Plan:     Yield Protection (01)      County: Berrien (021)
                                            Revenue Protection (02)
                                            Revenue Prot with Harvest Price Exclusion (03)

| Damage % | DF | Damage % | DF | Damage % | DF |
| :-- | :-- | :-- | :-- | :-- | :-- |
| 10 and below | None | 18.01-19 | 0.164 | 27.01-28 | 0.303 |
| 10.01-11 | 0.062 | 19.01-20 | 0.179 | 28.01-29 | 0.318 |
| 11.01-12 | 0.072 | 20.01-21 | 0.195 | 29.01-30 | 0.333 |
| 12.01-13 | 0.082 | 21.01-22 | 0.210 | 30.01-31 | 0.349 |
| 13.01-14 | 0.092 | 22.01-23 | 0.226 | 31.01-32 | 0.364 |
| 14.01-15 | 0.103 | 23.01-24 | 0.241 | 32.01-33 | 0.379 |
| 15.01-16 | 0.118 | 24.01-25 | 0.256 | 33.01-34 | 0.395 |
| 16.01-17 | 0.133 | 25.01-26 | 0.272 | 34.01-35 | 0.410 |
| 17.01-18 | 0.149 | 26.01-27 | 0.287 | Above 35 | See section B |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| | |
| :-- | :-- |
| Musty Odor | 0.051 |
| Sour Odor | 0.051 |
| COFO | 0.051 |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, on the date of final inspection for the unit adjust production in the following manner:

1. If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2. For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3. If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

   a.   The action or advisory level of the Food and Drug Administration; or

   b.   Another public health organization of the United States; or

   c.   A public health agency of the applicable State in which the insured crop is grown.

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

   1.   For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

   a.   Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price.

   b.   For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

   c.   Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| Vomitoxin Range | DF |
|---|---|
| .1 – .   ppm | .000 |
| .1 – 1 .   ppm | .225 |
| 10.1 ppm & above | See C3 below |

2.  For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

   a.  If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

   i.   For production sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

   ii.  For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

   iii. For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

   iv.  For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

   v.   For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

   b.  If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

   i.   For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

   ii.  For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

   iii. For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

   iv.  For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| | | |
| :--- | :--- | :--- |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

DFs for Aflatoxin:

| Aflatoxin Range | DF |
| :--- | :--- |
| .1 – 2 .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .  ppb | .200 |
| 1   .1 – 2   .  ppb | .300 |
| 2   .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

DFs for Fumonisin:

| Fumonisin Range | DF |
| :--- | :--- |
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3.  For production that has Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

a.  For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

i.   The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

ii.  .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

b.  For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

i.   The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

| Special Provisions of Insurance |
|---|
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

    ii.   .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold other than a disinterested third party.  No other DF from section A or B will be included.

   c.   If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

   1.   The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

   2.   If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value and will be adjusted as follows:

     a.   For production in section A – the pre-established DFs.

     b.   For production in section B – .     .

     c.   For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

   3.   If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| | |
|---|---|
| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Branch (023) |

### Program Dates for Insurable Types and Practices

| Sales Closing Date | Earliest Planting Date | Final Planting Date | End of Late Planting Period Date | Acreage Reporting Date | Premium Billing Date |
|---|---|---|---|---|---|
| 3/15/2019 | 4/10/2019 | 6/5/2019 | 6/25/2019 | 7/15/2019 | 8/15/2019 |

| TP | Type | Practice |
|---|---|---|
| T/P 1 | Grain 016 | Non-Irrigated 003 |
| T/P 2 | Grain 016 | Irrigated 002 |
| T/P 3 | Grain 016 | Organic(Certified) Non-Irr. 713 *4 |
| T/P 4 | Grain 016 | Organic(Certified) Irr. 702 *4 |
| T/P 5 | Grain 016 | Organic(Transitional) Non-Irr. 714 |
| T/P 6 | Grain 016 | Organic(Transitional) Irr. 712 |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Date**

In lieu of the definition of late planting period in section 1 of the Basic Provisions, please refer to the End Of Late Planting Period Date.

**Price**

*4  For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

**Insurance Availability**

In addition to the types listed in section 5(b)(2) of the Coarse Grains Crop Provisions, purple and pink hybrid corn varieties may be insurable by written agreement.

Insurance shall not attach or be considered to have attached without a written agreement to a planted crop on acreage from which, in the same calendar year:

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| | | |
| :--- | :--- | :--- |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Branch (023) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

1.  A perennial hay crop was harvested; or

2.  A crop (other than a cover crop) reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. To qualify for a written agreement, you must provide a minimum of the most recent three years of your double cropping actual production history for the crop in the county. A cover crop is one that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance.

| **Special Provisions of Insurance** | | |
| :-: | :-: | :-: |
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Branch (023) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Branch (023) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to corn grain production for the insured crop.

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold prior to 60 days after the calendar date for the EOIP, we will adjust your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

a.   Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

b.   Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

| **Special Provisions of Insurance** | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:   Yield Protection (01) | County: Branch (023) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

    c.   Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.

1.   OPTION TO DELAY CLAIM SETTLEMENT:

    a.    On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

    b.   If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

    c.   At any time during this delay in settlement, you may request  to settle your claim for any unsold production using the applicable DFs.

    d.   For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

    e.   If the production is later sold, we will not recalculate or adjust your claim for indemnity.

    f.   If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

    g.   This option will not apply to any production qualifying under section C3.

2.   SECTION 14(e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.

3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.

If the production is not sold within this period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not

| Special Provisions of Insurance |
|---|
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:      Yield Protection (01)<br>             Revenue Protection (02)<br>             Revenue Prot with Harvest Price Exclusion (03) | County: Branch (023) |

later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.

4.    DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP , otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.

5.    FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

6.    ZERO MARKET VALUE

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value*** such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.    REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.    Moisture content;

b.    Damage due to uninsured causes;

c.    Drying;

d.    Handling;

e.    Processing; or

f.    Any other costs associated with normal harvesting, handling, and marketing of your production.

| Special Provisions of Insurance |
|---|
| 2019 and Succeeding Crop Years |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Branch (023) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

   i. RIVs cannot be used in combination with chart DFs.

   ii. If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

   iii. If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

   iv. The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Corn will be discounted for grade as follows:

| Grade | DF |
|---|---|
| U.S. Sample Grade | 0.085 |

TEST WEIGHT DISCOUNT

Discounts for low test weight as follows (U.S. Grade No.5 for Test Weight –   .   lbs. to 46 lbs.; U.S. Sample Grade –   .   lbs. and below:

| Test Weight Pounds | DF |
|---|---|
| 49 and above | None |
| 48-48.99 | 0.041 |
| 47-47.99 | 0.051 |
| 46-46.99 | 0.062 |
| 45-45.99 | 0.072 |
| 44-44.99 | 0.082 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows (U.S. Grade No. 5 for Damage - 10.01% to 15%; U.S. Sample Grade - 15.01% and above):

7

NHF2-526 Policy 000119

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26)

Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Branch (023)

Revenue Protection (02)

Revenue Prot with Harvest Price Exclusion (03)

| Damage % | DF | Damage % | DF | Damage % | DF |
|---|---|---|---|---|---|
| 10 and below | None | 18.01-19 | 0.164 | 27.01-28 | 0.303 |
| 10.01-11 | 0.062 | 19.01-20 | 0.179 | 28.01-29 | 0.318 |
| 11.01-12 | 0.072 | 20.01-21 | 0.195 | 29.01-30 | 0.333 |
| 12.01-13 | 0.082 | 21.01-22 | 0.210 | 30.01-31 | 0.349 |
| 13.01-14 | 0.092 | 22.01-23 | 0.226 | 31.01-32 | 0.364 |
| 14.01-15 | 0.103 | 23.01-24 | 0.241 | 32.01-33 | 0.379 |
| 15.01-16 | 0.118 | 24.01-25 | 0.256 | 33.01-34 | 0.395 |
| 16.01-17 | 0.133 | 25.01-26 | 0.272 | 34.01-35 | 0.410 |
| 17.01-18 | 0.149 | 26.01-27 | 0.287 | Above 35 | See section B |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| Musty Odor | 0.051 |
|---|---|
| Sour Odor | 0.051 |
| COFO | 0.051 |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, on the date of final inspection for the unit adjust production in the following manner:

1.  If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3.  If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public

NHF2-526 Policy 000120

8

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Branch (023) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

   a.   The action or advisory level of the Food and Drug Administration; or

   b.   Another public health organization of the United States; or

   c.   A public health agency of the applicable State in which the insured crop is grown.

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

   1.   For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

   a.   Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price.

   b.   For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

   c.   Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:     Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Branch (023) |

| Vomitoxin Range | DF |
|---|---|
| .1 − .   ppm | .000 |
| .1 − 1 .   ppm | .225 |
| 10.1 ppm & above | See C3 below |

2. For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

   a. If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

      i. For production sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

      ii. For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

      iii. For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

      iv. For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

      v. For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

   b. If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

      i. For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

      ii. For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

      iii. For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

      iv. For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| 2019 and Succeeding Crop Years | | |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/27/2018 | Plan:   Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Branch (023) |

DFs for Aflatoxin:

| Aflatoxin Range | DF |
| --- | --- |
| .1 – 2 .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .   ppb | .200 |
| 1   .1 – 2   .  ppb | .300 |
| 2   .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

DFs for Fumonisin:

| Fumonisin Range | DF |
| --- | --- |
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3.  For production that has Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

a.  For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

i.  The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

ii.  .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

b.  For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

i.  The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Branch (023) |

    ii.   .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from section A or B will be included.

  c.   If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

  1.   The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

  2.   If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value and will be adjusted as follows:

    a.   For production in section A – the pre-established DFs.

    b.   For production in section B – .      .

    c.   For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

  3.   If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| | |
|---|---|
| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Cass (027) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Program Dates for Insurable Types and Practices

| Sales Closing Date | Earliest Planting Date | Final Planting Date | End of Late Planting Period Date | Acreage Reporting Date | Premium Billing Date |
|---|---|---|---|---|---|
| 3/15/2019 | 4/10/2019 | 6/5/2019 | 6/25/2019 | 7/15/2019 | 8/15/2019 |

| TP | Type | Practice |
|---|---|---|
| T/P 1 | Grain 016 | Non-Irrigated 003 |
| T/P 2 | Grain 016 | Irrigated 002 |
| T/P 3 | Grain 016 | Organic(Certified) Non-Irr. 713 *4 |
| T/P 4 | Grain 016 | Organic(Certified) Irr. 702 *4 |
| T/P 5 | Grain 016 | Organic(Transitional) Non-Irr. 714 |
| T/P 6 | Grain 016 | Organic(Transitional) Irr. 712 |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Date**

In lieu of the definition of late planting period in section 1 of the Basic Provisions, please refer to the End Of Late Planting Period Date.

**Price**

*4 For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

**Insurance Availability**

In addition to the types listed in section 5(b)(2) of the Coarse Grains Crop Provisions, purple and pink hybrid corn varieties may be insurable by written agreement.

Insurance shall not attach or be considered to have attached without a written agreement to a planted crop on acreage from which, in the same calendar year:

NHF2-526 Policy 000125

1

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Cass (027) |

1. A perennial hay crop was harvested; or

2. A crop (other than a cover crop) reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. To qualify for a written agreement, you must provide a minimum of the most recent three years of your double cropping actual production history for the crop in the county. A cover crop is one that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance.

NHF2-526 Policy 000126

2

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Cass (027) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01)<br>              Revenue Protection (02)<br>              Revenue Prot with Harvest Price Exclusion (03) | County: Cass (027) |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to corn grain production for the insured crop.

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold prior to 60 days after the calendar date for the EOIP, we will adjust your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

   a.  Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

   b.  Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

| **Special Provisions of Insurance** | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Cass (027) |
|  | Revenue Protection (02) |  |
|  | Revenue Prot with Harvest Price Exclusion (03) |  |

c.   Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.

1.   OPTION TO DELAY CLAIM SETTLEMENT:

a.    On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

b.   If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

c.   At any time during this delay in settlement, you may request  to settle your claim for any unsold production using the applicable DFs.

d.   For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

e.   If the production is later sold, we will not recalculate or adjust your claim for indemnity.

f.   If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

g.   This option will not apply to any production qualifying under section C3.

2.   SECTION 14(e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.

3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.

If the production is not sold within this period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Cass (027) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.

4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP , otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.

5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

6.   ZERO MARKET VALUE

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value*** , such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

| Special Provisions of Insurance |
| --- |
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/27/2018 | Plan:     Yield Protection (01)<br>            Revenue Protection (02)<br>            Revenue Prot with Harvest Price Exclusion (03) | County: Cass (027) |

i.   RIVs cannot be used in combination with chart DFs.

ii.  If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

iii. If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

iv.  The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Corn will be discounted for grade as follows:

| Grade | DF |
| --- | --- |
| U.S. Sample Grade | 0.085 |

TEST WEIGHT DISCOUNT

Discounts for low test weight as follows (U.S. Grade No.5 for Test Weight –    .   lbs. to 46 lbs.; U.S. Sample Grade –    .   lbs. and below:

| Test Weight Pounds | DF |
| --- | --- |
| 49 and above | None |
| 48-48.99 | 0.041 |
| 47-47.99 | 0.051 |
| 46-46.99 | 0.062 |
| 45-45.99 | 0.072 |
| 44-44.99 | 0.082 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows (U.S. Grade No. 5 for Damage - 10.01% to 15%; U.S. Sample Grade - 15.01% and above):

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

Year: 2019                    Commodity: Corn (0041)                                        State:   Michigan (26)

Date: 11/27/2018              Plan:     Yield Protection (01)                               County: Cass (027)
                                        Revenue Protection (02)
                                        Revenue Prot with Harvest Price Exclusion (03)

| Damage % | DF | Damage % | DF | Damage % | DF |
| --- | --- | --- | --- | --- | --- |
| 10 and below | None | 18.01-19 | 0.164 | 27.01-28 | 0.303 |
| 10.01-11 | 0.062 | 19.01-20 | 0.179 | 28.01-29 | 0.318 |
| 11.01-12 | 0.072 | 20.01-21 | 0.195 | 29.01-30 | 0.333 |
| 12.01-13 | 0.082 | 21.01-22 | 0.210 | 30.01-31 | 0.349 |
| 13.01-14 | 0.092 | 22.01-23 | 0.226 | 31.01-32 | 0.364 |
| 14.01-15 | 0.103 | 23.01-24 | 0.241 | 32.01-33 | 0.379 |
| 15.01-16 | 0.118 | 24.01-25 | 0.256 | 33.01-34 | 0.395 |
| 16.01-17 | 0.133 | 25.01-26 | 0.272 | 34.01-35 | 0.410 |
| 17.01-18 | 0.149 | 26.01-27 | 0.287 | Above 35 | See section B |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| Musty Odor | 0.051 |
| --- | --- |
| Sour Odor | 0.051 |
| COFO | 0.051 |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, on the date of final inspection for the unit adjust production in the following manner:

1.  If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3.  If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Cass (027) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

    a.   The action or advisory level of the Food and Drug Administration; or

    b.   Another public health organization of the United States; or

    c.   A public health agency of the applicable State in which the insured crop is grown.

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

    1.   For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

    a.   Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price.

    b.   For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

    c.   Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:     Yield Protection (01)  Revenue Protection (02)  Revenue Prot with Harvest Price Exclusion (03) | County: Cass (027) |

| Vomitoxin Range | DF |
|---|---|
| .1 − .  ppm | .000 |
| .1 − 1 .  ppm | .225 |
| 10.1 ppm & above | See C3 below |

2. For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

   a. If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

      i. For production sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

      ii. For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

      iii. For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

      iv. For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

      v. For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

   b. If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

      i. For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

      ii. For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

      iii. For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

      iv. For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

| **Special Provisions of Insurance**<br>**2019 and Succeeding Crop Years** |||
| --- | --- | --- |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Cass (027) |

DFs for Aflatoxin:

| Aflatoxin Range | DF |
| --- | --- |
| .1 – 2  .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .   ppb | .200 |
| 1   .1 – 2   .  ppb | .300 |
| 2   .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

DFs for Fumonisin:

| Fumonisin Range | DF |
| --- | --- |
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3.  For production that has Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

a.  For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

i.   The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

ii.  .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

b.  For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

i.   The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

| Special Provisions of Insurance 2019 and Succeeding Crop Years | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Cass (027) |

    ii.   .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold other than a disinterested third party.  No other DF from section A or B will be included.

    c.   If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

1.   The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

2.   If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value and will be adjusted as follows:

    a.   For production in section A – the pre-established DFs.

    b.   For production in section B – .     .

    c.   For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

3.   If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| | |
|---|---|
| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:  Michigan (26) |
| Date: 11/27/2018 | Plan:  Yield Protection (01) | County: Hillsdale (059) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Program Dates for Insurable Types and Practices

| Sales Closing Date 3/15/2019 | Earliest Planting Date 4/10/2019 | Final Planting Date 6/5/2019 | End of Late Planting Period Date 6/25/2019 | Acreage Reporting Date 7/15/2019 | Premium Billing Date 8/15/2019 |
|---|---|---|---|---|---|

| TP | Type | Practice |
|---|---|---|
| T/P 1 | Grain 016 | Non-Irrigated 003 |
| T/P 2 | Grain 016 | Irrigated 002 |
| T/P 3 | Grain 016 | Organic(Certified) Non-Irr. 713 *4 |
| T/P 4 | Grain 016 | Organic(Certified) Irr. 702 *4 |
| T/P 5 | Grain 016 | Organic(Transitional) Non-Irr. 714 |
| T/P 6 | Grain 016 | Organic(Transitional) Irr. 712 |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Date**

In lieu of the definition of late planting period in section 1 of the Basic Provisions, please refer to the End Of Late Planting Period Date.

**Price**

For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

**Insurance Availability**

In addition to the types listed in section 5(b)(2) of the Coarse Grains Crop Provisions, purple and pink hybrid corn varieties may be insurable by written agreement.

Insurance shall not attach or be considered to have attached without a written agreement to a planted crop on acreage from which, in the same calendar year:

| **Special Provisions of Insurance** | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Hillsdale (059) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

1.  A perennial hay crop was harvested; or

2.  A crop (other than a cover crop) reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. To qualify for a written agreement, you must provide a minimum of the most recent three years of your double cropping actual production history for the crop in the county. A cover crop is one that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance.

| Special Provisions of Insurance |
| --- |
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Hillsdale (059) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Hillsdale (059) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to corn grain production for the insured crop.

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold prior to 60 days after the calendar date for the EOIP, we will adjust your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

a.  Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

b.  Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Corn (0041) | State:  Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:  Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Hillsdale (059) |

    c.   Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.

1.  OPTION TO DELAY CLAIM SETTLEMENT:

    a.    On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

    b.   If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

    c.   At any time during this delay in settlement, you may request  to settle your claim for any unsold production using the applicable DFs.

    d.   For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

    e.   If the production is later sold, we will not recalculate or adjust your claim for indemnity.

    f.   If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

    g.   This option will not apply to any production qualifying under section C3.

2.  SECTION 14(e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.

3.  EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.

If the production is not sold within this period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Hillsdale (059) |

later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.

4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP , otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.

5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

6.   ZERO MARKET VALUE

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value*** , such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

NHF2-526 Policy 000142

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Hillsdale (059) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

i.    RIVs cannot be used in combination with chart DFs.

ii.   If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

iii.  If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

iv.   The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Corn will be discounted for grade as follows:

| Grade | DF |
|---|---|
| U.S. Sample Grade | 0.085 |

TEST WEIGHT DISCOUNT

Discounts for low test weight as follows (U.S. Grade No.5 for Test Weight –    .    lbs. to 46 lbs.; U.S. Sample Grade –    .    lbs. and below:

| Test Weight Pounds | DF |
|---|---|
| 49 and above | None |
| 48-48.99 | 0.041 |
| 47-47.99 | 0.051 |
| 46-46.99 | 0.062 |
| 45-45.99 | 0.072 |
| 44-44.99 | 0.082 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows (U.S. Grade No. 5 for Damage - 10.01% to 15%; U.S. Sample Grade - 15.01% and above):

| Special Provisions of Insurance |
|---|
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:       Yield Protection (01) | County: Hillsdale (059) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| Damage % | DF | Damage % | DF | Damage % | DF |
|---|---|---|---|---|---|
| 10 and below | None | 18.01-19 | 0.164 | 27.01-28 | 0.303 |
| 10.01-11 | 0.062 | 19.01-20 | 0.179 | 28.01-29 | 0.318 |
| 11.01-12 | 0.072 | 20.01-21 | 0.195 | 29.01-30 | 0.333 |
| 12.01-13 | 0.082 | 21.01-22 | 0.210 | 30.01-31 | 0.349 |
| 13.01-14 | 0.092 | 22.01-23 | 0.226 | 31.01-32 | 0.364 |
| 14.01-15 | 0.103 | 23.01-24 | 0.241 | 32.01-33 | 0.379 |
| 15.01-16 | 0.118 | 24.01-25 | 0.256 | 33.01-34 | 0.395 |
| 16.01-17 | 0.133 | 25.01-26 | 0.272 | 34.01-35 | 0.410 |
| 17.01-18 | 0.149 | 26.01-27 | 0.287 | Above 35 | See section B |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| Musty Odor | 0.051 |
|---|---|
| Sour Odor | 0.051 |
| COFO | 0.051 |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, on the date of final inspection for the unit adjust production in the following manner:

1.  If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3.  If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public

| Special Provisions of Insurance |
| --- |
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Hillsdale (059) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

    a.   The action or advisory level of the Food and Drug Administration; or

    b.   Another public health organization of the United States; or

    c.   A public health agency of the applicable State in which the insured crop is grown.

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

    1.   For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

    a.   Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price.

    b.   For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

    c.   Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Hillsdale (059) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| Vomitoxin Range | DF |
|---|---|
| .1 −  .   ppm | .000 |
| .1 − 1 .   ppm | .225 |
| 10.1 ppm & above | See C3 below |

2. For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

   a. If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

      i. For production sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

      ii. For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

      iii. For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

      iv. For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

      v. For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

   b. If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

      i. For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

      ii. For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

      iii. For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

      iv. For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

Year: 2019

Date: 11/27/2018

Plan:   Yield Protection (01)

Revenue Protection (02)

Revenue Prot with Harvest Price Exclusion (03)

State:   Michigan (26)

County: Hillsdale (059)

DFs for Aflatoxin:

| Aflatoxin Range | DF |
| --- | --- |
| .1 – 2  .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .   ppb | .200 |
| 1   .1 – 2   .  ppb | .300 |
| 2   .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

DFs for Fumonisin:

| Fumonisin Range | DF |
| --- | --- |
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3.  For production that has Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

a.  For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

i.  The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

ii.  .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

b.  For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

i.  The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

| Special Provisions of Insurance |
| :---: |
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| :--- | :--- | :--- |
| Date: 11/27/2018 | Plan:    Yield Protection (01)<br>             Revenue Protection (02)<br>             Revenue Prot with Harvest Price Exclusion (03) | County: Hillsdale (059) |

    ii.   .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold other than a disinterested third party.  No other DF from section A or B will be included.

   c.   If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

1.   The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

2.   If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value and will be adjusted as follows:

   a.   For production in section A – the pre-established DFs.

   b.   For production in section B – .      .

   c.   For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

3.   If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| :--- | :--- |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Van Buren (159) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Program Dates for Insurable Types and Practices

| Sales Closing Date 3/15/2019 | Earliest Planting Date 4/24/2019 | Final Planting Date 6/15/2019 | End of Late Planting Period Date 7/10/2019 | Acreage Reporting Date 7/15/2019 | Premium Billing Date 8/15/2019 |
|---|---|---|---|---|---|

| TP | Type | Practice |
|---|---|---|
| T/P 01 | Commodity 091 | Nfac (Non-Irrigated) 053 *3 |
| T/P 02 | Commodity 091 | Nfac (Irrigated) 094 *3 |
| T/P 03 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 04 | All Other Food Grades 128 *7 | Nfac (Irrigated) 094 *3 |
| T/P 05 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 06 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated) 094 *3 |
| T/P 07 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 08 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated) 094 *3 |
| T/P 09 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 10 | Low Linolenic Acid 884 *7 | Nfac (Irrigated) 094 *3 |
| T/P 11 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 12 | Low Saturated Fat 885 *7 | Nfac (Irrigated) 094 *3 |
| T/P 13 | High Protein 886 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 14 | High Protein 886 *7 | Nfac (Irrigated) 094 *3 |
| T/P 15 | Commodity 091 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 16 | Commodity 091 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 17 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 18 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 19 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |

NHF2-526 Policy 000149

1

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:      Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Van Buren (159) |

| TP | Type | Practice |
|---|---|---|
| T/P 20 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 21 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 22 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 23 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 24 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 25 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 26 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 27 | High Protein 886 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 28 | High Protein 886 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 29 | Commodity 091 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 30 | Commodity 091 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 31 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 32 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 33 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 34 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 35 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 36 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 37 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 38 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 39 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 40 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 41 | High Protein 886 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 42 | High Protein 886 *7 | Nfac (Irrigated)(OT) 740 *3 |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Van Buren (159) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Practice**

*3     NFAC (Not Following Another Crop): A planted crop not following:

1. A perennial hay crop that was harvested in the same calendar year; and

2. A crop (other than a cover crop) that has reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. A crop that follows a cover crop that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance, is considered NFAC.

**Price**

*4     For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Van Buren (159) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

**Insurance Availability**

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Van Buren (159) |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

*7      If you produce any of the following specialty soybean type(s) (including specialty type(s) grown for seed):

    a.   Large seeded food grade –Food grade soybeans commonly used for human food products which generally have a minimum seed size of 18 g/100 seeds (2,520 seeds/lb).

    b.   Small seeded food grade –Food grade varieties of soybeans commonly used for human food products which generally have a maximum seed size of 12 g/100 seeds (3,780 seeds/lb).

    c.   Low linolenic acid – Soybeans commonly used to produce soybean oil with a linolenic acid level of three percent or less.

    d.   Low saturated fat - Soybeans containing 50 percent less saturated fat than commodity soybeans and are used to produce soybean oil with eight percent or less total saturated fats.

    e.   High protein –Food grade varieties of soybeans containing protein levels of 42 percent or greater on a dry matter basis (36.5 percent on a 13 percent moisture basis).

    f.   All other food grades – Any food grade varieties of soybeans not identified by large seeded food grade, small seeded food grade, low linolenic acid, low saturated fat, and high protein types.

You may elect to use the price contained in your production contract (contract price) by the acreage reporting date to determine your projected price and harvest price, as applicable, for each specialty type only if the total number of insured acres of the specialty type does not exceed 110 percent of insured specialty type acreage under the contract (the number of acres under contract is determined as indicated below).  The acreage must be under contract with a business enterprise equipped with facilities appropriate to handle and store specialty type soybean production.  The contract must be executed by you and the business enterprise, in effect for the crop year, and you must provide a copy to us no later than the acreage reporting date.

To be considered a contract, the executed document must contain:

(a) A requirement that you plant, grow and deliver specialty type soybeans to the business enterprise;

(b) The amount of production that will be accepted or a statement that all production from a specified number of acres will be accepted.

To determine the number of acres under contract:

    1.   For acreage only based contracts and, acreage and production based contracts which specify a maximum number of acres, the lesser of:

       i.   The insured acres (planted acreage and acreage that is prevented from being planted); or

NHF2-526 Policy 000153

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| | | |
| :--- | :--- | :--- |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Van Buren (159) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

    ii.   The maximum number of acres specified in the contract.

  2.   For production only based contracts, the lesser of:

    i.   The number of acres determined by dividing the production stated in the contract by the approved yield; or

    ii.   The insured acres (planted acreage and acreage that is prevented from being planted).

(c) The price to be paid for the contracted production or a method to determine such price:

  1.   For yield protection:

    i.   If the contract provides a fixed price for the contracted production, the projected price will be the contract price.

    ii.   If the contract provides for a premium amount over a price determined after the acreage reporting date, the projected price will be the result of adding the premium amount to the CEPP projected price.

  2.   For revenue protection:

    i.   If the contract provides a fixed price for the contracted production:

      A.   The projected price will be the contract price.

      B.   The harvest price will be the result of the CEPP projected price subtracted from the contract price and the difference shall be added to the CEPP harvest price.

    ii.   If the contract provides a premium amount over a price determined after the acreage reporting date:

      A.   The projected price will be the result of adding the premium amount to the CEPP projected price.

      B.   The harvest price will be the result of the CEPP projected price subtracted from the projected price and the difference shall be added to the CEPP harvest price.

  3.   The price used will be the price in the contract without regard to incentives or discounts.

  4.   In no case will the contract price exceed the amount determined by multiplying the CEPP projected price, as applicable, by the maximum contract price factor shown in the Prices tab of these actuarial documents.

  5.   If you have more than one contract price for any one specialty type, the price used will be the weighted average of the contract prices.  Each contract price is subject to the limits referred to in (c)(4).

(d) Other such terms that establish the obligations of each party to the contract; and

(e) The contract must clearly indicate the specific specialty type or verification must be provided that the contracted variety is one of the specialty types listed above.

6

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| | | |
| :--- | :--- | :--- |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Van Buren (159) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

For specialty type soybeans the following replant rules apply:

(a) In addition to the definition of practical to replant in the Basic Provisions, for specialty type soybeans under contract it will not be considered practical to replant unless production from the replanted acreage can be delivered under the terms of the specialty type contract or the business enterprise agrees to accept such contracted production.

(b) In addition to section 9 of the Coarse Grains Crop Provisions when it **is** practical to replant the specialty type originally planted, you must replant to the specialty type originally planted on the acreage.

(c) When it is **not** practical to replant the specialty type originally planted on the acreage:

1. You may choose to:

    i.    Not replant and may receive an indemnity;

    ii.   Not replant the specialty type originally planted on the acreage and plant to another crop in which case the first/second crop rules in section 15 of the Basic Provisions apply; or

    iii.  Replant to another specialty type or commodity type, provided it is practical to replant such type.  The replanted type will be considered a replanted crop.

2. If it is not practical to replant to another specialty type or commodity type and you plant any type of soybeans, the crop planted will be considered a second crop.

Note: Quality adjustment will be provided as specified in the crop provisions and special provisions.  No additional quality adjustment will be made for any specialty type.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to soybean grain production for the insured crop

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under

| Special Provisions of Insurance |
| --- |
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Van Buren (159) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

    a.   Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

    b.   Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

    c.   Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.

1.   OPTION TO DELAY CLAIM SETTLEMENT:

    a.   On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

    b.   If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

    c.   At any time during this delay in settlement, you may request to settle your claim for any unsold production using the applicable DFs.

    d.   For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

    e.   If the production is later sold, we will not recalculate or adjust your claim for indemnity.

    f.   If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

| Special Provisions of Insurance |
|---|
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:        Yield Protection (01) | County: Van Buren (159) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

    g.   This option will not apply to any production qualifying under section C3.


2.   SECTION 14 (e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.


3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.  If the production is not sold within this 30 day period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.


4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP, otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.


5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f  ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only  for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.


6.   ZERO MARKET VALUE

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Van Buren (159) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value\*\*\*, such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

  i.   RIVs cannot be used in combination with chart DFs.

  ii.   If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

  iii.   If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

  iv.   The RIV and local market price\* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Soybeans will be discounted for grade as follows:

| Grade | DF |
| --- | --- |
| U.S. Sample Grade | 0.030 |

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Van Buren (159) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

TEST WEIGHT DISCOUNT:

Discounts for low test weight as follows:

| Test Weight Pounds | DF |
|---|---|
| 49 and above | None |
| 48-48.99 | 0.007 |
| 47-47.99 | 0.009 |
| 46-46.99 | 0.011 |
| 45-45.99 | 0.013 |
| 44-44.99 | 0.015 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows U.S. Sample Grade for Damage –  . 1   and above:

| Damage % | DF | Damage % | DF | Damage % | DF |
|---|---|---|---|---|---|
| 08 and below | None | 17.01-18 | 0.116 | 27.01-28 | 0.196 |
| 08.01-9 | 0.044 | 18.01-19 | 0.124 | 28.01-29 | 0.204 |
| 09.01-10 | 0.052 | 19.01-20 | 0.132 | 29.01-30 | 0.212 |
| 10.01-11 | 0.060 | 20.01-21 | 0.140 | 30.01-31 | 0.220 |
| 11.01-12 | 0.068 | 21.01-22 | 0.148 | 31.01-32 | 0.228 |
| 12.01-13 | 0.076 | 22.01-23 | 0.156 | 32.01-33 | 0.236 |
| 13.01-14 | 0.084 | 23.01-24 | 0.164 | 33.01-34 | 0.244 |
| 14.01-15 | 0.092 | 24.01-25 | 0.172 | 34.01-35 | 0.252 |
| 15.01-16 | 0.100 | 25.01-26 | 0.180 | Above 35 | See section B |
| 16.01-17 | 0.108 | 26.01-27 | 0.188 | | |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| Musty Odor | 0.020 |
|---|---|
| Sour Odor | 0.020 |
| COFO | 0.040 |

| **Special Provisions of Insurance** | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Van Buren (159) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, a garlicky grade on the date of final inspection for the unit adjust production in the following manner:

1.  If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3.  If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

a.  The action or advisory level of the Food and Drug Administration; or

b.  Another public health organization of the United States; or

c.  A public health agency of the applicable State in which the insured crop is grown.

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:   Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Van Buren (159) |

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

1.  For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

    a.  Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

    b.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

    c.  Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Vomitoxin Range | DF |
|---|---|
| .1 – .  ppm | .000 |
| .1 – 1 .  ppm | .450 |
| 10.1 ppm & above | See C3 below |

2.  For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

    a.  If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

        i.  For production sold to a disinterested third partyprior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

        ii.  For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

        iii.  For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

13

| Special Provisions of Insurance 2019 and Succeeding Crop Years | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Van Buren (159) |

    iv.   For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

    v.   For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

  b.  If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

    i.   For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

    ii.   For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

    iii.   For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

    iv.   For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

DFs for Aflatoxin:

| Aflatoxin Range | DF |
|---|---|
| .1 – 2 .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1  .   ppb | .200 |
| 1   .1 – 2  .  ppb | .300 |
| 2   .1 – 3  .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Van Buren (159) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| Fumonisin Range | DF |
| --- | --- |
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3. For production that has an Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

   a. For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

      i. The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

      ii. .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

   b. For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

      i. The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

      ii. .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from sections A or B will be included.

   c. If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

1. The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

2. If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/14/2018 | Plan:     Yield Protection (01)<br>          Revenue Protection (02)<br>          Revenue Prot with Harvest Price Exclusion (03) | County: Van Buren (159) |

and will be adjusted as follows:

a.   For production in section A – the pre-established DFs.

b.   For production in section B – .    .

c.   For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

3.   If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| --- | --- |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Program Dates for Insurable Types and Practices

| Sales Closing Date 3/15/2019 | Earliest Planting Date 4/24/2019 | Final Planting Date 6/15/2019 | End of Late Planting Period Date 7/10/2019 | Acreage Reporting Date 7/15/2019 | Premium Billing Date 8/15/2019 |
|---|---|---|---|---|---|

| TP | Type | Practice |
|---|---|---|
| T/P 01 | Commodity 091 | Nfac (Non-Irrigated) 053 *3 |
| T/P 02 | Commodity 091 | Nfac (Irrigated) 094 *3 |
| T/P 03 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 04 | All Other Food Grades 128 *7 | Nfac (Irrigated) 094 *3 |
| T/P 05 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 06 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated) 094 *3 |
| T/P 07 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 08 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated) 094 *3 |
| T/P 09 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 10 | Low Linolenic Acid 884 *7 | Nfac (Irrigated) 094 *3 |
| T/P 11 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 12 | Low Saturated Fat 885 *7 | Nfac (Irrigated) 094 *3 |
| T/P 13 | High Protein 886 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 14 | High Protein 886 *7 | Nfac (Irrigated) 094 *3 |
| T/P 15 | Commodity 091 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 16 | Commodity 091 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 17 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 18 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 19 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |

NHF2-526 Policy 000165

1

| Special Provisions of Insurance |
|:---:|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| TP | Type | Practice |
|---|:---:|:---:|
| T/P 20 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 21 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 22 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 23 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 24 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 25 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 26 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 27 | High Protein 886 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 28 | High Protein 886 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 29 | Commodity 091 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 30 | Commodity 091 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 31 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 32 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 33 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 34 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 35 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 36 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 37 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 38 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 39 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 40 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 41 | High Protein 886 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 42 | High Protein 886 *7 | Nfac (Irrigated)(OT) 740 *3 |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Practice**

*3    NFAC (Not Following Another Crop): A planted crop not following:

   1.   A perennial hay crop that was harvested in the same calendar year; and

   2.   A crop (other than a cover crop) that has reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. A crop that follows a cover crop that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance, is considered NFAC.

**Price**

*4    For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

| Special Provisions of Insurance |
|---|
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Soybeans (0081) | State: Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan: Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

**Insurance Availability**

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

NHF2-526 Policy 000168

4

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |

| | | |
| --- | --- | --- |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

*7      If you produce any of the following specialty soybean type(s) (including specialty type(s) grown for seed):

a.  Large seeded food grade –Food grade soybeans commonly used for human food products which generally have a minimum seed size of 18 g/100 seeds (2,520 seeds/lb).

b.  Small seeded food grade –Food grade varieties of soybeans commonly used for human food products which generally have a maximum seed size of 12 g/100 seeds (3,780 seeds/lb).

c.  Low linolenic acid – Soybeans commonly used to produce soybean oil with a linolenic acid level of three percent or less.

d.  Low saturated fat - Soybeans containing 50 percent less saturated fat than commodity soybeans and are used to produce soybean oil with eight percent or less total saturated fats.

e.  High protein –Food grade varieties of soybeans containing protein levels of 42 percent or greater on a dry matter basis (36.5 percent on a 13 percent moisture basis).

f.  All other food grades – Any food grade varieties of soybeans not identified by large seeded food grade, small seeded food grade, low linolenic acid, low saturated fat, and high protein types.

You may elect to use the price contained in your production contract (contract price) by the acreage reporting date to determine your projected price and harvest price, as applicable, for each specialty type only if the total number of insured acres of the specialty type does not exceed 110 percent of insured specialty type acreage under the contract (the number of acres under contract is determined as indicated below).  The acreage must be under contract with a business enterprise equipped with facilities appropriate to handle and store specialty type soybean production.  The contract must be executed by you and the business enterprise, in effect for the crop year, and you must provide a copy to us no later than the acreage reporting date.

To be considered a contract, the executed document must contain:

(a) A requirement that you plant, grow and deliver specialty type soybeans to the business enterprise;

(b) The amount of production that will be accepted or a statement that all production from a specified number of acres will be accepted.

To determine the number of acres under contract:

1.  For acreage only based contracts and, acreage and production based contracts which specify a maximum number of acres, the lesser of:

i.   The insured acres (planted acreage and acreage that is prevented from being planted); or

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

  ii. The maximum number of acres specified in the contract.

 2. For production only based contracts, the lesser of:

  i. The number of acres determined by dividing the production stated in the contract by the approved yield; or

  ii. The insured acres (planted acreage and acreage that is prevented from being planted).

(c) The price to be paid for the contracted production or a method to determine such price:

 1. For yield protection:

  i. If the contract provides a fixed price for the contracted production, the projected price will be the contract price.

  ii. If the contract provides for a premium amount over a price determined after the acreage reporting date, the projected price will be the result of adding the premium amount to the CEPP projected price.

 2. For revenue protection:

  i. If the contract provides a fixed price for the contracted production:

   A. The projected price will be the contract price.

   B. The harvest price will be the result of the CEPP projected price subtracted from the contract price and the difference shall be added to the CEPP harvest price.

  ii. If the contract provides a premium amount over a price determined after the acreage reporting date:

   A. The projected price will be the result of adding the premium amount to the CEPP projected price.

   B. The harvest price will be the result of the CEPP projected price subtracted from the projected price and the difference shall be added to the CEPP harvest price.

 3. The price used will be the price in the contract without regard to incentives or discounts.

 4. In no case will the contract price exceed the amount determined by multiplying the CEPP projected price, as applicable, by the maximum contract price factor shown in the Prices tab of these actuarial documents.

 5. If you have more than one contract price for any one specialty type, the price used will be the weighted average of the contract prices.  Each contract price is subject to the limits referred to in (c)(4).

(d) Other such terms that establish the obligations of each party to the contract; and

(e) The contract must clearly indicate the specific specialty type or verification must be provided that the contracted variety is one of the specialty types listed above.

6

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| :--- | :--- | :--- |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Berrien (021) |
|  |            Revenue Protection (02) |  |
|  |            Revenue Prot with Harvest Price Exclusion (03) |  |

For specialty type soybeans the following replant rules apply:

(a) In addition to the definition of practical to replant in the Basic Provisions, for specialty type soybeans under contract it will not be considered practical to replant unless production from the replanted acreage can be delivered under the terms of the specialty type contract or the business enterprise agrees to accept such contracted production.

(b) In addition to section 9 of the Coarse Grains Crop Provisions when it **is** practical to replant the specialty type originally planted, you must replant to the specialty type originally planted on the acreage.

(c) When it is **not** practical to replant the specialty type originally planted on the acreage:

1.  You may choose to:

    i.   Not replant and may receive an indemnity;

    ii.  Not replant the specialty type originally planted on the acreage and plant to another crop in which case the first/second crop rules in section 15 of the Basic Provisions apply; or

    iii. Replant to another specialty type or commodity type, provided it is practical to replant such type.  The replanted type will be considered a replanted crop.

2.  If it is not practical to replant to another specialty type or commodity type and you plant any type of soybeans, the crop planted will be considered a second crop.

Note: Quality adjustment will be provided as specified in the crop provisions and special provisions.  No additional quality adjustment will be made for any specialty type.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to soybean grain production for the insured crop

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

    a.   Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

    b.   Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

    c.   Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.

1.   OPTION TO DELAY CLAIM SETTLEMENT:

    a.   On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

    b.   If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

    c.   At any time during this delay in settlement, you may request to settle your claim for any unsold production using the applicable DFs.

    d.   For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

    e.   If the production is later sold, we will not recalculate or adjust your claim for indemnity.

    f.   If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

g.   This option will not apply to any production qualifying under section C3.

2.   SECTION 14 (e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.

3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.  If the production is not sold within this 30 day period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.

4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP, otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.

5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f  ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only  for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

6.   ZERO MARKET VALUE

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value\*\*\*, such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.  Moisture content;

b.  Damage due to uninsured causes;

c.  Drying;

d.  Handling;

e.  Processing; or

f.  Any other costs associated with normal harvesting, handling, and marketing of your production.

    i.   RIVs cannot be used in combination with chart DFs.

    ii.  If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

    iii. If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

    iv.  The RIV and local market price\* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Soybeans will be discounted for grade as follows:

| Grade | DF |
|---|---|
| U.S. Sample Grade | 0.030 |

| Special Provisions of Insurance |
|---|
| 2019 and Succeeding Crop Years |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

TEST WEIGHT DISCOUNT:

Discounts for low test weight as follows:

| Test Weight Pounds | DF |
|---|---|
| 49 and above | None |
| 48-48.99 | 0.007 |
| 47-47.99 | 0.009 |
| 46-46.99 | 0.011 |
| 45-45.99 | 0.013 |
| 44-44.99 | 0.015 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows U.S. Sample Grade for Damage –  . 1   and above:

| Damage % | DF | Damage % | DF | Damage % | DF |
|---|---|---|---|---|---|
| 08 and below | None | 17.01-18 | 0.116 | 27.01-28 | 0.196 |
| 08.01-9 | 0.044 | 18.01-19 | 0.124 | 28.01-29 | 0.204 |
| 09.01-10 | 0.052 | 19.01-20 | 0.132 | 29.01-30 | 0.212 |
| 10.01-11 | 0.060 | 20.01-21 | 0.140 | 30.01-31 | 0.220 |
| 11.01-12 | 0.068 | 21.01-22 | 0.148 | 31.01-32 | 0.228 |
| 12.01-13 | 0.076 | 22.01-23 | 0.156 | 32.01-33 | 0.236 |
| 13.01-14 | 0.084 | 23.01-24 | 0.164 | 33.01-34 | 0.244 |
| 14.01-15 | 0.092 | 24.01-25 | 0.172 | 34.01-35 | 0.252 |
| 15.01-16 | 0.100 | 25.01-26 | 0.180 | Above 35 | See section B |
| 16.01-17 | 0.108 | 26.01-27 | 0.188 | | |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| Musty Odor | 0.020 |
|---|---|
| Sour Odor | 0.020 |
| COFO | 0.040 |

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, a garlicky grade on the date of final inspection for the unit adjust production in the following manner:

1. If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2. For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3. If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

a. The action or advisory level of the Food and Drug Administration; or

b. Another public health organization of the United States; or

c. A public health agency of the applicable State in which the insured crop is grown.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) Revenue Protection (02) Revenue Prot with Harvest Price Exclusion (03) | County: Berrien (021) |

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

1. For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

   a. Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

   b. For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

   c. Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Vomitoxin Range | DF |
| --- | --- |
| .1 – .   ppm | .000 |
| .1 – 1 .  ppm | .450 |
| 10.1 ppm & above | See C3 below |

2. For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

   a. If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

   i. For production sold to a disinterested third partyprior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

   ii. For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

   iii. For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

iv. For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

v. For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

b. If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

i. For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

ii. For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

iii. For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

iv. For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

DFs for Aflatoxin:

| Aflatoxin Range | DF |
| --- | --- |
| .1 – 2  .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .  ppb | .200 |
| 1   .1 – 2   .  ppb | .300 |
| 2   .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |

| | | |
| --- | --- | --- |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| Fumonisin Range | DF |
| --- | --- |
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3. For production that has an Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

    a. For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

        i. The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

        ii. .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

    b. For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

        i. The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

        ii. .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from sections A or B will be included.

    c. If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

1. The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

2. If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value

NHF2-526 Policy 000179

15

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| | | |
| --- | --- | --- |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Berrien (021) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

and will be adjusted as follows:

   a.  For production in section A – the pre-established DFs.

   b.  For production in section B – .    .

   c.  For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

3.  If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| | |
| --- | --- |
| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Branch (023) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Program Dates for Insurable Types and Practices

| Sales Closing Date | Earliest Planting Date | Final Planting Date | End of Late Planting Period Date | Acreage Reporting Date | Premium Billing Date |
|---|---|---|---|---|---|
| 3/15/2019 | 4/24/2019 | 6/15/2019 | 7/10/2019 | 7/15/2019 | 8/15/2019 |

| TP | Type | Practice |
|---|---|---|
| T/P 01 | Commodity 091 | Nfac (Non-Irrigated) 053 *3 |
| T/P 02 | Commodity 091 | Nfac (Irrigated) 094 *3 |
| T/P 03 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 04 | All Other Food Grades 128 *7 | Nfac (Irrigated) 094 *3 |
| T/P 05 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 06 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated) 094 *3 |
| T/P 07 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 08 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated) 094 *3 |
| T/P 09 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 10 | Low Linolenic Acid 884 *7 | Nfac (Irrigated) 094 *3 |
| T/P 11 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 12 | Low Saturated Fat 885 *7 | Nfac (Irrigated) 094 *3 |
| T/P 13 | High Protein 886 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 14 | High Protein 886 *7 | Nfac (Irrigated) 094 *3 |
| T/P 15 | Commodity 091 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 16 | Commodity 091 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 17 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 18 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 19 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |

NHF2-526 Policy 000181

| | Special Provisions of Insurance | |
|---|---|---|
| | **2019 and Succeeding Crop Years** | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Branch (023) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| TP | Type | Practice |
|---|---|---|
| T/P 20 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 21 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 22 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 23 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 24 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 25 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 26 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 27 | High Protein 886 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 28 | High Protein 886 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 29 | Commodity 091 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 30 | Commodity 091 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 31 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 32 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 33 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 34 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 35 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 36 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 37 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 38 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 39 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 40 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 41 | High Protein 886 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 42 | High Protein 886 *7 | Nfac (Irrigated)(OT) 740 *3 |

NHF2-526 Policy 000182

2

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Branch (023) |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Practice**

*3   NFAC (Not Following Another Crop): A planted crop not following:

1. A perennial hay crop that was harvested in the same calendar year; and

2. A crop (other than a cover crop) that has reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. A crop that follows a cover crop that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance, is considered NFAC.

**Price**

*4   For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Branch (023) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

**Insurance Availability**

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

4

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Branch (023) |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

*7     If you produce any of the following specialty soybean type(s) (including specialty type(s) grown for seed):

   a.   Large seeded food grade –Food grade soybeans commonly used for human food products which generally have a minimum seed size of 18 g/100 seeds (2,520 seeds/lb).

   b.   Small seeded food grade –Food grade varieties of soybeans commonly used for human food products which generally have a maximum seed size of 12 g/100 seeds (3,780 seeds/lb).

   c.   Low linolenic acid – Soybeans commonly used to produce soybean oil with a linolenic acid level of three percent or less.

   d.   Low saturated fat - Soybeans containing 50 percent less saturated fat than commodity soybeans and are used to produce soybean oil with eight percent or less total saturated fats.

   e.   High protein –Food grade varieties of soybeans containing protein levels of 42 percent or greater on a dry matter basis (36.5 percent on a 13 percent moisture basis).

   f.   All other food grades – Any food grade varieties of soybeans not identified by large seeded food grade, small seeded food grade, low linolenic acid, low saturated fat, and high protein types.

You may elect to use the price contained in your production contract (contract price) by the acreage reporting date to determine your projected price and harvest price, as applicable, for each specialty type only if the total number of insured acres of the specialty type does not exceed 110 percent of insured specialty type acreage under the contract (the number of acres under contract is determined as indicated below).  The acreage must be under contract with a business enterprise equipped with facilities appropriate to handle and store specialty type soybean production.  The contract must be executed by you and the business enterprise, in effect for the crop year, and you must provide a copy to us no later than the acreage reporting date.

To be considered a contract, the executed document must contain:

(a) A requirement that you plant, grow and deliver specialty type soybeans to the business enterprise;

(b) The amount of production that will be accepted or a statement that all production from a specified number of acres will be accepted.

To determine the number of acres under contract:

   1.   For acreage only based contracts and, acreage and production based contracts which specify a maximum number of acres, the lesser of:

      i.   The insured acres (planted acreage and acreage that is prevented from being planted); or

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:       Yield Protection (01) | County: Branch (023) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

      ii.   The maximum number of acres specified in the contract.

   2.   For production only based contracts, the lesser of:

      i.   The number of acres determined by dividing the production stated in the contract by the approved yield; or

      ii.   The insured acres (planted acreage and acreage that is prevented from being planted).

(c) The price to be paid for the contracted production or a method to determine such price:

   1.   For yield protection:

      i.   If the contract provides a fixed price for the contracted production, the projected price will be the contract price.

      ii.   If the contract provides for a premium amount over a price determined after the acreage reporting date, the projected price will be the result of adding the premium amount to the CEPP projected price.

   2.   For revenue protection:

      i.   If the contract provides a fixed price for the contracted production:

        A.   The projected price will be the contract price.

        B.   The harvest price will be the result of the CEPP projected price subtracted from the contract price and the difference shall be added to the CEPP harvest price.

      ii.   If the contract provides a premium amount over a price determined after the acreage reporting date:

        A.   The projected price will be the result of adding the premium amount to the CEPP projected price.

        B.   The harvest price will be the result of the CEPP projected price subtracted from the projected price and the difference shall be added to the CEPP harvest price.

   3.   The price used will be the price in the contract without regard to incentives or discounts.

   4.   In no case will the contract price exceed the amount determined by multiplying the CEPP projected price, as applicable, by the maximum contract price factor shown in the Prices tab of these actuarial documents.

   5.   If you have more than one contract price for any one specialty type, the price used will be the weighted average of the contract prices.  Each contract price is subject to the limits referred to in (c)(4).

(d) Other such terms that establish the obligations of each party to the contract; and

(e) The contract must clearly indicate the specific specialty type or verification must be provided that the contracted variety is one of the specialty types listed above.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Branch (023) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

For specialty type soybeans the following replant rules apply:

(a) In addition to the definition of practical to replant in the Basic Provisions, for specialty type soybeans under contract it will not be considered practical to replant unless production from the replanted acreage can be delivered under the terms of the specialty type contract or the business enterprise agrees to accept such contracted production.

(b) In addition to section 9 of the Coarse Grains Crop Provisions when it **is** practical to replant the specialty type originally planted, you must replant to the specialty type originally planted on the acreage.

(c) When it is **not** practical to replant the specialty type originally planted on the acreage:

1.  You may choose to:

    i.   Not replant and may receive an indemnity;

    ii.  Not replant the specialty type originally planted on the acreage and plant to another crop in which case the first/second crop rules in section 15 of the Basic Provisions apply; or

    iii. Replant to another specialty type or commodity type, provided it is practical to replant such type.  The replanted type will be considered a replanted crop.

2.  If it is not practical to replant to another specialty type or commodity type and you plant any type of soybeans, the crop planted will be considered a second crop.

Note: Quality adjustment will be provided as specified in the crop provisions and special provisions.  No additional quality adjustment will be made for any specialty type.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to soybean grain production for the insured crop

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| | | |
| :--- | :--- | :--- |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Branch (023) |

sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

   a.   Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

   b.   Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

   c.   Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.


1.   OPTION TO DELAY CLAIM SETTLEMENT:

   a.   On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

   b.   If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

   c.   At any time during this delay in settlement, you may request to settle your claim for any unsold production using the applicable DFs.

   d.   For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

   e.   If the production is later sold, we will not recalculate or adjust your claim for indemnity.

   f.   If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Branch (023) |

   g.   This option will not apply to any production qualifying under section C3.

   2.   SECTION 14 (e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.

   3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.  If the production is not sold within this 30 day period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.

   4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP, otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.

   5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f  ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only  for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

   6.   ZERO MARKET VALUE

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Branch (023) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value***, such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

   i.   RIVs cannot be used in combination with chart DFs.

   ii.   If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

   iii.   If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

   iv.   The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Soybeans will be discounted for grade as follows:

| Grade | DF |
| --- | --- |
| U.S. Sample Grade | 0.030 |

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Branch (023) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

TEST WEIGHT DISCOUNT:

Discounts for low test weight as follows:

| Test Weight Pounds | DF |
|---|---|
| 49 and above | None |
| 48-48.99 | 0.007 |
| 47-47.99 | 0.009 |
| 46-46.99 | 0.011 |
| 45-45.99 | 0.013 |
| 44-44.99 | 0.015 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows U.S. Sample Grade for Damage –  . 1   and above:

| Damage % | DF | Damage % | DF | Damage % | DF |
|---|---|---|---|---|---|
| 08 and below | None | 17.01-18 | 0.116 | 27.01-28 | 0.196 |
| 08.01-9 | 0.044 | 18.01-19 | 0.124 | 28.01-29 | 0.204 |
| 09.01-10 | 0.052 | 19.01-20 | 0.132 | 29.01-30 | 0.212 |
| 10.01-11 | 0.060 | 20.01-21 | 0.140 | 30.01-31 | 0.220 |
| 11.01-12 | 0.068 | 21.01-22 | 0.148 | 31.01-32 | 0.228 |
| 12.01-13 | 0.076 | 22.01-23 | 0.156 | 32.01-33 | 0.236 |
| 13.01-14 | 0.084 | 23.01-24 | 0.164 | 33.01-34 | 0.244 |
| 14.01-15 | 0.092 | 24.01-25 | 0.172 | 34.01-35 | 0.252 |
| 15.01-16 | 0.100 | 25.01-26 | 0.180 | Above 35 | See section B |
| 16.01-17 | 0.108 | 26.01-27 | 0.188 | | |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| Musty Odor | 0.020 |
|---|---|
| Sour Odor | 0.020 |
| COFO | 0.040 |

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State: Michigan (26) |
| Date: 11/14/2018 | Plan: Yield Protection (01) | County: Branch (023) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section. For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, a garlicky grade on the date of final inspection for the unit adjust production in the following manner:

1. If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2. For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3. If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food. For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed. Such production is not required to be sampled and tested by an approved laboratory. Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop. Such production will be considered to have zero market value if destroyed in an acceptable manner. Refer to Section D. If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

a. The action or advisory level of the Food and Drug Administration; or

b. Another public health organization of the United States; or

c. A public health agency of the applicable State in which the insured crop is grown.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Branch (023) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

1. For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

   a. Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

   b. For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

   c. Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Vomitoxin Range | DF |
|---|---|
| .1 –  .   ppm | .000 |
| .1 – 1  .  ppm | .450 |
| 10.1 ppm & above | See C3 below |

2. For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

   a. If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

      i. For production sold to a disinterested third partyprior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

      ii. For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

      iii. For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Branch (023) |

    iv.  For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

    v.   For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

  b.  If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

    i.   For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

    ii.  For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

    iii. For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

    iv.  For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

DFs for Aflatoxin:

| Aflatoxin Range | DF |
|---|---|
| .1 – 2 .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .  ppb | .200 |
| 1   .1 – 2   .  ppb | .300 |
| 2   .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

| Special Provisions of Insurance | | |
| :-- | :-- | :-- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Branch (023) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| Fumonisin Range | DF |
| :-- | :-- |
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3.  For production that has an Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

    a.  For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

        i.   The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

        ii.  .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

    b.  For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

        i.   The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

        ii.  .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from sections A or B will be included.

    c.  If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

1.  The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

2.  If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value

| Special Provisions of Insurance |
| :---: |
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Soybeans (0081) | State:  Michigan (26) |
| --- | --- | --- |
| Date: 11/14/2018 | Plan:      Yield Protection (01)<br>            Revenue Protection (02)<br>            Revenue Prot with Harvest Price Exclusion (03) | County: Branch (023) |

and will be adjusted as follows:

a.  For production in section A – the pre-established DFs.

b.  For production in section B – .     .

c.  For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

3.  If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| --- | --- |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Cass (027) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Program Dates for Insurable Types and Practices

| Sales Closing Date 3/15/2019 | Earliest Planting Date 4/24/2019 | Final Planting Date 6/15/2019 | End of Late Planting Period Date 7/10/2019 | Acreage Reporting Date 7/15/2019 | Premium Billing Date 8/15/2019 |
|---|---|---|---|---|---|

| TP | Type | Practice |
|---|---|---|
| T/P 01 | Commodity 091 | Nfac (Non-Irrigated) 053 *3 |
| T/P 02 | Commodity 091 | Nfac (Irrigated) 094 *3 |
| T/P 03 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 04 | All Other Food Grades 128 *7 | Nfac (Irrigated) 094 *3 |
| T/P 05 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 06 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated) 094 *3 |
| T/P 07 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 08 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated) 094 *3 |
| T/P 09 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 10 | Low Linolenic Acid 884 *7 | Nfac (Irrigated) 094 *3 |
| T/P 11 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 12 | Low Saturated Fat 885 *7 | Nfac (Irrigated) 094 *3 |
| T/P 13 | High Protein 886 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 14 | High Protein 886 *7 | Nfac (Irrigated) 094 *3 |
| T/P 15 | Commodity 091 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 16 | Commodity 091 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 17 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 18 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 19 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |

NHF2-526 Policy 000197

1

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Cass (027) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| TP | Type | Practice |
|---|---|---|
| T/P 20 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 21 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 22 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 23 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 24 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 25 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 26 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 27 | High Protein 886 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 28 | High Protein 886 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 29 | Commodity 091 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 30 | Commodity 091 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 31 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 32 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 33 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 34 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 35 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 36 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 37 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 38 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 39 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 40 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 41 | High Protein 886 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 42 | High Protein 886 *7 | Nfac (Irrigated)(OT) 740 *3 |

NHF2-526 Policy 000198

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Cass (027) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Practice**

*3      NFAC (Not Following Another Crop): A planted crop not following:

1.  A perennial hay crop that was harvested in the same calendar year; and

2.  A crop (other than a cover crop) that has reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. A crop that follows a cover crop that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance, is considered NFAC.

**Price**

*4      For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

| Special Provisions of Insurance |
| --- |
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Cass (027) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

**Insurance Availability**

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

4

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Cass (027) |
|  | Revenue Protection (02) |  |
|  | Revenue Prot with Harvest Price Exclusion (03) |  |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

*7      If you produce any of the following specialty soybean type(s) (including specialty type(s) grown for seed):

   a.   Large seeded food grade –Food grade soybeans commonly used for human food products which generally have a minimum seed size of 18 g/100 seeds (2,520 seeds/lb).

   b.   Small seeded food grade –Food grade varieties of soybeans commonly used for human food products which generally have a maximum seed size of 12 g/100 seeds (3,780 seeds/lb).

   c.   Low linolenic acid – Soybeans commonly used to produce soybean oil with a linolenic acid level of three percent or less.

   d.   Low saturated fat - Soybeans containing 50 percent less saturated fat than commodity soybeans and are used to produce soybean oil with eight percent or less total saturated fats.

   e.   High protein –Food grade varieties of soybeans containing protein levels of 42 percent or greater on a dry matter basis (36.5 percent on a 13 percent moisture basis).

   f.   All other food grades – Any food grade varieties of soybeans not identified by large seeded food grade, small seeded food grade, low linolenic acid, low saturated fat, and high protein types.

You may elect to use the price contained in your production contract (contract price) by the acreage reporting date to determine your projected price and harvest price, as applicable, for each specialty type only if the total number of insured acres of the specialty type does not exceed 110 percent of insured specialty type acreage under the contract (the number of acres under contract is determined as indicated below).  The acreage must be under contract with a business enterprise equipped with facilities appropriate to handle and store specialty type soybean production.  The contract must be executed by you and the business enterprise, in effect for the crop year, and you must provide a copy to us no later than the acreage reporting date.

To be considered a contract, the executed document must contain:

(a) A requirement that you plant, grow and deliver specialty type soybeans to the business enterprise;

(b) The amount of production that will be accepted or a statement that all production from a specified number of acres will be accepted.

To determine the number of acres under contract:

   1.   For acreage only based contracts and, acreage and production based contracts which specify a maximum number of acres, the lesser of:

      i.    The insured acres (planted acreage and acreage that is prevented from being planted); or

| Special Provisions of Insurance |||
| 2019 and Succeeding Crop Years |||
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Cass (027) |

ii.   The maximum number of acres specified in the contract.

2.   For production only based contracts, the lesser of:

i.   The number of acres determined by dividing the production stated in the contract by the approved yield; or

ii.   The insured acres (planted acreage and acreage that is prevented from being planted).

(c) The price to be paid for the contracted production or a method to determine such price:

1.   For yield protection:

i.   If the contract provides a fixed price for the contracted production, the projected price will be the contract price.

ii.   If the contract provides for a premium amount over a price determined after the acreage reporting date, the projected price will be the result of adding the premium amount to the CEPP projected price.

2.   For revenue protection:

i.   If the contract provides a fixed price for the contracted production:

A.   The projected price will be the contract price.

B.   The harvest price will be the result of the CEPP projected price subtracted from the contract price and the difference shall be added to the CEPP harvest price.

ii.   If the contract provides a premium amount over a price determined after the acreage reporting date:

A.   The projected price will be the result of adding the premium amount to the CEPP projected price.

B.   The harvest price will be the result of the CEPP projected price subtracted from the projected price and the difference shall be added to the CEPP harvest price.

3.   The price used will be the price in the contract without regard to incentives or discounts.

4.   In no case will the contract price exceed the amount determined by multiplying the CEPP projected price, as applicable, by the maximum contract price factor shown in the Prices tab of these actuarial documents.

5.   If you have more than one contract price for any one specialty type, the price used will be the weighted average of the contract prices.  Each contract price is subject to the limits referred to in (c)(4).

(d) Other such terms that establish the obligations of each party to the contract; and

(e) The contract must clearly indicate the specific specialty type or verification must be provided that the contracted variety is one of the specialty types listed above.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Cass (027) |

For specialty type soybeans the following replant rules apply:

(a) In addition to the definition of practical to replant in the Basic Provisions, for specialty type soybeans under contract it will not be considered practical to replant unless production from the replanted acreage can be delivered under the terms of the specialty type contract or the business enterprise agrees to accept such contracted production.

(b) In addition to section 9 of the Coarse Grains Crop Provisions when it **is** practical to replant the specialty type originally planted, you must replant to the specialty type originally planted on the acreage.

(c) When it is **not** practical to replant the specialty type originally planted on the acreage:

   1.  You may choose to:

       i.   Not replant and may receive an indemnity;

       ii.  Not replant the specialty type originally planted on the acreage and plant to another crop in which case the first/second crop rules in section 15 of the Basic Provisions apply; or

       iii.  Replant to another specialty type or commodity type, provided it is practical to replant such type.  The replanted type will be considered a replanted crop.

   2.  If it is not practical to replant to another specialty type or commodity type and you plant any type of soybeans, the crop planted will be considered a second crop.

Note: Quality adjustment will be provided as specified in the crop provisions and special provisions.  No additional quality adjustment will be made for any specialty type.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to soybean grain production for the insured crop

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under

7

| Special Provisions of Insurance |||
| :---: | :---: | :---: |
| **2019 and Succeeding Crop Years** |||
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Cass (027) |

sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

    a.   Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

    b.   Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

    c.   Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.

    1.   OPTION TO DELAY CLAIM SETTLEMENT:

        a.   On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

        b.   If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

        c.   At any time during this delay in settlement, you may request to settle your claim for any unsold production using the applicable DFs.

        d.   For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

        e.   If the production is later sold, we will not recalculate or adjust your claim for indemnity.

        f.   If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

NHF2-526 Policy 000204

8

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Cass (027) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

g.   This option will not apply to any production qualifying under section C3.

2.   SECTION 14 (e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.

3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.  If the production is not sold within this 30 day period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.

4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP, otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.

5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f  ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only  for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

6.   ZERO MARKET VALUE

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01)<br>             Revenue Protection (02)<br>             Revenue Prot with Harvest Price Exclusion (03) | County: Cass (027) |

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value***, such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.  Moisture content;

b.  Damage due to uninsured causes;

c.  Drying;

d.  Handling;

e.  Processing; or

f.  Any other costs associated with normal harvesting, handling, and marketing of your production.

i.   RIVs cannot be used in combination with chart DFs.

ii.  If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

iii. If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

iv.  The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Soybeans will be discounted for grade as follows:

| Grade | DF |
| --- | --- |
| U.S. Sample Grade | 0.030 |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Cass (027) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

TEST WEIGHT DISCOUNT:

Discounts for low test weight as follows:

| Test Weight Pounds | DF |
|---|---|
| 49 and above | None |
| 48-48.99 | 0.007 |
| 47-47.99 | 0.009 |
| 46-46.99 | 0.011 |
| 45-45.99 | 0.013 |
| 44-44.99 | 0.015 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows U.S. Sample Grade for Damage –  . 1    and above:

| Damage % | DF | Damage % | DF | Damage % | DF |
|---|---|---|---|---|---|
| 08 and below | None | 17.01-18 | 0.116 | 27.01-28 | 0.196 |
| 08.01-9 | 0.044 | 18.01-19 | 0.124 | 28.01-29 | 0.204 |
| 09.01-10 | 0.052 | 19.01-20 | 0.132 | 29.01-30 | 0.212 |
| 10.01-11 | 0.060 | 20.01-21 | 0.140 | 30.01-31 | 0.220 |
| 11.01-12 | 0.068 | 21.01-22 | 0.148 | 31.01-32 | 0.228 |
| 12.01-13 | 0.076 | 22.01-23 | 0.156 | 32.01-33 | 0.236 |
| 13.01-14 | 0.084 | 23.01-24 | 0.164 | 33.01-34 | 0.244 |
| 14.01-15 | 0.092 | 24.01-25 | 0.172 | 34.01-35 | 0.252 |
| 15.01-16 | 0.100 | 25.01-26 | 0.180 | Above 35 | See section B |
| 16.01-17 | 0.108 | 26.01-27 | 0.188 | | |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| Musty Odor | 0.020 |
|---|---|
| Sour Odor | 0.020 |
| COFO | 0.040 |

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Cass (027) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, a garlicky grade on the date of final inspection for the unit adjust production in the following manner:

1.  If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3.  If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

a.  The action or advisory level of the Food and Drug Administration; or

b.  Another public health organization of the United States; or

c.  A public health agency of the applicable State in which the insured crop is grown.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Cass (027) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

1.  For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

   a.  Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

   b.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

   c.  Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Vomitoxin Range | DF |
|---|---|
| .1 − .   ppm | .000 |
| .1 − 1 .  ppm | .450 |
| 10.1 ppm & above | See C3 below |

2.  For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

   a.  If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

   i.  For production sold to a disinterested third partyprior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

   ii.  For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

   iii.  For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

| Special Provisions of Insurance |
| --- |
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Cass (027) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

    iv.  For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

    v.  For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

  b.  If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

    i.  For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

    ii.  For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

    iii.  For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

    iv.  For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

DFs for Aflatoxin:

| Aflatoxin Range | DF |
| --- | --- |
| .1 – 2  .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .  ppb | .200 |
| 1   .1 – 2   .  ppb | .300 |
| 2   .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

| **Special Provisions of Insurance** | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Cass (027) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| Fumonisin Range | DF |
|---|---|
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3.  For production that has an Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

    a.  For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

        i.   The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

        ii.  .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

    b.  For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

        i.   The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

        ii.  .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from sections A or B will be included.

    c.  If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

1.  The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

2.  If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value

| Special Provisions of Insurance |
| --- |
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/14/2018 | Plan:       Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Cass (027) |

and will be adjusted as follows:

a.  For production in section A – the pre-established DFs.

b.  For production in section B – .       .

c.  For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

3.  If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| --- | --- |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Hillsdale (059) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Program Dates for Insurable Types and Practices

| Sales Closing Date 3/15/2019 | Earliest Planting Date 4/24/2019 | Final Planting Date 6/15/2019 | End of Late Planting Period Date 7/10/2019 | Acreage Reporting Date 7/15/2019 | Premium Billing Date 8/15/2019 |
|---|---|---|---|---|---|

| TP | Type | Practice |
|---|---|---|
| T/P 01 | Commodity 091 | Nfac (Non-Irrigated) 053 *3 |
| T/P 02 | Commodity 091 | Nfac (Irrigated) 094 *3 |
| T/P 03 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 04 | All Other Food Grades 128 *7 | Nfac (Irrigated) 094 *3 |
| T/P 05 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 06 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated) 094 *3 |
| T/P 07 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 08 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated) 094 *3 |
| T/P 09 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 10 | Low Linolenic Acid 884 *7 | Nfac (Irrigated) 094 *3 |
| T/P 11 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 12 | Low Saturated Fat 885 *7 | Nfac (Irrigated) 094 *3 |
| T/P 13 | High Protein 886 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 14 | High Protein 886 *7 | Nfac (Irrigated) 094 *3 |
| T/P 15 | Commodity 091 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 16 | Commodity 091 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 17 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 18 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 19 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |

NHF2-526 Policy 000213

1

| Special Provisions of Insurance |||
| **2019 and Succeeding Crop Years** |||

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Hillsdale (059) |
|  |              Revenue Protection (02) |  |
|  |              Revenue Prot with Harvest Price Exclusion (03) |  |

| TP | Type | Practice |
|---|---|---|
| T/P 20 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 21 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 22 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 23 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 24 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 25 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 26 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 27 | High Protein 886 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 28 | High Protein 886 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 29 | Commodity 091 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 30 | Commodity 091 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 31 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 32 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 33 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 34 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 35 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 36 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 37 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 38 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 39 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 40 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 41 | High Protein 886 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 42 | High Protein 886 *7 | Nfac (Irrigated)(OT) 740 *3 |

NHF2-526 Policy 000214

2

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Hillsdale (059) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Practice**

*3   NFAC (Not Following Another Crop): A planted crop not following:

1. A perennial hay crop that was harvested in the same calendar year; and

2. A crop (other than a cover crop) that has reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. A crop that follows a cover crop that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance, is considered NFAC.

**Price**

*4   For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Hillsdale (059) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

**Insurance Availability**

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:     Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Hillsdale (059) |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

*7   If you produce any of the following specialty soybean type(s) (including specialty type(s) grown for seed):

   a.   Large seeded food grade –Food grade soybeans commonly used for human food products which generally have a minimum seed size of 18 g/100 seeds (2,520 seeds/lb).

   b.   Small seeded food grade –Food grade varieties of soybeans commonly used for human food products which generally have a maximum seed size of 12 g/100 seeds (3,780 seeds/lb).

   c.   Low linolenic acid – Soybeans commonly used to produce soybean oil with a linolenic acid level of three percent or less.

   d.   Low saturated fat - Soybeans containing 50 percent less saturated fat than commodity soybeans and are used to produce soybean oil with eight percent or less total saturated fats.

   e.   High protein –Food grade varieties of soybeans containing protein levels of 42 percent or greater on a dry matter basis (36.5 percent on a 13 percent moisture basis).

   f.   All other food grades – Any food grade varieties of soybeans not identified by large seeded food grade, small seeded food grade, low linolenic acid, low saturated fat, and high protein types.

You may elect to use the price contained in your production contract (contract price) by the acreage reporting date to determine your projected price and harvest price, as applicable, for each specialty type only if the total number of insured acres of the specialty type does not exceed 110 percent of insured specialty type acreage under the contract (the number of acres under contract is determined as indicated below).  The acreage must be under contract with a business enterprise equipped with facilities appropriate to handle and store specialty type soybean production.  The contract must be executed by you and the business enterprise, in effect for the crop year, and you must provide a copy to us no later than the acreage reporting date.

To be considered a contract, the executed document must contain:

(a) A requirement that you plant, grow and deliver specialty type soybeans to the business enterprise;

(b) The amount of production that will be accepted or a statement that all production from a specified number of acres will be accepted.

To determine the number of acres under contract:

   1.   For acreage only based contracts and, acreage and production based contracts which specify a maximum number of acres, the lesser of:

      i.   The insured acres (planted acreage and acreage that is prevented from being planted); or

NHF2-526 Policy 000217

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Hillsdale (059) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

      ii.   The maximum number of acres specified in the contract.

    2.   For production only based contracts, the lesser of:

      i.   The number of acres determined by dividing the production stated in the contract by the approved yield; or

      ii.   The insured acres (planted acreage and acreage that is prevented from being planted).

(c) The price to be paid for the contracted production or a method to determine such price:

    1.   For yield protection:

      i.   If the contract provides a fixed price for the contracted production, the projected price will be the contract price.

      ii.   If the contract provides for a premium amount over a price determined after the acreage reporting date, the projected price will be the result of adding the premium amount to the CEPP projected price.

    2.   For revenue protection:

      i.   If the contract provides a fixed price for the contracted production:

        A.   The projected price will be the contract price.

        B.   The harvest price will be the result of the CEPP projected price subtracted from the contract price and the difference shall be added to the CEPP harvest price.

      ii.   If the contract provides a premium amount over a price determined after the acreage reporting date:

        A.   The projected price will be the result of adding the premium amount to the CEPP projected price.

        B.   The harvest price will be the result of the CEPP projected price subtracted from the projected price and the difference shall be added to the CEPP harvest price.

    3.   The price used will be the price in the contract without regard to incentives or discounts.

    4.   In no case will the contract price exceed the amount determined by multiplying the CEPP projected price, as applicable, by the maximum contract price factor shown in the Prices tab of these actuarial documents.

    5.   If you have more than one contract price for any one specialty type, the price used will be the weighted average of the contract prices.  Each contract price is subject to the limits referred to in (c)(4).

(d) Other such terms that establish the obligations of each party to the contract; and

(e) The contract must clearly indicate the specific specialty type or verification must be provided that the contracted variety is one of the specialty types listed above.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Soybeans (0081) | State:  Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:  Yield Protection (01) | County: Hillsdale (059) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

For specialty type soybeans the following replant rules apply:

(a) In addition to the definition of practical to replant in the Basic Provisions, for specialty type soybeans under contract it will not be considered practical to replant unless production from the replanted acreage can be delivered under the terms of the specialty type contract or the business enterprise agrees to accept such contracted production.

(b) In addition to section 9 of the Coarse Grains Crop Provisions when it **is** practical to replant the specialty type originally planted, you must replant to the specialty type originally planted on the acreage.

(c) When it is **not** practical to replant the specialty type originally planted on the acreage:

1. You may choose to:

    i.   Not replant and may receive an indemnity;

    ii.  Not replant the specialty type originally planted on the acreage and plant to another crop in which case the first/second crop rules in section 15 of the Basic Provisions apply; or

    iii. Replant to another specialty type or commodity type, provided it is practical to replant such type.  The replanted type will be considered a replanted crop.

2. If it is not practical to replant to another specialty type or commodity type and you plant any type of soybeans, the crop planted will be considered a second crop.

Note: Quality adjustment will be provided as specified in the crop provisions and special provisions.  No additional quality adjustment will be made for any specialty type.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to soybean grain production for the insured crop

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under

| Special Provisions of Insurance | | |
| 2019 and Succeeding Crop Years | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Hillsdale (059) |

sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

    a.  Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

    b.  Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

    c.  Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.


1.  OPTION TO DELAY CLAIM SETTLEMENT:

    a.  On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

    b.  If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

    c.  At any time during this delay in settlement, you may request to settle your claim for any unsold production using the applicable DFs.

    d.  For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

    e.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

    f.  If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Hillsdale (059) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

g.   This option will not apply to any production qualifying under section C3.


2.   SECTION 14 (e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.


3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.  If the production is not sold within this 30 day period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.


4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP, otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.


5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f  ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only  for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.


6.   ZERO MARKET VALUE

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Hillsdale (059) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value\*\*\*, such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

   i.   RIVs cannot be used in combination with chart DFs.

   ii.   If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

   iii.   If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

   iv.   The RIV and local market price\* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Soybeans will be discounted for grade as follows:

| Grade | DF |
|---|---|
| U.S. Sample Grade | 0.030 |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Hillsdale (059) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

TEST WEIGHT DISCOUNT:

Discounts for low test weight as follows:

| Test Weight Pounds | DF |
|---|---|
| 49 and above | None |
| 48-48.99 | 0.007 |
| 47-47.99 | 0.009 |
| 46-46.99 | 0.011 |
| 45-45.99 | 0.013 |
| 44-44.99 | 0.015 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows U.S. Sample Grade for Damage – . 1   and above:

| Damage % | DF | Damage % | DF | Damage % | DF |
|---|---|---|---|---|---|
| 08 and below | None | 17.01-18 | 0.116 | 27.01-28 | 0.196 |
| 08.01-9 | 0.044 | 18.01-19 | 0.124 | 28.01-29 | 0.204 |
| 09.01-10 | 0.052 | 19.01-20 | 0.132 | 29.01-30 | 0.212 |
| 10.01-11 | 0.060 | 20.01-21 | 0.140 | 30.01-31 | 0.220 |
| 11.01-12 | 0.068 | 21.01-22 | 0.148 | 31.01-32 | 0.228 |
| 12.01-13 | 0.076 | 22.01-23 | 0.156 | 32.01-33 | 0.236 |
| 13.01-14 | 0.084 | 23.01-24 | 0.164 | 33.01-34 | 0.244 |
| 14.01-15 | 0.092 | 24.01-25 | 0.172 | 34.01-35 | 0.252 |
| 15.01-16 | 0.100 | 25.01-26 | 0.180 | Above 35 | See section B |
| 16.01-17 | 0.108 | 26.01-27 | 0.188 | | |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| Musty Odor | 0.020 |
|---|---|
| Sour Odor | 0.020 |
| COFO | 0.040 |

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Hillsdale (059) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, a garlicky grade on the date of final inspection for the unit adjust production in the following manner:

1.  If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3.  If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

a.  The action or advisory level of the Food and Drug Administration; or

b.  Another public health organization of the United States; or

c.  A public health agency of the applicable State in which the insured crop is grown.

NHF2-526 Policy 000224

12

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Hillsdale (059) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

1.  For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

a.  Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

b.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

c.  Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Vomitoxin Range | DF |
|---|---|
| .1 –   .   ppm | .000 |
| .1 – 1  .   ppm | .450 |
| 10.1 ppm & above | See C3 below |

2.  For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

a.  If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

i.  For production sold to a disinterested third partyprior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

ii.  For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

iii.  For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Hillsdale (059) |
|  | Revenue Protection (02) |  |
|  | Revenue Prot with Harvest Price Exclusion (03) |  |

iv.  For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

v.  For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

b.  If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

i.  For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

ii.  For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

iii.  For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

iv.  For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

DFs for Aflatoxin:

| Aflatoxin Range | DF |
|---|---|
| .1 – 2 .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .  ppb | .200 |
| 1   .1 – 2   .  ppb | .300 |
| 2   .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:        Yield Protection (01) | County: Hillsdale (059) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| Fumonisin Range | DF |
|---|---|
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3. For production that has an Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

   a. For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

   i. The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

   ii. .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

   b. For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

   i. The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

   ii. .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from sections A or B will be included.

   c. If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

1. The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

2. If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value

| Special Provisions of Insurance |
| --- |
| **2019 and Succeeding Crop Years** |

| | | |
| --- | --- | --- |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Hillsdale (059) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

and will be adjusted as follows:

a.   For production in section A – the pre-established DFs.

b.   For production in section B – .     .

c.   For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

3.   If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| | |
| --- | --- |
| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

**EXHIBIT**

**11**

**NEW HEIGHTS FARM II, LLC**
**6241 RANSOM ST**
**ZEELAND, MI 49464**

**MP-2019-MI-084-1139527**

# Multiple Peril Crop Insurance Policy

Great American Insurance Company







GREAT AMERICAN
INSURANCE GROUP

Crop Division
GreatAmericanCrop.com

Great American Insurance is an equal opportunity provider.

**PLEASE READ YOUR POLICY CAREFULLY.** This policy is signed by the President and Secretary of the company.

F.18151G (4/17)

President          Secretary

NHF2-527 Policy 000006



Peoria
1315 W. Commerce Drive
Peoria IL, 61615-1462

# Multiple Peril Crop Insurance
## DECLARATION OF COVERAGE
**EFFECTIVE FOR THE 2019 CROP YEAR**

04/04/2019
Page: 1 of 3

**Policy Number:** 2019-MI-084-1139527

| **INSURED:** | NEW HEIGHTS FARM II, LLC<br>6241 RANSOM ST<br>ZEELAND, MI  49464 |
|---|---|

**Person Type:** Limited Liability Company (LLC)
**Tax ID:** XX-XXX1610
**ID # Type:** EIN
**Phone:** (616) 875-7880
**Mobile:**
**Spouse's SSN:**

**Spouse's Name:**
**Articles of Incorporation are filed in:**  Michigan

**Authorized Representative(s):**  NICHOLAS BOERSEN          **POA(s):**
**Limited Authorized Rep(s):**

## SBI SUMMARY

| Name of Person | Complete Address | Telephone # | Tax ID # | Tax ID Type<br>SSN EIN Other | Person Type | L/T |
|---|---|---|---|---|---|---|
| NICHOLAS BOERSEN | 4678 72ND ST<br>ZEELAND MI 49464 | (616) 610-2886 | XXX-XX-0951 | SSN | Individual (I) | |

## POLICY INFORMATION FOR THE STATE OF MICHIGAN

| County | Crop(s) Insured/Type | Plan | Coverage Level | % Price Election, Proj. Price, or Amt of Ins. | Options/Elections/Endorsements | Status | Applicable Provisions/Endorsements |
|---|---|---|---|---|---|---|---|
| Eaton (45) | Corn | Revenue Protection (02) | 80% | 100% | MCPFTAYA EU | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>CPA CROP Provisions 06/01/2013<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>14ceppcorn ENDR 06/26/2013<br>16cepp - Section I ENDR 11/30/2015<br>2019 SPECIAL COUNTY PROVISIONS |
| Eaton (45) | Soybeans | Revenue Protection (02) | 80% | 100% | MCPFTAYA EU | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>CPA CROP Provisions 06/01/2013<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>16cepp - Section I ENDR 11/30/2015<br>17-cepp-soybeans ENDR 05/20/2016<br>2019 SPECIAL COUNTY PROVISIONS |
| Ingham (65) | Corn | Revenue Protection (02) | 80% | 100% | MCPFTAYA EU | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>CPA CROP Provisions 06/01/2013<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014 |

(Form M915)

Declaration Of Coverage - for the 2019 Crop Year

Policy Number:  2019-MI-084-1139527          NEW HEIGHTS FARM II, LLC
        Agency: 102212 SPARTAN INSURANCE-MAIN 2 / PETOSKEY, MI



### POLICY INFORMATION FOR THE STATE OF MICHIGAN

| County | Crop(s) Insured/Type | Plan | Coverage Level | % Price Election, Proj. Price, or Amt of Ins. | Options/Elections/ Endorsements | Status | Applicable Provisions/Endorsements |
|---|---|---|---|---|---|---|---|
| | | | | | | | FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>14ceppcorn ENDR 06/26/2013<br>16cepp - Section I 11/30/2015<br>2019 SPECIAL COUNTY PROVISIONS |
| Ingham (65) | Soybeans | Revenue Protection (02) | 80% | 100% | MCPFTAYA EU | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>CPA CROP Provisions 06/01/2013<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>16cepp - Section I ENDR 11/30/2015<br>17-cepp-soybeans ENDR 05/20/2016<br>2019 SPECIAL COUNTY PROVISIONS |
| Washtenaw (161) | Corn | Revenue Protection (02) | 80% | 100% | PFYA EP | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>14ceppcorn ENDR 06/26/2013<br>16cepp - Section I ENDR 11/30/2015<br>2019 SPECIAL COUNTY PROVISIONS |
| Washtenaw (161) | Soybeans | Revenue Protection (02) | 80% | 100% | PFYA EP | Active | Replant and Double Cropping Amendment BASIC Provisions 06/27/2017<br>18-br - Basic Provisions 11/30/2017<br>PRODUCTION GUIDELINES Rev 6-14 CROP Provisions 06/14/2014<br>PRECISION FARMING NOTIFICATION Rev 6-14 CROP Provisions 06/14/2014<br>FIELD LOCATION REQUIREMENT GUIDELINES CROP Provisions 08/04/2016<br>2017-Coarse Grains Crop Provisions 11/28/2016<br>IRR PRAC GUIDELINES - F.18505A (1217) CROP Provisions 12/19/2017<br>16cepp - Section I ENDR 11/30/2015<br>17-cepp-soybeans ENDR 05/20/2016<br>2019 SPECIAL COUNTY PROVISIONS |

ALL STATE/COUNTY OPTION:     No
ASSIGNMENT OF INDEMNITY:     None

### IMPORTANT DATES EFFECTIVE FOR THE 2019 CROP YEAR

| COUNTY | CROP | SALES CLOSING | PRODUCTION REPORTING | ACREAGE REPORTING | PREMIUM BILLING | TERMINATION | CANCELLATION |
|---|---|---|---|---|---|---|---|
| Eaton (45) | Corn | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2019 | 3/15/2020 | 3/15/2019 |
| Eaton (45) | Soybeans | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2019 | 3/15/2020 | 3/15/2019 |
| Ingham (65) | Corn | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2019 | 3/15/2020 | 3/15/2019 |
| Ingham (65) | Soybeans | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2019 | 3/15/2020 | 3/15/2019 |
| Washtenaw (161) | Corn | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2019 | 3/15/2020 | 3/15/2019 |

(Form M815)

Declaration Of Coverage - for the 2019 Crop Year

Page: 3 of 3



Policy Number: 2019-MI-084-1139527        NEW HEIGHTS FARM II, LLC
        Agency: 102212 SPARTAN INSURANCE-MAIN 2 / PETOSKEY, MI

| IMPORTANT DATES EFFECTIVE FOR THE 2019 CROP YEAR | | | | | | | |
|---|---|---|---|---|---|---|---|
| COUNTY | CROP | SALES CLOSING | PRODUCTION REPORTING | ACREAGE REPORTING | PREMIUM BILLING | TERMINATION | CANCELLATION |
| Washtenaw (161) | Soybeans | 3/15/2019 | 4/29/2019 | 7/15/2019 | 8/15/2019 | 3/15/2020 | 3/15/2019 |

| PLEASE REVIEW FOR ACCURACY AND CONTACT YOUR AGENT IF YOU HAVE ANY QUESTIONS. |
|---|

YOUR AGENT IS:        CHRISTINE M. SHELLENBARGER
                      SPARTAN INSURANCE-MAIN 2
                      806 BOTSFORD RD
                      PETOSKEY, MI  49770

**Code No:** 102212

**Phone:** (855) 347-1066

**Fax:** (231) 347-1067

**E-mail:** cshell58@hotmail.com

(Form M915)

NHF2-527 Policy 000010

# SUMMARY OF CHANGES FOR THE COMMON CROP INSURANCE POLICY
## BASIC PROVISIONS – REINSURED VERSION (18-BR)
### (Released November 2017)

The following is a brief description of the changes to the Common Crop Insurance Policy Basic Provisions that are effective for the 2018 and succeeding crop years for all crops with a 2018 contract change date on or after November 30, 2017, and for the 2019 and succeeding crop years for all crops with a 2018 contract change date prior to November 30, 2017.

- Throughout the policy, changed the phrase:
    - "Web site" and added the word "website" in its place;
    - "FSA farm serial number" and added the phrase "FSA farm number" in its place; and
    - "Replant payment" and added the phrase "replanting payment" in its place.
- Preamble – Revised the order of priority in the preamble to include the actuarial documents.
- Section 1 – Revised the definitions of "Cooperative Extension System," "good farming practices," "price election," "replanted crop."
- Redesignated section 2(e)(2) as section 2(e)(3).
- Section 2(e)(2) – Clarified that with the policyholder's consent the premium and administrative fees can be offset from any prevented planting or indemnity due the policyholder even if the offset occurs before the fees are billed.
- Section 2(f)(2)(i)(D) - Updated the years used in the example.
- Section 2(f)(3)(ii) - Removed the prohibition that does not allow a policyholder to enter into a written payment agreement if they previously failed to make a payment under an agreement to give approved insurance providers the flexibility to enter into these agreements.
- Section 2(f)(5) - Updated the years used in the example.
- Removed section 2(j).
- Section 3(f)(3) – Allow these provisions to be changed in the Special Provisions.
- Section 3(h)(1) – Changed the reference of "valid basis" to "valid agronomic basis."
- Section 6(a)(3) - Added a new paragraph (iii) that provides if the policyholder planted the insured crop on or within five days prior to the final planting date and the final planting date is five or fewer days prior to the acreage reporting date, the policyholder must submit an acreage report no later than five days after the acreage reporting date.
- Section 7(h) - Revised the conservation compliance provisions to remove the certification deadline of June 1.
- Section 9(a)(2)(viii)(A) - Changed the reference to the "Group Risk Protection Plan of Insurance" to "Area Risk Protection Insurance."
- Section 17(f)(9) - Changed the reference to "manpower" to "labor."
- Section 18 – Modified this section to:
    - Provide minor clarifications, as well as removing language that is no longer needed due to program modifications, changes via Special Provisions, or unnecessary duplication.
    - Remove section 18(e)(3).
    - Revise section 18(f)(1)(ii) to remove language regarding the information needed to determine the approved yield.  The APH already contains the information needed to determine the approved yield so this language is no longer needed.  Also revised to remove the unnecessary signature requirement on the submitted actual production history documents.
    - Revise section 18(f)(1)(iii) to add "the crop" as an option for evidence of adaptability.
    - Revise 18(f)(2)(i) to allow an entity to use verifiable and insurance records from substantial beneficial interests of that entity to qualify for a written agreement request for counties without actuarial documents.
    - Remove section 18(f)(1)(vi).
    - Revise section 18(f)(2)(i) to clarify this section is also applicable to perennial crops that have previously produced a crop.  Also revised to allow "you" to include anyone with a substantial beneficial interest in "you."

- Revise section 18(f)(2)(i)(A) to remove the requirement of the policyholder's signature on the completed APH submitted with the written agreement request and also to state the completed APH is based on verifiable production records of actual yields for the crop to be consistent with the APH requirement for other written agreement request types.
- Revise section 18(f)(2)(i)(B) to clarify this section is also applicable to perennial crops that have previously produced a crop.
- Revise section 18(f)(2)(i)(B)(2) to remove the requirement that the policyholder must insure the crop for the three previous crop years before they can substitute a year of insurance experience for a year of verifiable records, and also revised to allow an entity to use the production history from a substantial beneficial interest in the entity that has a history of growing the crop to qualify for a written agreement.
- Add new section 18(f)(2)(i)(B)(3) to limit a year that counts as producing the crop to the most recent ten crop years, unless the producer can provide verifiable production records or insured the crop outside of the most recent ten crop years.
- Revise section 18(f)(2)(ii) to clarify this section is also applicable to perennial crops that have previously produced a crop.  Also revised to allow "you" to include anyone with a substantial beneficial interest in "you."
- Revise section 18(f)(2)(ii)(A) to remove the requirement of the policyholder's signature on the completed APH submitted with the written agreement request and also state the completed APH is based on verifiable production records of actual yields for the similar crop to be consistent with the APH requirement for other written agreement request types.  Also revised to remove the order or precedence that the similar crop records must come from the county, if produced in the county, prior to using any area similar crop records, to be consistent with the requirements for the requested crop.
- Revise section 18(f)(2)(ii)(B) to clarify this section is also applicable to perennial crops that have previously produced a crop.
- Revise section 18(f)(2)(ii)(B)(2) to remove the requirement that the policyholder must insure the similar crop for the three previous crop years before they can substitute a year of insurance experience for a year of verifiable records, and also revised to allow an entity to use the production history from a substantial beneficial interest in the entity that has a history of growing the similar crop to qualify for a written agreement.
- Add new section 18(f)(2)(ii)(B)(3) to limit a year that counts as producing the similar crop to the most recent ten crop years, unless the producer can provide verifiable production records or insured the similar crop outside of the most recent ten crop years.
- Revise section 18(f)(2)(ii)(C) to allow an entity to use the production history from a substantial beneficial interest in the entity that has a history of growing the crop or similar crop to qualify for a written agreement, and to clarify this section is also applicable to perennial crops that have previously produced a crop.
- Remove section 18(f)(2)(vi).
- Remove section 18(g)(3).
- Revise section 18(h)(2) to clarify the APH history used to determine 50 percent of the transitional yield for the crop, type, and practice can be from either the county or a similar county and to clarify that this provision only applies when the crop has been previously grown.
- Revise section 18(h)(4) to clarify this provision is also applicable if a similar crop was not previously grown in the area and to allow the crop or similar crop to be grown in the area, as growing the crop or similar crop in the area can qualify a policyholder in the county even if they have not grown the crop in the requested county.  Also revised to remove the phrase "based on sales receipts, contemporaneous feeding records or a contract for the crop."
- Revise section 18(h)(5) to allow a written agreement request to be denied for a particular practice or type if that practice or type is not adapted to the county.

- Section 21(b)(2) - Updated the years used in the example.
- Sections 34(a)(4)(viii), (viii)(A)-(D) – Revised to allow a policyholder to select an enterprise unit for either irrigated or non-irrigated practice and choose the most appropriate unit structure on the other practice, be it a separate enterprise unit or optional or basic units.

**18-BR**

**(Released Nov 2017)**

## COMMON CROP INSURANCE POLICY
### (This is a continuous policy.  Refer to section 2.)



This insurance policy is reinsured by the Federal Crop Insurance Corporation (FCIC) under the provisions of the Federal Crop Insurance Act (Act) (7 U.S.C. 1501 et seq.).  All provisions of the policy and rights and responsibilities of the parties are specifically subject to the Act.  The provisions of the policy may not be waived or varied in any way by us, our insurance agent or any other contractor or employee of ours or any employee of USDA unless the policy specifically authorizes a waiver or modification by written agreement.  We will use the procedures (handbooks, manuals, memoranda and bulletins), as issued by FCIC and published on RMA's website at http://www.rma.usda.gov/ or a successor website, in the administration of this policy, including the adjustment of any loss or claim submitted hereunder.  In the event that we cannot pay your loss because we are insolvent or are otherwise unable to perform our duties under our reinsurance agreement with FCIC, your claim will be settled in accordance with the provisions of this policy and FCIC will be responsible for any amounts owed.  No state guarantee fund will be liable for your loss.

Throughout this policy, "you" and "your" refer to the named insured shown on the accepted application and "we," "us," and "our" refer to the insurance company providing insurance.  Unless the context indicates otherwise, use of the plural form of a word includes the singular and use of the singular form of the word includes the plural.

AGREEMENT TO INSURE:  In return for the payment of the premium, and subject to all of the provisions of this policy, we agree with you to provide the insurance as stated in this policy.  If there is a conflict between the Act, the regulations published at 7 CFR chapter IV, and the procedures as issued by FCIC, the order of priority is: (1) the Act; (2) the regulations; and (3) the procedures as issued by FCIC, with (1) controlling (2), etc.  If there is a conflict between the policy provisions published at 7 CFR part 457 and the administrative regulations published at 7 CFR part 400, the policy provisions published at 7 CFR part 457 control.  If a conflict exists among the policy, the order of priority is:  (1) the Catastrophic Risk Protection Endorsement, as applicable; (2) the Special Provisions; (3) the actuarial documents; (4) the Commodity Exchange Price Provisions, as applicable; (5) the Crop Provisions; and (6) these Basic Provisions, with (1) controlling (2), etc.

### TERMS AND CONDITIONS
### BASIC PROVISIONS

1.  **Definitions.**
    **Abandon** - Failure to continue to care for the crop, providing care so insignificant as to provide no benefit to the crop, or failure to harvest in a timely manner, unless an insured cause of loss prevents you from properly caring for or harvesting the crop or causes damage to it to the extent that most producers of the crop on acreage with similar characteristics in the area would not normally further care for or harvest it.

    **Acreage report** - A report required by section 6 of these Basic Provisions that contains, in addition to other required information, your report of your share of all acreage of an insured crop in the county, whether insurable or not insurable.

    **Acreage reporting date** - The date contained in the Special Provisions or as provided in section 6 by which you are required to submit your acreage report.

    **Act** - The Federal Crop Insurance Act (7 U.S.C. 1501 et seq.).

    **Actual Production History (APH)** - A process used to determine production guarantees in accordance with 7 CFR part 400, subpart G.

    **Actual yield** - The yield per acre for a crop year calculated from the production records or claims for indemnities.  The actual yield is determined by dividing total production (which includes harvested and appraised production) by planted acres.

    **Actuarial documents** - The information for the crop year which is available for public inspection in your agent's office and published on RMA's website and which shows available crop insurance policies, coverage levels, information needed to determine amounts of insurance,

prices, premium rates, premium adjustment percentages, practices, particular types or varieties of the insurable crop, insurable acreage, and other related information regarding crop insurance in the county.

**Additional coverage** - A level of coverage greater than catastrophic risk protection.

**Administrative fee** - An amount you must pay for catastrophic risk protection, and additional coverage for each crop year as specified in section 7 and the Catastrophic Risk Protection Endorsement.

**Agricultural commodity** - Any crop or other commodity produced, regardless of whether or not it is insurable.

**Agricultural experts** - Persons who are employed by the Cooperative Extension System or the agricultural departments of universities, or other persons approved by FCIC, whose research or occupation is related to the specific crop or practice for which such expertise is sought.

**Annual crop** - An agricultural commodity that normally must be planted each year.

**Application** - The form required to be completed by you and accepted by us before insurance coverage will commence.  This form must be completed and filed in your agent's office not later than the sales closing date of the initial insurance year for each crop for which insurance coverage is requested.  If cancellation or termination of insurance coverage occurs for any reason, including but not limited to indebtedness, suspension, debarment, disqualification, cancellation by you or us or violation of the controlled substance provisions of the Food Security Act of 1985, a new application must be filed for the crop.  Insurance coverage will not be provided if you are

NHF2-527 Policy 000013

ineligible under the contract or under any Federal statute or regulation.

**Approved yield** - The actual production history (APH) yield, calculated and approved by the verifier, used to determine the production guarantee by summing the yearly actual, assigned, adjusted or unadjusted transitional yields and dividing the sum by the number of yields contained in the database, which will always contain at least four yields.  The database may contain up to 10 consecutive crop years of actual or assigned yields.  The approved yield may have yield exclusions elected under section 5, yield adjustments elected under section 36, revisions according to section 3, or other limitations according to FCIC approved procedures applied when calculating the approved yield.

**Area** - Land surrounding the insured acreage with geographic characteristics, topography, soil types and climatic conditions similar to the insured acreage.

**Assignment of indemnity** - A transfer of policy rights, made on our form, and effective when approved by us in writing, whereby you assign your right to an indemnity payment for the crop year only to creditors or other persons to whom you have a financial debt or other pecuniary obligation.

**Average yield** - The yield calculated by totaling the yearly actual yields, assigned yields in accordance with sections 3(f)(1) (failure to provide production report), 3(h)(1) (excessive yields), and 3(i) (second crop planted without double cropping history on prevented planted acreage), and adjusted or unadjusted transitional yields, and dividing the total by the number of yields contained in the database.

**Basic unit** - All insurable acreage of the insured crop in the county on the date coverage begins for the crop year:

(1)   In which you have 100 percent crop share; or

(2)   Which is owned by one person and operated by another person on a share basis.  (Example: If, in addition to the land you own, you rent land from five landlords, three on a crop share basis and two on a cash basis, you would be entitled to four units; one for each crop share lease and one that combines the two cash leases and the land you own.)  Land which would otherwise be one unit may, in certain instances, be divided according to guidelines contained in section 34 of these Basic Provisions and in the applicable Crop Provisions.

**Beginning farmer or rancher** – An individual who has not actively operated and managed a farm or ranch in any state, with an insurable interest in a crop or livestock as an owner-operator, landlord, tenant, or sharecropper for more than five crop years, as determined in accordance with FCIC procedures.  Any crop year's insurable interest may, at your election, be excluded if earned while under the age of 18, while in full-time military service of the United States, or while in post-secondary education, in accordance with FCIC procedures.  A person other than an individual may be eligible for beginning farmer or rancher benefits if there is at least one individual substantial beneficial interest holder and all individual substantial beneficial interest holders qualify as a beginning farmer or rancher.

**Buffer zone** - A parcel of land, as designated in your organic plan, that separates agricultural commodities grown under organic practices from agricultural commodities grown under non-organic practices, and used to minimize the possibility of unintended contact by prohibited substances or organisms.

**Cancellation date** - The calendar date specified in the Crop Provisions on which coverage for the crop will automatically renew unless canceled in writing by either you or us or terminated in accordance with the policy terms.

**Catastrophic risk protection** - The minimum level of coverage offered by FCIC.  Catastrophic risk protection is not available with revenue protection.

**Catastrophic Risk Protection Endorsement** - The part of the crop insurance policy that contains provisions of insurance that are specific to catastrophic risk protection.

**Certified organic acreage** - Acreage in the certified organic farming operation that has been certified by a certifying agent as conforming to organic standards in accordance with 7 CFR part 205.

**Certifying agent** - A private or governmental entity accredited by the USDA Secretary of Agriculture for the purpose of certifying a production, processing or handling operation as organic.

**Claim for indemnity** - A claim made on our form that contains the information necessary to pay the indemnity, as specified in the applicable FCIC issued procedures, and complies with the requirements in section 14.

**Code of Federal Regulations (CFR)** - The codification of general and permanent rules published in the Federal Register by the Executive departments and agencies of the Federal Government.  Rules published in the Federal Register by FCIC are contained in 7 CFR chapter IV.  The full text of the CFR is available in electronic format at http://www.access.gpo.gov/ or a successor website.

**Commodity Exchange Price Provisions (CEPP)** – A part of the policy that is used for all crops for which revenue protection is available, regardless of whether you elect revenue protection or yield protection for such crops.  This document includes the information necessary to derive the projected price and the harvest price for the insured crop, as applicable.

**Consent** - Approval in writing by us allowing you to take a specific action.

**Contract** - (See "policy").

**Contract change date** - The calendar date by which changes to the policy, if any, will be made available in accordance with section 4 of these Basic Provisions.

**Conventional farming practice** - A system or process that is necessary to produce an agricultural commodity, excluding organic farming practices.

**Cooperative Extension System** – A nationwide network consisting of a State office located at each State's land-grant university, and local or regional offices.  These offices are staffed by one or more agricultural experts, who work in cooperation with the National Institute of Food and Agriculture, and who provide information to agricultural producers and others.

**County** - Any county, parish, or other political subdivision of a state shown on your accepted application, including

(2 of 42)

acreage in a field that extends into an adjoining county if the county boundary is not readily discernible.

**Cover crop** - A crop generally recognized by agricultural experts as agronomically sound for the area for erosion control or other purposes related to conservation or soil improvement.  A cover crop may be considered to be a second crop (see the definition of "second crop").

**Coverage** - The insurance provided by this policy, against insured loss of production or value, by unit as shown on your summary of coverage.

**Coverage begins, date** - The calendar date insurance begins on the insured crop, as contained in the Crop Provisions, or the date planting begins on the unit (see section 11 of these Basic Provisions for specific provisions relating to prevented planting).

**Crop Provisions** - The part of the policy that contains the specific provisions of insurance for each insured crop.

**Crop year** - The period within which the insured crop is normally grown, regardless of whether or not it is actually grown, and designated by the calendar year in which the insured crop is normally harvested, unless otherwise specified in the Crop Provisions.

**Damage** - Injury, deterioration, or loss of production of the insured crop due to insured or uninsured causes.

**Days** - Calendar days.

**Deductible** - The amount determined by subtracting the coverage level percentage you choose from 100 percent. For example, if you elected a 65 percent coverage level, your deductible would be 35 percent (100% - 65% = 35%).

**Delinquent debt** - Has the same meaning as the term defined in 7 CFR part 400, subpart U.

**Disinterested third party** - A person that does not have any familial relationship (parents, brothers, sisters, children, spouse, grandchildren, aunts, uncles, nieces, nephews, first cousins, or grandparents, related by blood, adoption or marriage, are considered to have a familial relationship) with you or who will not benefit financially from the sale of the insured crop.  Persons who are authorized to conduct quality analysis in accordance with the Crop Provisions are considered disinterested third parties unless there is a familial relationship.

**Double crop** - Producing two or more crops for harvest on the same acreage in the same crop year.

**Earliest planting date** - The initial planting date contained in the Special Provisions, which is the earliest date you may plant an insured agricultural commodity and qualify for a replanting payment if such payments are authorized by the Crop Provisions.

**End of insurance period, date of** - The date upon which your crop insurance coverage ceases for the crop year (see Crop Provisions and section 11).

**Enterprise unit** - All insurable acreage of the same insured crop or all insurable irrigated or non-irrigated acreage of the same insured crop in the county in which you have a share on the date coverage begins for the crop year, provided the requirements of section 34 are met.

**Field** - All acreage of tillable land within a natural or artificial boundary (*e.g.*, roads, waterways, fences, etc.). Different planting patterns or planting different crops do not create separate fields.

**Final planting date** - The date contained in the Special Provisions for the insured crop by which the crop must

initially be planted in order to be insured for the full production guarantee or amount of insurance per acre.

**First insured crop** - With respect to a single crop year and any specific crop acreage, the first instance that an agricultural commodity is planted for harvest or prevented from being planted and is insured under the authority of the Act.  For example, if winter wheat that is not insured is planted on acreage that is later planted to soybeans that are insured, the first insured crop would be soybeans.  If the winter wheat was insured, it would be the first insured crop.

**FSA** - The Farm Service Agency, an agency of the USDA, or a successor agency.

**FSA farm number** - The number assigned to the farm by the local FSA office.

**Generally recognized** - When agricultural experts or organic agricultural experts, as applicable, are aware of the production method or practice and there is no genuine dispute regarding whether the production method or practice allows the crop to make normal progress toward maturity and produce at least the yield used to determine the production guarantee or amount of insurance.

**Good farming practices** - The production methods utilized to produce the insured crop and allow it to make normal progress toward maturity and produce at least the yield used to determine the production guarantee or amount of insurance, including any adjustments for late planted acreage, which are those generally recognized by agricultural experts or organic agricultural experts, depending on the practice, for the area.  We may, or you may request us to, contact FCIC to determine if production methods will be considered "good farming practices."

**Harvest price** - A price determined in accordance with the Commodity Exchange Price Provisions and used to value production to count for revenue protection.

**Harvest price exclusion** - Revenue protection with the use of the harvest price excluded when determining your revenue protection guarantee.  This election is continuous unless canceled by the cancellation date.

**Household** - A domestic establishment including the members of a family (parents, brothers, sisters, children, spouse, grandchildren, aunts, uncles, nieces, nephews, first cousins, or grandparents, related by blood, adoption or marriage, are considered to be family members) and others who live under the same roof.

**Insurable interest** - Your percentage of the insured crop that is at financial risk.

**Insurable loss** - Damage for which coverage is provided under the terms of your policy, and for which you accept an indemnity payment.

**Insured** - The named person as shown on the application accepted by us.  This term does not extend to any other person having a share or interest in the crop (for example, a partnership, landlord, or any other person) unless specifically indicated on the accepted application.

**Insured crop** - The crop in the county for which coverage is available under your policy as shown on the application accepted by us.

**Intended acreage report** - A report of the acreage you intend to plant, by crop, for the current crop year and used solely for the purpose of establishing eligible prevented planting acreage, as required in section 17.

**Interplanted** - Acreage on which two or more crops are planted in a manner that does not permit separate agronomic maintenance or harvest of the insured crop.

**Irrigated practice** - A method of producing a crop by which water is artificially applied during the growing season by appropriate systems and at the proper times, with the intention of providing the quantity of water needed to produce at least the yield used to establish the irrigated production guarantee or amount of insurance on the irrigated acreage planted to the insured crop.

**Late planted** - Acreage initially planted to the insured crop after the final planting date.

**Late planting period** - The period that begins the day after the final planting date for the insured crop and ends 25 days after the final planting date, unless otherwise specified in the Crop Provisions or Special Provisions.

**Liability** - Your total amount of insurance, value of your production guarantee, or revenue protection guarantee for the unit determined in accordance with the Settlement of Claim provisions of the applicable Crop Provisions.

**Limited resource farmer** - Has the same meaning as the term defined by USDA at http://lrftool.sc.egov.usda.gov/LRP_Definition.aspx or successor website.

**Native sod** - Acreage that has no record of being tilled (determined in accordance with information collected and maintained by an agency of the USDA or other verifiable records that you provide and are acceptable to us) for the production of an annual crop on or before February 7, 2014, and on which the plant cover is composed principally of native grasses, grass-like plants, forbs, or shrubs suitable for grazing and browsing.

**Negligence** - The failure to use such care as a reasonably prudent and careful person would use under similar circumstances.

**Non-contiguous** - Acreage of an insured crop that is separated from other acreage of the same insured crop by land that is neither owned by you nor rented by you for cash or a crop share. However, acreage separated by only a public or private right-of-way, waterway, or an irrigation canal will be considered as contiguous.

**Offset** - The act of deducting one amount from another amount.

**Organic agricultural experts** - Persons who are employed by the following organizations: Appropriate Technology Transfer for Rural Areas, Sustainable Agriculture Research and Education or the Cooperative Extension System, the agricultural departments of universities, or other persons approved by FCIC, whose research or occupation is related to the specific organic crop or practice for which such expertise is sought.

**Organic crop -** An agricultural commodity that is organically produced consistent with section 2103 of the Organic Foods Production Act of 1990 (7 U.S.C. 6502).

**Organic farming practice** - A system of plant production practices used to produce an organic crop that is approved by a certifying agent in accordance with 7 CFR part 205.

**Organic plan** - A written plan, in accordance with the National Organic Program published in 7 CFR part 205, that describes the organic farming practices that you and a certifying agent agree upon annually or at such other times as prescribed by the certifying agent.

**Organic standards** - Standards in accordance with the Organic Foods Production Act of 1990 (7 U.S.C. 6501 et seq.) and 7 CFR part 205.

**Perennial crop** - A plant, bush, tree or vine crop that has a life span of more than one year.

**Person** - An individual, partnership, association, corporation, estate, trust, or other legal entity, and wherever applicable, a State or a political subdivision or agency of a State. "Person" does not include the United States Government or any agency thereof.

**Planted acreage** - Land in which seed, plants, or trees have been placed, appropriate for the insured crop and planting method, at the correct depth, into a seedbed that has been properly prepared for the planting method and production practice.

**Policy** - The agreement between you and us to insure an agricultural commodity and consisting of the accepted application, these Basic Provisions, the Crop Provisions, the Special Provisions, the Commodity Exchange Price Provisions, if applicable, other applicable endorsements or options, the actuarial documents for the insured agricultural commodity, the Catastrophic Risk Protection Endorsement, if applicable, and the applicable regulations published in 7 CFR chapter IV. Insurance for each agricultural commodity in each county will constitute a separate policy.

**Practical to replant** - Our determination, after loss or damage to the insured crop, that you are able to replant to the same crop in such areas and under such circumstances as it is customary to replant and that replanting the insured crop will allow the crop to attain maturity prior to the calendar date for the end of the insurance period. We may consider circumstances as to whether: (1) it is physically possible to replant the acreage; (2) seed germination, emergence, and formation of a healthy plant is likely; (3) field, soil, and growing conditions allow for proper planting and growth of the replanted crop to reach maturity; or (4) other conditions exist, as provided by the Crop Provisions or Special Provisions. Unless we determine it is not practical to replant, based on the circumstances listed above, it will be considered practical to replant through: (1) the final planting date if no late planting period is applicable; (2) the end of the late planting period if the late planting period is less than 10 days; or (3) the 10th day after the final planting date if the crop has a late planting period of 10 days or more. We will consider it practical to replant regardless of the availability of seed or plants, or the input costs necessary to produce the insured crop such as seed or plants, irrigation water, etc.

**Premium billing date** - The earliest date upon which you will be billed for insurance coverage based on your acreage report. The premium billing date is contained in the Special Provisions.

**Prevented planting** - Failure to plant the insured crop by the final planting date designated in the Special Provisions for the insured crop in the county, or within any applicable late planting period, due to an insured cause of loss that is general to the surrounding area and that prevents other producers from planting acreage with similar

characteristics.  Failure to plant because of uninsured causes such as lack of proper equipment or labor to plant acreage, or use of a particular production method, is not considered prevented planting.

**Price election** - The amount contained in the actuarial documents that is the value per pound, bushel, ton, carton, or other applicable unit of measure for the purposes of determining premium and indemnity under the policy.  A price election is not applicable for crops for which revenue protection is available.

**Production guarantee (per acre)** - The number of pounds, bushels, tons, cartons, or other applicable units of measure determined by multiplying the approved yield per acre by the coverage level percentage you elect.

**Production report** - A written record showing your annual production and used by us to determine your yield for insurance purposes in accordance with section 3.  The report contains yield information for previous years, including planted acreage and production.  This report must be supported by written verifiable records from a warehouseman or buyer of the insured crop, by measurement of farm-stored production, or by other records of production approved by us on an individual case basis in accordance with FCIC approved procedures.

**Prohibited substance** - Any biological, chemical, or other agent that is prohibited from use or is not included in the organic standards for use on any certified organic, transitional or buffer zone acreage.   Lists of such substances are contained at 7 CFR part 205.

**Projected price** - The price for each crop determined in accordance with the Commodity Exchange Price Provisions.  The applicable projected price is used for each crop for which revenue protection is available, regardless of whether you elect to obtain revenue protection or yield protection for such crop.

**Replanted crop** –
(1) The same agricultural commodity replanted on the same acreage as the insured crop for harvest in the same crop year if:
   (i) The replanting is specifically made optional by the policy and you elect to replant the crop and insure it under the policy covering the first insured crop; or
   (ii) Replanting is required by the policy.
(2) Unless otherwise specified in the Special Provisions, the crop will be considered an insured replanted crop and no replanting payment will be paid if we have determined it is not practical to replant the insured crop and you choose to plant the acreage to the same insured crop within or prior to the late planting period or after the final planting date if no late planting period is applicable.  If we determine it is not practical to replant and you plant the acreage to the same insured crop, any indemnity will be based on the greater of:
   (i) Our appraised production on the initially planted crop;
   (ii) Our subsequent appraisal of the replanted crop if the replanted crop is not harvested; or
   (iii) The harvested production from the replanted crop.

**Replanting** - Performing the cultural practices necessary to prepare the land to replace the seed or plants of the damaged or destroyed insured crop and then replacing the seed or plants of the same crop in the same insured acreage.  The same crop does not necessarily mean the same type or variety of the crop unless different types or varieties constitute separate crops or it is otherwise specified in the policy.

**Representative sample** - Portions of the insured crop that must remain in the field for examination and review by our loss adjuster when making a crop appraisal, as specified in the Crop Provisions.  In certain instances we may allow you to harvest the crop and require only that samples of the crop residue be left in the field.

**Revenue protection** - A plan of insurance that provides protection against loss of revenue due to a production loss, price decline or increase, or a combination of both.  If the harvest price exclusion is elected, the insurance coverage provides protection only against loss of revenue due to a production loss, price decline, or a combination of both.

**Revenue protection guarantee (per acre)** - For revenue protection only, the amount determined by multiplying the production guarantee (per acre) by the greater of your projected price or your harvest price.  If the harvest price exclusion is elected, the production guarantee (per acre) is only multiplied by your projected price.

**RMA's website** - A website hosted by RMA and located at http://www.rma.usda.gov/ or a successor website.

**Sales closing date** - A date contained in the Special Provisions by which an application must be filed.  The last date by which you may change your crop insurance coverage for a crop year.

**Second crop** - With respect to a single crop year, the next occurrence of planting any agricultural commodity for harvest following a first insured crop on the same acreage.  The second crop may be the same or a different agricultural commodity as the first insured crop, except the term does not include a replanted crop.  A cover crop, planted after a first insured crop and planted for the purpose of haying, grazing or otherwise harvesting in any manner or that is hayed or grazed during the crop year, or that is otherwise harvested is considered to be a second crop.  A cover crop that is covered by FSA's noninsured crop disaster assistance program (NAP) or receives other USDA benefits associated with forage crops will be considered as planted for the purpose of haying, grazing or otherwise harvesting.  A crop meeting the conditions stated herein will be considered to be a second crop regardless of whether or not it is insured.  Notwithstanding the references to haying and grazing as harvesting in these Basic Provisions, for the purpose of determining the end of the insurance period, harvest of the crop will be as defined in the applicable Crop Provisions.

**Section** - For the purposes of unit structure, a unit of measure under a rectangular survey system describing a tract of land usually one mile square and usually containing approximately 640 acres.

**Share** - Your insurable interest in the insured crop as an owner, operator, or tenant at the time insurance attaches.  However, only for the purpose of determining the amount

NHF2-527 Policy 000017

of indemnity, your share will not exceed your share at the earlier of the time of loss or the beginning of harvest.

**Special Provisions** - The part of the policy that contains specific provisions of insurance for each insured crop that may vary by geographic area.

**State** - The state shown on your accepted application.

**Substantial beneficial interest** - An interest held by any person of at least 10 percent in you (*e.g.*, there are two partnerships that each have a 50 percent interest in you and each partnership is made up of two individuals, each with a 50 percent share in the partnership. In this case, each individual would be considered to have a 25 percent interest in you, and both the partnerships and the individuals would have a substantial beneficial interest in you. The spouses of the individuals would not be considered to have a substantial beneficial interest unless the spouse was one of the individuals that made up the partnership. However, if each partnership is made up of six individuals with equal interests, then each would only have an 8.33 percent interest in you and although the partnership would still have a substantial beneficial interest in you, the individuals would not for the purposes of reporting in section 2). The spouse of any individual applicant or individual insured will be presumed to have a substantial beneficial interest in the applicant or insured unless the spouses can prove they are legally separated or otherwise legally separate under the applicable State dissolution of marriage laws. Any child of an individual applicant or individual insured will not be considered to have a substantial beneficial interest in the applicant or insured unless the child has a separate legal interest in such person.

**Summary of coverage** - Our statement to you, based upon your acreage report, specifying the insured crop and the guarantee or amount of insurance coverage provided by unit.

**Sustainable farming practice** - A system or process for producing an agricultural commodity, excluding organic farming practices, that is necessary to produce the crop and is generally recognized by agricultural experts for the area to conserve or enhance natural resources and the environment.

**Tenant** - A person who rents land from another person for a share of the crop or a share of the proceeds of the crop (see the definition of "share" above).

**Termination date** - The calendar date contained in the Crop Provisions upon which your insurance ceases to be in effect because of nonpayment of any amount due us under the policy, including premium.

**Tilled** - The termination of existing plants by plowing, disking, burning, application of chemicals, or by other means to prepare acreage for the production of an annual crop.

**Timely planted** - Planted on or before the final planting date designated in the Special Provisions for the insured crop in the county.

**Transitional acreage** - Acreage on which organic farming practices are being followed that does not yet qualify to be designated as organic acreage.

**USDA** - United States Department of Agriculture.

**Verifiable records** - Has the same meaning as the term defined in 7 CFR part 400, subpart G.

**Void** - When the policy is considered not to have existed for a crop year.

**Whole-farm unit** - All insurable acreage of all the insured crops planted in the county in which you have a share on the date coverage begins for each crop for the crop year and for which the whole-farm unit structure is available in accordance with section 34.

**Written agreement** - A document that alters designated terms of a policy as authorized under these Basic Provisions, the Crop Provisions, or the Special Provisions for the insured crop (see section 18).

**Yield protection** - A plan of insurance that only provides protection against a production loss and is available only for crops for which revenue protection is available.

**Yield protection guarantee (per acre)** - When yield protection is selected for a crop that has revenue protection available, the amount determined by multiplying the production guarantee by your projected price.

2.  **Life of Policy, Cancellation, and Termination.**

   (a) This is a continuous policy and will remain in effect for each crop year following the acceptance of the original application until canceled by you in accordance with the terms of the policy or terminated by operation of the terms of the policy or by us. In accordance with section 4, FCIC may change the coverage provided from year to year.

   (b) With respect to your application for insurance:

   (1) You must include your social security number (SSN) if you are an individual (if you are an individual applicant operating as a business, you may provide an employer identification number (EIN) but you must also provide your SSN); or

   (2) You must include your EIN if you are a person other than an individual;

   (3) In addition to the requirements of section 2(b)(1) or (2), you must include the following for all persons who have a substantial beneficial interest in you:

   (i) The SSN for individuals; or

   (ii) The EIN for persons other than individuals and the SSNs for all individuals that comprise the person with the EIN if such individuals also have a substantial beneficial interest in you;

   (4) You must include:

   (i) Your election of revenue protection, yield protection, or other available plan of insurance; coverage level; percentage of price election or percentage of projected price, as applicable; crop, type, variety, or class; and any other material information required on the application to insure the crop; and

   (ii) All the information required in section 2(b)(4)(i) or your application will not be accepted and no coverage will be provided;

   (5) Your application will not be accepted and no insurance will be provided for the year of application if the application does not contain your SSN or EIN. If your application contains an incorrect SSN or EIN for you, your application will be considered not to have been accepted, no

NHF2-527 Policy 000018

insurance will be provided for the year of application and for any subsequent crop years, as applicable, and such policies will be void if:

(i) Such number is not corrected by you; or

(ii) You correct the SSN or EIN:

    (A) You cannot prove that any error was inadvertent (Simply stating the error was inadvertent is not sufficient to prove the error was inadvertent); or

    (B) It is determined that the incorrect number would have allowed you to obtain disproportionate benefits under the crop insurance program, you are determined to be ineligible for insurance or you could avoid an obligation or requirement under any State or Federal law;

(6) With respect to persons with a substantial beneficial interest in you:

(i) The insurance coverage for all crops included on your application will be reduced proportionately by the percentage interest in you of persons with a substantial beneficial interest in you (presumed to be 50 percent for spouses of individuals) if the SSNs or EINs of such persons are included on your application, the SSNs or EINs are correct, and the persons with a substantial beneficial interest in you are ineligible for insurance;

(ii) Your policies for all crops included on your application, and for all applicable crop years, will be void if the SSN or EIN of any person with a substantial beneficial interest in you is incorrect or is not included on your application and:

    (A) Such number is not corrected or provided by you, as applicable;

    (B) You cannot prove that any error or omission was inadvertent (Simply stating the error or omission was inadvertent is not sufficient to prove the error or omission was inadvertent); or

    (C) Even after the correct SSN or EIN is provided by you, it is determined that the incorrect or omitted SSN or EIN would have allowed you to obtain disproportionate benefits under the crop insurance program, the person with a substantial beneficial interest in you is determined to be ineligible for insurance, or you or the person with a substantial beneficial interest in you could avoid an obligation or requirement under any State or Federal law; or

(iii) Except as provided in sections 2(b)(6)(ii)(B) and (C), your policies will not be voided if you subsequently provide the correct SSN or EIN for persons with a substantial beneficial interest in you and the persons are eligible for insurance;

(7) When any of your policies are void under sections 2(b)(5) or (6):

(i) You must repay any indemnity, prevented planting payment or replanting payment that may have been paid for all applicable crops and crop years;

(ii) Even though the policies are void, you will still be required to pay an amount equal to 20 percent of the premium that you would otherwise be required to pay; and

(iii) If you previously paid premium or administrative fees, any amount in excess of the amount required in section 2(b)(7)(ii) will be returned to you;

(8) Notwithstanding any of the provisions in this section, if you certify to an incorrect SSN or EIN, or receive an indemnity, prevented planting payment or replanting payment and the SSN or EIN was not correct, you may be subject to civil, criminal or administrative sanctions;

(9) If any of the information regarding persons with a substantial beneficial interest in you changes after the sales closing date for the previous crop year, you must revise your application by the sales closing date for the current crop year to reflect the correct information. However, if such information changed less than 30 days before the sales closing date for the current crop year, you must revise your application by the sales closing date for the next crop year. If you fail to provide the required revisions, the provisions in section 2(b)(6) will apply; and

(10) If you are, or a person with a substantial beneficial interest in you is, not eligible to obtain a SSN or EIN, whichever is required, you must request an assigned number for the purposes of this policy from us:

(i) A number will be provided only if you can demonstrate you are, or a person with a substantial beneficial interest in you is, eligible to receive Federal benefits;

(ii) If a number cannot be provided for you in accordance with section 2(b)(10)(i), your application will not be accepted; or

(iii) If a number cannot be provided for any person with a substantial beneficial interest in you in accordance with section 2(b)(10)(i), the amount of coverage for all crops on the application will be reduced proportionately by the percentage interest of such person in you.

(c) After acceptance of the application, you may not cancel this policy for the initial crop year. Thereafter, the policy will continue in force for each succeeding crop year unless canceled or terminated as provided below.

(d) Either you or we may cancel this policy after the initial crop year by providing written notice to the other on or before the cancellation date shown in the Crop Provisions.

(e) Any amount due to us for any policy authorized under the Act will be offset from any indemnity or prevented

planting payment due you for this or any other crop insured with us under the authority of the Act.

  (1) Even if your claim has not yet been paid, you must still pay the premium and administrative fee on or before the termination date for you to remain eligible for insurance.

  (2) If you and we agree, your premium and administrative fees can be offset from any indemnity or prevented planting payment due you even if it is prior to the billing date of the premium and administrative fees.

  (3) If we offset any amount due us from an indemnity or prevented planting payment owed to you, the date of payment for the purpose of determining whether you have a delinquent debt will be the date that you submit the claim for indemnity in accordance with section 14(e) (Your Duties).

(f) A delinquent debt for any policy will make you ineligible to obtain crop insurance authorized under the Act for any subsequent crop year and result in termination of all policies in accordance with section 2(f)(2).

  (1) With respect to ineligibility:

    (i) Ineligibility for crop insurance will be effective on:

      (A) The date that a policy was terminated in accordance with section 2(f)(2) for the crop for which you failed to pay premium, an administrative fee, or any related interest owed, as applicable;

      (B) The payment due date contained in any notification of indebtedness for any overpaid indemnity, prevented planting payment or replanting payment, if you fail to pay the amount owed, including any related interest owed, as applicable, by such due date; or

      (C) The termination date for the crop year prior to the crop year in which a scheduled payment is due under a written payment agreement if you fail to pay the amount owed by any payment date in any agreement to pay the debt.

    (ii) If you are ineligible and a policy has been terminated in accordance with section 2(f)(2), you will not receive any indemnity, prevented planting payment or replanting payment, if applicable, and such ineligibility and termination of the policy may affect your eligibility for benefits under other USDA programs. Any indemnity, prevented planting payment or replanting payment that may be owed for the policy before it has been terminated will remain owed to you, but may be offset in accordance with section 2(e), unless your policy was terminated in accordance with sections 2(f)(2)(i)(A), (B), or (D).

  (2) With respect to termination:

    (i) Termination will be effective on:

      (A) For a policy with unpaid administrative fees or premiums, the termination date immediately subsequent to the billing date for the crop year (For policies for which the sales closing date is prior to the termination date, such policies will terminate for the current crop year even if insurance attached prior to the termination date. Such termination will be considered effective as of the sales closing date and no insurance will be considered to have attached for the crop year and no indemnity, prevented planting or replanting payment will be owed);

      (B) For a policy with other amounts due, the termination date immediately following the date you have a delinquent debt (For policies for which the sales closing date is prior to the termination date, such policies will terminate for the current crop year even if insurance attached prior to the termination date. Such termination will be considered effective as of the sales closing date and no insurance will be considered to have attached for the crop year and no indemnity, prevented planting or replanting payment will be owed);

      (C) For all other policies that are issued by us under the authority of the Act, the termination date that coincides with the termination date for the policy with the delinquent debt or, if there is no coincidental termination date, the termination date immediately following the date you become ineligible; or

      (D) For execution of a written payment agreement and failure to make any scheduled payment, the termination date for the crop year prior to the crop year in which you failed to make the scheduled payment (for this purpose only, the crop year will start the day after the termination date and end on the next termination date, *e.g.*, if the termination date is November 30 and you fail to make a payment on November 15, 2019, your policy will terminate on November 30, 2018, for the 2019 crop year).

    (ii) For all policies terminated under sections 2(f)(2)(i)(A), (B), or (D), any indemnities, prevented planting payments or replanting payments paid subsequent to the termination date must be repaid.

    (iii) Once the policy is terminated, it cannot be reinstated for the current crop year unless:

      (A) The termination was in error;

      (B) The Administrator of the Risk Management Agency, at his or her sole discretion, determines that the following are met:

NHF2-527 Policy 000020

(*1*) In accordance with 7 CFR part 400, subpart U, and FCIC issued procedures, you provide documentation that your failure to pay your debt is due to an unforeseen or unavoidable event or an extraordinary weather event that created an impossible situation for you to make timely payment;

(*2*) You remit full payment of the delinquent debt owed to us or FCIC with your request submitted in accordance with section 2(f)(2)(iii)(B)(*3*); and

(*3*) You submit a written request for reinstatement of your policy to us no later than 60 days after the termination date or the missed payment date of a previously executed written payment agreement, or in the case of overpaid indemnity or any amount that became due after the termination date, the due date specified in the notice to you of the amount due, if applicable.

(*i*) If authorization for reinstatement, as defined in 7 CFR part 400, subpart U, is granted, your policies will be reinstated effective at the beginning of the crop year for which you were determined ineligible, and you will be entitled to all applicable benefits under such policies, provided you meet all eligibility requirements and comply with the terms of the policy; and

(*ii*) There is no evidence of fraud or misrepresentation; or

(C) We determine that, in accordance with 7 CFR part 400, subpart U, and FCIC issued procedures, the following are met:

(*1*) You can demonstrate:

(*i*) You made timely payment for the amount of premium owed but you inadvertently omitted some small amount, such as the most recent month's interest or a small administrative fee;

(*ii*) The amount of the payment was clearly transposed from the amount that was otherwise due (For example, you owed $892 but you paid $829); or

(*iii*) You timely made the full payment of the amount owed but the delivery of that payment was delayed, and was postmarked no more than seven calendar days after the termination date or the missed payment date of a previously executed written payment agreement, or in the case of overpaid indemnity or any amount that became due after the termination date, the due date specified in a notice to you of an amount due, as applicable.

(*2*) You remit full payment of the delinquent debt owed to us; and

(*3*) You submit a written request for reinstatement of your policy to us in accordance with 7 CFR part 400, subpart U, and applicable procedures no later than 30 days after the termination date or the missed payment date of a previously executed written payment agreement, or in the case of overpaid indemnity or any amount that became due after the termination date, the due date specified in the notice to you of the amount due, if applicable; and

(*4*) If authorization for reinstatement, as defined in 7 CFR part 400, subpart U, is granted, your policies will be reinstated effective at the beginning of the crop year for which you were determined ineligible, and you will be entitled to all applicable benefits under such policies, provided you meet all eligibility requirements and comply with the terms of the policy; and

(*5*) There is no evidence of fraud or misrepresentation.

(iv) A determination made under:

(A) Section 2(f)(2)(iii)(B) may only be appealed to the National Appeals Division in accordance with 7 CFR part 11; and

(B) Section 2(f)(2)(iii)(C) may only be appealed in accordance with section 20.

(3) To regain eligibility, you must:

(i) Repay the delinquent debt in full;

(ii) Execute a written payment agreement, in accordance with 7 CFR part 400, subpart U, and make payments in accordance with the agreement; or

(iii) Have your debts discharged in bankruptcy.

(4) After you become eligible for crop insurance, if you want to obtain coverage for your crops, you must submit a new application on or before the sales closing date for the crop (Since applications

for crop insurance cannot be accepted after the sales closing date, if you make any payment after the sales closing date, you cannot apply for insurance until the next crop year).

(5) For example, for the 2019 crop year, if crop A, with a termination date of October 31, 2018, and crop B, with a termination date of March 15, 2019, are insured and you do not pay the premium for crop A by the termination date, you are ineligible for crop insurance as of October 31, 2018, and crop A's policy is terminated as of that date. Crop B's policy does not terminate until March 15, 2019, and an indemnity for the 2018 crop year may still be owed. If you enter into a written payment agreement on September 25, 2019, the earliest date by which you can obtain crop insurance for crop A is to apply for crop insurance by the October 31, 2019, sales closing date and for crop B is to apply for crop insurance by the March 15, 2020, sales closing date. If you fail to make a payment that was scheduled to be made on April 1, 2020, your policy will terminate as of October 31, 2019, for crop A, and March 15, 2020, for crop B, and no indemnity, prevented planting payment or replanting payment will be due for that crop year for either crop. You will not be eligible to apply for crop insurance for any crop until after the amounts owed are paid in full or you have your debts discharged in bankruptcy.

(6) If you are determined to be ineligible under section 2(f), persons with a substantial beneficial interest in you may also be ineligible until you become eligible again.

(g) In cases where there has been a death, disappearance, judicially declared incompetence, or dissolution of any insured person:

(1) If any married individual insured dies, disappears, or is judicially declared incompetent, the named insured on the policy will automatically convert to the name of the spouse if:

 (i)   The spouse was included on the policy as having a substantial beneficial interest in the named insured; and

 (ii)  The spouse has a share of the crop.

(2) The provisions in section 2(g)(3) will be applicable if:

 (i)   Any partner, member, shareholder, etc., of an insured entity dies, disappears, or is judicially declared incompetent, and such event automatically dissolves the entity; or

 (ii)  An individual, whose estate is left to a beneficiary other than a spouse or left to the spouse and the criteria in section 2(g)(1) are not met, dies, disappears, or is judicially declared incompetent.

(3) If section 2(g)(2) applies and the death, disappearance, or judicially declared incompetence occurred:

 (i)   More than 30 days before the cancellation date, the policy is automatically canceled as of the cancellation date and a new application must be submitted; or

 (ii)  Thirty days or less before the cancellation date, or after the cancellation date, the policy will continue in effect through the crop year immediately following the cancellation date and be automatically canceled as of the cancellation date immediately following the end of the insurance period for the crop year, unless canceled by the cancellation date prior to the start of the insurance period:

  (A)  A new application for insurance must be submitted prior to the sales closing date for coverage for the subsequent crop year; and

  (B)  Any indemnity, replanting payment or prevented planting payment will be paid to the person or persons determined to be beneficially entitled to the payment and such person or persons must comply with all policy provisions and pay the premium.

(4) If any insured entity is dissolved for reasons other than death, disappearance, or judicially declared incompetence:

 (i)   Before the cancellation date, the policy is automatically canceled as of the cancellation date and a new application must be submitted; or

 (ii)  On or after the cancellation date, the policy will continue in effect through the crop year immediately following the cancellation date and be automatically canceled as of the cancellation date immediately following the end of the insurance period for the crop year, unless canceled by the cancellation date prior to the start of the insurance period:

  (A)  A new application for insurance must be submitted prior to the sales closing date for coverage for the subsequent crop year; and

  (B)  Any indemnity, replanting payment or prevented planting payment will be paid to the person or persons determined to be beneficially entitled to the payment and such person or persons must comply with all policy provisions and pay the premium.

(5) If section 2(g)(2) or (4) applies, a remaining member of the insured person or the beneficiary is required to report to us the death, disappearance, judicial incompetence, or other event that causes dissolution not later than the next cancellation date, except if section 2(g)(3)(ii) applies, notice must be provided by the cancellation date for the next crop year. If notice is not provided timely, the provisions of section 2(g)(2) or (4) will apply retroactive to the date such notice should have been provided and any payments made after the date the policy should have been canceled must be returned.

(h) We may cancel your policy if no premium is earned for 3 consecutive years.

(i) The cancellation and termination dates are contained in the Crop Provisions.

(j) Any person may sign any document relative to crop insurance coverage on behalf of any other person covered by such a policy, provided that the person has a properly executed power of attorney or such other legally sufficient document authorizing such person to sign.  You are still responsible for the accuracy of all information provided on your behalf and may be subject to the consequences in section 6(g), and any other applicable consequences, if any information has been misreported.

**3.  Insurance Guarantees, Coverage Levels, and Prices.**

(a) Unless adjusted or limited in accordance with your policy, the production guarantee or amount of insurance, coverage level, and price at which an indemnity will be determined for each unit will be those used to calculate your summary of coverage for each crop year.

(b) With respect to the insurance choices:

(1) For all acreage of the insured crop in the county, unless one of the conditions in section 3(b)(2) exists, you must select the same:

   (i) Plan of insurance (*e.g.*, yield protection, revenue protection, actual production history, amount of insurance, etc.);

   (ii) Level of coverage (all catastrophic risk protection or the same level of additional coverage); and

   (iii) Percentage of the available price election, or projected price for yield protection.  For revenue protection, the percentage of price is specified in section 3(c)(2).  If different prices are provided by type or variety, insurance will be based on the price provided for each type or variety and the same price percentage will apply to all types or varieties.

(2) You do not have to select the same plan of insurance, level of coverage or percentage of available price election or projected price if:

   (i) The applicable Crop Provisions allow you the option to separately insure individual crop types or varieties.  In this case, each individual type or variety insured by you will be subject to separate administrative fees.  For example, if two grape varieties in California are insured under the Catastrophic Risk Protection Endorsement and two varieties are insured under an additional coverage policy, a separate administrative fee will be charged for each of the four varieties; or

   (ii) You have additional coverage for the crop in the county and the acreage has been designated as "high-risk" by FCIC.  In such case, you will be able to exclude coverage for the high-risk land under the additional coverage policy and insure such acreage under a separate Catastrophic Risk

Protection Endorsement, provided the Catastrophic Risk Protection Endorsement is obtained from the same insurance provider from which the additional coverage was obtained.  If you have revenue protection and exclude high-risk land, the catastrophic risk protection coverage will be yield protection only for the excluded high-risk land.

(iii) You have additional coverage for the crop in the county, and the actuarial documents provide for separate coverage by irrigated and non-irrigated practices for the crop.

   (A) You may select one coverage level for all irrigated acreage and one coverage level for all non-irrigated acreage.  For example: you may choose a 65 percent coverage level for all irrigated acreage (corn irrigated practice) and an 80 percent coverage level for all non-irrigated acreage (corn non-irrigated practice).

   (B) If the Crop Provisions allow the option to separately insure individual crop types or varieties, and the actuarial documents provide for separate coverage, you may select coverage levels by irrigated and non-irrigated practice for each separate type or variety.

(c) With respect to revenue protection, if available for the crop:

(1) You may change to another plan of insurance and change your coverage level or elect the harvest price exclusion by giving written notice to us not later than the sales closing date for the insured crop;

(2) Your projected price and harvest price will be 100 percent of the projected price and harvest price issued by FCIC;

(3) If the harvest price exclusion is:

   (i) Not elected, your projected price is used to initially determine the revenue protection guarantee (per acre), and if the harvest price is greater than the projected price, the revenue protection guarantee (per acre) will be recomputed using your harvest price; or

   (ii) Elected, your projected price is used to compute your revenue protection guarantee (per acre);

(4) Your projected price is used to calculate your premium, any replanting payment, and any prevented planting payment; and

(5) If the projected price or harvest price cannot be calculated for the current crop year under the provisions contained in the Commodity Exchange Price Provisions:

   (i) For the projected price:

      (A) Revenue protection will not be provided and you will automatically be covered under the yield protection plan of insurance for the current crop year

unless you cancel your coverage by the cancellation date or change your plan of insurance by the sales closing date;

(B) Notice will be provided on RMA's website by the date specified in the applicable projected price definition contained in the Commodity Exchange Price Provisions;

(C) The projected price will be determined by FCIC and will be released by the date specified in the applicable projected price definition contained in the Commodity Exchange Price Provisions; and

(D) Your coverage will automatically revert to revenue protection for the next crop year that revenue protection is available unless you cancel your coverage by the cancellation date or change your coverage by the sales closing date; or

(ii) For the harvest price:

(A) Revenue protection will continue to be available; and

(B) The harvest price will be determined and announced by FCIC.

(d) With respect to yield protection, if available for the crop:

(1) You may change to another plan of insurance and change your percentage of price and your coverage level by giving written notice to us not later than the sales closing date for the insured crop;

(2) The percentage of the projected price selected by you multiplied by the projected price issued by FCIC is your projected price that is used to compute the value of your production guarantee (per acre) and the value of the production to count; and

(3) Since the projected price may change each year, if you do not select a new percentage of the projected price on or before the sales closing date, we will assign a percentage which bears the same relationship to the percentage that was in effect for the preceding year (*e.g.*, if you selected 100 percent of the projected price for the previous crop year and you do not select a new percentage for the current crop year, we will assign 100 percent for the current crop year).

(e) With respect to all plans of insurance other than revenue protection and yield protection (*e.g.*, APH, dollar amount plans of insurance, etc.):

(1) In addition to the price election or amount of insurance available on the contract change date, we may provide an additional price election or amount of insurance no later than 15 days prior to the sales closing date.

(i) You must select the additional price election or amount of insurance on or before the sales closing date for the insured crop.

(ii) These additional price elections or amounts of insurance will not be less than those available on the contract change date.

(iii) If you elect the additional price election or amount of insurance, any claim settlement and amount of premium will be based on your additional price election or amount of insurance.

(2) You may change to another plan of insurance or change your coverage level, amount of insurance or percentage of the price election, as applicable, for the following crop year by giving written notice to us not later than the sales closing date for the insured crop.

(3) Your amount of insurance will be the amount of insurance issued by FCIC multiplied by the coverage level percentage you elected. Your price election will be the price election issued by FCIC multiplied by the percentage of price you elected.

(4) Since the amount of insurance or price election may change each year, if you do not select a new amount of insurance or percentage of the price election on or before the sales closing date, we will assign an amount of insurance or percentage of the price election which bears the same relationship to the amount of insurance or percentage of the price election that was in effect for the preceding year (*e.g.*, if you selected 100 percent of the price election for the previous crop year and you do not select a new percentage of the price election for the current crop year, we will assign 100 percent of the price election for the current crop year).

(f) You must report all production of the crop (insured and uninsured) to us for the previous crop year by the earlier of the acreage reporting date or 45 days after the cancellation date, unless otherwise stated in the Special Provisions or as specified in section 18:

(1) If you do not provide the required production report, we will assign a yield for the previous crop year. The yield assigned by us will not be more than 75 percent of the yield used by us to determine your coverage for the previous crop year. The production report or assigned yield will be used to compute your approved yield for the purpose of determining your coverage for the current crop year.

(2) If you have filed a claim for any crop year, the documents signed by you which state the amount of production used to complete the claim for indemnity will be the production report for that year unless otherwise specified by FCIC.

(3) Production and acreage for the prior crop year must be reported for each proposed optional unit by the production reporting date, unless otherwise specified in the Special Provisions. If you do not provide the information stated above, the optional units will be combined into the basic unit.

(4) Appraisals obtained from only a portion of the acreage in a field that remains unharvested after the remainder of the crop within the field has been destroyed or put to another use will not be used to establish your actual yield unless

representative samples are required to be left by you in accordance with the Crop Provisions.

(g) It is your responsibility to accurately report all information that is used to determine your approved yield.

    (1) You must certify to the accuracy of this information on your production report.

    (2) If you fail to accurately report any information or if you do not provide any required records, you will be subject to the provisions regarding misreporting contained in section 6(g), unless the information is corrected:

        (i) On or before the production reporting date; or

        (ii) Because the incorrect information was the result of our error or the error of someone from USDA.

    (3) If you do not have written verifiable records to support the information on your production report, you will receive an assigned yield in accordance with section 3(f)(1) and 7 CFR part 400, subpart G for those crop years for which you do not have such records.

    (4) At any time we discover you have misreported any material information used to determine your approved yield or your approved yield is not correct, the following actions will be taken, as applicable:

        (i) We will correct your approved yield for the crop year such information is not correct, and all subsequent crop years;

        (ii) We will correct the unit structure, if necessary;

        (iii) Any overpaid or underpaid indemnity or premium must be repaid; and

        (iv) You will be subject to the provisions regarding misreporting contained in section 6(g)(1), unless the incorrect information was the result of our error or the error of someone from USDA.

(h) In addition to any consequences in section 3(g), at any time the circumstances described below are discovered, your approved yield will be adjusted:

    (1) By including an assigned yield determined in accordance with section 3(f)(1) and 7 CFR part 400, subpart G, if the actual yield reported in the database is excessive for any crop year, as determined by FCIC under its procedures, and you do not provide verifiable records to support the yield in the database (If there are verifiable records for the yield in your database, the yield is significantly different from the other yields in the county or your other yields for the crop and you cannot prove there is a valid agronomic basis to support the differences in the yields, the yield will be the average of the yields for the crop or the applicable county transitional yield if you have no other yields for the crop);

    (2) By reducing it to an amount consistent with the average of the approved yields for other databases for your farming operation with the same crop, type, and practice or the county transitional yield, as applicable, if:

        (i) The approved APH yield is greater than 115 percent of the average of the approved yields of all applicable databases for your farming operation that have actual yields in them or it is greater than 115 percent of the county transitional yield if no applicable databases exist for comparison;

        (ii) The current year's insurable acreage (including applicable prevented planting acreage) is greater than 400 percent of the average number of acres in the database or the acres contained in two or more individual years in the database are each less than 10 percent of the current year's insurable acreage in the unit (including applicable prevented planting acreage); and

        (iii) We determine there is no valid agronomic basis to support the approved yield; or

    (3) To an amount consistent with the production methods actually carried out for the crop year if you use a different production method than was previously used and the production method actually carried out is likely to result in a yield lower than the average of your previous actual yields. The yield will be adjusted based on your other units where such production methods were carried out or to the applicable county transitional yield for the production methods if other such units do not exist. You must notify us of changes in your production methods by the acreage reporting date. If you fail to notify us, in addition to the reduction of your approved yield described herein, you will be considered to have misreported information and you will be subject to the consequences in section 6(g). For example, for a non-irrigated unit, your yield is based upon acreage of the crop that is watered once prior to planting, and the crop is not watered prior to planting for the current crop year. Your approved APH yield will be reduced to an amount consistent with the actual production history of your other non-irrigated units where the crop has not been watered prior to planting or limited to the non-irrigated transitional yield for the unit if other such units do not exist.

(i) Unless you meet the double cropping requirements contained in section 17(f)(4), if you elect to plant a second crop on acreage where the first insured crop was prevented from being planted, you will receive a yield equal to 60 percent of the approved yield for the first insured crop to calculate your average yield for subsequent crop years (Not applicable to crops if the APH is not the basis for the insurance guarantee). If the unit contains both prevented planting and planted acreage of the same crop, the yield for such acreage will be determined by:

    (1) Multiplying the number of insured prevented planting acres by 60 percent of the approved yield for the first insured crop;

(2) Adding the totals from section 3(i)(1) to the amount of appraised or harvested production for all of the insured planted acreage; and

(3) Dividing the total in section 3(i)(2) by the total number of acres in the unit.

(j) Hail and fire coverage may be excluded from the covered causes of loss for an insured crop only if you select additional coverage of not less than 65 percent of the approved yield indemnified at the 100 percent price election, or an equivalent coverage as established by FCIC, and you have purchased the same or a higher dollar amount of coverage for hail and fire from us or any other source. If you elected a whole-farm unit, you may exclude hail and fire coverage only if allowed by the Special Provisions.

(k) The applicable premium rate, or formula to calculate the premium rate, and transitional yield will be those contained in the actuarial documents except, in the case of high-risk land, a written agreement may be requested to change such transitional yield or premium rate.

(l) Notwithstanding any other provision, if you qualify as a beginning farmer or rancher and were previously involved in a farming or ranching operation, including involvement in the decision-making or physical involvement in the production of the crop or livestock on the farm, for any acreage obtained by you, you may receive a yield that is the higher of:

(1) The actual production history of the previous producer of the crop or livestock on the acreage you were previously involved with; or

(2) Your actual production history.

4. **Contract Changes.**

(a) We may change the terms of your coverage under this policy from year to year.

(b) Any changes in policy provisions, amounts of insurance, premium rates, program dates, price elections or the Commodity Exchange Price Provisions, if applicable, can be viewed on RMA's website not later than the contract change date contained in the Crop Provisions (except as allowed herein or as specified in section 3). We may only revise this information after the contract change date to correct clear errors (*e.g.*, the price for oats was announced at $25.00 per bushel instead of $2.50 per bushel or the final planting date should be May 10 but the final planting date in the Special Provisions states August 10).

(c) After the contract change date, all changes specified in section 4(b) will also be available upon request from your crop insurance agent. You will be provided, in writing, a copy of the changes to the Basic Provisions, Crop Provisions, Commodity Exchange Price Provisions, if applicable, and Special Provisions not later than 30 days prior to the cancellation date for the insured crop. If available from us, you may elect to receive these documents and changes electronically. Acceptance of the changes will be conclusively presumed in the absence of notice from you to change or cancel your insurance coverage.

5. **Exclusion of Yields.**

If provided in the actuarial documents, you may elect to exclude any actual yield for any crop year when FCIC determines a county, or its contiguous counties, the per planted acre yield was at least 50 percent below the simple average of the per planted acre yield for the crop in the county for the previous 10 consecutive crop years.

6. **Report of Acreage.**

(a) An annual acreage report must be submitted to us on our form for each insured crop in the county on or before the acreage reporting date contained in the Special Provisions, except as follows:

(1) If you insure multiple crops with us that have final planting dates on or after August 15 but before December 31, you must submit an acreage report for all such crops on or before the latest applicable acreage reporting date for such crops; and

(2) If you insure multiple crops with us that have final planting dates on or after December 31 but before August 15, you must submit an acreage report for all such crops on or before the latest applicable acreage reporting date for such crops.

(3) Notwithstanding the provisions in sections 6(a)(1) and (2):

(i) If the Special Provisions designate separate planting periods for a crop, you must submit an acreage report for each planting period on or before the acreage reporting date contained in the Special Provisions for the planting period;

(ii) If planting of the insured crop continues after the final planting date or you are prevented from planting during the late planting period, the acreage reporting date will be the later of:

(A) The acreage reporting date contained in the Special Provisions;

(B) The date determined in accordance with sections (a)(1) or (2); or

(C) Five days after the end of the late planting period for the insured crop, if applicable; and

(iii) If you plant the insured crop on or within five days prior to the final planting date and the final planting date is five or fewer days prior to the acreage reporting date, you must submit an acreage report no later than five days after the acreage reporting date (for example, if the final planting date contained in the Special Provisions is July 10, the acreage reporting date contained in the Special Provisions is July 15 and you plant the insured crop on July 9, you have until July 20 to submit an acreage report for the insured crop).

(b) If you do not have a share in an insured crop in the county for the crop year, you must submit an acreage report, on or before the acreage reporting date, so indicating.

(c) Your acreage report must include the following information, if applicable:

(1) The amount of acreage of the crop in the county (insurable and not insurable) in which you have a share and the date the insured crop was planted on the unit as follows:

   (i) The last date any timely planted acreage was planted and the number of acres planted by such date; and

   (ii) The date of planting and the number of acres planted per day for acreage planted during the late planting period (If you fail to report the number of acres planted on a daily basis, all acreage planted in the late planting period will be presumed to have been planted on the last day planting took place in the late planting period for the purposes of section 16);

(2) Your share at the time coverage begins;

(3) The practice;

(4) The type; and

(5) The land identifier for the crop acreage (*e.g.*, legal description, FSA farm number or common land unit number if provided to you by FSA, etc.) as required on our form.

(d) Regarding the ability to revise an acreage report you have submitted to us:

(1) For planted acreage, you cannot revise any information pertaining to the planted acreage after the acreage reporting date without our consent (Consent may only be provided when no cause of loss has occurred; our appraisal has determined that the insured crop will produce at least 90 percent of the yield used to determine your guarantee or the amount of insurance for the unit (including reported and unreported acreage), except when there are unreported units (see section 6(f)); the information on the acreage report is clearly transposed; you provide adequate evidence that we or someone from USDA have committed an error regarding the information on your acreage report; or if expressly permitted by the policy);

(2) For prevented planting acreage:

   (i) On or before the acreage reporting date, you can change any information on any initially submitted acreage report, except as provided in section 6(d)(2)(iii) (*e.g.*, you can correct the reported share, add acreage of the insured crop that was prevented from being planted, etc.);

   (ii) After the acreage reporting date, you cannot revise any information on the acreage report (*e.g.*, if you have failed to report prevented planting acreage on or before the acreage reporting date, you cannot revise it after the acreage reporting date to include prevented planting acreage) but we will revise information that is clearly transposed or you provide adequate evidence that we or someone from USDA have committed an error regarding the information on your acreage report; and

   (iii) You cannot revise your initially submitted acreage report at any time to change the insured crop, or type, that was reported as prevented from being planted;

(3) You may request an acreage measurement from FSA or a business that provides such measurement service prior to the acreage reporting date, submit documentation of such request and an acreage report with estimated acreage by the acreage reporting date, and if the acreage measurement shows the estimated acreage was incorrect, we will revise your acreage report to reflect the correct acreage:

   (i) If an acreage measurement is only requested for a portion of the acreage within a unit, you must separately designate the acreage for which an acreage measurement has been requested;

   (ii) If an acreage measurement is not provided to us by the time we receive a notice of loss, we may:

      (A) Defer finalization of the claim until the measurement is completed, and:

         (*1*) Make all necessary loss determinations, except the acreage measurement; and

         (*2*) Finalize the claim in accordance with applicable policy provisions after you provide the acreage measurement to us (If you fail to provide the measurement, your claim will not be paid); or

      (B) Elect to measure the acreage, and:

         (*1*) Finalize your claim in accordance with applicable policy provisions; and

         (*2*) Estimated acreage under this section will not be accepted from you for any subsequent acreage report; and

   (iii) Premium will still be due in accordance with sections 2(e) and 7. If the acreage is not measured as specified in section 6(d)(3)(ii) and the acreage measurement is not provided to us at least 15 days prior to the premium billing date, your premium will be based on the estimated acreage and will be revised, if necessary, when the acreage measurement is provided. If the acreage measurement is not provided by the termination date, you will be precluded from providing any estimated acreage for all subsequent crop years.

(4) If there is an irreconcilable difference between:

   (i) The acreage measured by FSA or a measuring service and our on-farm measurement, our on-farm measurement will be used; or

   (ii) The acreage measured by a measuring service, other than our on-farm measurement, and FSA, the FSA measurement will be used; and

(15 of 42)

(5) If the acreage report has been revised in accordance with section 6(d)(1), (2),  or (3), the information on the initial acreage report will not be considered misreported for the purposes of section 6(g).

(e) We may elect to determine all premiums and indemnities based on the information you submit on the acreage report or upon the factual circumstances we determine to have existed, subject to the provisions contained in section 6(g).

(f) If you do not submit an acreage report by the acreage reporting date, or if you fail to report all units, we may elect to determine by unit the insurable crop acreage, share, type and practice, or to deny liability on such units.  If we deny liability for the unreported units, your share of any production from the unreported units will be allocated, for loss purposes only, as production to count to the reported units in proportion to the liability on each reported unit.  However, such production will not be allocated to prevented planting acreage or otherwise affect any prevented planting payment.

(g) You must provide all required reports and you are responsible for the accuracy of all information contained in those reports.  You should verify the information on all such reports prior to submitting them to us.

(1) Except as provided in section 6(g)(2), if you submit information on any report that is different than what is determined to be correct and such information results in:

(i) A lower liability than the actual liability determined, the production guarantee or amount of insurance on the unit will be reduced to an amount consistent with the reported information (In the event the insurable acreage is under-reported for any unit, all production or value from insurable acreage in that unit will be considered production or value to count in determining the indemnity); or

(ii) A higher liability than the actual liability determined, the information contained in the acreage report will be revised to be consistent with the correct information.

(2) If your share is misreported and the share is:

(i) Under-reported, any claim will be determined using the share you reported; or

(ii) Over-reported, any claim will be determined using the share we determine to be correct.

(h) If we discover you have incorrectly reported any information on the acreage report for any crop year, you may be required to provide documentation in subsequent crop years substantiating your report of acreage for those crop years, including, but not limited to, an acreage measurement service at your own expense.   If the correction of any misreported information would affect an indemnity, prevented planting payment or replanting payment that was paid in a prior crop year, such claim will be adjusted and you will be required to repay any overpaid amounts.

(i) Errors in reporting units may be corrected by us at the time of adjusting a loss to reduce our liability and to conform to applicable unit division guidelines.

7.  **Annual Premium and Administrative Fees.**

(a) The annual premium is earned and payable at the time coverage begins.  You will be billed for the premium and administrative fee not earlier than the premium billing date specified in the Special Provisions.

(b) Premium or administrative fees owed by you will be offset from an indemnity or prevented planting payment due you in accordance with section 2(e).

(c) The annual premium amount is determined, as applicable, by either:

(1) Multiplying the production guarantee per acre times your price election or your projected price, as applicable, times the premium rate, times the insured acreage, times your share at the time coverage begins, and times any premium adjustment percentages that may apply; or

(2) Multiplying your amount of insurance per acre times the premium rate, times the insured acreage, times your share at the time coverage begins, and times any premium adjustment percentages that may apply.

(d) The information needed to determine the premium rate and any premium adjustment percentages that may apply are contained in the actuarial documents or an approved written agreement.

(e) In addition to the premium charged:

(1) You, unless otherwise authorized in 7 CFR part 400, must pay an administrative fee each crop year of $30 per crop per county for all levels of coverage in excess of catastrophic risk protection.

(2) The administrative fee must be paid no later than the time premium is due.

(3) Payment of an administrative fee will not be required if you file a bona fide zero acreage report on or before the acreage reporting date for the crop.  If you falsely file a zero acreage report you may be subject to criminal and administrative sanctions.

(4) The administrative fee will be waived if you request it and:

(i) You qualify as a beginning farmer or rancher;

(ii) You qualify as a limited resource farmer; or

(iii) You were insured prior to the 2005 crop year or for the 2005 crop year and your administrative fee was waived for one or more of those crop years because you qualified as a limited resource farmer under a policy definition previously in effect, and you remain qualified as a limited resource farmer under the definition that was in effect at the time the administrative fee was waived.

(5) Failure to pay the administrative fees when due may make you ineligible for certain other USDA benefits.

(16 of 42)

(f) If the amount of premium (gross premium less premium subsidy paid on your behalf by FCIC) and administrative fee you are required to pay for any acreage exceeds the liability for the acreage, coverage for those acres will not be provided (no premium or administrative fee will be due and no indemnity will be paid for such acreage).

(g) If you qualify as a beginning farmer or rancher, your premium subsidy will be 10 percentage points greater than the premium subsidy that you would otherwise receive, unless otherwise specified in the Special Provisions.

(h) You will be ineligible for any premium subsidy paid on your behalf by FCIC for any policy issued by us if:

    (1) USDA determines you have committed a violation of the highly erodible land conservation or wetland conservation provisions of 7 CFR part 12 as amended by the Agricultural Act of 2014; or

    (2) You have not filed form AD-1026 with FSA for the reinsurance year by the premium billing date.

        (i) Notwithstanding section 7(h)(2), you may be eligible for premium subsidy without having a timely filed form AD-1026:

            (A) For the initial reinsurance year if you certify by the premium billing date for your policy that you meet the qualifications as outlined in FCIC approved procedures for producers who are new to farming, new to crop insurance, a new entity, or have not previously been required to file form AD-1026; or

            (B) If FSA approves relief for failure to timely file due to circumstances beyond your control or failure to timely provide adequate information to complete form AD-1026 in accordance with the provisions contained in 7 CFR part 12.

        (ii) To be eligible for premium subsidy paid on your behalf by FCIC, it is your responsibility to assure you meet all the requirements for:

            (A) Compliance with the conservation provisions specified in section 7(h)(1) of this section; and

            (B) Filing form AD-1026 to be properly identified as in compliance with the conservation provisions specified in section 7(h)(1) of this section.

**8. Insured Crop.**

(a) The insured crop will be that shown on your accepted application and as specified in the Crop Provisions or Special Provisions and must be grown on insurable acreage.

(b) A crop which will NOT be insured will include, but will not be limited to, any crop:

    (1) That is not grown on planted acreage (except for the purposes of prevented planting coverage), or that is a type, class or variety or where the conditions under which the crop is planted are not generally recognized for the area (For example, where agricultural experts determine that planting a non-irrigated corn crop after a failed small grain crop on the same acreage in the same crop year is not appropriate for the area);

    (2) For which the information necessary for insurance (price election, amount of insurance, projected price and harvest price, as applicable, premium rate, etc.) is not included in the actuarial documents, unless such information is provided by a written agreement in accordance with section 18;

    (3) That is a volunteer crop;

    (4) Planted following the same crop on the same acreage and the first planting of the crop has been harvested in the same crop year unless specifically permitted by the Crop Provisions or the Special Provisions (For example, the second planting of grain sorghum would not be insurable if grain sorghum had already been planted and harvested on the same acreage during the crop year);

    (5) That is planted for the development or production of hybrid seed or for experimental purposes, unless permitted by the Crop Provisions or by written agreement to insure such crop; or

    (6) That is used solely for wildlife protection or management. If the lease states that specific acreage must remain unharvested, only that acreage is uninsurable. If the lease specifies that a percentage of the crop must be left unharvested, your share will be reduced by such percentage.

(c) Although certain policy documents may state that a crop type, class, variety or practice is not insurable, it does not mean all other crop types, classes, varieties or practices are insurable. To be insurable the crop type, class, variety or practice must meet all the conditions in this section.

**9. Insurable Acreage.**

(a) All acreage planted to the insured crop in the county in which you have a share:

    (1) Except as provided in section 9(a)(2), is insurable if the acreage has been planted and harvested or insured (including insured acreage that was prevented from being planted) in any one of the three previous crop years. Acreage that has not been planted and harvested (grazing is not considered harvested for the purposes of section 9(a)(1)) or insured in at least one of the three previous crop years may still be insurable if:

        (i) Such acreage was not planted:

            (A) In at least two of the three previous crop years to comply with any other USDA program;

            (B) Due to the crop rotation, the acreage would not have been planted in the previous three years (*e.g.*, a crop rotation of corn, soybeans, and alfalfa; and the alfalfa remained for four years before the acreage was planted to corn again); or

            (C) Because a perennial tree, vine, or bush crop was on the acreage in at least two of the previous three crop years;

(ii)   Such acreage constitutes five percent or less of the insured planted acreage in the unit;

(iii)  Such acreage was not planted or harvested because it was pasture or rangeland, the crop to be insured is also pasture or rangeland, and the Crop Provisions, Special Provisions, or a written agreement specifically allow insurance for such acreage; or

(iv)  The Crop Provisions, Special Provisions, or a written agreement specifically allow insurance for such acreage; or

(2)  Is not insurable if:

(i)   The only crop that has been planted and harvested on the acreage in the three previous crop years is a cover, hay (except wheat harvested for hay) or forage crop (except insurable silage).  However, such acreage may be insurable only if:

(A)  The crop to be insured is a hay or forage crop and the Crop Provisions, Special Provisions, or a written agreement specifically allow insurance for such acreage; or

(B)  The hay or forage crop was part of a crop rotation;

(ii)  The acreage has been strip-mined.  However, such acreage may be insurable only if:

(A)  An agricultural commodity, other than a cover, hay (except wheat harvested for hay), or forage crop (except insurable silage) has been harvested from the acreage for at least five crop years after the strip-mined land was reclaimed; or

(B)  A written agreement specifically allows insurance for such acreage;

(iii)  The actuarial documents do not provide the information necessary to determine the premium rate, unless insurance is allowed by a written agreement;

(iv)  The insured crop is damaged and it is practical to replant the insured crop, but the insured crop is not replanted;

(v)   The acreage is interplanted, unless insurance is allowed by the Crop Provisions;

(vi)  The acreage is otherwise restricted by the Crop Provisions or Special Provisions;

(vii) The acreage is planted in any manner other than as specified in the policy provisions for the crop unless a written agreement specifically allows insurance for such planting;

(viii) The acreage is of a second crop, if you elect not to insure such acreage when an indemnity for a first insured crop may be subject to reduction in accordance with the provisions of section 15 and you intend to collect an indemnity payment that is equal to 100 percent of the insurable loss for the first insured crop acreage.  This election

must be made on a first insured crop unit basis (e.g., if the first insured crop unit contains 40 planted acres that may be subject to an indemnity reduction, then no second crop can be insured on any of the 40 acres).  In this case:

(A)  If the first insured crop is insured under this policy, you must provide written notice to us of your election not to insure acreage of a second crop at the time the first insured crop acreage is released by us (if no acreage in the first insured crop unit is released, this election must be made by the earlier of the acreage reporting date for the second crop or when you sign the claim for indemnity for the first insured crop) or, if the first insured crop is insured under Area Risk Protection Insurance (7 CFR part 407), this election must be made before the second crop insured under this policy is planted, and if you fail to provide such notice, the second crop acreage will be insured in accordance with the applicable policy provisions and you must repay any overpaid indemnity for the first insured crop;

(B)  In the event a second crop is planted and insured with a different insurance provider, or planted and insured by a different person, you must provide written notice to each insurance provider that a second crop was planted on acreage on which you had a first insured crop; and

(C)  You must report the crop acreage that will not be insured on the applicable acreage report; or

(ix)  The acreage is of a crop planted following a second crop or following an insured crop that is prevented from being planted after a first insured crop, unless it is a practice that is generally recognized by agricultural experts or organic agricultural experts for the area to plant three or more crops for harvest on the same acreage in the same crop year, and additional coverage insurance provided under the authority of the Act is offered for the third or subsequent crop in the same crop year.  Insurance will only be provided for a third or subsequent crop as follows:

(A)  You must provide records acceptable to us that show:

(1)  You have produced and harvested the insured crop following two other crops harvested on the same acreage in the same crop year in at least two of the last four years in which you produced the insured crop; or

(2) The applicable acreage has had three or more crops produced and harvested on it in the same crop year in at least two of the last four years in which the insured crop was grown on the acreage; and

(B) The amount of insurable acreage will not exceed 100 percent of the greatest number of acres for which you provide the records required in section 9(a)(2)(ix)(A).

(b) If insurance is provided for an irrigated practice, you must report as irrigated only that acreage for which you have adequate facilities and adequate water, or the reasonable expectation of receiving adequate water at the time coverage begins, to carry out a good irrigation practice. If you knew or had reason to know that your water may be reduced before coverage begins, no reasonable expectation exists.

(c) Notwithstanding the provisions in section 8(b)(2), if acreage is irrigated and a premium rate is not provided for an irrigated practice, you may either report and insure the irrigated acreage as "non-irrigated," or report the irrigated acreage as not insured (If you elect to insure such acreage under a non-irrigated practice, your irrigated yield will only be used to determine your approved yield if you continue to use a good irrigation practice. If you do not use a good irrigation practice, you will receive a yield determined in accordance with section 3(h)(3)).

(d) We may restrict the amount of acreage that we will insure to the amount allowed under any acreage limitation program established by the United States Department of Agriculture if we notify you of that restriction prior to the sales closing date.

(e) Except as provided in section 9(f), in the states of Iowa, Minnesota, Montana, Nebraska, North Dakota, or South Dakota, during the first four crop years of planting on native sod acreage that has been tilled after February 7, 2014, such acreage may be insured if the requirements of section 9(a) have been met but will:

(1) Notwithstanding the provisions in section 3 regarding your production guarantee, receive a production guarantee (per acre) that is based on 65 percent of the transitional yield for the county; and

(2) For additional coverage policies, receive a premium subsidy that is 50 percentage points less than would otherwise be provided on acreage not qualifying as native sod. If the premium subsidy applicable to these acres is less than 50 percent before the reduction, you will receive no premium subsidy.

(f) Section 9(e) is not applicable to cumulative native sod acreage that is five acres or less in the county.

**10. Share Insured.**

(a) Insurance will attach:

(1) Only if the person completing the application has a share in the insured crop; and

(2) Only to that person's share, except that insurance may attach to another person's share of the insured crop if the other person has a share of the crop and:

(i) The application clearly states the insurance is requested for a person other than an individual (*e.g.*, a partnership or a joint venture); or

(ii) The application clearly states you as landlord will insure your tenant's share, or you as tenant will insure your landlord's share. If you as a landlord will insure your tenant's share, or you as a tenant will insure your landlord's share, you must provide evidence of the other party's approval (lease, power of attorney, etc.) and such evidence will be retained by us:

(A) You also must clearly set forth the percentage shares of each person on the acreage report; and

(B) For each landlord or tenant, you must report the landlord's or tenant's social security number, employer identification number, or other identification number we assigned for the purposes of this policy, as applicable.

(b) With respect to your share:

(1) We will consider to be included in your share under your policy, any acreage or interest reported by or for:

(i) Your spouse, unless such spouse can prove he/she has a separate farming operation, which includes, but is not limited to, separate land (transfers of acreage from one spouse to another is not considered separate land), separate capital, separate inputs, separate accounting, and separate maintenance of proceeds; or

(ii) Your child who resides in your household or any other member of your household, unless such child or other member of the household can demonstrate such person has a separate share in the crop (Children who do not reside in your household are not included in your share); and

(2) If it is determined that the spouse, child or other member of the household has a separate policy but does not have a separate farming operation or share of the crop, as applicable:

(i) The policy for one spouse or child or other member of the household will be void and the policy remaining in effect will be determined in accordance with section 22(a)(1) and (2);

(ii) The acreage or share reported under the policy that is voided will be included under the remaining policy; and

(iii) No premium will be due and no indemnity will be paid for the voided policy.

(c) Acreage rented for a percentage of the crop, or a lease containing provisions for **BOTH** a minimum payment (such as a specified amount of cash,

bushels, pounds, etc.,) **AND** a crop share will be considered a crop share lease.

(d) Acreage rented for cash, or a lease containing provisions for **EITHER** a minimum payment **OR** a crop share (such as a 50/50 share or $100.00 per acre, whichever is greater) will be considered a cash lease.

**11. Insurance Period.**

(a) Except for prevented planting coverage (see section 17), coverage begins on each unit or part of a unit at the later of:

(1) The date we accept your application (For the purposes of this paragraph, the date of acceptance is the date that you submit a properly executed application in accordance with section 2);

(2) The date the insured crop is planted; or

(3) The calendar date contained in the Crop Provisions for the beginning of the insurance period.

(b) Coverage ends on each unit or part of a unit at the earliest of:

(1) Total destruction of the insured crop;

(2) Harvest of the insured crop;

(3) Final adjustment of a loss on a unit;

(4) The calendar date contained in the Crop Provisions or Special Provisions for the end of the insurance period;

(5) Abandonment of the insured crop; or

(6) As otherwise specified in the Crop Provisions.

(c) Except as provided in the Crop Provisions or applicable endorsement, in addition to the requirements of section 11(b), coverage ends on any acreage within a unit once any event specified in section 11(b) occurs on that acreage. Coverage only remains in effect on acreage that has not been affected by an event specified in section 11(b).

**12. Causes of Loss.**

Insurance is provided only to protect against unavoidable, naturally occurring events. A list of the covered naturally occurring events is contained in the applicable Crop Provisions. All other causes of loss, including but not limited to the following, are NOT covered:

(a) Any act by any person that affects the yield, quality or price of the insured crop (*e.g.*, chemical drift, fire, terrorism, etc.);

(b) Failure to follow recognized good farming practices for the insured crop;

(c) Water that is contained by or within structures that are designed to contain a specific amount of water, such as dams, locks or reservoir projects, etc., on any acreage when such water stays within the designed limits (For example, a dam is designed to contain water to an elevation of 1,200 feet but you plant a crop on acreage at an elevation of 1,100 feet. A storm causes the water behind the dam to rise to an elevation of 1,200 feet. Under such circumstances, the resulting damage would not be caused by an insurable cause of loss. However, if you planted on acreage that was above 1,200 feet elevation, any damage caused by water that exceeded that elevation would be caused by an insurable cause of loss);

(d) Failure or breakdown of the irrigation equipment or facilities, or the inability to prepare the land for irrigation using your established irrigation method (*e.g.*, furrow irrigation), unless the failure, breakdown or inability is due to a cause of loss specified in the Crop Provisions.

(1) You must make all reasonable efforts to restore the equipment or facilities to proper working order within a reasonable amount of time unless we determine it is not practical to do so.

(2) Cost will not be considered when determining whether it is practical to restore the equipment or facilities;

(e) Failure to carry out a good irrigation practice for the insured crop, if applicable; or

(f) Any cause of loss that results in damage that is not evident or would not have been evident during the insurance period, including, but not limited to, damage that only becomes evident after the end of the insurance period unless expressly authorized in the Crop Provisions. Even though we may not inspect the damaged crop until after the end of the insurance period, damage due to insured causes that would have been evident during the insurance period will be covered.

**13. Replanting Payment.**

(a) If allowed by the Crop Provisions, a replanting payment may be made on an insured crop replanted after we have given consent and the acreage replanted is at least the lesser of 20 acres or 20 percent of the insured planted acreage for the unit (as determined on the final planting date or within the late planting period if a late planting period is applicable). If the crops to be replanted are in a whole-farm unit, the 20 acres or 20 percent requirement is to be applied separately to each crop to be replanted in the whole-farm unit.

(b) No replanting payment will be made on acreage:

(1) On which our appraisal establishes that production will exceed the level set by the Crop Provisions;

(2) Initially planted prior to the earliest planting date established by the Special Provisions; or

(3) On which one replanting payment has already been allowed for the crop year.

(c) The replanting payment per acre will be:

(1) The lesser of your actual cost for replanting or the amount specified in the Crop Provisions or Special Provisions; or

(2) If the Crop Provisions or Special Provisions specify that your actual cost will not be used to determine your replanting payment, the amount determined in accordance with the Crop Provisions or Special Provisions.

(d) No replanting payment will be paid if we determine it is not practical to replant.

**14. Duties in the Event of Damage, Loss, Abandonment, Destruction, or Alternative Use of Crop or Acreage.**

Your Duties:

(a) In case of damage or loss of production or revenue to any insured crop, you must protect the crop from further damage by providing sufficient care.

(b) Notice provisions:
  (1) For a planted crop, when there is damage or loss of production, you must give us notice, by unit, within 72 hours of your initial discovery of damage or loss of production (but not later than 15 days after the end of the insurance period, even if you have not harvested the crop).
  (2) For crops for which revenue protection is elected, if there is no damage or loss of production, you must give us notice not later than 45 days after the latest date the harvest price is released for any crop in the unit where there is a revenue loss.
  (3) In the event you are prevented from planting an insured crop that has prevented planting coverage, you must notify us within 72 hours after:
    (i) The final planting date, if you do not intend to plant the insured crop during the late planting period or if a late planting period is not applicable; or
    (ii) You determine you will not be able to plant the insured crop within any applicable late planting period.
  (4) All notices required in this section that must be received by us within 72 hours may be made by telephone or in person to your crop insurance agent but must be confirmed in writing within 15 days.
  (5) If you fail to comply with these notice requirements, any loss or prevented planting claim will be considered solely due to an uninsured cause of loss for the acreage for which such failure occurred, unless we determine that we have the ability to accurately adjust the loss. If we determine that we do not have the ability to accurately adjust the loss:
    (i) For any prevented planting claim, no prevented planting coverage will be provided and no premium will be owed or prevented planting payment will be paid; or
    (ii) For any claim for indemnity, no indemnity will be paid but you will still be required to pay all premiums owed.
(c) Representative samples:
  (1) If representative samples are required by the Crop Provisions, you must leave representative samples of the unharvested crop intact:
    (i) If you report damage less than 15 days before the time you will begin harvest or during harvest of the damaged unit; or
    (ii) At any time when required by us.
  (2) The samples must be left intact until we inspect them or until 15 days after completion of harvest on the remainder of the unit, whichever is earlier.
  (3) Unless otherwise specified in the Crop Provisions or Special Provisions, the samples of the crop in each field in the unit must be 10 feet wide and extend the entire length of the rows, if the crop is planted in rows, or if the crop is not planted in rows, the longest dimension of the field.
  (4) The period to retain representative samples may be extended if it is necessary to accurately determine the loss. You will be notified in writing of any such extension.
(d) Consent:
  (1) You must obtain consent from us before, and notify us after you:
    (i) Destroy any of the insured crop that is not harvested;
    (ii) Put the insured crop to an alternative use;
    (iii) Put the acreage to another use; or
    (iv) Abandon any portion of the insured crop.
  (2) We will not give consent for any of the actions in section 14(d)(1)(i) through (iv) if it is practical to replant the crop or until we have made an appraisal of the potential production of the crop.
  (3) Failure to obtain our consent will result in the assignment of an amount of production or value to count in accordance with the Settlement of Claim provisions of the applicable Crop Provisions.
(e) Claims:
  (1) Except as otherwise provided in your policy, you must submit a claim declaring the amount of your loss by the dates shown in section 14(e)(3), unless you:
    (i) Request an extension in writing by such date and we agree to such request (Extensions will only be granted if the amount of the loss cannot be determined within such time period because the information needed to determine the amount of the loss is not available); or
    (ii) Have harvested farm-stored grain production and elect, in writing, to delay measurement of your farm-stored production and settlement of any potential associated claim for indemnity (Extensions will be granted for this purpose up to 180 days after the end of the insurance period).
      (A) For policies that require APH, if such extension continues beyond the date you are required to submit your production report, you will be assigned the previous year's approved yield as a temporary yield in accordance with applicable procedures.
      (B) Any extension does not extend any date specified in the policy by which premiums, administrative fees, or other debts owed must be paid.
      (C) Damage that occurs after the end of the insurance period (for example, while the harvested crop production is in storage) is not covered; and
  (2) Failure to timely submit a claim or provide the required information necessary to determine the amount of the claim will result in no indemnity, prevented planting payment or replanting payment:
    (i) Even though no indemnity or replanting payment is due, you will still be required to pay the premium due under the policy for the unit; or

NHF2-527 Policy 000033

(ii) Failure to timely submit a prevented planting claim will result in no prevented planting coverage and no premium will be due.

(3) You must submit a claim not later than:

  (i) For policies other than revenue protection, 60 days after the date the insurance period ends for all acreage in the unit (When there is acreage in the unit where the insurance period ended on different dates, it is the last date the insurance period ends on the unit. For example, if a unit has corn acreage that was put to another use on July 15 and corn acreage where harvest was completed on September 30, the claim must be submitted not later than 60 days after September 30); or

  (ii) For revenue protection, the later of:
    (A) 60 days after the last date the harvest price is released for any crop in the unit; or
    (B) The date determined in accordance with section 14(e)(3)(i).

(4) To receive any indemnity (or receive the rest of an indemnity in the case of acreage that is planted to a second crop), prevented planting payment or replanting payment, you must, if applicable:

  (i) Provide:
    (A) A complete harvesting, production, and marketing record of each insured crop by unit including separate records showing the same information for production from any acreage not insured.
    (B) Records as indicated below if you insure any acreage that may be subject to an indemnity reduction as specified in section 15(e)(2):
      (1) Separate records of production from such acreage for all insured crops planted on the acreage (*e.g.*, if you have an insurable loss on 10 acres of wheat and subsequently plant cotton on the same 10 acres, you must provide records of the wheat and cotton production on the 10 acres separate from any other wheat and cotton production that may be planted in the same unit). If you fail to provide separate records for such acreage, we will allocate the production of each crop to the acreage in proportion to our liability for the acreage; or
      (2) If there is no loss on the unit that includes acreage of the second crop, no separate records need to be submitted for the second crop and you can receive the rest of the indemnity for the first insured crop.
    (C) Any other information we may require to settle the claim.

  (ii) Cooperate with us in the investigation or settlement of the claim, and, as often as we reasonably require:
    (A) Show us the damaged crop;
    (B) Allow us to remove samples of the insured crop; and
    (C) Provide us with records and documents we request and permit us to make copies.

  (iii) Establish:
    (A) The total production or value received for the insured crop on the unit;
    (B) That any loss occurred during the insurance period;
    (C) That the loss was caused by one or more of the insured causes specified in the Crop Provisions; and
    (D) That you have complied with all provisions of this policy.

  (iv) Upon our request, or that of any USDA employee authorized to conduct investigations of the crop insurance program, submit to an examination under oath.

(5) Failure to comply with any requirement contained in section 14(e)(4) will result in denial of the claim and any premium will still be owed, unless the claim denied is for prevented planting.

Our Duties:

(f) If you have complied with all the policy provisions, we will pay your loss within 30 days after the later of:
  (1) We reach agreement with you;
  (2) Completion of arbitration, reconsideration of determinations regarding good farming practices or any other appeal that results in an award in your favor, unless we exercise our right to appeal such decision;
  (3) Completion of any investigation by USDA, if applicable, of your current or any past claim for indemnity if no evidence of wrongdoing has been found (If any evidence of wrongdoing has been discovered, the amount of any indemnity, prevented planting or replant overpayment as a result of such wrongdoing may be offset from any indemnity or prevented planting payment owed to you); or
  (4) The entry of a final judgment by a court of competent jurisdiction.

(g) In the event we are unable to pay your loss within 30 days, we will give you notice of our intentions within the 30-day period.

(h) We may defer the adjustment of a loss until the amount of loss can be accurately determined. We will not pay for additional damage resulting from your failure to provide sufficient care for the crop during the deferral period.

(i) We recognize and apply the loss adjustment procedures established or approved by the Federal Crop Insurance Corporation.

(j) For revenue protection, we may make preliminary indemnity payments for crop production losses prior to the release of the harvest price if you have not elected the harvest price exclusion.

(1) First, we may pay an initial indemnity based upon your projected price, in accordance with the applicable Crop Provisions provided that your production to count and share have been established; and

(2) Second, after the harvest price is released, and if it is not equal to the projected price, we will recalculate the indemnity payment and pay any additional indemnity that may be due.

**15. Production Included in Determining an Indemnity and Payment Reductions.**

(a) The total production to be counted for a unit will include all production determined in accordance with the policy.

(b) Appraised production will be used to calculate your claim if you are not going to harvest your acreage. Such appraisals may be conducted after the end of the insurance period. If you harvest the crop after the crop has been appraised:

(1) You must provide us with the amount of harvested production (If you fail to provide verifiable records of harvested production, no indemnity will be paid and you will be required to return any previously paid indemnity for the unit that was based on an appraised amount of production); and

(2) If the harvested production exceeds the appraised production, claims will be adjusted using the harvested production, and you will be required to repay any overpaid indemnity; or

(3) If the harvested production is less than the appraised production, and:

   (i) You harvest after the end of the insurance period, your appraised production will be used to adjust the loss unless you can prove that no additional causes of loss or deterioration of the crop occurred after the end of the insurance period; or

   (ii) You harvest before the end of the insurance period, your harvested production will be used to adjust the loss.

(c) If you elect to exclude hail and fire as insured causes of loss and the insured crop is damaged by hail or fire, appraisals will be made as described in our form used to exclude hail and fire.

(d) The amount of an indemnity that may be determined under the applicable provisions of your policy may be reduced by an amount, determined in accordance with the Crop Provisions or Special Provisions, to reflect out-of-pocket expenses that were not incurred by you as a result of not planting, caring for, or harvesting the crop. Indemnities paid for acreage prevented from being planted will be based on a reduced guarantee as provided for in the policy and will not be further reduced to reflect expenses not incurred.

(e) With respect to acreage where you have suffered an insurable loss to planted acreage of your first insured crop in the crop year, except in the case of double cropping described in section 15(h):

(1) You may elect to not plant or to plant and not insure a second crop on the same acreage for

harvest in the same crop year and collect an indemnity payment that is equal to 100 percent of the insurable loss for the first insured crop; or

(2) You may elect to plant and insure a second crop on the same acreage for harvest in the same crop year (you will pay the full premium and, if there is an insurable loss to the second crop, receive the full amount of indemnity that may be due for the second crop, regardless of whether there is a subsequent crop planted on the same acreage) and:

   (i) Collect an indemnity payment that is 35 percent of the insurable loss for the first insured crop;

   (ii) Be responsible for premium that is 35 percent of the premium that you would otherwise owe for the first insured crop; and

   (iii) If the second crop does not suffer an insurable loss:

      (A) Collect an indemnity payment for the other 65 percent of insurable loss that was not previously paid under section 15(e)(2)(i); and

      (B) Be responsible for the remainder of the premium for the first insured crop that you did not pay under section 15(e)(2)(ii).

(f) With respect to acreage where you were prevented from planting the first insured crop in the crop year, except in the case of double cropping described in section 15(h):

(1) If a second crop is not planted on the same acreage for harvest in the same crop year, you may collect a prevented planting payment that is equal to 100 percent of the prevented planting payment for the acreage for the first insured crop; or

(2) If a second crop is planted on the same acreage for harvest in the same crop year (you will pay the full premium and, if there is an insurable loss to the second crop, receive the full amount of indemnity that may be due for the second crop, regardless of whether there is a subsequent crop planted on the same acreage) and:

   (i) Provided the second crop is not planted on or before the final planting date or during the late planting period (as applicable) for the first insured crop, you may collect a prevented planting payment that is 35 percent of the prevented planting payment for the first insured crop; and

   (ii) Be responsible for premium that is 35 percent of the premium that you would otherwise owe for the first insured crop.

(g) The reduction in the amount of indemnity or prevented planting payment and premium specified in sections 15(e) and 15(f), as applicable, will apply:

(1) Notwithstanding the priority contained in the Agreement to Insure section, which states that the Crop Provisions have priority over the Basic Provisions when a conflict exists, to any premium owed or indemnity or prevented planting payment

made in accordance with the Crop Provisions, and any applicable endorsement.

(2) Even if another person plants the second crop on any acreage where the first insured crop was planted or was prevented from being planted, as applicable.

(3) For prevented planting only:

    (i) If a volunteer crop or cover crop is hayed or grazed from the same acreage, after the late planting period (or after the final planting date if a late planting period is not applicable) for the first insured crop in the same crop year, or is otherwise harvested anytime after the late planting period (or after the final planting date if a late planting period is not applicable); or

    (ii) If you receive cash rent for any acreage on which you were prevented from planting.

(h) You may receive a full indemnity, or a full prevented planting payment for a first insured crop when a second crop is planted on the same acreage in the same crop year, if each of the following conditions are met, regardless of whether or not the second crop is insured or sustains an insurable loss:

(1) Planting two or more crops for harvest in the same crop year in the area is generally recognized by agricultural experts or organic agricultural experts;

(2) The second or more crops are customarily planted after the first insured crop for harvest on the same acreage in the same crop year in the area;

(3) Additional coverage insurance offered under the authority of the Act is available in the county on the two or more crops that are double cropped;

(4) In the case of prevented planting, the second crop is not planted on or prior to the final planting date or, if applicable, prior to the end of the late planting period for the first insured crop;

(5) You provide records, acceptable to us, of acreage and production specific to the double cropped acreage proving that:

    (i) You have double cropped acreage in at least two of the last four crop years in which the first insured crop was planted and incur an insurable loss or the first insured crop is prevented from being planted and a second crop is planted. If you acquired additional land for the current crop year you may apply the percentage of acres that you have previously double cropped to the total cropland acres that you are farming this year (if greater) using the following calculation:

    (A) Determine the number of acres of the first insured crop that were double cropped in each of the years for which double cropping records are provided (For example, records are provided showing: 100 acres of wheat planted in 2016 and 50 of those acres were double cropped with soybeans; and 100

acres of wheat planted in 2017 and 70 of those acres were double cropped with soybeans);

(B) Divide each result of section 15(h)(5)(i)(A) by the number of acres of the first insured crop that were planted in each respective year (In the example above, 50 divided by 100 equals 50 percent of the first insured crop acres that were double cropped in 2016 and 70 divided by 100 equals 70 percent of the first insured crop acres that were double cropped in 2017);

(C) Add the results of section 15(h)(5)(i)(B) and divide by the number of years the first insured crop was double cropped (In the example above, 50 plus 70 equals 120 divided by 2 equals 60 percent); and

(D) Multiply the result of 15(h)(5)(i)(C) by the number of insured acres of the first insured crop (In the example above, 60 percent multiplied by the number of wheat acres insured in 2018); or

    (ii) The applicable acreage was double cropped (by one or more other producers, and the producer(s) will allow you to use their records) for at least two of the last four crop years in which the first insured crop was grown on it; and

(6) If you do not have records of acreage and production specific to the double cropped acreage, as required in section 15(h)(5), but instead have records that combine production from acreage you double cropped with records of production from acreage you did not double crop, we will allocate the first and second crop production to the specific acreage in proportion to the liability for the acreage that was and was not double cropped.

(i) If you provided acceptable records in accordance with section 15(h), your double cropping history is based on the acres historically cropped:

(1) If the records you provided are from acreage you double cropped in at least two of the last four crop years, you may apply your history of double cropping to any acreage of the insured crop in the county (*e.g.*, if you have double cropped 100 acres of wheat and soybeans in the county and you acquire an additional 100 acres in the county, you can apply that history of double cropped acreage to any of the 200 acres in the county as long as it does not exceed 100 acres); or

(2) If the records you provided are from acreage that one or more other producers double cropped in at least two of the last four crop years, you may only use the history of double cropping for the same physical acres from which double cropping records were provided (*e.g.*, if a neighbor has double cropped 100 acres of wheat and soybeans in the county and you acquire your neighbor's 100 double cropped acres and an

additional 100 acres in the county, you can only apply your neighbor's history of double cropped acreage to the same 100 acres that your neighbor double cropped).

(j) If any Federal or State agency requires destruction of any insured crop or crop production, as applicable, because it contains levels of a substance, or has a condition, that is injurious to human or animal health in excess of the maximum amounts allowed by the Food and Drug Administration, other public health organizations of the United States or an agency of the applicable State, you must destroy the insured crop or crop production, as applicable, and certify that such insured crop or crop production has been destroyed prior to receiving an indemnity payment. Failure to destroy the insured crop or crop production, as applicable, will result in you having to repay any indemnity paid and you may be subject to administrative sanctions in accordance with section 515(h) of the Act and 7 CFR part 400, subpart R, and any applicable civil or criminal sanctions.

**16. Late Planting.**

Unless limited by the Crop Provisions, insurance will be provided for acreage planted to the insured crop after the final planting date in accordance with the following:

(a) The production guarantee or amount of insurance for each acre planted to the insured crop during the late planting period will be reduced by 1 percent per day for each day planted after the final planting date.

(b) Acreage planted after the late planting period (or after the final planting date for crops that do not have a late planting period) may be insured as follows:

(1) The production guarantee or amount of insurance for each acre planted as specified in this subsection will be determined by multiplying the production guarantee or amount of insurance that is provided for acreage of the insured crop that is timely planted by the prevented planting coverage level percentage you elected, or that is contained in the Crop Provisions if you did not elect a prevented planting coverage level percentage;

(2) Planting on such acreage must have been prevented by the final planting date (or during the late planting period, if applicable) by an insurable cause occurring within the insurance period for prevented planting coverage; and

(3) All production from insured acreage as specified in this section will be included as production to count for the unit.

(c) The premium amount for insurable acreage specified in this section will be the same as that for timely planted acreage. If the amount of premium you are required to pay (gross premium less our subsidy) for such acreage exceeds the liability, coverage for those acres will not be provided (no premium will be due and no indemnity will be paid).

(d) Any acreage on which an insured cause of loss is a material factor in preventing completion of planting, as specified in the definition of "planted acreage" (e.g., seed is broadcast on the soil surface but cannot be incorporated) will be considered as acreage planted after the final planting date and the production guarantee will be calculated in accordance with section 16(b)(1).

**17. Prevented Planting.**

(a) Unless limited by the policy provisions, a prevented planting payment may be made to you for eligible acreage if:

(1) You are prevented from planting the insured crop on insurable acreage by an insured cause of loss that occurs:

(i) On or after the sales closing date contained in the Special Provisions for the insured crop in the county for the crop year the application for insurance is accepted; or

(ii) For any subsequent crop year, on or after the sales closing date for the previous crop year for the insured crop in the county, provided insurance has been in force continuously since that date. Cancellation for the purpose of transferring the policy to a different insurance provider for the subsequent crop year will not be considered a break in continuity for the purpose of the preceding sentence;

(2) You include on your acreage report any insurable acreage of the insured crop that was prevented from being planted; and

(3) You did not plant the insured crop during or after the late planting period. Acreage planted to the insured crop during or after the late planting period is covered under the late planting provisions.

(b) The actuarial documents may contain additional levels of prevented planting coverage that you may purchase for the insured crop:

(1) Such purchase must be made on or before the sales closing date.

(2) If you do not purchase one of those additional levels by the sales closing date, you will receive the prevented planting coverage specified in the Crop Provisions.

(3) If you have a Catastrophic Risk Protection Endorsement for any crop, the additional levels of prevented planting coverage will not be available for that crop.

(4) You cannot increase your elected or assigned prevented planting coverage level for any crop year if a cause of loss that could prevent planting (even though it is not known whether such cause will actually prevent planting) has occurred during the prevented planting insurance period specified in section 17(a)(1)(i) or (ii) and prior to your request to change your prevented planting coverage level.

(c) The premium amount for acreage that is prevented from being planted will be the same as that for timely planted acreage except as specified in section 15(f). If the amount of premium you are required to pay (gross premium less the subsidy) for acreage that is prevented from being planted exceeds the liability on such acreage, coverage for those acres will not be

provided (no premium will be due and no indemnity will be paid for such acreage).

(d) Prevented planting coverage will be provided against:

    (1) Drought, failure of the irrigation water supply, failure or breakdown of irrigation equipment or facilities, or the inability to prepare the land for irrigation using your established irrigation method, due to an insured cause of loss only if, on the final planting date (or within the late planting period if you elect to try to plant the crop), you provide documentation acceptable to us to establish:

        (i) For non-irrigated acreage, the area that is prevented from being planted has insufficient soil moisture for germination of seed or progress toward crop maturity due to a prolonged period of dry weather. The documentation for prolonged period of dry weather must be verifiable using information collected by sources whose business it is to record and study the weather, including, but not limited to, local weather reporting stations of the National Weather Service; or

        (ii) For irrigated acreage:

            (A) Due to an insured cause of loss, there is not a reasonable expectation of having adequate water to carry out an irrigated practice or you are unable to prepare the land for irrigation using your established irrigation method:

                (1) If you knew or had reason to know on the final planting date or during the late planting period that your water will be reduced, no reasonable expectation exists; and

                (2) Available water resources will be verified using information from State Departments of Water Resources, U.S. Bureau of Reclamation, Natural Resources Conservation Service or other sources whose business includes collection of water data or regulation of water resources; or

            (B) The irrigation equipment or facilities have failed or broken down if such failure or breakdown is due to an insured cause of loss specified in section 12(d).

    (2) Causes other than drought, failure of the irrigation water supply, failure or breakdown of the irrigation equipment or facilities, or your inability to prepare the land for irrigation using your established irrigation method, provided the cause of loss is specified in the Crop Provisions. However, if it is possible for you to plant on or prior to the final planting date when other producers in the area are planting and you fail to plant, no prevented planting payment will be made.

(e) The maximum number of acres that may be eligible for a prevented planting payment for any crop will be determined as follows:

    (1) The total number of acres eligible for prevented planting coverage for all crops cannot exceed the number of acres of cropland in your farming operation for the crop year, unless you are eligible for prevented planting coverage on double cropped acreage in accordance with section 17(f)(4). The eligible acres for each insured crop will be determined as follows:

        (i) If you have planted any crop in the county for which prevented planting insurance was available (you will be considered to have planted if your APH database contains actual planted acres) or have received a prevented planting insurance guarantee in any one or more of the four most recent crop years, and the insured crop is not required to be contracted with a processor to be insured:

            (A) The number of eligible acres will be the maximum number of acres certified for APH purposes, or insured acres reported, for the crop in any one of the four most recent crop years (not including reported prevented planting acreage that was planted to a second crop unless you meet the double cropping requirements in section 17(f)(4)).

            (B) If you acquire additional land for the current crop year, the number of eligible acres determined in section 17(e)(1)(i)(A) for a crop may be increased by multiplying it by the ratio of the total cropland acres that you are farming this year (if greater) to the total cropland acres that you farmed in the previous year, provided that:

                (1) You submit proof to us that you acquired additional acreage for the current crop year by any of the methods specified in section 17(f)(12);

                (2) The additional acreage was acquired in time to plant it for the current crop year using good farming practices; and

                (3) No cause of loss has occurred at the time you acquire the acreage that may prevent planting (except acreage you leased the previous year and continue to lease in the current crop year).

            (C) If you add adequate irrigation facilities to your existing non-irrigated acreage or if you acquire additional land for the current crop year that has adequate irrigation facilities, the number of eligible acres determined in section 17(e)(1)(i)(A) for irrigated acreage of a

NHF2-527 Policy 000038

crop may be increased by multiplying it by the ratio of the total irrigated acres that you are farming this year (if greater) to the total irrigated acres that you farmed in the previous year, provided the conditions in sections 17(e)(1)(i)(B)(*1*), (*2*) and (*3*) are met. If there were no irrigated acres in the previous year, the eligible irrigated acres for a crop will be limited to the lesser of the number of eligible non-irrigated acres of the crop or the number of acres on which adequate irrigation facilities were added.

(ii) If you have not planted any crop in the county for which prevented planting insurance was available (you will be considered to have planted if your APH database contains actual planted acres) or have not received a prevented planting insurance guarantee in all of the four most recent crop years, and the insured crop is not required to be contracted with a processor to be insured:

(A) The number of eligible acres will be:

(*1*) The number of acres specified on your intended acreage report, which must be submitted to us by the sales closing date for all crops you insure for the crop year and that is accepted by us; or

(*2*) The number of acres specified on your intended acreage report, which must be submitted to us within 10 days of the time you acquire the acreage and that is accepted by us, if, on the sales closing date, you do not have any acreage in a county and you subsequently acquire acreage through a method described in section 17(f)(12) in time to plant it using good farming practices.

(B) The total number of acres listed on the intended acreage report may not exceed the number of acres of cropland in your farming operation at the time you submit the intended acreage report.

(C) If you acquire additional acreage after we accept your intended acreage report, the number of acres determined in section 17(e)(1)(ii)(A) may be increased in accordance with section 17(e)(1)(i)(B) and (C).

(D) Prevented planting coverage will not be provided for any acreage included on the intended acreage report or any increased amount of acreage determined in accordance with section 17(e)(1)(ii)(C) if a cause of loss that may prevent planting occurred before the acreage was acquired, as determined by us.

(iii) For any crop that must be contracted with a processor to be insured:

(A) The number of eligible acres will be:

(*1*) The number of acres of the crop specified in the processor contract, if the contract specifies a number of acres contracted for the crop year;

(*2*) The result of dividing the quantity of production stated in the processor contract by your approved yield, if the processor contract specifies a quantity of production that will be accepted (for the purposes of establishing the number of prevented planting acres, any reductions applied to the transitional yield for failure to certify acreage and production for four prior years will not be used); or

(*3*) Notwithstanding sections 17(e)(1)(iii)(A)(*1*) and (*2*), if a minimum number of acres or amount of production is specified in the processor contract, this amount will be used to determine the eligible acres.

(B) If a processor cancels or does not provide contracts, or reduces the contracted acreage or production from what would have otherwise been allowed, solely because the acreage was prevented from being planted due to an insured cause of loss, we will determine the number of eligible acres based on the number of acres or amount of production you had contracted in the county in the previous crop year. If the applicable Crop Provisions require that the price election be based on a contract price, and a contract is not in force for the current year, the price election will be based on the contract price in place for the previous crop year. If you did not have a processor contract in place for the previous crop year, you will not have any eligible prevented planting acreage for the applicable processor crop. The total eligible prevented planting acres in all counties cannot exceed the total number of acres or amount of production contracted in all counties in the previous crop year.

(2) Any eligible acreage determined in accordance with section 17(e)(1) will be reduced by subtracting the number of acres of the crop (insured and uninsured) that are timely and late planted, including acreage specified in section 16(b).

(f) Regardless of the number of eligible acres determined in section 17(e), prevented planting coverage will not be provided for any acreage:

(1) That does not constitute at least 20 acres or 20 percent of the insurable crop acreage in the unit, whichever is less (If the crop is in a whole-farm unit, the 20 acre or 20 percent requirement will be applied separately to each crop in the whole-farm unit). Any prevented planting acreage within a field that contains planted acreage will be considered to be acreage of the same crop, type, and practice that is planted in the field unless:

(i) The acreage that was prevented from being planted constitutes at least 20 acres or 20 percent of the total insurable acreage in the field and you produced both crops, crop types, or followed both practices in the same field in the same crop year within any one of the four most recent crop years;

(ii) You were prevented from planting a first insured crop and you planted a second crop in the field (There can only be one first insured crop in a field unless the requirements in section 17(f)(1)(i) or (iii) are met); or

(iii) The insured crop planted in the field would not have been planted on the remaining prevented planting acreage (e.g., where rotation requirements would not be met or you already planted the total number of acres specified in the processor contract);

(2) For which the actuarial documents do not provide the information needed to determine the premium rate, unless a written agreement designates such premium rate;

(3) Used for conservation purposes, intended to be left unplanted under any program administered by the USDA or other government agency, or required to be left unharvested under the terms of the lease or any other agreement (The number of acres eligible for prevented planting will be limited to the number of acres specified in the lease for which you are required to pay either cash or share rent);

(4) On which the insured crop is prevented from being planted, if you or any other person receives a prevented planting payment for any crop for the same acreage in the same crop year, excluding share arrangements, unless:

(i) It is a practice that is generally recognized by agricultural experts or organic agricultural experts in the area to plant the insured crop for harvest following harvest of the first insured crop, and additional coverage insurance offered under the authority of the Act is available in the county for both crops in the same crop year;

(ii) For the insured crop that is prevented from being planted, you provide records acceptable to us of acreage and production that show, in at least two of the last four crop years:

(A) You have double cropped acreage on which the insured crop that is prevented from being planted in the current crop year was grown (You may apply your history of double cropping to any acreage of the insured crop in the county (e.g., if you have double cropped 100 acres of wheat and soybeans in the county and you acquire an additional 100 acres in the county, you can apply that history of double cropped acreage to any of the 200 acres in the county as long as it does not exceed 100 acres)); or

(B) The acreage you are prevented from planting in the current crop year was double cropped with the insured crop that is prevented from being planted (You may only use the history of double cropping for the same physical acres from which double cropping records were provided (e.g., if a neighbor has double cropped 100 acres of wheat and soybeans in the county and you acquire your neighbor's 100 double cropped acres and an additional 100 acres in the county, you can only apply your neighbor's history of double cropped acreage to the same 100 acres that your neighbor double cropped)); and

(iii) The amount of acreage you are double cropping in the current crop year does not exceed the number of acres for which you provided the records required in section 17(f)(4)(ii);

(5) On which the insured crop is prevented from being planted, if:

(i) Any crop is planted within or prior to the late planting period or on or prior to the final planting date if no late planting period is applicable, unless:

(A) You meet the double cropping requirements in section 17(f)(4);

(B) The crop planted was a cover crop; or

(C) No benefit, including any benefit under any USDA program, was derived from the crop; or

(ii) Any volunteer or cover crop is hayed, grazed or otherwise harvested within or prior to the late planting period or on or prior to the final planting date if no late planting period is applicable;

(6) For which planting history or conservation plans indicate the acreage would have remained fallow for crop rotation purposes or on which any pasture or forage crop is in place on the acreage during the time planting of the insured crop generally occurs in the area. Cover plants that are seeded, transplanted, or that volunteer:

(i) More than 12 months prior to the final planting date for the insured crop that was prevented from being planted will be considered pasture or a forage crop that is in place (e.g., the cover crop is planted 15 months prior to the final planting date and remains in place during the time the insured crop would normally be planted); or

(ii) Less than 12 months prior to the final planting date for the insured crop that was prevented from being planted will not be considered pasture or a forage crop that is in place;

(7) That exceeds the number of acres eligible for a prevented planting payment;

(8) That exceeds the number of eligible acres physically available for planting;

(9) For which you cannot provide proof that you had the inputs (including, but not limited to, sufficient equipment and labor) available to plant and produce a crop with the expectation of producing at least the yield used to determine your production guarantee or amount of insurance. Evidence that you previously had planted the crop on the unit will be considered adequate proof unless:

(i) There has been a change in the availability of inputs since the crop was last planted that could affect your ability to plant and produce the insured crop;

(ii) We determine you have insufficient inputs to plant the total number of insured crop acres (*e.g.*, you will not receive a prevented planting payment if you have sufficient inputs to plant only 80 acres but you have already planted 80 acres and are claiming prevented planting on an additional 100 acres); or

(iii) Your planting practices or rotational requirements show the acreage would have remained fallow or been planted to another crop;

(10) Based on an irrigated practice production guarantee or amount of insurance unless adequate irrigation facilities were in place to carry out an irrigated practice on the acreage prior to the insured cause of loss that prevented you from planting.  Acreage with an irrigated practice production guarantee will be limited to the number of acres allowed for that practice under sections 17(e) and (f);

(11) Based on a crop type that you did not plant, or did not receive a prevented planting insurance guarantee for, in at least one of the four most recent crop years:

(i) Types for which separate projected prices or price elections, as applicable, amounts of insurance, or production guarantees are available must be included in your APH database in at least one of the four most recent crop years (Crops for which the insurance guarantee is not based on APH must be reported on your acreage report in at least one of the four most recent crop years) except as allowed in section 17(e)(1)(ii) or (iii); and

(ii) We will limit prevented planting payments based on a specific crop type to the number of acres allowed for that crop type as specified in sections 17(e) and (f); or

(12) If a cause of loss has occurred that may prevent planting at the time:

(i) You lease the acreage (except acreage you leased the previous crop year and continue to lease in the current crop year);

(ii) You buy the acreage;

(iii) The acreage is released from a USDA program which prohibits harvest of a crop;

(iv) You request a written agreement to insure the acreage; or

(v) You acquire the acreage through means other than lease or purchase (such as inherited or gifted acreage).

(g) If you purchased an additional coverage policy for a crop, and you executed a High-Risk Land Exclusion Option that separately insures acreage which has been designated as "high-risk" land by FCIC under a Catastrophic Risk Protection Endorsement for that crop, the maximum number of acres eligible for a prevented planting payment will be limited for each policy as specified in sections 17(e) and (f).

(h) If you are prevented from planting a crop for which you do not have an adequate base of eligible prevented planting acreage, as determined in accordance with section 17(e)(1), we will use acreage from another crop insured for the current crop year for which you have remaining eligible prevented planting acreage.

(1) The crop first used for this purpose will be the insured crop that would have a prevented planting payment most similar to the payment for the crop that was prevented from being planted.

(i) If there are still insufficient eligible prevented planting acres, the next crop used will be the insured crop that would have the next closest prevented planting payment.

(ii) In the event payment amounts based on other crops are an equal amount above and below the payment amount for the crop that was prevented from being planted, eligible acres for the crop with the higher payment amount will be used first.

(2) The prevented planting payment and premium will be based on:

(i) The crop that was prevented from being planted if the insured crop with remaining eligible acreage would have resulted in a higher prevented planting payment than would have been paid for the crop that was prevented from being planted; or

(ii) The crop from which eligible acres are being used if the insured crop with remaining eligible acreage will result in a lower prevented planting payment than would have been paid for the crop that was prevented from being planted.

(3) For example, assume you were prevented from planting 200 acres of corn and have 100 acres eligible for a corn prevented planting guarantee that would result in a payment of $40 per acre. You also had 50 acres of potato eligibility that would result in a $100 per acre payment and 90 acres of grain sorghum eligibility that would result in a $30 per acre payment.  Your prevented planting coverage will be based on 100 acres of

corn ($40 per acre), 90 acres of grain sorghum ($30 per acre), and an additional 10 acres of corn (using potato eligible acres and paid as corn at $40 per acre). Your prevented planting payment would be $7,100 ($4,000 + $2,700 + $400).

(4) Prevented planting coverage will be allowed as specified in section 17(h) only if the crop that was prevented from being planted meets all policy provisions, except for having an adequate base of eligible prevented planting acreage. Payment may be made based on crops other than those that were prevented from being planted even though other policy provisions, including but not limited to, processor contract and rotation requirements, have not been met for the crop whose eligible acres are being used.

(5) An additional administrative fee will not be due as a result of using eligible prevented planting acreage as specified in section 17(h).

(i) The prevented planting payment for any eligible acreage within a unit will be determined by:

(1) Multiplying the prevented planting coverage level percentage you elected, or that is contained in the Crop Provisions if you did not elect a prevented planting coverage level percentage, by:
   (i) Your amount of insurance per acre; or
   (ii) The amount determined by multiplying the production guarantee (per acre) for timely planted acreage of the insured crop (or type, if applicable) by your price election or your projected price, whichever is applicable;

(2) Multiplying the result of section 17(i)(1) by the number of eligible prevented planting acres in the unit; and

(3) Multiplying the result of section 17(i)(2) by your share.

**18. Written Agreements.**

Terms of this policy which are specifically designated for the use of written agreements may be altered by written agreement in accordance with the following:

(a) You must apply in writing for each written agreement (including renewal of a written agreement) no later than the sales closing date, except as provided in section 18(e);

(b) The application for a written agreement must contain all variable terms of the contract between you and us that will be in effect if the written agreement is not approved;

(c) If approved by FCIC, the written agreement will include all variable terms of the contract, including, but not limited to, the crop; practice, type or variety; guarantee; premium rate; and projected price, harvest price, price election or amount of insurance, as applicable, or the information needed to determine such variable terms. If the written agreement is for a county:

(1) That has a price election or amount of insurance stated in the actuarial documents for the crop, practice, type or variety, the written agreement will contain the price election or amount of insurance stated in the actuarial documents for the crop, practice, type or variety;

(2) That does not have price elections or amounts of insurance stated in the actuarial documents for

the crop, practice, type or variety, the written agreement will contain a price election or amount of insurance that does not exceed the price election or amount of insurance contained in the actuarial documents for the county that is used to establish the other terms of the written agreement, unless otherwise authorized by the Crop Provisions;

(3) For which revenue protection is not available for the crop, but revenue protection is available in the State for the crop, the written agreement will contain the information used to establish the projected price and harvest price, as applicable, for that State; or

(4) In a State for which revenue protection is not available for the crop, but revenue protection is available for the crop in another State, the written agreement is available for yield protection only, and will contain the information needed to determine the projected price for the crop from another State as determined by FCIC;

(d) Each written agreement will only be valid for the number of crop years specified in the written agreement, and a multi-year written agreement:

(1) Will only apply for any particular crop year designated in the written agreement if all terms and conditions in the written agreement are still applicable for the crop year and the conditions under which the written agreement has been provided have not changed prior to the beginning of the insurance period (If conditions change during or prior to the crop year, the written agreement will not be effective for that crop year but may still be effective for a subsequent crop year if conditions under which the written agreement has been provided exist for such year);

(2) May be canceled in writing by:
   (i) FCIC not less than 30 days before the cancellation date if it discovers that any term or condition of the written agreement, including the premium rate, is not appropriate for the crop; or
   (ii) You or us on or before the cancellation date;

(3) That is not renewed in writing after it expires, is not applicable for a crop year, or is canceled, then insurance coverage will be in accordance with the terms and conditions stated in this policy, without regard to the written agreement; and

(4) Will be automatically canceled if you transfer your policy to another insurance provider (No notice will be provided to you and for any subsequent crop year, for a written agreement to be effective, you must timely request renewal of the written agreement in accordance with this section);

(e) A request for a written agreement may be submitted:

(1) After the sales closing date, but on or before the acreage reporting date, if you demonstrate your physical inability to submit the request on or before the sales closing date (e.g., you have been hospitalized or a blizzard has made it impossible to submit the written agreement request in person or by mail); or

(2) For the first year the written agreement is requested:

   (i) On or before the acreage reporting date to:

     (A) Insure unrated land, or an unrated practice, type or variety of a crop; although, if required by FCIC, such written agreements may be approved only after appraisal of the acreage by us and:

       (1) The crop's potential is equal to or exceeds 90 percent of the yield used to determine your production guarantee or amount of insurance; and

       (2) You sign the written agreement no later than the date the first field is appraised or by the expiration date for you to accept the offer, whichever comes first; or

     (B) Establish optional units in accordance with FCIC procedures that otherwise would not be allowed or change the premium rate or transitional yield for designated high-risk land;

   (ii) On or before the cancellation date to insure a crop in a county that does not have actuarial documents for the crop (If the Crop Provisions do not provide a cancellation date for the county, the cancellation date for other insurable crops in the same State that have similar final planting and harvesting dates will be applicable); or

   (iii) On or before the date specified in the Crop Provisions or Special Provisions;

(f) A request for a written agreement must contain:

   (1) For all written agreement requests:

     (i) A completed "Request for Actuarial Change" form;

     (ii) A completed APH (only for crop policies that require APH) based on verifiable records of actual yields for the crop and county for which the written agreement is being requested (the actual yields do not necessarily have to be from the same physical acreage for which you are requesting a written agreement), and verifiable records of actual yields if required by FCIC;

     (iii) Evidence from agricultural experts or organic agricultural experts, as applicable, that the crop can be produced in the area if the request is to provide insurance for the crop, practices, types, or varieties that are not insurable, unless we are notified in writing by FCIC that such evidence is not required by FCIC;

     (iv) The legal description of the land (in areas where legal descriptions are available) and the FSA farm number including tract and field numbers, if available. The submission must also include an FSA aerial photograph, or field boundaries derived by a Geographic Information System or Global Positioning System, or other legible maps delineating field boundaries where you intend to plant the crop for which insurance is requested; and

     (v) For any perennial crop, an inspection report completed by us;

   (2) For written agreement requests for counties without actuarial documents for the crop, the requirements in section 18(f)(1) (except section 18(f)(1)(ii)) and:

     (i) For a crop you (or anyone with a substantial beneficial interest in you) have previously planted (or produced a crop if the crop is a perennial crop) in the county or area for at least three years:

       (A) A completed APH (only for crop policies that require APH) based on verifiable production records of actual yields for the crop; and

       (B) Verifiable production records for at least the three most recent crop years in which the crop was planted (or produced a crop if the crop is a perennial crop):

         (1) The verifiable production records do not necessarily have to be from the same physical acreage for which you are requesting a written agreement;

         (2) Verifiable production records do not have to be submitted for any year you (or anyone with a substantial beneficial interest in you) have insured the crop in the county or area and have certified the yields on the applicable production reports or the yields are based on your insurance claim (although you are not required to submit production records, you still must maintain production records in accordance with section 21); and

         (3) FCIC will not consider any crop year in which the crop was planted (or produced a crop if the crop is a perennial crop) outside of the most recent ten crop years as a year of previously planting the crop (or having produced a crop if the crop is a perennial crop), unless verifiable production records are provided, or the crop was insured for that crop year;

     (ii) For a crop you (or anyone with a substantial beneficial interest in you) have not previously planted (or produced a crop if the crop is a perennial crop) in the county or area for at least three years:

       (A) A completed APH (only for crop policies that require APH) based on verifiable production records of actual yields for the similar crop;

       (B) Verifiable production records for at least the three most recent crop years in which the similar crop was planted (or

(31 of 42)

produced a crop if the crop is a perennial crop) in the county or area:

(1) The verifiable production records for the similar crop do not necessarily have to be from the same physical acreage for which you are requesting a written agreement;

(2) Verifiable production records do not have to be submitted for any crop year you (or anyone with a substantial beneficial interest in you) have insured the similar crop in the county or area and have certified the yields on the applicable production reports or the yields are based on your insurance claim (although you are not required to submit production records, you still must maintain production records in accordance with section 21); and

(3) FCIC will not consider any crop year in which the similar crop was planted (or produced a crop if the crop is a perennial crop) outside of the most recent ten crop years as a year of previously planting the similar crop (or having produced a crop if the crop is a perennial crop), unless verifiable production records are provided, or the similar crop was insured, for that crop year;

(C) If you (or anyone with a substantial beneficial interest in you) have at least one year of production records, but less than three years of production records, for the crop in the county or area but have production records for a similar crop in the county or area such that the combination of both sets of records results in at least three years of production records, you must provide the information required in sections 18(f)(2)(i)(A) and (B) for the years you (or anyone with a substantial beneficial interest in you) planted the crop (or produced a crop if the crop is a perennial crop) in the county or area and the information required in sections 18(f)(2)(ii)(A) and (B) regarding the similar crop for the remaining years; and

(D) A similar crop to the crop for which a written agreement is being requested must:

(1) Be included in the same category of crops, e.g., row crops (including, but not limited to, small grains, coarse grains, and oil seed crops), vegetable crops grown in rows, tree crops, vine crops, bush crops, etc., as defined by FCIC;

(2) Have substantially the same growing season (i.e., normally planted around the same dates and harvested around the same dates);

(3) Require comparable agronomic conditions (e.g., comparable needs for water, soil, etc.); and

(4) Be subject to substantially the same risks (frequency and severity of loss would be expected to be comparable from the same cause of loss);

(iii) The dates you and other growers in the area normally plant and harvest the crop, if applicable;

(iv) The name, location of, and approximate distance to the place the crop will be sold or used by you; and

(v) For any irrigated practice, the water source, method of irrigation, and the amount of water needed for an irrigated practice for the crop; and

(3) Such other information as specified in the Special Provisions or required by FCIC;

(g) A request for a written agreement will not be accepted if:

(1) The request is submitted to us after the applicable deadline contained in sections 18(a) or (e);

(2) All the information required in section 18(f) is not submitted to us with the request for a written agreement (The request for a written agreement may be accepted if any missing information is available from other acceptable sources); or

(3) The request is not authorized by the policy;

(h) A request for a written agreement will be denied if:

(1) FCIC determines the risk is excessive;

(2) Your APH history demonstrates you have not produced at least 50 percent of the transitional yield for the crop, type, and practice obtained from the county, or a county with similar agronomic conditions and risk exposure, when previously grown;

(3) There is not adequate information available to establish an actuarially sound premium rate and insurance coverage for the crop and acreage;

(4) The crop, or a similar crop, was not previously grown in the county or area, or there is no evidence of a market for the crop (applicable only for counties without actuarial documents); or

(5) Agricultural experts or organic agricultural experts determine the crop, practice, or type is not adapted to the county;

(i) A written agreement will be denied unless:

(1) FCIC approves the written agreement;

(2) The original written agreement is signed by you and delivered to us, or postmarked, not later than the expiration date for you to accept the offer;

(3) We accept the written agreement offer; and

(4) The crop meets the minimum appraisal amount specified in section 18(e)(2)(i)(A)(1), if applicable;

(j) Multi-year written agreements may be canceled and requests for renewal may be rejected if the severity or frequency of your loss experience under the written agreement is significantly worse than expected based

on the information provided by you or used to establish your premium rate and the loss experience of other crops with similar risks in the area;

(k) With respect to your and our ability to reject an offer for a written agreement:

    (1) When a single Request for Actuarial Change form is submitted, regardless of how many requests for changes are contained on the form, you and we can only accept or reject the written agreement in its entirety (you cannot reject specific terms of the written agreement and accept others);

    (2) When multiple Request for Actuarial Change forms are submitted, regardless of when the forms are submitted, for the same condition or for the same crop (i.e., to insure corn on ten legal descriptions where there are no actuarial documents in the county or the request is to change the premium rates from the high-risk rates) all these forms may be treated as one request and you and we will only have the option of accepting or rejecting the written agreement in its entirety (you cannot reject specific terms of the written agreement and accept others);

    (3) When multiple Request for Actuarial Change forms are submitted, regardless of when the forms are submitted, for the different conditions or for different crops, separate agreements may be issued and you and we will have the option to accept or reject each written agreement; and

    (4) If we reject an offer for a written agreement approved by FCIC, you may seek arbitration or mediation of our decision to reject the offer in accordance with section 20;

(l) Any information that is submitted by you after the applicable deadlines in sections 18(a) and (e) will not be considered, unless such information is specifically requested in accordance with section 18(f)(3);

(m) If the written agreement or the policy is canceled for any reason, or the period for which an existing written agreement is in effect ends, a request for renewal of the written agreement must contain all the information required by this section and be submitted in accordance with section 18(a), unless otherwise specified by FCIC;

(n) If a request for a written agreement is not approved by FCIC, a request for a written agreement for any subsequent crop year that fails to address the stated basis for the denial will not be accepted (If the request for a written agreement contains the same information that was previously rejected or denied, you will not have any right to arbitrate, mediate or appeal the non-acceptance of your request); and

(o) If you disagree with any determination made by FCIC under section 18, you may obtain administrative review in accordance with 7 CFR part 400, subpart J or appeal in accordance with 7 CFR part 11, unless you have failed to comply with the provisions contained in section 18(g) or section 18(i)(2) or (4).

**19. Crops as Payment.**

You must not abandon any crop to us.  We will not accept any crop as compensation for payments due us.

**20. Mediation, Arbitration, Appeal, Reconsideration, and Administrative and Judicial Review.**

(a) If you and we fail to agree on any determination made by us except those specified in section 20(d) or (e), the disagreement may be resolved through mediation in accordance with section 20(g).  If resolution cannot be reached through mediation, or you and we do not agree to mediation, the disagreement must be resolved through arbitration in accordance with the rules of the American Arbitration Association (AAA), except as provided in sections 20(c) and (f), and unless rules are established by FCIC for this purpose.  Any mediator or arbitrator with a familial, financial or other business relationship to you or us, or our agent or loss adjuster, is disqualified from hearing the dispute.

    (1) All disputes involving determinations made by us, except those specified in section 20(d) or (e), are subject to mediation or arbitration.  However, if the dispute in any way involves a policy or procedure interpretation, regarding whether a specific policy provision or procedure is applicable to the situation, how it is applicable, or the meaning of any policy provision or procedure, either you or we must obtain an interpretation from FCIC in accordance with 7 CFR part 400, subpart X or such other procedures as established by FCIC.

        (i) Any interpretation by FCIC will be binding in any mediation or arbitration.

        (ii) Failure to obtain any required interpretation from FCIC will result in the nullification of any agreement or award.

        (iii) An interpretation by FCIC of a policy provision is considered a determination that is a matter of general applicability.

        (iv) An interpretation by FCIC of a procedure may be appealed to the National Appeals Division in accordance with 7 CFR part 11.

    (2) Unless the dispute is resolved through mediation, the arbitrator must provide to you and us a written statement describing the issues in dispute, the factual findings, the determinations and the amount and basis for any award and breakdown by claim for any award.  The statement must also include any amounts awarded for interest.  Failure of the arbitrator to provide such written statement will result in the nullification of all determinations of the arbitrator.  All agreements reached through settlement, including those resulting from mediation, must be in writing and contain at a minimum a statement of the issues in dispute and the amount of the settlement.

(b) Regardless of whether mediation is elected:

    (1) The initiation of arbitration proceedings must occur within one year of the date we denied your claim or rendered the determination with which you disagree, whichever is later;

    (2) If you fail to initiate arbitration in accordance with section 20(b)(1) and complete the process, you will not be able to resolve the dispute through judicial review;

    (3) If arbitration has been initiated in accordance with section 20(b)(1) and completed, and judicial review is sought, suit must be filed not later than one year after the date the arbitration decision was rendered; and

(4)  In any suit, if the dispute in any way involves a policy or procedure interpretation, regarding whether a specific policy provision or procedure is applicable to the situation, how it is applicable, or the meaning of any policy provision or procedure, an interpretation must be obtained from FCIC in accordance with 7 CFR part 400, subpart X or such other procedures as established by FCIC.  Such interpretation will be binding.

(c)  Any decision rendered in arbitration is binding on you and us unless judicial review is sought in accordance with section 20(b)(3).  Notwithstanding any provision in the rules of the AAA, you and we have the right to judicial review of any decision rendered in arbitration.

(d)  With respect to good farming practices:

(1)  We will make decisions regarding what constitutes a good farming practice and determinations of assigned production for uninsured causes for your failure to use good farming practices.

(i)  If you disagree with our decision of what constitutes a good farming practice, you must request a determination from FCIC of what constitutes a good farming practice before filing any suit against FCIC.

(ii)  If you disagree with our determination of the amount of assigned production, you must use the arbitration or mediation process contained in this section.

(iii)  You may not sue us for our decisions regarding whether good farming practices were used by you.

(2)  FCIC will make determinations regarding what constitutes a good farming practice.  If you do not agree with any determination made by FCIC:

(i)  You may request reconsideration by FCIC of this determination in accordance with the reconsideration process established for this purpose and published at 7 CFR part 400, subpart J; or

(ii)  You may file suit against FCIC.

(A)  You are not required to request reconsideration from FCIC before filing suit.

(B)  Any suit must be brought against FCIC in the United States district court for the district in which the insured acreage is located.

(C)  Suit must be filed against FCIC not later than one year after the date:

(*1*)  Of the determination; or

(*2*)  Reconsideration is completed, if reconsideration was requested under section 20(d)(2)(i).

(e)  Except as provided in sections 18(n) or (o), or 20(d) or (k), if you disagree with any other determination made by FCIC or any claim where FCIC is directly involved in the claims process or directs us in the resolution of the claim, you may obtain an administrative review in accordance with 7 CFR part 400, subpart J (administrative review) or appeal in accordance with 7 CFR part 11 (appeal).

(1)  If you elect to bring suit after completion of any appeal, such suit must be filed against FCIC not later than one year after the date of the decision rendered in such appeal.

(2)  Such suit must be brought in the United States district court for the district in which the insured acreage is located.

(3)  Under no circumstances can you recover any attorney fees or other expenses, or any punitive, compensatory or any other damages from FCIC.

(f)  In any mediation, arbitration, appeal, administrative review, reconsideration or judicial process, the terms of this policy, the Act, and the regulations published at 7 CFR chapter IV, including the provisions of 7 CFR part 400, subpart P, are binding.  Conflicts between this policy and any state or local laws will be resolved in accordance with section 31.  If there are conflicts between any rules of the AAA and the provisions of your policy, the provisions of your policy will control.

(g)  To resolve any dispute through mediation, you and we must both:

(1)  Agree to mediate the dispute;

(2)  Agree on a mediator; and

(3)  Be present, or have a designated representative who has authority to settle the case present, at the mediation.

(h)  Except as provided in section 20(i), no award or settlement in mediation, arbitration, appeal, administrative review or reconsideration process or judicial review can exceed the amount of liability established or which should have been established under the policy, except for interest awarded in accordance with section 26.

(i)  In a judicial review only, you may recover attorneys fees or other expenses, or any punitive, compensatory or any other damages from us only if you obtain a determination from FCIC that we, our agent or loss adjuster failed to comply with the terms of this policy or procedures issued by FCIC and such failure resulted in you receiving a payment in an amount that is less than the amount to which you were entitled.  Requests for such a determination should be addressed to the following: USDA/RMA/Deputy Administrator of Compliance/ Stop 0806, 1400 Independence Avenue, SW., Washington, D.C. 20250-0806.

(j)  If FCIC elects to participate in the adjustment of your claim, or modifies, revises or corrects your claim, prior to payment, you may not bring an arbitration, mediation or litigation action against us.  You must request administrative review or appeal in accordance with section 20(e).

(k)  Any determination made by FCIC that is a matter of general applicability is not subject to administrative review under 7 CFR part 400, subpart J or appeal under 7 CFR part 11.  If you want to seek judicial review of any FCIC determination that is a matter of general applicability, you must request a determination of non-appealability from the Director of the National Appeals Division in accordance with 7 CFR 11.6 before seeking judicial review.

**21.  Access to Insured Crop and Records, and Record Retention.**

(a)  We, and any employee of USDA authorized to investigate or review any matter relating to crop

(34 of 42)

insurance, have the right to examine the insured crop and all records related to the insured crop and any mediation, arbitration or litigation involving the insured crop as often as reasonably required during the record retention period.

(b) You must retain, and provide upon our request, or the request of any employee of USDA authorized to investigate or review any matter relating to crop insurance:

  (1) Complete records of the planting, replanting, inputs, production, harvesting, and disposition of the insured crop on each unit for three years after the end of the crop year (This requirement also applies to all such records for acreage that is not insured);

  (2) All records used to establish the amount of production you certified on your production reports used to compute your approved yield for three years after the calendar date for the end of the insurance period for the crop year for which you initially certified such records, unless such records have already been provided to us (*e.g.*, if you are a new insured and you certify 2015 through 2018 crop year production records in 2019 to determine your approved yield for the 2019 crop year, you must retain all records from the 2015 through 2018 crop years through the 2022 crop year. If you subsequently certify records of the 2019 crop year in 2020 to determine your approved yield for the 2020 crop year, you must retain the 2019 crop year records through the 2023 crop year and so forth for each subsequent year of production records certified); and

  (3) While you are not required to maintain records beyond the record retention period specified in section 21(b)(2), at any time, if we or FCIC have evidence that you, or anyone assisting you, knowingly misreported any information related to any yield you have certified, we or FCIC will replace all yields in your APH database determined to be incorrect with the lesser of an assigned yield determined in accordance with section 3 or the yield determined to be correct:

    (i) If an overpayment has been made to you, you will be required to repay the overpaid amount; and

    (ii) Replacement of yields in accordance with section 21(b)(3) does not exempt you from other sanctions applicable under the terms of the policy or any applicable law.

(c) We, or any employee of USDA authorized to investigate or review any matter relating to crop insurance, may extend the record retention period beyond three years by notifying you of such extension in writing.

(d) By signing the application for insurance authorized under the Act or by continuing insurance for which you have previously applied, you authorize us or USDA, or any person acting for us or USDA authorized to investigate or review any matter relating to crop insurance, to obtain records relating to the planting, replanting, inputs, production, harvesting, and disposition of the insured crop from any person who

may have custody of such records, including but not limited to, FSA offices, banks, warehouses, gins, cooperatives, marketing associations, and accountants. You must assist in obtaining all records we or any employee of USDA authorized to investigate or review any matter relating to crop insurance request from third parties.

(e) Failure to provide access to the insured crop or the farm, authorize access to the records maintained by third parties or assist in obtaining such records will result in a determination that no indemnity is due for the crop year in which such failure occurred.

(f) Failure to maintain or provide records will result in:

  (1) The imposition of an assigned yield in accordance with section 3(f)(1) and 7 CFR part 400, subpart G for those crop years for which you do not have the required production records to support a certified yield;

  (2) A determination that no indemnity is due if you fail to provide records necessary to determine your loss;

  (3) Combination of the optional units into the applicable basic unit;

  (4) Assignment of production to the units by us if you fail to maintain separate records:

    (i) For your basic units; or

    (ii) For any uninsurable acreage; and

  (5) The imposition of consequences specified in section 6(g), as applicable.

(g) If the imposition of an assigned yield under section 21(f)(1) would affect an indemnity, prevented planting payment or replanting payment that was paid in a prior crop year, such claim will be adjusted and you will be required to repay any overpaid amounts.

**22. Other Insurance.**

(a) **Other Like Insurance** - Nothing in this section prevents you from obtaining other insurance not authorized under the Act. However, unless specifically required by policy provisions, you must not obtain any other crop insurance authorized under the Act on your share of the insured crop. If you cannot demonstrate that you did not intend to have more than one policy in effect, you may be subject to the consequences authorized under this policy, the Act, or any other applicable statute. If you can demonstrate that you did not intend to have more than one policy in effect (For example, an application to transfer your policy or written notification to an insurance provider that states you want to purchase, or transfer, insurance and you want any other policies for the crop canceled would demonstrate you did not intend to have duplicate policies), and:

  (1) One is an additional coverage policy and the other is a Catastrophic Risk Protection policy:

    (i) The additional coverage policy will apply if both policies are with the same insurance provider or, if not, both insurance providers agree; or

    (ii) The policy with the earliest date of application will be in force if both insurance providers do not agree; or

  (2) Both are additional coverage policies or both are Catastrophic Risk Protection policies, the policy with the earliest date of application will be in force

and the other policy will be void, unless both policies are the same:

    (i)   The same insurance provider and the insurance provider agrees otherwise; or

    (ii)  Different insurance providers and both insurance providers agree otherwise.

(b) **Other Insurance Against Fire** - If you have other insurance, whether valid or not, against damage to the insured crop by fire during the insurance period, and you have not excluded coverage for fire from this policy, we will be liable for loss due to fire caused by a naturally occurring event only for the smaller of:

    (1)  The amount of indemnity determined pursuant to this policy without regard to such other insurance; or

    (2)  The amount by which the loss from fire is determined to exceed the indemnity paid or payable under such other insurance.

(c) For the purpose of section 22(b), the amount of loss from fire will be the difference between the total value of the insured crop before the fire and the total value of the insured crop after the fire. This amount will be determined in accordance with the provisions in section 35.

**23. Conformity to Food Security Act.**

Although your violation of a number of federal statutes, including the Act, may cause cancellation, termination, or voidance of your insurance contract, you should be specifically aware that your policy will be canceled if you are determined to be ineligible to receive benefits under the Act due to violation of the controlled substance provisions (title XVII) of the Food Security Act of 1985 (Pub. L. 99-198) and the regulations promulgated under the Act by USDA. Your insurance policy will be canceled if you are determined, by the appropriate Agency, to be in violation of these provisions. We will recover any and all monies paid to you or received by you during your period of ineligibility, and your premium will be refunded, less an amount for expenses and handling equal to 20 percent of the premium paid or to be paid by you.

**24. Amounts Due Us.**

(a) Interest will accrue at the rate of 1.25 percent simple interest per calendar month on any unpaid amount owed to us or on any unpaid administrative fees owed to FCIC. For the purpose of premium amounts owed to us or administrative fees owed to FCIC, interest will start to accrue on the first day of the month following the issuance of the notice by us, provided that a minimum of 30 days have passed from the premium billing date specified in the Special Provisions. We will collect any unpaid amounts owed to us and any interest owed thereon and, prior to the termination date, we will collect any administrative fees and interest owed thereon to FCIC. After the termination date, FCIC will collect any unpaid administrative fees and any interest owed thereon for any catastrophic risk protection policy and we will collect any unpaid administrative fees and any interest owed thereon for additional coverage policies.

(b) For the purpose of any other amounts due us, such as repayment of indemnities found not to have been earned, interest will start to accrue on the date that notice is issued to you for the collection of the unearned amount. Amounts found due under this

paragraph will not be charged interest if payment is made within 30 days of issuance of the notice by us. The amount will be considered delinquent if not paid within 30 days of the date the notice is issued by us.

(c) All amounts paid will be applied first to expenses of collection (see subsection (d) of this section) if any, second to the reduction of accrued interest, and then to the reduction of the principal balance.

(d) If we determine that it is necessary to contract with a collection agency or to employ an attorney to assist in collection, you agree to pay all of the expenses of collection.

(e) The portion of the amounts owed by you for a policy authorized under the Act that are owed to FCIC may be collected in part through administrative offset from payments you receive from United States government agencies in accordance with 31 U.S.C. chapter 37. Such amounts include all administrative fees, and the share of the overpaid indemnities and premiums retained by FCIC plus any interest owed thereon.

**25. Correction of Errors**

(a) In addition to any other corrections allowed in your policy subject to section 25(b), we may correct:

    (1)  Within 60 days after the sales closing date, any incorrect information on your application or provided by the sales closing date, including identification numbers for you and any person with an substantial beneficial interest in you, to ensure that the eligibility information is correct and consistent with information reported by you to any USDA agency;

    (2)  Within 30 days after the acreage reporting date, information reported to reconcile errors in the information with correct information that has been determined by any USDA agency;

    (3)  Within 30 days of any subsequent correction of data by FSA, erroneous information corrected as a result of verification of information; and

    (4)  At any time, any incorrect information if the incorrect information was caused by electronic transmission errors by us or errors made by any agency within USDA in transmitting the information provided by you for purposes of other USDA programs.

(b) Corrections may be made but will not take effect for the current crop year if the correction would allow you to:

    (1)  Avoid ineligibility requirements for insurance or obtain a disproportionate benefit under the crop insurance program or any related program administered by the Secretary;

    (2)  Obtain, enhance, or increase an insurance guarantee or indemnity if a cause of loss exists or has occurred before any correction has been made, or avoid premium owed if no loss is likely to occur; or

    (3)  Avoid an obligation or requirement under any Federal or State law.

**26. Interest Limitations.**

We will pay simple interest computed on the net indemnity ultimately found to be due by us or by a final judgment of a court of competent jurisdiction, from and including the 61st day after the date you sign, date, and submit to us the properly completed claim on our form. Interest will be

paid only if the reason for our failure to timely pay is NOT due to your failure to provide information or other material necessary for the computation or payment of the indemnity. The interest rate will be that established by the Secretary of the Treasury under section 12 of the Contract Disputes Act of 1978 (41 U.S.C. 611) and published in the *Federal Register* semiannually on or about January 1 and July 1 of each year, and may vary with each publication.

27. **Concealment, Misrepresentation or Fraud.**

    (a)  If you have falsely or fraudulently concealed the fact that you are ineligible to receive benefits under the Act or if you or anyone assisting you has intentionally concealed or misrepresented any material fact relating to this policy:

        (1)  This policy will be voided; and

        (2)  You may be subject to remedial sanctions in accordance with 7 CFR part 400, subpart R.

    (b)  Even though the policy is void, you will still be required to pay 20 percent of the premium that you would otherwise be required to pay to offset costs incurred by us in the service of this policy. If previously paid, the balance of the premium will be returned.

    (c)  Voidance of this policy will result in you having to reimburse all indemnities paid for the crop year in which the voidance was effective.

    (d)  Voidance will be effective on the first day of the insurance period for the crop year in which the act occurred and will not affect the policy for subsequent crop years unless a violation of this section also occurred in such crop years.

    (e)  If you willfully and intentionally provide false or inaccurate information to us or FCIC or you fail to comply with a requirement of FCIC, in accordance with 7 CFR part 400, subpart R, FCIC may impose on you:

        (1)  A civil fine for each violation in an amount not to exceed the greater of:

            (i)  The amount of the pecuniary gain obtained as a result of the false or inaccurate information provided or the noncompliance with a requirement of FCIC; or

            (ii)  $10,000; and

        (2)  A disqualification for a period of up to 5 years from receiving any monetary or non-monetary benefit provided under each of the following:

            (i)  Any crop insurance policy offered under the Act;

            (ii)  The Farm Security and Rural Investment Act of 2002 (7 U.S.C. 7333 et seq.);

            (iii)  The Agricultural Act of 1949 (7 U.S.C. 1421 et seq.);

            (iv)  The Commodity Credit Corporation Charter Act (15 U.S.C. 714 et seq.);

            (v)  The Agricultural Adjustment Act of 1938 (7 U.S.C. 1281 et seq.);

            (vi)  Title XII of the Food Security Act of 1985 (16 U.S.C. 3801 et seq.);

            (vii)  The Consolidated Farm and Rural Development Act (7 U.S.C. 1921 et seq.); and

            (viii)  Any federal law that provides assistance to a producer of an agricultural commodity

affected by a crop loss or a decline in the prices of agricultural commodities.

28. **Transfer of Coverage and Right to Indemnity.**

If you transfer any part of your share during the crop year, you may transfer your coverage rights, if the transferee is eligible for crop insurance. We will not be liable for any more than the liability determined in accordance with your policy that existed before the transfer occurred. The transfer of coverage rights must be on our form and will not be effective until approved by us in writing. Both you and the transferee are jointly and severally liable for the payment of the premium and administrative fees. The transferee has all rights and responsibilities under this policy consistent with the transferee's interest.

29. **Assignment of Indemnity.**

    (a)  You may assign your right to an indemnity for the crop year only to creditors or other persons to whom you have a financial debt or other pecuniary obligation. You may be required to provide proof of the debt or other pecuniary obligation before we will accept the assignment of indemnity.

    (b)  All assignments must be on our form and must be provided to us. Each assignment form may contain more than one creditor or other person to whom you have a financial debt or other pecuniary obligation.

    (c)  Unless you have provided us with a properly executed assignment of indemnity, we will not make any payment to a lienholder or other person to whom you have a financial debt or other pecuniary obligation even if you may have a lien or other assignment recorded elsewhere. Under no circumstances will we be liable:

        (1)  To any lienholder or other person to whom you have a financial debt or other pecuniary obligation where you have failed to include such lienholder or person on a properly executed assignment of indemnity provided to us; or

        (2)  To pay to all lienholders or other persons to whom you have a financial debt or other pecuniary obligation any amount greater than the total amount of indemnity owed under the policy.

    (d)  If we have received the properly executed assignment of indemnity form:

        (1)  Only one payment will be issued jointly in the names of all assignees and you; and

        (2)  Any assignee will have the right to submit all loss notices and forms as required by the policy.

    (e)  If you have suffered a loss from an insurable cause and fail to file a claim for indemnity within the period specified in section 14(e), the assignee may submit the claim for indemnity not later than 30 days after the period for filing a claim has expired. We will honor the terms of the assignment only if we can accurately determine the amount of the claim. However, no action will lie against us for failure to do so.

30. **[Reserved]**

31. **Applicability of State and Local Statutes.**

If the provisions of this policy conflict with statutes of the State or locality in which this policy is issued, the policy provisions will prevail. State and local laws and regulations in conflict with federal statutes, this policy, and the applicable regulations do not apply to this policy.

32. **Descriptive Headings.**

The descriptive headings of the various policy provisions are formulated for convenience only and are not intended to affect the construction or meaning of any of the policy provisions.

**33. Notices.**

(a)  All notices required to be given by you must be in writing and received by your crop insurance agent within the designated time unless otherwise provided by the notice requirement.  Notices required to be given immediately may be by telephone or in person and confirmed in writing.  Time of the notice will be determined by the time of our receipt of the written notice.  If the date by which you are required to submit a report or notice falls on Saturday, Sunday, or a Federal holiday, or if your agent's office is, for any reason, not open for business on the date you are required to submit such notice or report, such notice or report must be submitted on the next business day.

(b)  All notices and communications required to be sent by us to you will be mailed to the address contained in your records located with your crop insurance agent. Notice sent to such address will be conclusively presumed to have been received by you.  You should advise us immediately of any change of address.

**34. Units.**

(a)  You may elect an enterprise unit or whole-farm unit in accordance with the following:

(1)  For crops for which revenue protection is available, you may elect:

(i)  An enterprise unit if you elected revenue protection or yield protection; or

(ii)  A whole-farm unit if you elected:

(A)  Revenue protection and revenue protection is provided unless limited by the Special Provisions; or

(B)  Yield protection only if whole-farm units are allowed by the Special Provisions;

(2)  For crops for which revenue protection is not available, enterprise units or whole-farm units are available only if allowed by the Special Provisions;

(3)  You must make such election on or before the earliest sales closing date for the insured crops in the unit and report such unit structure on your acreage report:

(i)  For counties in which the actuarial documents specify a fall or winter sales closing date and a spring sales closing date, you may change your unit election on or before the spring sales closing date (earliest spring sales closing date for crops in the unit if electing a whole-farm unit) if you do not have any insured fall planted acreage of the insured crop;

(ii)  Your unit selection will remain in effect from year to year unless you notify us in writing by the earliest sales closing date for the crop year for which you wish to change this election; and

(iii)  These units may not be further divided except as specified herein;

(4)  For an enterprise unit:

(i)  To qualify, an enterprise unit must contain all of the insurable acreage of the same insured crop in:

(A)  Two or more sections, if sections are the basis for optional units where the insured acreage is located;

(B)  Two or more section equivalents determined in accordance with FCIC issued procedures, if section equivalents are the basis for optional units where the insured acreage is located or are applicable to the insured acreage;

(C)  Two or more FSA farm numbers, if FSA farm numbers are the basis for optional units where the insured acreage is located;

(D)  Any combination of two or more sections, section equivalents, or FSA farm numbers, if more than one of these are the basis for optional units where the acreage is located or are applicable to the insured acreage (*e.g.*, if a portion of your acreage is located where sections are the basis for optional units and another portion of your acreage is located where FSA farm numbers are the basis for optional units, you may qualify for an enterprise unit based on a combination of these two parcels;

(E)  One section, section equivalent, or FSA farm number that contains at least 660 planted acres of the insured crop.  You may qualify under this paragraph based only on the type of parcel that is utilized to establish optional units where your insured acreage is located (*e.g.*, if having two or more sections is the basis for optional units where the insured acreage is located, you may qualify for an enterprise unit if you have at least 660 planted acres of the insured crop in one section); or

(F)  Two or more units established by written agreement; and

(ii)  At least two of the sections, section equivalents, FSA farm numbers, or units established by written agreement in section 34(a)(4)(i)(A), (B), (C), (D), or (F) must each have planted acreage that constitutes at least the lesser of 20 acres or 20 percent of the insured crop acreage in the enterprise unit.  If there is planted acreage in more than two sections, section equivalents, FSA farm numbers or units established by written agreement in section 34(a)(4)(i)(A), (B), (C), (D), or (F), these can be aggregated to form at least two parcels to meet this requirement.  For example, if sections are the basis for optional units where the insured acreage is located and you have 80 planted acres in section one, 10 planted acres in section two, and 10 planted acres in section three, you may aggregate

sections two and three to meet this requirement.

(iii) The crop must be insured under revenue protection or yield protection, unless otherwise specified in the Special Provisions;

(iv) If you want to change your unit structure from enterprise units to basic or optional units in any subsequent crop year, you must maintain separate records of acreage and production:

    (A) For each basic unit, to be eligible to use records to establish the production guarantee for the basic unit; or

    (B) For optional units, to qualify for optional units and to be eligible to use such records to establish the production guarantee for the optional units;

(v) If you do not comply with the production reporting provisions in section 3(f) for the enterprise unit, your yield for the enterprise unit will be determined in accordance with section 3(f)(1);

(vi) You must separately designate on the acreage report each section or other basis in section 34(a)(4)(i) you used to qualify for an enterprise unit; and

(vii) If we discover you do not qualify for an enterprise unit and such discovery is made:

    (A) On or before the acreage reporting date, your unit division will be based on the basic or optional units, whichever you report on your acreage report and qualify for; or

    (B) At any time after the acreage reporting date, we will assign the basic unit structure; and

(viii) If allowed by the actuarial documents, you may elect separate enterprise units for irrigated or non-irrigated practices.

    (A) You may elect one enterprise unit for all irrigated practices or one enterprise unit for all non-irrigated practices or enterprise units for both.

    (B) You must separately meet the requirements in section 34(a)(4) for each enterprise unit.

    (C) If you elected separate enterprise units for both irrigated and non-irrigated practices and we discover you do not qualify for an enterprise unit for the irrigated or non-irrigated practice and such discovery is made:

        (1) On or before the acreage reporting date, you may elect to insure all acreage of the crop in the county in one enterprise unit provided you meet the requirements in section 34(a)(4), or your unit division will be based on basic or optional units, whichever you report on your acreage report and qualify for; or

        (2) At any time after the acreage reporting date, your unit structure will be one enterprise unit provided you meet the requirements in section 34(a)(4).  Otherwise, we will assign the basic unit structure.

    (D) If you elected an enterprise unit on one practice (irrigated or non-irrigated) and a different unit structure on the other practice and we discover you do not qualify for an enterprise unit for the irrigated or non-irrigated practice and such discovery is made:

        (1) On or before the acreage reporting date, your unit division will be based on basic or optional units, whichever you report on your acreage report and qualify for; or

        (2) At any time after the acreage reporting date, we will assign the basic unit structure.

(5) For a whole-farm unit:

    (i) To qualify:

        (A) All crops in the whole-farm unit must be insured:

            (1) Under revenue protection (if you elected the harvest price exclusion for any crop, you must elect it for all crops in the whole-farm unit), unless the Special Provisions allow whole-farm units for another plan of insurance and you insure all crops in the whole-farm unit under such plan (*e.g.*, if you plant corn and soybeans for which you have elected revenue protection and you plant canola for which you have elected yield protection, the corn, soybeans and canola would be assigned the unit structure in accordance with section 34(a)(5)(v));

            (2) With us (*e.g.*, if you insure your corn and canola with us and your soybeans with a different insurance provider, the corn, soybeans and canola would be assigned the unit structure in accordance with section 34(a)(5)(v)); and

            (3) At the same coverage level (*e.g.*, if you elect to insure your corn and canola at the 65 percent coverage level and your soybeans at the 75 percent coverage level, the corn, soybeans and canola would be assigned the unit structure in accordance with section 34(a)(5)(v) unless you can elect separate coverage levels for all irrigated and all non-irrigated crops in accordance with section 3(b)(2)(iii) (*e.g.*, if you elect to insure your irrigated corn at the 65 percent coverage level you must insure your irrigated canola at the 65 percent coverage level.  If you elect to insure your non-irrigated corn at the 70 percent coverage

level you must insure your non-irrigated canola at the 70 percent coverage level. If you elect to insure your irrigated corn at the 65 percent coverage level and your irrigated canola at the 70 percent coverage level your unit structure will be assigned in accordance with section 34(a)(5)(v));

(B) A whole-farm unit must contain all of the insurable acreage of at least two crops; and

(C) At least two of the insured crops must each have planted acreage that constitutes 10 percent or more of the total planted acreage liability of all insured crops in the whole-farm unit (For crops for which revenue protection is available, liability will be based on the applicable projected price only for the purpose of section 34(a)(i)(C));

(ii) You will be required to pay separate administrative fees for each crop included in the whole-farm unit;

(iii) You must separately designate on the acreage report each basic unit for each crop in the whole-farm unit;

(iv) If you want to change your unit structure from a whole-farm unit to basic or optional units in any subsequent crop year, you must maintain separate records of acreage and production:

(A) For each basic unit, to be eligible to use such records to establish the production guarantee for the basic units; or

(B) For optional units, to qualify for optional units and to be eligible to use such records to establish the production guarantee for the optional units; and

(v) If we discover you do not qualify for a whole-farm unit for at least one insured crop because, even though you elected revenue protection for all your crops:

(A) You do not meet all of the other requirements in section 34(a)(5)(i), and such discovery is made:

(1) On or before the acreage reporting date, your unit division for all crops for which you elected a whole-farm unit will be based on basic or optional units, whichever you report on your acreage report and qualify for; or

(2) At any time after the acreage reporting date, we will assign the basic unit structure for all crops for which you elected a whole-farm unit; or

(B) It was not possible to establish a projected price for at least one of your crops, your unit division will be based on the unit structure you report on your acreage report and qualify for only for the crop for which a projected price could not be established unless the

remaining crop in the unit would no longer qualify for a whole-farm unit, in such case your unit division for the remaining crops will be based on the unit structure you report on your acreage report and qualify for.

(b) Unless limited by the Crop Provisions or Special Provisions, a basic unit as defined in section 1 of the Basic Provisions may be divided into optional units if, for each optional unit, you meet the following:

(1) You must plant the crop in a manner that results in a clear and discernible break in the planting pattern at the boundaries of each optional unit;

(2) All optional units you select for the crop year are identified on the acreage report for that crop year (Units will be determined when the acreage is reported but may be adjusted or combined to reflect the actual unit structure when adjusting a loss. No further unit division may be made after the acreage reporting date for any reason);

(3) You have records, that are acceptable to us, for at least the previous crop year for all optional units that you will report in the current crop year (You may be required to produce the records for all optional units for the previous crop year); and

(4) You have records of marketed or stored production from each optional unit maintained in such a manner that permits us to verify the production from each optional unit, or the production from each optional unit is kept separate until loss adjustment is completed by us.

(c) Each optional unit must meet one or more of the following, unless otherwise specified in the Crop Provisions or allowed by written agreement:

(1) Optional units may be established if each optional unit is located in a separate section where the boundaries are readily discernible:

(i) In the absence of sections, we may consider parcels of land legally identified by other methods of measure, such as Spanish grants, provided the boundaries are readily discernible, if such parcels can be considered as the equivalent of sections for unit purposes in accordance with FCIC issued procedures; or

(ii) In the absence of sections as described in section 34(c)(1) or other methods of measure used to establish section equivalents as described in section 34(c)(1)(i), optional units may be established if each optional unit is located in a separate FSA farm number in accordance with FCIC issued procedure;

(2) In addition to, or instead of, establishing optional units by section, section equivalent or FSA farm number, optional units may be based on irrigated and non-irrigated acreage. To qualify as separate irrigated and non-irrigated optional units, the non-irrigated acreage may not continue into the irrigated acreage in the same rows or planting pattern. The irrigated acreage may not extend beyond the point at which the irrigation system can deliver the quantity of water needed to produce the yield on which the guarantee is based, except the corners of a field in which a

center-pivot irrigation system is used may be considered as irrigated acreage if the corners of a field in which a center-pivot irrigation system is used do not qualify as a separate non-irrigated optional unit. In this case, production from both practices will be used to determine your approved yield; and

(3) In addition to, or instead of, establishing optional units by section, section equivalent or FSA farm number, or irrigated and non-irrigated acreage, separate optional units may be established for acreage of the insured crop grown and insured under an organic farming practice. Certified organic, transitional and buffer zone acreages do not individually qualify as separate units. (See section 37 for additional provisions regarding acreage insured under an organic farming practice).

(d) Optional units are not available for crops insured under a Catastrophic Risk Protection Endorsement.

(e) If you do not comply fully with the provisions in this section, we will combine all optional units that are not in compliance with these provisions into the basic unit from which they were formed. We will combine the optional units at any time we discover that you have failed to comply with these provisions. If failure to comply with these provisions is determined by us to be inadvertent, and the optional units are combined into a basic unit, that portion of the additional premium paid for the optional units that have been combined will be refunded to you for the units combined.

## 35. Multiple Benefits.

(a) If you are eligible to receive an indemnity and are also eligible to receive benefits for the same loss under any other USDA program, you may receive benefits under both programs, unless specifically limited by the crop insurance contract or by law.

(b) Any amount received for the same loss from any USDA program, in addition to the crop insurance payment, will not exceed the difference between the crop insurance payment and the actual amount of the loss, unless otherwise provided by law. The amount of the actual loss is the difference between the total value of the insured crop before the loss and the total value of the insured crop after the loss.

(1) For crops for which revenue protection is not available:

(i) If you have an approved yield, the total value of the crop before the loss is your approved yield times the highest price election for the crop; and

(ii) If you have an approved yield, the total value of the crop after the loss is your production to count times the highest price election for the crop; or

(iii) If you have an amount of insurance, the total value of the crop before the loss is the highest amount of insurance available for the crop; and

(iv) If you have an amount of insurance, the total value of the crop after the loss is your production to count times the price contained in the Crop Provisions for valuing production to count.

(2) For crops for which revenue protection is

available and:

(i) You elect yield protection:

(A) The total value of the crop before the loss is your approved yield times the applicable projected price (at the 100 percent price level) for the crop; and

(B) The total value of the crop after the loss is your production to count times the applicable projected price (at the 100 percent price level) for the crop; or

(ii) You elect revenue protection:

(A) The total value of the crop before the loss is your approved yield times the higher of the applicable projected price or harvest price for the crop (If you have elected the harvest price exclusion, the applicable projected price for the crop will be used); and

(B) The total value of the crop after the loss is your production to count times the harvest price for the crop.

(c) FSA or another USDA agency, as applicable, will determine and pay the additional amount due you for any applicable USDA program, after first considering the amount of any crop insurance indemnity.

## 36. Substitution of Yields.

(a) When you have actual yields in your production history database that, due to an insurable cause of loss, are less than 60 percent of the applicable transitional yield you may elect, on an individual actual yield basis, to calculate and replace one or more of any such yields within each database.

(b) Each election made in section 36(a) must be made on or before the production reporting date for the insured crop and each such election will remain in effect for succeeding years unless canceled by the production reporting date for the succeeding crop year. If you cancel an election, the actual yield will be used in the database. For example, if you elected to substitute yields in your database for the 1998 and 2000 crop year, for any subsequent crop year, you can elect to cancel the substitution for either or both years.

(c) Each excluded actual yield will be replaced with a yield equal to 60 percent of the applicable transitional yield for the crop year in which the yield is being replaced, unless you qualify as a beginning farmer or rancher, in which case the excluded actual yield will be replaced with a yield equal to 80 percent of the applicable transitional yield for the crop year in which the yield is being replaced. (For example, if you elect to exclude a 2001 crop year actual yield, the transitional yield in effect for the 2001 crop year in the county will be used. If you also elect to exclude a 2002 crop year actual yield, the transitional yield in effect for the 2002 crop year in the county will be used). The replacement yields will be used in the same manner as actual yields for the purpose of calculating the approved yield.

(d) Once you have elected to exclude an actual yield from the database, the replacement yield will remain in effect until such time as that crop year is no longer included in the database unless this election is canceled in accordance with section 36(b).

(e) Although your approved yield will be used to determine your amount of premium owed, the

premium rate will be increased to cover the additional risk associated with the substitution of higher yields.

**37. Organic Farming Practices.**

(a) In accordance with section 8(b)(2), insurance will not be provided for any crop grown using an organic farming practice, unless the information needed to determine a premium rate for an organic farming practice is specified on the actuarial table, or insurance is allowed by a written agreement.

(b) If insurance is provided for an organic farming practice as specified in section 37(a), only the following acreage will be insured under such practice:

(1) Certified organic acreage;

(2) Transitional acreage being converted to certified organic acreage in accordance with an organic plan; and

(3) Buffer zone acreage.

(c) On the date you report your acreage, you must have:

(1) For certified organic acreage, a written certification in effect from a certifying agent indicating the name of the entity certified, effective date of certification, certificate number, types of commodities certified, and name and address of the certifying agent (A certificate issued to a tenant may be used to qualify a landlord or other similar arrangement);

(2) For transitional acreage, a certificate as described in section 37(c)(1), or written documentation from a certifying agent indicating an organic plan is in effect for the acreage; and

(3) Records from the certifying agent showing the specific location of each field of certified organic, transitional, buffer zone, and acreage not maintained under organic management.

(d) If you claim a loss on any acreage insured under an organic farming practice, you must provide us with copies of the records required in section 37(c).

(e) If any acreage qualifies as certified organic or transitional acreage on the date you report such acreage, and such certification is subsequently revoked by the certifying agent, or the certifying agent no longer considers the acreage as transitional acreage for the remainder of the crop year, that acreage will remain insured under the reported practice for which it qualified at the time the acreage was reported. Any loss due to failure to comply with organic standards will be considered an uninsured cause of loss.

(f) Contamination by application or drift of prohibited substances onto land on which crops are grown using organic farming practices will not be an insured peril on any certified organic, transitional or buffer zone acreage.

(g) In addition to the provisions contained in section 17(f), prevented planting coverage will not be provided for any acreage based on an organic farming practice in excess of the number of acres that will be grown under an organic farming practice and shown as such in the records required in section 37(c).

(h) In lieu of the provisions contained in section 17(f)(1) that specify prevented planting acreage within a field that contains planted acreage will be considered to be acreage of the same practice that is planted in the field, prevented planting acreage will be considered

as organic practice acreage if it is identified as certified organic, transitional, or buffer zone acreage in the organic plan.

(42 of 42)

**18-CCIP-Replant and Double Crop**
(June 2017)



## UNITED STATES DEPARTMENT OF AGRICULTURE
## FEDERAL CROP INSURANCE CORPORATION
## COMMON CROP INSURANCE POLICY BASIC PROVISIONS
## REPLANT AND DOUBLE CROPPING AMENDMENT

_____
(This is a Continuous Amendment)

This amendment modifies the provisions of the Common Crop Insurance Policy Basic Provisions (CCIP) for the 2018 and succeeding crop years for all crops with a 2018 contract change date on or after June 30, 2017, and for the 2019 and succeeding crop years for all crops with a 2018 contract change date prior to June 30, 2017.

The changes to the above policies are required as the result of changes made in the Final Rule to the Common Crop Insurance Policy Basic Provisions published in the Federal Register on June 27, 2017.

The revised provisions are as follows:

| In lieu of section: | The following provisions will apply: |
|---|---|
| 1 – definition of "practical to replant" | **Practical to replant** - Our determination, after loss or damage to the insured crop, that you are able to replant to the same crop in such areas and under such circumstances as it is customary to replant and that replanting the insured crop will allow the crop to attain maturity prior to the calendar date for the end of the insurance period.  We may consider circumstances as to whether: (1) it is physically possible to replant the acreage; (2) seed germination, emergence, and formation of a healthy plant is likely; (3) field, soil, and growing conditions allow for proper planting and growth of the replanted crop to reach maturity; or (4) other conditions exist, as provided by the Crop Provisions or Special Provisions.  Unless we determine it is not practical to replant, based on the circumstances listed above, it will be considered practical to replant through: (1) the final planting date if no late planting period is applicable; (2) the end of the late planting period if the late planting period is less than 10 days; or (3) the 10th day after the final planting date if the crop has a late planting period of 10 days or more.  We will consider it practical to replant regardless of the availability of seed or plants, or the input costs necessary to produce the insured crop such as seed or plants, irrigation water, etc. |
| 1 – definition of "replanted crop" | **Replanted crop** - The same agricultural commodity replanted on the same acreage as the insured crop for harvest in the same crop year if:  1) the replanting is specifically made optional by the policy and you elect to replant the crop and insure it under the policy covering the insured crop; or 2) replanting is required by the policy.  The crop will be considered a replanted insured crop and no replanting payment will be paid if we have determined it is not practical to replant the insured crop and you choose to plant the acreage to the same insured crop. |
| 15(h) | You may receive a full indemnity, or a full prevented planting payment for a first insured crop when a second crop is planted on the same acreage in the same crop year, if each of the following conditions are met, regardless of whether or not the second crop is insured or sustains an insurable loss:<br>(1) Planting two or more crops for harvest in the same crop year in the area is generally recognized by agricultural experts or organic agricultural experts;<br>(2) The second or more crops are customarily planted after the first insured crop for harvest on the same acreage in the same crop year in the area;<br>(3) Additional coverage insurance offered under the authority of the Act is available in the county on the two or more crops that are double cropped;<br>(4) In the case of prevented planting, the second crop is not planted on or prior to the final planting date or, if applicable, prior to the end of the late planting period for the first insured crop; |

NHF2-527 Policy 000055

**18-CCIP-Replant and Double Cropping**
(June 2017)

(5) You provide records, acceptable to us, of acreage and production specific to the double cropped acreage proving that:

(i) You have double cropped acreage in at least two of the last four crop years in which the first insured crop was planted and incur an insurable loss or the first insured crop is prevented from being planted and a second crop is planted.  If you acquired additional land for the current crop year you may apply the percentage of acres that you have previously double cropped to the total cropland acres that you are farming this year (if greater) using the following calculation:

(A) Determine the number of acres of the first insured crop that were double cropped in each of the years for which double cropping records are provided (For example, records are provided showing: 100 acres of wheat planted in 2016 and 50 of those acres were double cropped with soybeans; and 100 acres of wheat planted in 2017 and 70 of those acres were double cropped with soybeans);

(B) Divide each result of section 15(h)(5)(i)(A) by the number of acres of the first insured crop that were planted in each respective year (In the example above, 50 divided by 100 equals 50 percent of the first insured crop acres that were double cropped in 2016 and 70 divided by 100 equals 70 percent of the first insured crop acres that were double cropped in 2017);

(C) Add the results of section 15(h)(5)(i)(B) and divide by the number of years the first insured crop was double cropped (In the example above, 50 plus 70 equals 120 divided by 2 equals 60 percent); and

(D) Multiply the result of 15(h)(5)(i)(C) by the number of insured acres of the first insured crop (In the example above, 60 percent multiplied by the number of wheat acres insured in 2018); or

(ii) The applicable acreage was double cropped (by one or more other producers, and the producer(s) will allow you to use their records) for at least two of the last four crop years in which the first insured crop was grown on it; and

(6) If you do not have records of acreage and production specific to the double cropped acreage, as required in section 15(h)(5), but instead have records that combine production from acreage you double cropped with records of production from acreage you did not double crop, we will allocate the first and second crop production to the specific acreage in proportion to the liability for the acreage that was and was not double cropped.

(Page 2 of 2)

**SUMMARY OF CHANGES FOR THE COARSE GRAINS CROP PROVISIONS (17-0041)**
**(Released November 2016)**

The following is a brief description of the changes to the Coarse Grains Crop Provisions that will be effective for the 2017 crop year.  Please refer to the Crop Provisions for complete information.

Section 12 – Removed the prevented planting coverage level percent specified in the Crop Provisions to specify the percent in the actuarial documents to allow updates as needed.

**17-0041**
**(Released November 2016)**

**UNITED STATES DEPARTMENT OF AGRICULTURE**
**Federal Crop Insurance Corporation**
**COARSE GRAINS CROP PROVISIONS**



## 1. Definitions

**Coarse grains** - Corn, grain sorghum, and soybeans.

**Grain sorghum** - The crop defined as sorghum under the United States Grain Standards Act.

**Harvest** - Combining, threshing, or picking the insured crop for grain, or cutting for hay, silage, or fodder.

**Local market price** - The cash grain price per bushel for the U.S. No. 2 yellow corn, U.S. No. 2 grain sorghum, or U.S. No. 1 soybeans, offered by buyers in the area in which you normally market the insured crop. The local market price will reflect the maximum limits of quality deficiencies allowable for the U.S. No. 2 grade for yellow corn and grain sorghum, or U.S. No. 1 grade for soybeans. Factors not associated with grading under the Official United States Standards for Grain, including but not limited to protein and oil, will not be considered.

**Planted acreage** - In addition to the definition contained in the Basic Provisions, coarse grains must initially be planted in rows, unless otherwise provided by the Special Provisions, actuarial documents, or by written agreement.

**Production guarantee (per acre)** – In lieu of the definition contained in the Basic Provisions, the number of bushels (tons for corn insured as silage) determined by multiplying the approved yield per acre by the coverage level percentage you elect.

**Silage** - A product that results from severing the plant from the land and chopping it for the purpose of livestock feed.

**Ton** - Two thousand (2000) pounds avoirdupois.

## 2. Insurance Guarantees, Coverage Levels, and Prices for Determining Indemnities

In addition to the requirements of section 3 of the Basic Provisions, you must elect to insure your corn, grain sorghum, or soybeans with either revenue protection or yield protection by the sales closing date.

## 3. Contract Changes

In accordance with section 4 of the Basic Provisions, the contract change date is November 30 preceding the cancellation date.

## 4. Cancellation and Termination Dates

In accordance with section 2 of the Basic Provisions, the cancellation and termination dates are:

| State and County | Cancellation and Termination Dates |
|---|---|
| (a) **For corn and grain sorghum:** | |
| Val Verde, Edwards, Kerr, Kendall, Bexar, Wilson, Karnes, Goliad, Victoria, and Jackson Counties, Texas, and all Texas counties lying south thereof | January 31. |
| El Paso, Hudspeth, Culberson, Reeves, Loving, Winkler, Ector, Upton, Reagan, Sterling, Coke, Tom Green, Concho, McCulloch, San Saba, Mills, Hamilton, Bosque, Johnson, Tarrant, Wise, Cooke Counties, Texas, and all Texas counties lying south and east thereof to and including Terrell, Crockett, Sutton, Kimble, Gillespie, Blanco, Comal, Guadalupe, Gonzales, De Witt, Lavaca, Colorado, Wharton, and Matagorda Counties, Texas | February 15. |
| Alabama; Arizona; Arkansas; California; Florida; Georgia; Louisiana; Mississippi; Nevada; North Carolina; and South Carolina | February 28. |
| All other Texas counties and all other states | March 15. |
| (b) **For soybeans:** | |
| Jackson, Victoria, Goliad, Bee, Live Oak, McMullen, LaSalle, and Dimmit Counties, Texas and all Texas counties lying south thereof | January 31. |
| Alabama; Arizona; Arkansas; California; Florida; Georgia; Louisiana; Mississippi; Nevada; North Carolina; and South Carolina; and El Paso, Hudspeth, Culberson, Reeves, Loving, Winkler, Ector, Upton, Reagan, Sterling, Coke, Tom Green, Concho, McCulloch, San Saba, Mills, Hamilton, Bosque, Johnson, Tarrant, Wise, Cooke Counties, Texas, and all Texas counties lying south and east thereof to and including Maverick, Zavala, Frio, Atascosa, Karnes, De Witt, Lavaca, Colorado, Wharton, and Matagorda Counties, Texas | February 28. |
| All other Texas counties and all other states | March 15. |

## 5. Insured Crop

(a) In accordance with section 8 of the Basic Provisions, the crop insured will be each coarse grain crop you elect to insure for which premium rates are provided by the actuarial documents:

(1) In which you have a share;

(2) That is adapted to the area based on days to maturity and is compatible with agronomic and weather conditions in the area; and

(3) That is not (unless allowed by the Special Provisions or by written agreement):

(i) Interplanted with another crop except as allowed in section 5(b)(1); or

NHF2-527 Policy 000058

(ii) Planted into an established grass or legume.

(b) For corn only, in addition to the provisions of section 5(a), the corn crop insured will be all corn that is:

(1) Planted for harvest either as grain or as silage (see section 5(c)). A mixture of corn and sorghum (grain or forage-type) will be insured as corn silage if the sorghum does not constitute more than twenty percent (20%) of the plants;

(2) Yellow dent or white corn, including mixed yellow and white, waxy or high-lysine corn, high-oil corn blends containing mixtures of at least 90 percent high yielding yellow dent female plants with high-oil male pollinator plants, or commercial varieties of high-protein hybrids, and excluding:

(i) High-amylose, high-oil or high-protein (except as authorized in section 5(b)(2)), flint, flour, Indian, or blue corn, or a variety genetically adapted to provide forage for wildlife or any other open pollinated corn, unless a written agreement allows insurance of such excluded crops.

(ii) A variety of corn adapted for silage use only when the corn is reported for insurance as grain.

(c) For corn only, if the actuarial documents for the county provide a premium rate for:

(1) **Both grain and silage**, all insurable acreage will be insured as the type or types reported by you on or before the acreage reporting date;

(2) **Grain but not silage**, all insurable acreage will be insured as grain unless a written agreement allows insurance on all or a portion of the insurable acreage as silage; or

(3) **Silage but not grain**, all insurable corn acreage will be insured as silage unless a written agreement allows insurance on all or a portion of the insurable acreage as grain.

(d) For grain sorghum only, in addition to the provisions of section 5(a), the grain sorghum crop insured will be all of the grain sorghum in the county:

(1) That is planted for harvest as grain;

(2) That is a combine-type hybrid grain sorghum (grown from hybrid seed); and

(3) That is not a dual-purpose type of grain sorghum (a type used for both grain and forage), unless a written agreement allows insurance of such grain sorghum.

(e) For soybeans only, in addition to the provisions of section 5(a), the soybean crop insured will be all of the soybeans in the county that are planted for harvest as beans.

**6. Insurable Acreage**

In addition to the provisions of section 9 of the Basic Provisions, any acreage of the insured crop damaged before the final planting date, to the extent that a majority of producers in the area would not normally further care for the crop, must be replanted unless we agree that it is not practical to replant.

**7. Insurance Period**

In accordance with the provisions of section 11 of the Basic Provisions, the calendar date for the end of the insurance period is the date immediately following planting as follows:

(a) **For corn insured as grain:**

(1) Val Verde, Edwards, Kerr, Kendall, Bexar, Wilson, Karnes, Goliad, Victoria, and Jackson Counties, Texas, and all Texas counties lying south thereof. ... September 30.

(2) Clark, Cowlitz, Grays Harbor, Island, Jefferson, King, Kitsap, Lewis, Pierce, Skagit, Snohomish, Thurston, Wahkiakum, and Whatcom Counties, Washington. ... October 31.

(3) All other counties and states ... December 10.

(b) **For corn insured as silage:**

(1) Connecticut, Delaware, Idaho, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and West Virginia. ... October 20.

(2) All other states. ... September 30.

(c) **For grain sorghum:**

(1) Val Verde, Edwards, Kerr, Kendall, Bexar, Wilson, Karnes, Goliad, Victoria, and Jackson Counties, Texas, and all Texas counties lying south thereof ... September 30.

(2) All other Texas counties and all other states ... December 10.

(d) **For soybeans:**
All states ... December 10.

**8. Causes of Loss**

In accordance with the provisions of section 12 of the Basic Provisions, insurance is provided only against the following causes of loss which occur within the insurance period:

(a) Adverse weather conditions;

(b) Fire;

(c) Insects, but not damage due to insufficient or improper application of pest control measures;

(d) Plant disease, but not damage due to insufficient or improper application of disease control measures;

(e) Wildlife;

(f) Earthquake;

(g) Volcanic eruption;

(h) Failure of the irrigation water supply due to a

NHF2-527 Policy 000059

cause of loss specified in sections 8(a) through (g) that also occurs during the insurance period; or

(i) For revenue protection, a change in the harvest price from the projected price, unless FCIC can prove the price change was the direct result of an uninsured cause of loss specified in section 12(a) of the Basic Provisions.

**9.  Replanting Payments**

(a) A replanting payment is allowed as follows:

(1) In lieu of provisions in section 13 of the Basic Provisions that limit the amount of a replant payment to the actual cost of replanting, the amount of any replanting payment will be determined in accordance with these Crop Provisions;

(2) Except as specified in section 9(a)(1), you must comply with all requirements regarding replanting payments contained in section 13 of the Basic Provisions; and

(3) The insured crop must be damaged by an insurable cause of loss to the extent that the remaining stand will not produce at least 90 percent of the production guarantee for the acreage.

(b) Unless otherwise specified in the Special Provisions, the amount of the replanting payment per acre will be the lesser of 20 percent of the production guarantee or the number of bushels (tons for corn insured as silage) for the applicable crop specified below, multiplied by your projected price, multiplied by your share:

(1) 8 bushels for corn grain;

(2) 1 ton for corn silage;

(3) 7 bushels for grain sorghum; and

(4) 3 bushels for soybeans.

(c) When the crop is replanted using a practice that is uninsurable for an original planting, the liability on the unit will be reduced by the amount of the replanting payment.  The premium amount will not be reduced.

(d) If the acreage is replanted to an insured crop type that is different than the insured crop type originally planted on the acreage:

(1) The production guarantee, premium, and projected price and harvest price, as applicable, will be adjusted based on the replanted type;

(2) Replanting payments will be calculated using your projected price and production guarantee for the crop type that is replanted and insured; and

(3) A revised acreage report will be required to reflect the replanted type, as applicable.

**10. Duties in the Event of Damage or Loss**

(a) Representative samples are required in accordance with section 14 of the Basic Provisions.

(b) For any corn unit that has separate dates for the end of the insurance period (grain and silage), in lieu of the requirement contained in section 14 of the Basic Provisions to provide notice within 72 hours of your initial discovery of damage (but not later than 15 days after the end of the insurance period), you must provide notice within 72 hours of your initial discovery of damage (but not later than 15 days after the latest end of the insurance period applicable to the unit).

(c) If you will harvest any acreage in a manner other than as you reported it for coverage (*e.g.*, you reported planting it to harvest as grain but will harvest the acreage for silage, or you reported planting it to harvest as silage but will harvest the acreage for grain), you must notify us before harvest begins.  Failure to timely provide notice will result in production to count determined in accordance with section 11(c)(1)(i)(E).

**11. Settlement of Claim**

(a) We will determine your loss on a unit basis.  In the event you are unable to provide records of production that are acceptable to us for any:

(1) Optional unit, we will combine all optional units for which acceptable records of production were not provided; or

(2) Basic unit, we will allocate any commingled production to such units in proportion to our liability on the harvested acreage for each unit.

(b) In the event of loss or damage covered by this policy, we will settle your claim by:

(1) Multiplying the number of insured acres of each insured crop or type, as applicable, by your respective:

(i) Yield protection guarantee (per acre) if you elected yield protection; or

(ii) Revenue protection guarantee (per acre) if you elected revenue protection;

(2) Totaling the results of section 11(b)(1)(i) or 11(b)(1)(ii), whichever is applicable;

(3) Multiplying the production to count of each insured crop or type, as applicable, by your respective:

(i) Projected price if you elected yield protection; or

(ii) Harvest price if you elected revenue protection;

(4) Totaling the results of section 11(b)(3)(i) or 11(b)(3)(ii), whichever is applicable;

(5) Subtracting the result of section 11(b)(4) from the result of section 11(b)(2); and

(6) Multiplying the result of section (11)(b)(5) by your share.

For example:

You have 100 percent share in 50 acres of corn in the unit with a production guarantee (per acre) of 115 bushels, your projected price is $2.25, your harvest price is $2.20, and your production to count is 5,000 bushels.

If you elected yield protection:

(1) 50 acres x (115 bushel production guarantee x $2.25 projected price) = $12,937.50 value of the production guarantee

(3) 5,000 bushel production to count x $2.25 projected price = $11,250.00 value of the production to count

(5) $12,937.50 - $11,250.00 = $1,687.50

(6) $1,687.50 x 1.000 share = $1,688.00 indemnity; or

If you elected revenue protection:

(1) 50 acres x (115 bushel production guarantee x $2.25 projected price) = $12,937.50 revenue protection guarantee

(3) 5,000 bushel production to count x $2.20 harvest price = $11,000.00 value of the production to count

(5) $12,937.50 - $11,000.00 = $1,937.50

(6) $1,937.50 x 1.000 share = $1,938.00 indemnity.

(c) The total production to count (in bushels for corn insured as grain or in tons for corn insured as silage) from all insurable acreage on the unit will include:

(1) All appraised production as follows:

(i) For yield protection, not less than the production guarantee, or for revenue protection, not less than the amount of production that when multiplied by the harvest price equals the revenue protection guarantee (per acre) for acreage:

(A) That is abandoned;

(B) Put to another use without our consent;

(C) Damaged solely by uninsured causes;

(D) For which you fail to provide records of production that are acceptable to us; or

(E) For which you fail to give us notice before harvest begins if you report planting the corn to harvest as grain but harvest it as silage or you report planting the corn to harvest as silage but harvest it as grain.

(ii) Production lost due to uninsured causes;

(iii) Unharvested production (mature unharvested production may be adjusted for quality deficiencies and excess moisture in accordance with section 11(d)); and

(iv) Potential production on insured acreage you will put to another use or abandon, if you and we agree on the appraised amount of production.  Upon such agreement the insurance period for that acreage will end when you put the acreage to another use or abandon the crop.  If agreement on the appraised amount of production is not reached:

(A) If you do not elect to continue to care for the crop we may give you consent to put the acreage to another use if you agree to leave intact, and provide sufficient care for, representative samples of the crop in locations acceptable to us (The amount of production to count for such acreage will be based on the harvested production or appraisals from the samples at the time harvest should have occurred.  If you do not leave the required samples intact, or you fail to provide sufficient care for the samples, our appraisal made prior to giving you consent to put the acreage to another use will be used to determine the amount of production to count.); or

(B) If you elect to continue to care for the crop, the amount of production to count for the acreage will be the harvested production, or our reappraisal if additional damage occurs and the crop is not harvested; and

(2) All harvested production from the insurable acreage.

(d) Mature coarse grain production (excluding corn insured as silage) may be adjusted for excess moisture and quality deficiencies.  If moisture adjustment is applicable it will be made prior to any adjustment for quality.  Corn insured as silage will be adjusted for excess moisture and quality only as specified in section 11(e).

(1) Production will be reduced by 0.12 percent for each 0.1 percentage point of moisture in excess of:

(i) Fifteen percent (15%) for corn (If moisture exceeds 30 percent (30%), production will be reduced 0.2 percent for each 0.1 percentage point above 30 percent (30%));

(ii) Fourteen percent (14%) for grain sorghum; and

(iii) Thirteen percent (13%) for soybeans.

We may obtain samples of the production to determine the moisture content.

(2) Production will be eligible for quality adjustment if:

(i) Deficiencies in quality, in accordance with the Official United States Standards for Grain, result in:

(A) Corn not meeting the grade requirements for U.S. No. 4 (grades U.S. No. 5 or worse) because of test weight or kernel damage (excluding

(4 of 5)

heat damage) or having a musty, sour, or commercially objectionable foreign odor;

(B) Grain sorghum not meeting the grade requirements for U.S. No. 4 (grades U.S. Sample grade) because of test weight or kernel damage (excluding heat damage) or having a musty, sour, or commercially objectionable foreign odor (except smut odor), or meets the special grade requirements for smutty grain sorghum; or

(C) Soybeans not meeting the grade requirements for U.S. No. 4 (grades U.S. Sample grade) because of test weight or kernel damage (excluding heat damage) or having a musty, sour, or commercially objectionable foreign odor (except garlic odor), or which meet the special grade requirements for garlicky soybeans; or

(ii) Substances or conditions are present that are identified by the Food and Drug Administration or other public health organizations of the United States as being injurious to human or animal health.

(3) Quality will be a factor in determining your loss only if:

(i) The deficiencies, substances, or conditions resulted from a cause of loss against which insurance is provided under these crop provisions;

(ii) All determinations of these deficiencies, substances, or conditions are made using samples of the production obtained by us or by a disinterested third party approved by us;

(iii) With regard to deficiencies in quality (except test weight, which may be determined by our loss adjuster), the samples are analyzed by:

(A) A grain grader licensed under the United States Grain Standards Act or the United States Warehouse Act;

(B) A grain grader licensed under State law and employed by a warehouse operator who has a storage agreement with the Commodity Credit Corporation; or

(C) A grain grader not licensed under State law, but who is employed by a warehouse operator who has a commodity storage agreement with the Commodity Credit Corporation and is in compliance with State law regarding warehouses; and

(iv) With regard to substances or conditions injurious to human or animal health, the samples are analyzed by a laboratory approved by us.

(4) Coarse grain production that is eligible for quality adjustment, as specified in sections 11(d)(2) and (3), will be reduced by the quality adjustment factor contained in the Special Provisions.

(e) For corn insured as silage:

(1) Whenever our appraisal of grain content is less than 4.5 bushels of grain per ton of silage, the silage production will be reduced by 1 percentage point for each 0.1 (1/10) of a bushel less than 4.5 bushels per ton (If we cannot make a grain appraisal before harvest and you do not leave a representative unharvested sample, in accordance with the policy no reduction for grain-deficient silage will be made.); and

(2) If the normal silage harvesting period has ended, or for any acreage harvested as silage or appraised as silage after the calendar date for the end of the insurance period as specified in section 7(b), we may increase the silage production to count to a 65 percent moisture equivalent to reflect the normal moisture content of silage harvested during the normal silage harvesting period.

(f) Any production harvested from plants growing in the insured crop may be counted as production of the insured crop on a weight basis.

**12. Prevented Planting**

Your prevented planting coverage will be a percentage specified in the actuarial documents of your production guarantee for timely planted acreage. If you have additional coverage and pay an additional premium, you may increase your prevented planting coverage if such additional coverage is specified in the actuarial documents.

**14-CPA (Released June 2013)**

**CONTRACT PRICE ADDENDUM (CPA)**

**2014 AND SUCCEEDING CROP YEARS**

*(The CPA is available for insured crops that are grown under contract if contract pricing is allowed within the actuarial documents and under the terms of this addendum.)*

1.  Definitions

    Base Price – means the price which results from a specified calculation method in a contract.

    Buyer – means a business enterprise which acquires production of a crop via contract and must possess or have contractual access to facilities with equipment and capacity necessary to handle and store the amount of production under contract.

    Contract – means a written agreement between you and a buyer, executed on or before the acreage reporting date, which is in effect for the crop year.  The contract must include:

    (a) Your commitment to plant, grow and deliver an insurable crop to the buyer;

    (b) The buyer's commitment to purchase the production stated in the contract at the contract price;

    (c) The specific crop, type, practice or variety, which also must be insurable under the policy (if the contract states a variety, you must provide verification that the variety is a type or practice listed in the Special Provisions);

    (d) The amount of production or a statement that the buyer will accept all production from a specified number of acres;

    (e) The contract price or a method to determine the contract price.

**1**

**14-CPA (Released June 2013)**

Contract Price – means the price contained in a contract executed between you and a buyer.  The contract price is the amount specified without regard to incentives or discounts.

Maximum Contract Price – means the maximum price allowed under this Addendum determined by multiplying the projected price or price election, as applicable and as determined by RMA, by the maximum contract price factor contained in the actuarial documents.

Premium Amount – means the added price above the base price for planned production and is not an incentive that is related to the performance of the crop production (e.g. quality, timing, etc.).  The premium amount must be converted to consistent units and/or terms as the applicable projected price or price election for the insured crop.

2. Contract Pricing Availability

(a) If the actuarial documents specify the availability of contract pricing, you may use your contract price to determine your projected price, harvest price, or price election, as applicable, for such insurable crops.  You must elect contract pricing by the sales closing date and provide a copy of the contract to us by the acreage reporting date.  The CPA is continuous.

(b) Unless the Special Provisions restrict the total number of insured acres of a crop type or practice to not exceed 110 percent of the crop type's or practice's contracted acres, then the crop type's or practice's projected price or price election, as applicable, will be determined by a weighted average price of contracted and non-contracted acreage.

2

**14-CPA (Released June 2013)**

    (c) To determine the number of acres under contract:

        (1) For an acreage only based contract, the lesser of:

           (i) The insured acres (planted acreage and acreage prevented from being planted); or

           (ii) The number of acres specified in the contract.

        (2) For a production only based contract, the lesser of:

           (i) The number of acres determined by dividing the production stated in the contract by the approved yield; or

           (ii) The insured acres (planted acreage and acreage prevented from being planted).

        (3) For an acreage and production based contract that specifies a maximum number of acres, the lesser of:

           (i) The number of acres determined by dividing the production stated in the contract by the approved yield; or

           (ii) The insured acres (planted acreage and acreage prevented from being planted); or

           (iii) The number of acres specified in the contract.

3. How to Use Your Contract Price

    (a) Methods to determine the contract price by plan of insurance:

        (1) For yield protection (including area yield protection) or actual production history (APH):

           (i)  If the contract provides a fixed price for the contracted production, the projected price or price election, as applicable, is the contract price.

**3**

**14-CPA (Released June 2013)**

    (ii) If the contract provides for a premium amount over a base price to be determined and:

      A.  The base price is set on or before the acreage reporting date, the projected price or price election is the contract price;

      B.  The base price is not available by the acreage reporting date, the projected price or price election is the result of adding the premium amount to the applicable projected price or price election.  For example:  Your contract specifies the price you will receive for your production is $2 per unit (e.g. bushel, pound, etc.) over a base price.  The base price is determined after the acreage reporting date.  Your price election is $10 per unit if you did not elect to use this Addendum.  Under this Addendum your price election is $12 per unit ($10 + $2).

  (2) For revenue protection (including area revenue protection):

    (i)    If the contract provides a fixed price for the contracted production:

      A.  The projected price under this Addendum is the contract price.  For example:  Your contract specifies the price you will receive for your contracted production is $10 per unit.  Your projected price is $6 per unit as determined by the Commodity Exchange Price Provisions (CEPP) or the policy if you did not elect this Addendum.  Under this Addendum your projected price is $10 per unit which is the contract price.

      B.  The harvest price under this Addendum will be the result of the applicable projected price subtracted from the contract price and the

**4**

difference added to the applicable harvest price.  For example:  In (2)(i)(A) above, if you did not elect this Addendum your harvest price is $5 per unit as determined by the CEPP or the policy.  Under this Addendum, your harvest price is $9 per unit ($10 - $6 + $5).

(ii)   If the contract provides for a premium amount over a base price that is available by the acreage reporting date the contract is considered to be a fixed price contract and prices will be calculated as shown in 2(i).

(iii)   If the contract provides for a premium amount over a base price that will not be available until after the acreage reporting date:

A.   The projected price under this Addendum is the result of adding the premium amount to the applicable projected price.  For example: Your contract specifies the price you will receive for your contracted production is $4 per unit over the base price. The base price will be determined after the acreage reporting date.  Your projected price is $7 per unit as determined by the CEPP or the policy if you did not elect this Addendum.  Under this Addendum your projected price is $11 per unit ($7 + $4).

B.   The harvest price is the result of adding the premium amount to the applicable harvest price.  For example:  In (2)(iii)(A) above, if you did not elect this Addendum your harvest price is $8 per unit as determined by the CEPP or the policy.  Under this Addendum your harvest price will be $12 per unit ($8 + $4).

5

**14-CPA (Released June 2013)**

(b) Every projected price or price election determined under section 3(a) is limited to the maximum contract price.

(c) If you have more than one contract price for the crop type or practice, the projected price or price election under this Addendum, as applicable, is calculated by:

   (1) Multiplying the acreage for each contract by the contract price determined in section 3(a); and

   (2) Dividing the results of (c)(1) by the total acres of all the contracts.  Each contract price is subject to the maximum contract price.

(d) The weighted average price of contracted and non-contracted acreage for the crop type or practice is calculated by:

   (1) Multiplying the contracted acreage by the contract price determined in sections 3(a) or 3(c).  (Each contract price is subject to the maximum contract price.);

   (2) Multiplying the non-contracted acreage by the price determined by the CEPP or the policy, as applicable;

   (3) Adding the results from (1) and (2); and

   (4) Dividing the result from (3) by the total acres of the crop.

**6**

# REQUIREMENT TO REPORT FIELD LOCATION ON THE ACREAGE REPORT

Please be advised that the Risk Management Agency has issued the following guidelines.

Beginning with the 2017 reinsurance year, insureds must report field location on the acreage report as required by section 6(c)(5) and 8(c)(5), respectively, of the Basic Provisions for the following insurance plans under CCIP and ARPI:

01      Yield Protection
02      Revenue Protection
03      Revenue Protection with Harvest Price Exclusion
04      Area Yield Protection
05      Area Revenue Protection
06      Area Revenue Protection with Harvest Price Exclusion

The insured can meet the acreage reporting requirement for field location identification by:

If known and accurate, providing the FSA Farm, Tract, and Field Number, including the FSA administrative State and County; or otherwise

Clearly identifying the field location(s) and associated boundaries using AIP map-based reporting or other mapping resources which clearly delineates the field's location.

If an insured does not provide the field location as required, on the acreage report for a CCIP or ARPI policy under insurance plans 01-06, any and all applicable unreported or misreported information penalties would apply, including rejection of the acreage report and subsequent denial of liability to the insured.

Great American Insurance Company has map-based reporting forms and mapping resources available for insureds to comply with this requirement.  If you have any questions, please contact your crop insurance agent.

NHF2-527 Policy 000070



# IRRIGATED PRACTICE GUIDELINES

The following guidelines are provided to enable insureds to properly report planted or perennial crop acreage to be insured under the irrigated practice in order to receive maximum protection under their crop insurance policy. It is very important that these guidelines be utilized to document whether, at the time insurances attaches; there is a reasonable expectation of receiving adequate water to carry out a good irrigation practice for acreage reported under the irrigated practice. The guidelines, in entirety, are substantive and are to be given to the insured in administration of their crop insurance policy.

## 1   DEFINITIONS

The following definitions are provided to facilitate a uniform understanding of the standards and guidelines for insuring an irrigated practice for planted or perennial crop acreage.

A   <u>Adequacy of Irrigation Facilities</u> – Irrigation facilities are considered adequate if it is determined that, at the time insurance attaches to planted or perennial acreage, they will be available and usable at the times needed and have the capacity to timely deliver water in sufficient quantities to carry out a good irrigation practice for the acreage insured under the irrigated practice.

B   <u>Efficient Irrigation</u> – Carrying out a good irrigation practice using a lesser amount of irrigation water than historically applied, but still achieving the irrigated APH yield by implementing approved or enhanced management practices to increase efficiency of irrigation water use.

Enhanced management practices to increase efficiency of irrigation water use include, but are not limited to, the following:

- Irrigation Method – Employing an irrigation water distribution technique or technology that has demonstrated greater efficiency (e.g. converting gravity flood irrigation to a center pivot or underground drip tape).

- Converting high pressure impact sprinklers to low pressure impacts under center pivot irrigation.

- Soil Moisture Monitors – Using soil moisture monitor output to set the schedule and amount of irrigation water applied.

C   <u>Good Irrigation Practice</u> – The application of adequate water in an acceptable manner, at the proper times, to allow production of a normal crop which is often identified as the approved APH yield for crops.

D   <u>Irrigation Equipment and Facilities</u> – The physical resources, other than water, used to regulate the flow of water from a water source to the acreage. This includes pumps, valves, sprinkler heads, and other control devices. It also includes pipes or pipelines which: (1) are under the control of the insured or (2) routinely deliver water only to acreage which is owned or operated by the insured. A center pivot system is considered irrigation equipment and facilities.

E   <u>Irrigation Water Supply</u> – The water source and means for supplying irrigation water, without regard to the equipment or facilities. This includes the water source and dams, canals, ditches, pipelines, etc., which contain the water for movement from the source to the acreage and (1) are not under the control of the insured or (2) routinely deliver water to acreage in addition to that which is owned or operated by the insured. It DOES NOT INCLUDE any irrigation equipment or facilities.

F   <u>Reasonable Expectation of Adequate Water</u> – The insured had no reason to know at the time coverage began the amount of irrigation water may be limited or reduced. No reasonable expectation exists if the insured knew, or had reason to know, the amount of irrigation water may be reduced before coverage begins.

G   <u>Water Source</u> – The source from which water is made available. This includes wells, lakes, reservoirs, streams, aquifers, etc.

## 2   REQUIREMENTS

For planted or perennial acreage to be insured under and irrigated practice, the insured must:

1   be able to document and demonstrate that there is a reasonable expectation of adequate water (refer to section 3);

2   be able to document and demonstrate good irrigation practices;

3   be able to demonstrate that they have adequate irrigation equipment and facilities;

4   provide verifiable documentation to their AIP by the ARD that the irrigation water supply has replenished after a failure of the irrigation water supply prevented the insured from planting or the insured had a failure of irrigation water supply; and

5   keep separate production records for acreage insured under an irrigated practice from acreage insured under a practice other than irrigated (or with no practice applicable) and uninsured acreage.

**3   DETERMINATION OF REASONABLE EXPECTATION OF ADEQUATE WATER**

Factors to be considered (applicable to both the AIP and the insured) when determining and documenting whether a reasonable expectation of adequate water existed include, but are not limited to the following: Substantive

1   Most recent 10-year historical average of available water and any applicable forecasting data from a credible authority responsible for monitoring and forecasting such conditions such as Irrigation Districts, State Department of Water Resources, Bureau of Reclamation, Water Boards, etc.

   **Examples:**   Current Federal, state, or local water district allocations, historical inflows, current water levels, expected inflows resulting from snowpack, expected rainfall, etc.;

2   Water supply availability, quality, and usage;

3   Pump efficiency and capacity;

4   Water requirements (amount and timing) for all irrigated crops;

5   Water rights available to the insured (primary, secondary, urban versus agricultural use, etc.);

6   Contingency plans to handle water shortages;

7   Acres to be irrigated;

8   Ownership of the water source including the legal entitlement or rights to the water (state or Federal versus landowner or other private party);

9   Meters, measuring devices, and methods used to monitor good irrigation practice;

10  Soil types, soil moisture levels, and pre-plant irrigation needs;

11  Water conservation methods, devices used, and plans utilized (if applicable);

12  Past crop planting history and tillage methods;

13  Supplemental water availability and usage including return flow or any precipitation which would normally be received, after insurance attaches;

14  Recommendations from local Cooperative Extension Service (CES), National Resource Conservation Service (NRCS), or other source recognized by CES or NRCS to be an expert in the area regarding irrigation and crop production;

15  Decreased water allocation resulting from the diversion of water for environmental, public use or priority, or other reasons.

   **Note:**   Not an insurable cause of loss (COL) unless the diversion is made necessary due to an insured COL; and

16  Management practices used or to be used to carry out efficient irrigation, as applicable.

**4   FAILURE TO QUALIFY OR CARRY OUT A GOOD IRRIGATION PRACTICE**

A   If the acreage fails to qualify for insurance under the irrigated practice, it will result in such acreage being insured under a practice other than irrigated.  If no other appropriate practice is available for the acreage, insurance will not be considered to have attached on the acreage.

B   Failure to carry out a good irrigation practice on acreage properly insured under the irrigated practice will result in an appraisal for uninsured causes on such acreage, unless:

   1   the failure was caused by unavoidable failure of the irrigation water supply after insurance attached; or

   2   failure or breakdown of the irrigation equipment or facilities due to an insured COL, provided all reasonable efforts to restore the irrigation equipment facilities to proper working order within a reasonable amount of time, unless the AIP determines it is not practical to do so.

      **Note:**   Cost will not be considered when determining whether it is practical to restore the equipment or facilities.

C   If a loss is evident, any reported acreage qualifying as an irrigated practice at the time insurance attaches cannot be revised to a non-irrigated practice after the acreage reporting date, even if liability stays the same or decreases or if the insured failed to carry out a good irrigation practice.

**5   PREVENTED PLANTING COVERAGE**

A    Insureds may be eligible for a prevented planting payment for acreage historically grown under an irrigated practice for which the insured had no reasonable expectation of adequate water by the final planting date (or within the late planting period, if applicable). This applies even if the acreage could have been planted with a non-irrigated practice and the insured elects not to plant,  provided all other prevented planting provisions have been met, including that an insured COL must have occurred within the PP insurance period.

B    Insureds must provide, upon the AIP's request, documentation of the factors which were considered in reporting that there was no reasonable expectation of adequate water for the acreage reported as prevented planting under an irrigated practice.

NHF2-527 Policy 000073

NHF2-527 Policy 000074

# IMPORTANT NOTICE TO POLICYHOLDERS



## Use of Precision Farming Records for a Crop Insurance Claim

Great American Insurance Company (GAIC) may allow Precision Farming records, for those policyholders utilizing Precision Farming Technology Systems, to satisfy the claim documentation requirements under your crop insurance policy.  In an effort to effectively service your policy and provide you with the most up-to-date information, we've outlined the allowance and requirements below.

It is important to point out that the Multiple Peril Crop Insurance (MPCI) program is very specific in what qualifies as Precision Farming.  We encourage you to discuss your Precision Farming Technology System with your Agent early in the year.  If questions arise as a result of these discussions, the GAIC Claims Department will be happy to assist in determining how your system best fits within the framework of crop insurance claim reporting and record requirements.

## What is Precision Farming?

For crop insurance purposes, the USDA's Risk Management Agency has defined Precision Farming as follows:

> The utilization of systems' technologies and agronomic principles to manage variability within and between fields and/or over time that is associated with all aspects of agricultural production.  It requires the use of technologies, such as global positioning system (GPS) and geographic information systems (GIS) management tools for the purpose of improving crop management.  Precision farming may include the combination of variable seeding and fertilizer rates, minimizing seed and chemical overlaps, and the use of GPS/GIS yield mapping technology (i.e. a Precision Farming producer using variable seeding, cutting planting rate from 36,000 to 18,000 seeds/acre for non-irrigated corners, indicating a discernible break in yield with the use of GPS/GIS mapping).

Specifically, a Precision Farming Technology System must include at least the following components:

- GPS technology integrated with planter monitors, combine monitors and yield mapping software.
- The ability to produce reports summarizing planted acres, harvested acres & harvested production.
- The ability to provide evidence, by crop, that the system was properly calibrated according to the manufacturer's requirements, for the current crop year.  If your system is capable of producing a calibration report, we will accept that as evidence of calibration.  If not, you should maintain a hard-copy Annual Calibration Report, which your Agent can provide.

## I believe my system qualifies.  What does this mean for me?

By utilizing a Precision Farming Technology System that meets the above standard, GAIC may allow use of your planted acreage records to be acceptable as "determined" acres and use of your harvested production records to establish your total production (in lieu of settlement sheets, bin measurements, etc.).  In other words, your crop insurance claim may be based on the data and reports collected from your Precision Farming Technology System.

# IMPORTANT NOTICE TO POLICYHOLDERS (Cont'd)



**If I wish to use my Precision Farming Technology as described above, what is required?**
In addition to utilizing a Precision Farming Technology System that qualifies, there are several requirements that must be met, and those requirements differ for planted acreage records vs. harvested production records.  We have outlined the requirements for both categories below:

Planted Acreage Records
- For planted acreage records to be acceptable as evidence of determined acres, the following information must be provided <u>in conjunction with the Harvested Production Records:</u>
  - Insured's Name
  - Unit Number
  - FSA farm/tract/field ID number (optional)
  - Legal description of the acreage; and
  - A print out from the Precision Farming Technology System that includes the crop name, acres planted, and electronically produced maps of planted acreage and summary records. These records must illustrate any required discernable breaks between units or practices.
  - If overlapping rows were planted on the acreage, the system must account for this overlap.  If the system does not account for the overlapping rows, we will determine acres as if the Precision Farming technology was not being used.

Harvested Production Records
- For harvested production records to be acceptable as production evidence for a claim, the following information must be provided <u>in conjunction with the Planted Acreage Records:</u>
  - The system must be calibrated for each insured crop and crop year, in accordance with the owner's manual specifications.  The calibration must be within 3% of the actual weight of the production harvested during the calibration test.
  - The Annual Calibration Report must include all calibrations and adjustments performed, by crop, for the crop year.  The report must also include the date of each calibration/adjustment, and the amount of adjustment from the previous setting.
  - Insured's Name
  - Unit Number
  - FSA farm/tract/field ID number (optional)
  - Legal description of the acreage; and
  - A print out from the Precision Farming Technology System that includes the crop name, acres harvested, date harvested, total production (unadjusted for moisture), average moisture content; and
  - Yield maps and acreage/production summary records, which illustrate that separate production records were maintained by unit and/or practice.

**What else should I consider regarding Precision Farming Technology and my crop insurance?**
In the event your Precision Farming records are deemed unacceptable, we will make our claim determinations as if you did not utilize a Precision Farming Technology System.  In this case, we may use the combine monitor record as a load record when allocating production to the appropriate unit.

Should you have any questions on how Precision Farming fits within the structure of your crop insurance policy, please contact your Agent.

Great American appreciates your business and the opportunity to service your policy.

# IMPORTANT NOTICE TO ALL POLICYHOLDERS



So that Great American Insurance Company can continue to provide prompt service to your MPCI policy/claim, please review the following requirements:

**CRITERIA FOR THE USE OF LOAD RECORDS, STRUCTURE MARKINGS OR COMBINE MONITOR RECORDS FOR PRODUCTION THAT IS TO BE KEPT SEPARATE**

It is a requirement of the Multiple Peril Crop Insurance (MPCI) program that production must be kept separate by unit. Consequently, when commingled production has not been pre-measured by an Approved Insurance Provider (AIP), the Risk Management Agency (RMA) requires policyholders to follow certain requirements when documenting that production of two or more units have been commingled. For your review and so that we can better service your policy, the applicable requirements are provided below.

Please note that failure to adhere to these requirements may result in our inability to allocate the production we determine through measurements, settlement sheet verification, etc. to the appropriate unit, and may ultimately result in the collapsing of units; proration of production and loss of optional units for the following year.

<u>Criteria Needed to Accept Insured's Production Records or Storage-structure Markings</u>

- If load records or combine monitor records are used to keep production separate, the loads are recorded as outlined below.

- If structure markings are used, the structure is marked and identified as outlined below.

- There is no production from prior years in the structure, unless the production has been measured by the AIP or another USDA agency just prior to the current year's production being added. If another USDA agency's measurements are used, you must determine whether the grain was leveled.

- The total production within the structure must be accounted for; i.e., all production stored in the storage structure can be identified separately by unit number or field I.D., uninsured acreage, etc.

<u>Acceptable Load Records, Storage Structure Markings, Printed Records from Combine Monitors</u>

1. Load Records

   Maintain a contemporaneous ledger, by crop, recording loads of production for the crop identified by unit and/or field identification, date of harvest, identity of the conveyance used to transport the grain to the bin and the estimated bushel volume per conveyance. The adjuster must verify that the field identification can be correlated with the unit numbers for the crop for the current crop year. If field identification cannot be correlated to a unit number for the crop, the production must be considered commingled. Policyholders are permitted to adjust their load records for excess moisture, and if they have done so, this is what will be used to compare against the adjuster measured and calculated production (including adjustments for moisture if the adjuster's moisture test shows excess moisture).

2. Storage Structure Markings

   Identify the depth of such production by marking the storage structure with a permanent marker. Write the unit number(s) and/or field identification from which the production was harvested, and date and initial the mark. Also, on the storage structure, identify and mark the depth of uninsured-acreage production separately from insured-acreage production when the storage structure will contain both. The adjuster must verify that the field identification numbers can be correlated with the unit numbers for the crop for the current crop year. If field identification cannot be correlated to a unit number for the crop, the production must be considered commingled.

3.  Records From Combine Monitors that do NOT qualify as a Precision Farming Technology System

Printed records from combine monitors must show the location of field (field identification), name of crop, date, and number of pounds or bushels of the crop. Policyholders must also identify the unit number that correlates with the field identification on the records. The adjuster must verify that the field identification can be correlated with the unit numbers for the crop for the current crop year. If field identification cannot be correlated to a unit number for the crop, the production must be considered commingled. If production from the combine monitor records has been adjusted for moisture by the insured or automatically by the combine monitor, this recorded amount will be the amount compared against the adjuster's measured and calculated production, (including adjustments for moisture if the adjuster's moisture test shows excess moisture).

Contemporaneous and Conveyance, as used in the above paragraphs, are defined as follows:

Contemporaneous – Occurring or originating during the same time.

Conveyance – Anything in which agricultural commodities are transported. This may include combine hoppers, commodity bins, grain carts, grain wagons, farm truck, semi trailer, railcar, or barge. The term "transported" does not include all forms of grain movement; e.g., the following are not conveyances: grain augers, grain dryers, elevator legs, or picking lines.

## ACCEPTABLE WEIGHT TICKETS / RECORDS CRITERIA FOR PRODUCTION THAT IS TO BE WEIGHED AND FARM-STORED

To be acceptable, each individual scale weight ticket/record for each load must be available and must provide at least the following information:

- Policyholder Name
- Crop
- Per Load; the gross weight of the conveyance with production and the gross weight of the conveyance without production. However, the following exceptions apply:
  - o  If the production is weighed using a grain cart that prints out tickets showing the gross weight of production in the cart, only the gross weight per grain cart of the production is required
  - o  If the production is weighed using a grain cart that has an integrated panel showing the gross weight of the production in the cart from which the policyholder documents the weight, only the gross weight per grain cart of the production is required
  - o  If the production is weighed using a grain cart that is equipped with scales integrated with Bluetooth (or other wired/wireless) interface capable of electronically recording and storing weight records on a load by load basis from which the insured can print all individual load tickets and detailed summary, by unit, which includes all of the required information, only the gross weight per grain cart of the production is required.
- Date Weighed
- Load Number (if the scale does not print a number, the policyholder must apply a number)
- Identification and location of farm-storage structure in which the load(s) from each field are stored and/or satisfactory explanation of disposition of the production if any of the production is no longer stored at the time of inspection; and
- Unit and/or field identification from which the production was harvested that can be correlated to the unit numbers for the crop stored. To be acceptable, the adjuster must verify that the field identification can be correlated with the unit numbers for the crop for the current crop year. If field identification cannot be correlated to a unit number for the crop, the production must be considered commingled.

A summary record of scale weight tickets/records is not acceptable.

Policyholder must hand-write any of the required information listed above if the scale that is being used is not capable of printing the required information.

Should you have any questions and/or concerns regarding this information, please contact your agent immediately. Thank you and we appreciate your business!

14-CEPP (Released June 2013)

## COMMODITY EXCHANGE PRICE PROVISIONS (CEPP)

## 2014 AND SUCCEEDING CROP YEARS

**Section II:  Price Definitions**

*(See Section I for General Information applicable to all crops.)*

**Corn (0041)**

**Grain Type**

Projected price – The harvest year's average daily settlement price for the projected price discovery period for the harvest year's futures contract, as shown in the tables below, rounded to the nearest whole cent.  The projected price will be released no later than three business days following the end of the projected price discovery period.

Harvest price - The harvest year's average daily settlement price for the harvest price discovery period for the harvest year's futures contract, as shown in the tables below, rounded to the nearest whole cent.  The harvest price will be released no later than three business days following the end of the harvest price discovery period.

NHF2-527 Policy 000079

| CORN – January 31 Sales Closing Date | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date | Beginning Date | Ending Date |
| Texas | CBOT | Corn | September | Dec 15 | Jan 14 | Aug 1 | Aug 31 |

| CORN – February 15 Sales Closing Date | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date | Beginning Date | Ending Date |
| Texas | CBOT | Corn | December | Jan 1 | Jan 31 | Sep 1 | Sep 30 |

| CORN – February 28 Sales Closing Date | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date | Beginning Date | Ending Date |
| Alabama | CBOT | Corn | September | Jan 15 | Feb 14 | Aug 1 | Aug 31 |
| Arizona | CBOT | Corn | December | Jan 15 | Feb 14 | Oct 1 | Oct 31 |
| Arkansas | CBOT | Corn | December | Jan 15 | Feb 14 | Aug 15 | Sep 14 |
| California | CBOT | Corn | December | Jan 15 | Feb 14 | Oct 1 | Oct 31 |
| Florida | CBOT | Corn | September | Jan 15 | Feb 14 | Aug 1 | Aug 31 |
| Georgia | CBOT | Corn | September | Jan 15 | Feb 14 | Aug 1 | Aug 31 |
| Louisiana | CBOT | Corn | September | Jan 15 | Feb 14 | Aug 1 | Aug 31 |
| Mississippi | CBOT | Corn | December | Jan 15 | Feb 14 | Aug 15 | Sep 14 |
| Nevada | CBOT | Corn | December | Jan 15 | Feb 14 | Oct 1 | Oct 31 |
| North Carolina | CBOT | Corn | December | Jan 15 | Feb 14 | Sep 1 | Sep 30 |
| South Carolina | CBOT | Corn | September | Jan 15 | Feb 14 | Aug 1 | Aug 31 |

**CEPP - Section II:  Corn (Released June 2013)** 2

| CORN – March 15 Sales Closing Date | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date* | Beginning Date | Ending Date |
| Colorado | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Connecticut | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Delaware | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Idaho | CBOT | Corn | December | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Illinois | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Indiana | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Iowa | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Kansas | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Kentucky | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Maine | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Maryland | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Massachusetts | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Michigan | CBOT | Corn | December | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Minnesota | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Missouri | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Montana | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Nebraska | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| New Hampshire | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| New Jersey | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| New Mexico | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| New York | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| North Dakota | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Ohio | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Oklahoma | CBOT | Corn | December | Feb 1 | Feb 28 | Sep 1 | Sep 30 |
| Oregon | CBOT | Corn | December | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Pennsylvania | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Rhode Island | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| South Dakota | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Tennessee | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Texas | CBOT | Corn | December | Feb 1 | Feb 28 | Sep 1 | Sep 30 |
| Utah | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Vermont | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Virginia | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Washington | CBOT | Corn | December | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| West Virginia | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Wisconsin | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Wyoming | CBOT | Corn | December | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| *February 28 Ending Date is extended to February 29 in leap years. | | | | | | | |

**CEPP - Section II:  Corn (Released June 2013)**                                             3

NHF2-527 Policy 000081

**Corn (0041)**

**Silage Type**

Corn for silage is not traded on any Commodity Exchange.  However, revenue protection is still considered to be available in counties where silage is an insurable type and the projected and harvest prices will be determined by RMA in accordance with this CEPP.  The result of this action will allow the producer to insure both the silage and grain types of corn under revenue protection.  With both types of corn insured under revenue protection the producer may qualify for a whole-farm unit. However, corn insured as silage will not have the benefit of the projected price and the harvest price moving as the price on the Commodity Exchange moves for corn for grain.

Projected price – A price determined by RMA and released by January 31 of the harvest year.

Harvest price -- A price equal to the silage type projected price.

**Corn (0041)**

**Organic (Certified) Practice**

Projected price – The corn (grain type) projected price as determined above, multiplied by a factor determined by RMA, rounded to the nearest whole cent.  The factor will be available in the Price Discovery Reporting application located at http://www.rma.usda.gov.  The method used for calculating the factor will be available at http://www.rma.usda.gov/pubs/.   The organic (certified) practice projected price will be released no later than three business days following the end of the corn (grain type) projected price discovery period.

Harvest price – The corn (grain type) harvest price as determined above, multiplied by the same factor determined for the organic (certified) practice projected price, rounded to the nearest whole cent.  The organic (certified) practice harvest price will be released no later than three business days following the end of the corn (grain type) harvest price discovery period.

**CEPP - Section II:  Corn (Released June 2013)**                                                       **5**

NHF2-527 Policy 000084

**16-CEPP (Released November 2015)**

## COMMODITY EXCHANGE PRICE PROVISIONS (CEPP)

## 2016 AND SUCCEEDING CROP YEARS

**Section I:  General Information**

*The CEPP applies only to crops for which revenue protection (including area revenue protection) and yield protection (including area yield protection) are available.  See Section II, by crop specification, for price definitions.*

1.  Definitions

**Average Daily Settlement Price** – The sum of all daily settlement prices divided by the total number of daily settlement prices included in the sum.  All daily settlement prices during the price discovery period for the contract specified in the applicable crop's projected price or harvest price definition will be included in the sum, provided the threshold requirements, as defined below, are met.  If the threshold requirements are not met for the specified contract, see the terms under the substitute average daily settlement price definition.  If the threshold requirements are not met under the terms of the substitute average daily settlement price definition, the applicable projected price and harvest price will be established in accordance with I.2(c), I.2(e)(1), or I.2(f).

**CBOT** – Chicago Board of Trade.

**CME** – Chicago Mercantile Exchange.

**Daily Settlement Price** – A price established in accordance with the CEPP which is available for the crop at the end of a trading day.

**Full Active Trading Day** – For all exchanges **except** the Portland Merchants Exchange, any trading day on which a minimum of 1 open interest contract for the

**CEPP - Section I:  General Information (Released November 2015)**          **1**

NHF2-527 Policy 000085

relevant futures contract is available at the close of trading.  For the Portland

Merchants Exchange, there is **no** open interest requirement.

**Harvest Price** – See the definition in section II.

**Harvest Year** – The calendar year in which the crop is normally harvested.

**ICE** –  InterContinentalExchange.

**KCBT** – Kansas City Board of Trade.

**MGE** – Minneapolis Grain Exchange.

**NASS** – The National Agricultural Statistics Service, an agency within USDA.

**Projected Price** – See the definition in section II.

**Substitute Average Daily Settlement Price** – An average daily settlement price used

when the threshold requirements for the contract specified in the applicable crop's

projected or harvest price definition are not met.  The substitute average daily

settlement price is generally obtained from the contract immediately prior to the

contract specified in the applicable insured crop's projected price or harvest price

definition, or another contract as determined by RMA.  It must represent the same

crop year as the insured crop.  Threshold requirements must be met for the substitute

average daily settlement price.  If threshold requirements are not met, the applicable

projected price and harvest price will be established in accordance with I.2(c),

I.2(e)(1), or I.2(f).

**Threshold Requirements** – The minimum number of full active trading day(s) and

the minimum trading volume that must occur during the price discovery period for

the contract specified in the applicable crop's projected price or harvest price

definition for revenue protection coverage to be offered.  There must be one full

NHF2-527 Policy 000086

active trading day during the price discovery period.  The contract must also trade at least once during the discovery period, i.e., there must be one trading day with a volume of at least one.

**USDA** – United States Department of Agriculture.

2.  Price Determinations

(a) In accordance with either section 1 of the Common Crop Insurance Policy Basic Provisions or section 1 of the Area Risk Protection Insurance Basic Provisions, these Commodity Exchange Price Provisions specify how and when the projected price and harvest price will be determined by crop.

(1) These provisions are a part of the policy **for all crops for which revenue protection is available**, regardless of whether the producer elects revenue protection or yield protection for such crops.

(2) This document includes the information necessary to derive the projected price and the harvest price for the insured crop, as applicable.

(b) The CEPP will be used to determine:

(1) The projected price and harvest price for insured crops for which revenue protection is selected; or

(2) The projected price for insured crops for which yield protection is selected.

(c) RMA reserves the right to omit any daily settlement price or substitute daily settlement price used to compute the average daily settlement price or substitute average daily settlement price if market conditions are different than those used to rate or price revenue protection.

(d) RMA reserves the right to set the projected price for yield protection.

**CEPP - Section I:  General Information (Released November 2015)**                           **3**

NHF2-527 Policy 000087

(e) If the projected price cannot be calculated by the procedures outlined in these

Commodity Exchange Price Provisions:

(1) No revenue protection will be available;

(2) If revenue protection is not available, notice will be provided on RMA's Web

site at http://www.rma.usda.gov/ by the date specified in the applicable

projected price definition;

(3) Yield protection will continue to be available; and

(4) The projected price for yield protection will be determined by RMA and

released by the date specified in the applicable projected price definition in the

CEPP.

(f) If the harvest price cannot be calculated by the procedures outlined in this CEPP,

the harvest price will be determined by RMA.

(g) The harvest price will not be greater than the projected price multiplied by 2.00.

(h) Projected prices, harvest prices and associated factors and adjustments for all

crops, except the corn silage type, can be found at

http://www.rma.usda.gov/tools/pricediscovery.html.  The methods used for

calculating the factors and adjustments can be found at

http://www.rma.usda.gov/pubs/.

(i) In counties with a fall sales closing date for which insurance is provided on both

the spring and fall/winter types, the projected price for spring types will be

released after the fall sales closing date at the time specified in the applicable

definition of projected price.

NHF2-527 Policy 000088

(j)  For each insurance offer, if the actuarial documents specify that contract pricing is available, <u>and</u> procedures for establishing contract pricing are not specified in the crop provisions or special provisions, the Contract Price Addendum (CPA), found at http://www.rma.usda.gov, outlines the procedures for using a contract price to determine your projected price and, if applicable, harvest price.

(k)  For revenue protection coverage to be offered, implied volatilities must be available for the option contract corresponding to the futures contract specified in the applicable crop's projected price or harvest price definition.  The implied volatility requirements are specified in the volatility factor calculation methodology paper, which is found at http://www.rma.usda.gov/pubs/.

**CEPP - Section I:  General Information (Released November 2015)**                    **5**

NHF2-527 Policy 000090

**17-CEPP (Released May 2016)**

## COMMODITY EXCHANGE PRICE PROVISIONS (CEPP)
## 2017 AND SUCCEEDING CROP YEARS

### Section II:  Price Definitions

*(See Section I for General Information applicable to all crops.)*

### Soybeans (0081)

Projected price – The harvest year's average daily settlement price for the projected price discovery period for *either* the harvest year's futures contract (November), *or* the post-harvest year's futures contract (January), as shown in the tables below, rounded to the nearest whole cent.  The projected price will be released no later than three business days following the end of the projected price discovery period.

Harvest price - The harvest year's average daily settlement price for the harvest price discovery period for *either* the harvest year's futures contract (November), *or* the post-harvest year's futures contract (January), as shown in the tables below, rounded to the nearest whole cent.  The harvest price will be released no later than three business days following the end of the harvest price discovery period.

| SOYBEANS – January 31 Sales Closing Date | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date | Beginning Date | Ending Date |
| Texas | CBOT | Soybeans | November | Dec 15 | Jan 14 | Sep 1 | Sep 30 |

| SOYBEANS – February 28 Sales Closing Date | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date | Beginning Date | Ending Date |
| Alabama | CBOT | Soybeans | January | Jan 15 | Feb 14 | Nov 1 | Nov 30 |
| Arkansas | CBOT | Soybeans | November | Jan 15 | Feb 14 | Oct 1 | Oct 31 |
| Florida | CBOT | Soybeans | January | Jan 15 | Feb 14 | Nov 1 | Nov 30 |
| Georgia | CBOT | Soybeans | January | Jan 15 | Feb 14 | Nov 1 | Nov 30 |
| Louisiana | CBOT | Soybeans | November | Jan 15 | Feb 14 | Oct 1 | Oct 31 |
| Mississippi | CBOT | Soybeans | November | Jan 15 | Feb 14 | Oct 1 | Oct 31 |
| North Carolina | CBOT | Soybeans | January | Jan 15 | Feb 14 | Nov 1 | Nov 30 |
| South Carolina | CBOT | Soybeans | January | Jan 15 | Feb 14 | Nov 1 | Nov 30 |
| Texas | CBOT | Soybeans | November | Jan 15 | Feb 14 | Oct 1 | Oct 31 |

NHF2-527 Policy 000091

| SOYBEANS – March 15 Sales Closing Date | | | | Projected Price Discovery Period | | Harvest Price Discovery Period | |
|---|---|---|---|---|---|---|---|
| State | Commodity Exchange | Contract Commodity | Contract Month | Beginning Date | Ending Date* | Beginning Date | Ending Date |
| Colorado | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Delaware | CBOT | Soybeans | January | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Illinois | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Indiana | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Iowa | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Kansas | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Kentucky | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Maryland | CBOT | Soybeans | January | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Michigan | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Minnesota | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Missouri | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Nebraska | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| New Jersey | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| New York | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| North Dakota | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Ohio | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Oklahoma | CBOT | Soybeans | January | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Oregon | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Pennsylvania | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| South Dakota | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Tennessee | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Texas | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Vermont | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| Virginia | CBOT | Soybeans | January | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Washington | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| West Virginia | CBOT | Soybeans | January | Feb 1 | Feb 28 | Nov 1 | Nov 30 |
| Wisconsin | CBOT | Soybeans | November | Feb 1 | Feb 28 | Oct 1 | Oct 31 |
| *February 28 Ending Date is extended to February 29 in leap years. | | | | | | | |

NHF2-527 Policy 000092

**Soybeans (0081)**

**Organic (Certified) Practice**

Projected price – The soybeans projected price as determined above, multiplied by a factor determined by RMA, rounded to the nearest whole cent.  The factor will be available in the Price Discovery Reporting application located at http://www.rma.usda.gov.  The method for calculating the factor will be available at http://www.rma.usda.gov/pubs/.  The organic (certified) practice projected price will be released no later than three business days following the end of the soybeans projected price discovery period.

Harvest price – The soybeans harvest price as determined above, multiplied by the same factor determined for the organic (certified) practice projected price, rounded to the nearest whole cent.  The organic (certified) practice harvest price will be released no later than three business days following the end of the soybeans harvest price discovery period.

NHF2-527 Policy 000093

NHF2-527 Policy 000094

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Washtenaw (161) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Program Dates for Insurable Types and Practices

| Sales Closing Date 3/15/2019 | Earliest Planting Date 4/10/2019 | Final Planting Date 6/5/2019 | End of Late Planting Period Date 6/25/2019 | Acreage Reporting Date 7/15/2019 | Premium Billing Date 8/15/2019 |
|---|---|---|---|---|---|

| TP | Type | Practice |
|---|---|---|
| T/P 1 | Grain 016 | Non-Irrigated 003 |
| T/P 2 | Grain 016 | Irrigated 002 |
| T/P 3 | Grain 016 | Organic(Certified) Non-Irr. 713 *4 |
| T/P 4 | Grain 016 | Organic(Certified) Irr. 702 *4 |
| T/P 5 | Grain 016 | Organic(Transitional) Non-Irr. 714 |
| T/P 6 | Grain 016 | Organic(Transitional) Irr. 712 |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Date**

In lieu of the definition of late planting period in section 1 of the Basic Provisions, please refer to the End Of Late Planting Period Date.

**Price**

For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

**Insurance Availability**

In addition to the types listed in section 5(b)(2) of the Coarse Grains Crop Provisions, purple and pink hybrid corn varieties may be insurable by written agreement.

Insurance shall not attach or be considered to have attached without a written agreement to a planted crop on acreage from which, in the same calendar year:

| Special Provisions of Insurance |
|:---:|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Washtenaw (161) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

1.  A perennial hay crop was harvested; or

2.  A crop (other than a cover crop) reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. To qualify for a written agreement, you must provide a minimum of the most recent three years of your double cropping actual production history for the crop in the county. A cover crop is one that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Washtenaw (161) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Washtenaw (161) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to corn grain production for the insured crop.

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold prior to 60 days after the calendar date for the EOIP, we will adjust your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

a.   Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

b.   Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01)<br>         Revenue Protection (02)<br>         Revenue Prot with Harvest Price Exclusion (03) | County: Washtenaw (161) |

   c.   Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.

1.   OPTION TO DELAY CLAIM SETTLEMENT:

   a.    On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

   b.   If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

   c.   At any time during this delay in settlement, you may request  to settle your claim for any unsold production using the applicable DFs.

   d.   For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

   e.   If the production is later sold, we will not recalculate or adjust your claim for indemnity.

   f.   If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

   g.   This option will not apply to any production qualifying under section C3.

2.   SECTION 14(e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.

3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.

If the production is not sold within this period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not

| **Special Provisions of Insurance** | | |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Washtenaw (161) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.

4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP , otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.

5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

6.   ZERO MARKET VALUE

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value*** , such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Washtenaw (161) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

i.   RIVs cannot be used in combination with chart DFs.

ii.  If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

iii. If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

iv.  The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Corn will be discounted for grade as follows:

| Grade | DF |
|---|---|
| U.S. Sample Grade | 0.085 |

TEST WEIGHT DISCOUNT

Discounts for low test weight as follows (U.S. Grade No.5 for Test Weight –    .    lbs. to 46 lbs.; U.S. Sample Grade –    .    lbs. and below:

| Test Weight Pounds | DF |
|---|---|
| 49 and above | None |
| 48-48.99 | 0.041 |
| 47-47.99 | 0.051 |
| 46-46.99 | 0.062 |
| 45-45.99 | 0.072 |
| 44-44.99 | 0.082 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows (U.S. Grade No. 5 for Damage - 10.01% to 15%; U.S. Sample Grade - 15.01% and above):

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

Year: 2019

Date: 11/27/2018

Commodity: Corn (0041)

Plan:  Yield Protection (01)
 Revenue Protection (02)
 Revenue Prot with Harvest Price Exclusion (03)

State:   Michigan (26)

County: Washtenaw (161)

| Damage % | DF | Damage % | DF | Damage % | DF |
| --- | --- | --- | --- | --- | --- |
| 10 and below | None | 18.01-19 | 0.164 | 27.01-28 | 0.303 |
| 10.01-11 | 0.062 | 19.01-20 | 0.179 | 28.01-29 | 0.318 |
| 11.01-12 | 0.072 | 20.01-21 | 0.195 | 29.01-30 | 0.333 |
| 12.01-13 | 0.082 | 21.01-22 | 0.210 | 30.01-31 | 0.349 |
| 13.01-14 | 0.092 | 22.01-23 | 0.226 | 31.01-32 | 0.364 |
| 14.01-15 | 0.103 | 23.01-24 | 0.241 | 32.01-33 | 0.379 |
| 15.01-16 | 0.118 | 24.01-25 | 0.256 | 33.01-34 | 0.395 |
| 16.01-17 | 0.133 | 25.01-26 | 0.272 | 34.01-35 | 0.410 |
| 17.01-18 | 0.149 | 26.01-27 | 0.287 | Above 35 | See section B |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| | |
| --- | --- |
| Musty Odor | 0.051 |
| Sour Odor | 0.051 |
| COFO | 0.051 |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, on the date of final inspection for the unit adjust production in the following manner:

1. If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2. For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3. If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public

NHF2-527 Policy 000102

8

| Special Provisions of Insurance |
| :---: |
| 2019 and Succeeding Crop Years |

| | | |
| :--- | :--- | :--- |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Washtenaw (161) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

    a.   The action or advisory level of the Food and Drug Administration; or

    b.   Another public health organization of the United States; or

    c.   A public health agency of the applicable State in which the insured crop is grown.

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

    1.   For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

    a.   Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price.

    b.   For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

    c.   Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Washtenaw (161) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| Vomitoxin Range | DF |
|---|---|
| .1 − .   ppm | .000 |
| .1 − 1 .  ppm | .225 |
| 10.1 ppm & above | See C3 below |

2.  For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

   a.  If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

   i.  For production sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

   ii.  For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

   iii.  For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

   iv.  For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

   v.  For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

   b.  If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

   i.  For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

   ii.  For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

   iii.  For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

   iv.  For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Washtenaw (161) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

DFs for Aflatoxin:

| Aflatoxin Range | DF |
|---|---|
| .1 – 2  .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .  ppb | .200 |
| 1   .1 – 2   .  ppb | .300 |
| 2   .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

DFs for Fumonisin:

| Fumonisin Range | DF |
|---|---|
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3.  For production that has Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

a.  For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

i.   The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

ii.  .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

b.  For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

i.   The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Corn (0041) | | State:   Michigan (26) |
| :--- | :--- | :--- | :--- |
| Date: 11/27/2018 | Plan: | Yield Protection (01) | County: Washtenaw (161) |
| | | Revenue Protection (02) | |
| | | Revenue Prot with Harvest Price Exclusion (03) | |

    ii.   .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from section A or B will be included.

  c.  If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

  1.  The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

  2.  If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value and will be adjusted as follows:

    a.  For production in section A – the pre-established DFs.

    b.  For production in section B – .   .

    c.  For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

  3.  If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| :--- | :--- |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Eaton (045) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Program Dates for Insurable Types and Practices

| Sales Closing Date 3/15/2019 | Earliest Planting Date 4/15/2019 | Final Planting Date 6/5/2019 | End of Late Planting Period Date 6/25/2019 | Acreage Reporting Date 7/15/2019 | Premium Billing Date 8/15/2019 |
|---|---|---|---|---|---|

| TP | Type | Practice |
|---|---|---|
| T/P 01 | Blue 383 *3 | Non-Irrigated 003 |
| T/P 02 | Blue 383 *3 | Irrigated 002 |
| T/P 03 | Grain 016 | Non-Irrigated 003 |
| T/P 04 | Grain 016 | Irrigated 002 |
| T/P 05 | Blue 383 *3 | Organic(Certified) Non-Irr. 713 *5 |
| T/P 06 | Blue 383 *3 | Organic(Certified) Irr. 702 *5 |
| T/P 07 | Grain 016 | Organic(Certified) Non-Irr. 713 *5 |
| T/P 08 | Grain 016 | Organic(Certified) Irr. 702 *5 |
| T/P 09 | Blue 383 *3 | Organic(Transitional) Non-Irr. 714 |
| T/P 10 | Blue 383 *3 | Organic(Transitional) Irr. 712 |
| T/P 11 | Grain 016 | Organic(Transitional) Non-Irr. 714 |
| T/P 12 | Grain 016 | Organic(Transitional) Irr. 712 |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

*3   If you produce any of the following specialty corn type(s) for which yields and rates are available in the actuarial documents:

a.   High amylase – Corn that has been genetically modified to increase its content of the enzyme amylase and that is used primarily for the production of ethanol.

NHF2-527 Policy 000107

1

| Special Provisions of Insurance |
| :---: |
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| :--- | :--- | :--- |
| Date: 11/27/2018 | Plan:     Yield Protection (01)<br>            Revenue Protection (02)<br>            Revenue Prot with Harvest Price Exclusion (03) | County: Eaton (045) |

b.   Blue – Corn grown on a plant that produces ears with blue colored kernels or with a mixture of blue and white colored kernels and that is used for the production of tortilla chips, tortillas, and other food products for human consumption.

c.   White – Corn that is white-kernelled and contains not more than 2.0 percent of corn of other colors. White kernels of corn with a slight tinge of light straw or pink color are considered White corn.

d.   Waxy – Corn that consists of 95 percent or more waxy corn, according to procedures prescribed in FGIS instructions.

You may elect to use the price contained in your production contract (contract price) by the acreage reporting date to determine your projected price and harvest price, as applicable, for each specialty type only if the total number of insured acres of the specialty type does not exceed 110 percent of insured specialty type acreage under the contract (the number of acres under contract is determined as indicated below).  The acreage must be under contract with a business enterprise equipped with facilities appropriate to handle and store specialty type corn production. The contract must be executed by you and the business enterprise, in effect for the crop year, and you must provide a copy to us no later than the acreage reporting date.

In lieu of the requirement contained in section 5(b)(2)(i) of the Crop Provisions, blue corn produced under a contract that meets the conditions specified in these Special Provisions is insurable without a written agreement.

To be considered a contract, the executed document must contain:

a.   A requirement that you plant, grow and deliver specialty type corn to the business enterprise;

b.   The amount of production that will be accepted or a statement that all production from a specified number of acres will be accepted.

To determine the number of acres under contract:

   1.   For acreage only based contracts and, acreage and production based contracts which specify a maximum number of acres, the lesser of:

      i.   The insured acres (planted acreage and acreage that is prevented from being planted); or

      ii.   The maximum number of acres specified in the contract.

   2.   For production only based contracts, the lesser of:

      i.   The number of acres determined by dividing the production stated in the contract by the approved yield; or

      ii.   The insured acres (planted acreage and acreage that is prevented from being planted).

c.   The price to be paid for the contracted production or a method to determine such price:

2

| Special Provisions of Insurance |
|:---:|
| **2019 and Succeeding Crop Years** |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:   Yield Protection (01) | County: Eaton (045) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

1.  For yield protection:

    i.    If the contract provides a fixed price for the contracted production, the projected price will be the contract price.  A contract that provides for a premium amount that is priced on or before the acreage reporting date will be considered to be a fixed price contract.

    ii.    If the contract provides for a premium amount over a price to be determined and it is not priced by the acreage reporting date, the contract price will be the result of adding the premium amount to the CEPP projected price.

2.  For revenue protection:

    i.    If the contract provides a fixed price for the contracted production:

    A.   The projected price will be the contract price.

    B.   For high amylase type, the harvest price will be the result of the CEPP projected price subtracted from the contract price and the difference shall be added to the CEPP harvest price.

    C.   For blue type, the harvest price shall equal the projected price.

    ii.    If the contract provides for a premium amount over a price to be determined and it is not priced by the acreage reporting date:

    A.   The projected price will be the result of adding the premium amount to the CEPP projected price.

    B.   For high amylase type, the harvest price will be the result of the CEPP projected price subtracted from the projected price and the difference shall be added to the CEPP harvest price.

    C.   For blue type, the harvest price shall be equal to the projected price.

    iii.   A contract that provides for a premium amount over a market price to be determined but that is priced on or before the acreage reporting date will be considered to be a fixed price contract.

3.   The price used will be the price in the contract without regard to incentives or discounts.

4.   In no case will the contract price exceed the amount determined by multiplying the CEPP projected price, as applicable, by the maximum contract price factor in the Prices tab of these actuarial documents.

5.   If you have more than one contract price for any one specialty type, the price used will be the weighted average of the contract prices. Each contract price is subject to the limits referred to in (c)(4).

| Special Provisions of Insurance |
|---|
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Eaton (045) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

d.   Other such terms that establish the obligations of each party to the contract; and

e.   The contract must clearly indicate the specific specialty type or verification must be provided that the contracted variety is one of the specialty types listed above.

For specialty type corn the following replant rules apply:

a.   In addition to the definition of practical to replant in the Basic Provisions, for specialty type corn under contract it will not be considered practical to replant unless production from the replanted acreage can be delivered under the terms of the specialty type contract or the business enterprise agrees to accept such contracted production.

b.   In addition to section 9 of the Coarse Grains Crop Provisions when it is practical to replant the specialty type originally planted, you must replant to the specialty type originally planted on the acreage.

c.    When it is not practical to replant the specialty type originally planted on the acreage:

   1.   You may choose to:

      i.      Not replant and may receive an indemnity;

      ii.     Not replant the specialty type originally planted on the acreage and plant to another crop in which case the first/second crop rules in section 15 of the Basic Provisions apply; or

      iii.    Replant to another specialty type or commodity type, provided it is practical to replant such type.  The replanted type will be considered a replanted crop.

   2.   If it is not practical to replant to another specialty type or commodity type and you plant any type of corn, the crop planted will be considered a second crop.

For high amylase, quality adjustment will be provided as specified in the Crop Provisions and Special Provisions.  Blue type is not eligible for the quality adjustment specified in the Crop Provisions and Special Provisions.  No additional quality adjustment will be made for any specialty type.

White and waxy contract price values will not increase replanting or prevented planting payments.  Those payments will be calculated using the grain corn Commodity Exchange Price Provisions (CEPP) values and Basic Provisions and Coarse Grains Crop Provisions payment formula.

White and waxy corn, insured as white or waxy, grown under organic certified and organic transitional practices is not eligible for the organic Projected Price and Harvest Price defined within the Commodity Exchange Price Provisions (CEPP) or the Contract Price Addendum.

White and waxy corn grown under organic certified and organic transitional practices may be insured as grain and is eligible for the Projected Price and Harvest Price defined within the Commodity Exchange Price Provisions (CEPP), and may be insured under the Contract Price Addendum, as allowed by Section I(2)(j) of the CEPP.

| Special Provisions of Insurance |
| :-: |
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| :-- | :-- | :-- |
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Eaton (045) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

**Date**

In lieu of the definition of late planting period in section 1 of the Basic Provisions, please refer to the End Of Late Planting Period Date.

**Price**

*5   For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

**Insurance Availability**

In addition to the types listed in section 5(b)(2) of the Coarse Grains Crop Provisions, purple and pink hybrid corn varieties may be insurable by written agreement.

Insurance shall not attach or be considered to have attached without a written agreement to a planted crop on acreage from which, in the same calendar year:

1. A perennial hay crop was harvested; or

2. A crop (other than a cover crop) reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. To qualify for a written agreement, you must provide a minimum of the most recent three years of your double cropping actual production history for the crop in the county. A cover crop is one that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:   Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Eaton (045) |

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:   Yield Protection (01) | County: Eaton (045) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to corn grain production for the insured crop.

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold prior to 60 days after the calendar date for the EOIP, we will adjust your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

a.   Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

b.   Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

NHF2-527 Policy 000113

7

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Eaton (045) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

c.   Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.

1.   OPTION TO DELAY CLAIM SETTLEMENT:

a.    On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

b.   If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

c.   At any time during this delay in settlement, you may request  to settle your claim for any unsold production using the applicable DFs.

d.   For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

e.   If the production is later sold, we will not recalculate or adjust your claim for indemnity.

f.   If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

g.   This option will not apply to any production qualifying under section C3.

2.   SECTION 14(e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.

3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.

If the production is not sold within this period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01)<br>              Revenue Protection (02)<br>              Revenue Prot with Harvest Price Exclusion (03) | County: Eaton (045) |

later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.

4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP , otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.

5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

6.   ZERO MARKET VALUE

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value*** , such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

| Special Provisions of Insurance |
| --- |
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/27/2018 | Plan:    Yield Protection (01) | County: Eaton (045) |
|  | Revenue Protection (02) |  |
|  | Revenue Prot with Harvest Price Exclusion (03) |  |

i.   RIVs cannot be used in combination with chart DFs.

ii.  If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

iii. If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

iv.  The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Corn will be discounted for grade as follows:

| Grade | DF |
| --- | --- |
| U.S. Sample Grade | 0.085 |

TEST WEIGHT DISCOUNT

Discounts for low test weight as follows (U.S. Grade No.5 for Test Weight – .  lbs. to 46 lbs.; U.S. Sample Grade – .  lbs. and below:

| Test Weight Pounds | DF |
| --- | --- |
| 49 and above | None |
| 48-48.99 | 0.041 |
| 47-47.99 | 0.051 |
| 46-46.99 | 0.062 |
| 45-45.99 | 0.072 |
| 44-44.99 | 0.082 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows (U.S. Grade No. 5 for Damage - 10.01% to 15%; U.S. Sample Grade - 15.01% and above):

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

Year: 2019        Commodity: Corn (0041)        State:   Michigan (26)

Date: 11/27/2018        Plan:   Yield Protection (01)        County: Eaton (045)

                 Revenue Protection (02)

                 Revenue Prot with Harvest Price Exclusion (03)

| Damage % | DF | Damage % | DF | Damage % | DF |
|---|---|---|---|---|---|
| 10 and below | None | 18.01-19 | 0.164 | 27.01-28 | 0.303 |
| 10.01-11 | 0.062 | 19.01-20 | 0.179 | 28.01-29 | 0.318 |
| 11.01-12 | 0.072 | 20.01-21 | 0.195 | 29.01-30 | 0.333 |
| 12.01-13 | 0.082 | 21.01-22 | 0.210 | 30.01-31 | 0.349 |
| 13.01-14 | 0.092 | 22.01-23 | 0.226 | 31.01-32 | 0.364 |
| 14.01-15 | 0.103 | 23.01-24 | 0.241 | 32.01-33 | 0.379 |
| 15.01-16 | 0.118 | 24.01-25 | 0.256 | 33.01-34 | 0.395 |
| 16.01-17 | 0.133 | 25.01-26 | 0.272 | 34.01-35 | 0.410 |
| 17.01-18 | 0.149 | 26.01-27 | 0.287 | Above 35 | See section B |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| | |
|---|---|
| Musty Odor | 0.051 |
| Sour Odor | 0.051 |
| COFO | 0.051 |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, on the date of final inspection for the unit adjust production in the following manner:

1.  If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3.  If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public

| Special Provisions of Insurance | | |
| :---: | :---: | :---: |
| **2019 and Succeeding Crop Years** | | |

| | | |
| :--- | :--- | :--- |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Eaton (045) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

   a.   The action or advisory level of the Food and Drug Administration; or

   b.   Another public health organization of the United States; or

   c.   A public health agency of the applicable State in which the insured crop is grown.

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

   1.   For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

   a.   Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price.

   b.   For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

   c.   Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/27/2018 | Plan:       Yield Protection (01) | County: Eaton (045) |
|  |               Revenue Protection (02) |  |
|  |               Revenue Prot with Harvest Price Exclusion (03) |  |

| Vomitoxin Range | DF |
| --- | --- |
| .1 − .   ppm | .000 |
| .1 − 1 .   ppm | .225 |
| 10.1 ppm & above | See C3 below |

2. For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

   a. If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

      i. For production sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

      ii. For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

      iii. For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

      iv. For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

      v. For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

   b. If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

      i. For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

      ii. For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

      iii. For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

      iv. For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Eaton (045) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

DFs for Aflatoxin:

| Aflatoxin Range | DF |
|---|---|
| .1 – 2  .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .   ppb | .200 |
| 1  .1 – 2   .  ppb | .300 |
| 2  .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

DFs for Fumonisin:

| Fumonisin Range | DF |
|---|---|
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3.  For production that has Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

a.  For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

i.   The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

ii.  .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

b.  For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

i.   The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

| Special Provisions of Insurance |
| --- |
| **2019 and Succeeding Crop Years** |

| | | |
| --- | --- | --- |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Eaton (045) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

    ii.   .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from section A or B will be included.

  c.  If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

  1.  The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

  2.  If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value and will be adjusted as follows:

    a.  For production in section A – the pre-established DFs.

    b.  For production in section B – .     .

    c.  For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

  3.  If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| | |
| --- | --- |
| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

NHF2-527 Policy 000122

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:   Yield Protection (01) | County: Ingham (065) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Program Dates for Insurable Types and Practices

| Sales Closing Date | Earliest Planting Date | Final Planting Date | End of Late Planting Period Date | Acreage Reporting Date | Premium Billing Date |
|---|---|---|---|---|---|
| 3/15/2019 | 4/15/2019 | 6/5/2019 | 6/25/2019 | 7/15/2019 | 8/15/2019 |

| TP | Type | Practice |
|---|---|---|
| T/P 01 | Blue 383 *3 | Non-Irrigated 003 |
| T/P 02 | Blue 383 *3 | Irrigated 002 |
| T/P 03 | Grain 016 | Non-Irrigated 003 |
| T/P 04 | Grain 016 | Irrigated 002 |
| T/P 05 | Blue 383 *3 | Organic(Certified) Non-Irr. 713 *5 |
| T/P 06 | Blue 383 *3 | Organic(Certified) Irr. 702 *5 |
| T/P 07 | Grain 016 | Organic(Certified) Non-Irr. 713 *5 |
| T/P 08 | Grain 016 | Organic(Certified) Irr. 702 *5 |
| T/P 09 | Blue 383 *3 | Organic(Transitional) Non-Irr. 714 |
| T/P 10 | Blue 383 *3 | Organic(Transitional) Irr. 712 |
| T/P 11 | Grain 016 | Organic(Transitional) Non-Irr. 714 |
| T/P 12 | Grain 016 | Organic(Transitional) Irr. 712 |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

*3    If you produce any of the following specialty corn type(s) for which yields and rates are available in the actuarial documents:

a.   High amylase – Corn that has been genetically modified to increase its content of the enzyme amylase and that is used primarily for the production of ethanol.

NHF2-527 Policy 000123

1

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Ingham (065) |

b.   Blue – Corn grown on a plant that produces ears with blue colored kernels or with a mixture of blue and white colored kernels and that is used for the production of tortilla chips, tortillas, and other food products for human consumption.

c.   White – Corn that is white-kernelled and contains not more than 2.0 percent of corn of other colors. White kernels of corn with a slight tinge of light straw or pink color are considered White corn.

d.   Waxy – Corn that consists of 95 percent or more waxy corn, according to procedures prescribed in FGIS instructions.

You may elect to use the price contained in your production contract (contract price) by the acreage reporting date to determine your projected price and harvest price, as applicable, for each specialty type only if the total number of insured acres of the specialty type does not exceed 110 percent of insured specialty type acreage under the contract (the number of acres under contract is determined as indicated below).  The acreage must be under contract with a business enterprise equipped with facilities appropriate to handle and store specialty type corn production. The contract must be executed by you and the business enterprise, in effect for the crop year, and you must provide a copy to us no later than the acreage reporting date.

In lieu of the requirement contained in section 5(b)(2)(i) of the Crop Provisions, blue corn produced under a contract that meets the conditions specified in these Special Provisions is insurable without a written agreement.

To be considered a contract, the executed document must contain:

a.   A requirement that you plant, grow and deliver specialty type corn to the business enterprise;

b.   The amount of production that will be accepted or a statement that all production from a specified number of acres will be accepted.

To determine the number of acres under contract:

1.   For acreage only based contracts and, acreage and production based contracts which specify a maximum number of acres, the lesser of:

i.   The insured acres (planted acreage and acreage that is prevented from being planted); or

ii.  The maximum number of acres specified in the contract.

2.   For production only based contracts, the lesser of:

i.   The number of acres determined by dividing the production stated in the contract by the approved yield; or

ii.  The insured acres (planted acreage and acreage that is prevented from being planted).

c.   The price to be paid for the contracted production or a method to determine such price:

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| | | |
| :--- | :--- | :--- |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Ingham (065) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

1.   For yield protection:

   i.      If the contract provides a fixed price for the contracted production, the projected price will be the contract price.  A contract that provides for a premium amount that is priced on or before the acreage reporting date will be considered to be a fixed price contract.

   ii.    If the contract provides for a premium amount over a price to be determined and it is not priced by the acreage reporting date, the contract price will be the result of adding the premium amount to the CEPP projected price.

2.   For revenue protection:

   i.      If the contract provides a fixed price for the contracted production:

   A.    The projected price will be the contract price.

   B.    For high amylase type, the harvest price will be the result of the CEPP projected price subtracted from the contract price and the difference shall be added to the CEPP harvest price.

   C.    For blue type, the harvest price shall equal the projected price.

   ii.    If the contract provides for a premium amount over a price to be determined and it is not priced by the acreage reporting date:

   A.    The projected price will be the result of adding the premium amount to the CEPP projected price.

   B.    For high amylase type, the harvest price will be the result of the CEPP projected price subtracted from the projected price and the difference shall be added to the CEPP harvest price.

   C.    For blue type, the harvest price shall be equal to the projected price.

   iii.   A contract that provides for a premium amount over a market price to be determined but that is priced on or before the acreage reporting date will be considered to be a fixed price contract.

3.   The price used will be the price in the contract without regard to incentives or discounts.

4.   In no case will the contract price exceed the amount determined by multiplying the CEPP projected price, as applicable, by the maximum contract price factor in the Prices tab of these actuarial documents.

5.   If you have more than one contract price for any one specialty type, the price used will be the weighted average of the contract prices. Each contract price is subject to the limits referred to in (c)(4).

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Ingham (065) |

d.   Other such terms that establish the obligations of each party to the contract; and

e.   The contract must clearly indicate the specific specialty type or verification must be provided that the contracted variety is one of the specialty types listed above.

For specialty type corn the following replant rules apply:

a.   In addition to the definition of practical to replant in the Basic Provisions, for specialty type corn under contract it will not be considered practical to replant unless production from the replanted acreage can be delivered under the terms of the specialty type contract or the business enterprise agrees to accept such contracted production.

b.   In addition to section 9 of the Coarse Grains Crop Provisions when it is practical to replant the specialty type originally planted, you must replant to the specialty type originally planted on the acreage.

c.    When it is not practical to replant the specialty type originally planted on the acreage:

1.   You may choose to:

   i.    Not replant and may receive an indemnity;

   ii.   Not replant the specialty type originally planted on the acreage and plant to another crop in which case the first/second crop rules in section 15 of the Basic Provisions apply; or

   iii.  Replant to another specialty type or commodity type, provided it is practical to replant such type.  The replanted type will be considered a replanted crop.

2.   If it is not practical to replant to another specialty type or commodity type and you plant any type of corn, the crop planted will be considered a second crop.

For high amylase, quality adjustment will be provided as specified in the Crop Provisions and Special Provisions.  Blue type is not eligible for the quality adjustment specified in the Crop Provisions and Special Provisions.  No additional quality adjustment will be made for any specialty type.

White and waxy contract price values will not increase replanting or prevented planting payments.  Those payments will be calculated using the grain corn Commodity Exchange Price Provisions (CEPP) values and Basic Provisions and Coarse Grains Crop Provisions payment formula.

White and waxy corn, insured as white or waxy, grown under organic certified and organic transitional practices is not eligible for the organic Projected Price and Harvest Price defined within the Commodity Exchange Price Provisions (CEPP) or the Contract Price Addendum.

White and waxy corn grown under organic certified and organic transitional practices may be insured as grain and is eligible for the Projected Price and Harvest Price defined within the Commodity Exchange Price Provisions (CEPP), and may be insured under the Contract Price Addendum, as allowed by Section I(2)(j) of the CEPP.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Ingham (065) |
|  | Revenue Protection (02) |  |
|  | Revenue Prot with Harvest Price Exclusion (03) |  |

**Date**

In lieu of the definition of late planting period in section 1 of the Basic Provisions, please refer to the End Of Late Planting Period Date.

**Price**

*5   For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

**Insurance Availability**

In addition to the types listed in section 5(b)(2) of the Coarse Grains Crop Provisions, purple and pink hybrid corn varieties may be insurable by written agreement.

Insurance shall not attach or be considered to have attached without a written agreement to a planted crop on acreage from which, in the same calendar year:

1.   A perennial hay crop was harvested; or

2.   A crop (other than a cover crop) reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. To qualify for a written agreement, you must provide a minimum of the most recent three years of your double cropping actual production history for the crop in the county. A cover crop is one that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance.

NHF2-527 Policy 000127

5

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:       Yield Protection (01) | County: Ingham (065) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

6

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Ingham (065) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to corn grain production for the insured crop.

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold prior to 60 days after the calendar date for the EOIP, we will adjust your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

a.  Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

b.  Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Ingham (065) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

    c.   Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.

1.   OPTION TO DELAY CLAIM SETTLEMENT:

    a.    On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

    b.   If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

    c.   At any time during this delay in settlement, you may request  to settle your claim for any unsold production using the applicable DFs.

    d.   For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

    e.   If the production is later sold, we will not recalculate or adjust your claim for indemnity.

    f.   If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

    g.   This option will not apply to any production qualifying under section C3.

2.   SECTION 14(e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.

3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.

If the production is not sold within this period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01)<br>          Revenue Protection (02)<br>          Revenue Prot with Harvest Price Exclusion (03) | County: Ingham (065) |

later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.

4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP , otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.

5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

6.   ZERO MARKET VALUE

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value*** , such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

| Special Provisions of Insurance |
| --- |
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/27/2018 | Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Ingham (065) |

   i.   RIVs cannot be used in combination with chart DFs.

   ii.   If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

   iii.   If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

   iv.   The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Corn will be discounted for grade as follows:

| Grade | DF |
| --- | --- |
| U.S. Sample Grade | 0.085 |

TEST WEIGHT DISCOUNT

Discounts for low test weight as follows (U.S. Grade No.5 for Test Weight –    .    lbs. to 46 lbs.; U.S. Sample Grade –    .    lbs. and below:

| Test Weight Pounds | DF |
| --- | --- |
| 49 and above | None |
| 48-48.99 | 0.041 |
| 47-47.99 | 0.051 |
| 46-46.99 | 0.062 |
| 45-45.99 | 0.072 |
| 44-44.99 | 0.082 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows (U.S. Grade No. 5 for Damage - 10.01% to 15%; U.S. Sample Grade - 15.01% and above):

| Special Provisions of Insurance |
|---|
| 2019 and Succeeding Crop Years |

Year: 2019  Commodity: Corn (0041)  State: Michigan (26)

Date: 11/27/2018  Plan:  Yield Protection (01)  County: Ingham (065)

Revenue Protection (02)

Revenue Prot with Harvest Price Exclusion (03)

| Damage % | DF | Damage % | DF | Damage % | DF |
|---|---|---|---|---|---|
| 10 and below | None | 18.01-19 | 0.164 | 27.01-28 | 0.303 |
| 10.01-11 | 0.062 | 19.01-20 | 0.179 | 28.01-29 | 0.318 |
| 11.01-12 | 0.072 | 20.01-21 | 0.195 | 29.01-30 | 0.333 |
| 12.01-13 | 0.082 | 21.01-22 | 0.210 | 30.01-31 | 0.349 |
| 13.01-14 | 0.092 | 22.01-23 | 0.226 | 31.01-32 | 0.364 |
| 14.01-15 | 0.103 | 23.01-24 | 0.241 | 32.01-33 | 0.379 |
| 15.01-16 | 0.118 | 24.01-25 | 0.256 | 33.01-34 | 0.395 |
| 16.01-17 | 0.133 | 25.01-26 | 0.272 | 34.01-35 | 0.410 |
| 17.01-18 | 0.149 | 26.01-27 | 0.287 | Above 35 | See section B |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| Musty Odor | 0.051 |
|---|---|
| Sour Odor | 0.051 |
| COFO | 0.051 |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, on the date of final inspection for the unit adjust production in the following manner:

1.  If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3.  If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public

| Special Provisions of Insurance | | |
| --- | --- | --- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01)<br>              Revenue Protection (02)<br>              Revenue Prot with Harvest Price Exclusion (03) | County: Ingham (065) |

health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

a.   The action or advisory level of the Food and Drug Administration; or

b.   Another public health organization of the United States; or

c.   A public health agency of the applicable State in which the insured crop is grown.

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

1.   For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

a.   Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price.

b.   For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

c.   Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Special Provisions of Insurance 2019 and Succeeding Crop Years | | |
|---|---|---|

| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
|---|---|---|
| Date: 11/27/2018 | Plan:   Yield Protection (01) Revenue Protection (02) Revenue Prot with Harvest Price Exclusion (03) | County: Ingham (065) |

| Vomitoxin Range | DF |
|---|---|
| .1 − . ppm | .000 |
| .1 − 1 . ppm | .225 |
| 10.1 ppm & above | See C3 below |

2. For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

   a. If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

      i. For production sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

      ii. For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

      iii. For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

      iv. For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

      v. For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

   b. If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

      i. For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

      ii. For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

      iii. For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

      iv. For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DFs will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| | | |
| :--- | :--- | :--- |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:     Yield Protection (01) | County: Ingham (065) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

DFs for Aflatoxin:

| Aflatoxin Range | DF |
| :--- | :--- |
| .1 – 2 .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
|  .1 – 1   .  ppb | .200 |
| 1  .1 – 2   . ppb | .300 |
| 2  .1 – 3   . ppb | .400 |
| 300.1 ppb & above | See C3 below |

DFs for Fumonisin:

| Fumonisin Range | DF |
| :--- | :--- |
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3.  For production that has Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

    a.  For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

        i.   The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

        ii.  .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

    b.  For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

        i.   The RIV applied by the buyer  due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Corn (0041) | State:   Michigan (26) |
| Date: 11/27/2018 | Plan:      Yield Protection (01) | County: Ingham (065) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

    ii.   .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from section A or B will be included.

    c.   If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

1.   The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

2.   If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value and will be adjusted as follows:

    a.   For production in section A – the pre-established DFs.

    b.   For production in section B – .      .

    c.   For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

3.   If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| | |
|---|---|
| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

NHF2-527 Policy 000138

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Washtenaw (161) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Program Dates for Insurable Types and Practices

| Sales Closing Date 3/15/2019 | Earliest Planting Date 4/24/2019 | Final Planting Date 6/15/2019 | End of Late Planting Period Date 7/10/2019 | Acreage Reporting Date 7/15/2019 | Premium Billing Date 8/15/2019 |
|---|---|---|---|---|---|

| TP | Type | Practice |
|---|---|---|
| T/P 01 | Commodity 091 | Nfac (Non-Irrigated) 053 *3 |
| T/P 02 | Commodity 091 | Nfac (Irrigated) 094 *3 |
| T/P 03 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 04 | All Other Food Grades 128 *7 | Nfac (Irrigated) 094 *3 |
| T/P 05 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 06 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated) 094 *3 |
| T/P 07 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 08 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated) 094 *3 |
| T/P 09 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 10 | Low Linolenic Acid 884 *7 | Nfac (Irrigated) 094 *3 |
| T/P 11 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 12 | Low Saturated Fat 885 *7 | Nfac (Irrigated) 094 *3 |
| T/P 13 | High Protein 886 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 14 | High Protein 886 *7 | Nfac (Irrigated) 094 *3 |
| T/P 15 | Commodity 091 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 16 | Commodity 091 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 17 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 18 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 19 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |

NHF2-527 Policy 000139

1

| | Special Provisions of Insurance | |
|---|:---:|---|
| | **2019 and Succeeding Crop Years** | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Washtenaw (161) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| TP | Type | Practice |
|---|---|---|
| T/P 20 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 21 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 22 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 23 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 24 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 25 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 26 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 27 | High Protein 886 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 28 | High Protein 886 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 29 | Commodity 091 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 30 | Commodity 091 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 31 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 32 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 33 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 34 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 35 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 36 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 37 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 38 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 39 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 40 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 41 | High Protein 886 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 42 | High Protein 886 *7 | Nfac (Irrigated)(OT) 740 *3 |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Washtenaw (161) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Practice**

*3   NFAC (Not Following Another Crop): A planted crop not following:

1. A perennial hay crop that was harvested in the same calendar year; and

2. A crop (other than a cover crop) that has reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. A crop that follows a cover crop that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance, is considered NFAC.

**Price**

*4   For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Washtenaw (161) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

**Insurance Availability**

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

| Special Provisions of Insurance | | |
|---|---|---|
| 2019 and Succeeding Crop Years | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Washtenaw (161) |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

*7      If you produce any of the following specialty soybean type(s) (including specialty type(s) grown for seed):

    a.   Large seeded food grade –Food grade soybeans commonly used for human food products which generally have a minimum seed size of 18 g/100 seeds (2,520 seeds/lb).

    b.   Small seeded food grade –Food grade varieties of soybeans commonly used for human food products which generally have a maximum seed size of 12 g/100 seeds (3,780 seeds/lb).

    c.   Low linolenic acid – Soybeans commonly used to produce soybean oil with a linolenic acid level of three percent or less.

    d.   Low saturated fat - Soybeans containing 50 percent less saturated fat than commodity soybeans and are used to produce soybean oil with eight percent or less total saturated fats.

    e.   High protein –Food grade varieties of soybeans containing protein levels of 42 percent or greater on a dry matter basis (36.5 percent on a 13 percent moisture basis).

    f.   All other food grades – Any food grade varieties of soybeans not identified by large seeded food grade, small seeded food grade, low linolenic acid, low saturated fat, and high protein types.

You may elect to use the price contained in your production contract (contract price) by the acreage reporting date to determine your projected price and harvest price, as applicable, for each specialty type only if the total number of insured acres of the specialty type does not exceed 110 percent of insured specialty type acreage under the contract (the number of acres under contract is determined as indicated below).  The acreage must be under contract with a business enterprise equipped with facilities appropriate to handle and store specialty type soybean production.  The contract must be executed by you and the business enterprise, in effect for the crop year, and you must provide a copy to us no later than the acreage reporting date.

To be considered a contract, the executed document must contain:

(a) A requirement that you plant, grow and deliver specialty type soybeans to the business enterprise;

(b) The amount of production that will be accepted or a statement that all production from a specified number of acres will be accepted.

To determine the number of acres under contract:

    1.   For acreage only based contracts and, acreage and production based contracts which specify a maximum number of acres, the lesser of:

        i.    The insured acres (planted acreage and acreage that is prevented from being planted); or

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Washtenaw (161) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

     ii.   The maximum number of acres specified in the contract.

   2.   For production only based contracts, the lesser of:

     i.   The number of acres determined by dividing the production stated in the contract by the approved yield; or

     ii.   The insured acres (planted acreage and acreage that is prevented from being planted).

(c) The price to be paid for the contracted production or a method to determine such price:

   1.   For yield protection:

     i.   If the contract provides a fixed price for the contracted production, the projected price will be the contract price.

     ii.   If the contract provides for a premium amount over a price determined after the acreage reporting date, the projected price will be the result of adding the premium amount to the CEPP projected price.

   2.   For revenue protection:

     i.   If the contract provides a fixed price for the contracted production:

        A.   The projected price will be the contract price.

        B.   The harvest price will be the result of the CEPP projected price subtracted from the contract price and the difference shall be added to the CEPP harvest price.

     ii.   If the contract provides a premium amount over a price determined after the acreage reporting date:

        A.   The projected price will be the result of adding the premium amount to the CEPP projected price.

        B.   The harvest price will be the result of the CEPP projected price subtracted from the projected price and the difference shall be added to the CEPP harvest price.

   3.   The price used will be the price in the contract without regard to incentives or discounts.

   4.   In no case will the contract price exceed the amount determined by multiplying the CEPP projected price, as applicable, by the maximum contract price factor shown in the Prices tab of these actuarial documents.

   5.   If you have more than one contract price for any one specialty type, the price used will be the weighted average of the contract prices.  Each contract price is subject to the limits referred to in (c)(4).

(d) Other such terms that establish the obligations of each party to the contract; and

(e) The contract must clearly indicate the specific specialty type or verification must be provided that the contracted variety is one of the specialty types listed above.

NHF2-527 Policy 000144

6

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Washtenaw (161) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

For specialty type soybeans the following replant rules apply:

(a) In addition to the definition of practical to replant in the Basic Provisions, for specialty type soybeans under contract it will not be considered practical to replant unless production from the replanted acreage can be delivered under the terms of the specialty type contract or the business enterprise agrees to accept such contracted production.

(b) In addition to section 9 of the Coarse Grains Crop Provisions when it **is** practical to replant the specialty type originally planted, you must replant to the specialty type originally planted on the acreage.

(c) When it is **not** practical to replant the specialty type originally planted on the acreage:

1.  You may choose to:

    i.   Not replant and may receive an indemnity;

    ii.  Not replant the specialty type originally planted on the acreage and plant to another crop in which case the first/second crop rules in section 15 of the Basic Provisions apply; or

    iii. Replant to another specialty type or commodity type, provided it is practical to replant such type.  The replanted type will be considered a replanted crop.

2.  If it is not practical to replant to another specialty type or commodity type and you plant any type of soybeans, the crop planted will be considered a second crop.

Note: Quality adjustment will be provided as specified in the crop provisions and special provisions.  No additional quality adjustment will be made for any specialty type.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to soybean grain production for the insured crop

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:     Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Washtenaw (161) |

sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

    a.   Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

    b.   Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

    c.   Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.

1.   OPTION TO DELAY CLAIM SETTLEMENT:

    a.   On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

    b.   If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

    c.   At any time during this delay in settlement, you may request to settle your claim for any unsold production using the applicable DFs.

    d.   For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

    e.   If the production is later sold, we will not recalculate or adjust your claim for indemnity.

    f.   If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

| Special Provisions of Insurance | | |
|---|---|---|
| 2019 and Succeeding Crop Years | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Washtenaw (161) |

g.   This option will not apply to any production qualifying under section C3.


2.   SECTION 14 (e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.


3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.  If the production is not sold within this 30 day period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.


4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP, otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.


5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f  ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only  for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.


6.   ZERO MARKET VALUE

| Special Provisions of Insurance |
| --- |
| **2019 and Succeeding Crop Years** |

| | | |
| --- | --- | --- |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Washtenaw (161) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value***, such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

   i.   RIVs cannot be used in combination with chart DFs.

   ii.   If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

   iii.   If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

   iv.   The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Soybeans will be discounted for grade as follows:

| Grade | DF |
| --- | --- |
| U.S. Sample Grade | 0.030 |

| Special Provisions of Insurance |
| :---: |
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Washtenaw (161) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

TEST WEIGHT DISCOUNT:

Discounts for low test weight as follows:

| Test Weight Pounds | DF |
| --- | --- |
| 49 and above | None |
| 48-48.99 | 0.007 |
| 47-47.99 | 0.009 |
| 46-46.99 | 0.011 |
| 45-45.99 | 0.013 |
| 44-44.99 | 0.015 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows U.S. Sample Grade for Damage –  . 1   and above:

| Damage % | DF | Damage % | DF | Damage % | DF |
| --- | --- | --- | --- | --- | --- |
| 08 and below | None | 17.01-18 | 0.116 | 27.01-28 | 0.196 |
| 08.01-9 | 0.044 | 18.01-19 | 0.124 | 28.01-29 | 0.204 |
| 09.01-10 | 0.052 | 19.01-20 | 0.132 | 29.01-30 | 0.212 |
| 10.01-11 | 0.060 | 20.01-21 | 0.140 | 30.01-31 | 0.220 |
| 11.01-12 | 0.068 | 21.01-22 | 0.148 | 31.01-32 | 0.228 |
| 12.01-13 | 0.076 | 22.01-23 | 0.156 | 32.01-33 | 0.236 |
| 13.01-14 | 0.084 | 23.01-24 | 0.164 | 33.01-34 | 0.244 |
| 14.01-15 | 0.092 | 24.01-25 | 0.172 | 34.01-35 | 0.252 |
| 15.01-16 | 0.100 | 25.01-26 | 0.180 | Above 35 | See section B |
| 16.01-17 | 0.108 | 26.01-27 | 0.188 | | |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| Musty Odor | 0.020 |
| --- | --- |
| Sour Odor | 0.020 |
| COFO | 0.040 |

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:      Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Washtenaw (161) |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, a garlicky grade on the date of final inspection for the unit adjust production in the following manner:

1.  If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3.  If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

a.  The action or advisory level of the Food and Drug Administration; or

b.  Another public health organization of the United States; or

c.  A public health agency of the applicable State in which the insured crop is grown.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Washtenaw (161) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

1. For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

   a. Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

   b. For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

   c. Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Vomitoxin Range | DF |
|---|---|
| .1 −  .   ppm | .000 |
| .1 − 1  .   ppm | .450 |
| 10.1 ppm & above | See C3 below |

2. For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

   a. If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

      i. For production sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

      ii. For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

      iii. For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

<table>
<tr><td colspan="3" align="center"><b>Special Provisions of Insurance</b><br><b>2019 and Succeeding Crop Years</b></td></tr>
<tr><td>Year: 2019</td><td>Commodity: Soybeans (0081)</td><td>State:   Michigan (26)</td></tr>
<tr><td>Date: 11/14/2018</td><td>Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03)</td><td>County: Washtenaw (161)</td></tr>
</table>

iv.  For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

v.  For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

b.  If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

i.  For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

ii.  For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

iii.  For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

iv.  For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

DFs for Aflatoxin:

| Aflatoxin Range | DF |
|---|---|
| .1 – 2 .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .  ppb | .200 |
| 1   .1 – 2   .  ppb | .300 |
| 2   .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

| Special Provisions of Insurance |
| :-: |
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| :-- | :-- | :-- |
| Date: 11/14/2018 | Plan:   Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Washtenaw (161) |

| Fumonisin Range | DF |
| :-- | :-- |
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3. For production that has an Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

   a. For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

      i. The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

      ii. .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

   b. For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

      i. The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

      ii. .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from sections A or B will be included.

   c. If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

1. The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

2. If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value

| Special Provisions of Insurance |
|---|
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:     Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Washtenaw (161) |

and will be adjusted as follows:

   a.  For production in section A – the pre-established DFs.

   b.  For production in section B – .     .

   c.  For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

3.  If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
|---|---|
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Eaton (045) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Program Dates for Insurable Types and Practices

| Sales Closing Date | Earliest Planting Date | Final Planting Date | End of Late Planting Period Date | Acreage Reporting Date | Premium Billing Date |
|---|---|---|---|---|---|
| 3/15/2019 | 4/29/2019 | 6/15/2019 | 7/10/2019 | 7/15/2019 | 8/15/2019 |

| TP | Type | Practice |
|---|---|---|
| T/P 01 | Commodity 091 | Nfac (Non-Irrigated) 053 *3 |
| T/P 02 | Commodity 091 | Nfac (Irrigated) 094 *3 |
| T/P 03 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 04 | All Other Food Grades 128 *7 | Nfac (Irrigated) 094 *3 |
| T/P 05 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 06 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated) 094 *3 |
| T/P 07 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 08 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated) 094 *3 |
| T/P 09 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 10 | Low Linolenic Acid 884 *7 | Nfac (Irrigated) 094 *3 |
| T/P 11 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 12 | Low Saturated Fat 885 *7 | Nfac (Irrigated) 094 *3 |
| T/P 13 | High Protein 886 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 14 | High Protein 886 *7 | Nfac (Irrigated) 094 *3 |
| T/P 15 | Commodity 091 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 16 | Commodity 091 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 17 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 18 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 19 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |

NHF2-527 Policy 000155

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

Year: 2019  
Date: 11/14/2018

Commodity: Soybeans (0081)

Plan:  Yield Protection (01)  
Revenue Protection (02)  
Revenue Prot with Harvest Price Exclusion (03)

State:   Michigan (26)  
County: Eaton (045)

| TP | Type | Practice |
|---|---|---|
| T/P 20 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 21 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 22 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 23 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 24 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 25 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 26 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 27 | High Protein 886 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 28 | High Protein 886 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 29 | Commodity 091 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 30 | Commodity 091 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 31 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 32 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 33 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 34 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 35 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 36 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 37 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 38 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 39 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 40 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 41 | High Protein 886 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 42 | High Protein 886 *7 | Nfac (Irrigated)(OT) 740 *3 |

NHF2-527 Policy 000156

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Eaton (045) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Practice**

*3    NFAC (Not Following Another Crop): A planted crop not following:

1. A perennial hay crop that was harvested in the same calendar year; and

2. A crop (other than a cover crop) that has reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. A crop that follows a cover crop that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance, is considered NFAC.

**Price**

*4    For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Eaton (045) |
|  |           Revenue Protection (02) |  |
|  |           Revenue Prot with Harvest Price Exclusion (03) |  |

**Insurance Availability**

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Eaton (045) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

*7      If you produce any of the following specialty soybean type(s) (including specialty type(s) grown for seed):

a.   Large seeded food grade –Food grade soybeans commonly used for human food products which generally have a minimum seed size of 18 g/100 seeds (2,520 seeds/lb).

b.   Small seeded food grade –Food grade varieties of soybeans commonly used for human food products which generally have a maximum seed size of 12 g/100 seeds (3,780 seeds/lb).

c.   Low linolenic acid – Soybeans commonly used to produce soybean oil with a linolenic acid level of three percent or less.

d.   Low saturated fat - Soybeans containing 50 percent less saturated fat than commodity soybeans and are used to produce soybean oil with eight percent or less total saturated fats.

e.   High protein –Food grade varieties of soybeans containing protein levels of 42 percent or greater on a dry matter basis (36.5 percent on a 13 percent moisture basis).

f.   All other food grades – Any food grade varieties of soybeans not identified by large seeded food grade, small seeded food grade, low linolenic acid, low saturated fat, and high protein types.

You may elect to use the price contained in your production contract (contract price) by the acreage reporting date to determine your projected price and harvest price, as applicable, for each specialty type only if the total number of insured acres of the specialty type does not exceed 110 percent of insured specialty type acreage under the contract (the number of acres under contract is determined as indicated below).  The acreage must be under contract with a business enterprise equipped with facilities appropriate to handle and store specialty type soybean production.  The contract must be executed by you and the business enterprise, in effect for the crop year, and you must provide a copy to us no later than the acreage reporting date.

To be considered a contract, the executed document must contain:

(a) A requirement that you plant, grow and deliver specialty type soybeans to the business enterprise;

(b) The amount of production that will be accepted or a statement that all production from a specified number of acres will be accepted.

To determine the number of acres under contract:

1.   For acreage only based contracts and, acreage and production based contracts which specify a maximum number of acres, the lesser of:

i.    The insured acres (planted acreage and acreage that is prevented from being planted); or

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| :--- | :--- | :--- |
| Date: 11/14/2018 | Plan:      Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Eaton (045) |

        ii.   The maximum number of acres specified in the contract.

    2.   For production only based contracts, the lesser of:

        i.   The number of acres determined by dividing the production stated in the contract by the approved yield; or

        ii.   The insured acres (planted acreage and acreage that is prevented from being planted).

(c) The price to be paid for the contracted production or a method to determine such price:

    1.   For yield protection:

        i.   If the contract provides a fixed price for the contracted production, the projected price will be the contract price.

        ii.   If the contract provides for a premium amount over a price determined after the acreage reporting date, the projected price will be the result of adding the premium amount to the CEPP projected price.

    2.   For revenue protection:

        i.   If the contract provides a fixed price for the contracted production:

            A.   The projected price will be the contract price.

            B.   The harvest price will be the result of the CEPP projected price subtracted from the contract price and the difference shall be added to the CEPP harvest price.

        ii.   If the contract provides a premium amount over a price determined after the acreage reporting date:

            A.   The projected price will be the result of adding the premium amount to the CEPP projected price.

            B.   The harvest price will be the result of the CEPP projected price subtracted from the projected price and the difference shall be added to the CEPP harvest price.

    3.   The price used will be the price in the contract without regard to incentives or discounts.

    4.   In no case will the contract price exceed the amount determined by multiplying the CEPP projected price, as applicable, by the maximum contract price factor shown in the Prices tab of these actuarial documents.

    5.   If you have more than one contract price for any one specialty type, the price used will be the weighted average of the contract prices.  Each contract price is subject to the limits referred to in (c)(4).

(d) Other such terms that establish the obligations of each party to the contract; and

(e) The contract must clearly indicate the specific specialty type or verification must be provided that the contracted variety is one of the specialty types listed above.

6

| Special Provisions of Insurance | | |
| :-- | :-- | :-- |
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Eaton (045) |

For specialty type soybeans the following replant rules apply:

(a) In addition to the definition of practical to replant in the Basic Provisions, for specialty type soybeans under contract it will not be considered practical to replant unless production from the replanted acreage can be delivered under the terms of the specialty type contract or the business enterprise agrees to accept such contracted production.

(b) In addition to section 9 of the Coarse Grains Crop Provisions when it **is** practical to replant the specialty type originally planted, you must replant to the specialty type originally planted on the acreage.

(c) When it is **not** practical to replant the specialty type originally planted on the acreage:

1.  You may choose to:

    i.    Not replant and may receive an indemnity;

    ii.   Not replant the specialty type originally planted on the acreage and plant to another crop in which case the first/second crop rules in section 15 of the Basic Provisions apply; or

    iii.  Replant to another specialty type or commodity type, provided it is practical to replant such type.  The replanted type will be considered a replanted crop.

2.  If it is not practical to replant to another specialty type or commodity type and you plant any type of soybeans, the crop planted will be considered a second crop.

Note: Quality adjustment will be provided as specified in the crop provisions and special provisions.  No additional quality adjustment will be made for any specialty type.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to soybean grain production for the insured crop

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01)<br>         Revenue Protection (02)<br>         Revenue Prot with Harvest Price Exclusion (03) | County: Eaton (045) |

sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

a. Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

b. Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

c. Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.

1. OPTION TO DELAY CLAIM SETTLEMENT:

a. On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

b. If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

c. At any time during this delay in settlement, you may request to settle your claim for any unsold production using the applicable DFs.

d. For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

e. If the production is later sold, we will not recalculate or adjust your claim for indemnity.

f. If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| :--- | :--- | :--- |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Eaton (045) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

    g.   This option will not apply to any production qualifying under section C3.

    2.   SECTION 14 (e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.

    3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.  If the production is not sold within this 30 day period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.

    4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP, otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.

    5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f  ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only  for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.

    6.   ZERO MARKET VALUE

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Eaton (045) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value***, such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

   i.   RIVs cannot be used in combination with chart DFs.

   ii.   If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

   iii.   If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

   iv.   The RIV and local market price* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Soybeans will be discounted for grade as follows:

| Grade | DF |
|---|---|
| U.S. Sample Grade | 0.030 |

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Eaton (045) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

TEST WEIGHT DISCOUNT:

Discounts for low test weight as follows:

| Test Weight Pounds | DF |
|---|---|
| 49 and above | None |
| 48-48.99 | 0.007 |
| 47-47.99 | 0.009 |
| 46-46.99 | 0.011 |
| 45-45.99 | 0.013 |
| 44-44.99 | 0.015 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows U.S. Sample Grade for Damage –  . 1   and above:

| Damage % | DF | Damage % | DF | Damage % | DF |
|---|---|---|---|---|---|
| 08 and below | None | 17.01-18 | 0.116 | 27.01-28 | 0.196 |
| 08.01-9 | 0.044 | 18.01-19 | 0.124 | 28.01-29 | 0.204 |
| 09.01-10 | 0.052 | 19.01-20 | 0.132 | 29.01-30 | 0.212 |
| 10.01-11 | 0.060 | 20.01-21 | 0.140 | 30.01-31 | 0.220 |
| 11.01-12 | 0.068 | 21.01-22 | 0.148 | 31.01-32 | 0.228 |
| 12.01-13 | 0.076 | 22.01-23 | 0.156 | 32.01-33 | 0.236 |
| 13.01-14 | 0.084 | 23.01-24 | 0.164 | 33.01-34 | 0.244 |
| 14.01-15 | 0.092 | 24.01-25 | 0.172 | 34.01-35 | 0.252 |
| 15.01-16 | 0.100 | 25.01-26 | 0.180 | Above 35 | See section B |
| 16.01-17 | 0.108 | 26.01-27 | 0.188 | | |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| Musty Odor | 0.020 |
|---|---|
| Sour Odor | 0.020 |
| COFO | 0.040 |

| **Special Provisions of Insurance** | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01) | County: Eaton (045) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, a garlicky grade on the date of final inspection for the unit adjust production in the following manner:

1.  If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3.  If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

a.  The action or advisory level of the Food and Drug Administration; or

b.  Another public health organization of the United States; or

c.  A public health agency of the applicable State in which the insured crop is grown.

NHF2-527 Policy 000166

12

| Special Provisions of Insurance |
| --- |
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| --- | --- | --- |
| Date: 11/14/2018 | Plan:   Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Eaton (045) |

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

1.  For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

    a.  Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

    b.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

    c.  Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Vomitoxin Range | DF |
| --- | --- |
| .1 −  .   ppm | .000 |
| .1 − 1  .   ppm | .450 |
| 10.1 ppm & above | See C3 below |

2.  For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

    a.  If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

    i.  For production sold to a disinterested third partyprior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

    ii.  For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

    iii.  For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

| **Special Provisions of Insurance** | | |
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Eaton (045) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

    iv.  For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

    v.  For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

  b.  If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

    i.  For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

    ii.  For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

    iii.  For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

    iv.  For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

DFs for Aflatoxin:

| Aflatoxin Range | DF |
|---|---|
| .1 – 2 .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .  ppb | .200 |
| 1   .1 – 2   .  ppb | .300 |
| 2   .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

| Special Provisions of Insurance | |
| :-- | :-- |
| **2019 and Succeeding Crop Years** | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| :-- | :-- | :-- |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Eaton (045) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

| Fumonisin Range | DF |
| :-- | :-- |
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3.  For production that has an Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

    a.  For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

       i.  The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

       ii.  .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

    b.  For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

       i.  The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

       ii.  .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from sections A or B will be included.

    c.  If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

1.  The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

2.  If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value

| **Special Provisions of Insurance**<br>**2019 and Succeeding Crop Years** | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Eaton (045) |

and will be adjusted as follows:

    a.   For production in section A – the pre-established DFs.

    b.   For production in section B – .        .

    c.   For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

  3.   If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
|---|---|
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:  Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Ingham (065) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

### Program Dates for Insurable Types and Practices

| Sales Closing Date 3/15/2019 | Earliest Planting Date 4/29/2019 | Final Planting Date 6/15/2019 | End of Late Planting Period Date 7/10/2019 | Acreage Reporting Date 7/15/2019 | Premium Billing Date 8/15/2019 |
|---|---|---|---|---|---|

| TP | Type | Practice |
|---|---|---|
| T/P 01 | Commodity 091 | Nfac (Non-Irrigated) 053 *3 |
| T/P 02 | Commodity 091 | Nfac (Irrigated) 094 *3 |
| T/P 03 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 04 | All Other Food Grades 128 *7 | Nfac (Irrigated) 094 *3 |
| T/P 05 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 06 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated) 094 *3 |
| T/P 07 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 08 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated) 094 *3 |
| T/P 09 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 10 | Low Linolenic Acid 884 *7 | Nfac (Irrigated) 094 *3 |
| T/P 11 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 12 | Low Saturated Fat 885 *7 | Nfac (Irrigated) 094 *3 |
| T/P 13 | High Protein 886 *7 | Nfac (Non-Irrigated) 053 *3 |
| T/P 14 | High Protein 886 *7 | Nfac (Irrigated) 094 *3 |
| T/P 15 | Commodity 091 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 16 | Commodity 091 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 17 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 18 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 19 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |

| | Special Provisions of Insurance | |
|---|---|---|
| | **2019 and Succeeding Crop Years** | |

Year: 2019      Commodity: Soybeans (0081)      State:   Michigan (26)

Date: 11/14/2018      Plan:     Yield Protection (01)      County: Ingham (065)
                                    Revenue Protection (02)
                                    Revenue Prot with Harvest Price Exclusion (03)

| TP | Type | Practice |
|---|---|---|
| T/P 20 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 21 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 22 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 23 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 24 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 25 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 26 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 27 | High Protein 886 *7 | Nfac (Non-Irrigated)(OC) 727 *3 *4 |
| T/P 28 | High Protein 886 *7 | Nfac (Irrigated)(OC) 739 *3 *4 |
| T/P 29 | Commodity 091 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 30 | Commodity 091 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 31 | All Other Food Grades 128 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 32 | All Other Food Grades 128 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 33 | Large Seeded Food Grade 882 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 34 | Large Seeded Food Grade 882 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 35 | Small Seeded Food Grade 883 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 36 | Small Seeded Food Grade 883 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 37 | Low Linolenic Acid 884 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 38 | Low Linolenic Acid 884 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 39 | Low Saturated Fat 885 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 40 | Low Saturated Fat 885 *7 | Nfac (Irrigated)(OT) 740 *3 |
| T/P 41 | High Protein 886 *7 | Nfac (Non-Irrigated)(OT) 728 *3 |
| T/P 42 | High Protein 886 *7 | Nfac (Irrigated)(OT) 740 *3 |

NHF2-527 Policy 000172

2

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Ingham (065) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

## Statement

**General**

Contact your agent regarding possible premium discounts, options, and/or additional coverage that may be available.

In lieu of Section 17(f)(5)(ii) of the Common Crop Insurance Basic Provisions, haying or grazing a cover crop will not impact eligibility for a prevented planting payment provided such action did not contribute to the acreage being prevented from planting.

**Practice**

*3    NFAC (Not Following Another Crop): A planted crop not following:

1. A perennial hay crop that was harvested in the same calendar year; and

2. A crop (other than a cover crop) that has reached the headed or budded stage prior to termination, regardless of the percentage of plants that reached the headed or budded stage;

Termination means growth has ended. A crop that follows a cover crop that meets the criteria outlined in the Insurance Availability section of this Special Provisions of Insurance, is considered NFAC.

**Price**

*4    For acreage insured as certified organic, the Projected Price and Harvest Price will equal the respective Projected Price and Harvest Price as defined within the Commodity Exchange Price Provisions (CEPP) multiplied by a factor determined by RMA and published on www.rma.usda.gov.

## Special Provisions of Insurance
### 2019 and Succeeding Crop Years

| | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Ingham (065) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

**Insurance Availability**

In accordance with section 9(a)(1)(iv) in the Common Crop Insurance Policy Basic Provisions (Basic Provisions), acreage that has not been planted and harvested or insured (including insured acreage that was prevented from being planted) in at least one of the three previous crop years or acreage where the only crop that has been planted and harvested in one of the three previous crop years was a cover, hay, or forage crop (hereinafter referred to as new breaking acreage) is insurable at 80 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if all of the following requirements 1 through 4 below are met.  New breaking acreage is insurable at 65 percent of the applicable published county T-Yield in the actuarial documents without a written agreement if only requirements 1, 2, and 4 below are met.

1. The policyholder must provide documentation that 75 percent or more of the new breaking acreage by field (or within an existing field if only a portion of the field is new breaking acreage) is composed of soil types defined as Capability Class I, II, or III as determined by the Natural Resources Conservation Service (NRCS) Web Soil Survey (http://websoilsurvey.nrcs.usda.gov/app/HomePage.htm);

2. The policyholder must certify that the new breaking acreage was broken out or chemically destroyed prior to planting;

3. The policyholder must provide documentation that the new breaking acreage has been previously broken and planted to a crop.  Examples of documentation include but are not limited to:  a FSA-578 document showing the prior crop that the new breaking acreage was planted to, a prior crop year's FSA-578 document showing that the new breaking acreage is classified as cropland, receipts/invoices from custom planters or custom harvesters detailing the fields that were planted or harvested, etc.; and

4. If NRCS requires a Conservation Plan on the new breaking acreage, the policyholder must provide documentation that one is, or will be, in place.  If NRCS does not require a Conservation Plan on the new breaking acreage, the producer must certify that one is not required.

Up to and including 320 acres of new breaking acreage per county (on a whole field basis), that meet the requirements above, may be insurable under this Special Provisions statement for the policyholder/entity per each sales closing date (for example, a total of 320 acres or less of new breaking acreage for crops with a September 30 sales closing date and total of 320 acres or less of new breaking acreage for crops with a March 15 sales closing date).  Any new breaking acreage (on a whole field basis) that meets the requirements above and exceeds the 320-acre limitation will require a written agreement to establish insurability (only the acreage that exceeds 320 acres requires a written agreement, up to 320 acres may be approved under this Special Provisions statement even if the producer has more than 320 new breaking acres in the county).

Underwriting Standards:
The producer must provide the applicable documentation and certification described in requirements 1 through 4 above to the Approved Insurance Provider (AIP) on or before the acreage reporting date for insurability of such new breaking acreage.  If the above requirements are met and the described documentation and certification is provided to the AIP by the acreage reporting date, the new breaking acreage will be insurable using the appropriate percentage (65 percent or 80 percent) applied to the applicable published county T-Yield in the actuarial documents (simple average T-Yields, new producer T-Yields, and variable T-Yield percentages do not apply).  A separate APH Database must be established for this new breaking acreage the initial crop year it is insured (in subsequent crop years standard APH procedure will apply provided the acreage is insurable under the terms of the Basic Provisions).  Additionally, new breaking acreage will not be eligible for prevented planting coverage the initial crop year it is insured under this Special Provisions statement.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Ingham (065) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

Insurance shall attach to a crop following a cover crop when the cover crop meets the definition provided in the Basic Provisions, was planted within the last 12 months, and is managed and terminated according to NRCS guidelines. If growing conditions warrant a deviation from the guidelines, producers should contact either Extension or the local NRCS for management guidance. For information on cover crops and crop insurance and the Cover Crop Termination Guidelines go to http://www.rma.usda.gov/news/currentissues/covercrops/.

*7     If you produce any of the following specialty soybean type(s) (including specialty type(s) grown for seed):

   a.   Large seeded food grade –Food grade soybeans commonly used for human food products which generally have a minimum seed size of 18 g/100 seeds (2,520 seeds/lb).

   b.   Small seeded food grade –Food grade varieties of soybeans commonly used for human food products which generally have a maximum seed size of 12 g/100 seeds (3,780 seeds/lb).

   c.   Low linolenic acid – Soybeans commonly used to produce soybean oil with a linolenic acid level of three percent or less.

   d.   Low saturated fat - Soybeans containing 50 percent less saturated fat than commodity soybeans and are used to produce soybean oil with eight percent or less total saturated fats.

   e.   High protein –Food grade varieties of soybeans containing protein levels of 42 percent or greater on a dry matter basis (36.5 percent on a 13 percent moisture basis).

   f.   All other food grades – Any food grade varieties of soybeans not identified by large seeded food grade, small seeded food grade, low linolenic acid, low saturated fat, and high protein types.

You may elect to use the price contained in your production contract (contract price) by the acreage reporting date to determine your projected price and harvest price, as applicable, for each specialty type only if the total number of insured acres of the specialty type does not exceed 110 percent of insured specialty type acreage under the contract (the number of acres under contract is determined as indicated below).  The acreage must be under contract with a business enterprise equipped with facilities appropriate to handle and store specialty type soybean production.  The contract must be executed by you and the business enterprise, in effect for the crop year, and you must provide a copy to us no later than the acreage reporting date.

To be considered a contract, the executed document must contain:

(a) A requirement that you plant, grow and deliver specialty type soybeans to the business enterprise;

(b) The amount of production that will be accepted or a statement that all production from a specified number of acres will be accepted.

To determine the number of acres under contract:

   1.   For acreage only based contracts and, acreage and production based contracts which specify a maximum number of acres, the lesser of:

        i.    The insured acres (planted acreage and acreage that is prevented from being planted); or

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Ingham (065) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

ii.   The maximum number of acres specified in the contract.

2.  For production only based contracts, the lesser of:

i.   The number of acres determined by dividing the production stated in the contract by the approved yield; or

ii.   The insured acres (planted acreage and acreage that is prevented from being planted).

(c) The price to be paid for the contracted production or a method to determine such price:

1.  For yield protection:

i.   If the contract provides a fixed price for the contracted production, the projected price will be the contract price.

ii.   If the contract provides for a premium amount over a price determined after the acreage reporting date, the projected price will be the result of adding the premium amount to the CEPP projected price.

2.  For revenue protection:

i.   If the contract provides a fixed price for the contracted production:

A.   The projected price will be the contract price.

B.   The harvest price will be the result of the CEPP projected price subtracted from the contract price and the difference shall be added to the CEPP harvest price.

ii.   If the contract provides a premium amount over a price determined after the acreage reporting date:

A.   The projected price will be the result of adding the premium amount to the CEPP projected price.

B.   The harvest price will be the result of the CEPP projected price subtracted from the projected price and the difference shall be added to the CEPP harvest price.

3.  The price used will be the price in the contract without regard to incentives or discounts.

4.  In no case will the contract price exceed the amount determined by multiplying the CEPP projected price, as applicable, by the maximum contract price factor shown in the Prices tab of these actuarial documents.

5.  If you have more than one contract price for any one specialty type, the price used will be the weighted average of the contract prices.  Each contract price is subject to the limits referred to in (c)(4).

(d) Other such terms that establish the obligations of each party to the contract; and

(e) The contract must clearly indicate the specific specialty type or verification must be provided that the contracted variety is one of the specialty types listed above.

| Special Provisions of Insurance |
|---|
| 2019 and Succeeding Crop Years |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Ingham (065) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

For specialty type soybeans the following replant rules apply:

(a) In addition to the definition of practical to replant in the Basic Provisions, for specialty type soybeans under contract it will not be considered practical to replant unless production from the replanted acreage can be delivered under the terms of the specialty type contract or the business enterprise agrees to accept such contracted production.

(b) In addition to section 9 of the Coarse Grains Crop Provisions when it **is** practical to replant the specialty type originally planted, you must replant to the specialty type originally planted on the acreage.

(c) When it is **not** practical to replant the specialty type originally planted on the acreage:

1.  You may choose to:

    i.    Not replant and may receive an indemnity;

    ii.   Not replant the specialty type originally planted on the acreage and plant to another crop in which case the first/second crop rules in section 15 of the Basic Provisions apply; or

    iii.  Replant to another specialty type or commodity type, provided it is practical to replant such type.  The replanted type will be considered a replanted crop.

2.  If it is not practical to replant to another specialty type or commodity type and you plant any type of soybeans, the crop planted will be considered a second crop.

Note: Quality adjustment will be provided as specified in the crop provisions and special provisions.  No additional quality adjustment will be made for any specialty type.

**Quality**

GENERAL STATEMENTS:

The following sections only apply to soybean grain production for the insured crop

The Quality Adjustment Factor (QAF) is 1.000 minus the sum of the applicable Discount Factors (DF) expressed below as three-place decimals.  The sum of all applicable DFs will be limited to 1.000.  Only the quality adjustment factors contained herein are considered in determining production to count.  No other quality adjustment factors are considered in determining production to count.

The production to count remaining after allowable reductions to gross production (in accordance with the applicable Crop Provisions), is multiplied by the QAF (not less than zero) to determine net production to count.

Production qualifying for quality adjustment, that does not contain substances or conditions that are injurious to human or animal health, shall be adjusted under

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Ingham (065) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

sections A or B, but not both.

Unless the AIP grants an extension of time to harvest as specified below, the samples of production used to determine insurable quality deficiencies under sections A, B and C must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the end of the insurance period (EOIP).

For any production qualifying under sections B or C (except for section C3) that is sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.  If the production is later sold, we will not recalculate or adjust your claim for indemnity.

For production qualifying under sections B or C (except for production qualifying under section C3) that is unsold 60 days after the calendar date for the EOIP, an automatic 30 day extension will be allowed only for the purpose of submitting your claim for indemnity, unless an extension of time to harvest has been granted or a delay in measurement of farm stored production has been elected under the general statements below.

The DF for production qualifying for quality adjustment containing substances or conditions that are injurious to human or animal health will be determined in accordance with section C.  For production qualifying for quality adjustment under:

    a.   Sections C1 or C2 and section A below, the DF will be determined by adding the applicable DFs from section A to the applicable DFs from sections C1 or C2.

    b.   Sections C1 or C2 and section B below, the DF will be determined by adding the applicable DFs from section B to the applicable DFs from sections C1 or C2.

    c.   Section C3, the DF will be determined under section C3 only.  No additional DFs from section A or section B will be included.

1. OPTION TO DELAY CLAIM SETTLEMENT:

    a.   On the date of final inspection for the unit, if any of your unsold***** production qualifies for quality adjustment under sections B and/or C1 or C2a ii and C2a iv below, your claim will be settled using the applicable DF's for unsold production unless you elect in writing to delay settlement of your claim for up to 60 days after the calendar date for the EOIP.

    b.   If you sell the production to a disinterested third party during this delay, your claim will be settled using the Reduction In Value (RIV) as outlined below, unless the production qualifies under section C (except for production containing Vomitoxin only) and has been in on-farm storage.

    c.   At any time during this delay in settlement, you may request to settle your claim for any unsold production using the applicable DFs.

    d.   For any production sold**** to other than a disinterested third party**, or that is not sold 60 days after the calendar date for the EOIP, we will settle your claim using the applicable DFs.

    e.   If the production is later sold, we will not recalculate or adjust your claim for indemnity.

    f.   If the time to harvest has been extended as stated below, this option will not apply beyond 60 days after the calendar date for the EOIP.

| Special Provisions of Insurance | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:      Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Ingham (065) |

g.   This option will not apply to any production qualifying under section C3.


2.   SECTION 14 (e) OF THE BASIC PROVISIONS

Only when it has been determined that the production qualifies for quality adjustment will the provisions in this Quality Adjustment Statement apply, otherwise this SP statement does not supersede the provisions contained in section 14 (e) in the Basic Provisions.


3.   EXTENSION OF TIME TO HARVEST

If we determine you are prevented from harvesting by the calendar date for the EOIP due to an insurable cause of damage that occurred during the insurance period and we allow an extension of time to harvest, the time to determine insurable quality deficiencies will also be extended.  If you harvest the crop prior to 60 days after the calendar date for the EOIP, your claim will be settled in accordance with sections A, B, or C as applicable unless you elected to delay settlement of your claim, in which case, refer to 1 above.  If you were unable to harvest your crop until AFTER 60 days after the calendar date for the EOIP, and your production qualifies for quality adjustment under sections B1, C1a or C2a i, you will be allowed 30 days after harvest to market your grain and receive an RIV unless the production qualifies solely under section A, in which case, only the DF(s) in section A will be used.  If the production is not sold within this 30 day period, the claim will be settled using the applicable pre-established DF.  You must complete and submit a claim for indemnity not later than the earlier of 60 days after harvest, or 60 days after the date we determine the crop could have been harvested and you did not harvest.  If your production qualifies under section C3, your claim will be settled as specified in section C3.


4.   DELAY IN MEASUREMENT OF FARM STORED PRODUCTION

If you elect to delay measurement of farm stored production as provided in the Basic Provisions, all samples of farm stored production used to determine insurable quality deficiencies must be obtained in accordance with this Quality Adjustment Statement, but not later than 60 days after the EOIP, otherwise such production will not be adjusted for quality.  All samples obtained to test for substances or conditions injurious to human or animal health (other than vomitoxin) must be taken prior to production entering storage.  For Vomitoxin only, samples for testing may be obtained from storage.  The gross amount of production will be determined by us not later than 180 days after the EOIP.  At the end of 180 days, the adjuster will measure the production as soon as possible so your claim can be completed and submitted no later than 30 days after the 180th day.


5.   FAIR CONSIDERATION TO DELIVER TO DISTANT MARKETS

Except as allowed in paragraph 7 f  ii below, fair consideration to deliver sold production to a distant market is allowed only when there are no buyers in your local market and only  for the types and levels of damage included in sections B1, C1a, C2a i, C3a i and C3b i below.  Fair consideration is not allowed for production that is unsold, sold to other than a disinterested third party, fed, utilized in any other manner, or when a pre-established DF is applicable.


6.   ZERO MARKET VALUE

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| | | |
| :--- | :--- | :--- |
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01) | County: Ingham (065) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

If on the date of final inspection for the unit, any production which due to insurable causes is determined to have zero market value\*\*\*, such production will not be considered production to count if the production is destroyed in a manner acceptable to us (see section D).  Fair consideration may be used in the determination of zero market value, except for production fed or used in any other manner.

7.   REDUCTION IN VALUE (RIV):

RIVs must be reasonable, usual, and customary.  No RIV will be made or accepted by us if it is due to:

a.   Moisture content;

b.   Damage due to uninsured causes;

c.   Drying;

d.   Handling;

e.   Processing; or

f.   Any other costs associated with normal harvesting, handling, and marketing of your production.

    i.   RIVs cannot be used in combination with chart DFs.

    ii.   If a lower RIV is available for production sold at a distant market, the RIV at the distant market may be increased by the fair consideration to deliver the production to the distant market, provided the resulting RIV does not exceed the RIV in your local marketing area.

    iii.   If the RIV can be decreased by conditioning the production, the RIV may be increased by the cost of conditioning provided the resulting RIV does not exceed the RIV before conditioning.

    iv.   The RIV and local market price\* are determined on the date such quality adjusted production is sold to a disinterested third party.

SECTION A - DISCOUNT FACTOR CHARTS

On the date of final inspection for the unit, the discount factors are determined using the following charts.  If the DF for any one qualifying level of deficiency is not shown on the charts in this section, then determine all DFs using section B or C as applicable.

GRADE DISCOUNT:

Soybeans will be discounted for grade as follows:

| Grade | DF |
| :--- | :--- |
| U.S. Sample Grade | 0.030 |

| Special Provisions of Insurance |
|---|
| **2019 and Succeeding Crop Years** |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Ingham (065) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

TEST WEIGHT DISCOUNT:

Discounts for low test weight as follows:

| Test Weight Pounds | DF |
|---|---|
| 49 and above | None |
| 48-48.99 | 0.007 |
| 47-47.99 | 0.009 |
| 46-46.99 | 0.011 |
| 45-45.99 | 0.013 |
| 44-44.99 | 0.015 |
| Below 44 | See section B |

DAMAGE DISCOUNT:

Discounts for excessive kernel damage (excluding heat damage) as follows U.S. Sample Grade for Damage –   . 1    and above:

| Damage % | DF | Damage % | DF | Damage % | DF |
|---|---|---|---|---|---|
| 08 and below | None | 17.01-18 | 0.116 | 27.01-28 | 0.196 |
| 08.01-9 | 0.044 | 18.01-19 | 0.124 | 28.01-29 | 0.204 |
| 09.01-10 | 0.052 | 19.01-20 | 0.132 | 29.01-30 | 0.212 |
| 10.01-11 | 0.060 | 20.01-21 | 0.140 | 30.01-31 | 0.220 |
| 11.01-12 | 0.068 | 21.01-22 | 0.148 | 31.01-32 | 0.228 |
| 12.01-13 | 0.076 | 22.01-23 | 0.156 | 32.01-33 | 0.236 |
| 13.01-14 | 0.084 | 23.01-24 | 0.164 | 33.01-34 | 0.244 |
| 14.01-15 | 0.092 | 24.01-25 | 0.172 | 34.01-35 | 0.252 |
| 15.01-16 | 0.100 | 25.01-26 | 0.180 | Above 35 | See section B |
| 16.01-17 | 0.108 | 26.01-27 | 0.188 | | |

SAMPLE GRADE DISCOUNTS:

Discounts for sample grade factors as follows:

| Musty Odor | 0.020 |
|---|---|
| Sour Odor | 0.020 |
| COFO | 0.040 |

| **Special Provisions of Insurance** | | |
|---|---|---|
| **2019 and Succeeding Crop Years** | | |

| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
|---|---|---|
| Date: 11/14/2018 | Plan:      Yield Protection (01) | County: Ingham (065) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

SECTION B - DEFICIENCY NOT IN DISCOUNT FACTOR CHARTS

DFs included in section A are not used if production meets requirements under this section.  For production that has a test weight below 44 pounds per bushel, and/or kernel damage above 35 percent, a garlicky grade on the date of final inspection for the unit adjust production in the following manner:

1.  If sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

2.  For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be .500 (unless you elect to delay settlement as specified in the General Statements above).

3.  If unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner or is sold to other than a disinterested third party the DF will be .500.

SECTION C - SUBSTANCES OR CONDITIONS THAT ARE INJURIOUS TO HUMAN OR ANIMAL HEALTH

The sum of all DFs for production containing substances or conditions that are injurious to human or animal health is allowed, in addition to applicable DFs from sections A or B above, except as shown in C3 below.

Any potential loss due to substances or conditions identified by the Food and Drug Administration, other public health organizations of the United States, or a public health agency of the applicable State in which the insured crop is grown, at a level determined as injurious to human or animal health, will be covered only if the appropriate samples of the production were obtained by our adjuster (or a trained disinterested third party approved by us) (except for flood-damaged grain), and the analysis was performed by an approved laboratory using quantitative tests.

The Food and Drug Administration guidelines state when an edible portion of a crop is exposed to flood waters, it is considered adulterated and can be injurious to human or animal health and should not be used for feed or food.  For acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters, such production is considered to contain substances or conditions qualifying under Section C3 with a level exceeding the maximum amount allowed.  Such production is not required to be sampled and tested by an approved laboratory.  Whether you intend to harvest or not harvest such acreage, you must give us notice to inspect the crop.  Such production will be considered to have zero market value if destroyed in an acceptable manner.  Refer to Section D.  If you harvest production from such flood-damaged acreage and commingle with production from acreage not damaged by flood, such commingled production will not be adjusted for any quality deficiencies listed in Section C.

For production that contains substances or conditions determined to be injurious to human or animal health, when applicable, adjustments will be made for levels of substances or conditions in excess of the amount allowed by the lower of the following:

a.  The action or advisory level of the Food and Drug Administration; or

b.  Another public health organization of the United States; or

c.  A public health agency of the applicable State in which the insured crop is grown.

| **Special Provisions of Insurance**<br>**2019 and Succeeding Crop Years** | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:   Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Ingham (065) |

For production that will be stored on the farm, or in commercial storage (except for production containing Vomitoxin), the appropriate samples must be obtained prior to the production entering storage, otherwise such production will not be adjusted for such quality deficiencies listed in section C.  For Vomitoxin only, samples for testing may be obtained from storage.

1. For production containing Vomitoxin only (no other section C deficiencies are present) qualifying under section C and that has a level of 10.0 ppm or less, adjust the production in the following manner.  If on the date of final adjustment for the unit, the production is:

   a. Sold to a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

   b. For unsold production or production sold to other than a disinterested third party prior to 60 days after the calendar date for the EOIP, the DF will be the applicable DFs shown in the chart below (unless you elect to delay settlement as specified in the General Statements above) added to the applicable DFs included in sections A or B2 above.

   c. Unsold 60 days after the calendar date for the EOIP, fed, utilized in any other manner, or is sold to other than a disinterested third party, the DF will be the applicable DFs shown in the chart below added to the applicable DFs included in sections A or B3 above.

DFs for Vomitoxin:

| Vomitoxin Range | DF |
|---|---|
| .1 −  .   ppm | .000 |
| .1 − 1  .   ppm | .450 |
| 10.1 ppm & above | See C3 below |

2. For production containing substances or conditions, other than Vomitoxin, that qualifies under section C with an Aflatoxin level of 300 ppb or less, with a Fumonisin level of 100 ppm or less, or other substances or conditions with a level less than the maximum amount allowed, adjust the production in the following manner.

   a. If on the date of final adjustment for the unit, the production was transported directly from the field to the buyer, or transported directly from the field and put into commercial storage without going into on farm storage, the DF will be:

      i. For production sold to a disinterested third partyprior to 60 days after the calendar date for the EOIP, the sum of all RIVs applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price.

      ii. For unsold production containing Aflatoxin or Fumonisin prior to 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b (unless you elect to delay settlement as specified in the General Statements above), added to the applicable DFs included in sections A or B2 above.

      iii. For unsold production containing Aflatoxin or Fumonisin 60 days after the calendar date for the EOIP, the applicable DFs shown in the charts below in section C2b, added to the applicable DFs included in sections A or B3 above.

| Special Provisions of Insurance |||
| **2019 and Succeeding Crop Years** |||
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Ingham (065) |
|  | Revenue Protection (02) |  |
|  | Revenue Prot with Harvest Price Exclusion (03) |  |

    iv.  For unsold production containing all other mycotoxins or substances or conditions prior to 60 days after the calendar date for the EOIP (unless you elect to delay settlement as specified in the General Statements above), the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B2 above.

    v.  For unsold production containing all other mycotoxins or substances or conditions 60 days after the calendar date for the EOIP, the DFs will be .500, except as stated in section C3 below.  This DF will be added to the applicable DFs included in sections A or B3 above.

  b.  If on the date of final adjustment for the unit, the unsold production is in on-farm storage, is in commercial storage but was not transported directly from the field, was fed or utilized in any other manner, was in on-farm storage and has been sold, or was sold to other than a disinterested third party:

    i.  For Aflatoxin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

    ii.  For Fumonisin, we will use the applicable DFs shown in the chart below, except as stated in section C3 below.  This chart DF will be added to the applicable DFs included in sections A or B2 above.

    iii.  For all other mycotoxins or substances or conditions, prior to 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B2 above.

    iv.  For all other mycotoxins or substances or conditions, 60 days after the calendar date for the EOIP, the DF will be .500.  This DF will be added to the applicable DFs included in sections A or B3 above.

DFs for Aflatoxin:

| Aflatoxin Range | DF |
| --- | --- |
| .1 – 2  .  ppb | .000 |
| 20.1 - 50.0  ppb | .100 |
| .1 – 1   .  ppb | .200 |
| 1   .1 – 2   .  ppb | .300 |
| 2   .1 – 3   .  ppb | .400 |
| 300.1 ppb & above | See C3 below |

| **Special Provisions of Insurance**<br>**2019 and Succeeding Crop Years** | | |
|---|---|---|
| Year: 2019 | Commodity: Soybeans (0081) | State:   Michigan (26) |
| Date: 11/14/2018 | Plan:     Yield Protection (01)<br>Revenue Protection (02)<br>Revenue Prot with Harvest Price Exclusion (03) | County: Ingham (065) |

| Fumonisin Range | DF |
|---|---|
| 0.1 - 2.0 ppm | .000 |
| 2.1 - 20.0 ppm | .100 |
| 20.1 - 40.0 ppm | .200 |
| 40.1 - 60.0 ppm | .300 |
| 60.1 - 100.0 ppm | .400 |
| 100.1 ppm & above | See C3 below |

3.  For production that has an Aflatoxin level in excess of 300 ppb, a Vomitoxin level in excess of 10 ppm, a Fumonisin level in excess of 100 ppm, or any other substances or conditions qualifying under section C having a level exceeding the maximum amount allowed or when the edible portion of a crop is exposed to flood waters, a claim will not be completed until all such production is sold, fed, utilized in any other manner, or destroyed. An automatic 30 day extension will be allowed for you to submit your claim for indemnity, following the date we determine the production was sold, fed, utilized in any other manner, or destroyed. On the date of final adjustment for the unit, the following will apply (if such production is Zero Market Value, see section D):

    a.  For production containing Vomitoxin only (no other section C deficiencies are present), the DF will be:

        i.  The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party; or

        ii.  .500 for production, fed, utilized in any other manner, or sold to other than a disinterested third party.  No other DF from section A or B will be included.

    b.  For production containing Aflatoxin, Fumonisin, or any other substances or conditions (except for production containing Vomitoxin as detailed in C3a above), the DF will be:

        i.  The RIV applied by the buyer due to all insurable quality deficiencies, and that value divided by the local market price for production sold to a disinterested third party.  Such production must have been transported directly from the field to the buyer, or transported directly from the field and put into commercial storage prior to being sold.

        ii.  .500 for production that was in on-farm storage and was later sold, was in on-farm storage and was transported to commercial storage and later sold, was fed, was utilized in any other manner, or was sold to other than a disinterested third party.  No other DF from sections A or B will be included.

    c.  If production qualifying under section C3 is destroyed in a manner acceptable to us, the DF will be 1.000.  For production destroyed in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.

SECTION D - ZERO MARKET VALUE PRODUCTION

For production listed in sections A, B, or C that we determine has zero market value due to insured quality deficiencies:

1.  The DF will be 1.000 if such production is destroyed in a manner acceptable to us.

2.  If you do not destroy (or refuse to destroy) production in a manner acceptable to us, such production to count is no longer considered to be zero market value

| Special Provisions of Insurance |
| :---: |
| **2019 and Succeeding Crop Years** |

| | | |
| :--- | :--- | :--- |
| Year: 2019 | Commodity: Soybeans (0081) | State:    Michigan (26) |
| Date: 11/14/2018 | Plan:    Yield Protection (01) | County: Ingham (065) |
| | Revenue Protection (02) | |
| | Revenue Prot with Harvest Price Exclusion (03) | |

and will be adjusted as follows:

a.  For production in section A – the pre-established DFs.

b.  For production in section B – .    .

c.  For production in sections C1 or C2, such production will not be adjusted for any quality deficiencies listed in section C.

3.  If you destroy production qualifying under section C3 in a manner unacceptable to us, such production will not be adjusted for any quality deficiencies listed in section C.  If you do not destroy (or refuse to destroy) such production, a claim will not be completed until such production is sold, fed, utilized in any other manner, or destroyed.  An automatic extension of time will be allowed for you to submit your claim for indemnity.

| | |
| :--- | :--- |
| * | "Local Market Price" as defined in the applicable Basic, Crop, or these Provisions. |
| ** | "Disinterested third party" as defined in the applicable Basic, Crop, or these Provisions.  In addition to the definition of "Disinterested third party", a person or business who does not routinely purchase production for resale or for feed will not be considered a disinterested third party if the RIVs applied by the buyer are not reflective of the RIVs in the local market. |
| *** | "Zero market value" occurs when no buyers in your local area are willing to purchase the production and fair consideration to deliver production to a market outside your local marketing area (distant market) is equal to or greater than the production's value at the distant market or when acreage of an insured crop in which the edible portion of the crop has been exposed to flood waters. |
| **** | "Sold" – Grain is considered sold on the date that final settlement between the buyer and seller has occurred and title of the grain has passed from the seller to the buyer |
| ***** | "Unsold" – Grain that does not meet the definition of "sold." |

**GREAT AMERICAN INSURANCE COMPANY** — Crop Insurance Division

Peoria
1315 W. Commerce Drive
Peoria, IL 61615-1462

# Multiple Peril Crop Insurance
## Schedule of Insurance with Production Report
### for the 2019 Crop Year

EXHIBIT 12

10/10/2019
Page: 1 of 16

**Policy Number: 2019-MI-084-1139526**

| INSURED: | NEW HEIGHTS FARM II, LLC | | AGENT: | |
|---|---|---|---|---|

**INSURED:** NEW HEIGHTS FARM II, LLC
6241 RANSOM ST
ZEELAND, MI 49464

**Person Type:** Limited Liability Company (LLC)
**Identification Number:** XX-XXX1610
**ID # Type:** ☐ SSN ☒ EIN ☐ Assigned Number
**Phone:** (616) 875-7880
**2nd Phone:** (616) 610-2886

**AGENT:**
SPARTAN INSURANCE -SHELLENBARGER 2
806 BOTSFORD RD
PETOSKEY, MI 49770

**Code No:** 236133
**Phone:** (855) 347-1066
**Fax:** (231) 347-1067

**SBI Name:**
**SBI Identification #:**

**Authorized Representative(s):** NICHOLAS BOERSEN
**POA(s):**
**Limited Authorized Rep(s):**
**Added Acreage (CL):**

**INSURED CROP SUMMARY FOR STATE: Michigan**   Assignment of Indemnity to: WILMINGTON TRUST, N.A.   All Counties Option: Yes

| Name of County | Name of Crop(s) | BFR | EU DNQ | EP DNQ | Unit Structure | ***New Producer | Plan | Cov Level | % Price Elect, Proj. Price, or Amt of Ins. | Fee | Options/ Elections/ Endorsements | Named Peril Endorsement | Insured Premium | Liability | Acres |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Berrien (21) | Corn | ☒ | ☐ | ☐ | EP | ☐ | RP (02) | 80% | 100% of Max | $0 | PF/TA/YA | None | $ 2,308 | $ 159,748 | 236.93 |
| Berrien (21) | Soybeans | ☒ | ☐ | ☐ | EP | ☐ | RP (02) | 80% | 100% of Max | $0 | PF/TA/YA | None | $ 0 | $ 0 | 0.00 |
| Branch (23) | Corn | ☒ | ☐ | ☐ | EU | ☐ | RP (02) | 80% | 100% of Max | $0 | PF/TA/YA | None | $ 0 | $ 0 | 0.00 |
| Branch (23) | Soybeans | ☒ | ☐ | ☐ | EU | ☐ | RP (02) | 80% | 100% of Max | $0 | PF/TA/YA | None | $ 0 | $ 0 | 0.00 |
| Cass (27) | Corn | ☒ | ☐ | ☒ | EP | ☐ | RP (02) | 80% | 100% of Max | $0 | PF/TA/YA | None | $ 6,772 | $ 550,709 | 808.12 |
| Cass (27) | Soybeans | ☒ | ☐ | ☐ | EP | ☐ | RP (02) | 80% | 100% of Max | $0 | PF/TA/YA | None | $ 0 | $ 0 | 0.00 |
| Hillsdale (59) | Corn | ☒ | ☐ | ☒ | EP | ☐ | RP (02) | 80% | 100% of Max | $0 | PF/TA/YA | None | $ 1,994 | $ 202,085 | 344.11 |
| Hillsdale (59) | Soybeans | ☒ | ☐ | ☐ | EP | ☐ | RP (02) | 80% | 100% of Max | $0 | PF/TA/YA | None | $ 0 | $ 0 | 0.00 |
| Van Buren (159) | Corn | ☒ | ☐ | ☐ | EP | ☐ | RP (02) | 80% | 100% of Max | $0 | PF/TA/YA | None | $ 64,306 | $ 3,191,448 | 5,284.42 |
| Van Buren (159) | Soybeans | ☒ | ☐ | ☐ | EP | ☐ | RP (02) | 80% | 100% of Max | $0 | PF/TA/YA | None | $ 0 | $ 0 | 0.00 |

| | Grand Total: | $ 75,380 | $ 4,103,990 | 6,673.58 |
|---|---|---|---|---|

**CROP ACREAGE SUMMARY (Review information for accuracy and report errors immediately. Revisions are subject to approval by company.)**

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 0001-0001-EP Corn 80% | Irr/Grain Berrien (21) 01-Insured | 27-4S-17W / 35-4S-17W / 11169-6474-1 / 583-3900-1 / 584-3903-1,5 / 584-4441-5,8 | 1.00 / 1.00 PFTA 1.020 / 0.72 | 0.02631507 No | 217 BU 209 BU 209 BU | 173.6 BU $87,140 21,785 BU | 4.00 E 87,140 | 1.0000 | 125.49 5/18/2019 | $5,473 $1,204 | ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage, (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only.), (J)Unharvested and put to another use. (ARPI only.), (K)Unharvested and production appraised by AIP (ARPI Only.), (L)Unreported production. (ARPI only.), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only.), (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability:** (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
I certify I have not produced the insured crop in the county for more than two years.

(Form M205)   See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139526    NEW HEIGHTS FARM II, LLC

Agency: 236133 SPARTAN INSURANCE -SHELLENBARGER 2 / PETOSKEY, MI

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 234 | 0001-0003-EP Corn 80% | Irr/Grain Berrien (21) 01-Insured | 26-4S-17W / 11169-4425-24,25,30 | 1.00 / 1.00 PF 1.020 / 0.71 | 0.02631507 | 209 BU 209 BU | 167.2 BU $34,330 8,582 BU | 4.00 E 34,330 | 1.0000 | 51.33 5/18/2019 | $1,885 $414 | ☐ Commingled Prod |
| 2 | 0001-0002-EP Corn 80% | Non-Irr/Grain Berrien (21) 01-Insured | 27-4S-17W / 34-4S-17W / 584-3903-1,5 / 584-3935-1 | 1.00 / 1.00 PFTA 1.020 / 0.73 | 0.04887162 | 199 BU 191 BU 191 BU | 159.2 BU $38,278 9,570 BU | 4.00 E 38,278 | 1.0000 | 60.11 5/17/2019 | $3,136 $690 | ☐ Commingled Prod |
| **Total for Berrien, Corn** | | | | Acres: 236.93 | | Guarantee/Amt. of Cov.: 159,748 DOL | | Liability: $159,748 | | | $10,494 | $2,308 |
| 19 | 0001-0002-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Berrien (21) 15-ZC | 23-4S-17W / 27-4S-17W / 34-4S-17W / 583-3900-1 / 584-3903-1,5 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.05913216 No | 52 BU 50 BU 50 BU | 41.6 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 18 | 0001-0001-EP Soybeans 80% | Nfac (Irr)/Commodity Berrien (21) 15-ZC | 27-4S-17W / 35-4S-17W / 11169-6474-1 / 583-3900-1 / 584-3903-1,5 / 584-4441-5,8 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.07614217 No | 40 BU 40 BU 40 BU | 32.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 27 | 0001-0017-EP Soybeans 80% | Nfac (Irr)/Commodity Berrien (21) 15-ZC | 26-4S-17W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.07614217 No | 40 BU 40 BU 40 BU | 32.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| **Total for Berrien, Soybeans** | | | | Acres: 0.00 | | Guarantee/Amt. of Cov.: 0 DOL | | Liability: $0 | | | $0 | $0 |
| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
| 31 | 0001-0002-EU Corn 80% | Non-Irr/Grain Branch (23) 15-ZC | 12-6S-6W / 13-6S-6W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.04290725 No | 174 BU 172 BU 172 BU | 139.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| **Total for Branch, Corn** | | | | Acres: 0.00 | | Guarantee/Amt. of Cov.: 0 DOL | | Liability: $0 | | | $0 | $0 |
| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
| 36 | 0001-0002-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Branch (23) 15-ZC | 6-6S-5W / 12-6S-6W / 13-6S-6W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.02411027 | 48 BU 47 BU 47 BU | 38.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| **Total for Branch, Soybeans** | | | | Acres: 0.00 | | Guarantee/Amt. of Cov.: 0 DOL | | Liability: $0 | | | $0 | $0 |

* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage, (B)Harvested Production: farm stored/measured by insured, (C)Harvested Production: pick/daily sales records, (D)Harvested Production: automated yield monitoring system, (E)Harvested Production: farm stored/measured by authorized representative, (F)Harvested Production: livestock feeding records, (G)Harvested Production: field harvest records, (H)Harvested Production: other, (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only), (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only, (N)Appraisal (non-loss). For CCIP policies only, (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
I certify I have not produced the insured crop in the county for more than two years.

(Form M205)        See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139526    NEW HEIGHTS FARM II, LLC

Agency: 236133 SPARTAN INSURANCE -SHELLENBARGER 2 / PETOSKEY, MI

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 0001-0001-EU Corn 80% | Irr/Grain<br><br>Cass (27) 01-Insured | SILVER CREEK<br>1-5S-16W / 2-5S-16W / 3-5S-16W / 10-5S-16W / 29-5S-16W / 32-5S-16W / 5342-2548-10 / 5342-5194-1 / 5342-5840-27,7 / 5342-6665-1 / 6412-7289-7 | 1.00 / 1.00 PFTA 1.020 / 0.65 | 0.02471978<br><br>No | 217 BU 209 BU 209 BU | 173.6 BU $393,135 98,284 BU<br>393,135 | 4.00 E | 1.0000 | 566.15 5/28/2019 | $21,464<br><br>$4,722 | ☐ Commingled Prod |
| 41 | 0001-0001-EU Corn 80% | Non-Irr/Grain<br><br>Cass (27) 01-Insured | SILVER CREEK<br>2-5S-16W / 5342-5711-1 / 5342-5840-7 | 1.00 / 1.00 PFTA 1.020 / 0.64 | 0.04352686<br><br>No | 193 BU 187 BU 187 BU | 154.4 BU $4,175 1,044 BU<br>4,175 | 4.00 E | 1.0000 | 6.76 5/15/2019 | $284<br><br>$63 | ☐ Commingled Prod |
| 42 | 0001-0002-EU Corn 80% | Irr/Grain<br><br>Cass (27) 14-ZU | WAYNE<br>27-5S-15W / 10009-9912-10 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.02471978<br><br>No | 217 BU 209 BU 209 BU | 173.6 BU $0 0 | 4.00 E | 1.0000 | 0.00 | $0<br><br>$0 | ☐ Commingled Prod |
| 235 | 0001-0003-EU Corn 80% | Non-Irr/Grain<br><br>Cass (27) 01-Insured | 19-5S-15W / 9878-9760-1 | 1.00 / 1.00 PF 1.020 / 0.64 | 0.04352686<br><br>No | 187 BU 187 BU | 149.6 BU $49,775 12,444 BU<br>49,775 | 4.00 E | 1.0000 | 83.18 5/15/2019 | $3,058<br><br>$673 | ☐ Commingled Prod |
| 48 | 0001-0005-EU Corn 80% | Irr/Grain<br><br>Cass (27) 14-ZU | LAGRANGE<br>10-6S-15W / 11-6S-15W / 7797-7858-12,17 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.02471978<br><br>No | 217 BU 209 BU 209 BU | 173.6 BU $0 0 | 4.00 E | 1.0000 | 0.00 | $0<br><br>$0 | ☐ Commingled Prod |
| 56 | 0001-0009-EU Corn 80% | Irr/Grain<br><br>Cass (27) 01-Insured | JEFFERSON<br>8-7S-15W / 17-7S-15W / 7941-6108-1 / 7941-8203-15 | 1.00 / 1.00 PFTA 1.020 / 0.65 | 0.02508027<br><br>No | 213 BU 204 BU 204 BU | 170.4 BU $103,624 25,906 BU<br>103,624 | 4.00 E | 1.0000 | 152.03 5/28/2019 | $5,972<br><br>$1,314 | ☐ Commingled Prod |

| Total for Cass, Corn | Acres: 808.12 | Guarantee/Amt. of Cov.: 550,708 DOL | Liability: $550,709 | $30,778 | $6,772 |
|---|---|---|---|---|---|

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 77 | 0001-0001-EP Soybeans 80% | Nfac (Non-Irr)/Commodity<br><br>Cass (27) 15-ZC | SILVER CREEK<br>2-5S-16W / 5342-5840-7 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03688608<br><br>No | 49 BU 49 BU 49 BU | 39.2 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0<br><br>$0 | ☐ Commingled Prod |
| 107 | 0001-0019-EP Soybeans 80% | Nfac (Non-Irr)/Commodity<br><br>Cass (27) 15-ZC | 19-5S-15W / 9878-9760-1 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03232041<br><br>No | 56 BU 56 BU 56 BU | 44.8 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0<br><br>$0 | ☐ Commingled Prod |

---

* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (F)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only), (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3d party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)    See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number:  2019-MI-084-1139526     NEW HEIGHTS FARM II, LLC

Agency:  236133 SPARTAN INSURANCE -SHELLENBARGER 2 / PETOSKEY, MI

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note / Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 78 | 0001-0001-EP Soybeans 80% | Nfac (Irr)/Commodity Cass (27) 15-ZC | SILVER CREEK — 1-5S-16W / 2-5S-16W / 29-5S-16W / 5342-5194-1 / 5342-5711-1 / 6412-7289-7 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.04491019 No | 52 BU 52 BU 52 BU | 41.6 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 80 | 0001-0002-EP Soybeans 80% | Nfac (Irr)/Commodity Cass (27) 15-ZC | WAYNE — 27-5S-15W / 10009-9912-10 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.05263484 No | 45 BU 45 BU 45 BU | 36.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 86 | 0001-0005-EP Soybeans 80% | Nfac (Irr)/Commodity Cass (27) 15-ZC | LAGRANGE — 10-6S-15W / 11-6S-15W / 7797-7858-12,17 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.04874163 No | 48 BU 48 BU 48 BU | 38.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 94 | 0001-0009-EP Soybeans 80% | Nfac (Irr)/Commodity Cass (27) 15-ZC | JEFFERSON — 8-7S-15W / 17-7S-15W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0371971 No | 63 BU 62 BU 62 BU | 50.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

| Total for Cass, Soybeans | | | | Acres: 0.00 | | Guarantee/Amt. of Cov.: 0 DOL | | Liability: $0 | | $0 | $0 |

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note / Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 108 | 0001-0001-EU Corn 80% | Irr/Grain Hillsdale (59) 14-ZU | 2-7S-4W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.01776452 No | 189 BU 187 BU 187 BU | 151.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 237 | 0001-0001-EU Corn 80% | Irr/Grain Hillsdale (59) 01-Insured | 2-7S-4W / 1561-2222-1,2 | 1.00 / 1.00 PFTA 1.020 / 0.70 | 0.01776452 No | 189 BU 187 BU 187 BU | 151.2 BU $27,613 6,903 BU 27,613 | 4.00 E | 1.0000 | 46.58 6/7/2019 (2 L2 - 0.980) | $1,292 $284 | ☐ Commingled Prod |
| 109 | 0001-0002-EU Corn 80% | Non-Irr/Grain Hillsdale (59) 14-ZU | 35-6S-4W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03010298 No | 179 BU 176 BU 176 BU | 143.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 231 | 0001-0003-EU Corn 80% | Irr/Grain Hillsdale (59) 14-ZU | 4-7S-4W / 11-7S-4W / 35-6S-4W | 1.00 / 1.00 PF 1.020 / 1.00 | 0.01776452 No | 187 BU 187 BU | 149.6 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 236 | 0001-0003-EU Corn 80% | Irr/Grain Hillsdale (59) 01-Insured | 4-7S-4W / 11-7S-4W / 35-6S-4W / 1366-2326-16,8 / 6084-74-1 / 768-2178-31 / 9733-52290-13,15,17,18,20 | 1.00 / 1.00 PF 1.020 / 0.70 | 0.01776452 No | 187 BU 187 BU | 149.6 BU $174,472 43,618 BU 174,472 | 4.00 E | 1.0000 | 297.53 6/7/2019 (2 L2 - 0.980) | $7,772 $1,710 | ☐ Commingled Prod |

| Total for Hillsdale, Corn | | | | Acres: 344.11 | | Guarantee/Amt. of Cov.: 202,084 DOL | | Liability: $202,085 | | $9,064 | $1,994 |

* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production with no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal

* I certify I have not produced the insured crop in the county for more than two years.

(Form M205)     See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139526   NEW HEIGHTS FARM II, LLC

Agency: 236133 SPARTAN INSURANCE -SHELLENBARGER 2 / PETOSKEY, MI

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note / Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * / Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 113 | 0001-0001-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Hillsdale (59) 15-ZC | | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.01703368 No | 49 BU 48 BU 48 BU | 39.2 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 | ☐ Commingled Prod |
| | | | 4-7S-4W / 35-6S-4W / 6084-74-1 | | | | | | | | $0 | |
| 114 | 0001-0002-EP Soybeans 80% | Nfac (Irr)/Commodity Hillsdale (59) 15-ZC | | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.01830619 No | 45 BU 44 BU 44 BU | 36.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 | ☐ Commingled Prod |
| | | | 2-7S-4W / 11-7S-4W / 35-6S-4W / 9733-52290-18 | | | | | | | | $0 | |

**Total for Hillsdale, Soybeans**   Acres: 0.00   Guarantee/Amt. of Cov.: 0 DOL   Liability: $0   $0   $0

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note / Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * / Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 130 | 0001-0002-EP Corn 80% | Irr/Grain Van Buren (159) 01-Insured | GENEVA TWP IRR | 1.00 / 1.00 PFTA 1.020 / 0.65 | 0.04132338 No | 226 BU 217 BU 217 BU | 180.8 BU $221,458 55,365 BU | 4.00 E 221,458 | 1.0000 | 306.22 5/28/2019 | $16,323 | ☐ Commingled Prod |
| | | | 4-1S-16W / 9-1S-16W / 152-10849-12,16 / 152-58-1,2,3 / 5460-66-10,7 / 7536-62-11,5 | | | | | | | | $3,591 | |
| 138 | 0001-0006-EP Corn 80% | Irr/Grain Van Buren (159) 01-Insured | BANGOR TWP IRR | 1.00 / 1.00 PFTA 1.020 / 0.65 | 0.04201636 No | 220 BU 212 BU 212 BU | 176.0 BU $89,542 22,385 BU | 4.00 E 89,542 | 1.0000 | 127.19 5/28/2019 | $6,676 | ☐ Commingled Prod |
| | | | 28-2S-16W / 9271-596-1 | | | | | | | | $1,468 | |
| 146 | 0001-0010-EP Corn 80% | Irr/Grain Van Buren (159) 01-Insured | LAWRENCE TWP IRR | 1.00 / 1.00 PFTA 1.020 / 0.65 | 0.04201636 No | 220 BU 212 BU 212 BU | 176.0 BU $183,519 45,880 BU | 4.00 E 183,519 | 1.0000 | 260.68 6/3/2019 | $13,683 | ☐ Commingled Prod |
| | | | 1-3S-15W / 22-3S-15W / 35-3S-15W / 4383-1610-2,3 / 6312-7573-1 / 9250-12121-1,2 | | | | | | | | $3,011 | |
| 148 | 0001-0011-EP Corn 80% | Irr/Grain Van Buren (159) 01-Insured | PAW PAW TWP IRR | 1.00 / 1.00 PFTA 1.020 / 0.65 | 0.04201636 No | 220 BU 212 BU 212 BU | 176.0 BU $53,849 13,462 BU | 4.00 E 53,849 | 1.0000 | 76.49 5/28/2019 | $4,015 | ☐ Commingled Prod |
| | | | 1-3S-14W / 29-3S-14W / 31-3S-14W / 5448-6461-1 / 6679-9095-2,8 | | | | | | | | $883 | |
| 152 | 0001-0013-EP Corn 80% | Irr/Grain Van Buren (159) 01-Insured | KEELER TWP IRR | 1.00 / 1.00 PFTA 1.020 / 0.65 | 0.04132338 No | 226 BU 217 BU 217 BU | 180.8 BU $45,648 11,412 BU | 4.00 E 45,648 | 1.0000 | 63.12 5/18/2019 | $3,365 | ☐ Commingled Prod |
| | | | 16-4S-16W / 6920-9282-6 | | | | | | | | $740 | |
| 154 | 0001-0014-EP Corn 80% | Irr/Grain Van Buren (159) 01-Insured | HAMILTON TWP IRR | 1.00 / 1.00 PFTA 1.020 / 0.65 | 0.04201636 No | 220 BU 212 BU 212 BU | 176.0 BU $99,299 24,825 BU | 4.00 E 99,299 | 1.0000 | 141.05 5/17/2019 | $7,404 | ☐ Commingled Prod |
| | | | 3-4S-15W / 7-4S-15W / 24-4S-15W / 4383-1610-1 / 5017-1506-3 / 6606-1645-5 / 6607-1646-8 / 9271-8526-2 | | | | | | | | $1,629 | |

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI only), (L)Unappraised production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only, (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only), (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only, (Z)Zero Planted Acres

**Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal

** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)   See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139526     NEW HEIGHTS FARM II, LLC

Agency: 236133 SPARTAN INSURANCE -SHELLENBARGER 2 / PETOSKEY, MI

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 157 | Irr/Grain | DECATUR TWP IRR | | | | | 160.0 BU $334,419 | | 1.0000 | | |
| | | 1-4S-14W / 2-4S-14W / 6-4S-14W / 10-4S-14W / 11-4S-14W / 18-4S-14W / 21-4S-14W / 22-4S-14W / 27-4S-14W / 1981-1664-1,2,3 / 5222-10447-1 / 5676-8355-6 / 6342-8584-2 / 6884-9096-1 / 7273-9543-7 / 7728-10108-1 / 9242-1681-17,19,22 / 9250-12124-3 / 9250-12125-2 / 9250-1627-1 | 1.00 / 1.00 PFTA 1.020 / 0.65 | 0.04433691 No | 200 BU 193 BU 193 BU | 83,605 BU | 4.00 E 334,419 | | 522.53 5/26/2019 | $25,893 $5,697 |
| | 0001-0015-EP Corn 80% | | | | | | | | | | ☐ Commingled Prod |
| | Van Buren (159) 01-Insured | | | | | | | | | | |
| 168 | Irr/Grain Van Buren (159) 01-Insured | 35-4S-16W / 36-4S-16W / 5342-5149-1 / 5342-6652-11 | 1.00 / 1.00 PFTA 1.020 / 0.65 | 0.04490882 No | 192 BU 189 BU 189 BU | 153.6 BU $63,492 15,873 BU | 4.00 E 63,492 | 1.0000 | 103.34 5/19/2019 | $4,607 $1,013 | ☐ Commingled Prod |
| 173 | Irr/Grain Van Buren (159) 14-ZU | 16-4S-14W / 9261-10550-8 | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.04888467 No | 182 BU 164 BU 179 BU | 145.6 BU $0 0 | 4.00 E | 0.00 | $0 $0 | ☐ Commingled Prod |
| 177 | Irr/Grain Van Buren (159) 01-Insured | 5-3S-16W / 24-2S-16W / 34-2S-15W / 8976-11614-1,3,4 / 8976-443-1,3,9 / 9269-445-13,24,27,29 / 9271-10898-1 / 9271-9788-18 | 1.00 / 1.00 PFTA 1.020 / 0.64 | 0.05866578 No | 124 BU 124 BU 124 BU | 99.2 BU $192,027 48,007 BU | 4.00 E 192,027 | 1.0000 | 483.94 6/5/2019 | $16,354 $3,598 | ☐ Commingled Prod |
| 232 | Irr/Grain Van Buren (159) 01-Insured | 7-2S-16W / 8-2S-16W / 10-2S-16W / 13-2S-16W / 14-2S-16W / 17-2S-16W / 21-3S-16W / 22-2S-16W / 28-3S-15W / 29-4S-13W / 8432-11302-1 / 8976-10862-56 / 8976-2943-1 / 9271-11680-16 / 9271-2384-9 / 9271-474-1 / 9271-533-1,2,3 / 9271-8650-3 / 9271-8651-3 / 9271-9075-20,22 / 9271-9076-2 / 9271-960-2,7 / 9271-9788-14 / 9271-9790-1,2 | 1.00 / 1.00 PF 1.020 / 0.64 | 0.04378685 No | 197 BU 197 BU | 157.6 BU $586,486 146,622 BU | 4.00 E 586,486 | 1.0000 | 930.34 6/5/2019 | $40,194 $8,843 | ☐ Commingled Prod |
| | 0001-0035-EP Corn 80% | | | | | | | | | | |
| 243 | Irr/Grain Van Buren (159) 01-Insured | 3-2S-15W / 9261-654-1 | 1.00 / 1.00 PF 1.020 / 0.64 | 0.04378685 No | 197 BU 197 BU | 157.6 BU $69,949 17,487 BU | 4.00 E 69,949 | 1.0000 | 110.96 6/4/2019 | $4,794 $1,055 | ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / P=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage, (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only), (L)Unreported production. (ARPI Only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

** Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
* I certify I have not produced the insured crop in the county for more than two years.

(Form M205)          See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139526    NEW HEIGHTS FARM II, LLC

Agency: 236133 SPARTAN INSURANCE -SHELLENBARGER 2 / PETOSKEY, MI

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 118 | 0001-0001-EP Corn 80% | Non-Irr/Grain Van Buren (159) 01-Insured | PINE GROVE #25 25-1S-13W / 9374-9242-17,18,27,28,29,30,31,32,33,34,35,36,37,38,39,40,41,42,43 | 1.00 / 1.00 PFTAYA 1.020 / 0.64 | 0.09647082 No | 186 BU 169 BU 172 BU 75,948 BU | 148.8 BU $303,790 303,790 | 4.00 E | 1.0000 | 510.40 6/2/2019 | $38,022 $8,365 | ☐ Commingled Prod |
| 129 | 0001-0001-EP Corn 80% | Non-Irr/Grain Van Buren (159) 01-Insured | SOUTH HAVEN TWP 1-1S-17W / 12-1S-17W / 152-59-1 / 3389-10854-17 / 3389-10855-22 / 5461-6-12,13 | 1.00 / 1.00 PFTA 1.020 / 0.63 | 0.09238199 No | 184 BU 179 BU 179 BU 11,876 BU | 147.2 BU $47,504 47,504 | 4.00 E | 1.0000 | 80.68 5/29/2019 | $4,989 $1,097 | ☐ Commingled Prod |
| 119 | 0001-0002-EP Corn 80% | Non-Irr/Grain Van Buren (159) 01-Insured | ALMENA #1 1-2S-13W / 9374-7404-1,2 | 1.00 / 1.00 PFTAYA 1.020 / 0.64 | 0.09709278 No | 185 BU 168 BU 171 BU 23,070 BU | 148.0 BU $92,281 92,281 | 4.00 E | 1.0000 | 155.88 6/2/2019 | $11,608 $2,554 | ☐ Commingled Prod |
| 131 | 0001-0002-EP Corn 80% | Non-Irr/Grain Van Buren (159) 01-Insured | GENEVA TWP 3-1S-16W / 4-1S-16W / 9-1S-16W / 10-1S-16W / 152-10848-5 / 2519-2037-5 / 5460-68-5,7 / 9332-11526-1 | 1.00 / 1.00 PFTA 1.020 / 0.63 | 0.08629743 No | 203 BU 197 BU 197 BU 12,391 BU | 162.4 BU $49,564 49,564 | 4.00 E | 1.0000 | 76.30 5/29/2019 | $4,937 $1,086 | ☐ Commingled Prod |
| 120 | 0001-0003-EP Corn 80% | Non-Irr/Grain Van Buren (159) 01-Insured | PINE GROVE #24 24-1S-13W / 9374-9242-44,45,46,47,48,49,50 | 1.00 / 1.00 PFTAYA 1.020 / 0.64 | 0.09709278 No | 184 BU 167 BU 171 BU 26,971 BU | 147.2 BU $107,886 107,886 | 4.00 E | 1.0000 | 183.23 6/2/2019 | $13,284 $2,923 | ☐ Commingled Prod |
| 121 | 0001-0004-EP Corn 80% | Non-Irr/Grain Van Buren (159) 01-Insured | PINE GROVE #26 26-1S-13W / 9374-9242-26 | 1.00 / 1.00 PFTAYA 1.020 / 0.64 | 0.09902077 No | 181 BU 163 BU 167 BU 4,935 BU | 144.8 BU $19,739 19,739 | 4.00 E | 1.0000 | 34.08 6/2/2019 | $2,522 $555 | ☐ Commingled Prod |
| 122 | 0001-0005-EP Corn 80% | Non-Irr/Grain Van Buren (159) 01-Insured | PINE GROVE #35 & #36 35-1S-13W / 36-1S-13W / 9374-7405-1 / 9374-9242-10,11,12,13,14,15,16,20,21,22,23,24,25,3,4,5,6,7,8 | 1.00 / 1.00 PFTAYA 1.020 / 0.64 | 0.09709278 No | 185 BU 168 BU 172 BU 90,628 BU | 148.0 BU $362,511 362,511 | 4.00 E | 1.0000 | 612.35 6/2/2019 | $44,637 $9,820 | ☐ Commingled Prod |
| 139 | 0001-0006-EP Corn 80% | Non-Irr/Grain Van Buren (159) 14-ZU | BANGOR TWP 17-2S-16W / 27-2S-16W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.08629743 No | 203 BU 197 BU 197 BU | 162.4 BU $0 0 | 4.00 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 241 | 0001-0006-EP Corn 80% | Non-Irr/Grain Van Buren (159) 01-Insured | BANGOR TWP 17-2S-16W / 27-2S-16W / 7962-10520-1,2,3 | 1.00 / 1.00 PFTA 1.020 / 0.63 | 0.08629743 No | 203 BU 197 BU 197 BU 10,324 BU | 162.4 BU $41,296 41,296 | 4.00 E | 1.0000 | 64.85 6/7/2019 (2 L2 - 0.980) | $4,196 $923 | ☐ Commingled Prod |
| 141 | 0001-0007-EP Corn 80% | Non-Irr/Grain Van Buren (159) 14-ZU | ARLINGTON TWP 25-2S-15W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.08870536 No | 198 BU 190 BU 190 BU | 158.4 BU $0 0 | 4.00 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / M=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / R=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres
** Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)    See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number:  2019-MI-084-1139526      NEW HEIGHTS FARM II, LLC

Agency:  236133 SPARTAN INSURANCE -SHELLENBARGER 2 / PETOSKEY, MI

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 145 | 0001-0009-EP Corn 80% | Non-Irr/Grain Van Buren (159) 14-ZU | HARTFORD TWP 14-3S-16W / 23-3S-16W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.08772179 | 201 BU 193 BU 193 BU | 160.8 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 ☐ Commingled Prod |
| 147 | 0001-0010-EP Corn 80% | Non-Irr/Grain Van Buren (159) 01-Insured | LAWRENCE TWP 3-3S-15W / 22-3S-15W / 28-3S-15W / 35-3S-15W / 4383-1610-4,5 | 1.00 / 1.00 PFTA 1.020 / 0.64 No | 0.09407985 | 183 BU 175 BU 175 BU | 146.4 BU $4,585 1,146 BU | 4.00 E 4,585 | 1.0000 | 7.83 5/26/2019 | $522 $115 ☐ Commingled Prod |
| 156 | 0001-0014-EP Corn 80% | Non-Irr/Grain Van Buren (159) 01-Insured | HAMILTON TWP 3-4S-15W / 12-4S-15W / 24-4S-15W / 5017-1506-3 / 6607-1646-9 / 6884-9256-16,21 | 1.00 / 1.00 PFTA 1.020 / 0.64 No | 0.09350517 | 183 BU 176 BU 176 BU | 146.4 BU $36,389 9,097 BU | 4.00 E 36,389 | 1.0000 | 62.14 5/28/2019 | $3,990 $878 ☐ Commingled Prod |
| 158 | 0001-0015-EP Corn 80% | Non-Irr/Grain Van Buren (159) 01-Insured | DECATUR TWP 1-4S-14W / 2-4S-14W / 3-4S-14W / 21-4S-14W / 22-4S-14W / 27-4S-14W / 1922-2248-1 / 8961-2233-1 / 8976-11770-1,10,11,3,4,5,6,9 / 9250-1627-5 / 9261-11410-12 | 1.00 / 1.00 PFTA 1.020 / 0.64 No | 0.09350517 | 183 BU 176 BU 176 BU | 146.4 BU $29,860 7,465 BU | 4.00 E 29,860 | 1.0000 | 50.99 5/28/2019 | $3,274 $721 ☐ Commingled Prod |
| 161 | 0001-0016-EP Corn 80% | Non-Irr/Grain Van Buren (159) 14-ZU | PORTER TWP 12-4S-13W | 1.00 / 1.00 PFTA 1.020 / 1.00 No | 0.08629743 | 203 BU 197 BU 197 BU | 162.4 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 ☐ Commingled Prod |
| 163 | 0001-0018-EP Corn 80% | Non-Irr/Grain Van Buren (159) 14-ZU | ADDED LAND 2014 20-1S-16W / 9261-3092-1 | 1.00 / 1.00 PFTA 1.020 / 1.00 No | 0.09772492 | 168 BU 166 BU 166 BU | 134.4 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 ☐ Commingled Prod |
| 166 | 0001-0020-EP Corn 80% | Non-Irr/Grain Van Buren (159) 01-Insured | 14-2S-14W / 15-2S-14W / 35-2S-14W / 9271-11348-1,3 / 9271-789-1 | 1.00 / 1.00 PFTA 1.020 / 0.63 No | 0.09968502 | 162 BU 162 BU 162 BU | 129.6 BU $27,247 6,812 BU | 4.00 E 27,247 | 1.0000 | 52.56 6/5/2019 | $2,839 $624 ☐ Commingled Prod |
| 242 | 0001-0020-EP Corn 80% | Non-Irr/Grain Van Buren (159) 01-Insured | 14-2S-14W / 15-2S-14W / 35-2S-14W / 9271-789-1 | 1.00 / 1.00 PFTA 1.020 / 0.63 No | 0.09968502 | 162 BU 162 BU 162 BU | 129.6 BU $24,200 6,050 BU | 4.00 E 24,200 | 1.0000 | 48.13 6/8/2019 (3 L2 - 0.970) | $2,600 $572 ☐ Commingled Prod |
| 170 | 0001-0024-EP Corn 80% | Non-Irr/Grain Van Buren (159) 01-Insured | 19-1S-15W / 19-2S-15W / 25-1S-16W / 7962-11909-1 | 1.00 / 1.00 PFTA 1.020 / 0.63 No | 0.09466353 | 176 BU 173 BU 173 BU | 140.8 BU $12,492 3,123 BU | 4.00 E 12,492 | 1.0000 | 22.18 6/4/2019 | $1,293 $285 ☐ Commingled Prod |
| 238 | 0001-0024-EP Corn 80% | Non-Irr/Grain Van Buren (159) 01-Insured | 19-1S-15W / 19-2S-15W / 25-1S-16W / 3534-2031-1 | 1.00 / 1.00 PFTA 1.020 / 0.63 No | 0.09466353 | 176 BU 173 BU 173 BU | 140.8 BU $13,265 3,316 BU | 4.00 E 13,265 | 1.0000 | 24.03 6/7/2019 (2 L2 - 0.980) | $1,401 $308 ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage, (B)Harvested Production: farm stored/measured by insured, (C)Harvested Production: pick/daily sales records, (D)Harvested Production: automated yield monitoring system, (E)Harvested Production: farm stored/measured by authorized representative, (F)Harvested Production: livestock feeding records, (G)Harvested Production: field harvest records, (H)Harvested Production: other, (I)Unharvested and destroyed  (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only), (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production with no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)        See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139526   NEW HEIGHTS FARM II, LLC

Agency: 236133 SPARTAN INSURANCE -SHELLENBARGER 2 / PETOSKEY, MI

| Line | Unit/Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map/Exp Opt/Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share %/ Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 239 | 0001-0024-EP Corn 80% | Non-Irr/Grain Van Buren (159) 14-ZU | 19-1S-15W / 19-2S-15W / 25-1S-16W / 256-112-5,6,7 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.09466353 No | 176 BU 173 BU 173 BU | 140.8 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 172 | 0001-0026-EP Corn 80% | Non-Irr/Grain Van Buren (159) 14-ZU | PAW PAW TWP 31-3S-14W / 6679-9095-2 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.09466353 No | 173 BU 173 BU 173 BU | 138.4 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 178 | 0001-0032-EP Corn 80% | Non-Irr/Grain Van Buren (159) 01-Insured | 8-2S-16W / 24-2S-16W / 28-2S-16W / 604-3041-1 / 9157-2927-5 / 9271-9788-20 | 1.00 / 1.00 PFTA 1.020 / 0.63 | 0.12092493 No | 125 BU 125 BU 125 BU | 100.0 BU $34,740 8,685 BU | 4.00 E 34,740 | 1.0000 | 86.85 6/5/2019 | $4,232 $931 | ☐ Commingled Prod |
| 240 | 0001-0032-EP Corn 80% | Non-Irr/Grain Van Buren (159) 01-Insured | 8-2S-16W / 24-2S-16W / 28-2S-16W / 534-431-1 / 604-3041-1 | 1.00 / 1.00 PFTA 1.020 / 0.63 | 0.12092493 No | 125 BU 125 BU 125 BU | 100.0 BU $8,851 2,213 BU | 4.00 E 8,851 | 1.0000 | 22.58 6/7/2019 (2 L2 - 0.980) | $1,100 $242 | ☐ Commingled Prod |
| 180 | 0001-0034-EP Corn 80% | Non-Irr/Grain Van Buren (159) 14-ZU | 6-3S-15W / 8757-11703-1 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.09407985 No | 175 BU 175 BU 175 BU | 140.0 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 233 | 0001-0036-EP Corn 80% | Non-Irr/Grain Van Buren (159) 01-Insured | 3-2S-15W / 11-2S-14W / 14-2S-16W / 29-3S-14W / 9261-654-1 / 9263-12107-2 / 9268-11681-21 / 9271-11680-23 / 9271-788-2 | 1.00 / 1.00 PF 1.020 / 0.63 | 0.09407985 No | 175 BU 175 BU | 140.0 BU $35,560 8,890 BU | 4.00 E 35,560 | 1.0000 | 63.50 6/5/2019 | $3,540 $779 | ☐ Commingled Prod |

**Total for Van Buren, Corn**          Acres: 5,284.42          Guarantee/Amt. of Cov.: 3,191,451 DOL          Liability: $3,191,448          $292,294          $64,306

| Line | Unit/Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map/Exp Opt/Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share %/ Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 123 | 0001-0001-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | PINE GROVE #26 & 36 26-1S-13W / 36-1S-13W / 9374-9242-12,26 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.1037041 No | 48 BU 46 BU 46 BU | 38.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 181 | 0001-0001-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | SOUTH HAVEN TWP 1-1S-17W / 12-1S-17W / 3389-10855-22 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.10949712 No | 46 BU 44 BU 44 BU | 36.8 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 124 | 0001-0002-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | ALMENA #1 1-2S-13W / 9374-7404-1,2 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.12173416 No | 41 BU 40 BU 40 BU | 32.8 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only), (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3d party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
* I certify I have not produced the insured crop in the county for more than two years.

(Form M205)          See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139526　NEW HEIGHTS FARM II, LLC

Agency: 236133 SPARTAN INSURANCE -SHELLENBARGER 2 / PETOSKEY, MI

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 183 | 0001-0002-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | GENEVA TWP | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.09469777 No | 51 BU 50 BU 50 BU | 40.8 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 |
| | | | 4-1S-16W / 9-1S-16W / 10-1S-16W | | | | | | | | $0 ☐ Commingled Prod |
| 125 | 0001-0003-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | PINE GROVE #24 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.10594587 No | 47 BU 45 BU 45 BU | 37.6 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 |
| | | | 24-1S-13W / 25-1S-13W / 9374-9242-44,45,46,47,48,49,50 | | | | | | | | $0 ☐ Commingled Prod |
| 126 | 0001-0004-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | PINE GROVE #25 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.1037041 No | 48 BU 46 BU 46 BU | 38.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 |
| | | | 25-1S-13W / 9374-9242-17 | | | | | | | | $0 ☐ Commingled Prod |
| 127 | 0001-0005-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | PINE GROVE #35 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.15173071 No | 33 BU 33 BU 33 BU | 26.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 |
| | | | 35-1S-13W / 9374-9242-25 | | | | | | | | $0 ☐ Commingled Prod |
| 191 | 0001-0006-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | BANGOR TWP | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.09034923 No | 54 BU 52 BU 52 BU | 43.2 BU $0 | 9.54 E 0 | 1.0000 | | $0 |
| | | | 7-2S-16W / 8-2S-16W / 13-2S-16W / 14-2S-16W / 17-2S-16W / 22-2S-16W / 24-2S-16W / 27-2S-16W / 28-2S-16W / 9271-9788-14 | | | | | | | | $0 ☐ Commingled Prod |
| 193 | 0001-0007-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | ARLINGTON TWP | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.09034923 No | 54 BU 52 BU 52 BU | 43.2 BU $0 | 9.54 E 0 | 1.0000 | | $0 |
| | | | 25-2S-15W | | | | | | | | $0 ☐ Commingled Prod |
| 195 | 0001-0008-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | WAVERLY TWP | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.09034923 No | 54 BU 52 BU 52 BU | 43.2 BU $0 | 9.54 E 0 | 1.0000 | | $0 |
| | | | 11-2S-14W / 14-2S-14W / 15-2S-14W / 9271-788-2 / 9271-789-1 | | | | | | | | $0 ☐ Commingled Prod |
| 197 | 0001-0009-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | HARTFORD TWP | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.09034923 No | 54 BU 52 BU 52 BU | 43.2 BU $0 | 9.54 E 0 | 1.0000 | | $0 |
| | | | 5-3S-16W / 14-3S-16W / 21-3S-16W / 23-3S-16W / 8757-1019-1 / 8976-11614-1 / 9271-960-2 | | | | | | | | $0 ☐ Commingled Prod |
| 199 | 0001-0010-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | LAWRENCE TWP | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.09034923 No | 54 BU 52 BU 52 BU | 43.2 BU $0 | 9.54 E 0 | 1.0000 | | $0 |
| | | | 1-3S-15W / 3-3S-15W / 6-3S-15W / 22-3S-15W / 28-3S-15W / 35-3S-15W / 6312-7573-1 / 9271-2384-9 | | | | | | | | $0 ☐ Commingled Prod |
| 201 | 0001-0011-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | PAW PAW TWP | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.13329474 No | 38 BU 37 BU 37 BU | 30.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 |
| | | | 29-3S-14W / 9263-12107-2 | | | | | | | | $0 ☐ Commingled Prod |

---

\* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

\* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production with no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

\*\*Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal

\* I certify I have not produced the insured crop in the county for more than two years.

(Form M205)　　See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number:  2019-MI-084-1139526   NEW HEIGHTS FARM II, LLC

Agency:  236133 SPARTAN INSURANCE -SHELLENBARGER 2 / PETOSKEY, MI

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 205 | 0001-0013-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | KEELER TWP 16-4S-16W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.10155588 No | 48 BU 47 BU 47 BU | 38.4 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 207 | 0001-0014-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | HAMILTON TWP 3-4S-15W / 12-4S-15W / 24-4S-15W / 6606-1645-5 / 6884-9256-16 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.09469777 No | 51 BU 50 BU 50 BU | 40.8 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 210 | 0001-0015-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | DECATUR TWP 1-4S-14W / 3-4S-14W / 6-4S-14W / 10-4S-14W / 11-4S-14W / 18-4S-14W / 21-4S-14W / 22-4S-14W / 1922-2248-1 / 5676-8355-6 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.09034923 No | 54 BU 52 BU 52 BU | 43.2 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 215 | 0001-0018-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | 20-1S-16W / 9261-3092-1 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.11461967 No | 42 BU 42 BU 42 BU | 33.6 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 226 | 0001-0029-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | 19-1S-15W / 25-1S-16W / 27-4S-14W / 256-112-6 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.11461967 No | 42 BU 42 BU 42 BU | 33.6 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 227 | 0001-0030-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | 31-3S-14W / 6679-9095-2 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.10155588 No | 47 BU 47 BU 47 BU | 37.6 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 229 | 0001-0032-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | 2-4S-14W / 9250-1627-5 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.10949712 No | 44 BU 44 BU 44 BU | 35.2 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 230 | 0001-0033-EP Soybeans 80% | Nfac (Non-Irr)/Commodity Van Buren (159) 15-ZC | 3-2S-15W / 9261-654-1 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.10949712 No | 44 BU 44 BU 44 BU | 35.2 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 184 | 0001-0002-EP Soybeans 80% | Nfac (Irr)/Commodity Van Buren (159) 15-ZC | GENEVA TWP IRR 3-1S-16W / 4-1S-16W / 9-1S-16W / 152-10848-5 / 5460-66-7 / 9332-11526-1 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.09029418 No | 61 BU 60 BU 60 BU | 48.8 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 192 | 0001-0006-EP Soybeans 80% | Nfac (Irr)/Commodity Van Buren (159) 15-ZC | BANGOR TWP IRR 7-2S-16W / 8-2S-16W / 13-2S-16W / 14-2S-16W / 17-2S-16W / 22-2S-16W / 24-2S-16W / 27-2S-16W / 28-2S-16W / 8976-10862-56 / 9269-445-24 / 9271-8650-3 / 9271-9075-22 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.09211351 No | 61 BU 59 BU 59 BU | 48.8 BU $0 0 | 9.54 E | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage, (B)Harvested Production: farm stored/measured by insured, (C)Harvested Production: pick/daily sales records, (D)Harvested Production: automated yield monitoring system, (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other, (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

** Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
* I certify I have not produced the insured crop in the county for more than two years.

(Form M205)   See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

10/10/2019

Policy Number: 2019-MI-084-1139526    NEW HEIGHTS FARM II, LLC

Agency: 236133 SPARTAN INSURANCE -SHELLENBARGER 2 / PETOSKEY, MI

Page: 12 of 16

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 198 | 0001-0009-EP Soybeans 80% | Nfac (Irr)/Commodity Van Buren (159) 15-ZC | HARTFORD TWP IRR 5-3S-16W / 21-3S-16W / 23-3S-16W / 8976-11614-3 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.12474314 No | 45 BU 45 BU 45 BU | 36.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 ☐ Commingled Prod |
| 200 | 0001-0010-EP Soybeans 80% | Nfac (Irr)/Commodity Van Buren (159) 15-ZC | LAWRENCE TWP IRR 1-3S-15W / 3-3S-15W / 6-3S-15W / 22-3S-15W / 28-3S-15W / 35-3S-15W / 4383-1610-2 / 8757-11703-1 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.09498522 No | 58 BU 57 BU 57 BU | 46.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 ☐ Commingled Prod |
| 206 | 0001-0013-EP Soybeans 80% | Nfac (Irr)/Commodity Van Buren (159) 15-ZC | KEELER TWP IRR 16-4S-16W / 35-4S-16W / 36-4S-16W / 5342-5149-1 / 5342-6652-11 / 6920-9282-6 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.106 No | 54 BU 52 BU 52 BU | 43.2 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 ☐ Commingled Prod |
| 208 | 0001-0014-EP Soybeans 80% | Nfac (Irr)/Commodity Van Buren (159) 15-ZC | HAMILTON TWP IRR 3-4S-15W / 12-4S-15W / 24-4S-15W / 6606-1645-5 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.09700163 No | 57 BU 56 BU 56 BU | 45.6 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 ☐ Commingled Prod |
| 211 | 0001-0015-EP Soybeans 80% | Nfac (Irr)/Commodity Van Buren (159) 15-ZC | DECATUR TWP IRR 1-4S-14W / 3-4S-14W / 6-4S-14W / 10-4S-14W / 11-4S-14W / 18-4S-14W / 21-4S-14W / 22-4S-14W / 9250-12123-1 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.09700163 No | 57 BU 56 BU 56 BU | 45.6 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 ☐ Commingled Prod |
| 214 | 0001-0017-EP Soybeans 80% | Nfac (Irr)/Commodity Van Buren (159) 15-ZC | 3-2S-15W / 9261-654-1 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.11681469 No | 48 BU 48 BU 48 BU | 38.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 ☐ Commingled Prod |
| 218 | 0001-0021-EP Soybeans 80% | Nfac (Irr)/Commodity Van Buren (159) 15-ZC | 29-4S-13W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.1488064 No | 39 BU 39 BU 39 BU | 31.2 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 ☐ Commingled Prod |
| 220 | 0001-0023-EP Soybeans 80% | Nfac (Irr)/Commodity Van Buren (159) 15-ZC | 7-4S-15W / 9271-8526-2 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.11986494 No | 47 BU 47 BU 47 BU | 37.6 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 ☐ Commingled Prod |
| 223 | 0001-0026-EP Soybeans 80% | Nfac (Irr)/Commodity Van Buren (159) 15-ZC | ARLINGTON TWP IRR 34-2S-15W / 9271-10898-1 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.1085143 No | 51 BU 51 BU 51 BU | 40.8 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 ☐ Commingled Prod |
| 225 | 0001-0028-EP Soybeans 80% | Nfac (Irr)/Commodity Van Buren (159) 15-ZC | 1-3S-14W / 10-2S-16W / 27-4S-14W / 31-3S-14W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.19489674 No | 31 BU 31 BU 31 BU | 24.8 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only), (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

** Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal

** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)    See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139526   NEW HEIGHTS FARM II, LLC

Agency: 236133 SPARTAN INSURANCE -SHELLENBARGER 2 / PETOSKEY, MI

| 228 | 0001-0031-EP Soybeans 80% | Nfac (Irr)/Commodity Van Buren (159) 15-ZC | 2-4S-14W / 9250-1627-1 | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.12474314 No | 45 BU 45 BU 45 BU | 36.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total for Van Buren, Soybeans** | | | | Acres: 0.00 | | Guarantee/Amt. of Cov.: 0 DOL | | Liability: $0 | | $0 | | $0 |

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only), (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only), (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

** Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)     See Signature Page for Required Statements



**Schedule of Insurance with Production Report - for the 2019 Crop Year**

10/10/2019

Policy Number: 2019-MI-084-1139526     NEW HEIGHTS FARM II, LLC

Page: 14 of 16

Agency: 236133 SPARTAN INSURANCE -SHELLENBARGER 2 / PETOSKEY, MI

| ☐ Required Review | *MPCI POLICY TOTALS:* | Base Premium: | $342,630 | - | #Risk Subsidy: | $267,250 | = | Insured's Premium: | $75,380 |
|---|---|---|---|---|---|---|---|---|---|
| ☐ Required Inspection | Total Acres: | 6,673.58 | | | ***A&O Subsidy: | $63,386 | | #Administrative Fees: | $0 |
| | Total Liability: | $4,103,990 | Total Premium: | $406,016 = | Total Subsidy: | $330,636 | + | Insured's Premium & Fees: | $75,380 |

***Note: This amount may increase by 1.15 percent of net book premium (except for group plans of insurance) if the loss ratio in the State exceeds 1.20. However, the amount of premium the producer must pay will not change.

#Note: Beginning Farmer and Rancher benefits apply to county crops on this policy. This includes an exemption from paying the administrative fee for catastrophic and additional coverage policies, an additional 10 percentage points of premium subsidy for additional coverage policies that have premium subsidy, and an increase in the substitute Yield Adjustment.

Remarks:

\* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

\* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only), (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only), (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

** Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal

** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)          See Signature Page for Required Statements

**Schedule of Insurance with Production Report - for the 2019 Crop Year**

10/10/2019

Page: 15 of 16

Policy Number: 2019-MI-084-1139526    NEW HEIGHTS FARM II, LLC

Agency:  236133 SPARTAN INSURANCE -SHELLENBARGER 2 / PETOSKEY, MI

### COLLECTION OF INFORMATION AND DATA (PRIVACY ACT) STATEMENT Agents, Loss Adjusters and Policyholders

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information requested on documents established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required or permitted by law, law enforcement agencies, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIPs contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to the public to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures and the denial of program eligibility or benefits derived therefrom. Also, failure to provide true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.

.

**Non-Discrimination Policy**In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating on the basis of race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs).
**To File a Program Complaint** If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at www.ascr.usda.gov/ad-3027-usda-program-discrimination-complaint-form, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410 or email at program.intake@usda.gov.**Persons with Disabilities** Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible State or local Agency that administers the program or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English. Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email.

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed.  (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only), (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

"Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)    See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139526    NEW HEIGHTS FARM II, LLC

Agency: 236133 SPARTAN INSURANCE -SHELLENBARGER 2 / PETOSKEY, MI

**CERTIFICATION STATEMENT**                          **ANTI-REBATING STATEMENT(S)**

**Applicant/Insured Statement**

"I certify, for the crop year indicated, that I have not directly or indirectly received, accepted, or been paid, offered, promised, or given any benefit, including money, goods, or services for which payment is usually made, rebate, discount, abatement, credit, or reduction of premium, or any other valuable consideration, as an inducement to procure insurance or in exchange for purchasing this insurance policy after it has been procured. I understand that this prohibition does not include payment of administrative fees, performance based discounts, and any other payment approved by FCIC that are authorized under sections 508(a)(9)(B) and 508(d)(3) of the Federal Crop Insurance Act (Act) (7 U.S.C. §§ 1508(a)(9)(B) and 1508(d)(3)). I understand that a false certification or failure to completely and accurately report any information on this form may subject me, and any person with a substantial beneficial interest in me, to sanctions, including but not limited to, criminal and civil penalties and administrative sanctions in accordance with section 515(h) of the Act (7 U.S.C. §1515(h)) and all other applicable federal statutes."

I understand this form may be reviewed or audited and that information inaccurately reported or failure to retain records to support information on this form may result in a recomputation of the approved APH yield.

I certify that to the best of my knowledge and belief all of the information on this form is correct. I also understand that failure to report completely and accurately may result in sanctions under my policy, including but not limited to voidance of the policy, and in criminal or civil penalties (18 U.S.C. ß1006 and ß1014; 7 U.S.C. ß1506; 31 U.S.C. ß3729, ß3730 and any other applicable federal statutes).

**Authorized Representative:** NICHOLAS BOERSEN                          **POA(s):**

**Limited Authorized Rep:**


NEW HEIGHTS FARM II, LLC
_____     _____

*Insured's Printed Name*                    *Signature*                                   *(Date)*

**Agent Statement**

"I certify, for the crop year indicated, that I have neither offered nor promised, directly or indirectly, any benefit, including money, goods, or services for which payment is usually made, rebate, discount, credit, reduction of premium, or any other valuable consideration to this person either as an inducement to procure insurance or in exchange for obtaining insurance after it has been procured. I understand that this prohibition does not include payment of administrative fees, performance based discounts, and any other payment approved by FCIC that are authorized under sections 508(a)(9)(B) and 508(d)(3) of the Federal Crop Insurance Act (Act) (7 U.S.C. §§ 1508(a)(9)(B) and 1508(d)(3)). I understand that a false certification or failure to completely and accurately report any violation may subject me, and all agencies/companies I represent, to sanctions, including but not limited, to criminal and civil penalties and administrative sanctions in accordance with section 515(h) of the Act (7 USC §1515(h)) and all other applicable federal statutes."


_____     _____     _____

*Agent's Printed Name*                    *Signature*                         *(Date)*          *(Agent's Code)*


* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI only), (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability:** (A) Insurable, (B) Uninsurable., (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)



**EXHIBIT 13**

08/19/2019
Page: 1 of 10

# Multiple Peril Crop Insurance
## Schedule of Insurance with Production Report
### for the 2019 Crop Year

**GREAT AMERICAN INSURANCE COMPANY**
Crop Insurance Division

Peoria
1315 W. Commerce Drive
Peoria, IL 61615-1462

**Policy Number: 2019-MI-084-1139527**

| INSURED: | NEW HEIGHTS FARM II, LLC<br>6241 RANSOM ST<br>ZEELAND, MI 49464 | | |
|---|---|---|---|

**Person Type:** Limited Liability Company (LLC)
**Identification Number:** XX-XXX1610
**ID # Type:** ☐ SSN ☑ EIN ☐ Assigned Number
**Phone:** (616) 875-7880
**2nd Phone:** (616) 610-2886

**SBI Name:**
**SBI Identification #:**

**AGENT:**

SPARTAN INSURANCE -MAIN 3
806 BOTSFORD RD
PETOSKEY, MI 49770

**Code No:** 236132
**Phone:** (855) 347-1066
**Fax:** (231) 347-1067

**Authorized Representative(s):** NICHOLAS BOERSEN
**POA(s):**
**Limited Authorized Rep(s):**
**Added Acreage (CL):**

**INSURED CROP SUMMARY FOR STATE: Michigan**    Assignment of Indemnity to:  None    All Counties Option: No

| Name of County | Name of Crop(s) | BFR | EU DNQ | EP DNQ | Unit Structure | ***New Producer | Plan | Cov Level | % Price Elect, Proj. Price, or Amt of Ins. | Fee | Options/ Elections/ Endorsements | Named Peril Endorsement | Insured Premium | Liability | Acres |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Eaton (45) | Corn | ☑ | ☐ | ☐ | EU | ☐ | RP (02) | 80% | 100% of Max | $0 | MC/PF/TA/YA | None | $ 1,716 | $ 111,949 | 223.62 |
| Eaton (45) | Soybeans | ☑ | ☐ | ☐ | EU | ☐ | RP (02) | 80% | 100% of Max | $0 | MC/PF/TA/YA | None | $ 0 | $ 0 | 0.00 |
| Ingham (65) | Corn | ☑ | ☐ | ☐ | EU | ☐ | RP (02) | 80% | 100% of Max | $0 | MC/PF/TA/YA | None | $ 0 | $ 0 | 0.00 |
| Ingham (65) | Soybeans | ☑ | ☐ | ☐ | EU | ☐ | RP (02) | 80% | 100% of Max | $0 | MC/PF/TA/YA | None | $ 3,322 | $ 220,221 | 680.28 |
| Washtenaw (161) | Corn | ☑ | ☐ | ☑ | EP | ☑ | RP (02) | 80% | 100% of Max | $0 | PF/YA | None | $ 10,671 | $ 514,155 | 1,189.65 |
| Washtenaw (161) | Soybeans | ☑ | ☐ | ☐ | EP | ☑ | RP (02) | 80% | 100% of Max | $0 | PF/YA | None | $ 0 | $ 0 | 0.00 |
| | | | | | | | | | | | **Grand Total:** | | $ 15,709 | $ 846,325 | 2,093.55 |

**CROP ACREAGE SUMMARY (Review information for accuracy and report errors immediately.  Revisions are subject to approval by company.)**

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 0001-0001-EU Corn 80% | Non-Irr/Grain Eaton (45) 14-ZU | 13-2N-4W / 14-2N-3W | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.0297407 No | 185 BU 169 BU 177 BU | 148.0 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 66 | 0001-0001-EU Corn 80% | Non-Irr/Grain Eaton (45) 01-Insured | 13-2N-4W / 8533-2978-1,2,3 | 1.00 / 1.00 PFTAYA 1.020 / 0.70 | 0.0297407 No | 185 BU 169 BU 177 BU | 148.0 BU $78,462 19,615 BU 78,462 | 4.00 E 0 | 1.0000 | 148.94 6/16/2019 (11 L2 - 0.890) | $5,539 $1,218 | ☐ Commingled Prod |
| 2 | 0001-0002-EU Corn 80% | Non-Irr/Grain Eaton (45) 14-ZU | 33-1N-3W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.02857453 No | 184 BU 180 BU 180 BU | 147.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 | ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated retail monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production with no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability:** (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
I certify I have not produced the insured crop in the county for more than two years.

(Form M205)    See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

08/19/2019
Page: 2 of 10

Policy Number:  2019-MI-084-1139527     NEW HEIGHTS FARM II, LLC
Agency:  236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| L i n e | Unit/Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map/Exp Opt/Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price* Liability | Share %/ Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 0001-0003-EU Corn 80% | Non-Irr/Grain Eaton (45) 14-ZU | 23-2N-4W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0288525 No | 181 BU 177 BU 177 BU | 144.8 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 4 | 0001-0004-EU Corn 80% | Non-Irr/Grain Eaton (45) 14-ZU | 23-2N-4W / 24-2N-4W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0288525 No | 181 BU 177 BU 177 BU | 144.8 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 5 | 0001-0005-EU Corn 80% | Non-Irr/Grain Eaton (45) 14-ZU | 18-3N-3W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0297407 No | 171 BU 169 BU 169 BU | 136.8 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 8 | 0001-0009-EU Corn 80% | Non-Irr/Grain Eaton (45) 14-ZU | 7-1N-3W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.02943513 No | 173 BU 171 BU 171 BU | 138.4 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 9 | 0001-0010-EU Corn 80% | Non-Irr/Grain Eaton (45) 14-ZU | 9-1N-3W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.02943513 No | 173 BU 171 BU 171 BU | 138.4 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 10 | 0001-0011-EU Corn 80% | Non-Irr/Grain Eaton (45) 14-ZU | 24-3N-4W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.02943513 No | 173 BU 171 BU 171 BU | 138.4 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 65 | 0001-0011-EU Corn 80% | Non-Irr/Grain Eaton (45) 01-Insured | 24-3N-4W / 9115-958-1,2,3,4 | 1.00 / 1.00 PFTA 1.020 / 0.69 | 0.02943513 No | 173 BU 171 BU 171 BU | 138.4 BU $33,487 8,372 BU | 4.00 E 33,487 | 1.0000 | 74.68 6/24/2019 (19 L2 - 0.810) | $2,262 $498 | ☐ Commingled Prod |
| 13 | 0001-0014-EU Corn 80% | Non-Irr/Grain Eaton (45) 14-ZU | 22-1N-3W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03038282 No | 164 BU 163 BU 163 BU | 131.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 16 | 0001-0016-EU Corn 80% | Non-Irr/Grain Eaton (45) 14-ZU | 21-2N-3W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0297407 No | 170 BU 169 BU 169 BU | 136.0 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

| Total for Eaton, Corn | | | | Acres: 223.62 | | Guarantee/Amt. of Cov.: 111,948 DOL | | Liability: $111,949 | | | $7,801 | $1,716 |

| L i n e | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 17 | 0001-0001-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Eaton (45) 15-ZC | 13-2N-4W / 14-2N-3W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03146766 No | 52 BU 50 BU 50 BU | 41.6 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only), (M)Claim For indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
* I certify I have not produced the insured crop in the county for more than two years.

(Form M205)          See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number:  2019-MI-084-1139527    NEW HEIGHTS FARM II, LLC

Agency:  236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price* Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 18 | 0001-0002-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Eaton (45) 15-ZC | 7-1N-3W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03422171 No | 48 BU 46 BU 46 BU | 38.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 19 | 0001-0003-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Eaton (45) 15-ZC | 22-1N-3W | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.03526465 No | 48 BU 45 BU 47 BU | 38.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 20 | 0001-0004-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Eaton (45) 15-ZC | 9-1N-3W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03422171 No | 48 BU 46 BU 46 BU | 38.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 21 | 0001-0005-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Eaton (45) 15-ZC | 18-3N-3W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03526465 No | 46 BU 45 BU 45 BU | 36.8 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 22 | 0001-0006-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Eaton (45) 15-ZC | 23-2N-4W | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.03356362 No | 50 BU 47 BU 49 BU | 40.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 23 | 0001-0007-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Eaton (45) 15-ZC | 24-2N-4W | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.03356362 No | 50 BU 47 BU 49 BU | 40.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 24 | 0001-0008-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Eaton (45) 15-ZC | 33-1N-3W | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.03886219 No | 45 BU 41 BU 44 BU | 36.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 25 | 0001-0011-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Eaton (45) 15-ZC | 24-3N-4W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03356362 No | 48 BU 47 BU 47 BU | 38.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 29 | 0001-0015-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Eaton (45) 15-ZC | 21-2N-3W | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.03886219 No | 45 BU 41 BU 45 BU | 36.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

| *Total for Eaton, Soybeans* | | | | Acres: 0.00 | | Guarantee/Amt. of Cov.: 0 DOL | | Liability: $0 | | $0 | $0 |

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 34 | 0001-0005-EU Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 11-1N-2W / 14-1N-1W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0331132 No | 179 BU 175 BU 175 BU | 143.2 BU $0 | 4.00 E 0 | 1.0000 | | $0 $0 | ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only) (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)        See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

08/19/2019

Policy Number: 2019-MI-084-1139527    NEW HEIGHTS FARM II, LLC

Agency: 236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

Page: 4 of 10

| # | Code | Type | Section | Price | Rate | Ins. | Yield | Cov. | Prac. | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 35 | 0001-0006-EU Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 14-1N-2W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03386806 | No | 170 BU 168 BU 168 BU | 136.0 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 37 | 0001-0008-EU Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 5-1N-2W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03348435 | No | 174 BU 172 BU 172 BU | 139.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 38 | 0001-0009-EU Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 7-1N-2W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03348435 | No | 174 BU 172 BU 172 BU | 139.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 39 | 0001-0010-EU Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 9-1N-2W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03348435 | No | 174 BU 172 BU 172 BU | 139.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 40 | 0001-0011-EU Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 21-1N-2W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03348435 | No | 174 BU 172 BU 172 BU | 139.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 41 | 0001-0012-EU Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 26-1N-2W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03348435 | No | 174 BU 172 BU 172 BU | 139.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 42 | 0001-0013-EU Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 27-1N-2W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03348435 | No | 174 BU 172 BU 172 BU | 139.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 43 | 0001-0014-EU Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 1-1N-2W / 6-1N-1W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03275399 | No | 179 BU 177 BU 177 BU | 143.2 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 44 | 0001-0015-EU Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 29-2N-2W / 30-2N-2W / 31-2N-2W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.0355425 | No | 156 BU 156 BU 156 BU | 124.8 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 45 | 0001-0016-EU Corn 80% | Non-Irr/Grain Ingham (65) 15-ZC | 15-1N-2W / 28-1N-2W / 32-2N-2W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.03329725 | No | 173 BU 173 BU 173 BU | 138.4 BU $0 | 4.00 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |

| *Total for Ingham, Corn* | Acres: 0.00 | Guarantee/Amt. of Cov.: 0 DOL | Liability: $0 | $0 | $0 |
|---|---|---|---|---|---|

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage, (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested production appraised by AIP (ARPI Only), (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability:** (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)    See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number:  2019-MI-084-1139527    NEW HEIGHTS FARM II, LLC

Agency:  236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| L i n e | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield Adj Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 47 | 0001-0002-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 14-ZU | 30-3N-2W | 1.00 / 1.00 PFTA 1.020 / 1.00 | 0.02576141 No | 51 BU 50 BU 50 BU | 40.8 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 50 | 0001-0005-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 14-ZU | 5-1N-2W | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.02915177 No | 48 BU 44 BU 47 BU | 38.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 51 | 0001-0006-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 14-ZU | 7-1N-2W | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.02915177 No | 48 BU 44 BU 47 BU | 38.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 52 | 0001-0007-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 14-ZU | 9-1N-2W | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.02915177 No | 48 BU 44 BU 47 BU | 38.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 53 | 0001-0008-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 14-ZU | 21-1N-2W | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.02915177 No | 48 BU 44 BU 47 BU | 38.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 54 | 0001-0009-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 14-ZU | 26-1N-2W / 27-1N-2W | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.02915177 No | 48 BU 44 BU 47 BU | 38.4 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 56 | 0001-0011-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 14-ZU | 11-1N-2W | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.02856232 No | 49 BU 45 BU 48 BU | 39.2 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 57 | 0001-0012-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 14-ZU | 14-1N-2W | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.02856232 No | 49 BU 45 BU 48 BU | 39.2 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 58 | 0001-0013-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 14-ZU | A/L 2015 1-1N-2W / 6-1N-1W | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.03297403 No | 44 BU 39 BU 43 BU | 35.2 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 68 | 0001-0013-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 01-Insured | A/L 2015 1-1N-2W / 6-1N-1W / 8034-2218-4 / 8034-6435-4 | 1.00 / 1.00 PFTAYA 1.020 / 0.78 | 0.03297403 No | 44 BU 39 BU 43 BU | 35.2 BU $44,207 4,634 BU | 9.54 E 44,207 | 1.0000 | 143.02 6/23/2019 (8 L2 - 0.920) | $3,404 $749 | ☐ Commingled Prod |

* Price Type Code indicates type of price used for calculation of premium & coverages:

A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Projected / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (E)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only.), (J)Unharvested and put to another use. (ARPI only.), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only.), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage. (P)Unharvested with Harvest incomplete. (ARPI only.), (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)        See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139527     NEW HEIGHTS FARM II, LLC
Agency: 236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| Line | Unit/Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 60 | 0001-0015-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 14-ZU | 15-1N-2W / 32-2N-2W | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.02915177 No | 48 BU 44 BU 48 BU | 38.4 BU $0 9.54 E 0 | | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 61 | 0001-0016-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 01-Insured | 29-2N-2W / 30-2N-2W / 31-2N-2W / 8128-1183-12 / 8128-1325-1,14,7,9 / 8128-3652-1,2 / 8128-5895-15,17,34 | 1.00 / 1.00 PFTAYA 1.020 / 0.77 | 0.0337957 No | 43 BU 38 BU 43 BU | 34.4 BU $141,726 9.54 E 14,856 BU 141,726 | | 1.0000 | 431.86 6/14/2019 | $9,399 $2,068 | ☐ Commingled Prod |
| 67 | 0001-0016-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 01-Insured | 29-2N-2W / 30-2N-2W / 31-2N-2W / 5578-2182-1,2 / 8128-1325-2 / 8128-889-3 | 1.00 / 1.00 PFTAYA 1.020 / 0.77 | 0.0337957 No | 43 BU 38 BU 43 BU | 34.4 BU $34,288 9.54 E 3,594 BU 34,288 | | 1.0000 | 105.40 6/16/2019 (1 L2 - 0.990) | $2,294 $505 | ☐ Commingled Prod |
| 62 | 0001-0017-EU Soybeans 80% | Nfac (Non-Irr)/Commodity Ingham (65) 14-ZU | 28-1N-2W | 1.00 / 1.00 PFTAYA 1.020 / 1.00 | 0.03145779 No | 46 BU 41 BU 46 BU | 36.8 BU $0 9.54 E 0 | | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| **Total for Ingham, Soybeans** | | | | | Acres: 680.28 | | Guarantee/Amt. of Cov.: 220,221 DOL | Liability: $220,221 | | | **$15,097** | **$3,322** |

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 63 | 0001-0001-EU Corn 80% | Non-Irr/Grain Washtenaw (161) 14-ZU | GENERIC LINE 1-3S-3E / 7-3S-4E / 12-3S-3E / 13-3S-3E / 17-3S-4E / 18-3S-4E / 24-3S-3E | 1.00 / 1.00 PF 1.020 / 1.00 | 0.07649743 No | 137 BU 137 BU | 109.6 BU $0 4.00 E 0 | | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| 69 | 0001-0001-EU Corn 80% | Non-Irr/Grain Washtenaw (161) 01-Insured | GENERIC LINE 1-3S-3E / 7-3S-4E / 12-3S-3E / 13-3S-3E / 17-3S-4E / 18-3S-4E / 24-3S-3E / 3057-13300-1,2 / 3057-1547-1,10,11,12,13,14,18,19,2,20,21, 3,4,6,7,9 / 9037-11703-5 | 1.00 / 1.00 PF 1.020 / 0.64 | 0.07649743 No | 137 BU 137 BU | 109.6 BU $445,531 4.00 E 111,383 BU 445,531 | | 1.0000 | 1,026.57 6/6/2019 (1 L2 - 0.990) | $41,856 $9,208 | ☐ Commingled Prod |
| 70 | 0001-0001-EU Corn 80% | Non-Irr/Grain Washtenaw (161) 01-Insured | GENERIC LINE 1-3S-3E / 7-3S-4E / 12-3S-3E / 13-3S-3E / 17-3S-4E / 18-3S-4E / 24-3S-3E / 3057-1547-15,16,17 / 9037-11703-4 | 1.00 / 1.00 PF 1.020 / 0.64 | 0.07649743 No | 137 BU 137 BU | 109.6 BU $68,624 4.00 E 17,156 BU 68,624 | | 1.0000 | 163.08 6/9/2019 (4 L2 - 0.960) | $6,649 $1,463 | ☐ Commingled Prod |
| 71 | 0001-0002-EU Corn 80% | Irr/Grain Washtenaw (161) 14-ZU | GENERIC LINE | 1.00 / 1.00 PF 1.020 / 1.00 | 0.05337228 No | 138 BU 138 BU | 110.4 BU $0 4.00 E 0 | | 1.0000 | 0.00 | $0 $0 | ☐ Commingled Prod |
| Washtenaw (161) Corn Assignment: WILMINGTON TRUST, N.A. | | | | | | | | | | | | |
| **Total for Washtenaw Corn** | | | | | Acres: 1,189.65 | | Guarantee/Amt. of Cov.: 514,155 DOL | Liability: $514,155 | | | **$48,505** | **$10,671** |

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / F=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

**Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)     See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139527    NEW HEIGHTS FARM II, LLC

Agency: 236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| Line | Unit / Structure Crop Coverage | Practice/Type/Variety County - Map Area Acreage Type | Line Note Legal Description, FSA Farm/Tract/Field | Factors Map / Exp Opt / Unit | Base Rate/ Land Other Cnty? | APH Yield Rate Yield | Guar/Acre Total Guar UOM Guar | Price * Liability | Share % / Others Sharing | Acres Plant Date (Late - Factor) | Premium Base Insured's | 2019 Production & Record Type * |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 64 | 0001-0001-EP Soybeans 80% | Nfac (Non-Irr)/Commodity | GENERIC LINE | 1.00 / 1.00 PF | 0.054 | 40 BU 40 BU | 32.0 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 | |
| | | Washtenaw (161) 15-ZC | 1-3S-3E / 7-3S-4E / 12-3S-3E / 13-3S-3E / 17-3S-4E / 18-3S-4E / 24-3S-3E | 1.020 / 1.00 | No | | | | | | $0 | ☐ Commingled Prod |
| 72 | 0001-0002-EP Soybeans 80% | Nfac (Irr)/Commodity | GENERIC LINE | 1.00 / 1.00 PF | 0.055096 | 39 BU 39 BU | 31.2 BU $0 | 9.54 E 0 | 1.0000 | 0.00 | $0 | |
| | | Washtenaw (161) 15-ZC | | 1.020 / 1.00 | | | | | | | $0 | ☐ Commingled Prod |
| | Washtenaw (161) Soybeans Assignment: WILMINGTON TRUST, N.A. | | | | | | | | | | | |

| Total for Washtenaw Soybeans | Acres: 0.00 | Guarantee/Amt. of Cov.: 0  DOL | Liability: $0 | $0 | $0 |
|---|---|---|---|---|---|

---

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed.  (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only), (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

** Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)        See Signature Page for Required Statements

**Schedule of Insurance with Production Report - for the 2019 Crop Year**

Policy Number: 2019-MI-084-1139527    NEW HEIGHTS FARM II, LLC
Agency: 236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

| | *MPCI POLICY TOTALS:* | Base Premium: | $71,403 | - | #Risk Subsidy: | $55,694 | = | Insured's Premium: | $15,709 |
|---|---|---|---|---|---|---|---|---|---|
| ☐ Required Review | Total Acres: | 2,093.55 | | | ***A&O Subsidy: | $13,209 | | #Administrative Fees: | $0 |
| ☐ Required Inspection | Total Liability: | $846,325 | Total Premium: | $84,612 = | Total Subsidy: | $68,903 | + | Insured's Premium & Fees: | $15,709 |

***Note: This amount may increase by 1.15 percent of net book premium (except for group plans of insurance) if the loss ratio in the State exceeds 1.20. However, the amount of premium the producer must pay will not change.

#Note: Beginning Farmer and Rancher benefits apply to county crops on this policy. This includes an exemption from paying the administrative fee for catastrophic and additional coverage policies, an additional 10 percentage points of premium subsidy for additional coverage policies that have premium subsidy, and an increase in the substitute Yield Adjustment.

Remarks:

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only). (J)Unharvested and put to another use. (ARPI only). (K)Unharvested and production appraised by AIP (ARPI Only). (L)Unreported production. (ARPI only). (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)    See Signature Page for Required Statements

**Schedule of Insurance with Production Report - for the 2019 Crop Year**

Policy Number:  2019-MI-084-1139527     NEW HEIGHTS FARM II, LLC
Agency:  236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

### COLLECTION OF INFORMATION AND DATA (PRIVACY ACT) STATEMENT Agents, Loss Adjusters and Policyholders

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information requested on documents established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required or permitted by law, law enforcement agencies, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIPs contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to the public to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures and the denial of program eligibility or benefits derived therefrom. Also, failure to provide true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.

.

**Non-Discrimination Policy**
In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating on the basis of race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs).

**To File a Program Complaint**
If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at www.ascr.usda.gov/ad-3027-usda-program-discrimination-complaint-form, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410 or email at program.intake@usda.gov.

**Persons with Disabilities**
Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible State or local Agency that administers the program or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English. Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email.

---

\* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

\* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only). (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI Only)., (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

\*\* Insurability: (A) Insurable, (B) Uninsurable, (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
\*\* I certify I have not produced the insured crop in the county for more than two years.

(Form M205)          See Signature Page for Required Statements



# Schedule of Insurance with Production Report - for the 2019 Crop Year

Policy Number: 2019-MI-084-1139527    NEW HEIGHTS FARM II, LLC

Agency: 236132 SPARTAN INSURANCE -MAIN 3 / PETOSKEY, MI

---

**CERTIFICATION STATEMENT**

**ANTI-REBATING STATEMENT(S)**

**Applicant/Insured Statement**

"I certify, for the crop year indicated, that I have not directly or indirectly received, accepted, or been paid, offered, promised, or given any benefit, including money, goods, or services for which payment is usually made, rebate, discount, abatement, credit, or reduction of premium, or any other valuable consideration, as an inducement to procure insurance or in exchange for purchasing this insurance policy after it has been procured. I understand that this prohibition does not include payment of administrative fees, performance based discounts, and any other payment approved by FCIC that are authorized under sections 508(a)(9)(B) and 508(d)(3) of the Federal Crop Insurance Act (Act) (7 U.S.C. §§ 1508(a)(9)(B) and 1508(d)(3)). I understand that a false certification or failure to completely and accurately report any information on this form may subject me, and any person with a substantial beneficial interest in me, to sanctions, including but not limited to, criminal and civil penalties and administrative sanctions in accordance with section 515(h) of the Act (7 U.S.C. §1515(h)) and all other applicable federal statutes."

I understand this form may be reviewed or audited and that information inaccurately reported or failure to retain records to support information on this form may result in a recomputation of the approved APH yield.

I certify that to the best of my knowledge and belief all of the information on this form is correct. I also understand that failure to report completely and accurately may result in sanctions under my policy, including but not limited to voidance of the policy, and in criminal or civil penalties (18 U.S.C. ß1006 and ß1014; 7 U.S.C. ß1506; 31 U.S.C. ß3729, ß3730 and any other applicable federal statutes).

**Authorized Representative:** NICHOLAS BOERSEN

**POA(s):**

**Limited Authorized Rep:**

NEW HEIGHTS FARM II, LLC

_____    _____

*Insured's Printed Name*                          *Signature*                                                                    *(Date)*

**Agent Statement**

"I certify, for the crop year indicated, that I have neither offered nor promised, directly or indirectly, any benefit, including money, goods, or services for which payment is usually made, rebate, discount, credit, reduction of premium, or any other valuable consideration to this person either as an inducement to procure insurance or in exchange for obtaining insurance after it has been procured. I understand that this prohibition does not include payment of administrative fees, performance based discounts, and any other payment approved by FCIC that are authorized under sections 508(a)(9)(B) and 508(d)(3) of the Federal Crop Insurance Act (Act) (7 U.S.C. §§ 1508(a)(9)(B) and 1508(d)(3)). I understand that a false certification or failure to completely and accurately report any violation may subject me, and all agencies/companies I represent, to sanctions, including but not limited, to criminal and civil penalties and administrative sanctions in accordance with section 515(h) of the Act (7 USC §1515(h)) and all other applicable federal statutes."

_____    _____    _____

*Agent's Printed Name*                          *Signature*                                          *(Date)*                    *(Agent's Code)*

---

* Price Type Code indicates type of price used for calculation of premium & coverages:
A=Average / B=Base / C=CAT / D=Dollar / E=Established / H=Projected Harvest / M=Market / N=Non-Quota / Q=Quota / P=Pre-Sales / S=Support / T=Contract / W=Written Agreement

* Record Types: (A)Harvested Production: sold/commercial storage., (B)Harvested Production: farm stored/measured by insured., (C)Harvested Production: pick/daily sales records., (D)Harvested Production: automated yield monitoring system., (E)Harvested Production: farm stored/measured by authorized representative., (F)Harvested Production: livestock feeding records., (G)Harvested Production: field harvest records., (H)Harvested Production: other., (I)Unharvested and destroyed. (ARPI only), (J)Unharvested and put to another use. (ARPI only), (K)Unharvested and production appraised by AIP (ARPI only), (L)Unreported production. (ARPI only), (M)Claim for indemnity. For CCIP policies only., (N)Appraisal (non-loss). For CCIP policies only., (O)UUF or third party damage, (P)Unharvested with Harvest incomplete. (ARPI only)., (Q)Zero production when no claim/appraisal/UUF/3rd party or production record. For CCIP policies only., (Z)Zero Planted Acres

** Insurability: (A) Insurable, (B) Uninsurable., (C) Uninsured Acre, (D) Acreage where a PP payment was reduced due to planting of second crop, (E) Uninsurable cause of loss appraisal
** I certify I have not produced the insured crop in the county for more than two years.

(Form M205)



**EXHIBIT 14**

507-4-NOL

# MPCI NOTICE OF PP OR DAMAGE OR LOSS

| AGENCY NAME & ADDRESS                102212 | PROFIT CENTER NAME & ADDRESS            22 |
|---|---|
| SPARTAN INSURANCE-MAIN 2 | Peoria |
| 806 BOTSFORD RD | 1315 W. Commerce Drive |
| PETOSKEY, MI  49770 | Peoria, IL  61615-1462 |
| Phone: (855) 347-1066     Fax: (231) 347-1067 | Phone:  (800) 345-1065     Fax:   (309) 689-1055 |

Great American INSURANCE COMPANY Crop Insurance Division

**CROP YEAR** 2019

| INSURED NAME & ADDRESS | |
|---|---|
| NEW HEIGHTS FARM II, LLC | **POLICY NO.**  2019-MI-084-1139527 |
| 6241 RANSOM ST | **CLAIM NO.**  2019-1139527-01 |
| ZEELAND, MI  49464 | **HOME/OFFICE PHONE**  (616) 875-7880 |
|  | **MOBILE PHONE**  (616) 610-2886 |
|  | **EMAIL** |
| **Best time to contact insured:**  Contact Stacy at 616-836-0273 | |

| ADJUSTER NAME & PHONE | SUPERVISOR NAME & PHONE |
|---|---|
| JAMES BRINKMAN | JAMES BRINKMAN |
| Phone:  (989) 928-4712 | Phone:  (989) 928-4712 |

**THIS IS A NOTICE OF:**
- [x] PREVENTED PLANTING
- [ ] REPLANT (if replant on any unit is greater than 50 acres)
- [ ] REPLANT (SELF CERT.<50 ACRES)
- [ ] PROBABLE LOSS
- [ ] DAMAGE ONLY (appears production will exceed guarantee at this time)
- [ ] IMMEDIATE INSPECTION REQUESTED - Reason:

**POLICYHOLDER  INTENTION:**
- [ ] REPLANT
- [ ] TO HARVEST
- [ ] TO CHOP/SILAGE
- [x] LEAVE FOR COVER
- [ ] PLANT TO ANOTHER CROP
- [ ] UNKNOWN AT THIS TIME
- [ ] PASTURE
- [ ] HAY
- [ ] DIRECT MKT.CROP
- [ ] DESTROY
- [ ] OTHER   (explain in Remarks)

| COUNTY | CROP | UNIT | ACRES | LEGAL DESCRIPTION / FSN | EST./ AC. PROD. | CAUSE OF LOSS | DATE OF DAMAGE | DATE OF NOTICE | DATE OF HARVEST |
|---|---|---|---|---|---|---|---|---|---|
| Eaton | Corn (41) | 00010001 | 0.00 | 13-002N-004W / 14-002N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Soybeans (81) | 00010001 | 0.00 | 13-002N-004W / 14-002N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Corn (41) | 00010002 | 0.00 | 33-001N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Soybeans (81) | 00010002 | 0.00 | 07-001N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Soybeans (81) | 00010002 | 0.00 | 30-003N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Corn (41) | 00010003 | 0.00 | 23-002N-004W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Soybeans (81) | 00010003 | 0.00 | 22-001N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Corn (41) | 00010004 | 0.00 | 23-002N-004W / 24-002N-004W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Soybeans (81) | 00010004 | 0.00 | 09-001N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Corn (41) | 00010005 | 0.00 | 18-003N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Corn (41) | 00010005 | 0.00 | 11-001N-002W / 14-001N-001W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Soybeans (81) | 00010005 | 0.00 | 18-003N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Soybeans (81) | 00010005 | 0.00 | 05-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Corn (41) | 00010006 | 0.00 | 14-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Soybeans (81) | 00010006 | 0.00 | 23-002N-004W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Soybeans (81) | 00010006 | 0.00 | 07-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Soybeans (81) | 00010007 | 0.00 | 24-002N-004W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Soybeans (81) | 00010007 | 0.00 | 09-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Corn (41) | 00010008 | 0.00 | 05-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Soybeans (81) | 00010008 | 0.00 | 33-001N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Soybeans (81) | 00010008 | 0.00 | 21-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Corn (41) | 00010009 | 0.00 | 07-001N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Corn (41) | 00010009 | 0.00 | 07-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Ingham | Soybeans (81) | 00010009 | 0.00 | 26-001N-002W / 27-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |
| Eaton | Corn (41) | 00010010 | 0.00 | 09-001N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 | |

F.18417 Rev. (6/11)

507-4-NOL

## MPCI NOTICE OF PP OR DAMAGE OR LOSS

GREAT AMERICAN
INSURANCE COMPANY
Crop Insurance Division

**INSURED NAME & ADDRESS**
NEW HEIGHTS FARM II, LLC
6241 RANSOM ST
ZEELAND, MI  49464

| | |
|---|---|
| POLICY NO. | 2019-MI-084-1139527 |
| CLAIM NO. | 2019-1139527-01 |
| HOME/OFFICE PHONE | (616) 875-7880 |
| MOBILE PHONE | (616) 610-2886 |

**CROP YEAR** 2019

**Best time to contact insured:** Contact Stacy at 616-836-0273

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Ingham | Corn (41) | 00010010 | 0.00 | 09-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Eaton | Corn (41) | 00010011 | 0.00 | 24-003N-004W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Corn (41) | 00010011 | 0.00 | 21-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Eaton | Soybeans (81) | 00010011 | 0.00 | 24-003N-004W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Soybeans (81) | 00010011 | 0.00 | 11-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Corn (41) | 00010012 | 0.00 | 26-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Soybeans (81) | 00010012 | 0.00 | 14-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Corn (41) | 00010013 | 0.00 | 27-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Soybeans (81) | 00010013 | 0.00 | 01-001N-002W / 06-001N-001W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Eaton | Corn (41) | 00010014 | 0.00 | 22-001N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Corn (41) | 00010014 | 0.00 | 01-001N-002W / 06-001N-001W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Corn (41) | 00010015 | 0.00 | 29-002N-002W / 30-002N-002W / 31-002N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Eaton | Soybeans (81) | 00010015 | 0.00 | 21-002N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Soybeans (81) | 00010015 | 0.00 | 15-001N-002W / 32-002N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Eaton | Corn (41) | 00010016 | 0.00 | 21-002N-003W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Corn (41) | 00010016 | 0.00 | 15-001N-002W / 28-001N-002W / 32-002N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Soybeans (81) | 00010016 | 0.00 | 29-002N-002W / 30-002N-002W / 31-002N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |
| Ingham | Soybeans (81) | 00010017 | 0.00 | 28-001N-002W | | Excess Moisture/Precip | 6/27/2019 | 6/27/2019 |

** Unit has more legals. Please refer to APH or SOI forms for all legals.

NOTE: Refer to Basic Provisions (BP) and the specific Crop Provisions (CP)  for more details on notice requirements for acreage prevented from planting, and notice requirements for damage or loss requirements.

- If you have less than 100% share, is the other share insured under a Federal Crop insurance program?   ☐ YES  ☐ NO  ☑ N/A

  If "Yes" please list the person's name and insurance company (AIP) for which they carry Federal Crop insurance and the policy number if known.

  _____    _____    _____
  Shareholder's Name     Insurance Company     Policy #

- I (the insured) am an agent, employee, or contractor affiliated with Federal Crop insurance and the policy number if known?   ☐ YES  ☑ NO

**REMARKS / COMMENTS**
NOL generated by CSHELLENBARGER and received by Great American on 6/27/2019 at 13:22:46
They are still planting but will have some acres that will not get planted.

**COMPANION POLICIES**

_____    _____    _____
Insured's Signature              Date Signed              Date of Notice

F.18417 Rev. (6/11)

EXHIBIT
**15**

507-4-NOL

# MPCI NOTICE OF PP OR DAMAGE OR LOSS

| **AGENCY NAME & ADDRESS** 236133 | **PROFIT CENTER NAME & ADDRESS** 22 |
|---|---|
| SPARTAN INSURANCE -SHELLENBARGER 2 | Peoria |
| 806 BOTSFORD RD | 1315 W. Commerce Drive |
| PETOSKEY, MI  49770 | Peoria, IL  61615-1462 |
| Phone: (855) 347-1066        Fax: (231) 347-1067 | Phone:  (800) 345-1065    Fax:   (309) 689-1055 |

GREAT**AMERICAN**.
INSURANCE COMPANY
Crop Insurance Division

**CROP YEAR** 2019

| **INSURED NAME & ADDRESS** | |
|---|---|
| NEW HEIGHTS FARM II, LLC | **POLICY NO.**  2019-MI-084-1139526 |
| 6241 RANSOM ST | **CLAIM NO.**  2019-1139526-01 |
| ZEELAND, MI  49464 | **HOME/OFFICE PHONE**  (616) 875-7880 |
| | **MOBILE PHONE**  (616) 610-2886 |
| | **EMAIL** |
| **Best time to contact insured:**   Contact Nick at 616-610-2886 or Stacy at 616-836-0273 | |

| **ADJUSTER NAME & PHONE** | **SUPERVISOR NAME & PHONE** |
|---|---|
| JAMES BRINKMAN | JAMES BRINKMAN |
| Phone:  (989) 928-4712 | Phone:  (989) 928-4712 |

**THIS IS A NOTICE OF:**

- [ ] PREVENTED PLANTING
- [ ] REPLANT (if replant on any unit is greater than 50 acres)
- [ ] REPLANT (SELF CERT.<50 ACRES)
- [x] PROBABLE LOSS
- [ ] DAMAGE ONLY (appears production will exceed guarantee at this time)
- [ ] IMMEDIATE INSPECTION REQUESTED - Reason:

**POLICYHOLDER INTENTION:**

- [ ] REPLANT
- [x] TO HARVEST
- [ ] TO CHOP/SILAGE
- [ ] LEAVE FOR COVER
- [ ] PLANT TO ANOTHER CROP
- [ ] UNKNOWN AT THIS TIME
- [ ] PASTURE
- [ ] HAY
- [ ] DIRECT MKT.CROP
- [ ] DESTROY
- [ ] OTHER  (explain in Remarks)

| COUNTY | CROP | UNIT | ACRES | LEGAL DESCRIPTION / FSN | EST./ AC. PROD. | CAUSE OF LOSS | DATE OF DAMAGE | DATE OF NOTICE | DATE OF HARVEST |
|---|---|---|---|---|---|---|---|---|---|
| Hillsdale | Corn (41) | 00010001 | 46.58 | 02-007S-004W / 02-007S-004W / 02-007S-004W** | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010001 | 591.08 | 01-001S-017W / 12-001S-017W / 25-001S-013W** | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Hillsdale | Corn (41) | 00010002 | 0.00 | 35-006S-004W | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010002 | 538.40 | 01-002S-013W / 03-001S-016W / 04-001S-016W** | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Hillsdale | Corn (41) | 00010003 | 297.53 | 04-007S-004W / 04-007S-004W / 11-002S-004W** | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010003 | 183.23 | 24-001S-013W / 24-001S-013W / 24-001S-013W** | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010004 | 34.08 | 26-001S-013W / 26-001S-013W | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010005 | 612.35 | 35-001S-013W / 36-001S-013W / 35-001S-013W** | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010006 | 192.00 | 17-002S-016W / 17-002S-016W / 27-002S-016W** | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010007 | 0.00 | 25-002S-015W | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010009 | 0.00 | 14-003S-016W / 23-003S-016W | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010010 | 268.51 | 01-003S-015W / 03-003S-015W / 22-003S-015W** | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010011 | 76.49 | 01-003S-014W / 29-003S-014W / 31-003S-014W** | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010013 | 63.12 | 16-004S-016W / 16-004S-016W | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010014 | 203.19 | 03-004S-015W / 03-004S-015W / 07-004S-015W** | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010015 | 573.52 | 01-004S-014W / 01-004S-014W / 02-004S-014W** | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010016 | 0.00 | 12-004S-013W | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010018 | 0.00 | 20-001S-016W / 20-001S-016W | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010020 | 100.69 | 14-002S-014W / 14-002S-014W / 15-002S-014W** | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010022 | 103.34 | 35-004S-016W / 36-004S-016W / 35-004S-016W** | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010024 | 46.21 | 19-001S-015W / 19-001S-015W / 19-001S-015W** | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010026 | 0.00 | 31-003S-014W / 31-003S-014W | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010027 | 0.00 | 16-004S-014W / 16-004S-014W | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010031 | 483.94 | 05-003S-016W / 24-002S-016W / 34-002S-015W** | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010032 | 109.43 | 08-002S-016W / 24-002S-016W / 24-002S-016W** | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |

F.18417 Rev. (6/11)

507-4-NOL

# MPCI NOTICE OF PP OR DAMAGE OR LOSS

**GREAT AMERICAN**
INSURANCE COMPANY
Crop Insurance Division

| INSURED NAME & ADDRESS |
|---|
| NEW HEIGHTS FARM II, LLC |
| 6241 RANSOM ST |
| ZEELAND, MI  49464 |

| POLICY NO. | 2019-MI-084-1139526 |
|---|---|
| CLAIM NO. | 2019-1139526-01 |
| HOME/OFFICE PHONE | (616) 875-7880 |
| MOBILE PHONE | (616) 610-2886 |

**CROP YEAR** 2019

**Best time to contact insured:** Contact Nick at 616-610-2886 or Stacy at 616-836-0273

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Van Buren | Corn (41) | 00010034 | 0.00 | 06-003S-015W / 06-003S-015W | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010035 | 930.34 | 07-002S-016W / 08-002S-016W / 10-002S-016W** | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Van Buren | Corn (41) | 00010036 | 174.46 | 03-002S-015W / 11-002S-014W / 14-002S-016W** | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |

** Unit has more legals. Please refer to APH or SOI forms for all legals.

NOTE: Refer to Basic Provisions (BP) and the specific Crop Provisions (CP)  for more details on notice requirements for acreage prevented from planting, and notice requirements for damage or loss requirements.

- If you have less than 100% share, is the other share insured under a Federal Crop insurance program?  ☐ YES  ☐ NO  ☑ N/A

  If "Yes" please list the person's name and insurance company (AIP) for which they carry Federal Crop insurance and the policy number if known.

  _____    _____    _____
  Shareholder's Name        Insurance Company          Policy #

- I (the insured) am an agent, employee, or contractor affiliated with Federal Crop insurance and the policy number if known?  ☐ YES  ☑ NO

| REMARKS / COMMENTS | COMPANION POLICIES |
|---|---|
| NOL generated by CSHELLENBARGER and received by Great American on 12/9/2019 at 14:00:32 Insured has approximately 300 acres of corn in Hillsdale County and 450 acres of corn in VanBuren County that has not been harvested. | |

_____        _____        _____
Insured's Signature                      Date Signed              Date of Notice

## COLLECTION OF INFORMATION AND DATA (PRIVACY ACT) STATEMENT

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information requested on documents established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required or permitted by law, law enforcement agencies, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIPs contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to the public to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures and the denial of program eligibility or benefits derived therefrom. Also, failure to provide true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.

**Non-Discrimination Policy** In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating on the basis of race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs).
**To File a Program Complaint** If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at www.ascr.usda.gov/ad-3027-usda-program-discrimination-complaint-form, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410 or email at program.intake@usda.gov. **Persons with Disabilities** Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible State or local Agency that administers the program or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English. Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email.

F.18417 Rev. (6/11)



# NOTICE OF PP OR DAMAGE OR LOSS

| AGENCY NAME & ADDRESS 236132 | PROFIT CENTER NAME & ADDRESS 22 | GREAT AMERICAN INSURANCE COMPANY |
|---|---|---|
| SPARTAN INSURANCE -MAIN 3<br>806 BOTSFORD RD<br>PETOSKEY, MI 49770<br><br>Phone: (855) 347-1066    Fax: (231) 347-1067 | Peoria<br>1315 W. Commerce Drive<br>Peoria, IL 61615-1462<br><br>Phone: (800) 345-1065    Fax:  (309) 689-1055 | Crop Insurance Division<br><br>**CROP YEAR** 2019 |

| INSURED NAME & ADDRESS | | |
|---|---|---|
| NEW HEIGHTS FARM II, LLC<br>6241 RANSOM ST<br>ZEELAND, MI 49464 | POLICY NO.<br>CLAIM NO.<br>HOME/OFFICE PHONE<br>MOBILE PHONE<br>EMAIL | 2019-MI-084-1139527<br>2019-1139527-02<br>(616) 875-7880<br>(616) 610-2886 |

**Best time to contact insured:**   Contact Nick at 616-610-2886 or Stacy at 616-836-0273.

| ADJUSTER NAME & PHONE | SUPERVISOR NAME & PHONE |
|---|---|
| SHARON SHOCK<br>Phone:  (260) 341-4412 | SHARON SHOCK<br>Phone:  (260) 341-4412 |

THIS IS A NOTICE OF:

POLICYHOLDER INTENTION:

- [ ] PREVENTED PLANTING
- [ ] REPLANT (if replant on any unit is greater than 50 acres)
- [ ] REPLANT (SELF CERT.<50 ACRES)
- [x] PROBABLE LOSS
- [ ] DAMAGE ONLY (appears production will exceed guarantee at this time)
- [ ] IMMEDIATE INSPECTION REQUESTED - Reason:

- [ ] REPLANT
- [x] TO HARVEST
- [ ] TO CHOP/SILAGE
- [ ] LEAVE FOR COVER
- [ ] PLANT TO ANOTHER CROP
- [ ] UNKNOWN AT THIS TIME

- [ ] PASTURE
- [ ] HAY
- [ ] DIRECT MKT.CROP
- [ ] DESTROY
- [ ] OTHER   (explain in Remarks)

| COUNTY | CROP | UNIT | ACRES | LEGAL DESCRIPTION / FSN | EST./ AC. PROD. | CAUSE OF LOSS | DATE OF DAMAGE | DATE OF NOTICE | DATE OF HARVEST |
|---|---|---|---|---|---|---|---|---|---|
| Washtenaw | Corn (41) | 00010001 | 1189.65 | 01-003S-003E / 01-003S-003E / 01-003S-003E** | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |
| Washtenaw | Corn (41) | 00010002 | 0.00 | | | Excess Moisture/Precip | 12/9/2019 | 12/9/2019 | |

**\*\* Unit has more legals. Please refer to APH or SOI forms for all legals.**

**NOTE:** Refer to Basic Provisions (BP) and the specific Crop Provisions (CP)  for more details on notice requirements for acreage prevented from planting, and notice requirements for damage or loss requirements.

- ● If you have less than 100% share, is the other share insured under a Federal Crop insurance program?     [ ] YES  [ ] NO  [x] N/A

  If "Yes" please list the person's name and insurance company (AIP) for which they carry Federal Crop insurance and the policy number if known.

  _____  _____  _____
  Shareholder's Name          Insurance Company          Policy #

- ● I (the insured) am an agent, employee, or contractor affiliated with Federal Crop insurance and the policy number if known?     [ ] YES  [x] NO

| REMARKS / COMMENTS | COMPANION POLICIES |
|---|---|
| NOL generated by CSHELLENBARGER and received by Great American on 12/9/2019 at 14:02:33<br>Insured has 1189.6 acres of corn left to harvest in Washtenaw County. | |

_____        _____        _____
Insured's Signature                     Date Signed                         Date of Notice

great american001992

F.18417 Rev. (6/11)

NHF2 Claims 000386

507-4-NOL

## MPCI NOTICE OF PP OR DAMAGE OR LOSS

**INSURED NAME & ADDRESS**
NEW HEIGHTS FARM II, LLC
6241 RANSOM ST
ZEELAND, MI 49464

| | |
|---|---|
| POLICY NO. | 2019-MI-084-1139527 |
| CLAIM NO. | 2019-1139527-02 |
| HOME/OFFICE PHONE | (616) 875-7880 |
| MOBILE PHONE | (616) 610-2886 |

GREAT AMERICAN
INSURANCE COMPANY
Crop Insurance Division

**CROP YEAR** 2019

**Best time to contact insured:** Contact Nick at 616-610-2886 or Stacy at 616-836-0273.

### COLLECTION OF INFORMATION AND DATA (PRIVACY ACT) STATEMENT

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information requested on documents established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required or permitted by law, law enforcement agencies, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIPs contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to the public to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures and the denial of program eligibility or benefits derived therefrom. Also, failure to provide true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.


**Non-Discrimination Policy** In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating on the basis of race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs).
**To File a Program Complaint** If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at www.ascr.usda.gov/ad-3027-usda-program-discrimination-complaint-form, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410 or email at program.intake@usda.gov. **Persons with Disabilities** Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible State or local Agency that administers the program or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English. Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email.

great american001993

F.18417 Rev. (6/11)

NHF2 Claims 000387

**EXHIBIT 16**

507-4-NOL

# MPCI NOTICE OF PP OR DAMAGE OR LOSS

**GREAT AMERICAN** INSURANCE COMPANY — Crop Insurance Division

| AGENCY NAME & ADDRESS | 236132 |
|---|---|
| SPARTAN INSURANCE -MAIN 3 | |
| 806 BOTSFORD RD | |
| PETOSKEY, MI  49770 | |
| Phone: (855) 347-1066    Fax: (231) 347-1067 | |

**PROFIT CENTER NAME & ADDRESS** 22
Peoria
1315 W. Commerce Drive
Peoria, IL  61615-1462
Phone: (800) 345-1065    Fax:  (309) 689-1055

**CROP YEAR** 2019

**INSURED NAME & ADDRESS**
NEW HEIGHTS FARM II, LLC
6241 RANSOM ST
ZEELAND, MI  49464

**POLICY NO.** 2019-MI-084-1139527
**CLAIM NO.** 2019-1139527-03
**HOME/OFFICE PHONE** (616) 875-7880
**MOBILE PHONE** (616) 610-2886
**EMAIL**

**Best time to contact insured:** Contact Nick Boersen at 616-610-2886

**ADJUSTER NAME & PHONE**
SHARON SHOCK
Phone:  (260) 341-4412

**SUPERVISOR NAME & PHONE**
SHARON SHOCK
Phone:  (260) 341-4412

**THIS IS A NOTICE OF:**
- [ ] PREVENTED PLANTING
- [ ] REPLANT (if replant on any unit is greater than 50 acres)
- [ ] REPLANT (SELF CERT.<50 ACRES)
- [x] PROBABLE LOSS
- [ ] DAMAGE ONLY (appears production will exceed guarantee at this time)
- [ ] IMMEDIATE INSPECTION REQUESTED - Reason:

**POLICYHOLDER INTENTION:**
- [ ] REPLANT
- [x] TO HARVEST
- [ ] TO CHOP/SILAGE
- [ ] LEAVE FOR COVER
- [ ] PLANT TO ANOTHER CROP
- [ ] UNKNOWN AT THIS TIME
- [ ] PASTURE
- [ ] HAY
- [ ] DIRECT MKT.CROP
- [ ] DESTROY
- [ ] OTHER (explain in Remarks)

| COUNTY | CROP | UNIT | ACRES | LEGAL DESCRIPTION / FSN | EST./ AC. PROD. | CAUSE OF LOSS | DATE OF DAMAGE | DATE OF NOTICE | DATE OF HARVEST |
|---|---|---|---|---|---|---|---|---|---|
| Eaton | Corn (41) | 00010001 | 148.94 | 13-002N-004W / 14-002N-003W / 13-002N-004W** | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Eaton | Corn (41) | 00010002 | 0.00 | 33-001N-003W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010002 | 0.00 | 30-003N-002W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Eaton | Corn (41) | 00010003 | 0.00 | 23-002N-004W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Eaton | Corn (41) | 00010004 | 0.00 | 23-002N-004W / 24-002N-004W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Eaton | Corn (41) | 00010005 | 0.00 | 18-003N-003W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010005 | 0.00 | 05-001N-002W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010006 | 0.00 | 07-001N-002W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010007 | 0.00 | 09-001N-002W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010008 | 0.00 | 21-001N-002W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Eaton | Corn (41) | 00010009 | 0.00 | 07-001N-003W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010009 | 0.00 | 26-001N-002W / 27-001N-002W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Eaton | Corn (41) | 00010010 | 0.00 | 09-001N-003W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Eaton | Corn (41) | 00010011 | 74.68 | 24-003N-004W / 24-003N-004W / 24-003N-004W** | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010011 | 0.00 | 11-001N-002W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010012 | 0.00 | 14-001N-002W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010013 | 143.02 | 01-001N-002W / 01-001N-002W / 06-001N-001W** | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Eaton | Corn (41) | 00010014 | 0.00 | 22-001N-003W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010015 | 0.00 | 15-001N-002W / 32-002N-002W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Eaton | Corn (41) | 00010016 | 0.00 | 21-002N-003W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010016 | 537.26 | 29-002N-002W / 29-002N-002W / 30-002N-002W** | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |
| Ingham | Soybeans (81) | 00010017 | 0.00 | 28-001N-002W | | Excess Moisture/Precip | 10/31/2019 | 12/11/2019 | |

F.18417 Rev. (6/11)

507-4-NOL

## MPCI NOTICE OF PP OR DAMAGE OR LOSS

**GREAT AMERICAN**
INSURANCE COMPANY
Crop Insurance Division

| INSURED NAME & ADDRESS | | |
|---|---|---|
| NEW HEIGHTS FARM II, LLC | | |
| 6241 RANSOM ST | | |
| ZEELAND, MI  49464 | POLICY NO. | 2019-MI-084-1139527 |
| | CLAIM NO. | 2019-1139527-03 |
| | HOME/OFFICE PHONE | (616) 875-7880 |
| | MOBILE PHONE | (616) 610-2886 |
| **Best time to contact insured:** Contact Nick Boersen at 616-610-2886 | | |

**CROP YEAR** 2019

** Unit has more legals. Please refer to APH or SOI forms for all legals.

NOTE: Refer to Basic Provisions (BP) and the specific Crop Provisions (CP)  for more details on notice requirements for acreage prevented from planting, and notice requirements for damage or loss requirements.

● If you have less than 100% share, is the other share insured under a Federal Crop insurance program?   ☐ YES   ☐ NO   ☑ N/A

  If "Yes" please list the person's name and insurance company (AIP) for which they carry Federal Crop insurance and the policy number if known.

| Shareholder's Name | Insurance Company | Policy # |
|---|---|---|

● I (the insured) am an agent, employee, or contractor affiliated with Federal Crop insurance and the policy number if known?   ☐ YES   ☑ NO

| REMARKS / COMMENTS | COMPANION POLICIES |
|---|---|
| NOL generated by CSHELLENBARGER and received by Great American on 12/11/2019 at 12:02:22 Soybeans are all sold and delivered and ready to have the claim settled.  Eaton Corn has been harvested and insured would like to wait until all corn is harvested to work on corn claims. | |

_____     _____     _____
Insured's Signature                 Date Signed                Date of Notice

### COLLECTION OF INFORMATION AND DATA (PRIVACY ACT) STATEMENT

The following statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. 552a): The Risk Management Agency (RMA) is authorized by the Federal Crop Insurance Act (7 U.S.C. 1501-1524) or other Acts, and the regulations promulgated thereunder, to solicit the information requested on documents established by RMA or by approved insurance providers (AIPs) that have been approved by the Federal Crop Insurance Corporation (FCIC) to deliver Federal crop insurance. The information is necessary for AIPs and RMA to operate the Federal crop insurance program, determine program eligibility, conduct statistical analysis, and ensure program integrity. Information provided herein may be furnished to other Federal, State, or local agencies, as required or permitted by law, law enforcement agencies, courts or adjudicative bodies, foreign agencies, magistrate, administrative tribunal, AIPs contractors and cooperators, Comprehensive Information Management System (CIMS), congressional offices, or entities under contract with RMA. For insurance agents, certain information may also be disclosed to the public to assist interested individuals in locating agents in a particular area. Disclosure of the information requested is voluntary. However, failure to correctly report the requested information may result in the rejection of this document by the AIP or RMA in accordance with the Standard Reinsurance Agreement between the AIP and FCIC, Federal regulations, or RMA-approved procedures and the denial of program eligibility or benefits derived therefrom. Also, failure to provide true and correct information may result in civil suit or criminal prosecution and the assessment of penalties or pursuit of other remedies.

**Non-Discrimination Policy** In accordance with Federal law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating on the basis of race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs).
**To File a Program Complaint** If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form, found online at www.ascr.usda.gov/ad-3027-usda-program-discrimination-complaint-form, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter by mail to the U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410 or email at program.intake@usda.gov. **Persons with Disabilities** Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible State or local Agency that administers the program or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English. Persons with disabilities, who wish to file a program complaint, please see information above on how to contact the Department by mail directly or by email.

F.18417 Rev. (6/11)



**EXHIBIT 17**



GREAT AMERICAN
INSURANCE GROUP

3/10/2020

New Heights Farm LLC II
6241 Ransom St
Zeeland, MI 49464

Policy Number 1139526/1139527-2019
Balance Due:    $97,913.00

Dear policyholder:

Great American Insurance (GAI) has agreed to your request for a payment plan for the balance due on your MPCI policy.  The following is an outline of the scheduled installments to be made. **Please be advised that these payments are aproximate; your account will continue to accrue interest until the balance has been paid in full. ** If the payment is not received or postmarked on or before the scheduled due date, this agreement will be considered in default and the entire balance will be due immediately. At that time, your name will be added to the Ineligible Tracking System with an ineligiblity date of 03/15/20. If Great American Insurance processes any indemnity claim while any debt referred to in this agreement is still outstanding, the indemnity will not be paid to you, but will be applied as payment toward the next scheduled installment(s) against this debt.
Please sign the form below and return it by 03/15/20.

|  | Current Balance: | $97,913.00 | |
|---|---|---|---|
| **Due Date:** | | | |
| 3/15/2020 | $35,000.00 | Balance: | $62,913.00 |
| 5/1/2020 | $9,442.00 | Balance: | $54,257.00 |
| 6/1/2020 | $9,442.00 | Balance: | $45,493.00 |
| 7/1/2020 | $9,442.00 | Balance: | $36,619.00 |
| 8/1/2020 | $9,442.00 | Balance: | $27,634.00 |
| 9/1/2020 | $9,442.00 | Balance: | $18,537.00 |
| 10/1/2020 | $9,442.00 | Balance: | $9,326.00 (plus interest) |
| 11/1/2020 | $9,442.00 | Balance | $0.00 |

I accept the terms of this repayment agreement. The monthly payment must be received or postmarked on or before the scheduled due date. Payment may be paid online at greatamericancrop.com or by phone 800-341-5546

Signature: _____  Date: _____
Signature: _____  Date: 3/10/2020

Rebecca Combs
Great American Insurance
Agency Collection Representative III
513-763-8424
513-246-0612 fax
rcombs@gaig.com

Payment Information for
Insured: **New Heights Farm** 6241 Ransom St
Policy Number: **1139526/113952** Zeeland, MI 49464
Type: **MPCI**

Send payments to:
Great American Insurance Company
Crop Division
3923 Solutions Center
Chicago, IL 60677

| | |
|---|---:|
| Premium | $91,089.00 |
| - Payment/Loss Credit | 0.00 |
| + Interest | 6,824.00 |
| Amount due | $97,913.00 |

| | | Beginning Balance | Payment | Applied to Principal | Applied to Interest | Ending Balance | | Additional Interest |
|---|---|---:|---:|---:|---:|---:|---|---:|
| Payment 1 | 3/15/2020 | $97,913.00 | $35,000.00 | $28,176.00 | $6,824.00 | $62,913.00 | + | $786.00 |
| Payment 2 | 5/1/2020 | $63,699.00 | $9,442.00 | $8,656.00 | $786.00 | $54,257.00 | + | $678.00 |
| Payment 3 | 6/1/2020 | $54,935.00 | $9,442.00 | $8,764.00 | $678.00 | $45,493.00 | + | $568.00 |
| Payment 4 | 7/1/2020 | $46,061.00 | $9,442.00 | $8,874.00 | $568.00 | $36,619.00 | + | $457.00 |
| Payment 5 | 8/1/2020 | $37,076.00 | $9,442.00 | $8,985.00 | $457.00 | $27,634.00 | + | $345.00 |
| Payment 6 | 9/1/2020 | $27,979.00 | $9,442.00 | $9,097.00 | $345.00 | $18,537.00 | + | $231.00 |
| Payment 7 | 10/1/2020 | $18,768.00 | $9,442.00 | $9,211.00 | $231.00 | $9,326.00 | + | $116.00 |
| Payment 8 | 11/1/2020 | $9,442.00 | $9,442.00 | $9,326.00 | $116.00 | $0.00 | | |

Please enclose remittance form with each payment

---

## PLEASE CALL 1-888-410-0468 FOR PAYOFF AMOUNT

**Payment 8 of 8**                **$9,442.00**

**Payment Agreement**

Due Date:    11/1/2020
Insured:    New Heights Farm LLC II
Policy Number:    1139526/1139527-2019

**Payment 7 of 8**                **$9,442.00**

**Payment Agreement**

Due Date:    10/1/2020
Insured:    New Heights Farm LLC II
Policy Number:    1139526/1139527-2019

**Payment 6 of 8**                **$9,442.00**

**Payment Agreement**

Due Date:    9/1/2020
Insured:    New Heights Farm LLC II
Policy Number:    1139526/1139527-2019

**Payment 5 of 8**                **$9,442.00**

**Payment Agreement**

Due Date:    8/1/2020
Insured:    New Heights Farm LLC II
Policy Number:    1139526/1139527-2019

**EXHIBIT 18**



1315 W Commerce Drive
Peoria IL  61615-1462

GreatAmericanInsurance.com

Crop Insurance Division
800.345.1065 toll-free
309.689.1055 fax
309.689.1065 ph

August 21, 2020

Mr. Nick Boersen
New Heights Farm II, LLC
6241 Ransom Street
Zeeland, MI 49464

      Re:    Notification of USDA Investigation
            RMA Case Number: SIS-2020-00024
            Policy: New Heights Farm II Policy Nos. 2019-MI-084-1139526, 1139527

Dear Mr. Boersen:

Your policy provisions and binding USDA Risk Management Agency (RMA) policy interpretations prohibit Great American Insurance Company from paying or otherwise determining your 2019 crop year claims at this time.  We are also deferring further adjustment of your loss claim until RMA and the USDA Office of Inspector General (OIG) completes ongoing investigations.  Our explanation for those actions follows below.

RMA formally notified Great American that RMA's Special Investigations Staff (SIS) has opened an investigation of suspected fraud in regard to your policy and claims, and also that OIG has opened its own investigation of suspected wrongdoing in relation to the same.

Our notice to you concerning these circumstances was delayed at the behest of RMA and other federal agency investigators, who had until now indicated that we should withhold this notice.  We are mindful of the inconvenience which that unavoidably caused.

As you know, Great American has been investigating and adjusting your crop year 2019 claims, and we appreciate the cooperation you provided as that process unfolded.  We have not made any determinations as of this date in relation to any of your claims because we have been unable to accurately determine whether there is, or the correct amount of, any loss.  And in light of the pending RMA and OIG investigation processes and the fact that their findings are likely to affect our loss determination, Great American remains unable to do so at this time.  In such circumstances, the policy terms and other applicable authorities instruct us to defer further adjustment and to otherwise withhold any payment which might be due while any USDA investigation is ongoing.

Notification of USDA Investigation
August 24, 2020
Page 2

Specifically, section 14(h) of the Basic Provisions of your policy terms instructs that Great American should "*defer adjustment of a loss until the amount of loss can be accurately determined.*" In addition, Basic Provisions section 14(f)(3) prohibits Great American from paying any losses determined to exist until the "*Completion of any investigation by USDA, if applicable, of your current or any past claim for indemnity if no evidence of wrongdoing has been found.*"

Prior Federal Crop Insurance Corporation (FCIC) interpretative directives also govern in this situation. In Final Agency Determination No. FAD-270 (2016), FCIC indicated:

> *… Section 14(f)(3) (Our Duties) … requires withholding payment pending an investigation of a current or any past claim for indemnity when there is evidence of wrongdoing on the part of the policyholder. FAD-78 further explains that delay in paying any claim applies if the USDA Office of Inspector General (OIG) investigates a policyholder's current or past claim because of such suspected wrongdoing, the AIP is prohibited from paying a current year's replanting, prevented planting payment, or claim for indemnity until the investigation is complete. … likewise, if the RMA Compliance Office provides written notification to the AIP not to initiate payment pending an investigation, the AIP is prohibited from making payment. Therefore, if either of these criteria are met, the AIP is prohibited from making payment.*

> *There is nothing within the policy or subsequent FADs that states the specificity of the nature of the suspected wrongdoing must be provided to withhold payment. In fact, in most investigations of wrongdoing, FCIC does not discuss the nature of the specific wrongdoing in order to protect the integrity of the investigation. …*

> *… The policy is clear that until the investigation is complete, no indemnity or other payment can be made.*

> *… Once all investigations are concluded, an indemnity or other payment can be made if no evidence of wrongdoing has been found.*

> (See https://legacy.rma.usda.gov/regs/533/2016/fad-270.html)

Also, FAD-190 (2013) specifies that commencement of an investigation is not itself a determination which is subject to the policy's appeal processes:

> *… In order for there to be an arbitration or request for reconsideration there must be a decision or determination in which the insured disagrees. The fact that a claim is under investigation does not in and of itself constitute a decision or determination that is subject to arbitration or reconsideration. However, if there has been a decision or determination unrelated to the investigation, the insured is entitled to seek arbitration or reconsideration of the determination within the timeframes specified in the policy. …*

Notification of USDA Investigation
August 24, 2020
Page 3

(See https://legacy.rma.usda.gov/regs/533/2013/fad-190.html)

FCIC's Final Agency Determinations, including those above, are "*binding on all participants in the Federal crop insurance program for the crop years the policy provisions are in effect.*" See 7 CFR §400.766(b)(2) (2020 edition).

We therefore must await the completion and results of the ongoing RMA and OIG investigations before we can make any determinations in relation to your 2019 claims.

**If and when the company makes a determination which you dispute, you have the right to resolve your disagreement through arbitration in accordance with Basic Provisions ¶20.** I have enclosed a copy of "*Your Right to Resolve Crop Insurance Disputes,*" which contains a complete overview of your rights.

Section 21(b) of the Basic Provisions normally requires you as a policyholder to retain the originals of all of the records in your possession which pertain to your insured and uninsured crops, your APH certification, or to any claim for a 3-year period (see section 21(b)(1) and (2) for the particulars of those requirements). However, **we hereby notify you that you should retain such records until the later of the end of that 3-year period or when you are notified by us or USDA that the USDA investigation processes have concluded.** Section 21(c) permits us to extend that record retention period in this manner.

By way of background, the United States Department of Agriculture, Risk Management Agency (RMA) governs federally reinsured crop insurance policies. RMA authors or approves the policy provisions, which are federal law, as well as underwriting and claims adjusting procedures. The policy terms and conditions preempt any contrary state laws. Neither Great American Insurance Company nor any of its adjusters, employees, or agents have the power to waive any provisions of the policy terms (see the introductory paragraphs to your policy's Basic Provisions). All companies issuing federally reinsured policies must abide by RMA's rules, regulations, practices, and procedures in the administration of the federal crop insurance program and in the determination of all claims, and Great American has undertaken the actions herein in compliance with those RMA requirements. Great American and RMA also have the right to review and audit your policy, application, acreage report, production history, guarantee, and any claims you have made, in order to ensure compliance with RMA requirements.

We greatly value our business relationship with all of our customers and agents and are committed to administering all Multi-Peril Crop Insurance policies and claims in accordance with the Risk Management Agency's policy language and procedural requirements.

Notification of USDA Investigation
August 24, 2020
Page 4

Sincerely,

Craig Eversole
Senior Claims Manager
Great American Insurance

cc:     Agent
        Loss file

Attachment: *Your Right to Resolve Crop Insurance Disputes*