# *Wiley v. Glickman*

United States District Court for the District of North Dakota, Southeastern Division

September 3, 1999, Decided ; September 3, 1999, Filed

A3-99-32

**Reporter**
1999 U.S. Dist. LEXIS 20278 *; 1999 WL 33283312

Paul Wiley, et al., Plaintiffs, vs. Dan Glickman, Secretary, United States Department of Agriculture; Ken Ackerman, Manager, Federal Crop Insurance Corporation and Administrator, Risk Management Agency, Defendants.

**Disposition:** [*1] Plaintiffs' motions for summary judgment (doc. # 30) and permanent injunction (doc. # 32) GRANTED. Bulletin MGR-99-004 void and of no effect. Defendants' cross motion for summary judgment (doc. # 38) DENIED. Plaintiffs' motion to strike DENIED AS MOOT. Remaining motions GRANTED.

**Counsel:** For PAUL WILEY, LARISSA WILEY, TOM WILEY, GAIL WILEY, DENNIS OVA, CONNIE OVA, KIM LEES, JAN LEES, DONNA SCHRADER, JON MARKER, GLORIA MARKER, DONALD READEL, JACQUELINE READEL, CURT TRULSON, LESLEY TRULSON, DAN SKARSGARD, DUANE VAN DYKE, CARLA VAN DYKE, LARRY READEL, NADINE READEL, DAVID BARNICK, LISA BARNICK, JOE VOGELWEDE, LEANNE VOGELWEDE, MARSHALL KRAFT, JANE KRAFT, DERRIN SCHREINER, LEWIS KUSTER, JERILYNN KUSTER, plaintiffs: Sarah M. Vogel, Courtney Koebele, WHEELER WOLF, BISMARCK, ND.

For SCOTT SCHRADER, plaintiff: Sarah M. Vogel, WHEELER WOLF, BISMARCK, ND.

For RAIN AND HAIL, L.L.C., NORTH CENTRAL CROP INSURANCE, INC., BLAKELY CROP HAIL, INC., NAU COUNTRY INSURANCE CO., NAU/AGFORCE INSURANCE SERVICES, INC., AMERICAN GROWERS INSURANCE COMPANY, FIREMAN'S FUND INSURANCE COMPANY, GREAT AMERICAN INSURANCE COMPANY, HARTFORD FIRE INSURANCE COMPANY, THE, intervenors: P. John Owen, Morrison & Hecker, [*2] Kansas City, MO.

For RAIN AND HAIL, L.L.C., intervenor: Bruce B. Green, Frank W. Pechacek, Jr., WILLSON & PECHACEK, PLC, COUNCIL BLUFFS, IA.

For RURAL COMMUNITY INSURANCE SERVICES, INC., NORTH CENTRAL CROP INSURANCE, INC., BLAKELY CROP HAIL, INC., NAU COUNTRY INSURANCE CO., NAU/AGFORCE INSURANCE SERVICES, INC., AMERICAN GROWERS INSURANCE COMPANY, FIREMAN'S FUND INSURANCE COMPANY, GREAT AMERICAN INSURANCE COMPANY, HARTFORD FIRE INSURANCE COMPANY, THE, intervenors: Wickham Corwin, Nancy J. Morris, Conmy, Feste, Bossart, Hubbard & Corwin, Ltd., Fargo, ND.

For UNITED STATES DEPARTMENT OF AGRICULTURE, FEDERAL CROP INSURANCE CORPORATION, RISK MANAGEMENT AGENCY, defendants: John T. Schneider, U.S. ATTORNEY'S OFFICE, FARGO, ND.

For UNITED STATES DEPARTMENT OF AGRICULTURE, FEDERAL CROP INSURANCE CORPORATION, RISK MANAGEMENT AGENCY, defendants: Margit Halvorson Williams, US DEPARTMENT OF AGRICULTURE, ST PAUL, MN.

**Judges:** RODNEY S. WEBB, CHIEF JUDGE,

UNITED STATES DISTRICT COURT.

**Opinion by:** RODNEY S. WEBB

## Opinion

**ORDER**

**I INTRODUCTION**

Before the court are plaintiffs' motion for summary judgment (doc. # 30); plaintiffs' motion for permanent injunction (doc. # 32); and defendants' [*3] cross motion for summary judgment (doc. # 38). [1] This action arises out of a dispute over a purported amendment to the terms of the 1999 Durum Wheat Crop Revenue Coverage (CRC) insurance policy, issued pursuant to the Federal Crop Insurance Act (FCIA), Title *7, United States Code Section 1501, et seq.*, and sold by various private insurance companies pursuant to reinsurance agreements with the Federal Crop Insurance Corporation (FCIC). Plaintiffs are North Dakota farmers who are either entitled to CRC Durum Wheat coverage by virtue of an endorsement to an existing CRC policy, or who have timely applied for the Durum Wheat CRC policy. Defendant Ackerman is the manager of FCIC and the administrator of the Risk Management Agency (RMA). Defendant Glickman is the Secretary of the United States Department of Agriculture (USDA).

[*4] **II BACKGROUND**

Federal delivery of crop insurance began with the passage of the Federal Crop Insurance Act of 1938. See H.R. Rep. No. 103-649, reprinted in 1994 U.S.S.C.A.N. 2516, 2518. Private insurance companies had theretofore deemed the risks associated with providing multi-peril crop insurance excessive. See *Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 383 n.1, 92 L. Ed. 10, 68 S. Ct. 1 (1947)*. Consequently, "the Government engaged in crop insurance as a pioneer." Id.

From its origin, the stated purpose of the federal crop insurance program has been "to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance." *7 U.S.C. § 1502(a)*. To carry out this purpose, Congress created FCIC, a wholly owned government corporation within USDA. *7 U.S.C. § 1503*.

Despite its lofty goals, federal crop insurance remained largely a "pilot program" during its first forty two years of existence, restricted in both geographic area and crop coverage. See 1994 U.S.S.C.A.N. at 2518. As of 1980, FCIC offered coverage for only about thirty crops [*5] in half of the counties in the United States. Steffen N. Johnson, A Regulatory 'Waste Land': Defining a Justified Federal Role in Crop Insurance, *72 N.D.L.Rev. 505, 513 (1996)*. Moreover, participation in the crop insurance program was low even where coverage was available. Id. "This state of affairs caused Congress to rely up on disaster assistance and emergency loan programs as a means of protecting agriculture from natural risks." Id.

The growing reliance upon ad hoc disaster relief led to the passage of the Federal Crop Insurance Act of 1980. See H.R. Rep. 96-430 (1979), reprinted in 1980 U.S.S.C.A.N. 3068, 3073-74. The goal of the 1980 Act was to eliminate this reliance by expanding and improving the crop insurance program so as to make it "the farmers' primary source of risk management." 1994 U.S.S.C.A.N. at 2519. To that end, the Act expanded the sale of "all-risk" crop insurance to all major commodities nationwide, and provided a large premium subsidy to each eligible producer. Id. See *7 U.S.C. 1508*

---

[1] Also remaining before the court are plaintiffs' motions to strike (doc. # 19); for class certification (doc. # 29); for leave to file a reply brief on class certification (doc. # 36); to exceed page limit (doc. # 53); and defendants' motion to consolidate (doc. # 33). All but plaintiffs' motion for class certification will be disposed of via a separate Order.

Case 1:23-cv-00663-HYJ-PJG   ECF No. 40-4,   PageID.3525   Filed 09/25/23   Page 3 of 18

Page 3 of 18
1999 U.S. Dist. LEXIS 20278, *5

*(1988)* (amended 1994). The Act also directed FCIC to provide reinsurance, to the "maximum extent practicable," to those **[*6]** companies willing to shoulder a portion of the crop insurance risk. See *§ 1508(e)*(1988)(amended 1994).

While these reforms expanded the availability of federal crop insurance, they failed to generate the participation Congress envisioned. See 1994 U.S.S.C.A.N. at 2519. Enrollment in the crop insurance program generally hovered around 30 to 35 percent of the total acreage planted to the major field crops after the 1980 reforms. See H.R. Rep. No. 106-300, 106th Cong., 1st Sess. (1999), 1999 WL 595269. As a result, Congress was repeatedly forced to respond to natural disasters with ad hoc relief measures throughout the 1980's and early 1990's. See 1994 U.S.S.C.A.N. at 2519. The repeated availability of this ad hoc relief, in turn, proved a major disincentive to participation in the crop insurance program. See id. at 2540; Johnson, supra, at 515-16.

Determined to "eliminate the need for ad hoc disaster assistance" by increasing participation in the crop insurance program, Congress enacted the Federal Crop Insurance Reform Act of 1994. See 1994 U.S.S.C.A.N. at 2517. The Act directed FCIC to provide "free" [2] catastrophic (CAT) coverage nationwide, **[*7]** and additional or "buy-up" coverage with significantly increased premium subsidies and coverage limits. See U.S.C. *§ 1508*. The Act also eliminated the legal authority to enact ad hoc relief for disasters affecting crops covered by the crop insurance program, and linked eligibility for participation in other USDA assistance programs to the acquisition of (at least) CAT coverage. See, *§ 1508(b)(7)*(1994)(amended 1996).

Two years later, Congress softened the linkage requirement by allowing farmers to remain eligible provided they waive, in writing, their eligibility for loss assistance. See *§ 1508(b)(7)(A)(ii)*. Thus, farmers who self insure may remain eligible for farm programs. See Johnson, supra, at 521. Congress also established the RMA in 1996 and placed FCIC under the authority of that agency. See id.

The 1994 Act also continued the reliance upon private insurance companies to deliver crop insurance. See *§ 1508(k)*. As a result, a substantial **[*8]** portion of today's federal crop insurance program, including the Durum Wheat CRC policy at issue in this case, is delivered by private insurance companies that have entered into a "cooperative financial arrangement," the Standard Reinsurance Agreement (SRA), with FCIC. See Ex. 1 accompanying Vogel Aff. Under the SRA, private insurance companies agree to deliver insurance approved by FCIC to eligible buyers. See *§ 1508(k)(1)*. The private insurance companies are responsible for all aspects of customer service, and guarantee payment of the insured producers' share of the premium to FCIC. See GAO, Crop Insurance - Opportunities Exist To Reduce Government Costs For Private Sector Delivery (1997)(hereinafter, "GAO, Private Sector Delivery"). In return, FCIC pays the insurance companies an administrative fee to reimburse the expenses of selling and servicing policies, including expenses associated with adjusting claims. See id. In addition, the insurance companies share a portion of the underwriting risk with FCIC and can earn or lose money according to the claims they must pay farmers. See id. Companies earn money when premiums exceed claims paid for those policies **[*9]** on which they retain risk, and lose money when the reverse occurs. See id.

As a result of these reforms, participation in the federal crop insurance program increased from 38 percent of crops insured in 1994 to 67 percent in 1998. See H.R. Rep. 106-300 (1999), 1999 WL 595269. While this marks a significant expansion of multi-peril insurance protection, farmers remain vulnerable to the swings in prices triggered by domestic and international production levels and demand. See GAO, Crop Revenue Insurance -

---

[2] Save for a small administrative fee.

Problems With New Plans Need To Be Addressed, 1998 WL 400444 (hereinafter "GAO, Crop Revenue Insurance"). Prior to 1996, these price swings were mitigated somewhat through various government price and income support programs. Id. Pursuant to the Federal Agriculture Improvement and Reform Act of 1996 (1996 farm bill), however, many of these programs were replaced with "production flexibility contracts;" agreements between USDA and participating farmers that provide for fixed but declining seven-year annual payments. Id.

To replace this lost price protection, FCIC has recently made available "revenue insurance" plans, which offer [*10] protection against both production and price risks. Id. See 7 U.S.C. § 1508(h)(9). CRC, the revenue insurance plan at issue in this case, was developed by private insurance companies that requested and received FCIC approval. See GAO, Crop Revenue Insurance, supra; 63 Fed. Reg. 37,829 (1998). CRC is administered by FCIC as part of its overall responsibility for the crop insurance program. See GAO, Crop Revenue Insurance, supra; 63 Fed. Reg. 37,829 (1998). As it does for traditional multi-peril crop insurance, FCIC supports CRC by (1) subsidizing the premiums farmers pay, (2) paying private insurance companies to sell the insurance and process claims, and (3) agreeing to pay a large portion of any underwriting losses that occur if claims exceed premiums. See GAO, Crop Revenue Insurance, supra. CRC is required to afford at least a minimum level of coverage that is an alternative to CAT coverage. See § 1508(h)(9); 63 Fed. Reg. 37,829 (1998).

CRC basically operates as follows: A "minimum guarantee" is calculated before planting by multiplying a base price (provided by a Commodity Exchange Endorsement [*11] to the CRC policy) times an approved yield times a selected coverage level. 63 Fed. Reg. 37,829 (1998). At harvest, a "harvest guarantee" is set using the harvest price (also provided by a Commodity Exchange Endorsement) times the approved yield times the coverage level. Id. The higher of the two guarantees becomes the final guarantee to the producer. Id. The farmer's actual yield is then multiplied by the harvest price to determine the calculated revenue. Id. If the final guarantee is higher than the calculated revenue, an indemnity is owed on the difference. [3] See id.

In February of 1998, American Agrisurance, Inc. (AmAg) proposed a Durum endorsement to the Wheat CRC policy for reinsurance by FCIC. See Attach. [*12] 1 accompanying Defs.' Statement of Material Facts Not In Dispute. The FCIC Board of Directors approved the endorsement on May 5, 1998, and the policy was published in the July 14, 1998 Federal Register. See Attach. 2 accompanying Defs.' Statement of Material Facts Not In Dispute; 63 Fed. Reg. 37, 829 (1998). The policy provided, in pertinent part:

> ACTION: Notice of availability.
>
> SUMMARY: In accordance with section 508(h) of the Federal Crop Insurance Act (Act), the Federal Crop Insurance Corporation (FCIC) Board of Directors (Board) approves for reinsurance and subsidy the insurance of wheat in select states and counties under the Crop Revenue Coverage (CRC) plan of insurance for the 1999 crop year. *This notice is intended to inform eligible producers and the private insurance industry of the CRC coverage changes for wheat and provide its terms and conditions*.
>
> SUPPLEMENTARY INFORMATION: Section 508(h) of the Act allows for the submission of a policy to FCIC's Board and authorizes the Board to review and, if the Board finds that the interests of producers are adequately protected and that any premiums charged to the producers are actuarially

---

[3] With the "upward price protection" afforded by its two price guarantees, CRC can provide an indemnity when low prices adversely affect overall revenue, even when yields are high enough to offset the decline in prices. See GAO, Crop Revenue Insurance, supra.

appropriate, **[*13]** approve the policy for reinsurance and subsidy in accordance with section 508(e) of the Act.

In accordance with the Act, the Board approved a program of insurance known as CRC, originally submitted by [AmAg], a managing general agency for Redland Insurance Company.

The CRC program has been approved for reinsurance and premium subsidy, including subsidy for administrative and operating expenses. CRC is designed to protect producers against both price and yield losses. CRC provides a harvest revenue guarantee that pays losses from the established yield coverage at a higher price if the harvest time price is higher than the spring price. . . . . FCIC herewith gives notice of the above stated changes for the 1999 crop year for CRC wheat for use by private insurance companies.

Crop Revenue Coverage Insurance Policy

(This is a continuous policy. Refer to section 3.) This policy is reinsured by the Federal Crop Insurance Corporation (FCIC) under the authority of section 508(h) of the Federal Crop Insurance Act, as amended (*7 U.S.C. 1508(h)*). The provisions of the policy may not be waived or varied in any way by the crop insurance agent or any other agent **[*14]** or employee of the company. In the event the company cannot pay a loss, the claim will be settled in accordance with the provisions of the policy and paid by FCIC.

Basic Provisions
Terms and Conditions
1. Definitions
Application. The form required to be completed by you and accepted by us before insurance coverage will commence. This form must be completed and filed in your agent's office not later than the sales closing date of the initial insurance year for each crop for which insurance coverage is requested. If cancellation or termination of insurance coverage occurs for any reason, including but not limited to indebtedness, suspension, debarment, disqualification, cancellation by you or us, or violation of the controlled substance provisions of the Food Security Act of 1985, a new application must be filed for the crop. Insurance coverage will not be provided if you are ineligible under the contract or under any Federal statute or regulation.

Base Price. The initial price determined in accordance with the Commodity Exchange Endorsement and used to calculate your premium and Minimum Guarantee.

Cancellation date. The calendar date specified in the Crop **[*15]** Provisions on which coverage for the crop will automatically renew unless canceled in writing by either you or us, or terminated in accordance with the policy terms.

Contract. (see "policy".)

*Contract change date. The calender date by which we make any policy changes available for inspection in the agent's office (see section 5.)*

Final Guarantee. The number of dollars guaranteed per acre determined to be the higher of the Minimum Guarantee or the Harvest Guarantee, where:

(1) Minimum Guarantee--The Approved Yield per acre multiplied by the Base Price multiplied by the coverage level percentage you elect.

(2) Harvest Guarantee--The Approved Yield per acre multiplied by the Harvest Price multiplied by the coverage level percentage you elect.

Harvest Price. The final price determined in accordance with the Commodity Exchange Endorsement and used to calculate your Calculated Revenue (as defined in the Crop Provisions) and the Harvest Guarantee.

Policy. The agreement between you and us consisting of the accepted application, these Basic Provisions, the Crop Provisions, the Special Provisions, other applicable

endorsements or options, the actuarial documents [*16] for the insured crop, and the applicable regulations published in 7 C.F.R. chapter IV.

Sales closing date. A date contained in the Special Provisions by which an application must be filed. The last date by which you may change your crop insurance coverage for a crop year. [The sales closing date in the Durum Wheat CRC policy at issue is March 15, 1999.]

3. Life of Policy, Cancellation, and Termination

(a) This is a continuous policy and will remain in effect for each crop year following the acceptance of the original application until canceled by you in accordance with the terms of the policy or terminated by operation of the terms of the policy, or by us.

(c) After acceptance of the application, you may not cancel this policy for the initial crop year. Thereafter, the policy will continue in force for each succeeding crop year unless canceled or terminated as provided below.

(d) Either you or we may cancel this policy after the initial crop year by providing written notice to the other on or before the cancellation date shown in the Crop Provisions.

(h) The cancellation and termination dates are contained in the Crop Provisions.

4. Coverage Level, [*17] Price Percentage, and Approved Yield For Determining Final Guarantee and Indemnity

(d) This policy is an alternative to the Multiple Peril Crop Insurance program and satisfies the requirements of section 508(b)(7) of the Act.

5. Contract Changes

(a) We may change the terms of your coverage under this policy from year to year.

*(b) Any changes in policy provisions, premium rates, and program dates will be provided by us to your crop insurance agent not later than the contract change date contained in the Crop Provisions.* You may view the documents or request copies from your crop insurance agent.

(c) You will be notified, in writing, of changes to the Basic Provisions, Crop Provisions, and Special Provisions not later than 30 days prior to the cancellation date for the insured crop. Acceptance of changes will be conclusively presumed in the absence of notice from you to change or cancel your insurance coverage.

6. Liberalization

If we adopt any revisions that broaden the coverage under this policy subsequent to the contract change date without additional premium, the broadened coverage will apply.

Crop Revenue Coverage
Wheat Crop Provisions

This [*18] is a risk management program. This risk management tool will be reinsured under the authority provided by section 508(h) of the Federal Crop Insurance Act. If a conflict exists among the policy provisions, the order of priority is as follows: (1) the Special Provisions; (2) the Commodity Exchange Endorsement; (3) these Crop Provisions; and (4) the Basic Provisions with (1) controlling (2), etc.

4. Contract Changes

*In accordance with section 5 in the Basic Provisions, the contract change date is December 31 preceding the cancellation date for counties with a March 15 cancellation date* . . . . [The cancellation date contained in the Durum Wheat CRC policy at issue is March 15, 1999.]

Crop Revenue Coverage
Mandatory Actuarial Document Endorsement
Commodity Exchange Endorsement--Wheat
(This is a Continuous Endorsement)

If a conflict exists among the policy provisions, the order of priority is as follows: (1) the Special Provisions; (2) this Commodity Exchange Endorsement; (3) the Crop Provisions; and (4) the Basic Provisions, with (1) controlling (2), etc.

How this endorsement affects your coverage:

(I) This endorsement is attached to **[*19]** and made a part of your Crop Revenue Coverage (CRC) Wheat crop policy provisions and actuarial documents, subject to the terms and conditions described herein.

(II) This endorsement specifies how, where, and when commodity prices for your CRC Wheat policy are determined.

(III) This endorsement defines the Average Daily Settlement Price, as used in the Base Price and Harvest Price, as--The average calculated by summing all the daily settlement prices for the contract specified in the applicable Base Price and/or Harvest Price definition (established on full active trading days), during the month specified in the applicable Base Price and/or Harvest Price definition, and dividing that sum by the total number of days included in the sum. The average must include at least fifteen (15) days and each day included in the average must be a full active trading day for the contract specified in the applicable Base Price and/or Harvest Price definition. A full active trading day is any day on which there are fifty (50) or more open interest contracts of the contract specified in the Base Price and/or Harvest Price definition. If there are less than fifteen (15) full active trading days **[*20]** for the contract specified in the applicable Base Price and/or Harvest Price definition, during the month specified in the applicable Base Price and/or Harvest Price definition, then additional daily settlement prices, established on full active trading days, for the contract immediately prior to the contract specified in the applicable Base Price and/or Harvest Price definition, during the month specified in the applicable Base Price and/or Harvest Price definition, will be used until there are fifteen (15) prices from fifteen (15) full active trading days included in the average.

(IV) This endorsement defines the Base Price and Harvest Price as shown in Section 1 of the Crop Revenue Coverage Basic Provisions by wheat type and state as follows:

Durum Wheat--(Insured as Durum Wheat in Counties With a 3/15 Cancellation Date), (MGE)

North Dakota and Montana

Base Price (MGE)--The Northern Durum Price multiplied times the selected Price Percentage and rounded to the nearest whole cent. The Northern Durum Price equals the February harvest year's average daily settlement price for the harvest year's MGE September hard red spring wheat futures contract (rounded to the **[*21]** nearest whole cent) *plus an adjustment equal to the current five-year average difference between the August average daily settlement price for top milling durum wheat, as reported by the MGE (rounded to the nearest whole cent) and the August average daily settlement price for the nearby MGE September hard red spring wheat futures contract (rounded to the nearest whole cent).* The available Price Percentages and subsequent Base Price will be released as an Actuarial Document Addendum (Special Provisions) by March 10 of the harvest year. Harvest Price (MGE)--The August harvest year's average daily settlement price for top milling durum wheat as reported by the MGE (rounded to the nearest whole cent) multiplied times the selected Price Percentage and rounded to the nearest whole cent. The Harvest Price cannot be less than the Base Price minus two dollars ($ 2.00), or greater than the Base Price plus two dollars ($ 2.00). The Price Percentage used to calculate the Harvest Price is equal to the selected Price Percentage used to calculate the Base Price. The Harvest Price will be released as an Actuarial Document Addendum (Special Provisions) by September 10 of the harvest year.

**[*22]** *63 Fed. Reg. 37,829 (1998)*(emphasis added).

In late January, 1999, FCIC was alerted to a "flaw"

in the base price formula italicized above. See Attach. 3 accompanying Defs.' Statement of Material Facts Not In Dispute. The February harvest year's average daily settlement price for the harvest year's MGE September hard red spring wheat futures contract averaged $ 3.53 per bushel. See Attach. C accompanying Defs.' Br. in Opp'n To Pls.' Mot. for Summ. J. and Permanent Inj. (Decl. of Joseph Glauber). The adjustment over that price for the five-year average difference between the September Spring Wheat futures price in August and the price of top milling durum wheat traded on the MGE cash market proved to be $ 1.92 per bushel. See id. Thus, the CRC base price for Durum proved to be $ 5.45 per bushel. See id. In the fall of 1998 and early January 1999, however, the September 1999 Durum contract price averaged only $ .40 per bushel above that of the Spring Wheat contract. See id. Thus, assuming this circumstance remains through the 1999 harvest, the Durum Wheat CRC policy would provide a revenue guarantee well above expected market revenue. See id.

No [*23] doubt fearing the resulting indemnities, AmAg responded to this situation by submitting a "request to modify" the base price on February 5, 1999. [4] See Attach. 4 accompanying Defs.'

---

[4] In support of the request, Richard Gibson, AmAg's Chairman and CEO, stated:

> "Our initial price methodology was based on a procedure that has worked very well for northwest wheat. Our research showed it would work for expansion to durum wheat in the fourteen county area durum wheat had been written in for 1998. *Unanticipated program changes greatly expanded the coverage areas for 1999 and also allowed for 85% coverage. In addition, the current market and agriculture conditions have created a pricing environment never before experienced. The changes, coupled with current conditions, created a situation that did not fit the formula*."

See Att. 4 accompanying Defs.' Statement of Material Facts Not In Dispute (emphasis added). Indeed, according to a report by the General Accounting Office addressing problems with revenue insurance plans:

> "[FCIC] authorized the substantial expansion of [CRC] before the initial results of claims experience were available. In doing so, [FCIC] was acting within its authority to approve privately

---

Statement of Material Facts Not In Dispute. On February 8, 1999, the FCIC Board of Directors granted the request, withdrew reinsurance and premium subsidy for the Durum Wheat CRC policy published in the July 14, 1998 Federal Register, and approved reinsurance and premium subsidy for a Durum Wheat CRC policy containing a revised base price formula. FCIC informed reinsured companies of the change on February 9, 1999. On February 10, 1999, defendant Ackerman issued the following bulletin under RMA letterhead:

BULLETIN NO.: MGR-99-004
TO: All Reinsured Companies
All Risk Management Field Offices
All Other Interested Parties
FROM: Kenneth D. Ackerman /s/ Kenneth D. Ackerman Administrator
SUBJECT: 1999 Crop Revenue Coverage (CRC) Commodity Exchange Endorsement - Durum Wheat Base Price
BACKGROUND:

The CRC Base Price election formula for Durum Wheat as defined in the CRC Commodity Exchange Endorsement is based on market conditions for the past 5 years. However, this year [*24] projected durum wheat market prices are substantially different than the formula driven 5-year average. Due to this unforseen market anomaly the CRC Durum Wheat Base Price would be substantially higher than the actual market price for durum wheat. Due to the excessive risks associated with the artificially high prices generated under the current CRC Durum Wheat policy, the Federal Crop Insurance Corporation (FCIC) has determined that it cannot provide reinsurance, producer premium subsidy, and administrative and operating subsidy unless the policy is

---

developed crop insurance plans and in response to strong demand from farmers. USDA's Office of General Counsel advised against the expansion, noting that an expansion without any data to determine whether the plans or rates are sound might expose the Corporation to excessive risk."

See GAO Report, *Crop Revenue Insurance, supra.*

revised.

ACTION:

The following actions are effective immediately for the 1999 crop year:

1) FCIC will not offer reinsurance, producer premium subsidy or administrative and operating expense reimbursement on any CRC Durum Wheat policy unless it is sold with the amended Commodity Exchange Endorsement approved by the Board (see attachments), except as specified in paragraph 2 below. Since Federal preemption applied at the time of application, and continues to apply to the CRC Durum Wheat Policy, Federal preemption applies to all CRC Durum Wheat policies.

2) This action applies to all 1999 crop year CRC Durum Wheat policies [*25] in Arizona, California, Montana, North Dakota, and South Dakota, except those CRC Durum Wheat policies in Arizona and California written or applied for by the producer on or before October 31, 1998. Policies in Arizona and California written or applied for by October 31, 1998, will remain insured under the Commodity Exchange Endorsement in effect at the time of sale.

3) FCIC will accept, for reinsurance, producer premium subsidy and administrative and operating subsidy, those CRC Durum Wheat policies that have been revised through an amendment signed by the producer. FCIC has approved the attached forms amending the Commodity Exchange Endorsement. If a reinsured company elects to use a different form, it must submit it to FCIC for approval in accordance with Section V.E. of the 1999 Standard Reinsurance Agreement.

4) Reinsured Companies should inform policyholders their premium will be lower as a result of the lower Base Price.

DISPOSAL: This Bulletin will remain in effect until December 31, 1999.

Attachment A.

The provisions in section (IV) of the Commodity Exchange Endorsement - Wheat (99-CRC-CEE-WHEAT (Ed. 6/09/98)) regarding the Durum Wheat Base Price and Harvest [*26] Price for those counties with a 3/15 cancellation date are deleted. New provisions regarding the Durum Wheat Base Price and Harvest Price for those counties with a 3/15 cancellation date are added to section (IV) of the Commodity Exchange Endorsement - Wheat to read as follows:

Durum Wheat - (Insured as durum wheat in counties with a 3/15 cancellation date). Minneapolis Grain Exchange (MGE)

> Base Price (MGE) - The Northern Durum Price multiplied times the selected Price Percentage and rounded to the nearest whole cent. The Northern Durum Price equals the February harvest year's average daily settlement price for the harvest year's MGE September hard red spring wheat futures contract (rounded to the nearest whole cent) *plus an adjustment equal to the average of the current year nearby basis and the current 5-year harvest basis. The current year nearby basis is determined during the months of October, November, December, and January of the current crop year and is the difference between the average daily settlement price for top milling durum wheat, as reported by the MGE for such months (rounded to the nearest whole cent) and average daily settlement price for the nearby* [*27] *hard red spring wheat futures contract (rounded to the nearest whole cent). During the months of October and November the nearby futures contract used to determine the current year nearby basis for top milling durum wheat will be the December contract. During the months of December and January the nearby futures contract used to determine the current year nearby basis for top milling durum wheat will be the March contract. The current 5-year harvest basis is the average difference*

Case 1:23-cv-00663-HYJ-PJG ECF No. 40-4, PageID.3532 Filed 09/25/23 Page 10 of 18

Page 10 of 18
1999 U.S. Dist. LEXIS 20278, *27

> *between the August average daily settlement price for top milling durum wheat, as reported by the MGE (rounded to the nearest whole cent) and the August average daily settlement price for the nearby MGE September hard red spring wheat futures contract (rounded to the nearest whole cent).* The available Price Percentages and subsequent Base Price will be released as an Actuarial Document Addendum (Special Provisions) by March 10 of the harvest year.
>
> Harvest Price (MGE) - The August harvest year's average daily settlement price for top milling durum wheat as reported by the MGE (rounded to the nearest whole cent) multiplied times the selected Price Percentage and rounded to the nearest whole cent. The **[*28]** Harvest Price cannot be less than the Base Price minus $ 2, or greater than the Base Price plus $ 2. The Price Percentage used to calculate the Harvest Price is equal to the selected Price Percentage used to calculate the Base Price. The Harvest Price will be released as an Actuarial Document Addendum (Special Provisions) by September 10 of the harvest year.
>
> I have read the above referenced policy amendment and agree to the terms and conditions. I realize that if I do not accept the terms and conditions in this amendment, my application will be rejected or my policy will be canceled. I understand the amendment will be effective for the 1999 and subsequent crop years.

See Attach. 8 accompanying Defs.' Statement of Material Facts Not In Dispute (emphasis added). The amended base price formula would operate to reduce the adjustment for the five-year average difference between Spring Wheat futures and the price of top milling Durum wheat traded on the MGE by $ .77, to $ 1.15 per bushel, thereby reducing the base price to $ 4.68 per bushel. See Attach. C accompanying Defs.' Br. in Opp'n to Pls.' Mot. for Summ. J. and Permanent Inj. This bulletin was not published **[*29]** in the Federal Register.

**[*30]** Plaintiffs responded with this action on March 10, 1999, challenging the amendment pursuant to the Judicial Review Provisions of the Administrative Procedure Act, Title *5, United States Code Sections 702-06*. [5] Specifically, plaintiffs alleged that defendants promulgated the policy amendment in violation of a publication requirement contained in *Section 1508(h)(5) of Title 7, United States Code*. That section provides:

> (5) Required publication
> Any policy, provision of a policy, or rate approved under this subsection shall be published as a notice in the Federal Register and made available to all persons contracting with or reinsured by the Corporation under the terms and conditions of the contract between the Corporation and the person originally submitting the policy or other material.

*7 U.S.C. § 1508(h)(5)*. Second, plaintiffs alleged that the amendment violated the provision of the CRC policy requiring any change to be provided no later than December 31, 1998. Finally, plaintiffs alleged that the amendment would deprive them of a protected property right without due process of law, either by amending existing Durum Wheat CRC policies or **[*31]** by foreclosing upon the vested right to apply for and receive the original Durum Wheat CRC policy between the December 31, 1998 change date and the March 15, 1999 sales closing date. [6]

---

[5] At that time, plaintiffs filed a motion for temporary restraining order (doc. # 2), requesting the court to enjoin FCIC from forcing them to elect reduced CRC coverage or forego coverage altogether. Pursuant to a stipulation of the parties, this court subsequently ordered that any such elections would not constitute a waiver of the producer's right to sue (doc. # 9).

[6] Plaintiffs also allege that defendants deprived them of their statutory and constitutional right to notice of the administrative appeal procedures applicable to them. See Pls.' First Am. Compl. (doc. # 18). The court obviated consideration of this claim when it found the exhaustion requirement inapplicable to plaintiffs'

Case 1:23-cv-00663-HYJ-PJG   ECF No. 40-4,   PageID.3533   Filed 09/25/23   Page 11 of 18

Page 11 of 18
1999 U.S. Dist. LEXIS 20278, *31

On March 18, 1999, plaintiffs filed a motion for preliminary injunction **[*32]** (doc. # 12) requesting the court to enjoin enforcement of the amendment and require defendants to honor the original terms of the Durum Wheat CRC policy. The court granted the motion and entered a preliminary injunction on April 7, 1999 (doc. # 26), enforcing the original terms of the policy pending a final determination on the merits. The instant motions ensued, came on for hearing on June 24, 1999, and were thereafter taken under advisement. [7]

## III ANALYSIS

### A. MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs renew the allegations contained in their complaint to support their motion for summary judgment. Defendants, not surprisingly, take issue with all of these allegations. **[*33]** First, defendants maintain that they did not promulgate the policy amendment in violation of *Section 1508(h)(5) of Title 7, United States Code*, since that section merely directs FCIC to provide notice, and plaintiffs received actual notice of the policy amendment prior to the March 15, 1999 sales closing date.

Second, defendants argue that they are not the proper parties to an action for a violation of the terms of the CRC policy. While maintaining that plaintiffs should have sued FCIC, defendants add that in fact the private insurance companies reinsured by FCIC promulgated the policy amendment, and FCIC merely approved the change. Along these lines, defendants contend that FCIC can bear no contractual liability, since, as reinsurer, it is not in privity with plaintiffs.

Defendants finally maintain that none of the plaintiffs enjoyed due process property rights in their existing Durum Wheat CRC policy, nor the right to apply for the policy by March 15, 1999. Defendants contend that existing policyholders enjoyed no property rights because the policy could be canceled by either party after the initial year. Defendants further maintain that the remaining plaintiffs' CRC applications **[*34]** were merely offers to contract, under the terms of the CRC policy as well as general insurance principles. Further, these applications were appropriately rejected after FCIC withdrew its approval of the policies pursuant to its statutory authority to deny reinsurance where actuarial risk is excessive. Finally, even if this court interprets the July 14, 1998 publication of the Durum Wheat CRC policy as an offer, defendants maintain that any such offer was properly revoked, again in the name of actuarial soundness. [8]

### 1. Contract Theories

As the **[*35]** foregoing summary indicates, much of the discourse in this case has focused upon the existence (or absence) of a contractual obligation between the parties, or between plaintiffs and FCIC. As previously mentioned, however, plaintiffs have not sued defendants nor FCIC for breach of a contractual obligation. Rather, pursuant to the APA, plaintiffs request this court to enjoin the Secretary of USDA and the manager of FCIC from allegedly arbitrary and capricious conduct. [9]

Nevertheless, the court notes that it may have

---

substantive claims. See Order Gr. Prelim. Inj. (doc. # 26).

[7] Subsequently, indemnity payments began to come due for those insureds prevented from planting by a peril covered under their CRC policies. Consequently, and by stipulation of the parties, ten private insurance companies offering CRC policies through reinsurance arrangements with FCIC have intervened and interpled a total of $ 200,939.00.

[8] Defendants also argue, as they had in resisting plaintiffs' motion for preliminary injunction, that this court has no subject matter jurisdiction over this case due to plaintiffs' failure to exhaust administrative remedies, and that this court is precluded from entering injunctive relief against FCIC. The court fully addressed these arguments in its order granting plaintiffs' motion for preliminary injunction (doc. # 26) and sees no reason to revisit them here.

[9] The parties' preoccupation with contract theories has certainly been understandable. Indeed, the court struggled along with the parties to find the law applicable to the confusing interstice between private insurance principles and federal farm policy.

viewed favorably a contract action against FCIC had plaintiffs chosen to posture their suit in that fashion. As an initial matter, the court is by no means certain that the technicalities of offer and acceptance unique to insurance law would preclude **[*36]** contractual liability for FCIC. While the parties have argued at length regarding the precise definition of those terms as they relate to various provisions of the Durum Wheat CRC policy, the court finds that these terms, as well as all others contained in the policy, are readily defined when construed in accordance with FCIA.

Clearly, pursuant to the FCIA, FCIC can and should reject applications from those ineligible to participate in the crop insurance program. See *7 U.S.C. §§ 1506(n)*, *1521*; *7 C.F.R. § 400.47*. Those applicants notwithstanding, however, the Act clearly requires FCIC to afford coverage to all eligible applicants, provided they submit a timely and complete application. To wit; Title *7, United States Code Section 1520* provides:

> *§ 1520*. Producer eligibility
> Except as otherwise provided in this chapter, a producer shall not be denied insurance under this chapter if--
> (1) for purposes of catastrophic risk protection coverage, the producer is a "person" (as defined by the Secretary); and
>
> (2) for purposes of any other plan of insurance, the producer is 18 years of age and has a bona fide insurable interest in a crop as an owner-operator, **[*37]** landlord, tenant, or sharecropper.

*Section 1508(f)* provides:
> (f) Eligibility
> (1) In general
> To participate in catastrophic risk protection coverage under this section, a producer shall submit an application at the local office of the Department or to an approved insurance provider.

*§ 1508(f)(1)*. See also *7 C.F.R. § 457.7*. Indeed, as previously mentioned, the Act *requires* producers to purchase CAT coverage, *or its equivalent*, in order to remain eligible for other USDA programs (absent a waiver). See *§§ 1508(b)(7)(A)*; 1508(h)(9)(B)(ii)(emphasis added).

For purposes of *eligible* producers, then, the July 14, 1998 Federal Register publication appears to be a classic "take it or leave it" offer acceptable by a properly executed, timely application; the terms of the Durum Wheat CRC policy were completely spelled out in the Federal Register, and none were left to negotiation. See e.g., *Blumberg v. Paul Revere Life Ins. Co., 177 Misc. 2d 680, 677 N.Y.S.2d 412, 414 (N.Y. Sup. Ct. 1998)*. Moreover, defendant Ackerman himself has stated, in a joint hearing before the Subcommittee on Environment, Credit and Rural Development and **[*38]** the Subcommittee on Specialty Crops and Natural Resources:

> "[CAT] coverage is an individual insurance policy, . . . . It is a contract that a farmer can take to the bank as collateral on a loan."

1994 U.S.S.C.A.N. at 2547. Defendant Ackerman must have known then, as he must now, that Durum farmers will do just that; months before their applications are "accepted" under the definition of that term proposed by defendants today. See Testimony of James F. Hart on behalf of the Independent Bankers Association of America (IBAA) before the House Agriculture Committee Subcommittee on Environment, Credit and Rural Development on H.R. 4217, The Federal Crop Insurance Reform Act of 1994 ("Many . . . agricultural bankers rely on federally-subsidized . . . crop insurance . . . to protect crops used as collateral on operating loans").

The court is similarly far from certain that FCIC's status as reinsurer insulates it from contractual liability. To be sure, in true reinsurance arrangements the original insured has no interest in the reinsurance contract, and consequently any liability on behalf of the reinsurer is solely to the reinsured and not the original insured. See **[*39]**

*Williams Farms of Homestead, Inc. v. Rain and Hail Ins. Serv., Inc., 121 F.3d 630, 633 (11th Cir. 1997)*. As defendants point out, this liability-limiting principle has been applied in cases involving FCIC. See *Old Republic Ins. Co. v. Federal Crop Ins. Corp., 947 F.2d 269, 276 (7th Cir. 1991)*; Renville Ins. Serv., Inc. v. Continental Ins. Co., No. 4-95-74 (D. Minn. June 21, 1996).

Equally well-settled, however, is the exception to this rule where a reinsurance contract is "drawn in such form and with such provisions so as to create a liability on the part of the reinsurer directly to the original insured." *Ainsworth v. General Reinsurance Corp., 751 F.2d 962, 965 (8th Cir. 1985)*. Strong arguments can be made for the proposition that the Standard Reinsurance Agreement (SRA) falls within this exception. The SRA defines itself as "a cooperative financial assistance agreement between FCIC [and reinsureds] to deliver eligible crop insurance under the authority of [FCIA][.]" See Ex. 1 accompanying Vogel Aff. The SRA requires reinsureds to offer all approved plans of insurance for all approved crops in any state in which they **[*40]** write eligible crop insurance contracts, and requires reinsureds to accept and approve all applications from all eligible producers. See id. Reinsureds are prohibited from canceling any crop insurance contract held by any policyholder so long as the policyholder remains an eligible producer (and the reinsureds continue to write eligible crop insurance contracts within the state). See id. The SRA also contains a "cut-through" clause, so named because it "cuts through" the usual route of claim payment from reinsurer-to-reinsured and substitutes instead reinsurer to original insured in certain situations. [10] See id.; see generally *Seattle Fur Exch., Inc. v. Foreign Credit Ins. Ass'n, 7 F.3d 158, 163 (9th Cir. 1993)*.

**[*41]** The regulations incorporated by reference into the SRA reveal similar terms that inure directly to the benefit of policyholders. See 7 C.F.R. §§ 400.166 (obligations of FCIC to reinsureds); 400.168 (obligations of reinsureds). Finally, the Durum Wheat CRC policy itself clearly informs producers:

> This policy is reinsured by the Federal Crop Insurance Corporation (FCIC) under the authority of section 508(h) of the Federal Crop Insurance Act, as amended (*7 U.S.C. 1508(h)*). The provisions of the policy may not be waived or varied in any way by the crop insurance agent or any other agent or employee of the company. In the event the company cannot pay a loss, the claim will be settled in accordance with the provisions of the policy and paid by FCIC.

See *63 Fed. Reg. 37,829 (1998)*. Thus, with due deference to those authorities cited by defendants, it can hardly be said that the SRA is "totally distinct and disconnected" from the Durum Wheat CRC policy. See *Old Republic, 947 F.2d at 276*.

Finally, the court notes that the United States Supreme Court long ago declared the rules of law whereby private insurance companies **[*42]** are rendered liable inapplicable to FCIC. See *Merrill, 332 U.S. at 383-84* & n.1. Surely this cuts both ways. Just as FCIC may not be estopped by representations that subsequently prove inaccurate, it surely cannot seek refuge behind the technicalities of offer and acceptance unique to insurance law, nor the rules of liability governing common law reinsurance arrangements, in order to escape its obligations.

---

[10] The clause provides:

> Whenever the Company and its policy and its policy issuing company, if applicable, are unable to fulfill their obligations to any policyholder by reason of a directive or order duly issued by any Department of Insurance, Commissioner of Insurance, or by any court of law having competent jurisdiction, or under similar authority of any jurisdiction to which the Company is subject, all eligible crop insurance contracts affected by such directive or order that are in force and subject to this Agreement as of the date of such inability or failure to perform will be immediately transferred to FCIC without further action of the Company by the terms of this Agreement. FCIC will assume all obligations for unpaid losses whether occurring before or after the date of transfer . . . ."

Case 1:23-cv-00663-HYJ-PJG   ECF No. 40-4, PageID.3536   Filed 09/25/23   Page 14 of 18

Page 14 of 18
1999 U.S. Dist. LEXIS 20278, *42

Moreover, neither the rules of law applicable to insurance contracts, nor the Supreme Court's conclusion that they do not apply, render FCIC (or defendants for that matter) immune from the principles of good faith and fairness. Quite the contrary; witness this passage from the Eighth Circuit Court of Appeals in a case featuring FCIC in the role of direct insurer:

> "The record . . . [reflects] . . . that the FCIC, in its transactions with the growers throughout this ordeal, have succeeded in leading the growers down a primrose path . . . . While we do not hold the government liable under an estoppel theory, . . . the factual background regarding FCIC's course of dealing with these growers must be considered under basic principles of good faith and fairness. **[*43]** One may have to turn 'square corners' when dealing with a government entity, . . . but this does not mean the government may operate so recklessly so as to put the parties dealing with it entirely at its mercy."

*A.W.G. Farms, Inc. v. Federal Crop Ins. Corp., 757 F.2d 720, 728-29 (8th Cir. 1985)*. The court finds this passage applicable in this case.

2. *Chevron* Analysis

With that, the court turns to the issue at the heart of this case: whether the purported amendment to the Durum Wheat CRC policy was "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law." [11] See *5 U.S.C. § 706(2)(A)*. The parties have briefed the issue as it relates to the standard of review imposed upon the court by the Chevron case and its progeny. In Chevron, the United States Supreme Court outlined the test this court must employ when reviewing an agency's construction of the statute it administers:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If **[*44]** the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

The Chevron court also noted:

> The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

*Chevron USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43* & n.9, *81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984)*(citations omitted). Clearly, **[*45]** under Chevron, this court must defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in the statutes they are charged with administering. See id.; *Pelofsky v. Wallace, 102 F.3d 350, 353 (8th Cir. 1996)*(citations omitted). As the foregoing passage indicates, however, Chevron does not "permit abdication of [this court's] responsibility to determine whether the challenged action is contrary to statute, devoid of administrative authority, or . . .

---

[11] This is the standard of review notwithstanding the fact that the parties seek "summary judgment." See *Lodge Tower Condominium Ass'n v. Lodge Properties, Inc., 880 F. Supp. 1370, 1374-75 (D. Colo. 1995)*.

Case 1:23-cv-00663-HYJ-PJG   ECF No. 40-4, PageID.3537   Filed 09/25/23   Page 15 of 18

Page 15 of 18
1999 U.S. Dist. LEXIS 20278, *45

otherwise unreasonable." *Pelofsky, 102 F.3d at 353* (citations omitted). Rather, the Chevron court makes clear that an agency interpretation contrary to congressional intent as revealed by the plain language of the statute or its legislative history is not entitled to deference. See *Chevron, 467 U.S. at 843 n.9*; *Shakopee Mdewakanton Sioux Community v. Hope, 16 F.3d 261, 264 (8th Cir. 1994)*(citing *K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291, 100 L. Ed. 2d 313, 108 S. Ct. 1811 (1988))*.

 **[*46]** In undertaking this analysis, the court agrees with defendants' conclusion that there are "two main issues in question: First, whether FCIC, acting through defendant Ackerman, had the authority to withdraw reinsurance of the Durum Wheat CRC policy as published in the Federal Register and approve reinsurance of a new Durum Wheat CRC policy containing different coverage provisions. Second, . . . whether the methods used to accomplish the withdrawal and approval were based on a permissible construction of the statutes and in compliance with congressional intent." See Defs.' Post Hr'g Br. (doc. # 48).

With regard to the first question, defendants contend that their authority to amend the policy derives from Congress' mandate that the crop insurance program be operated in an actuarially sound manner, embodied in *Sections 1506(o)* and *1508(d)* of FCIA. See id. Defendants further maintain that Congress provided a "mechanism" to effectuate this mandate by providing FCIC the authority to limit coverage on the basis of insurance risk, pursuant to *Sections 1508(b)(8)* and *(c)(9)* of FCIA. See id.

Title *7, United States Code Section 1506(o)* provides, in pertinent part:

> (o) Actuarial **[*47]** soundness
> (2) Projected loss ratio as of October 1, 1998
> The Corporation shall take such actions, including the establishment of adequate premiums, as are necessary to improve the actuarial soundness of Federal multiperil crop insurance made available under this chapter to achieve, on and after October 1, 1998, an overall projected loss ratio of not greater than 1.075.

*§ 1506(o)*. "Loss ratio" is defined by the Act as "the ratio of all sums paid by [FCIC] as indemnities . . . to that portion of the premium designated for anticipated losses and a reasonable reserve, other than that portion of the premium designated for operating and administrative expenses." *§ 1502(b)(6)*. *Section 1508(d)(1)* further provides:

> (d) Premiums
> (1) Premiums required
> The Corporation shall fix adequate premiums for all the plans of insurance of the Corporation at such rates as the Board determines are actuarially sufficient to attain an expected loss ratio of not greater than . . . 1.075 after October 1, 1998.

The House Agricultural Committee explained these provisions as follows:

> (7) Fiscal and actuarial soundness: [FCIA] continues requirement that FCIC **[*48]** *set premiums* for all its insurance plans at rates actuarially sufficient to attain an expected loss ratio of not greater than [1.075].

1994 U.S.S.C.A.N. at 2518 (emphasis added). Testifying before the Subcommittee on Environment, Credit and Rural Development and the Subcommittee on Specialty Crops and Natural Resources, defendant Ackerman similarly defined the actuarial soundness requirement:

> "[FCIC IS REQUIRED] to achieve an overall projected loss ratio of 1.1 by the year beginning October 1995. . . . We are committed to, . . . meeting this loss ratio goal and attaining actuarial soundness."

Id. at 2552. [12]

---

[12] The 1980 version of the Act similarly provided, "To carry out the purposes of this chapter, [FCIC] is authorized and empowered . . . to fix adequate premiums for insurance at such rates as the Board deems actuarially sufficient to cover claims for losses . . . and to establish . . . a reasonable reserve against unforeseen losses." See *§ 1508(b)(1)* (1988)(amended 1994). Explaining that subdivision, the

 **[\*49]** Based upon the foregoing, it appears that defendants misconstrue the requirement of actuarial soundness, as well as the procedure by which Congress has directed FCIC to achieve this goal. The plain language of FCIA clearly indicates, and the Act's history confirms, that Congress directed FCIC to adjust *premium rates* to meet the goal of actuarial soundness, *not coverage levels*. [13] See *West Cent. Packing, Inc. v. Empire Fire and Marine Ins. Co., 826 F. Supp. 248, 255 n.10 (W.D. Mich. 1993)*.

 **[\*50]** Moreover, even if the court were to find the actuarial soundness requirement ambiguous, and accept defendants' construction of that requirement as reasonable, the manner by which the policy amendment was promulgated could not pass the first step of the court's Chevron analysis. [14] As the court's discussion of the history of the federal crop insurance program reveals, the overarching goal of FCIA has been and remains the establishment of the federal crop insurance program as the farmers' primary means of risk management. Title *7, United States Code Section 1508(h)(5)* is clearly intended to further this goal by providing notice of the availability of new types of insurance, such as CRC, to both reinsured companies and producers. Similarly, the December 31, 1998 contract change date contained in the Durum Wheat CRC policy furthers this purpose by allowing farmers to avail themselves to, and indeed rely upon, the coverage promised by the policy. Thus, by ignoring these requirements, defendants contravene the purpose of the statute they are entrusted to administer.

 **[\*51]** Furthermore, by reacting as they did to a perceived Durum "market anomaly," defendants contravene Congress' companion goal of ridding American agriculture of its reliance upon ad hoc assistance. Defendant Ackerman eloquently described the inequities that result from this reliance to the Subcommittee on Environment, Credit and Rural Development and the Subcommittee on Specialty Crops and Natural Resources:

> In a crisis, farmers without crop insurance, who depend on disaster relief, have no way of knowing in advance what their protection will be. Farmers do not know whether a disaster bill will be approved or, if approved, what payment level the bill will provide. Further, a farmer suffering a loss must hope that other farmers across the state, and in ten or twenty other states, are experiencing similar losses in order to create the momentum for legislative action.
> An examination of history reveals that victims of local disasters often get less aid than those of wider disasters, even though the individual farmers may suffer similar losses.
>
> For example, victims of 1992's Hurricane Andrew in Florida, received aid at 50.04 percent proration while victims of this summer's Midwest flood **[\*52]** received aid at 100 percent. Farmers with losses in states not

---

House Agricultural Committee stated that "[FCIC] is required to set premium rates which cover indemnities paid, plus establish a reasonable reserve. . . . This requirement of actuarial soundness would remain." H.R. Rep. 96-430 (1979), reprinted in 1979 U.S.S.C.A.N. 3068, 3074. See **West Cent. Packing, 826 F. Supp. 248 at 255 n.10** (interpreting prior version of FCIA).

[13] Indeed, this definition of actuarial soundness comports with hornbook insurance law:

> Enlightened insurance rating is aimed at developing rates that are adequate and neither excessive nor unfairly discriminatory. This threefold set of objectives is more often stated, however, in twofold form--first, assuring that rates are adequate to provide funds for paying losses, costs of administration, and reasonable profits and, second, assuring that rates are neither excessive (with the result of unreasonable profits or costs) nor unfairly discriminatory (with the result of unreasonably high rates to some policyholders and unreasonably low rates to others).

See Robert E. Keeton, Insurance Law § 8.4(a) (1971).

[14] In arriving at this conclusion the court does not find that failure to observe the publication requirement contained in *Section 1508(h)(5)*, in and of itself, renders defendants powerless to act. See *Brock v. Pierce County, 476 U.S. 253, 260, 90 L. Ed. 2d 248, 106 S. Ct. 1834 (1986)*. Indeed, like defendants, the court has found no legislative history behind that specific provision to indicate the consequences Congress intended for its violation. Nor does the court find that *section 1508(h)(5)* imposes upon defendants a formal rulemaking regime. See generally *Rainbow Valley Citrus Corp. v. Federal Crop Ins. Corp., 506 F.2d 467 (9th Cir. 1974)*.

Case 1:23-cv-00663-HYJ-PJG ECF No. 40-4, PageID.3539 Filed 09/25/23 Page 17 of 18

Page 17 of 18
1999 U.S. Dist. LEXIS 20278, *52

involved in the large disasters found that congressional decisions affecting their livelihoods were being based upon factors totally unconnected to their circumstances.

What will happen if natural disaster strikes again next year? Farmers trying to plan their operations in a businesslike manner simply have no way of knowing.

1994 U.S.S.C.A.N. at 2548-49. Defendants' decision to revise some Durum Wheat CRC policies in the face of declining Durum prices, while excepting those policies in Arizona and California written or applied for by the producer on or before October 31, 1998, rings eerily similar to the inequitable distribution of ad hoc relief defendant Ackerman decried.

In short, Congress, through FCIA, has spent nearly twenty years struggling to create a reliable, uniform crop insurance program which obviate the need for ad hoc assistance. By failing to adhere to the procedural requirements established by Congress, and reneging on provisions of crop insurance policies issued pursuant to Congress' authority, defendants violate the letter and purpose of FCIA, and thereby the intent of Congress, in the most fundamental **[*53]** of ways.

Based upon the foregoing, the court finds the purported amendment to the 1999 Durum Wheat CRC policy arbitrary, capricious, and an abuse of discretion. Accordingly, plaintiffs' motion for summary judgment (doc. # 30) is **GRANTED**. Defendants' cross motion for summary judgment (doc. # 38) is **DENIED**. In light of this holding, the court need not reach plaintiffs' due process claims.

### B. MOTION FOR PERMANENT INJUNCTION

The standards for determining whether a permanent injunction should issue are essentially the same as those for a preliminary injunction, except of course the court determines plaintiffs' success on the merits as opposed to the likelihood of success. Peabody Holding Co., Inc. v. Costain Group PLC, 813 F. Supp. 1402, 1414 (E.D. Mo. 1993) (citing Amoco Prod. Co. v. Village of Gambell, Alaska, 480 U.S. 531, 546 n.12, 94 L. Ed. 2d 542, 107 S. Ct. 1396 (1987)). Thus, in light of the determination that plaintiffs prevail on the merits, this court must consider (1) the threat of irreparable harm to the moving party; (2) the balance between that harm and any harm that granting the injunction might do to the other parties **[*54]** to the litigation; and (3) the public interest. National Credit Union Admin. Bd. v. Johnson, 133 F.3d 1097, 1101 (8th Cir. 1998) (citing Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981)). The court has done so, and concludes that immediate harm would befall plaintiffs if the purported policy amendment were to take effect, and this harm clearly outweighs the harm visited upon defendants by enforcing the original terms of the Durum Wheat CRC policy. The court further finds that granting plaintiffs the relief they seek vindicates Congress' stated purpose "to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance." See 7 U.S.C. § 1502(a). For the foregoing reasons, plaintiffs' motion for permanent injunction (doc. # 32) is **GRANTED**, and a permanent injunction hereby **ISSUED** as follows:

### PERMANENT INJUNCTION

**IT IS HEREBY ORDERED** that Bulletin MGR-99-004 is void and of no effect. **IT IS FURTHER ORDERED** that the original terms of the Durum Wheat CRC policy, as published in the July 14, 1998 Federal Register, 63 **[*55]** Fed. Reg. 37,829 (1998), specifically the original base price formula contained in the Durum Commodity Exchange Endorsement therein, control.

### IV SUMMARY

Plaintiffs' motions for summary judgment (doc. # 30) and permanent injunction (doc. # 32) are **GRANTED. IT IS HEREBY ORDERED** that Bulletin MGR-99-004 is void and of no effect. **IT**

**IS FURTHER ORDERED** that the original terms of the CRC policy, as published in the July 14, 1998 Federal Register, 63 Fed. Reg. 37,829 (1998), specifically the original base price formula contained in the Durum Commodity Exchange Endorsement therein, control. Defendants' cross motion for summary judgment (doc. # 38) is **DENIED**. [15]

**IT IS SO ORDERED**.

Dated this 3rd day of September, **[*56]** 1999.

RODNEY S. WEBB, CHIEF JUDGE

UNITED STATES DISTRICT COURT

**ORDER**

Before the court are plaintiffs' motions to strike (doc. # 19); for leave to file a reply brief on class certification (doc. # 36); to exceed page limit (doc. # 53); and defendants' motion to consolidate (doc. # 33). Plaintiffs' motion to strike is hereby **DENIED AS MOOT**. The remaining motions are hereby **GRANTED.**

**IT IS SO ORDERED**.

Dated this 3rd day of September, 1999.

RODNEY S. WEBB, CHIEF JUDGE

UNITED STATES DISTRICT COURT

---

End of Document

---

[15] In the court's view, plaintiff's motion for class certification (doc. # 29) need not be addressed, and is therefore **DENIED AS MOOT**, given the nature of the relief granted. The parties may request the court to revisit the issue if the need arises.